1          REPORTER'S RECORD

2        VOLUME 2 OF 21 VOLUME(S)

FILED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS
3/27/2015 12:36:05 PM
DEBRA SPISAK
Clerk

3     TRIAL COURT CAUSE NO. 1376838R

4    COURT OF APPEALS CASE NO. 02-14-00412-CR

5

6   THE STATE OF TEXAS          )  IN THE 372ND JUDICIAL
                                )
7                               )
                                )
8                               )
    VS.                         )  DISTRICT COURT
9                               )
                                )
10                              )
                                )
11                              )
    THOMAS OLIVAS               )  TARRANT COUNTY, TEXAS
12

13

14        * * * * * * * * * * * * * * * * * * * * * * * * * * * *

15            PRETRIAL HEARING

16        * * * * * * * * * * * * * * * * * * * * * * * * * * * *

17

18      On the 29th day of January, 2014, the following
    proceedings came on to be heard in the above-entitled
19  and numbered cause before the Honorable Scott Wisch,
    Presiding Judge, held in Fort Worth, Tarrant County,
20  Texas;
        Proceedings reported by computerized machine
21  shorthand with assisted realtime transcription.

22

23

        KAREN B. MARTINEZ, CERTIFIED SHORTHAND REPORTER
24              Official Court Reporter
             372nd Judicial District Court
25               Tarrant County, Texas

```
 1   APPEARANCES:

 2   ATTORNEYS FOR THE STATE:

 3       HONORABLE R. KEVIN ROUSSEAU
         SBOT NO: 17324950
 4       HONORABLE TAMLA S. RAY
         SBOT NO: 24046687
 5       Assistant Criminal District Attorneys
         Tim Curry Criminal Justice Center
 6       Fort Worth Texas  76196
         Phone: 817-884-1400
 7       Fax:  817-884-3333

 8   ATTORNEYS FOR THE DEFENDANT:

 9       HONORABLE TIM MOORE
         SBOT NO: 14378300
10       Attorney at Law
         115 West 2nd Street, Suite 202
11       Fort Worth, Texas  76102
         Phone: 817-332-3822
12       Fax:  817-332-2768

13           - AND -

14       HONORABLE JOETTA L. KEENE
         SBOT NO: 11165800
15       Attorney at Law
         204 South Mesquite Street
16       Arlington, Texas  76010
         Phone: 817-275-6611
17       Fax:  817-275-6621

18

19

20

21

22

23

24

25
```

```
 1              CHRONOLOGICAL INDEX

 2                Volume 2 of 21

 3               PRETRIAL HEARING
```

```
 4  January 29, 2014                    Page Vol.

 5  The Court Calls Case For Trial...............   6   2

 6  Motion to Suppress...........................   7   2
```

 7  STATE'S WITNESSES                        Voir
                          Direct   Cross   Dire    Vol.
 8
    Stewart, Detective Byron  19,81    53     --      2
 9
    Easley, Detective Daniel  88      106     --      2
10
    Both Sides Rest and Close....................  121   2
11
    State Waives Opening, Reserves Closing........  123   2
12
    Defendant's Closing Argument by Ms. Keene.....  123   2
13
    State's Closing Argument by Mr. Rousseau......  135   2
14
    Court's Rulings...............................  139   2
15
    Pretrial Hearing Concluded....................  151   2
16
    Court Reporter's Certificate..................  152   2
17

18        ALPHABETICAL LISTING OF WITNESSES

19                                       Voir
                          Direct   Cross   Dire    Vol.
20  Easley, Detective Daniel  88      106     --      2
21
    Stewart, Detective Byron  19,81    53     --      2
22
23

24

25
```

```
 1                         EXHIBITS

 2    STATE'S PRETRIAL
      NO.     DESCRIPTION           OFFERED  ADMITTED VOL.
 3
      *  1    Video Disc               12      12      2
 4           (Tarrant-1376698R-RR-SXPT1.mp4)

 5    *  1A   Transcript to SX PT 1    13      13      2

 6    *  2    Video Disc               12      12      2
             (Tarrant-1376698R-RR-SXPT2.mp4)
 7
      *  2A   Transcript to SX PT 2    13      13      2
 8
      *  3    Video Disc               12      12      2
 9           (Tarrant-1376698R-RR-SXPT3.mp4)

10    *  3A   Transcript to SX PT 3    13      13      2

11    *  4    Copy of Miranda Card     32      32      2

12    *  5    Consent to Search        35      36      2

13    *  6    Consent to Search        35      36      2

14    *  7    Consent to Search        35      36      2

15    *  8    Consent to Search        35      36      2

16    *  9    Consent to Search        35      36      2

17    * 10    Xerox Photograph         42      43      2

18    * 11    Xerox Photograph         42      43      2

19    * 12    Xerox Photograph         42      43      2

20    * 13    Xerox Photograph         42      43      2

21    * 14    Xerox Photograph         42      43      2

22    * 15    Xerox Photograph         42      43      2

23    * 16    Xerox Photograph         44      45      2

24    * 17    Xerox Photograph         44      45      2

25    * 18    Xerox Photograph         44      45      2
```

| 1 | * 19 | Xerox Photograph | 44 | 45 | 2 |
| 2 | * 20 | Xerox Photograph | 44 | 45 | 2 |
| 3 | * 21 | Xerox Photograph | 44 | 45 | 2 |
| 4 | * 22 | Xerox Photograph | 44 | 45 | 2 |
| 5 | * 23 | Xerox Photograph | 44 | 45 | 2 |

```
 6
    DEFENDANT'S PRETRIAL
 7  NO.    DESCRIPTION              OFFERED ADMITTED VOL.
 8  *   1  List of Names Provided
           by the State            75      75       2
 9
    _____
10  (*) Denotes an exhibit designated for the record only.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | Wednesday, January 29, 2014   10:10 a.m. |
| 3 | (OPEN COURT, DEFENDANT PRESENT) |
| 4 | THE COURT:  Prior to proceeding in what's |
| 5 | technically 1352014R, originally indicted as 1298688D, |
| 6 | both styled State of Texas versus Thomas Olivas, |
| 7 | documents have been prepared, served, request for notice |
| 8 | made, actual response to request for notice given, a lot |
| 9 | of legal paperwork was properly filed in the original |
| 10 | cause number, the 688D, last three digits.  The case was |
| 11 | reindicted, and the 014R, which is the case that will |
| 12 | actually be tried, has some additional motions, legal |
| 13 | documents, subpoenas.  And I told the parties, the clerk |
| 14 | of the court, everyone understands, that if these cases |
| 15 | involve an appeal of any legal issues by either side, |
| 16 | that the record of both cause numbers shall be |
| 17 | incorporated and forwarded upon proper request and be |
| 18 | made part of the record, instead of kill trees and |
| 19 | simply redundantly refile, reserve subpoenas, reissue |
| 20 | notices.  And the parties are all in agreement with that |
| 21 | procedure and in fact requested it. |
| 22 | Is that accurate, State? |
| 23 | MR. ROUSSEAU:  Yes, Your Honor. |
| 24 | THE COURT:  Defense? |
| 25 | MS. KEENE:  It is, Judge. |

1          THE COURT:  All right.  Secondly, we're here

2     for a motion to suppress in the 1352014R number, but

3     there are two motions filed in the original 688D number

4     of which one will be incorporated for purposes of our

5     pretrial hearing, the other has been superseded by the

6     new motion in the new cause number.

7          There is a motion to suppress evidence.

8     It's just styled Motion to Suppress.  It's file-marked

9     November the 4th of 2013.  And it addresses evidence

10    seized, physical evidence or photographs taken.  That

11    motion -- there's a new motion to suppress evidence

12    that's filed that addresses that issue in the new cause

13    number.

14          And I understand the Defense believes that

15    motion to be superseded by their new motion in the new

16    cause number.  Is that correct?

17          MS. KEENE:  That's true, Judge.

18          THE COURT:  And there's another motion filed

19    in the original cause number called Motion to Suppress

20    Statements, and I've been advised that motion is also

21    partially covered by a new superseding motion, but for

22    purposes of law, the Defense wants the Court to consider

23    and the State to be on notice that in addition to the

24    grounds in the new motion, they're also serving the

25    state statutory and constitutional grounds to suppress

 1    statements that are alleged of the original motion but

 2    aren't set out in the motion but factually the issues

 3    will be addressed in the new motion.

 4              Is that accurate?  Does the new motion cover

 5    the issues and there's just some law that you've

 6    asserted in the prior motion that's not in the new

 7    motion and you want that incorporated?

 8              Let's take a break.

 9              (Discussion off the record)

10              THE COURT:  On the record.

11              We're hearing one motion to suppress for

12    purposes of a hearing that addresses evidence and

13    statements purportedly made by the Defendant under

14    various circumstances, but in addition to the law cited

15    in writing, any law either side wants to argue and bring

16    to the Court's attention of course is fair game, and

17    you're specifically wanting to incorporate the state

18    statutory and constitutional grounds to suppress the

19    statements that are in your original motion that somehow

20    the computer left out of your amended motion?

21              MS. KEENE:  Correct.

22              THE COURT:  All right.  And the State

23    understands that and is prepared to deal with that?

24              MR. ROUSSEAU:  Yes, Your Honor.

25              THE COURT:  All right.  Then I'm going to

 1   close the original file and will allow the parties to

 2   argue why the state constitution and statutes either

 3   support or detract from the legality of any statements,

 4   and I'll consider any law.  And, plus, in all fairness

 5   to the good lawyers who represent both sides in this

 6   case, there's no rule that says you can't bring up any

 7   applicable law at any time as a matter of argument.  But

 8   the facts of the original motions in the original case

 9   are addressed by the new motion only, and so I'll only

10   hear the motion in the new cause number and decide all

11   the issues that are plead that deal with evidence and

12   statements.

13              All right.  Anything for the record either

14   side needs to cover before we proceed with the motion to

15   suppress?

16              MS. KEENE:  No, sir.

17              MR. ROUSSEAU:  No, sir.

18              THE COURT:  And, I guess, for the record,

19   there's a second motion to suppress styled First Amended

20   Motion to Suppress that deals with issues that don't

21   involve the testimony and issues raised by the original

22   motion and those will be dealt with once the first

23   motion is clear.

24              MR. ROUSSEAU:  Yes, Your Honor.

25              THE COURT:  All right.  Then...

```
 1              MR. ROUSSEAU:  First of all, Your Honor,
 2   just for clarification, just so we're clear, I delivered
 3   to you yesterday three discs accompanied by three
 4   transcripts that -- well, anyway, three transcripts.
 5   The first two discs and the first few transcripts all
 6   come from an interview done on March 21st, 2011 at
 7   Grapevine Police Department which would be the day
 8   following -- the morning -- the day following the
 9   offense.  And have you had a chance to review all of
10   those?
11              THE COURT:  Actually --
12              MR. ROUSSEAU:  I'm sorry.  State's Pretrial
13   Exhibit 1 and State's Pretrial Exhibit 2.
14              THE COURT:  Actually, that's -- you hadn't
15   said that, but you've clarified that.
16              At the request of the parties I was provided
17   three sets of documents and three DVDs, digital video
18   discs, all purporting to show an interview of the person
19   I now recognize in court as the same person on the face
20   of those interviews, and, actually, I'm seeing ready-to-
21   be-sworn other people who might have appeared on those
22   interviews, and they're marked State's Pretrial
23   Exhibit 1 and that one is also labeled "Interview Part
24   One, 3/21/11," March 21st, 2011.  State's Pretrial
25   Exhibit 2 is marked and it says "Interview Part Two,
```

1    3/21/2011".  Attached to each disc, or vice versa, was

2    what appears to be a transcription of the interview,

3    "part one" labeled in the upper right-hand corner of the

4    first page that corresponds to State's Pretrial

5    Exhibit 1, which is a 44-page document.  "Part two" is

6    labeled in black ink in the upper right-hand corner.

7    It's a 43-page document.  And there's a third disc --

8    might as well put this in the record now -- labeled

9    State's Pretrial Exhibit 3.  It's described on the face

10   of the DVD in Sharpie as "arrest interview" or maybe

11   "post-arrest interview, 9/24/12," and there is a

12   transcription of that interview that doesn't have "part

13   one" or "part two" on it, but in the upper left-hand

14   corner says "Olivas, Thomas," cause number and

15   "Interview 9/24/2012, Officer BP Stewart," and it is a

16   46-page document.

17          With a laptop computer and Apple iPhone

18   earplugs, I watched, listened to and simultaneously

19   reviewed on the transcript each and every one of these

20   DVDs from what my opinion was pretty close to six hours

21   with intermittent breaks.  And, in all fairness, I tried

22   to do it yesterday earlier and with all the other court

23   business and interruptions, I just gave it up and stayed

24   here until 9:00 o'clock last night, almost, to get it

25   done.

1    I have made minor notes on the face of the

2 transcripts to keep up with what's going on and an

3 occasional highlight, and some of that was done just to

4 make sure I would keep up with the transcript and I'm

5 not losing pages.  So no one should put any major

6 significance into what I wrote.  But I did write at the

7 top of one "OJ in cuffs," so for reference, if I had to

8 stop and start, means orange jumpsuit and was cuffed at

9 the beginning of the tape, which refers to the 9/24

10 interview.

11    But if you want to offer for purposes of the

12 record at this time of this hearing State's Pretrial

13 Exhibits 1, 2 and 3, the DVDs, if there's no

14 authenticity issues, since everyone approved me looking

15 at them in advance, you can get that out of the way and

16 then you can just identify them.

17    MR. ROUSSEAU:  I would like to offer them

18 for purposes of this hearing, Your Honor.

19    THE COURT:  All right.  Is there any

20 objection to State's Pretrial 1, State's Pretrial 2 or

21 State's Pretrial 3 for purposes of this hearing?

22    MS. KEENE:  No, sir.

23    THE COURT:  All right.  Then each of the

24 DVDs as so identified is admitted into evidence.

25    (State's Pretrial Exhibit No. 1-3 admitted)

```
 1              THE COURT:  Off the record.
 2              (Discussion off the record)
 3              THE COURT:  On the record.
 4              The transcript that is labeled "part one" in
 5    the upper right-hand corner that was attached to State's
 6    Exhibit Pretrial 1 now has a court reporter exhibit
 7    sticker "State's Pretrial 1-A".  The transcript that was
 8    labeled "part two" in the upper right-hand corner and
 9    also on the left-hand side has the original cause number
10    and the date of the interview in the upper left-hand
11    corner, as did the part one section, part two is now
12    labeled State's Pretrial 2 and that was the one -- 2-A
13    which came attached to Pretrial 2.  And the transcript
14    that deals with the 9/24/12 interview in State's Exhibit
15    Pretrial 3 is now labeled on the bottom right-hand
16    corner as "State's Pretrial 3-A".
17              Does the State offer those for purposes of
18    the hearing?
19              MR. ROUSSEAU:  Yes, Your Honor.
20              THE COURT:  Any objection?
21              MS. KEENE:  None.
22              THE COURT:  All right.
23              (State's Pretrial Exhibit No. 1A - 3A
24               admitted)
25              THE COURT:  And the Court understands, and
```

1    the law is clear, it's what you hear is what counts, not

2    what's on the transcript, but it's there as an aid.

3    And, also, quite frankly, since they're in evidence, if

4    the parties have things they wish to discuss in detail,

5    my record and rulings I might pencil in, with the

6    permission of the parties, "on page six, line..."

7    whatever of an exhibit.  If that comes up, y'all can use

8    that for reference, and we'll use the transcripts to

9    keep track of what we're talking about and that will

10   make it easier on any subsequent court, if there is some

11   issue.  They'll be at a bigger advantage versus scanning

12   through a DVD.

13           MR. ROUSSEAU:  No objection to you marking

14   the transcript any way you need to, to help you make a

15   ruling, Your Honor.

16           THE COURT:  Agreed?

17           MS. KEENE:  Agreed.

18           THE COURT:  All right.  And, again, let the

19   record reflect I've put a few little time things and

20   little notes and I had marked with a yellow highlighter

21   at different times and there's not any real significance

22   to that other than marking where I stopped if I took a

23   break and things like that.  And I will be honest, every

24   now and then there was something that "hummmm" and I

25   might have just subconsciously marked as I listened,

```
 1    pretending, thinking I'm the lawyer and not the judge,

 2    from having done both of your jobs, but the yellow

 3    marking has no significance, and I put it there.  It

 4    wasn't on the transcripts when they were delivered by

 5    the State.  Everything was black and white only.  That's

 6    my highlighter.

 7              All right.  Then off we go -- off the

 8    record.

 9              (Discussion off the record)

10              THE COURT:  Go ahead.

11              MR. ROUSSEAU:  I think we can get this out

12    of the way upfront.

13              Your Honor, although I have -- we have these

14    statements that we've been talking about, something that

15    I discovered only this morning, frankly, Detective

16    Stewart brought it to my attention, is that on the day

17    of the arrest, the interview dated 9/24, when he was

18    providing the warnings mandated by 38.22, one of the

19    warnings was inadvertently omitted, the second warning,

20    the one regarding any statement he makes may be used

21    against him in court.

22              I've done some research this morning.  My

23    preliminary research indicates to me that that causes me

24    to lose this statement.  That being the case, I will not

25    be asking you for a ruling today.  I will acknowledge to
```

1    the Court that I believe right now today that the law is

2    against me on that and that it will not be properly

3    admissible in court.

4         I discussed this with the Defense and I'd

5    ask permission just to continue my research after today

6    and if I find anything to the contrary, perhaps revisit

7    this when we get ready for trial, and I will bring it to

8    anyone's attention if I do find anything.  But I don't

9    believe as I sit here today that that is an admissible

10   interview.

11        THE COURT:  And let me say, I've had this

12   happen before, particularly with multiple interviews,

13   and it's really easy to let it all run together, which

14   by practice is have a little sheet of paper and check it

15   off no matter how many millions of times you've done it.

16   But I've had this happen probably three or four times

17   over the course of 20 years in the umpire seat.  It's

18   always been multiple interview things, and the one they

19   usually forget is "you can terminate the interview at

20   any time."  It happens.  It's a human system; life

21   happens.

22        I will say this.  I will preserve everything

23   that I've reviewed on that, if there were an issue to

24   come up under an impeachment theory or some other legal

25   theory that circumvents the 38.22 specific technical

1    requirements.  But the last time I looked at the law on

2    this, it was not a -- the substantial compliance is as

3    to what was said or how it was said, not to the fact it

4    wasn't said at all.  And I think my guts tell me your

5    research to date is probably accurate unless there's

6    been something new.

7              MR. ROUSSEAU:  That's where I believe we

8    are, Your Honor, but I'll keep checking.

9              THE COURT:  Well, thanks for that.

10              MR. ROUSSEAU:  With that, I'm ready to call

11    Detective Stewart.

12              THE COURT:  All right.  Come on up.

13              You want the witness rule?

14              MS. KEENE:  Yes.

15              THE COURT:  I thought so.

16              Why don't both of y'all come on up and I'll

17    swear you then put one of you back by the coffee pot.

18              Each of you state your full, legal names for

19    Karen.

20              THE WITNESS:  Byron Stewart.

21              THE WITNESS:  Daniel Wade Easley.

22              THE COURT:  All right.  Each of you face me

23    and raise your right hand.

24              (Two witnesses sworn)

25              THE COURT:  You both have been placed under

1  witness rules on occasions of prior testimony; is that

2  correct?

3              THE WITNESSES:  Yes, sir.

4              THE COURT:  You understand what the rules

5  require, where you may and may not be, who you may and

6  may not talk to and about what and in whose presence

7  while the trial is in progress; is that correct?

8              THE WITNESS:  Yes, Your Honor.

9              THE COURT:  Was that a "yes" nod?

10             THE WITNESS:  Yes, sir.

11             THE COURT:  All right.  Make sure you answer

12  out loud and even if we all know what you mean.

13             Then the rule is in place until this case

14  actually gets tried, even though today will only be

15  pretrial matters, and there will probably be a delay

16  before the trial on the merits happens for evidentiary

17  reasons.  And so if I say something, you might know

18  about it, but if I say something now, I would be

19  violating the rule.  So y'all can talk individually to

20  the lawyers about when the new trial date might be, but

21  "mum" is the word unless you're speaking in private with

22  the attorneys or their investigators about what you know

23  in order to assist in their preparation or to prepare

24  for your testimony.

25             So you can come on up and have a seat.

```
 1                    (Witness takes the stand)
 2                    THE COURT:  And, Detective Easley, you can
 3     go back by the coffee pot.
 4                    (Witness excused from courtroom)
 5                    DETECTIVE BYRON STEWART,
 6     having been first duly sworn, testified as follows:
 7                    DIRECT EXAMINATION
 8     BY MR. ROUSSEAU:
 9        Q.  You are Detective Byron Stewart; is that correct?
10        A.  Yes, sir.
11        Q.  Detective Stewart, are you a homicide detective
12     in the city of Arlington, Texas?
13        A.  Yes, sir.
14        Q.  Okay.  And have you --
15                    MR. ROUSSEAU:  And with the Court's
16     permission, I'll lead a little bit to get to where we
17     need to be.
18                    MS. KEENE:  Absolutely.
19                    THE COURT:  That's fine.
20        Q.  (BY MR. ROUSSEAU)  And have you been a homicide
21     detective for a lot of years?
22        A.  Yes, sir.
23        Q.  I'll cut right to the chase then.  Were you
24     assigned to investigate a capital murder, that is, a
25     murder involving two victims, that occurred at an
```

1    apartment in north Arlington on March the 20th of 2011?

2        A.  Yes, sir.

3        Q.  And did you -- ultimately did that investigation

4    reveal that the victims' names in that case were

5    Mechelle Gandy -- Mechelle, M-E-C-H-E-L-L-E, Gandy --

6    and Asher Ryan Olivas?

7        A.  Yes, sir.

8        Q.  And is it your understanding that Asher Olivas

9    was the child of Mechelle Gandy?

10       A.  Yes.

11       Q.  And did that homicide, those homicides,

12   essentially consist of Ms. Gandy being murdered by

13   cutting or stabbing at basically the same time that the

14   apartment is being caught on fire which caused the death

15   of the little baby?

16       A.  Yes, sir.

17       Q.  The little baby being Asher Olivas?

18       A.  Yes, sir.

19       Q.  So were you involved immediately, that is, from

20   the start, from the beginning of the night of March 20th

21   of 2011?

22       A.  Yes.

23       Q.  I want to move your attention somewhat forward in

24   the investigation.  Did you become aware that the

25   individual, that the child, Asher Olivas, was purported

1   to be the biological son of an individual named Thomas

2   Olivas?

3        A.  Yes, I did.

4        Q.  And was it your understanding that there was some

5   sort of legal proceedings that had been initiated to

6   determine the parentage and ultimately to establish a

7   child support ruling regarding the child, Asher Olivas?

8        A.  Yes.

9        Q.  That is, a lawsuit had been established, had been

10  filed, that would ultimately result in the knowledge of

11  whether or not Mr. Olivas, Thomas Olivas, was in fact

12  the biological father of the child and in fact to

13  establish child support?

14       A.  Yes.

15       Q.  Okay.  Were attempts made to contact Thomas

16  Olivas during the overnight hours between the fire

17  happening at the apartment and the next morning when the

18  sun came up?

19       A.  Yes.

20       Q.  And to your knowledge were any of those attempts

21  successful?

22       A.  Not at that time, no.

23       Q.  Is that a situation that you were monitoring;

24  that is, has anyone made contact with Mr. Olivas?

25       A.  Yes, sir.

1    Q.   And did you in the course of the early -- during

2   the part of your investigation did you determine that

3   Mr. Olivas lived in the city of Grapevine, Texas?

4    A.   Yes, I did.

5    Q.   And did you determine that he was employed at

6   Best Buy in Grapevine, Texas?

7    A.   Yes.

8    Q.   Did you do anything in regard to locating

9   Mr. Olivas, I mean locating where he actually was?

10    A.   Yes.

11    Q.   As opposed to where he lived?

12    A.   Yes.

13    Q.   Okay.  Were Arlington police detectives

14   dispatched to locate Mr. Olivas sometime during the

15   morning of March the 21st?

16    A.   Yes.

17    Q.   And did you become aware during the day that

18   Mr. Olivas had in fact been located?

19    A.   Yes.

20    Q.   And was it that he was located at his job at Best

21   Buy?

22    A.   Yes.

23    Q.   Was this information related to you?

24    A.   Yes, it was.

25    Q.   And were you in Arlington at the time?

1    A.  Yes.

2    Q.  We're going to get to question-to-answer here in

3    a minute.

4    A.  Okay.

5    Q.  Was it brought to your attention that sometime

6    during the early -- during the afternoon that Mr. Olivas

7    had left his job and was en route presumedly back to his

8    apartment?

9    A.  Yes.

10   Q.  And were Arlington police -- well, were Grapevine

11   police personnel on scene at that apartment?

12   A.  Yes, they were.

13   Q.  Do you know whether or not contact was made with

14   Mr. Olivas after he had reached the parking lot of his

15   apartment?

16   A.  Yes.

17   Q.  Had you directed -- at that point in time did you

18   have a warrant to arrest Mr. Olivas?

19   A.  No, I did not.

20   Q.  Did you know for a fact whether or not Mr. Olivas

21   actually had any role in the death of his child and the

22   child's mother?

23   A.  No, I did not.

24   Q.  Was he -- how would you characterize Mr. Olivas

25   at that point in time?

1    A.  As a person of interest and, also, as far as a

2  death notification that needed to be made.

3    Q.  The death notification because he was the

4  purported father of the child?

5    A.  Yes.

6    Q.  All right.  So once contact was made with

7  Mr. Olivas at the parking lot of his apartment, was that

8  information related to you?

9    A.  Yes, it was.

10    Q.  Did you make any type of request concerning

11  Mr. Olivas at that point in time?

12    A.  I did.

13    Q.  What did you do?

14    A.  I contacted Detective Easley with the Grapevine

15  Police Department and I asked him if he would speak with

16  Mr. Olivas and ask him if he would be willing to be

17  transported to the Grapevine Police Department for

18  questioning.

19    Q.  Do you know at that point in time whether or not

20  anyone asked Mr. Olivas whether they could conduct a

21  search of his premises, his apartment?

22    A.  Yes, I am aware of that.

23    Q.  And what was your understanding regarding whether

24  or not that consent was given?

25    A.  My understanding is that he did give consent.

1      Q.   And do you recall who was on -- well, let me ask

2   you, who were you in contact with at -- who at that

3   parking lot were you in contact with?

4      A.   Detective Easley with the Grapevine PD, Detective

5   Willis or Hummel with the Arlington police, as well as

6   Detective Layne Shimpaugh.

7              MR. ROUSSEAU:  Just for the court reporter,

8   Shimpaugh is S-H-I-M-P-A-U-G-H.

9      Q.   (BY MR. ROUSSEAU)  And Detective Layne Shimpaugh

10  is a detective with the Arlington Police Department; is

11  that correct?

12     A.   Yes, sir.

13     Q.   All right.  So you asked whether or not he

14  would -- anybody would give him a ride down to Grapevine

15  PD; is that correct?

16     A.   Yes.

17     Q.   Okay.  Do you have any firsthand knowledge of how

18  he actually got to the Grapevine Police Department?

19     A.   In my understanding, Detective Easley with the

20  Grapevine PD brought him to the...

21     Q.   And I want to jump ahead a little bit.  You

22  eventually interviewed Mr. Olivas, correct?

23     A.   Yes, I did.

24     Q.   And during that interview did he indicate to you

25  that it was in fact Detective Easley who had given him a

 1    ride to the Grapevine PD?

 2        A.   Yes, he did.

 3        Q.   All right.  Well, let's move back a little bit.

 4             All right.  Once you got word that he had

 5    been contacted and that officers were dealing with him

 6    at the complex, what did you do?

 7        A.   I started driving toward the city of Grapevine.

 8        Q.   And how long did it take you to get there?

 9        A.   I was rushing as fast as I could, but following

10    the rules of the traffic, it probably took me about

11    almost 30 minutes to get there.

12        Q.   And when you arrived, where did you go?

13        A.   Went straight to the police department in

14    Grapevine.

15        Q.   Had you ever been there before?

16        A.   I probably have in earlier times, but it's been a

17    while.

18        Q.   When you got there, what did you do?

19        A.   I contacted the person at the front desk, told

20    them who I was.  They were -- I was told that, okay,

21    they were expecting me to come, so I was escorted to the

22    detective area.

23        Q.   And in the detective area did you come into

24    contact with a person that you later came to know as

25    Thomas Olivas?

1    A.  Yes, I did.

2    Q.  And do you see that person present here in the

3    courtroom today?

4    A.  Yes, I do.

5    Q.  Could you point him out and describe an article

6    of clothing?

7    A.  Sitting right here to my left wearing a dark

8    burnt orange jumpsuit.

9           THE COURT:  What color is that?

10          THE WITNESS:  It looks like Texas burnt

11   orange to me, but I can't tell if --

12          THE COURT:  I don't think anyone at Texas

13   Tech would agree with that assessment.

14   Q.  (BY MR. ROUSSEAU)  I'm going to stand over here

15   and say:  Is it this person?

16   A.  No, it's not.

17   Q.  Is it this person?

18   A.  No.

19   Q.  Is it this person --

20   A.  Yes.

21   Q.  -- in the firey red jumpsuit?

22   A.  Is that firey red?

23   Q.  That's pretty firey red.

24   A.  Okay.  Then firey red jumpsuit.

25          THE COURT:  You need to slow down when

 1   you're approaching all traffic intersections where the

 2   lights run from left to right.

 3                THE WITNESS:  Okay.

 4                THE COURT:  But be very careful whether it's

 5   yellow or red when there's so many choices.

 6                I will let the record reflect when he asked

 7   where is he, he looked at the Defendant, nodded toward

 8   him and described where he's sitting in, I would call it

 9   a Red Raider, I don't know if it would be firey, but

10   it's obviously red, and to be perfectly clear, it's not

11   close to burnt orange and that just happens to just be a

12   fact of color.

13                THE WITNESS:  Okay.

14                THE COURT:  But I have no doubt he's

15   referred to the Defendant in open court.

16                You may continue.

17                MR. ROUSSEAU:  Okay.  Thank you.

18   Q.  (BY MR. ROUSSEAU)  When you made contact -- is

19   this the same Mr. Olivas that we've been talking about

20   leading up to this point, as well?

21   A.  Yes, it is.

22   Q.  Once you made contact with him -- well, describe

23   where he was when you made contact with him.

24   A.  He was sitting in the interview room at the

25   Grapevine PD.

1      Q.  We've had a chance to -- and we provided the

2   judge with a recording of -- with a video recording of

3   that interview and there's an interview room with the

4   Defendant sitting in it.  Is that room where you first

5   made contact with him?

6      A.  Yes, it is.

7      Q.  And when we can actually see you walk into the

8   interview room, was that your first contact with him?

9      A.  Yes, it is.

10      Q.  Okay.  It may speak for itself, but let me just

11   cover a couple of items.  Was he -- when you made

12   contact with him, was he in handcuffs?

13      A.  No, he was not.

14      Q.  Was he in leg shackles?

15      A.  No.

16      Q.  Was he physically restrained in any way?

17      A.  No, he was not.

18      Q.  Was he fully clothed?

19      A.  Yes, he was.

20      Q.  In his normal civilian clothing?

21      A.  Yes.

22      Q.  Was there -- the door to the interview room, was

23   it open or closed?

24      A.  It was open.

25      Q.  Was there a police officer posted outside the

1  door?

2     A.  No.

3     Q.  Was there anything -- were his movements

4  restricted in any way?

5     A.  No.

6     Q.  And was he formally under arrest?

7     A.  No, he wasn't.

8     Q.  To your knowledge had he been threatened in any

9  way?

10     A.  No.

11     Q.  To your knowledge was he forcibly taken to the

12  Grapevine Police Department?

13     A.  No.

14     Q.  When you made contact with him did you tell him

15  who you were?

16     A.  Yes, I did.

17     Q.  Did you tell him what you do for living, that is,

18  you identified yourself as a police officer?

19     A.  Yes.

20     Q.  And did you provide to him the warnings that are

21  commonly referred to as Miranda warnings that are

22  specifically required by Article 38.22 of the Code of

23  Criminal Procedure?

24     A.  Yes.

25     Q.  And you did this even though he was not under

1    arrest, correct?

2        A.   That's correct.

3        Q.   Did he indicate to you that he understood each of

4    those warnings?

5        A.   Yes, he did.

6        Q.   Did you read those warnings to him from a card?

7        A.   Yes.

8        Q.   So you didn't just recite them from memory?

9        A.   No.

10       Q.   I want to show you what's been marked as State's

11   Pretrial Exhibit No. 4.  Take a look at that.

12            Do you recognize that?

13       A.   Yes, I do.

14       Q.   Is that a photocopy of the -- I'm just going to

15   call it the Miranda card.  Is that a photocopy of the

16   Miranda card?

17       A.   Yes, it is.

18       Q.   Is it a true and correct copy?

19       A.   Yes, it is.

20       Q.   There are some markings at the top, looks like in

21   ink.  Can you explain to me what that is?

22       A.   That is the signature of Mr. Olivas.

23       Q.   Okay.

24       A.   And the date.

25       Q.   Did you read these to him individually?

```
 1        A.   Yes.

 2        Q.   Did you ask him, after each one, if he understood

 3   the warnings?

 4        A.   Yes.

 5        Q.   And did he indicate that he did?

 6        A.   Yes, he did.

 7             MR. ROUSSEAU:  Your Honor, I'll offer for

 8   purposes of this hearing State's Pretrial Exhibit 4.

 9             MS. KEENE:  No objection, Judge.

10             THE COURT:  All right.  Admitted.

11             (State's Pretrial Exhibit No. 4 admitted)

12        Q.   (BY MR. ROUSSEAU)  And you have the original with

13   you in your file; is that correct?

14        A.   Yes.

15        Q.   Did Mr. Olivas show any reluctance whatsoever to

16   talk to you?

17        A.   No, he did not.

18        Q.   How would you characterize his attitude regarding

19   assisting you in your investigation?

20        A.   He was cooperative.

21        Q.   Did you later -- well, did you proceed to inform

22   him about the substance of what you were -- the reason

23   you were there?

24        A.   Yes, I did.

25        Q.   You told him you were investigating the death of
```

1    Mechelle Gandy and his son?

2        A.    That's correct.

3        Q.    And did he, during the course of your interview,

4    acknowledge that Asher Olivas was, at least to his

5    knowledge, his son?

6        A.    Yes.

7        Q.    Did he continue to cooperate?

8        A.    Yes, he did.

9        Q.    At some point in time did you ask him if he would

10   consent to providing -- to allowing you to photograph

11   him?

12       A.    Yes, I did.

13       Q.    And did he consent to most of the photographs?

14       A.    Yes.

15       Q.    Was there any reluctance to consent to

16   photographs of his -- I'm just going to say his torso,

17   chest and back.    That is something that would require

18   him to take off his shirt.    Okay?

19       A.    Yes.

20       Q.    Did he have any reluctance to you photographing

21   those portions of his body?

22       A.    He initially did, yes.

23       Q.    Did he ultimately consent to that, agree to being

24   photographed in that way?

25       A.    Yes, he did.

1      Q.   And did he provide you with a signed consent to

2   take those photographs?

3      A.   Yes.

4      Q.   And I'll just back up a little bit.  During the

5   time that -- the entire time that you were in the

6   interview room with him, did Mr. Olivas sign a consent

7   for the police to conduct various types of searches?

8      A.   Yes, he did.

9      Q.   Were you the one who was getting him to --

10   actually handing him the documents for him to sign or

11   was someone else doing that?

12      A.   Someone else was at that time.

13      Q.   Who was that?

14      A.   Detective Easley.

15      Q.   And is Detective Easley -- he's the same person

16   who's here today and was sworn in a little while ago; is

17   that correct?

18      A.   That's correct.

19      Q.   And was he present in the room for most of your

20   interview with Mr. Olivas?

21      A.   Yes, he was.

22          MR. ROUSSEAU:  May we take a couple-minute

23   break?  I've got a few documents to mark.

24          THE COURT:  That's fine.  We'll take a short

25   recess.

```
 1                    (Break taken, 10:45 - 11:10 a.m.)

 2                    (OPEN COURT, DEFENDANT PRESENT)

 3                    (Witness on the stand)

 4                    THE COURT:  You may proceed.

 5      Q.   (BY MR. ROUSSEAU)  Let me show you what I've had

 6   marked as State's Pretrial Exhibits 5, 6, 7, 8, and 9.

 7   Take a look at those, please, and I'll ask you a

 8   question about them.

 9      A.   Okay.

10      Q.   Do you recognize each of those?

11      A.   Yes, I do.

12      Q.   Are they all true and correct copies of the

13   originals?

14      A.   Yes, they are.

15      Q.   Okay.  Are all consents to search signed by the

16   Defendant, Mr. Olivas?

17      A.   Yes, they are.

18      Q.   In each of these, regarding each of these

19   consents, was the consent freely and voluntarily given?

20      A.   Yes, it was.

21                    MR. ROUSSEAU:  I will offer for purposes of

22   this hearing State's Pretrial 5, 6, 7, 8, and 9.

23                    MS. KEENE:  No objection, Judge.

24                    THE COURT:  All right.  State's Pretrial 5,

25   which says iPhone; State's Pretrial 6, which says buccal
```

 1    swabs of skin and mouth, is admitted.  Pretrial 7, which

 2    says photographs and swab of body and clothing, is

 3    admitted.  Pretrial 8, which says green Ford Explorer

 4    and the license number, is admitted.  And Pretrial 9,

 5    which says single family residence, 601 Park Boulevard,

 6    No. 208, is admitted.

 7              To be clear, 5, 6, 7, 8, and 9 are offered

 8    for the record for purposes of evidence in this hearing

 9    only at this time; is that correct?

10              MR. ROUSSEAU:  Yes.

11              THE COURT:  And they're all admitted,

12    without objection, on that basis at this time.

13              Is that correct?

14              MS. KEENE:  That's correct, Judge.

15              THE COURT:  Then so be it.

16              (State's Pretrial Exhibit No. 5 - 9

17               admitted)

18    Q.  (BY MR. ROUSSEAU)  All right.  Let's talk

19    about -- well, let's take these one at a time.  First of

20    all, the iPhone, did the Defendant hand you an iPhone he

21    had with him?

22    A.  Yes, he did.

23    Q.  And was that -- were some of the contents of the

24    iPhone recovered by the police there at Grapevine PD?

25    A.  Yes.

1   Q.   And where he gave you consent to get buccal swabs

2   of his skin and mouth, was that done there at Grapevine

3   PD?

4   A.   Yes.

5   Q.   And he gave you -- to your knowledge was the

6   consent for his apartment, the one at 601 Park

7   Boulevard, No. 208, was that search done?

8   A.   Yes.

9   Q.   And I want to focus on two issues then, one

10  regarding the photographs taken of his body.  Did he

11  have any concern whatsoever with taking photographs on

12  any part of his body other than his torso, that is, his

13  chest, back and shoulder area?

14  A.   No, he did not.

15  Q.   He was fully comfortable with all that, correct?

16  A.   Yes.

17  Q.   Okay.  But he did have concerns about taking off

18  his shirt and letting you take pictures of his chest and

19  back, those areas; is that correct?

20  A.   That's correct.

21  Q.   Did he at one point in time ask you -- when you

22  first asked him, did he say something to the effect of

23  "I would prefer to 'consent' with someone over that"?

24  A.   Yes.

25  Q.   And did you clarify by asking him, "consult," did

1   he mean "consult" with someone?

2       A.   Yes.

3       Q.   A little later on did you ask him specifically if

4   he meant an attorney, did he want to talk to an

5   attorney?

6       A.   Yes, I did.

7       Q.   And did he ever say that yes, he wants to talk to

8   an attorney?

9       A.   No, he did not.

10      Q.   Did he say, in fact, "I don't know who," or words

11  to that effect?

12      A.   Yes, he did.

13      Q.   Okay.  Did you eventually -- did you ever tell

14  him that if he doesn't -- if he refuses to let you take

15  a picture of his -- that is, if he refuses to take off

16  his shirt and let you take a picture of his back and

17  chest, his torso, did you tell him that if he refuses

18  that you have to honor that?

19      A.   Yes, I did.

20      Q.   Did you specifically tell him that he is not

21  under arrest?

22      A.   Yes, I did.

23      Q.   Did you tell him that you can't do this unless he

24  consents to it being done?

25      A.   I did.

 1    Q.   Were there -- was there a back-and-forth
 2   conversation between yourself and him and between
 3   Detective Easley and him regarding your need for these
 4   photographs?
 5    A.   Yes.
 6    Q.   And did he indicate to you that he didn't want to
 7   take off his shirt for two reasons; one, because he does
 8   in fact have scratches on his body -- at some point did
 9   he tell you that?
10    A.   Yes, he did.
11    Q.   And that you might misinterpret those, or you
12   might assume that that was evidence of his guilt?
13    A.   Yes.
14    Q.   And I'm not quoting here but words to that
15   effect, correct?
16    A.   Yes.
17    Q.   And -- but he acknowledged that they were there?
18    A.   Yes, he did.
19    Q.   Did he also offer as a reason for not taking off
20   his shirt the fact that he suffers from a skin condition
21   that he calls eczema?
22    A.   Yes.
23    Q.   Ultimately, after discussion of this for, I want
24   to say, roughly around 20 minutes, did he ultimately
25   agree to take off his shirt and agree to be

1    photographed?

2        A.   Yes, he did.

3        Q.   Did you -- in order to convince him to take off

4    his shirt and agree to be photographed, did you threaten

5    him?

6        A.   No, I did not.

7        Q.   Did Detective Easley threaten him in your

8    presence?

9        A.   No, he did not.

10       Q.   Did you have the ability -- there were a few

11   times when you were out of the room, correct?

12       A.   Yes.   That's correct.

13       Q.   When you were out of the room were you monitoring

14   the interview that Detective Easley was conducting?

15       A.   Yes.

16       Q.   Did you at any time see or hear Detective Easley

17   threaten the Defendant?

18       A.   No, I did not.

19       Q.   And by "threaten," I mean did you tell him, first

20   of all, did you imply or state directly at any time that

21   he would be injured if he did not comply?

22       A.   No, I did not.

23       Q.   Did you state directly or imply that he would be

24   arrested if he did not comply?

25       A.   No, I did not.

1    Q.   Did you state clearly or imply that if he did not

2    comply that he would be charged with capital murder?

3    A.   No.

4    Q.   Or with any offense whatsoever?

5    A.   No, I did not.

6    Q.   And he ultimately consented; is that correct?

7    A.   Yes, he did.

8    Q.   And -- well, he had previously signed a consent

9    for the photographing of other parts of his body,

10   correct?

11   A.   That's correct.

12   Q.   When I say "other parts," I mean, he had no

13   problem with rolling his sleeves up and showing you the

14   tattoos that go all the way up to his shoulder, correct?

15   A.   That's correct.

16   Q.   It was simply the torso that he had concerns

17   about?

18   A.   That's correct.

19   Q.   So he allowed you to photograph his hands, his

20   wrists, his arms, everything up to his shoulder, but he

21   didn't want to take off his shirt, correct?

22   A.   That's correct.

23   Q.   But he ultimately did give you that consent,

24   right?

25   A.   Yes.

1        Q.   And he took off his shirt?

2        A.   Yes, he did.

3        Q.   And the photographing took what would you say?

4    Can you give an idea of how long it took to take those

5    photographs?

6        A.   I would say roughly five minutes.

7             MR. ROUSSEAU:  Sorry, Karen, I should have

8    had you mark these on the break.

9             THE COURT:  We'll take a short recess.

10            (Pause in proceedings)

11       Q.   (BY MR. ROUSSEAU)  Okay.  I'll show you State's

12   Pretrial Exhibits 10 through 15.  Would you take a quick

13   look at those and tell me whether or not those are true

14   and correct, whether they fairly and accurately depict

15   the torso of the Defendant as it appeared that day?

16       A.   Yes, they do.

17       Q.   Were these photographs taken by Detective Easley?

18       A.   Yes, they were.

19            MR. ROUSSEAU:  I'll offer 10 through 15

20   subject to any objection by Defense, for purposes of

21   this hearing.

22            MS. KEENE:  No objection for purposes of the

23   hearing, Judge.

24            THE COURT:  For purposes of the record, the

25   parties are in agreement these are the photos, some of

```
 1   which you can observe being taken on the...
 2              MR. ROUSSEAU:  Yes, Your Honor, I --
 3              THE COURT:  Video, where there's noises,
 4   that this is what appears to be going on?
 5         Okay.
 6              MR. ROUSSEAU:  Yes, Your Honor, and there
 7   are others that I'm not marking simply because they're
 8   not the ones that involve his torso, but they are
 9   photographs taken at the same time.
10              THE COURT:  And I guess for record purposes,
11   these are things that during the course of at least the
12   interview that's on Pretrial 1 and 2, this is going on
13   in the course of the same events as the conversation
14   that's being discussed at this time.  These pictures are
15   taken contemporaneous with the interview at the
16   Grapevine Police Department?
17              MR. ROUSSEAU:  Yes, Your Honor.  Yes.
18              THE COURT:  Joetta, you agree with that?
19              MS. KEENE:  Yes.
20              THE COURT:  Okay.  Then 10, 11, 12, 13, 14,
21   and 15 are each admitted for purposes of this hearing,
22   pretrial exhibits.
23              (State's Pretrial Exhibit No. 10 - 15
24               admitted)
25              (Pause in proceedings)
```

 1              MR. ROUSSEAU:  Judge, in an abundance of

 2    caution, we're going to go ahead and offer the other

 3    photographs that were taken that day.  I missed one

 4    involving the torso, but I'll qualify them to the

 5    witness real quick.

 6              THE COURT:  All right.

 7        Q.  (BY MR. ROUSSEAU)  Let me show you State's

 8    Exhibit No. 16 through 23.  Tell me if you recognize

 9    those as being other photographs that were taken at the

10    same -- during the same interview that we've been

11    discussing?

12              THE COURT:  Short recess.

13              (Discussion off the record)

14              THE COURT:  All right.  Have you had the

15    opportunity to look at the exhibits?

16              THE WITNESS:  Yes.

17              THE COURT:  You may continue.

18        Q.  (BY MR. ROUSSEAU)  They all fairly and accurately

19    depict the Defendant as he appeared the day that you

20    were interviewing him, that is, March 21st of 2011?

21        A.  Yes, they do.

22              MR. ROUSSEAU:  I'll offer State's 16 through

23    23 for purposes of this hearing.

24              MS. KEENE:  No objection, Judge, for

25    purposes of the hearing.

```
 1              THE COURT:  All right.  State's Pretrial 16,

 2  17, 18, 19, 20, 21, 22, 23 are each admitted without

 3  objection, for purposes of the pretrial hearing only.

 4              (State's Pretrial Exhibit No. 16 - 23

 5               admitted)

 6              MR. ROUSSEAU:  I'm not representing that

 7  these are sequential.  I'm just admitting them in that

 8  order.

 9              THE COURT:  I understand that 10 through 23

10  inclusive are pictures taken during the course of the

11  interview that occurred at the Grapevine Police

12  Department, or contemporaneous therewith, not as to any

13  particular order or time sequence.

14              And you may continue.

15  Q.  (BY MR. ROUSSEAU)  Now, Mr. Olivas is -- do you

16  know his age, at the time you were talking to him?  If

17  you need to refer to something, please do.

18              It might be stated -- the date of birth

19  might be stated on the Miranda card.

20              THE COURT:  So to be clear, are you asking

21  what his age was or what his birth date was?

22              MR. ROUSSEAU:  Just how old he was.  That

23  might be useful to him.

24              THE WITNESS:  '82, so...

25  Q.  (BY MR. ROUSSEAU)  This was 2011, so about
```

1    29 years of age?

2        A.   Yes.

3        Q.   Did he appear to be of at least average

4    intelligence?

5        A.   Yes.

6        Q.   Did he have any difficulties understanding your

7    communications with him?

8        A.   No, he didn't.

9        Q.   Did he ask sensible questions in response, that

10   is, if he needed clarification?

11       A.   Yes, he did.

12       Q.   Did the answers that he provided make sense in

13   the context of your conversation with him?

14       A.   Yes.

15       Q.   So he understood what you were saying?

16       A.   Yes, he did.

17       Q.   And just to jump ahead just a little bit, at one

18   point in time, when you were asking for consent to

19   search the Explorer, did he indicate that he had no

20   problem with it but it's not -- he had misgivings about

21   giving consent because he didn't know if he had the

22   right to do that?

23       A.   That's correct.

24       Q.   Was it your understanding that was a loner car;

25   that is, it did not belong to him?

1       A.   Yes.

2       Q.   And was that the basis of his misgivings?

3       A.   Yes.

4       Q.   At some point in time toward the end of the

5   interview, did he actually use the term "lawyer up"?  Do

6   you recall that?

7       A.   No.

8       Q.   Let me help you out just a moment, please.

9            First of all, are you familiar with the term

10  "lawyer up"?

11      A.   Yes, I am.

12      Q.   What does that mean?

13      A.   I take it as one wants a lawyer at that point.

14      Q.   Okay.  Turn to the, if you would, please -- you

15  have the transcript with you; is that correct?

16      A.   Yeah, I have two.  Which one are you...

17      Q.   It's the transcript, the second part of the first

18  interview, the one from March 21, the second part of

19  that interview.

20      A.   The one that starts off with "male voice off

21  camera" or...

22      Q.   Let me show you.

23      A.   Okay.

24           This one?

25      Q.   Yeah.  Turn to the last page.

1              Did you ask -- I want to go up ahead of that
2    just a little bit.  There was a question you asked.  Did
3    you ask Mr. Olivas a question about Amanda and giving
4    consent to search her car?
5         A.  Yes.
6         Q.  Now, is Amanda Rowe the individual that you
7    understand to be the owner of that vehicle?
8         A.  That's correct.
9         Q.  And Amanda Rowe -- he, the Defendant, told you
10   that's who owned the car, correct?
11        A.  That's correct.
12        Q.  So when you refer to "Amanda", you're talking
13   about Amanda Rowe?
14        A.  Yes.
15        Q.  Your question to him at the end of that is, "If I
16   have to get -- so you think I need to call her and get
17   her permission for that?"  What is his response?
18        A.  On line 12?
19        Q.  Yes.
20        A.  "I can't say yes to that one cause -- cause and
21   knowing her, she'll lawyer up."
22        Q.  "I can't say yes to that one cause and knowing
23   her, she'll lawyer up"?
24        A.  Yes.
25        Q.  So does that indicate to you that he knew that a

1   person could say no to something?

2       A.   It does.

3       Q.   And say, "No, I want to speak to a lawyer"?

4       A.   Yes.

5       Q.   Did he ever, himself, refuse to answer a question

6   and say, "I want to speak to an attorney first"?

7       A.   No, he didn't.

8       Q.   Even though you had asked him specifically

9   whether or not he -- when he first said he would like to

10  consult with someone, you asked him specifically if he

11  meant a lawyer, correct?

12      A.   That's correct.

13      Q.   Did the Defendant tell you, during the course of

14  your interview with him, what he did for a living?

15      A.   Yes.

16      Q.   Did he indicate to you that -- you already knew

17  about his job at Best Buy, right?

18      A.   Yes, I did.

19      Q.   Did you already know about his job as a waiter at

20  a restaurant called TruLuck's?

21      A.   I learned that in the interview.

22      Q.   So is it your understanding a waiter's job must

23  deal with the public and talk to the people one-on-one

24  and be able to understand what they need?

25      A.   Yes.

STATE OF THOMAS OLIVAS

1    Q.  Did he also say he had another job?

2    A.  Those are the only two that I recall.

3    Q.  Do you recall him saying anything about being an

4    Air Force reservist?

5    A.  Oh, yes.

6    Q.  Being in the military?

7    A.  Yes.

8    Q.  Did he say -- do you recall him saying what

9    specifically he did for the military?

10   A.  He was in the medical field.

11   Q.  An EMT?

12   A.  Yes.

13   Q.  And did he exhibit some knowledge -- when

14   Detective Easley was obtaining a buccal swab, did he

15   seem to indicate some knowledge that he had regarding

16   buccal swabs?

17   A.  Yes.

18   Q.  Did you inquire of him -- during the course of

19   your interview, did you inquire, did you ask any

20   questions regarding his educational background?

21   A.  As far as...

22   Q.  Did you obtain an understanding of his level of

23   education?

24   A.  Yes.

25   Q.  Do you recall what that is?

1    A.   He finished high school and had some college.

2    Q.   All right.  So, Detective, just to sum it up, did

3    the Defendant, in removing his shirt and allowing you to

4    take photographs of his torso, did he do that fully

5    understanding what his rights were?

6    A.   Yes, he did.

7    Q.   And did he knowingly, voluntarily and

8    intelligently waive those rights and allow you to -- or

9    allow you to have Detective Easley take those

10   photographs that we've seen here in court?

11   A.   Yes, he did.

12        MR. ROUSSEAU:  I will pass the witness, Your

13   Honor.

14        Oh, Ms. Keene was kind enough to copy me --

15   she called me before she sent this email to Detective

16   Stewart a couple of days ago, and she was kind enough to

17   copy me on the email, requesting him to list out every

18   individual that he talked to in connection with this

19   offense.  While I think that is an appropriate inquiry

20   for the trial, I don't believe it's appropriate for

21   here, for this proceeding, unless it has some bearing on

22   Mr. Olivas' consent, the issues that are raised in the

23   motion to suppress.  Just because she was kind enough to

24   let me know she intended to ask about that, before she

25   starts talking, I'm saying it now rather than objecting

1    later.

2              MS. KEENE:  Judge, it's a discovery issue.

3    It will be dealing with our discovery motion.  It's not

4    for --

5              THE COURT:  It's not something for crossing

6    a witness on a motion to suppress.  It's stuff for --

7              MS. KEENE:  I would like to ask him on the

8    record under oath about the witnesses he talked to,

9    their names, for purposes of discovery and the discovery

10   motion.

11             THE COURT:  Was this reduced to writing?

12             MS. KEENE:  I think he -- I asked if he

13   could reduce it to writing.  We could do it that way,

14   too.  It doesn't matter.

15             THE COURT:  Did you get the list?

16             THE WITNESS:  Yes, sir.

17             THE COURT:  Do you have a copy of the

18   written document that lists the names?

19             THE WITNESS:  Typed.

20             THE COURT:  Typed document?

21             THE WITNESS:  Yes.

22             THE COURT:  Do you have it with you?

23             THE WITNESS:  Yes.

24             THE COURT:  I mean, that you prepared

25   specifically in reference to her request?

```
 1                    THE WITNESS:  Yes, sir.
 2                    THE COURT:  Okay.  If you'll give me that
 3   document, the sheriff will go make a copy for the State
 4   and a copy for the Defense.  And...
 5                    MS. KEENE:  And we can move on.
 6                    THE COURT:  And you're good.  If you want
 7   one for the record, you can mark one for the record.
 8                    Make like four copies.
 9                    And that covers your concern?
10                    MS. KEENE:  Yes.
11                    THE COURT:  Well, there you go.
12                    And, Detective, thank you for that.
13                    And you may continue.
14                    CROSS-EXAMINATION
15   BY MS. KEENE:
16      Q.  Okay.  I hope I don't have that many questions
17   for you.
18      A.  Okay.
19      Q.  Whenever Thomas was brought to Grapevine Police
20   Department, he was not under arrest?
21      A.  Yes, ma'am.
22      Q.  He was free to go?
23      A.  Yes.
24      Q.  Did you have probable cause to arrest him if you
25   wanted to?
```

1     A.   No.

2     Q.   Did you have probable cause to detain him if you

3   wanted to?

4     A.   Just for the questioning.  I had probable cause

5   to detain him for questioning, yes.

6     Q.   To detain him for questioning?

7     A.   Yes.

8     Q.   What was the probable cause you had to detain him

9   for questioning?

10     A.   Well, I would say just to, again, speak with him

11   about the offense and, also, again, for the notification

12   of the deaths.

13     Q.   Is that something that you could have done at his

14   house as opposed to the police department?

15     A.   It could have been done there.

16     Q.   How come you made a decision to do it at the

17   police department as opposed to his house?

18     A.   Due to the number of questions that I had and the

19   fact that I wanted it documented, as well, I asked that

20   he go to the Grapevine Police Department.

21     Q.   So in your mind you've got probable cause to

22   question him as far as notification of the death,

23   correct?

24     A.   Well, I wouldn't say probable cause.  Just the

25   obligation to tell him, you know, what the situation

```
 1   was.
 2      Q.  But he was certainly in your mind at this point a
 3   person of interest?
 4      A.  Yes.  To talk to him about the offense, yes.
 5      Q.  But you knew that you didn't have probable cause
 6   to detain him to ask him those questions, at that time?
 7      A.  Probable cause to detain him?
 8      Q.  Yes.
 9              THE COURT:  Will you define what you mean by
10   "detain," Counsel, so the record will be clear and we'll
11   all be clear.
12      Q.  (BY MS. KEENE)  You believe you had probable
13   cause to hold him and say, "I have questions and you are
14   not free to leave"?
15      A.  Everything that I did with him was voluntarily,
16   so I asked if he would be willing to come to the
17   Grapevine Police Department.
18      Q.  If he'd said no, you believe you could have said,
19   "Stop, I need to ask you some questions"?
20      A.  If he'd said no, I would have to honor that, at
21   that time.
22      Q.  Okay.  And so you felt like you did not have the
23   probable cause to talk to him if he chose not to talk to
24   you?
25      A.  At that time, yes.
```

1      Q.   And you'd sent out, you said, an Arlington police

2   officer and there's also a Grapevine Police Department

3   present at his apartment; is that correct?

4      A.   Yes.

5      Q.   And you also sent them out to his work?

6      A.   Well, yes.

7      Q.   How many police officers went to his work, if you

8   know?

9      A.   It was the detectives in the fugitive unit.  They

10   also do surveillance, as well, and I would say at least

11   two of them had gone to Best Buy.

12      Q.   And was that Arlington police officers?

13      A.   Yes.

14      Q.   And they were fugitive officers?

15      A.   Yes.

16      Q.   How come you chose fugitive officers as opposed

17   to parole officers?

18      A.   They were plainclothes and, again, they do

19   surveillance, as well.

20      Q.   So they were more equipped to just go see if the

21   guy has even showed up for work, basically?

22      A.   Yes.

23      Q.   It was not their job to identify themselves as

24   police officers and to detain him or to talk to him?

25      A.   No.

STATE v. THOMAS OLIVAS

1    Q.   And they did their job, they saw that he was at

2   work?

3    A.   Yes.

4    Q.   And then they followed him back the entire way,

5   from Best Buy to his house?

6    A.   Yes.

7    Q.   And when they got to his house there were some

8   Grapevine police officers that were present at the

9   apartment complex?

10    A.   Yes.

11    Q.   How many Grapevine police officers were present

12   at Thomas' apartment complex?

13    A.   I don't know exactly how many, but I know there

14   were at least two, and that would be Detective Easley

15   being one and a uniformed officer.

16    Q.   So whenever Thomas parked his car, got out of his

17   car, did anything happen with any of these police

18   officers, if you know?

19    A.   As far as what exactly?

20    Q.   Did he get to go in his house?  How does he end

21   up, with all these police officers at his house, to

22   being in the police department, if you know?

23    A.   I don't know exactly what happened.  I just know

24   that he was eventually taken to the Grapevine Police

25   Department.

1  Q. Okay. And that's something -- Easley is here and

2 we can talk to him about that; is that fair?

3  A. That's fair.

4  Q. And it's your knowledge that Easley was one of

5 the persons that was present when this all happened,

6 when this event happened at his apartment?

7  A. That's correct.

8  Q. But, anyway, you were told that Thomas was

9 heading to the Grapevine Police Department?

10  A. Yes.

11  Q. Would Thomas have been allowed to get in his

12 truck and drive to the Grapevine Police Department?

13  A. I would assume he could have been, you know. It

14 just depends on what he and Detective Easley talked

15 about at the time.

16  Q. Would Thomas had been able to just go into his

17 house and shut the door?

18  A. Yes.

19  Q. How was Thomas brought to the police department?

20  A. My understanding, Detective Easley took him to

21 the police department.

22  Q. So he didn't bring his car?

23  A. No.

24  Q. He actually rode in a police car?

25  A. I don't know if it was a marked car, but, yeah,

 1  it could have been a police car.

 2     Q.  He rode with the police, and we'll find out later

 3  what type of car that was.

 4     A.  Yes.

 5     Q.  How many police officers do you think brought him

 6  to the police station?

 7     A.  My understanding, it was just Detective Easley.

 8     Q.  And then once he got to the police station, how

 9  long did he stay at the police station before you got

10  there to question him?

11     A.  Well, I would consider the drive from his

12  apartment to the police department and then my time of

13  arrival, I would say he probably waited somewhere around

14  20 to 25 minutes.

15     Q.  And in that 20 to 25 minutes was he free to go?

16     A.  Yes, he was.

17     Q.  If he got up and left, how would he get a ride

18  back to his apartment?

19     A.  He would have to let Detective Easley know and

20  tell him what his desires were and at that point, take

21  him back.

22     Q.  Okay.  So once you've come into play and you get

23  there and begin to talk to him -- and we all can just

24  watch the video.  I don't need to go -- the judge has

25  watched it.  We've all watched it -- over the specifics,

```
 1  but you begin to interview him; is that correct?
 2     A.  That's correct.
 3     Q.  And is everything that you said to him, any
 4  interaction that you had with him, recorded?
 5     A.  Yes.
 6     Q.  Is there anything that you said to him or
 7  anything that he said to you that is not recorded?
 8     A.  Not at that time, no.
 9     Q.  Are there -- do you know if there's any
10  recordings from Grapevine of anything they said or that
11  he said to them?
12     A.  Prior to my arrival?
13     Q.  Yes.
14     A.  No, I'm not aware of anything.
15     Q.  You don't know if there's any other tape
16  recordings or video recordings in regards to Thomas
17  Olivas, except for the ones that you took on that day?
18     A.  That's correct.
19     Q.  And then on the arrest day?
20     A.  Yes.
21     Q.  All right.  Once you began to talk to him, he was
22  very cooperative?
23     A.  Yes.
24     Q.  And he agreed to answer your questions; is that
25  correct?
```

1    A.   That's correct.

2    Q.   But you felt compelled to read him his warnings;

3    is that correct?

4    A.   That's correct.

5    Q.   How come?

6    A.   Just in case his involvement was more than I knew

7    at the time.

8    Q.   And so what were you worried about, if his

9    involvement was more than you knew at the time to read

10   him his rights, why was that important if he wasn't

11   under arrest?

12   A.   I just wanted him to be fully aware of what his

13   rights were.

14   Q.   Prior to you reading him his rights, did you ask

15   him about being able to look into his vehicle there at

16   the apartment?  Do you recall?

17   A.   No, I do not.

18   Q.   Do you have the transcript?

19         This will be easier.  I'll reference a page,

20   you can look at it, and then I'll ask you a question,

21   because I know it's, what, four hours, basically, of

22   conversation.  It's going to be in the very first

23   transcript, page three, line ten to about line 30, that

24   general discussion in there.

25         THE COURT:  Is ten, "Okay, we want to go

1   ahead and do the vehicle..." et cetera?

2                   MS. KEENE:  Yes.

3                   THE COURT:  Okay.

4       Q.  (BY MS. KEENE)  There's two transcripts from the

5   first report.

6                   MR. ROUSSEAU:  Byron, the first one is going

7   to start with "Male voice..."

8                   (Pause in proceedings)

9                   THE WITNESS:  Okay.  I'm sorry.  What's the

10  question again?

11      Q.  (BY MS. KEENE)  All right.  Basically, before you

12  read him his rights, you talk to him about the apartment

13  and the vehicle, searching it, correct?

14      A.  That's correct.

15      Q.  And he hesitates on the vehicle; is that correct?

16      A.  That's correct.

17      Q.  And he doesn't give you consent.  And you say,

18  "Let's just talk about that in a minute," and then you

19  move on to the rights?

20      A.  Yes.

21      Q.  Is that fair to say?

22      A.  Yes.

23      Q.  And then you end up reading him his rights.  You

24  basically said, "Let's just hold off on that."  Y'all

25  had a small conversation, what, less than a minute

STATE v. THOMAS OLIVAS

1   probably, in real time, and then you talk about a couple

2   of little things, but then you read him his rights; is

3   that correct?

4        A.   That's correct.

5        Q.   And then y'all talk about a number of different

6   things.  And then now if you go over to the second

7   transcript and at about page 22 you revisit the issue

8   about the car.  And does that kind of seem -- this would

9   be about two hours after the first conversation with the

10  car.  So a significant time has passed?

11       A.   Yes.

12       Q.   Does that seem about right?

13       A.   That's correct.

14       Q.   Basically, you had a conversation with him about

15  the car.  He's hesitant and does not give you consent.

16  Y'all then talk for two hours about a lot of things and

17  then you again bring up the car; is that fair?

18       A.   That's fair.

19       Q.   And you bring it up at about -- we can just --

20  line seven.  Okay?  You go back to his care, custody and

21  control of the car.  Is that correct?

22       A.   That's correct.

23       Q.   And he tells you, "I can't give consent to that."

24  Is that correct?

25       A.   That's correct.

1    Q.  Is that a "no, I'm not giving you consent" to

2    you?

3    A.  No.  No, it's not.

4    Q.  So if someone says, "I can't give you consent to

5    that," you don't take that as him saying, "I'm not

6    giving you consent to that"?

7    A.  No.

8    Q.  You take that as "I need to continue and ask a

9    lot more questions"?

10   A.  I take that as "I need to make clarification on

11   why you can't."

12   Q.  Okay.  And so then you talk then for about, oh,

13   three or four pages on the transcript -- second

14   transcript, page 22, starting at about line seven -- and

15   then you guys talk and continue to talk about the car,

16   his ability and why you really need to look in the car,

17   get his consent; fair to say?

18   A.  That's fair to say.

19   Q.  And then it is not until page 24, line 38 that he

20   says, "Okay, then I'll give consent."  Is that correct?

21   A.  Page 24, line...

22   Q.  Thirty-eight.

23   A.  Yes.

24   Q.  And so basically it took, on transcript, three

25   pages plus the first discussion to have with him before

1  he would give consent to look in the car; is that

2  correct?

3       A.   That's correct.

4       Q.   He had concerns about there being things in there

5  that might make look him guilty as well as him having

6  the authority to give you the consent; is that correct?

7       A.   That's correct.

8       Q.   And he talked to you about both of those issues

9  when he was making the decision to give the consent or

10  not; is that correct?

11      A.   That's correct.

12      Q.   So when he first told you, "I can't give consent

13  to that," he was referring to what you learned upon

14  talking to him more because he was talking about not

15  having the legal authority and also being concerned

16  about the smell of gas in the car?

17      A.   That was his concern.

18      Q.   Okay.   So he had two concerns of why he could not

19  give consent, correct?

20      A.   Correct.

21      Q.   And you talked to him for these number of pages

22  and then he says, "Okay, then I'll give consent."

23  Correct?

24      A.   That's correct.

25      Q.   The judge can watch the demeanor and the manner

1    in which that conversation takes place because y'all

2    took a video of it?

3        A.   That's correct.

4        Q.   All right.  Now, when we talk about the torso,

5    okay, that was really -- and in looking at this whole

6    interview, Thomas gave consent to look at his iPhone,

7    correct?

8        A.   That's correct.

9        Q.   No resistance at all?

10       A.   That's correct.

11       Q.   He just said, "Here, take my iPhone," correct?

12       A.   Yes.

13       Q.   You said, "What's this -- I think at some point

14   you say, "What's your password," and he gives out his

15   password for it.  No problem.  There's no talking him

16   into the consent for the iPhone, correct?

17       A.   Yes, he gave consent.

18       Q.   Or for the buccal swabs, the DNA; is that

19   correct?

20       A.   Yes, he gave consent.

21       Q.   For looking inside his house, correct?

22       A.   He gave consent.

23       Q.   But there was no talking him into that consent?

24            THE COURT:  Am I understanding your

25   question, there was no prolonged discussion about it,

```
 1   it's just...
 2              MS. KEENE:  Yeah, there you go.
 3              THE COURT:  "Can we do that?"
 4              "Yes, that's fine."  Is that what you mean
 5   by "talking into"?
 6              MS. KEENE:  Yeah.
 7              THE COURT:  All right.
 8              Is that correct?
 9              THE WITNESS:  Yes.  Yes, Your Honor.
10              THE COURT:  Okay.
11   Q.  (BY MS. KEENE)  In other words, "Can I look at
12   your iPhone," you know, you have consent, and he says
13   Yes.  You don't have to have a long discussion about
14   whether or not he gives consent; is that correct?
15   A.  Yeah, that was not a prolonged discussion.
16   Q.  Where there were prolonged discussions was really
17   in two different areas.  Is that from your memory?  Am I
18   being correct?
19   A.  Yes.
20   Q.  One was the torso pictures, him taking his shirt
21   off and y'all taking pictures of his torso, and
22   the second one was the car, the search of the car; is
23   that correct?
24   A.  Yes.
25   Q.  And so if you look at what would be the second
```

1   interview, page eight, and you look at about page (sic)

2   11, this is the first time, I believe, that you begin to

3   talk to him about taking pictures of his body.

4          Okay.  You see where I'm talking about, page

5   eight, line 11?

6   A.  Yes.

7   Q.  You say, "Are you willing to let me photograph

8   your hands?"  And he says, "Yeah."

9          "How about your back and shoulders and all

10  that kind of stuff, will you let me do that?"  And you

11  said, "I'd have to get consent."

12         "Actually on that one, I'm not... It's just

13  one of those things, uh, not yet, no," is that his

14  response?

15  A.  I'm sorry.  Hold on just a second.

16  Q.  Well, actually I can keep it more simple than

17  this, than reading this.  Whenever you first asked him

18  to take pictures of his torso, he said he did not want

19  to do that; is that correct?

20  A.  That's correct.

21  Q.  And then you begin, I think you testified on

22  direct, about a 20-minute conversation with him about

23  why he didn't want to do that, and that's when you

24  talked about the eczema and different things, correct?

25  A.  That's correct.

1    Q.   And then you also learned he was concerned about

2   the fact that he had scratches on his back.  He also

3   didn't want to do it because of that, correct?

4    A.   That's correct.

5    Q.   So like the car where he had two different

6   concerns for why he didn't want to give consent, on the

7   body he had also two different concerns; one was he had

8   scratches and one was he was embarrassed by the eczema?

9    A.   That's correct.

10    Q.   And so it was after a 20-minute conversation with

11   him, after he said no, he didn't want to, to let the

12   pictures be taken, that he then says yes, instead of

13   reading every line.  The judge has seen it, basically.

14   Is that about right?

15    A.   Yes.

16    Q.   He certainly said no in the beginning on the

17   taking pictures of his torso.

18    A.   Are you asking me?

19    Q.   Yes.

20    A.   Yes.

21    Q.   Okay.  In fact, throughout the conversation you

22   had with him, you told him that you can get a search

23   warrant to take the pictures.  Do you recall that?

24    A.   No, I do not.

25    Q.   Okay.  Maybe you can clarify this.  This is on

1    page 12.  Maybe it's not you.  Maybe it's Easley.  It

2    says, "Actually, I can go get the search warrant."

3                "You can take the pictures."  And I don't

4    know if that's a side conversation that's happened and

5    this is -- the transcript is revealing it incorrectly.

6    What is your memory of this?

7        A.  I don't exactly know what that was, as far as in

8    relation to the pictures, but I don't think it's in

9    relation to the pictures.

10       Q.  Okay.  You think that's in relation to something

11   else?  It just reads funny.  It just reads...

12       A.  I mean, you would have to talk to Detective

13   Easley.  That "E" indicates it's him.

14       Q.  Okay.

15       A.  And so -- but there was no discussion as far as

16   search warrant for the pictures.

17       Q.  So you never told Thomas in all this that you

18   could go get a warrant to take the pictures?

19       A.  No, I did not.

20       Q.  In fact, you didn't have probable cause to go get

21   a warrant to take the pictures, did you?

22       A.  No.

23       Q.  You were relying on his consent or you weren't

24   going to be able to get the pictures; is that correct?

25       A.  Yes.

 1        Q.   And so that's why it was important for you to

 2   continue to talk to him about letting you take the

 3   pictures because he had said no.  It was important to

 4   get the consent.

 5        A.   Are you asking me that?

 6        Q.   Yeah.

 7        A.   Okay.  I wanted the pictures and so I asked.

 8        Q.   But when he said no, you didn't honor the "no".

 9        A.   Well, my point was that he just needed to feel

10   comfortable as far as giving me the pictures and so I

11   asked him for the pictures on that basis.

12        Q.   And when he said no, you didn't take "no" as an

13   answer?

14        A.   That's correct.

15        Q.   If he had said, "I want a lawyer.  I do not want

16   to talk -- if you said, "Do you want to talk to me,

17   Thomas," and he said no, would you take that "no" as an

18   answer?

19        A.   Okay.  If he'd said he wanted a lawyer?

20        Q.   Yeah.

21        A.   Then I have to honor that.

22        Q.   If you said, "You want to talk to me now," and he

23   said no, would you have to honor that "no" right then?

24        A.   If he didn't want to talk to me?

25        Q.   Yes.

STATE OF THOMAS OLIVAS

1       A.  No, I can still ask for that.

2       Q.  So if he says, "I don't want to talk to you," you

3  can continue to talk to him?

4       A.  If he says he wants a lawyer, I would have to

5  honor that.  If he said he doesn't want to talk to me,

6  then, you know, it's my job to try to convince him to

7  talk to me.

8       Q.  Okay.

9            MS. KEENE:  May I approach the witness,

10  Judge?

11            THE COURT:  Yes.

12       Q.  (BY MS. KEENE)  And I'm showing you what's been

13  marked as Pretrial 1.  Is this basically the list of the

14  different witnesses that you or your team talked to

15  during your investigation in this case?

16       A.  Yes.

17       Q.  And this is something you prepared for the

18  pretrial hearing today?  Or is this something you

19  already had prepared?

20       A.  No, this is something I prepared.

21       Q.  Okay.  And you did it so that -- to basically

22  refresh your memory of what is really a lot of witnesses

23  that you talked to; is that correct?

24            MR. ROUSSEAU:  Objection.  Just a moment.

25            May I take him on voir dire on that point,

1    Your Honor?

2              THE COURT:  Well, she hasn't offered it yet.

3    When she offers it, you can.

4              MR. ROUSSEAU:  Well, it's the basis upon

5    which -- he prepared that in response to her request

6    that he do so, not to help him prepare for this hearing.

7    She asked him in an email to prepare it.

8              THE COURT:  And that was the discussion off

9    the record of the email and the request and I think -- I

10   don't know if we were off the record when you were

11   saying is this hearing going into cross-examination

12   about discovery or is it going to deal with the

13   suppression motions.  She sent an email.  She

14   acknowledged.  You got a copy.  You acknowledged.  I

15   asked him did he in fact respond to the request and he

16   showed me a document he prepared, that the deputy made

17   copies for everyone.  And instead of her ask him to list

18   names or anything, there's a copy I told her she can

19   mark and offer to show these are the names we were

20   provided in response to the request instead of going

21   through a lengthy examination.

22              So I understand your concern about the

23   characterization of "this is done to refresh his

24   memory".  Maybe that was poorly or unartfully worded

25   based upon the record that happened before, but I

 1    understand he has a list she asked him to prepare.  He

 2    responded to her request.  She has a copy, if she wants,

 3    to put in the record to show this is a list of everyone

 4    you talked to, to show her discovery concerns are

 5    addressed.  And if it's beyond that, then...

 6              MR. ROUSSEAU:  I understand, Your Honor.

 7    That's fine.

 8              THE COURT:  I think we're in a different

 9    situation.

10              MS. KEENE:  It's not beyond that, Judge.

11    That's it.  I didn't mean any characterization of

12    whatever was taken.

13              THE COURT:  Well, I mean, what the

14    black-and-white will read, for posterity, is you

15    prepared this list to refresh your memory, to assist you

16    in trial versus you prepared this list because I asked

17    you to please make a list of all the witnesses and you

18    responsibly and professionally did what I asked as

19    opposed to have the judge order it.  And so in light of

20    the context, I understand Kevin's concern, but it's a

21    discovery issue, and it's still your witness and it's

22    marked Defense Pretrial 1, so you may continue.

23    Q.   (BY MS. KEENE)  So in Pretrial 1, you prepared

24    this list in response to me sending you an email and

25    asking you to prepare the list; is that correct?

```
 1     A.   That's correct.
 2          MS. KEENE:  I'll offer Pretrial 1 for
 3   purposes of this record, Judge -- I mean -- for purposes
 4   of this hearing.
 5          MR. ROUSSEAU:  No objection for purposes of
 6   this hearing.
 7          THE COURT:  All right.  It's admitted and
 8   it's admitted for purposes of the pretrial hearings in
 9   general, not just the motion to suppress but including
10   any other motions that have been filed that have been
11   largely responded to without a court order, and I'm
12   happy to say on behalf of both sides in their
13   professionalism.
14          (Defendant's Pretrial Exhibit No. 1
15           admitted)
16          THE COURT:  You may continue.
17     Q.   (BY MS. KEENE)  Did you ever talk to Thomas
18   outside of the two interviews that you recorded?
19     A.   Yes.
20     Q.   And when did you talk to him?
21     A.   He called me on the phone a couple of times.
22     Q.   Do you know when he called you on the phone?
23     A.   Well, no, actually.  I did not document those
24   times that he called.
25     Q.   How long would you talk when he called you on the
```

```
 1   phone?
 2      A.  Very briefly, at some point about the status of
 3   the case.  At one point I think he told me about an
 4   attorney, that he was trying to contact an attorney.
 5      Q.  Okay.  And what attorney was that he was trying
 6   to contact?
 7      A.  I don't know exactly which one.  I mean, it was
 8   on his own, but he had mentioned that he was trying to
 9   contact an attorney.
10      Q.  And how long after the -- was this in between the
11   first conversation and the second conversation?
12              THE COURT:  Are you talking about the first
13   video and the second video?
14              MS. KEENE:  Yeah.
15              THE WITNESS:  The first video on the -- when
16   he first -- when I talked to him?
17      Q.  (BY MS. KEENE)  It was after that but before the
18   arrest?
19      A.  It was after that conversation.
20      Q.  About how long after the March 21st, 2011
21   discussion with him did he call you?
22      A.  I want to say a couple of days after that.
23      Q.  And is that when he talked to you about he was
24   contacting a lawyer?
25      A.  No.  Again, the first conversation was about
```

1   what's going on and numbers that I can get in contact

2   with other people to verify where he was and stuff at

3   the time and then I would say maybe a month after that

4   he talked to me about an attorney.

5       Q.  So a couple of days after this who did he tell

6   you that you could contact in the numbers that he gave

7   you?  Do you recall that?

8               MR. ROUSSEAU:  I object, Your Honor, for

9   purposes of this hearing.  We're outside the scope of

10  the hearing.

11              THE COURT:  I am going to allow limited --

12  there's a motion to suppress statements of the Defendant

13  and since this is a conversation, I'm going to allow it

14  to go as long as it deals with the substance of the

15  conversation, in case this comes up later so it's in the

16  record and we've dealt with it.  I'm not going to let

17  her ask did he call those people, what did they say, but

18  as far as any conversation with the accused, I'll allow

19  her to go into those, whether they're on video or not.

20              So you may continue -- read the last

21  question back to the witness.

22              THE REPORTER:  "So a couple of days after

23  this who did he tell you that you could contact in the

24  numbers that he gave you?  Do you recall that?"

25              THE COURT:  You can answer.

```
 1              THE WITNESS:  I think he gave me the name of
 2    Isaac Huerta and Wasim -- I can't recall his last name.
 3    These are two friends of his.
 4              THE COURT:  And hold on.  What was that
 5    second name?
 6              THE WITNESS:  Wasim, I think is his first
 7    name.
 8              THE COURT:  Can you spell that, as best you
 9    understood it, for the court reporter?
10              MR. ROUSSEAU:  Your Honor, I can provide the
11    names, the first and last names, if it would be helpful.
12              THE COURT:  You know that individual so you
13    can give that to Karen at the end of the hearing.
14              MR. ROUSSEAU:  Yes.
15              THE COURT:  Thank you.
16              You may continue.
17    Q.  (BY MS. KEENE)  Do you know if he gave you any
18    other names or numbers, if you recall?
19    A.  I can't recall.
20    Q.  But you know it was a short conversation, long
21    conversation?
22    A.  Short.
23    Q.  And he called you and basically gave you these
24    names, numbers of different people you could contact?
25    A.  Either he called me or I called him.  You know,
```

```
 1    it could go either way.
 2        Q.  And then it was after that conversation, about a
 3    month later, that he called and told you that he was --
 4        A.  Roughly, again, either I called or he called
 5    trying to maintain contact.
 6        Q.  And is that when he talked to you about he was
 7    talking to a lawyer?
 8        A.  He mentioned that he talked to his parents, or
 9    something like that, and that they were trying to look
10    for an attorney, or something like that.
11        Q.  And was there ever a time that you actually
12    talked to a lawyer about Thomas?
13        A.  No.
14        Q.  Do you recall a lawyer calling you and you
15    talking to a lawyer about Thomas Olivas?
16        A.  I can't recall.
17             THE COURT:  Just so I'm clear, does that
18    question refer to the timeframe between the two recorded
19    video interviews?
20             MS. KEENE:  Yes, sir.
21             THE COURT:  All right.  Did you understand
22    the question that way?
23             THE WITNESS:  Yes.
24             THE COURT:  All right.  You may continue.
25        Q.  (BY MS. KEENE)  Do you recall on one of these
```

1    interviews, and I'll look it up and figure out which one

2    it was, but I believe it was with Margie Campos, telling

3    her that you had talked to a lawyer of Thomas'?

4         A.   I can't recall but -- I just can't recall.

5         Q.   Okay.  So you don't have any memory of a lawyer

6    calling you and telling you not to talk to Thomas?

7         A.   No, I do not.

8         Q.   Or a memory of a lawyer telling you that Thomas

9    was invoking his Fifth Amendment rights from that day

10   forward?

11        A.   I don't recall.

12        Q.   Would you have written that down if that

13   conversation took place, or possibly, or not?

14        A.   It depends on where I was at the time.  It could

15   have been on my cell phone.  You know, it just depends.

16        Q.   Okay.  So if he called you on your cell phone and

17   you're working another case, it may not be something

18   that ended up getting in your file?

19        A.   Yeah.  It depends on where I was at the time.

20        Q.   And you just don't recall if you had a

21   conversation with another lawyer?

22        A.   I just can't remember, but that doesn't mean it

23   didn't or did occur.

24        Q.   Okay.

25             MS. KEENE:  I'll pass the witness, Judge.

STATE OF THOMAS OLIVAS

```
 1              MR. ROUSSEAU:  Just a few more questions,
 2    Your Honor.
 3                        REDIRECT EXAMINATION
 4    BY MR. ROUSSEAU:
 5       Q.  First of all, let's make clear what we're talking
 6    about --
 7              MR. ROUSSEAU:  And, Your Honor, this is as
 8    much for the record as anything else.  The term "first
 9    and second interview" have been tossed around here quite
10    a bit.  Let's make clear for the record, there was a
11    single, unitary interview done on March the 22nd (sic)
12    of 2011.  It was long and it takes up two discs, and so
13    we have two discs and two transcripts to go with those
14    discs but it's a single interview.
15              THE COURT:  And the way that's been pitched,
16    probably the record is better discussing the "Grapevine
17    interview" or the "Arlington interview", the "pre-arrest
18    interview" or the "post-arrest interview".  That's
19    probably better terminology.  And, in fact, on the end
20    of one of the discs there's a part that says, "The disc
21    is going to be empty.  We need to stop and put in a new
22    disc."  I think the transcripts are clear.  They have
23    two interviews identified on two separate dates.  But
24    two discs, one interview, one on the other, I can see
25    how that can be confusing.
```

1          MR. ROUSSEAU:  My partner just told me that

2     I said March 22nd.  I meant to say March 21st.

3          THE COURT:  I think the dates are written on

4     the face of the transcripts and the DVDs and in

5     testimony.  And on the face of the exhibits it says this

6     is what the date is.

7          You may continue.

8     Q.  (BY MR. ROUSSEAU)  All right.  Just to clarify a

9     couple of things.  Let's look at the first transcript,

10    the first portion of the March 21st interview.  When you

11    are discussing with the Defendant, when he first says

12    something about the car -- you ask him about consent to

13    search the apartment and consent to search the car.  Do

14    you recall that?

15    A.  Yes, sir.

16    Q.  That's going to be on page two occupying

17    basically the top half of the page.  Were you on the

18    telephone at that time?

19    A.  Yes, I was.

20    Q.  So when you're -- a part of the -- your words

21    spoken on this page, you're actually speaking to someone

22    on the telephone, correct?

23    A.  Yes, I am.

24    Q.  So when you ask him about the car, were you at

25    the same time talking to someone on the telephone who

1    was actually present at the apartment complex with the

2    car?

3        A.   That's correct.

4        Q.   Was that person asking you if they had consent to

5    search the car?

6        A.   Yes, they were.

7        Q.   Okay.  So they weren't going to search the car

8    until they had consent, correct?

9        A.   That's correct.

10       Q.   And is that when you asked him if he'd given

11   consent to search the car?

12       A.   That's correct.

13       Q.   Because you'd been in the room for all of three

14   or four minutes at that time, right?

15       A.   That's correct.

16       Q.   And these things were happening before you ever

17   arrived in the room, correct?

18       A.   That's correct.

19       Q.   So in asking him these questions, at the same

20   time that you're on the phone, are you trying to assess

21   what the status of the situation is right then?

22       A.   I am.

23       Q.   Okay.  And so when he said something about the

24   car, not giving permission to search the car, is that

25   when you essentially said, "We'll get to that later,"

 1   and you're talking to the person on the phone as well as

 2   Thomas?

 3        A.   That's correct.

 4        Q.   Thank you.

 5             Talking about his initial reluctance to

 6   remove his shirt.  When he would say he didn't want to

 7   pull off his shirt, did he give you several reasons at

 8   various times as to why he didn't want to take off his

 9   shirt?

10        A.   Yes, he did.

11        Q.   They included, first of all, he had scratches on

12   him that he thought might make him look guilty, correct?

13        A.   That's correct.

14        Q.   So did you attempt to address that concern of

15   his?

16        A.   I did.

17        Q.   Later did he indicate to you that he had --

18   because he claims that he suffers from eczema was one of

19   his concerns regarding the appearance of his torso?

20        A.   That's correct.

21        Q.   That is, it was just embarrassing; is that

22   correct?

23        A.   That's correct.

24        Q.   So did you attempt to address that concern?

25        A.   I did.

STATE OF THOMAS OLIVAS

1   Q.   Okay.  And later did he say that he didn't want

2   to take off his shirt because of the discomfort, that he

3   immediately goes into -- his skin starts to revolt and

4   it itches like crazy the second it's exposed to air, did

5   he say something along those lines?

6   A.   Yes, he did.

7   Q.   Okay.  Did you attempt to address those concerns

8   by saying, "We'll be quick"?

9   A.   I did.

10  Q.   Okay.  So as opposed to him just flatly saying,

11  "No, I'm not going to do it," he would say, "No, and..."

12  this is why, correct?

13  A.   Correct.

14  Q.   And then you would attempt to address those

15  concerns?

16  A.   That's correct.

17  Q.   Because you did want the photographs, right?

18  A.   I did.

19  Q.   While the time -- during the time that you were

20  there with Mr. Olivas at Grapevine PD, was he ever

21  formally placed under arrest?

22  A.   No, he was not.

23  Q.   Was he under arrest -- when you left the

24  Grapevine Police Department that night was Mr. Olivas

25  under arrest?

1    A.   No, he wasn't.

2    Q.   Do you know how Mr. Olivas -- well, was he put in

3    jail that night?

4    A.   No, he was not.

5    Q.   Did you make any requests about -- concerning

6    getting him back to his apartment?

7    A.   Yes.

8    Q.   Tell us about that.

9    A.   I inquired the Grapevine officers that someone

10   get him back to his apartment.

11   Q.   And during the course of the interview had

12   Detective Easley, or the Defendant himself -- and I

13   apologize, I can't remember which -- at one point in

14   time indicate that some of Mr. Olivas' property was

15   actually in their car, the car belonging to the

16   Grapevine Police Department?

17   A.   Yes.

18   Q.   You didn't have it?

19   A.   No, I did not.

20   Q.   Okay.  Was this in the context of talking about

21   how he'd gotten there in the first place?

22   A.   Yes.

23   Q.   So you made a request that somebody take him

24   home, correct?

25   A.   That's correct.

STATE OF THOMAS OLIVAS

1  Q.  When you left -- then you left, right?

2  A.  Yes.

3  Q.  Do you know how he actually got home that night?

4  A.  I don't know exactly how, but I would assume

5  through Grapevine Police Department.

6  Q.  It was somebody, somebody that wasn't you,

7  correct?

8  A.  Yes.

9  Q.  Do you have an understanding one way or another

10 about whether he was in fact taken back to his house

11 that night?

12 A.  Yes.

13 Q.  What is that understanding?

14 A.  That he was taken back.

15 Q.  You just don't know how?

16 A.  No.

17 Q.  Okay.

18         MR. ROUSSEAU:  I'll pass the witness.

19         MS. KEENE:  I have no questions, Judge.

20         THE COURT:  All right.  May the witness be

21 excused for now?

22         MS. KEENE:  He may.

23         MR. ROUSSEAU:  Yes, Your Honor.

24         THE COURT:  All right.  You're excused

25 subject to witness rules.

```
 1                    (Witness excused from courtroom)
 2                    MR. ROUSSEAU:  Detective Easley.
 3                    (Witness takes the stand)
 4                    THE COURT:  State your full, legal name
 5      again for the court reporter.
 6                    THE WITNESS:  Daniel Wade Easley.
 7                    THE COURT:  Who was sworn before we started.
 8                    State may proceed.
 9                    DETECTIVE DANIEL EASLEY,
10      having been first duly sworn, testified as follows:
11                    DIRECT EXAMINATION
12      BY MR. ROUSSEAU:
13         Q.   Detective Easley, you're with the Grapevine
14      Police Department; is that correct?
15         A.   Yes, sir.
16         Q.   And how long have you been with the Grapevine PD?
17         A.   Since 1999.
18         Q.   Coming up on 15 years now?
19         A.   Yes, sir -- actually, I'm sorry, I've been a
20      police officer since 1999.  I've been at Grapevine since
21      2002.
22         Q.   We're not going to reinvent the wheel here so let
23      me just kind of jump to the chase.
24                    Were you requested to assist -- on March
25      21st, 2011, were you requested to give some assistance
```

STATE OF THOMAS OLIVAS

```
 1   to the Arlington Police Department in connection with a
 2   homicide that occurred in their city?
 3        A.   Yes, sir.
 4        Q.   And what is the first thing you did, sir?
 5        A.   From what I recall, I responded to 601 Park, I
 6   believe, to watch the residence of the suspect, or the
 7   person of interest.
 8        Q.   Did you have a name for that person of interest
 9   at that time?
10        A.   Yes.  As I was responding out there, I was told
11   that I'd be looking for Thomas Olivas and a picture was
12   given to me.
13        Q.   And I think -- you and I discussed this last
14   night, correct?
15        A.   Yes, sir.
16        Q.   Do you recall whether or not you got a -- whether
17   that picture was given to you electronically?
18        A.   I believe it was, yes, sir.
19        Q.   In any event you had a photograph of Mr. Olivas,
20   at least the person that you were anticipating, that you
21   were looking for?
22        A.   Yes, sir.
23        Q.   Okay.  And about what time of the day did you get
24   to his apartment?
25        A.   From what I recall and without looking --
```

 1    Q.   Feel free to look at your report if it will help
 2   you.
 3    A.   It was about 8:30, is about when I was told to go
 4   out and help, so somewhere around 8:30 in the morning.
 5    Q.   Were there other officers on the scene, as well?
 6    A.   Yes, sir.  Other officers had been sent out
 7   earlier to do other tasks so...
 8    Q.   At some point in time did you become aware that
 9   Mr. Olivas was expected there shortly?
10    A.   Yes.  I had been informed by two Arlington
11   detectives that they believed he was en route to the
12   location I was at, the residence.
13              THE COURT:  All right.  Time out.
14              (Discussion off the record)
15              THE COURT:  You may continue.
16    Q.   (BY MR. ROUSSEAU)  At some point, anyway, you got
17   word that he was on his way home?
18    A.   Yes, sir.
19    Q.   And 601 Park Boulevard, is that an apartment
20   complex?
21    A.   Yes, sir.
22    Q.   Was there a specific apartment that you were
23   setting up on?
24    A.   Yes, sir.  It was Apartment 208.
25    Q.   And did you witness a vehicle drive into the

```
 1  parking lot that you had come to associate with this
 2  person?
 3      A.  Yes.
 4      Q.  And was it a dark green Ford Explorer?
 5      A.  Yes, sir.
 6      Q.  Did the person get out of the car and proceed to
 7  walk toward their apartment or --
 8      A.  Yes.
 9      Q.  -- toward his apartment?
10      A.  Yes.
11      Q.  Okay.  And did you make contact with him?
12      A.  Yes.
13      Q.  About what time of day was this?
14      A.  About 3:20, a little after 3:20 in the afternoon.
15      Q.  Around 3:20 is when you got word he was on the
16  way, correct?
17      A.  Yes.
18      Q.  And it was shortly after that?
19      A.  Yes.
20      Q.  The person that you made contact with there in
21  the parking lot, do you see him present here in the
22  courtroom?
23      A.  Yes.
24      Q.  Could you point him out and describe some article
25  of clothing, please.
```

 1     A.   Yes, sir.  He's sitting over to my left wearing a

 2   red shirt.

 3          MR. ROUSSEAU:  Your Honor, may the record

 4   reflect the witness identified the Defendant?

 5          THE COURT:  It may for purposes of this

 6   hearing.

 7     Q.   (BY MR. ROUSSEAU)  When you made contact with

 8   him, initially, when you first made contact with him,

 9   was anyone with you?

10     A.   Yes.

11     Q.   Okay.  Who was with you when you made contact

12   with the Defendant?

13     A.   Initially there was another detective from

14   Grapevine Police Department, her name was Detective

15   Rebecca Graves, and followed up very shortly by the two

16   Arlington detectives.

17     Q.   So the two of you approached him together?

18     A.   Yes, sir.

19     Q.   How were you dressed?

20     A.   In a dress shirt, slacks, very similar to how I'm

21   dressed now without the sport coat, wearing a badge and

22   a firearm, handcuffs, magazine, things of that nature.

23     Q.   You were not in uniform?

24     A.   No, sir.

25     Q.   Were you driving a marked police unit?

```
 1      A.   No, sir.

 2      Q.   Was Detective Graves?

 3      A.   No, sir.

 4      Q.   So she was dressed similar to you?

 5      A.   Yes.

 6      Q.   Okay.  Did you identify yourself as a police

 7 officer?

 8      A.   Yes.

 9      Q.   Did you tell him anything about why it was that

10 you were there to talk to him?

11      A.   No, sir.

12      Q.   Did you know anything about the details of the

13 offense?

14      A.   Not at this time, sir.

15      Q.   You subsequently found out, though?

16      A.   Yes.

17      Q.   You said that you were joined shortly after that

18 by a couple of Arlington police detectives; is that

19 correct?

20      A.   Yes.

21      Q.   What is shortly after that?  Give us some

22 approximation of the elapsed time between you making

23 contact and then the Arlington people showing up.

24      A.   No more than probably four minutes or so, two to

25 four minutes.
```

1    Q.   Okay.  Did the Defendant -- well, did you arrest
2    him?
3    A.   No, sir.
4    Q.   Did he make any comments to you while you were
5    standing there waiting for Arlington police to show up?
6    A.   Yes.  A comment that I noted, which I thought was
7    a little odd, he had made a comment.  And I'll have
8    to -- he asked if we could go inside before his
9    neighbors think that he killed Rebeca and his daughter,
10   and I noted that in my report.
11   Q.   I want to jump ahead a little bit in the story.
12   You later sat in on an interview with the Defendant; is
13   that correct?
14   A.   Yes, sir.
15   Q.   And he clarified that comment in some fashion,
16   correct?
17   A.   Yes.  He said that if he had known the
18   circumstances of the investigation, he wouldn't have
19   made that comment.
20   Q.   Okay.  Did you ask the Defendant what time he had
21   left for work that morning?
22   A.   Yes.  At some point I had asked him -- I remember
23   in my report I noted he indicated he left for Best Buy
24   between 8:30 and 8:45 in the morning.
25   Q.   Now, do you recall whether or not that -- and I'm

1   looking at your report just like you're looking at your

2   report.  Do you recall whether -- that back-and-forth

3   between you and him regarding what time he left for

4   work, do you recall whether that happened there in the

5   parking lot or was it later during the interview, do you

6   know?

7       A.   I don't recall.

8       Q.   Okay.  You wrote this report when?

9       A.   It would have been that evening or possibly early

10  the next day.

11      Q.   Did you provide the Defendant a ride down to the

12  Grapevine Police Department?

13      A.   Yes, sir.

14      Q.   And about what time was that?

15      A.   About 3:45 in the afternoon, is what I noted in

16  the report.

17      Q.   So he had gotten home shortly after 3:20 in the

18  afternoon and by 3:45 -- or around 3:45 in the afternoon

19  you were headed to the Grapevine Police Department with

20  him?

21      A.   Yes.

22      Q.   Was he in custody?

23      A.   No, sir.

24      Q.   Did you tell him he had to go?

25      A.   No, sir.

1    Q.   Was anyone else in the car with you other than

2    the Defendant?

3    A.   I don't believe so.  I believe, actually, I may

4    have transported him myself.  I don't know for certain.

5    If there was anybody else in the car -- there may have

6    been another detective, only so she could get to the

7    police department, but not that I recall.

8    Q.   Assuming it was just you and the Defendant, or I

9    guess even if there had been another police officer with

10   you, where would the Defendant have sat in the car?

11   A.   I believe, and I don't recall for certain, but I

12   believe he sat in the passenger seat of the car.

13   Q.   Front seat?

14   A.   Yes.

15   Q.   If you have someone in custody, where do they

16   seat?

17   A.   In the backseat.

18   Q.   Did you -- during the course of the interview

19   that later took place with Detective Stewart did you

20   obtain written consents from the Defendant and actually

21   collect some samples, say, for example, a buccal swab

22   and swabs from his hands, that sort of thing?

23   A.   Yes, sir.

24   Q.   And I am not going to go over it in great detail.

25   We have the video.  We've seen those.  But you are the

```
 1   one that actually collected those items; is that
 2   correct?
 3        A.  Yes, sir.
 4        Q.  All right.  I want to move ahead a little bit.
 5   I've already mentioned the fact that you took part in an
 6   interview.  This was not a Grapevine case, right?
 7        A.  Correct.
 8        Q.  You were there I guess more as a courtesy; is
 9   that right?
10        A.  Correct.
11        Q.  I want to ask you -- when I say courtesy, I
12   guess, I mean courtesy to whom?
13        A.  Arlington Police Department.
14        Q.  While you were in the presence of the Defendant,
15   did anyone threaten him?
16        A.  No, sir.
17        Q.  Did anyone harm him in any way?
18        A.  No.
19        Q.  Did anyone -- was he ever placed in handcuffs?
20        A.  No, sir.
21        Q.  Was he ever restrained in any way?
22        A.  No, sir.
23        Q.  We have the video, of course, and we've seen the
24   Defendant sitting alone in a room prior to Detective
25   Stewart's arrival?
```

1        A.  Yes.

2        Q.  And he's in that room alone; is that correct?

3        A.  Yes.

4        Q.  Do you recall if the door was open or closed to

5    that room?

6        A.  The door, right before the interview started the

7    door remained open.

8        Q.  Tell us about what's outside that door.

9        A.  There's an office -- well, there's a series of

10   offices.  The most immediate office belongs to our

11   investigative assistant.

12       Q.  Investigative assistant, so is that a male or

13   female?

14       A.  Female.

15       Q.  Is she a police officer?

16       A.  No.

17       Q.  Does she wear a police officer's uniform?

18       A.  No.

19       Q.  Does she wear a firearm?

20       A.  No.

21       Q.  Was there -- in addition to her, was there a

22   police officer setting up on that door to make sure he

23   didn't leave?

24       A.  No, sir.

25       Q.  At various times during the -- or at least at

STATE OF THOMAS OLIVAS

99

1  some point in time during the interview during a break

2  does the Defendant get up and wonder out of the room?

3      A.   Possibly.  I don't recall exactly.

4      Q.   All right.  And I don't know if you watched that

5  portion of the interview or not.

6      A.   Not that I recall, watching that portion of the

7  video, that is.

8      Q.   Was he deprived of water?  Did he have water

9  while he was there?

10     A.   Yes.

11     Q.   Okay.  Was he offered a chance to go to the

12  restroom?

13     A.   Yes.

14     Q.   There is -- do you have -- did I give you a copy

15  of the transcript when we met last night?

16     A.   Yes, sir.

17     Q.   Okay.  Do you have it with you?

18     A.   Yes.

19     Q.   The part that I'm asking you about is going to be

20  in the second -- there's two portions of the transcript,

21  part one and part two.  I want to turn your attention to

22  part two.  Okay?

23     A.   Okay.

24     Q.   It's going to be page -- I think I'm correct.

25  Let's go to page 12.  I may -- I'll just point out to

1    you what I'm talking about.  It will save us a lot of

2    back and forth.  Let me see yours.

3              Okay.  You've made some corrections,

4    correct?

5        A.  Yes, sir.

6        Q.  All right.  Then that's what I want to ask you

7    about.  This is in -- follows a portion of the interview

8    regarding him giving some consent and I believe it's

9    consent regarding the search of the vehicle.  I may be

10   wrong about that.  I apologize if I am.  But the

11   transcript right after Detective Stewart leaves the room

12   to take a phone call --

13       A.  Yes.

14       Q.  -- okay?

15             The transcript says -- and where it says

16   "E", that's "Easley" for you, correct?

17       A.  Correct.

18       Q.  Okay.  "E", here it says that you say,

19   "Actually -- "I'll actually get this consent -- "I will

20   actually -- "Actually, I can go get the search warrant,"

21   correct, that's what it says in the typed words?

22       A.  Yes, sir.

23       Q.  We were listening to this last night, correct?

24       A.  Yes, sir.

25       Q.  Did you hear something different than that?

```
1        A.   Yes, sir.

2        Q.   What did you actually say right there at line 11?

3        A.   What it sounded more like to me was "Actually, I

4    can go get the consent to search form."

5        Q.   And did you in fact go get a consent to search

6    form immediately following that?

7        A.   Yes.  I had the consent to search form on the

8    video.  I had the consent to search form on like a book

9    or a binder or something.

10       Q.   And do you just -- does he in fact give him

11   instructions, a few lines down, regarding where to sign

12   and how to indicate that he is giving his consent?

13       A.   Yes.

14       Q.   And did you make a time reference so that you

15   could write it on that consent to search form?

16       A.   Yes.

17       Q.   Look at line 25.

18       A.   Yes, sir.

19       Q.   And what is the time reference:

20       A.   "It is now 6:08."

21       Q.   So that is from line 11 down to line 25, correct?

22       A.   Yes, sir.

23       Q.   Had there been any conversation between you and

24   the Defendant or Detective Stewart about you going and

25   getting a search warrant at that point in time?
```

 1    A.  No, sir.

 2    Q.  Was there ever a conversation about a search

 3  warrant at all?

 4    A.  No, sir.

 5    Q.  All right.  During the interview the Defendant

 6  did provide, several times provided, consent to search

 7  the apartment, for one, right?

 8    A.  Yes, sir.

 9    Q.  He gave consent to search -- ultimately gave his

10  consent to search the Ford Explorer, correct?

11    A.  Yes.

12    Q.  Gave his consent to search, to search, that is,

13  to take photographs of his body, his tattoos on his arms

14  and, finally, of his torso, correct?

15    A.  Yes.

16    Q.  He gave consent to obtain the contents of his

17  iPhone, correct?

18    A.  Yes.

19    Q.  And I may be leaving something out.  Were all of

20  those consents given voluntarily?

21    A.  Yes, sir.

22    Q.  Were you present when he was warned of his

23  constitutional rights, rights under the -- the Miranda

24  warnings, as well as the rights under 38.22 of the Code

25  of Criminal Procedure?

1      A.   Yes, sir.

2      Q.   And did he appear to you to understand those

3   rights?

4      A.   Yes.

5      Q.   Did he waive each and every one of those rights?

6      A.   Yes.

7      Q.   Did he give these consents freely and

8   voluntarily?

9      A.   Yes, sir.

10     Q.   Was there ever any concern -- did you ever have

11   any concern about the Defendant's ability to understand

12   what was going on in that room?

13     A.   No, sir.

14     Q.   Did he strike you as an intelligent person?

15     A.   Yes.

16     Q.   Articulate?

17     A.   Yes.

18     Q.   Able to express his thoughts?

19     A.   Yes.

20     Q.   Able to understand what was being communicated to

21   him?

22     A.   Yes.

23     Q.   Did you ever hear him flatly say, "I will not

24   give my consent" for any of these items?

25     A.   No.

```
 1        Q.   When he was talking about -- when -- did he show
 2   a reluctance, though, to allow you to photograph his
 3   torso?
 4        A.   Yes.
 5        Q.   Did he provide reasons for his reluctance?
 6        A.   Yes.
 7        Q.   That is, he has eczema?
 8        A.   Yes.
 9        Q.   And he also has scratches that he didn't want
10   anyone to see?
11        A.   Correct.
12        Q.   Okay.  Did you and Detective Stewart attempt to
13   address those concerns with him?
14        A.   Yes.
15        Q.   Did you ever make him any promises regarding
16   him -- in order to obtain his consent?
17        A.   Promised we wouldn't publish the pictures or show
18   anybody the pictures, things of that nature, but other
19   than that, no.
20        Q.   Okay.  And that was to address his concerns about
21   the way the eczema looks?
22        A.   Yes.
23        Q.   Did you ever tell him that if he didn't allow
24   these photographs or this consent to search this car he
25   would be arrested?
```

1    A.  No.

2    Q.  He ultimately was not arrested; is that correct?

3    A.  Correct.

4    Q.  He did provide during the interview his jacket

5  and some shoes; is that correct?

6    A.  Yes.

7    Q.  Do you know how the Defendant got back to his

8  apartment that night?

9    A.  No.

10   Q.  Is that something that we have asked you to try

11  to ascertain for us?

12   A.  Yes.

13   Q.  Have you had any luck?

14   A.  No, sir.

15   Q.  Can you tell us whether or not he was locked up

16  in jail that night?

17   A.  He was not.

18   Q.  He was free to go?

19   A.  Yes.

20   Q.  If you would, please, look on the same transcript

21  we're talking about there.  Look at page eight, line --

22  well, let's just look at line 16.  He has just been --

23  Detective Stewart has just told him that he, Detective

24  Stewart, will need consent in order to take these

25  photographs.  You see where the Defendant states,

1    "Actually, on that one, I'm not...  It's just one of

2    those things, uh, not yet, no"?

3       A.  Yes.

4       Q.  So he says, "Not yet, no," correct?

5       A.  Correct.

6       Q.  All right.  And y'all continue to talk to him to

7    attempt to obtain a consent, correct?

8       A.  Yes.

9       Q.  That is all I have for now.

10          MR. ROUSSEAU:  I will pass the witness.

11                   CROSS-EXAMINATION

12   BY MS. KEENE:

13      Q.  Let's just hit this first.  If you flip over to

14   page nine, at the very top, were you present when, and

15   it may have been Detective Stewart, says, "How about

16   with that shirt off?  Would you let me take pictures,"

17   and he says, "No."  Is that correct?

18      A.  Yes.

19      Q.  And you were present whenever he said that,

20   correct?

21      A.  Yes.

22      Q.  There was no hesitation or ambiguity in his

23   answer at that point, was there?

24      A.  Not that I recall.

25      Q.  In fact, he just said "no".  He said "yes" to a

1    lot of different pictures, but this is the particular

2    picture that he said "no" to; is that correct?

3        A.   Yes.

4        Q.   And then it was -- that's fine.  That's enough.

5             So whenever you were sent out to his house,

6    his apartment, how long had you been there before he

7    arrived?

8        A.   Quite a while.  I'd been told to go out at about

9    8:30 and it was about -- it was a little bit after 3:20.

10       Q.   So you're out there six, seven hours, eight

11   hours?

12       A.   Yes.

13       Q.   And whenever he arrives at 3:30ish in the

14   afternoon, how many police officers were out there?

15       A.   Oh, I don't know for certain.  We had taken

16   shifts.  Our criminal investigations units had taken

17   shifts in watching the residence.  There had been patrol

18   officers that had come and gone.  At that particular

19   time only two people that I can absolutely attest to

20   being there were Mr. Detective Graves and myself.

21       Q.   Detective Graves?

22       A.   Yes.

23       Q.   And you?

24       A.   Yes.  Detective Rebecca Graves.

25       Q.   You don't remember any other Grapevine police

```
1    officers that were there, period?
2        A.   Not at the time that --
3        Q.   That he arrives?
4        A.   -- we made contact with Mr. --
5        Q.   Correct.
6        A.   -- Olivas.
7             Yes.
8        Q.   There were two Arlington police detectives that
9    came prior to Thomas right before he pulls up?
10       A.   They came somewhere around the time that he
11   showed up.  I don't know if it was just prior to him
12   showing up or if it was just after.  I believe it was
13   just after.  I know they walked up after we had made
14   contact with Mr. Olivas.
15       Q.   How did you know?  Did somebody inform you he was
16   on his way home or he's about to be there?
17       A.   Yes.
18       Q.   And were there police officers following him from
19   Best Buy to his residence?
20       A.   I don't know if they were following him.  I know
21   that they'd said that they believed he had just left
22   Best Buy in a green SUV.
23       Q.   And about how much time after, when they told you
24   that, did he arrive at his apartment?
25       A.   It wasn't very long at all.
```

1     Q.   It's not a very long commute, is it?

2     A.   No, ma'am.

3     Q.   So five minutes or less, basically?

4     A.   Yes.

5     Q.   And then here comes the green SUV that you were

6  told that he'd be driving?

7     A.   Correct.

8     Q.   How many police officers total were there

9  whenever he gets out of the SUV and is confronted?

10    A.   There was only two of us that approached him and

11 confronted him originally.

12    Q.   And then how many total, before you guys leave,

13 police officers are there?

14    A.   There were two Grapevine and I believe just the

15 two Arlington.  I don't recall if anybody else showed up

16 or at all.

17    Q.   So four officers total including yourself?

18    A.   Yes, four.  Yes.

19    Q.   Each of the police officers are in plainclothes?

20    A.   Yes, ma'am.

21    Q.   Was it apparent, though, that -- you stated

22 that -- let me start over.

23         You stated that Thomas said, "Can I go

24 inside before the neighbors think I killed Rebeca and my

25 daughter?"  Is that correct?

```
 1        A.  Yes.
 2        Q.  Is that when y'all are outside in the parking lot
 3   area?
 4        A.  Yes.
 5        Q.  Was it apparent that he's been talked to by a
 6   number of police officers?
 7        A.  Yes.
 8        Q.  Give me an idea, or give us an idea, of what that
 9   looks like or why you'd think, "I'm going to go in.  My
10   neighbors are going to be wondering what I did"?
11        A.  I can see where -- well, not real sure exactly
12   what you're asking me.  If you're asking me to paint the
13   picture --
14        Q.  Paint the picture, yes.
15        A.  There were four individuals standing around
16   Mr. Olivas, talking.  I know at least two of us, it was
17   apparent that we were police officers because we had
18   identification on our belt.  The Arlington detectives, I
19   don't recall if their identification was as obvious or
20   not, but, yes, four people standing in the parking lot
21   talking to him, obviously two of them being officials.
22        Q.  And were y'all surrounding him or just talking to
23   him face-to-face?
24        A.  I was just talking to him face-to-face.
25        Q.  If he took off running, then you would be able to
```

```
 1   stop him.  He was that close?
 2      A.  If he took off running, I would not have chased
 3   him.  I don't have a reason really to chase him other
 4   than to try to identify him, talk to him, what have you,
 5   if that's what you're asking.
 6      Q.  No, but that's okay.  How close are you to him?
 7      A.  Well, I don't recall.  Generally I try to stay a
 8   safe distance away from somebody.  Probably maybe five
 9   feet.
10           THE COURT:  Point in here how far away.
11   Relative to you and the court reporter, close or same
12   or --
13           THE WITNESS:  Probably a little bit closer.
14   Maybe just about the same distance.  Maybe just a little
15   bit closer.
16      Q.  (BY MS. KEENE)  And the other police officers,
17   are they about the same distance?  Are they with you?
18   Are they behind him?
19      A.  Honestly I don't recall where they were standing.
20      Q.  Okay.  But there were four police officers, one
21   female and three males, talking to Thomas?
22      A.  Yes.
23      Q.  And was any of this conversation recorded in any
24   manner?
25      A.  Not that I'm aware of.
```

1    Q.   About how long was that conversation?

2    A.   It was very short.

3    Q.   And in the conversation, the only thing Thomas

4    said is, "Can I go inside before the neighbors,"

5    basically, "think I killed my wife and kiddo?"

6    A.   That was the only notable thing that I recall.

7    There may have been other conversation, but it wasn't

8    anything -- I don't want to say anything of any

9    consequence, but it wasn't anything about -- relative to

10   the case or the investigation.

11   Q.   Is there any discussion about why you are there?

12   A.   Not that I recall.  I remember thinking I didn't

13   want -- being that I didn't know anything about the

14   investigation, I didn't want to talk to him and tell him

15   exactly what was going on because I didn't know for

16   certain exactly how he was being implicated in the case.

17   Q.   All right.  Thomas gets out of his car.  How is

18   he approached, by two, you said, police officers?

19   A.   Yes.

20   Q.   And you're one of them?

21   A.   Yes.

22   Q.   So what do you say?  Just approach a citizen and

23   say, "Can you come down to the Grapevine Police

24   Department with me," or how does that take place?

25   A.   From what I recall, and I don't remember exactly

 1   how I said it, I do remember walking towards him as he

 2   was walking -- because his vehicle was actually parked

 3   quite aways away and he started walking so I had plenty

 4   of time to tell the other detective, "Hey, this looks

 5   like him walking to us now."  I get out the car and I

 6   approach him in the parking lot.  I just said, "Hey, I'm

 7   Officer Easley with the Grapevine Police Department.

 8   Would it be okay if we talk?"  It would have been

 9   something along those lines.

10       Q.  Okay.  And then he says something like "yes"?

11       A.  Yes.

12       Q.  And then now you've got four of you that -- two

13   more approach, correct?

14       A.  A total of three more.  Myself and then three

15   more approach -- or two more.

16       Q.  So four of y'all talking?

17       A.  Yes.

18       Q.  But what is being said?

19       A.  I don't recall.  I don't recall what was exactly

20   said.

21       Q.  How is he convinced by these four police officers

22   to go get in the car with one of them?

23       A.  From what I recall, we just asked him if he would

24   be willing to come in and talk to us.  I don't recall if

25   we even told him why.  We may have.  Somebody may have,

STATE v. THOMAS OLIVAS

1   but I don't recall if we did or not.

2      Q.   Like someone may have said something like, what,

3   like "there's a double homicide" or "there's a fire," or

4   do you have any memory?  You're the one that was out

5   there.

6      A.   There may have been some mention of "have you

7   heard of the homicide in Arlington".  May have been.

8   Like I said, I don't recall.

9      Q.   What you don't recall is him saying anything that

10  jogged your -- that you remember of implicating himself

11  in this?

12     A.   No, not at all.

13     Q.   You certainly don't remember him saying anything

14  that stood out to you to be "I might need to make a note

15  of that," except for this "Can we go inside before the

16  neighbors think I killed Rebeca and my daughter"?

17     A.   Yes.

18     Q.   That's the only thing you heard him say out there

19  that caused you to think "I need to make note of that"?

20     A.   Yes.

21     Q.   Anything else he said that would have been, in

22  your opinion, something a normal person would have said

23  when four police officers approached them?

24     A.   Yes.

25     Q.   Okay.  This was the only thing that he said that

 1   stood out to you?

 2       A.   Correct.

 3       Q.   Okay.  And then about how long is the

 4   conversation that y'all have out there before he gets in

 5   your car?

 6       A.   I don't remember exactly.  I know from reviewing

 7   the CAD times and the time that I estimated that we made

 8   contact with him, there wasn't very many minutes between

 9   those two times, and that's also going to include

10   getting into the car and things of that nature.  So I

11   would estimate no more than ten minutes of talking

12   and/or silence.

13       Q.   And so in the ten minutes after talking to him,

14   he then voluntarily says he'll come to the police

15   department?

16       A.   Yes.

17       Q.   How come he didn't drive his own car and follow

18   you?

19       A.   I don't recall why that wasn't allowed, other

20   than I know Arlington was interested in the vehicle.

21       Q.   Arlington didn't want any evidence that possibly

22   was in the vehicle to be contaminated; is that fair?

23       A.   Yes.

24       Q.   So it would be at least in Arlington's best

25   interest for him to get in your car and for the vehicle

1    that he drove to be left right there; is that correct?

2       A.  Yes.

3       Q.  And, actually, y'all put a guard on that vehicle,

4    or a police officer, to watch the vehicle?

5       A.  I don't -- we may have.

6       Q.  All right.  So once you get him into your car --

7    and you said he sat in your front seat?

8       A.  I believe so, yes.

9       Q.  And how long did it take to drive him to the

10   police station?

11      A.  It wouldn't have taken very long.  Maybe five

12   minutes, seven minutes.

13      Q.  Was he told in all this that he didn't have to

14   go?

15      A.  I don't recall if I said that for certain.  I

16   know my usual routine, being that this wasn't my first

17   investigation, is to repeatedly reiterate that they're

18   allowed to go, to ensure that they understand that, you

19   know, this is completely their decision and they can

20   leave at any time.  I would imagine that was probably

21   brought up, but being that I didn't record it, I don't

22   know for certain.

23      Q.  What you do know is you asked him to come and he

24   came?

25      A.  Yes.

1    Q.  You don't know whether or not you said, "You
2    don't have to come," because you don't have a memory of
3    that, correct?
4    A.  Correct.
5    Q.  And so when he came, it's about a five-minute,
6    ten-minute?  How long does it take in a car to get to
7    the police station?
8    A.  Five to seven minutes.
9    Q.  And is any of that recorded?
10   A.  We do.  I believe I did check out on the radio
11   with our dispatch that we were en route to the police
12   department.  And I believe I checked in that we were --
13   we had arrived at the police department.  It should all
14   be covered in our CAD system.
15   Q.  I mean as far as video or audio recording of that
16   drive.
17   A.  No.  I was in an unmarked criminal investigations
18   car.  It's not equipped with cameras.
19   Q.  And was there any sort of conversation in the car
20   driving there between you and Thomas?
21   A.  Not memorable conversation.
22   Q.  "Not memorable" meaning you just don't remember?
23   A.  Correct.
24   Q.  But it was certainly nothing like a confession?
25   A.  True.

1    Q.   Okay.   Because you would have made note of that?

2    A.   Yes.

3    Q.   And there was no discussion about this offense in

4    the car?

5    A.   No.

6    Q.   Whatever the discussion was, it would have

7    been -- it was insignificant and you didn't put it in

8    your report?

9    A.   Correct.

10   Q.   Or you guys just sat silently and drove all the

11   way there?

12   A.   Possibly.

13   Q.   Once you arrive at Grapevine, do you actually

14   drive up to the front and you guys get out, or do you go

15   like into a sally port?

16   A.   We have an entrance close to our interview rooms

17   in our criminal investigations division.  So we would

18   have parked in the back and walked through a back door

19   into the police department.  I say back door.  Our

20   police department is actually very confusing because

21   it's got a lobby that goes all the way through the

22   building, so the front and back are often confused for

23   each other.  There's a main entrance in both the front

24   and back.

25   Q.   Once he gets inside the police department where

1    do you take him?

2       A.   Into one of the interview rooms.

3       Q.   And is he sat inside the interview room?

4       A.   Yes, he's sat in the interview room.

5       Q.   And how much time after he's sat in the interview

6    room is the recording started?

7       A.   It wouldn't have been very long.  We try to get

8    the recording started as soon as we possibly can.

9       Q.   And was he free to leave at that point?

10      A.   Yes.

11      Q.   Had he got up and just walked out, could he have

12   done that by himself?

13      A.   Yes.  He could have come out the same entrance we

14   went in.

15      Q.   Whenever -- there's one time that he does leave.

16   Whenever he's given an interview, he gets to go smoke a

17   cigarette.  Do you recall that?

18      A.   No, I don't.

19      Q.   When he left he was -- a police officer went with

20   him to go smoke a cigarette.  Would that be standard?

21      A.   If he had gone outside the building through the

22   entrance that we came in, he would not have been able to

23   come back.  It's restricted access coming into the

24   building.  Free access flowing out; restricted access

25   coming back in.  So it would not have been uncommon for

1  an officer to go with them just to make sure that they

2  could get back into the building to where they were

3  sitting.

4     Q.  So it wouldn't surprise you at all to hear that a

5  police officer went out with him to smoke a cigarette?

6     A.  No, it would not.

7     Q.  Because that's the only way you could get back

8  in, if you went outside?

9     A.  True.

10    Q.  Was to have somebody with authority or with the

11 right swipe or key to get back in?

12    A.  Yes.

13    Q.  But you don't have a specific memory of that

14 happening?

15    A.  No.

16          MS. KEENE:  Pass the witness.

17          MR. ROUSSEAU:  I don't have any further

18 questions, Your Honor.

19          THE COURT:  All right.  May the witness be

20 excused, at least for now?

21          MS. KEENE:  He may, Judge.

22          MR. ROUSSEAU:  Yes.

23          THE COURT:  All right.  Remember your

24 instructions.  Remember the witness rule.  Thanks for

25 coming in.

```
 1                  (Witness excused from courtroom)

 2                  (Pause in proceedings)

 3                  THE COURT:  All right.  Outside the presence

 4     of the witness I just re-listened to the audio that's

 5     referred to on State's Pretrial 2-A and it's been

 6     discussed on line 11, page 12 and it sounds to me like

 7     it says, "I can get the consent to search done,"

 8     followed by him, "I know you filled out a lot of these,"

 9     immediately discussing in the context of the tape.  So

10     that's -- as a matter of fact that's what the Court

11     heard and the exhibit will speak for itself.

12                  Y'all may continue.  Still the State's case.

13                  MR. ROUSSEAU:  That's all I have at this

14     point, Your Honor.

15                  THE COURT:  You rest on Defense motion to

16     suppress?

17                  MR. ROUSSEAU:  Statements of the Defendant,

18     yes, sir.

19                  THE COURT:  All right.  What about evidence,

20     what beyond what's here in evidence...

21                  MR. ROUSSEAU:  Can we go off the record?

22                  THE COURT:  Yes.

23                  (Discussion off the record)

24                  THE COURT:  On the record.

25                  State rests as to the pretrial Defense
```

1   motion to suppress?

2          MR. ROUSSEAU:  Regarding the Defendant's

3   statements, yes, Your Honor.

4          THE COURT:  And the evidence obtained during

5   the course of the interview when the statements were

6   given, particularly those contained in State's Pretrial

7   1 and 2?

8          MR. ROUSSEAU:  Yes, Your Honor.

9          THE COURT:  All right.  And as of now,

10  you've indicated you have no desire, on the issue of, in

11  case-in-chief, to offer State's Exhibit Pretrial 3 based

12  on 38.22 issues, which are still being researched, and

13  you want to withhold any ruling or addressing that issue

14  at this time?

15         MR. ROUSSEAU:  Just to be safe, Pretrial 3

16  is the 9/24 arrest interview?

17         MR. MOORE:  Yes.

18         MR. ROUSSEAU:  Then you're correct, Your

19  Honor.

20         THE COURT:  All right.  Does the Defense

21  have any evidence you wish to offer on the merits of the

22  motion and matter I just addressed with the State?

23         MS. KEENE:  No, sir.

24         THE COURT:  Do you rest, as well?

25         MS. KEENE:  Yes.

1          THE COURT:  All right.  Then State waive

2    opening, reserve close?

3          MR. ROUSSEAU:  Yes, sir.

4          THE COURT:  All right.  Then the Defense may

5    close.

6                 <u>DEFENDANT'S CLOSING STATEMENT</u>

7          MS. KEENE:  Judge, we really have two large

8    issues.  One of them being an illegal detention of

9    Thomas Olivas on March the 21st, 2011.  What we heard

10   from the detective is that they did not have probable

11   cause to detain him.  However, they showed up at his

12   house, four in number, and become such a presence, and

13   they agree that they become such a presence, in the

14   parking lot that he says, "Can we go inside?"  But they

15   don't go inside.  Instead they say, "Let's come on down

16   to the police department."

17          I would submit to the Court that he does not

18   at this point believe that he's free to just go inside

19   because they said, "No, we'd like you to come to the

20   police department."  If four police officers are present

21   outside, wanting to talk to you, how free do you feel

22   like you can say to them, "I don't want to talk to you"?

23   They said they didn't tell him why they wanted to talk

24   to him, but it was such a presence to him that he said,

25   "I don't want my neighbors to think I, you know, killed

1    my wife and kid."  So something significant was

2    happening and he could tell it just based on that one

3    statement.  So the detective said he did not have

4    probable cause but yet they were able to bring Thomas

5    down to the police station.  No one is clear about why

6    Thomas couldn't drive himself down there.  Except you

7    can glean from what was happening is they don't want

8    him -- they don't want him anywhere near that truck

9    because they don't want him to contaminate the evidence.

10   They want him in their car and with a perception that he

11   can't, that he's not free to leave, so Thomas then ends

12   up down at the police station without probable cause,

13   not believing that he can just get up and leave.

14            So it would be an illegal detention.  And

15   based on that illegal detention, we would argue that all

16   the continuing consents are the fruits of that illegal

17   detention, being the consent to take his buccal swab,

18   consent to take any photographs of his body, period, the

19   consent to -- consent with the car, just the fact that

20   it was even discussed we believe would not be admissible

21   into evidence, and then, of course, the actual statement

22   itself.  We would say that those, I think four major

23   items, would be suppressible based upon illegal

24   detention.

25            They also took his clothing he had on that

1    day, so that would be another piece of physical evidence

2    that we would argue would be a fruit of the poisonous

3    tree, as far as the illegal detention, and then, also,

4    anything that came off of his iPhone, because he

5    freely gave them his iPhone and talked about his iPhone.

6    We talked a little bit about it in this hearing.  But if

7    the arrest is an arrest and it was not based on probable

8    cause and it was an illegal detention, so to speak, then

9    all of those things would be fruits of the poisonous

10   tree.  So basically a ruling on the arrest and then all

11   of the things that came from the arrest we would ask the

12   Court to suppress.

13            And number two is, being just more specific,

14   is this idea of consent.  And even assuming that this is

15   not an illegal detention, just looking at what does it

16   mean under the Fourth Amendment, what sort of rights do

17   citizens have.  And we know from the Fourth Amendment

18   that a citizen has a right to be free from searches,

19   period, and all the searches are presumed to be

20   unreasonable unless there's a warrant.  And we know that

21   the only exception to that is if someone gives their

22   consent.  And so when Thomas says, "Yes, I'll give you

23   my iPhone -- he does it very freely and the Court saw it

24   in the videotape -- when Thomas says yes to whatever

25   else it was, "Yes, here's my buccal swab, you can have

1    it," but when they talk to Thomas about his body, he is

2    very clear and he says no.  It is not ambiguous.  It is

3    not anything.  It is "no".  So at that moment Thomas

4    invoked his Fourth Amendment right to not -- to be free

5    of an unreasonable search, a search without probable

6    cause.  And the police officer, and you heard the police

7    officer, his view of the Fifth Amendment, too, if you

8    say you have a right, "I don't want to talk to you

9    anymore," he can just keep on talking to you and

10   convince you to give up your rights.  That's not the

11   law.  It's --

12               THE COURT:  Well, let me just say, when it's

13   not a custodial interrogation, you don't have to warn

14   someone of their rights.  There are some delineations.

15   And it wasn't really clarified with the witness.

16               MS. KEENE:  You're correct.  You're correct.

17   If he was in custody, maybe he would have had a

18   different answer.  Actually, that's a very --

19               THE COURT:  Right.

20               MS. KEENE:  -- good point, Judge.

21               Certainly the Fourth Amendment doesn't

22   require custodial.  You have a right to be free of a

23   search whether you're in custody or not.  The police

24   don't have a right to just come up to you and say, "I

25   want all of your stuff," and take it from you.  So if

```
 1    you say no, you say, "I am invoking my Fourth Amendment
 2    right not to be searched," they need to stop.  They have
 3    to stop.  And so there are a number of cases that I
 4    found.  Most of them are older because I think this is
 5    well-settled law.  It says, "This reasoning is equally
 6    applicable in using it against a defendant for refusal
 7    to consent to entry of their house without a warrant.
 8    The right to refuse protects both the innocent and the
 9    guilty --
10              THE REPORTER:  Could you slow down, please.
11              MS. KEENE:  Oh, I'm sorry.
12              -- and to use its exercise against the
13    defendant would be," as the Court stated, "a penalty
14    imposed by the courts for exercising constitutional
15    right."  So it's the same idea under the Fourth
16    Amendment as it is under the Fifth.  If I say, "I'm
17    going to invoke Fifth Amendment right to remain silent,"
18    you can't bring that in front of a jury and use that as
19    evidence of guilt.  And so when Thomas says, "I'm
20    invoking my Fifth Amendment right not to be searched, my
21    body," --
22              THE COURT:  You mean his Fourth Amendment
23    right.
24              MS. KEENE:  I mean, "my Fourth Amendment
25    right, for my body not to be searched," that can't be
```

1    brought before the jury, and they're supposed to honor

2    that.  He says he honors it, but then we know after

3    20 minutes, ten pages of convincing him, "Oh, don't give

4    up that right," makes it not voluntary.  He has invoked

5    his Fourth Amendment right "no".  And he's very clear

6    about when he says yes and he's very clear about when he

7    says no.  He ultimately concedes because they've

8    badgered him.  You watched it.  They badgered him about

9    "give us" -- "Come on, what you hiding," basically,

10   "under that shirt?"  "What you hiding in that car?"  And

11   so to show those conversations to the jury is going to

12   allow them to infer guilt based on him invoking his

13   constitutional rights.  And that's what these various

14   court opinions, as well as the constitution, says you

15   can't do.

16            I mean, what kind of a -- I think it says in

17   this one -- I love this language -- "In the case of

18   silence, the prosecutor can argue that if the defendant

19   had nothing to hide, he would not keep silent.  In the

20   case of refusal of entry, the prosecutor can argue if

21   the defendant were not trying to hide something or

22   someone, she would have let the officers in.  In either

23   case, whether the argument is made or not, the desired

24   inference will be drawn by the jury.  This is why the

25   evidence is inadmissible in the case of silence.  It's

1    also why the evidence is inadmissible in the case of

2    refusal to let the officers search."

3             And so it is a constitutional right to be

4    free from the search.  He did not give his consent

5    voluntarily.  In fact, he said no.  After 20 minutes or

6    more of them harboring in on him, they convinced him to

7    change his mind.  And, Judge, this is the same thing as

8    if he's in custody and he says, "You have a right to

9    remain silent," and I invoke it, they don't get to keep

10   prodding on him, keep talking to him until he finally,

11   "All right.  I concede.  I'll talk."

12            On the issue of the car, he we would also

13   object to him invoking his right for the car not to be

14   searched and all of that -- tapes in regards to that.

15            THE COURT:  Well, and let me just -- to be

16   fair to your record, it seems to me he's invoking

17   Amanda's possible right to object to the car not being

18   searched.

19            MS. KEENE:  I believe that that is less

20   clear when he starts but then it becomes more clear that

21   he's talking about there's a smell of gasoline, he

22   doesn't want them to go in there, but, yes, it does

23   appear that he's invoking Amanda's --

24            THE COURT:  And he can't be responsible for

25   what she might have in the car.  He doesn't --

```
 1              MS. KEENE:  Correct.
 2              THE COURT:  -- like he searches the car.  He
 3    doesn't know what she may have.
 4              MS. KEENE:  Correct.
 5              THE COURT:  And I see your inference that if
 6    it's the gasoline, it might affect me if in fact there
 7    is something significant to the gasoline.
 8              MS. KEENE:  I think upon them further
 9    talking to him, it becomes very clear that what he's
10    doing is invoking his Fourth Amendment right not to have
11    a search of his car.
12              THE COURT:  Is there a standing issue, do
13    you think?
14              MS. KEENE:  No -- well, there's a standing
15    issue ultimately when they go get consent to search the
16    car.  That's why I'm not arguing about whatever they
17    found in the car, because they go to Amanda and they get
18    her consent, that's fine.
19              THE COURT:  So you have two issues; one, the
20    search of the car, two, discussion with him whether it's
21    okay to search the car when he says no?
22              MS. KEENE:  Correct.  What we're arguing
23    about is the discussion with him about searching the
24    car.  The actual search of the car, they do it legally
25    and they do it another way, so that's irrelevant, to
```

1   whatever they found in that car, with the pictures, et

2   cetera.  It's the fact they're talking to him and really

3   all the discussion of him going, "No, no," and then why

4   do you have to go into the reasoning of why you're

5   invoking your Fourth Amendment right?  Why are you going

6   to do that?

7           Under the constitution you have a right to

8   remain silent, you have a right to be free of searches.

9   If a police officer can come and say, "I want to come

10  into your house," you say, "No," and they go, "Why?"

11  "What?"  And you have to explain why?  And then that

12  gets to be put in front of a jury?  Really?  What kind

13  of constitutional right is it if I'm getting

14  penalized --

15          THE COURT:  Let me ask you a question.  If

16  you walk up and knock on a door and say, "Hi, your

17  neighbors think you're running a drug lab in your house.

18  Will you talk to me about it," and they say no and slam

19  the door in your face, you think that's admissible, if

20  they just go knock on your door and ask that question,

21  if in fact later you're charged with running a drug lab

22  in your house?

23          MS. KEENE:  I think, yes, that's admissible,

24  the way you phrased the question.  I think that if they

25  came in and said, "Can we look inside your house," and

1    they said no, I don't think that that's admissible.

2          THE COURT:  What would be the difference of

3    saying, "I'm not going to talk to you" versus "I'm not

4    going to let you look in my garage to see if there's a

5    drug lab to put the little old ladies at peace across

6    the street"?

7          MS. KEENE:  I guess it depends exactly on

8    what is said and what the circumstances are.

9          THE COURT:  Okay.

10         MS. KEENE:  But certainly if you're in

11   custody, obviously any time you say, "I don't want to

12   talk," it's over.  But if they just want to come up and

13   say, "I want to talk about the drug lab," I don't why

14   that wouldn't be admissible, that you said, "I don't

15   want to talk to you about no drug lab."  That's their

16   words.  But if they said, "We want to come search your

17   house.  We don't have a warrant.  We don't got no

18   probable cause.  Will you let us," and you say no --

19         THE COURT:  It's still words.

20         MS. KEENE:  It's an invocation of your

21   Fourth Amendment right not to be searched.

22         THE COURT:  All right.

23         MS. KEENE:  And they don't get to then use

24   that, because what happens is they put that in front of

25   the jury, just exactly like the Court said, there's an

1    inference of "why", because we're all humans.  Human

2    beings say, "Thomas, why won't you let us see your

3    body?"  "Why won't you let us in the car?"  "That's

4    funny, the two things you said no to."  They're going to

5    use that as evidence and the jury is going to take it as

6    evidence.

7              So we would argue under constitutional

8    grounds, as well as under 403, and just good old

9    evidentiary grounds, of those issues being misconstrued

10   and taken as guilt even though he --

11             THE COURT:  So your legal position that

12   whether you have a Fifth Amendment right concerning

13   conversations, whether you're in custody, whether you're

14   detained, is one issue, that a Fourth Amendment issue is

15   separate and distinct from a Fifth and Sixth Amendment

16   issue?

17             MS. KEENE:  Absolutely.

18             THE COURT:  That the right to a

19   reasonable -- to be free from unreasonable searches and

20   seizures...

21             MS. KEENE:  Is for all citizens regardless

22   if they're in custody or not.

23             THE COURT:  And I understand that argument

24   and I understand it when it says, you know, "Put your

25   hands on the wall.  We're cutting off your shirt even

1    though you said no," as opposed to the discussion of

2    "why you don't want your shirt cut off," had they forced

3    the shirt.  I see those are different issues.  Whether

4    there's the consent or not, I understand.

5                 Just like the Fifth Amendment, if the

6    officer continues the conversation, well, maybe they can

7    still push it but the jury doesn't hear about it.  But,

8    you know, if you knock on the door, "Your neighbor says

9    there's a lab.  Will you talk to us," and they say no

10   and slam the door in your face when it's not custodial,

11   so I see the custodial issue still intertwines even with

12   the Fourth Amendment issue.

13                 MS. KEENE:  I do.  Judge, I do, too.  And if

14   he was in custody, it would intertwine in a big way.

15                 THE COURT:  Right.

16                 MS. KEENE:  Because he could actually argue

17   then that he was actually also saying a right to remain

18   silent on that issue and y'all kept talking to him about

19   it.

20                 THE COURT:  Right.

21                 MS. KEENE:  If it is construed, when you

22   look at the way he was detained, that he actually was in

23   custody for purposes of this conversation, then it's

24   also a good Fifth Amendment argument.  But I'm saying

25   just forget that --

STATE v. THOMAS OLIVAS

1               THE COURT:  Right.

2               MS. KEENE:  -- let's forget that and say,

3  you know what, it was a voluntary him-coming-down-there,

4  when he says no, it means no.  And you don't get to put

5  in front of the jury that he said no and it took

6  20 minutes to convince him and all that conversation

7  that took place.  When he says no and the cop says, but

8  doesn't do it, "I honor that," you honor that and you

9  don't get to basically convince him after 20 minutes of

10  conversation and take the pictures and put it in front

11  of the jury, all of that, because he said no.  And it

12  wasn't -- both of those, he wasn't waffling.

13  Particularly on the body, he was like "no".

14               THE COURT:  Okay.

15               MS. KEENE:  It's an interesting issue for

16  you, Judge.

17               THE COURT:  I understand your position.

18               MS. KEENE:  Okay.  That's our argument.

19               THE COURT:  All right.  State may respond.

20              STATE'S CLOSING ARGUMENT

21               MR. ROUSSEAU:  Well, first of all, he was

22  not in custody.  It's well-settled law that if he

23  voluntarily accompanied police to a police station does

24  not constitute custody.  Just like sitting down and

25  talking to your probation officer, you may be required

1    to be there but you're not in custody.  This is

2    well-settled law.  And there doesn't need to be, I

3    believe, much time wasted on was he in custody or not.

4    He voluntarily went down there.

5             All this talk about he wasn't allowed to

6    drive his own vehicle, we don't know he wasn't allowed

7    to drive his own vehicle.  They asked him if he would

8    accompany them to the police department and he said yes.

9    That's it.  That's all the conversation.  That's all the

10   testimony we have on whether or not -- on how he got to

11   the police department.  So the rest of this conversation

12   about could he have driven his car, was he allowed to

13   drive his car, that's simply a non-factor here, because

14   there's no evidence that it ever entered his own mind to

15   drive his own vehicle.  They asked him to ride with them

16   and he went.  It's as simple as that.

17            So question is was it voluntary, and it was

18   in fact voluntary.  The interview speaks for itself.  He

19   was overwhelmingly eager to cooperate.  He even made

20   statements many times like, "Whatever, Officer,

21   absolutely."  "You're doing your job."  "I'm here to

22   help you."  "Whatever you need, Officer."  "I absolutely

23   understand why you're doing this."  "Whatever I can do

24   to help."  "I have nothing to hide."  He was eager to

25   assist them in any way he could until it came to the

STATE V. THOMAS OLIVAS

1   question of taking a picture of his body, and I'm

2   distinguishing that from his arms and his hands and that

3   sort of thing.

4           THE COURT:  The part of his body that was

5   not already exposed to air.

6           MR. ROUSSEAU:  Yes, sir.  Yes, sir.  His

7   torso.

8           So that and the vehicle.  And regarding both

9   of those topics, Your Honor, every time he would say no,

10  beginning with the first, the first question from the

11  detective about taking a picture of his torso, he said,

12  "Not yet, no.  Not yet."  So according to Defense he

13  should have stopped there, boom, asked no more

14  questions.  Well, it's not that simple.  The detectives

15  are there to obtain evidence if they can without

16  violating his rights, if they can do so legally.  And he

17  never gave an unqualified "no" to anything up to and

18  including the time where he has that one-line answer

19  that says "no," because it's in the middle of a

20  back-and-forth.  I apologize, I don't have it.  I'm not

21  turned to it, Your Honor.  But -- just one moment.

22           (Pause in proceedings)

23           MR. ROUSSEAU:  "How about that shirt off?

24  Would you let -- this is the top of page nine -- "Would

25  you let me take pictures?"

```
 1                "No."
 2                "You don't feel comfortable with that?"
 3                "No, I don't."
 4                "Okay."
 5                "I would prefer to consent with someone over
 6     that."  And both detectives essentially, "You mean
 7     consult?"  He says -- Thomas says, "I completely
 8     understand where you're coming from.  It's just eczema.
 9     I scratch a lot."  So he throws out this explanation for
10     why he doesn't want to take off his shirt and be
11     photographed, and so they address the concern that he
12     raised over and over and over.  He would throw out some
13     concern, from, one, "I have scratches that will make me
14     look guilty," that's one.  Two, "I have eczema which is
15     embarrassing," to, three, "I have eczema which attacks
16     me like a swarm of angry bees the moment my skin is
17     exposed to air."  The detectives, in response to him
18     throwing out these excuses, address those excuses to try
19     to put him at ease and, frankly, let's face it, to his
20     defeat his arguments against doing it.  They want the
21     photographs if they can get them legally, and he
22     ultimately did consent.
23                A person is -- on the question of consent, a
24     person is most -- it's measured against a reasonableness
25     consent.  And, you know, it's a person of reasonable
```

 1   firmness.  You look at police overreaching.  You look at
 2   threats.  You look at the setting; was he restrained,
 3   was he hounded, was he yelled at.  None of this
 4   occurred.  In fact, you can see for yourself in the
 5   interview, they were overly polite.  They were extremely
 6   kind to him.  He was not deprived of water.  He was
 7   given the chance to go to the restroom.  He was told
 8   repeatedly he's not under arrest and "we can't do this
 9   unless you tell us that we can."  There's simply no room
10   in the law to say that the State does not get to use
11   evidence that's indicative of guilt because -- under
12   these circumstances.  They essentially killed the man
13   with kindness.  You cannot call this police
14   overreaching.  You cannot call this browbeating.  You
15   cannot call this custodial interrogation.  And even if
16   it had been custodial interrogation, it was complied
17   with.  The rules were complied with.  38.22 was fully
18   addressed.  There's simply no basis to suppress any of
19   these items, Your Honor.
20               THE COURT:  All right.  The Court finds as a
21   matter of fact that on March 21st of 2011 that the
22   defendant in this cause, Thomas Olivas, was contacted by
23   officers of the Grapevine and Arlington Police
24   Department and requested to come to the Grapevine Police
25   Department for an interview, that he was transported

1    there, not in handcuffs and not under arrest at that, in

2    an unmarked vehicle, was taken to an interview room of

3    the Grapevine Police Department and thereafter was

4    involved in a multi-hour series of conversations with

5    intermittent breaks for intermittent purposes.

6            The interview, which concluded with the

7    words, "I'm done.  I just want to call it an evening.

8    And if you need me, you know where to find me.  I'm not

9    hiding from you.  I'm giving you everything you need,

10   but I'm done.  I hate to say it this time.  I'm done,"

11   at which time the interview concludes and the Defendant

12   is allowed to leave the Grapevine Police Department.

13           The Court finds as a matter of fact,

14   concludes as a matter of law that the interview that

15   took place that's contained -- I keep saying four

16   corners -- within the four corners as relatively,

17   accurately transcribed State's Pretrial 1-A and 2-A and

18   contained within the video and words, audio and video,

19   of State's Pretrial 1 and 2 was not a custodial

20   interview within the meaning of Texas and U.S.

21   constitutional parameters nor within the parameters of

22   Article 38.22 of the Texas Code of Criminal Procedure.

23           However, as an appellate attorney might say,

24   assuming arguendo that it was, that on the face of the

25   interview shortly after its beginning, he was read his

1    38.22 warnings.  It was recorded on the face of the

2    interview.  And had it been a custodial interrogation,

3    at least for purposes of the statute, it was -- he

4    received the same warnings as would be proper and

5    appropriate for a custodial interview.  So he was

6    advised of his constitutional rights.

7              And as a matter of law, if it's not a

8    custodial interview issue, raised by Ms. Keene properly,

9    which have very different impacts when you -- the issue

10   between invoking a constitutional right versus the

11   failure to waive a constitutional right that's

12   implemented as a matter of law.  And once you're in

13   custody, it's not a matter of whether you choose to

14   invoke a right to remain silent, it's you must

15   affirmatively waive that right before the interview

16   takes place.  So it's a timing issue.  But I find as a

17   matter of fact, it was not a custodial interview.

18             I find as concerns State's Pretrial 5, 6, 7,

19   and 8 that -- well, first of all, 5, as concerns the

20   iPhone, unequivocal consent to search an iPhone.  You

21   did everything but shove it in their hands.  As far as

22   buccal swabs, I find free and voluntary consent to

23   provide buccal swabs and was quite impressed with his

24   discussion of DNA testing and how in the military you

25   give it for identification purposes in case you're a

1    combat casualty and there are pieces of you left and so

2    your family knows which casket has your body parts, and

3    how even the military says it cannot be used in any

4    criminal or non-identification purpose, showing a very

5    sophisticated knowledge on his part of the concept of

6    DNA testing and the privacy rights that are given to our

7    servicemen and women such that someone can't say, "I

8    want to see if he's the father," "he's a suspect," or

9    any other reason, because the military requires you to

10   give that for purposes of identification.  I would note,

11   too, that based upon that, I am impressed and grateful

12   for the Defendant's service to his country before these

13   allegations, which is irrelevant to the legal decision

14   here today.

15            I find the search of the apartment as

16   evidenced by State's Pretrial 9 is a free and voluntary

17   consent based on the context of the discussions and the

18   actual execution of the documents.

19            I understand the concerns as to what I will

20   assume State's Pretrial 7 covers, which is photographs

21   and swabs of the body.  And I understand and clearly

22   understood Ms. Keene's concern about he said no.  But

23   the whole eczema issue was a nonresponsive comment the

24   Defendant made when the officer -- he says, "I need to

25   consult with someone," I can respect that, and then he

1    goes off into the eczema descriptions and goes on and on

2    about eczema and scratches and looks like a cat got him

3    and how you scratch and its involuntary and all these

4    reasons implying an embarrassment to show or be seen.

5    And when you look at the entire context of the

6    circumstances -- this conversation continues to go on

7    because he keeps throwing "eczema" out like he's almost

8    embarrassed that he's not cooperating with the photos

9    but he's embarrassed about the appearance of the eczema

10   and having to deal with the hereditary condition.

11            And when you look at the entire context of

12   the entire series of conversations, he is not in

13   custody.  I'm not aware of a rule that says whether you

14   consent or aren't sure if you want to consent.  The

15   bottom line is the consent that allowed the photos to be

16   taken and what was its context, and I find that to be a

17   free and voluntary consent.  Whether that's what's

18   governed in writing by 7 or simply the conversations and

19   statements he makes in the manner and means in which he

20   displayed himself and cooperated with the photography.

21   I believe as a matter of fact that his position was,

22   and, quite frankly, as a matter of trial strategy still

23   is, I have nothing to hide and here's these pictures but

24   I don't want my medical condition misconstrued.  And,

25   quite frankly, from the face of the record, scratches

1   due to eczema are much preferable to scratches without

2   explanation.  And the context shows an attempt to

3   cooperate and a free and voluntary consent to those

4   ultimate photographs, which I assume are contained

5   within and observed in 10 through 23, inclusive, but

6   most specifically as to those that show bare skin on the

7   chest or torso where a T-shirt would normally cover.  I

8   don't have the specific numbers.  It's clear that he was

9   unequivocal and unhesitating to show other injuries,

10   including scratch injuries that were not covered by the

11   chest, in fact, gave explanations of how they occurred.

12          I find as a matter of fact, conclude as a

13   matter of law that each and every exhibit offered in

14   this hearing today, be it the visual display of the

15   interview, the oral interview, the photographs, the

16   iPhone, the clothing collected, and all testing done

17   thereon, were the direct result of the Defendant's

18   presence at the Grapevine Police Department on the date

19   of this interview and had he not been there, these items

20   would not have been obtained by consent or otherwise.

21   And if he were in custodial custody, I still find that

22   the consent was freely and voluntarily given, because

23   there is no rule that says you can't get a consent to

24   search from a person who's in jail, as long as it's

25   freely and voluntarily provided.

1            As far as the specifics, in all fairness,

2    I'm not sure this hearing is exactly the time and place

3    to go in -- every little statement made during the

4    course of all these interviews or the things that out of

5    403 or other issues may or may not need to be trimmed

6    because the context might be misunderstood, I'm not

7    going to make a ruling on that.  I'm making a

8    constitutional and statutory ruling on their

9    admissibility.

10            But, Joetta, just like the situation, you

11   come to the door and "The little old lady said you have

12   a drug lab in your garage.  Do you mind if we look to

13   calm their 80-year-old fear," and you say no, you have

14   a right to say no, but I'm not sure you'd have a right

15   to have that same "no" barred.  But I'd be willing to

16   look at the issues on the discussion of the consent and

17   the what, and there might be pieces that maybe under 403

18   might be more confusing.  I'm not saying that clearly at

19   this time because I don't have an objection before me on

20   that basis.

21            MS. KEENE:  Well, I did object on 403.

22            THE COURT:  Well, but it's not line-itemed

23   and I can't shotgun a 403 to everything in those papers.

24   You'll have to be more specific.

25            MR. ROUSSEAU:  Your Honor, there was a

1    portion in there we didn't really discuss.  The

2    detective asked, "Have you ever been arrested before,"

3    and there's a conversation about that.  We will

4    obviously be deleting that before --

5              THE COURT:  There's discussions about when

6    he was in the service, and I mixed my interviews up of

7    what was a post-arrest discussion versus the pre-arrest

8    discussion on that he was getting out of the service and

9    he didn't care and everything was dropped there.  There

10   are issues throughout that may be on independent legal

11   basis to those addressed today under 38.22, 38.23,

12   Fourth Amendment, Fifth Amendment, Sixth Amendment, U.S.

13   Constitution, Article 1, Section 9, Section 10, which is

14   the legal basis of everything before me, as I

15   understand.

16              Is that correct, Ms. Keene?

17              MS. KEENE:  That is, Judge.  That was

18   beautiful.  I have one question for you.

19              THE COURT:  Hold on.  Those basis, the

20   motion to suppress as a matter of law is overruled as to

21   the matters I have directly addressed in this record.

22   And at the time evidence is brought to court,

23   biologicals, DNA swabs, things other than the photos

24   that are in evidence today, if there is anything that

25   either side believes is covered by this motion that was

1   collected as a direct result of these consents,

2   independent of the auto issue where the owner gave an

3   independent consent, which would be addressed

4   separately, if before they're offered, as long as

5   they're identified for the record outside the jury's

6   presence that these are issues that -- "we are in

7   agreement or disagreement" -- were covered by Court's

8   prior ruling.  And I'll tell you, "Yes, it was and the

9   ruling stands and is a running objection," or "No.  I

10  didn't have a chance to address that."  Or the other

11  side can say, "No.  We think this is independent of a

12  prior ruling of the Court."  But I will give you a

13  record to make sure there's no piece of evidence that

14  slips through this trial.  Because y'all had the

15  professionalism and courtesy to the court reporter for

16  storage and other reasons not to bring every little

17  possible item in here today, I will make sure you have a

18  record, as the items are marked for trial on the merits,

19  as to whether this motion covered it or not, outside the

20  jury's presence.

21          So now you may...

22          MS. KEENE:  How do you want us to address

23  the 403s?  You said you wanted us to line-item, like

24  submit these sections?

25          THE COURT:  What I think probably you need

1    to do on the 403s, I'd get a clean copy of the motion,

2    I'd get together and if you're in agreement with the

3    things, like "have you ever been in trouble before,"

4    other events involving third parties, of throwing

5    phones, of breaking things, stuff -- if it's something

6    that's motive, then it might come in and I can rule.

7    Since I don't know the big picture that the trial

8    lawyers on both sides know, of legal theories, of

9    defense or prosecution -- I can sense through all these

10   interviews there are two women and two babies and

11   neither would probably be happy with the other.  There

12   could be other events that might directly relate to a

13   state of mind of the deceased or the accused that might

14   be admissible.  There might be things that are just

15   things that happened that the officer wants to pursue to

16   decide is this a person of interest or a suspect.

17   Anything y'all agree to remove, take it out.  Anything

18   you can't agree to remove, you can mark on the

19   transcripts and say here's what our objection is and

20   why, and you'll have a clean record without having to

21   play the tape, and I can address that prior to trial at

22   a mutually convenient time.

23            MS. KEENE:  Including the "no" on the

24   consent?

25            THE COURT:  Well, on the consent, yeah.  The

```
 1   "no" on the consent, my opinion right now is that's like
 2   "can we come in your house" and you say no.  I'm willing
 3   to reconsider that based on law that addresses a
 4   noncustodial refusal to cooperate, where someone walks
 5   up to you on the street and says, "Hey, buddy, will you
 6   talk to us?  We'd really like to clear this up," and you
 7   say no.  The time and place and circumstances are very
 8   specific, as to whether that's just a fact that you said
 9   no because you're an old fart -- pardon me -- or you
10   don't understand or because you're trying to obstruct
11   justice.  There are all these different rules and
12   circumstances that are sometimes admissible and
13   sometimes it's not, and I would like to look at specific
14   cases before I rule on whether that comes out.
15               MS. KEENE:  Okay.
16               THE COURT:  But the general conversation is
17   admitted.  If there are certain particular parts -- I
18   think if it's not custodial, it's just the conversation.
19   But the difference between allegedly invoking a Fourth
20   Amendment right and being punished for it versus
21   refusing to waive it and being punished for it, the
22   refusing to waive is crystal clear.  The invoking part
23   is not as crystal clear if you just say, "I don't want
24   to talk to you because I have a Fifth Amendment right,"
25   and if you throw that out in a conversation, it's not
```

STATE v. THOMAS OLIVAS

1    insulated versus if you say, "I don't want to talk,"

2    after you're advised of that right.

3              And having said that, even if this is a

4    noncustodial conversation, there is the additional legal

5    issue both sides can look at, that they warned him of

6    his rights whether they had to or not and if you warn

7    someone of their rights and then they say, "Well, I

8    don't want to talk" or "I want to lawyer up," or

9    anything else, can it be used against them even if you

10   didn't have to warn them of their rights after you tell

11   them something and then is it a lie if it wasn't --

12   didn't apply.

13             This is a little gray and so on those

14   specific line-item details, if you will, and deletions,

15   I'd want to look at a little more law before I make

16   those kind of rulings, because this is kind of a hybrid

17   record.

18             All right.  Anything else on that?

19             MS. KEENE:  There's nothing else from us,

20   Judge.

21             MR. ROUSSEAU:  No, Your Honor.

22             THE COURT:  All right.  Off the record.

23             (Discussion off the record)

24             THE COURT:  On the record, real quick.

25             The State indicates they intend to present

1    their motion on discovery of defense experts.  So y'all

2    have until tomorrow morning to decide for in-house use

3    only or testimonial, and you can make your decision and

4    let me know in the morning.

5              We'll be in recess until tomorrow at 9:00

6    o'clock.

7              (Pretrial Hearing concluded at 1:45 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              COURT REPORTER'S CERTIFICATE
 2   THE STATE OF TEXAS         )
 3   COUNTY OF TARRANT          )
 4      I, Karen B. Martinez, Official Court Reporter in and
 5   for the 372nd District Court of Tarrant County, State of
 6   Texas, do hereby certify that the above and foregoing
 7   contains a true and correct transcription of all
 8   portions of evidence and other proceedings requested in
 9   writing by counsel for the parties to be included in
10   this volume of the Reporter's Record, in the
11   above-styled and numbered cause, all of which occurred
12   in open court or in chambers and were reported by me.
13      I further certify that this Reporter's Record of the
14   proceedings truly and correctly reflects the exhibits,
15   if any, admitted by the respective parties.
16      I further certify that the total cost for the
17   preparation of this Reporter's Record is **located at the
18   end of Volume 21**.
19      WITNESS MY OFFICIAL HAND this the 30th day of March,
20   2015.
21                      /s/ Karen B. Martinez
22                      Karen B. Martinez, Texas CSR 6735
                        Expiration Date:  12/31/2015
23                      Official Court Reporter
                        372nd District Court
24                      Tarrant County, Texas
                        (817)884-2996
25                      kbmartinez@tarrantcounty.com
```