1          REPORTER'S RECORD

2          VOLUME 4 OF 21 VOLUME(S)

FILED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS
3/27/2015 12:36:05 PM
DEBRA SPISAK
Clerk

3          TRIAL COURT CAUSE NO. 1376658R

4          COURT OF APPEALS CASE NO. 02-14-00412-CR

5

6    THE STATE OF TEXAS        )  IN THE 372ND JUDICIAL
                               )
7                              )
                               )
8    VS.                       )  DISTRICT COURT
                               )
9                              )
                               )
10                             )
                               )
11   THOMAS OLIVAS             )  TARRANT COUNTY, TEXAS

12

13

14

15      ********************************

16      DEFENDANT'S MOTION FOR CONTINUANCE

17      ********************************

18

19      On the 8th day of September, 2014, the following
    proceedings came on to be heard in the above-entitled
20   and numbered cause before the Honorable Scott Wisch,
    Presiding Judge, held in Fort Worth, Tarrant County,
21   Texas;
       Proceedings reported by computerized machine
    shorthand with assisted realtime transcription.

22

23

       KAREN B. MARTINEZ, CERTIFIED SHORTHAND REPORTER
24              Official Court Reporter
             372nd Judicial District Court
25               Tarrant County, Texas

```
 1 │ APPEARANCES:
   │
 2 │ ATTORNEYS FOR THE STATE:
   │
 3 │    HONORABLE R. KEVIN ROUSSEAU
   │    SBOT NO: 17324950
 4 │    HONORABLE TAMLA S. RAY
   │    SBOT NO: 24046687
 5 │    Assistant Criminal District Attorneys
   │    Tim Curry Criminal Justice Center
 6 │    Fort Worth Texas  76196
   │    Phone: 817-884-1400
 7 │    Fax:   817-884-3333
   │
 8 │ ATTORNEYS FOR THE DEFENDANT:
   │
 9 │    HONORABLE TIM MOORE
   │    SBOT NO: 14378300
10 │    Attorney at Law
   │    115 West 2nd Street, Suite 202
11 │    Fort Worth, Texas  76102
   │    Phone: 817-332-3822
12 │    Fax:   817-332-2768
   │
13 │        - AND -
   │
14 │    HONORABLE JOETTA L. KEENE
   │    SBOT NO: 11165800
15 │    Attorney at Law
   │    204 South Mesquite Street
16 │    Arlington, Texas  76010
   │    Phone: 817-275-6611
17 │    Fax:   817-275-6621
   │
18 │
   │
19 │
   │
20 │
   │
21 │
   │
22 │
   │
23 │
   │
24 │
   │
25 │
```

```
 1                    CHRONOLOGICAL INDEX

 2                     Volume 4 of 21

 3            DEFENDANT'S MOTION FOR CONTINUANCE
```

```
 4    September 8, 2014                         Page  Vol.

 5    The Court Calls Case for Hearing..............   4   4

 6    State's Factual Recitation by Mr. Rousseau....   4   4

 7    Defendant's Response by Mr. Moore.............  14   4

 8    Defendant's Response by Ms. Keene.............  20   4

 9    Court's Ruling................................  26   4

10    Hearing Concluded.............................  30   4

11    Court Reporter's Certificate..................  31   4
```

```
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1                P R O C E E D I N G S
 2          Monday, September 8, 2014   12:40 p.m.
 3              (OPEN COURT, DEFENDANT PRESENT)
 4              THE COURT:  This is Cause Number 1376698R,
 5    as in Romeo, The State of Texas versus Thomas Olivas.  A
 6    capital murder case, waived the death penalty on the
 7    record, scheduled for trial, voir dire to begin in the
 8    morning, special set, after adjusting to the schedule of
 9    the parties.
10              And I'm going to want a short factual
11    recitation, Mr. Rousseau, about the information you
12    obtained last week, what you did with it.
13              And then, Mr. Moore, I'll allow you just to
14    respond, not to the issues concerning the continuance,
15    but just why -- what brings us here to have the Defense
16    feeling obligated to file a motion for continuance.
17              MR. ROUSSEAU:  Thank you, Your Honor.
18              There is a company called Securus,
19    S-E-C-U-R-U-S.
20              THE COURT:  Pause.
21              (Pause in proceedings)
22              THE COURT:  Back on the record.
23              Secure, what -- a company called?
24              MR. ROUSSEAU:  It's a -- the company is
25    called Securus, S-E-C-U-R-U-S.  It's a third-party -- my
```

1    understanding, it's a third-party contractor who records

2    and maintains phone calls made by inmates within the

3    Tarrant County Jail.

4              The calls are available to our office upon

5    request and they are available to the Defense via a

6    subpoena.  If we have made a request to obtain those

7    phone calls and then once they come into our possession,

8    it's our office policy to provide them to the Defense.

9    This case is -- predates the Michael Morton Act so it

10   is -- we're not required by law, but we've always had

11   the open-file policy, so our policy says we give them up

12   if we have them and that's what -- that's what has

13   occurred in this case.

14             THE COURT:  All right.  So if you will, what

15   records did you request, when did you request them, when

16   did you get them, what did you do with them?

17             MR. ROUSSEAU:  Okay.  Here we go.  I

18   obtained four weeks' worth of phone calls dating from

19   mid June to mid July.  I believe the exact dates are

20   June -- June 15th to July 15th, but I would have to

21   check that.  I obtained those -- I requested those and I

22   received those last week, specifically on Friday,

23   without knowing the number of the calls or the total

24   duration of the calls.

25             THE COURT:  Just so I'm clear, Friday,

```
 1   September 5th.
 2               MR. ROUSSEAU:  I'll trust your calendar,
 3   Judge.  It was three days ago.
 4               THE COURT:  If this is the 8th, three days
 5   ago.
 6               MR. ROUSSEAU:  Yes, sir.
 7               THE COURT:  All right.
 8               MR. ROUSSEAU:  When I got them -- when I got
 9   the -- a disc was delivered to me and I was told that
10   there were 28 hours' worth of phone calls on that disc.
11   I immediately made a copy of the disc and I notified
12   Mr. Moore by call and by -- I called him and I also sent
13   him an e-mail telling him that this was available.
14               THE COURT:  Can you hold that thought?
15               MR. ROUSSEAU:  Yes.
16               THE COURT:  Do you know -- were the calls
17   requested, how broad or narrow was the request, calls
18   between the Defendant and any particular person or any
19   person?  Do you know what was requested?
20               MR. ROUSSEAU:  All calls.
21               THE COURT:  All calls made collect by the
22   Defendant from the Tarrant County Jail to anybody.
23               MR. ROUSSEAU:  I didn't say made collect,
24   but I think that's the only way they can make a call.
25               THE COURT:  I think that's correct.  Any
```

 1    call that he made where he has to go through the system

 2    that identifies the caller to any third party that was

 3    not in jail.

 4          MR. ROUSSEAU:  Yes, Your Honor.

 5          THE COURT:  Is there any restriction on

 6    that, if there were like calls, hypothetically, to like

 7    attorneys or anything?  Do you know if the jail records

 8    those calls, too, or not?

 9          MR. ROUSSEAU:  I think, Your Honor, that

10    those are screened out, but I'm not the authority on

11    that.  I could not tell you.

12          THE COURT:  And to be fair, you've indicated

13    the 28, plus or minus, hours of calls purported on this

14    disc, you have not listened to any of them yet?

15          MR. ROUSSEAU:  No, sir -- well, with the

16    very tiny exception, which I will make clear in a

17    moment.

18          THE COURT:  That will be fine.  All right.

19    Continue.

20          MR. ROUSSEAU:  I went to Mr. Moore's office.

21    I believe I got there -- and, Tim, you can correct me.

22          I believe I got there about 3:00 o'clock

23    in -- on Friday.  I know I left my office roughly 2:45.

24          THE COURT:  Sometime in the midafternoon of

25    last Friday.

 1            MR. ROUSSEAU:  Yes, sir.

 2            THE COURT:  All right.  Carry on.

 3            MR. ROUSSEAU:  And I delivered -- I was --

 4   he was not expecting me.  I just showed up and I

 5   delivered the disc to him.  He was in his office.  I was

 6   escorted back to his office.  I gave him the disc.  I

 7   informed Mr. Moore that I had not opened the disc.  When

 8   I say "open," I mean put it in to a computer to see what

 9   is on it.

10            THE COURT:  Electronically opened.

11            MR. ROUSSEAU:  Yes.  I had not opened the

12   disc.  I agreed to not open the disc and I agreed to not

13   attempt to use the content of the disc in any way.  The

14   reason I was going to all this trouble, for lack of a

15   better word, is because I realized I had 28 hours and

16   I -- of calls on this disc.  I didn't want to delay this

17   trial when I saw how much I had.  I had no intention of

18   opening that can of worms.

19            So when I handed the disc to Mr. Moore, we

20   had the conversation that I just told you about.

21   Mr. Moore put the disc into his computer and he had

22   some -- with some assistance from --

23            THE COURT:  A staff member?

24            MR. ROUSSEAU:  Yes.

25            THE COURT:  Okay.

1          MR. ROUSSEAU:  Someone in his office.

2    I don't know Rich's last name.

3          MR. MOORE:  Rich McCracken.

4          MR. ROUSSEAU:  Rich McCracken.  I apologize

5    to Mr. McCracken.

6          He opened the -- he was able to get the disc

7    to play and I had to call my partner, Tamla Ray, to kind

8    of coach us through how to make the contents available

9    to us.  The disc -- leaning -- watching from behind Mr.

10   Moore's desk, I was able to see that the disc appears to

11   contain a series of calls to two different phone

12   numbers, both in 915 area code.  Mr. Moore -- I can't

13   remember if it was Mr. Moore or McCracken -- chose one

14   call for -- randomly chose one call from each of those

15   two phone numbers and opened them.  They both appeared

16   to be calls to -- from Mr. Olivas to his father.

17          We listened to a few seconds of each of the

18   two calls to verify that they were, in fact -- that

19   that's what we were hearing.  And I left Mr. Moore's

20   office at about 3:30 or so, and I've made no attempt to

21   review the disc since that time.  In fact, it's -- I

22   went home for the weekend and worked at home.  The disc

23   stayed in my office.  I did not return to the office

24   that day.

25          So I think that's a fair recitation of where

```
 1   we are.
 2                THE COURT:  So you requested during that
 3   time period calls made out of the jail from the
 4   Defendant with no limitation as to who, you've listened
 5   to little partials of two of what apparantly -- if it is
 6   28 hours or assumably numerous calls, regardless of
 7   duration, even if there's just 28.  And you have -- can
 8   make a copy of the disc, have it marked as Court's
 9   Pretrial Exhibit 1, deliver to the court reporter, after
10   having both sides assured that's what I'm being given is
11   what y'all have.
12                MR. ROUSSEAU:  Okay.
13                THE COURT:  And you do not intend to use any
14   of the contents directly or indirectly.
15                MR. ROUSSEAU:  No, sir.  And, Your Honor,
16   just for clarification.  I think we might already have a
17   Pretrial Exhibit 1.
18                THE COURT:  Or whatever the -- is it Court's
19   Pretrial 1?
20                MR. ROUSSEAU:  It's been too long, Your
21   Honor.  I don't remember.
22                THE COURT:  All right.  Well --
23                MR. ROUSSEAU:  I'll mark it any way the
24   Court sees fit.
25                THE COURT:  Well, in all fairness, I know we
```

 1  had the pretrial hearings.  As long as we make a record

 2  the next time we meet, regardless of when that may be...

 3           MR. ROUSSEAU:  Yes, sir.

 4           THE COURT:  In hours or days, that this is

 5  the disc that was discussed during the hearing on the

 6  Defendant's motion for continuance, file-marked on

 7  September 8th of 2014 at 9:03 a.m.  And --

 8           MR. ROUSSEAU:  Yeah.

 9           THE COURT:  -- as long as we're in

10  agreement, it doesn't really matter what the label is,

11  as long as it's identified.

12           So other than what appears to be a call with

13  the father, you have no idea of who, if anyone, he

14  talked to besides the father, from your perspective,

15  from the State -- what the State knows of the contents

16  of the disc?

17           MR. ROUSSEAU:  No, sir.

18           THE COURT:  Regardless of what Defense may

19  know based upon privileged conversations with their

20  client, which I'm assuming upon being given that disc

21  they probably grilled him -- I'm confident they grilled

22  him about anyone he may have talked to and what may have

23  been said, helpful or harmful.

24           MR. ROUSSEAU:  All right.

25           THE COURT:  You only know that there's

STATE v. THOMAS OLIVAS

1    a call -- two calls to the father.

2              MR. ROUSSEAU:  There were a lot of calls to

3    two different numbers.  They both appear to be numbers

4    belonging to the father.

5              THE COURT:  All right.  All right.  So you

6    don't know who's on the line, just based on knowing

7    there's calls to a number, you don't know who the

8    parties are, but that's the -- you're identifying that

9    by phone number.

10             MR. ROUSSEAU:  Two calls that we sampled

11   are -- those two same numbers appear over and over and

12   over.  The two that we sampled were from -- to his

13   father.

14             THE COURT:  The father is who appeared on

15   the line.  That --

16             MR. ROUSSEAU:  We are assuming it's his

17   father.  I believe it was his father.

18             THE COURT:  As someone who had one, you --

19   if the tenure of the conversation, the short part you

20   heard is consistent with someone talking to their dad.

21             MR. ROUSSEAU:  What it sounded like to me,

22   Your Honor.

23             THE COURT:  All right.  All right.

24             Anything else?

25             MR. ROUSSEAU:  Factually, that's all I have,

1   Your Honor.

2          THE COURT:  All right.

3          Mr. Moore.

4          MR. MOORE:  Well, Judge --

5          THE COURT:  First of all, do you have

6   anything that Kevin has dictated about the approximate

7   time about the sampling process with the assistance

8   of --

9          MR. ROUSSEAU:  Your Honor --

10          THE COURT:  Oh, I'm sorry.

11          MR. ROUSSEAU:  I apologize.  Okay.  Ms. Ray

12   is here and she told me she had the disc the day before,

13   on Thursday.  And I didn't get it until Friday, so --

14          THE COURT:  Okay.

15          MR. ROUSSEAU:  -- with that clarification.

16          THE COURT:  All right.  Tamla, have you

17   listened to any of the disc?

18          MS. RAY:  No, I haven't listened to it at

19   all.

20          THE COURT:  Okay.  All right.  All right.

21          With that addition, is there anything, as a

22   general summary, about what he has said about when you

23   got the disc, about what happened in your office?

24          MR. MOORE:  No, he's absolutely correct.

25          THE COURT:  All right.  Then you may pick it

```
 1   up from there.
 2            MR. MOORE:  Well, as my motion, as I've
 3   stated in my motion, Judge, that disc that Mr. Rousseau
 4   delivered on Friday, September 5th, to my office
 5   contains 119 recordings, which is approximately 29.5
 6   hours of telephone conversation between my client and
 7   he's -- Mr. Rousseau is correct, a telephone number that
 8   we sampled and two calls sounded like his dad.
 9            THE COURT:  All right.  Hold that thought.
10   Have you ever talked to his dad in person?
11            MR. MOORE:  Yes, I have.
12            THE COURT:  So it -- you'd have the ability
13   to recognize a voice that Kevin may not have?  Are
14   you -- is it your belief it's his dad?
15            MR. MOORE:  I wouldn't swear under oath it
16   was his dad, but I mean --
17            THE COURT:  It was consistent with -- what
18   you heard, you believe that's --
19            MR. MOORE:  Yes.
20            THE COURT:  -- correct?
21            Go ahead.
22            MR. MOORE:  I immediately contacted
23   co-counsel, Ms. Keene.  We discussed it.  We met at the
24   jail Saturday morning and went and saw our client,
25   Mr. Olivas, and explained the situation to him.  And
```

 1    that's why we collectively decided to file a motion for

 2    continuance.  We felt like that we needed to have an

 3    opportunity to review these tapes and listen to them for

 4    any possible Brady, for any possible exculpatory

 5    evidence, or evidence that could lead to Brady or any

 6    kind of exculpatory material.

 7                And that's why I prepared the motion and

 8    filed it this morning.  And we feel that -- we -- to

 9    effectively represent our client under the United States

10    and state constitution that we should be given an

11    opportunity at this late minute before trial -- and

12    we're not asking for a long period of time, but at least

13    enough time to review these tapes that they provided us,

14    like I said, to adequately and effectively represent our

15    client.

16                We've also asked in our motion that the

17    State provide us with all of the phone records -- phone

18    conversations that were recorded between Mr. Olivas and

19    whoever he may have called from the Tarrant County Jail

20    while he's been incarcerated.

21                We've also learned that Mr. Olivas had many

22    conversations with his mother who speaks Spanish and

23    those conversations were in Spanish between Mr. Olivas

24    and his mother, and we're also asking the Court not only

25    to grant us a continuance to review those, but to

1   provide an interpreter to listen to those conversations

2   to aid us in the representation of our client.

3            THE COURT:  I'll ask the two Defense

4   attorneys, have you ever encountered a situation

5   representing clients other than Mr. Olivas where the

6   recorded conversations, the sheriff's department, have

7   been used in evidence?  Are you aware of the existence

8   of the system by which inmate calls are recorded prior

9   to the disclosure that was made by Mr. Rousseau on

10  Friday afternoon?

11           MS. KEENE:  Yes, sir.

12           THE COURT:  Have you had occasions to be

13  aware that --

14           MR. MOORE:  Am I aware that --

15           THE COURT:  -- clients --

16           MR. MOORE:  -- that they are now --

17           THE COURT:  -- that calls are recorded?

18           MR. MOORE:  I'm aware that they --

19           THE COURT:  Prior to Friday were you aware

20  of it?

21           MR. MOORE:  I think everybody in this

22  courthouse is aware of it.

23           THE COURT:  That is my belief, especially

24  those of the character and quality of attorneys that

25  Mr. Olivas has standing beside him right now.  Have

 1  y'all made any efforts, because of potential Brady or

 2  investigatory reason or anything, to subpoena or try to

 3  obtain those phone records prior to the disc being

 4  dumped in your lap Friday afternoon?

 5          MR. MOORE:  Well, he came to my office and

 6  left around 3:30.  I --

 7          THE COURT:  No, I'm talking about before.

 8          MR. MOORE:  Oh.  Oh.

 9          THE COURT:  Before Kevin says "we got this

10  deal and we're not going to use it" or if "we got this

11  deal and we are to going to use it," had y'all made any

12  efforts for -- and I'm not questioning whether you would

13  or would not in the tactical and Pandora's box reasons

14  that someone may or may not do that.  I'm not trying to

15  be a barbershop quarterback.  But I'm just saying prior

16  to Kevin giving you some jail records, had y'all made

17  any efforts to obtain records of your client's calls

18  during the pendency of his incarceration in the --

19          MR. MOORE:  We had --

20          THE COURT:  -- Tarrant County Jail and your

21  representation of him during the same?

22          MR. MOORE:  We have not issued a subpoena to

23  Securus to obtain any records.  But I'll add this,

24  Judge, you know, we have to subpoena them, all the State

25  has to do is pick up the phone and request those

1    records.  And they did that.  And they are in possession

2    of them.  And they turned over a copy of some of them to

3    us, or 30 days' worth of them to us.

4            And it just seems to me out of fundamental

5    fairness that if the State has some evidence, regardless

6    of whether they say they listened to them or not, that

7    we ought to be provided an opportunity to at least

8    review them.

9            THE COURT:  And you have two issues in your

10   motion.  One is to review what they've obtained and one

11   for them to use their shortcut method to get any

12   conversations that your client has had.

13           MR. MOORE:  Okay.  Well, I'll tell you what,

14   I'll --

15           THE COURT:  I'm -- I'm --

16           MR. MOORE:  -- waive that.

17           THE COURT:  I'm just pointing that that's

18   part of the motion.  In all fairness, it's probably

19   something different than should be on the four corners

20   of a continuance motion.  But having said that, I guess

21   I just want to be aware -- and sadly, I have lawyers

22   come in every day, and I know y'all are not -- but for

23   purposes of a deaf and blind justice record that a court

24   reporter writes down, have you, for reasons of strategy

25   or investigative prowess or things you had information

1    from some source that there may have been a recorded

2    conversation where hypothetically your client tells you

3    that the person who really committed this crime he

4    called on the phone and apologized to them for him being

5    in jail and you'd had a reason to seek out and obtain

6    those records, you could have done so and without having

7    to rely on the cooperation of the State to make the

8    call, you would have issued the subpoena or talked to

9    someone at the sheriff's office and are confident you

10   could have obtained those records, had you sought to

11   obtain them, you could have gotten them.

12           MR. MOORE:  Well, I think that's fairly

13   obvious, Judge.

14           THE COURT:  Yeah, I think it is, too, but --

15   to us in this room, absolutely, but for the black and

16   white record of the court reporter, I'm not so sure.

17   And it's sad to say there are people who have stood in

18   the shoes you are, thankfully not on a case of this

19   magnitude, who had no clue they recorded jail

20   conversations, and wouldn't know to ask or wouldn't know

21   to look and it wouldn't be they were evil.  They would

22   just be inexperienced or maybe not as sophisticated in a

23   trial of serious criminal matters.

24           MS. KEENE:  And, Judge, I don't think the --

25           THE COURT:  Hold on a second.  Are you

*STATE vs. THOMAS OLIVAS*

```
 1    through for now, ready to pass?
 2              MR. MOORE:  I'll pass to Ms. Keene.
 3              THE COURT:  All right.  Ms. Keene.
 4              MS. KEENE:  I don't believe the record is
 5    complete at this point either.  There was no reason for
 6    us to subpoena those records.  And the Court talked
 7    about the different reasons and -- that you would not
 8    want to subpoena them, certainly from the Defense side.
 9    And we were not privy to any conversation with any
10    person, whether it be through hearsay or not, that
11    Thomas had had a conversation with an aunt or anyone
12    else that apparently had some relevance to this case.
13    We were never even privy to that.
14              I know the prosecutor -- I don't believe
15    that was part of the factual recitation.  I don't
16    remember it or not.
17              THE COURT:  And hold that thought.
18              Mr. Rousseau, who is the aunt?  Just so this
19    record is clear.
20              MR. ROUSSEAU:  Okay.  I think what Ms. Keene
21    is talking about is something we -- a conversation we
22    had off the record earlier.
23              THE COURT:  Yeah.
24              MR. ROUSSEAU:  The reason that --
25              THE COURT:  The word "aunt" didn't appear.
```

1   There was just a lead that you wanted to explore.  So

2   why don't you flesh that out.

3            MR. ROUSSEAU:  Yes, Judge.  The reason that

4   this -- I was interested in the record in the first

5   place is that in talking to a witness in -- sometime

6   over the summer, this witness had told me that -- that

7   she believed that -- she had heard, so we're talking

8   about second- or thirdhand information, she had heard

9   that the Defendant had called a relative, specifically

10  his aunt, and that in an attempt to encourage her to

11  come to the trial and be here in showing her support for

12  him had indicated that there were some DNA that had been

13  done that either exonerated him or pointed the --

14  pointed a finger at someone else, something to that

15  effect.  This person that I talked to really did not

16  have much information.

17            And it was for that reason that I was trying

18  to get this -- get this information.  That -- and when

19  I -- when we opened the disc, I saw that the only two

20  phone calls were to, as far as we know, to Mr. Olivas,

21  Sr., Mr. -- the Defendant's father.  I think that's what

22  Ms. Keene is talking about.

23            It's my understanding, Your Honor, that the

24  information I got in the first place that this phone

25  call existed was bad information, that it does not

1    exist.  I don't believe it's out there.  That's the only

2    thing I was looking for in the first place and I have no

3    intention of reviewing records any farther.

4              MS. KEENE:  Okay.  But let's say that that

5    witness, for whatever is, this is just me, why this is

6    so scary to have 30 hours that no one has reviewed, but

7    yet an appellate lawyer will.  Let's say, for instance,

8    that witness takes the stand and says whatever they say,

9    be it we know that based on they've already told us

10   about talking to an aunt, that they're inaccurate in

11   their recollection of certain things.  I would certainly

12   be able to get to cross-examine her, "But you also told

13   the prosecutors that Thomas had a conversation with your

14   mother," or "with your aunt," "and we know that not to

15   be true because here are the records," or whatever that

16   is.  It is a Pandora's box to get all of them I

17   understand, but don't have all of them.  We got 30 hours

18   that we're all just staring at and going, Is there

19   Brady?  Is there Brady?  Could this be used?  Could this

20   be used?

21             When the reality is, 30 hours, one week,

22   Judge.  If it's not there, it's not there.  But right

23   now we can't say.  We can just say there was a reason he

24   wanted it.  Okay?  So there was a big enough reason for

25   the Government, the State of Texas, to request it and

1   get it.  And now that we have it, we all have to just

2   stare at it and say, well, whether it hurts us or helps

3   us, we can't look at any more.

4          Defense doesn't have time.  We don't speak

5   Spanish, so we can't even if we had time to listen to

6   it.  We've got to have help.  And the Government, you

7   know, can't use it, but we can't use it, either, in case

8   that witness testifies.  And, actually, this tape could

9   be used to rebut that witness's testimony or however --

10          THE COURT:  Well --

11          MS. KEENE:  -- it can come up.

12          THE COURT:  -- I will just say this.  If the

13   issue is you can't use it and they won't use it, it

14   means it can't be used, it won't be used, not for

15   impeachment, not for rebuttal, not for case-in-chief.

16   If this were traditional discovery and the day of trial

17   someone says, Well, I found something interesting, well,

18   that's a little too bad, should have found it sooner.

19          But if we're realistically talking about

20   pretty much two years, the logic of your argument,

21   Joetta, if true, would apply to every phone call that's

22   ever been made by your client for two years, of what

23   could be there, what might be there, what could be

24   useful, what could be harmful.  And if that logic

25   totally trumped due process and was a due process issue,

```
 1    was of a constitutional dimension, then that would be a
 2    reason that any and everybody for either side should be
 3    wanting to go scan every single personal phone call made
 4    out of the jail because of the possibility there might
 5    be something helpful or harmful in order to advance
 6    their position in the trial, depending on where they sat
 7    in the courtroom.
 8              MS. KEENE:  I think we have specific
 9    instances here, though, and that we're not talking about
10    all of them.  I know that's in the motion, but forget
11    that part.  Just --
12              THE COURT:  Well, but --
13              MS. KEENE:  -- we're talking about
14    30 hours --
15              THE COURT:  -- but the logic would apply --
16    but the logic would still apply if there's something
17    there.  If you're talking about what's potential Brady
18    or helpful, it really wouldn't matter whether the State
19    found it first or whether the State thought they had a
20    lead that they don't and that the phone numbers don't
21    corroborate to some third-party aunt or other person.
22              MS. KEENE:  And, Judge, I was just thinking
23    about outside the box of the things that can come up
24    because we don't know what's on it.
25              THE COURT:  And that's why y'all are such
```

1   good lawyers.

2            MS. KEENE:  What --

3            THE COURT:  People think outside the box and

4   they don't get sucker punched.  But I guess, here's my

5   position, this is what my gut is telling me.  And with

6   due respect to Mr. Moore's offer to tell the client he

7   cannot make any more calls until this case is -- the

8   trial is over with, personal calls that happen to be

9   monitored as a matter of security or invasion of privacy

10  or any other good or bad spin you would want to put on

11  it but legal as long as there's a disclose that they're

12  monitored, can go on at infinitum.  And the same logic

13  would apply to two years of past calls, not just

14  30 days.  It could apply to three weeks of continued

15  calls, not just the past six weeks.  And there's always

16  something else you can do by being incredibly aggressive

17  and thorough officers of the court, no matter what side

18  of the courtroom you sit on.

19            Them getting a last-minute hint that there

20  might be a lead of a possible incriminating call that

21  did not take place or could not be found or did not turn

22  out to exist is why they shouldn't quit until they're

23  done.  The same reason that y'all shouldn't quit until

24  the last verdict is rendered by the jury.  But that

25  doesn't mean the trial stops every time there's a

STATE v. THOMAS OLIVAS

 1    what-could-happen versus a substantial and firm belief

 2    of what does happen.

 3              And if -- I cannot -- and I'm trying really

 4    conceptually reaching back from the umpire days to the

 5    American League time versus the National League time

 6    that I've sat in the dugouts like you guys do now of

 7    what could be Brady.  If there are the words out of your

 8    client's mouth, with thorough interviewing skills, as I

 9    know you have, if your client has indicated something to

10    you that he told someone and somehow that's Brady, or

11    something they told him, I would expect you'd be issuing

12    the subpoenas.  In fact, I'm confident that you would

13    have, regardless of the potential risk of digging up

14    something that you really don't want to hear or

15    potential of opening up, under optional completeness,

16    meaning unrelated conversations that might be unhelpful

17    to your trial strategy.

18              But if -- it is my opinion that if this

19    evidence cannot be used, if it is banned by judicial

20    decree and order of the Court that it cannot be used, it

21    cannot be referred to or alluded to, that any phone

22    conversations of anyone with your client in the Tarrant

23    County Jail during the time period -- you know, for

24    limine purposes of -- starting in September of 2012 and

25    certainly during the time period on this tape that no

STATE v. THOMAS OLIVAS

1    one will go into, refer or allude to the fact that there

2    had been any conversations with the Defendant, unless

3    and until there's a hearing outside the presence of the

4    jury as to why they would be relevant, that this

5    disclosure, it's like it didn't happen.  And then that

6    solves the constitutional issue of you can't be sucker

7    punched with something.  And just because there's the

8    potential, remote in my mind, as it could, that there's

9    potentially, possibly Brady, that would be true for

10   every phone call that's been made for two years of

11   something that's potentially, possibly Brady.  And that

12   could have been explored before now, including the calls

13   in question.

14            And then there's the dilemma of if there

15   were some absolute right to know every call at

16   infinitum, including those during the course of the

17   trial with something possibly incriminating or possibly

18   Brady could be said, any calls from this point forward

19   in the hypothetical, think-outside-the-box position

20   where a defendant might get on the stand, having sat

21   through a hearing like this, having continued to call

22   people and say things on the phone when their lawyers

23   told them not to do, that conceptually could be

24   available for impeachment in the hypothetical world.

25   But anything that's recorded on the face of the exhibit,

1    however it will be marked, will be banned from use by

2    either side for any purpose, unless there was a hearing

3    and an extremely compelling reason why it should be

4    admissible.

5              And about the only reason I can think of

6    that that would happen is in the extremely remote

7    position that there was something that turned out

8    beneficial to the Defense that was discovered in

9    hindsight.  But I just don't see on the four corners of

10   a hearsay conversation, I just don't see any way it

11   becomes admissible except for impeachment of the people

12   on the call who were accepting your client's calls, or

13   of your client, if he were to take the stand in either

14   phase of a criminal trial, if there were a lesser

15   offense.  And it's being banned for all purposes.  There

16   will be a protective order issued.  It can't be used.

17   And, quite frankly, my position would almost be, but for

18   the fact of future litigation, to say the tape hasn't

19   been listened to, then by God the original is given to

20   the court reporter and it doesn't get listened to, or at

21   least during the course of the trial it's not.  And

22   after the trial, it's available for anyone to go back

23   over.

24             But if it's like it didn't happen, then it

25   didn't happen.  And the State surrenders that evidence.

STATE v. THOMAS OLIVAS

1  So whatever remote fear you might have calling witnesses

2  in a punishment phase that subconsciously the State

3  mixes which inconsistent statements might have been made

4  on a phone conversation versus an interview, they don't

5  have it and they can't use it.

6          And so I think the Court would be inclined

7  to deny the motion for continuance as a matter of law,

8  but order the State to surrender the evidence and it can

9  be returned to them at the conclusion of the trial or on

10  the record when they point out a compelling

11  constitutional reason why they should get it back.  If

12  it never happened, then they don't need it.  And then we

13  just mark the original and surrender it to the court

14  reporter and two confident and ethical lawyers look me

15  in the eye and say that's the only copy, Judge, we don't

16  have another.  And you have it.

17          You can have the last word if there's

18  anything on behalf of your client you want to add, other

19  than you think I'm wrong, and that I understand from

20  your expressions and would expect nothing less.

21          MR. MOORE:  You sound like my wife.

22          THE COURT:  Well, I've known you almost as

23  long as she has.

24          MR. ROUSSEAU:  Your Honor, do you want to --

25          THE COURT:  Not quite.

```
 1                    MR. MOORE:  My expression.

 2                    MR. ROUSSEAU:  I can be back up here in five

 3     minutes with the only disc I have.

 4                    THE COURT:  That will be fine.  And have it

 5     marked appropriately.  Go get it and surrender it to

 6     court reporter and we'll be done.

 7                    MR. ROUSSEAU:  Thank you.

 8                    THE COURT:  And we're still game-on tomorrow

 9     morning, regular schedule.  Get your questionnaires and

10     everything else.  Off the record.

11                    (Hearing Concluded at 1:15 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

STATE vs. THOMAS OLIVAS

```
 1              COURT REPORTER'S CERTIFICATE
 2   THE STATE OF TEXAS         )
 3   COUNTY OF TARRANT          )
 4       I, Karen B. Martinez, Official Court Reporter in and
 5   for the 372nd District Court of Tarrant County, State of
 6   Texas, do hereby certify that the above and foregoing
 7   contains a true and correct transcription of all
 8   portions of evidence and other proceedings requested in
 9   writing by counsel for the parties to be included in
10   this volume of the Reporter's Record, in the
11   above-styled and numbered cause, all of which occurred
12   in open court or in chambers and were reported by me.
13       I further certify that this Reporter's Record of the
14   proceedings truly and correctly reflects the exhibits,
15   if any, admitted by the respective parties.
16       I further certify that the total cost for the
17   preparation of this Reporter's Record is **located at the
18   end of Volume 21**.
19       WITNESS MY OFFICIAL HAND this the 30th day of March,
20   2015.
21                      /s/ Karen B. Martinez
22                      Karen B. Martinez, Texas CSR 6735
                        Expiration Date:  12/31/2015
23                      Official Court Reporter
                        372nd District Court
24                      Tarrant County, Texas
                        (817)884-2996
25                      kbmartinez@tarrantcounty.com
```