1              REPORTER'S RECORD

2          VOLUME 7 OF 21 VOLUME(S)

FILED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS
3/27/2015 12:36:05 PM
DEBRA SPISAK
Clerk

3      TRIAL COURT CAUSE NO. 1376985

4   COURT OF APPEALS CASE NO. 02-14-00412-CR

5  THE STATE OF TEXAS        )  IN THE 372ND JUDICIAL

6                            )

7                            )

8                            )
   VS.                       )  DISTRICT COURT

9                            )

10                           )

11                           )
   THOMAS OLIVAS             )  TARRANT COUNTY, TEXAS

12

13

14        * * * * * * * * * * * * * * * * * * * * * * * * * * * *

15          TRIAL ON MERITS COMMENCES

16        * * * * * * * * * * * * * * * * * * * * * * * * * * * *

17

18     On the 10th day of September, 2014, the following
   proceedings came on to be heard in the above-entitled
19 and numbered cause before the Honorable Scott Wisch,
   Presiding Judge, held in Fort Worth, Tarrant County,
20 Texas;
       Proceedings reported by computerized machine
21 shorthand with assisted realtime transcription.

22

23

       KAREN B. MARTINEZ, CERTIFIED SHORTHAND REPORTER
24              Official Court Reporter
             372nd Judicial District Court
25                Tarrant County, Texas

STATE v. THOMAS OLIVAS

```
 1    APPEARANCES:

 2    ATTORNEYS FOR THE STATE:

 3        HONORABLE R. KEVIN ROUSSEAU
          SBOT NO: 17324950
 4        HONORABLE TAMLA S. RAY
          SBOT NO: 24046687
 5        Assistant Criminal District Attorneys
          Tim Curry Criminal Justice Center
 6        Fort Worth Texas  76196
          Phone: 817-884-1400
 7        Fax:   817-884-3333

 8    ATTORNEYS FOR THE DEFENDANT:

 9        HONORABLE TIM MOORE
          SBOT NO: 14378300
10        Attorney at Law
          115 West 2nd Street, Suite 202
11        Fort Worth, Texas  76102
          Phone: 817-332-3822
12        Fax:   817-332-2768

13            - AND -

14        HONORABLE JOETTA L. KEENE
          SBOT NO: 11165800
15        Attorney at Law
          204 South Mesquite Street
16        Arlington, Texas  76010
          Phone: 817-275-6611
17        Fax:   817-275-6621

18

19

20

21

22

23

24

25
```

KAREN B. SMITH
OFFICIAL COURT REPORTER

*STATE v. THOMAS OLIVAS*

```
 1              CHRONOLOGICAL INDEX

 2                Volume 7 of 21

 3           TRIAL ON MERITS COMMENCES

 4   September 10, 2014                    Page  Vol.
```

```
 5   Three Witnesses Sworn.......................   6   7

 6   The Court Continues Jury Instructions........  10   7

 7   The Court's Introduction to Jury Trial.......  25   7

 8   The Court Calls Case For Trial...............  29   7

 9   Reading of Indictment........................  29   7

10   Not Guilty Pleas Entered by Defendant........  32   7

11   State's Opening Statement by Mr. Rousseau.....  33   7

12   Defendant's Opening Statement by Ms. Keene....  46   7
```

```
13   STATE'S WITNESSES                       Voir
                          Direct   Cross   Dire    Vol.
14
     Gutierrez, Toni       53,66   63,68    --       7
15
     Lopez, Issac         73,120, 105,125   --       7
16                        127
     Lopez, Celia Murillo  134     --       --       7
17
     Arias, Jason          156    183       --       7
18
     Kornegay, Robert      189    205       --       7
19
     Hicks, Lester         214    242      249,257   7
20
     Mathews, Officer Jamon 260,296 277     --       7
21
```

```
     Recessed for the Day........................  302   7
22
     Court Reporter's Certificate................  303   7
23
```

```
24

25
```

STATE v. THOMAS OLIVAS

```
 1              ALPHABETICAL LISTING OF WITNESSES

 2                                          Voir
                           Direct   Cross   Dire    Vol.
 3
      Arias, Jason          156      183     --      7
 4
      Gutierrez, Toni       53,66    63,68   --      7
 5
      Hicks, Lester         214      242     249,257 7
 6
      Kornegay, Robert      189      205     --      7
 7
      Lopez, Celia Murillo  134      --      --      7
 8
      Lopez, Issac          73,120,  105,125 --      7
 9                          127
      Mathews, Officer Jamon 260,296 277     --      7
10

11                         EXHIBITS

12    STATE'S
      NO.    DESCRIPTION            OFFERED ADMITTED VOL.
13
        1    Audio Disc (Tarrant-1376698R-RR-SX1.mp3)
14                                   148     148     7

15      2    Large Aerial Photograph 84      85      7

16      3    Large Diagram           176     176     7

17      9    Photograph              96      96      7

18     13    Photograph              96      96      7

19    164    Large Photo on Black Board 240   240     7

20    165    Chart on Easel Paper    67      67      7

21

22

23

24

25
```

*STATE v. THOMAS OLIVAS*

```
DEFENDANT'S
NO.      DESCRIPTION                    OFFERED  ADMITTED  VOL.

  1     Xerox Photograph                 108       108      7

  2     Xerox Photograph                 108       108      7

  3     Chart on Easel Paper             108       108      7

  4     Chart on Easel Paper             119       120      7

  5     Chart on Easel Paper             295       296      7

_____
(*) Denotes an exhibit designated for the record only.
```

```
 1                P R O C E E D I N G S
 2           Wednesday, September 10, 2014   9:40 a.m.
 3               (OPEN COURT, DEFENDANT PRESENT, NO JURY)
 4               THE COURT:  All right.  Will y'all state
 5   your name to Karen, please.  And if she needs spellings,
 6   she'll ask, but I think she got it from Mr. Moore.
 7               What's your full, legal name?
 8               THE WITNESS:  Bernice Arlene Olivas.
 9               THE COURT:  Thank you.
10               THE WITNESS:  Rosa Olivas.
11               THE COURT:  Thank you.
12               THE WITNESS:  Bernardo Olivas.
13               THE COURT:  Thank you.  I need each of you
14   to face me and raise your right hands.
15               (Three witnesses sworn)
16               THE COURT:  Is that a "yes", ma'am?
17               THE WITNESS:  Yes.
18               THE COURT:  All right.  I see you nodding.
19   You have to use words.  She can't write down nods.
20   Okay?
21               Put your hands down.
22               There are certain rules that apply to all
23   witnesses in a trial.  Exceptions can be made with the
24   permission of the Court and the parties for family
25   members who don't have anything to say about who
```

1    committed the crime or whether there was a crime that
2    are only character witnesses, if there were to be a
3    sentencing phase.  I've been advised if you were to
4    testify, that would be all you would testify about.
5            Is that your understanding, as well?
6            THE WITNESSES:  Yes.
7            THE COURT:  All right.  Then here's what the
8    general rules are.  The general rule is you cannot talk
9    to any witness about anything you know about the case
10   until you are released as a witness and the trial is
11   over.  You're supposed to testify about what you know
12   and not base it on what you hear other people say.  The
13   general rule is you cannot be present in the courtroom
14   when anyone else testifies for the same reason you can't
15   talk to them outside the courtroom.  You're going to be
16   allowed to remain in the courtroom, but you're strictly
17   prohibited from talking to each other or anyone else
18   about what you see or hear during the course of the
19   trial, unless you're speaking in private with the
20   attorneys for either side or their staffs, who are
21   governed by the Court rules and don't share that with
22   other people.
23           Do you understand that instruction?
24           THE WITNESSES:  Yes, sir.
25           THE COURT:  Make sure you hear and

 1  understand any question asked, and if you can't hear or
 2  don't understand, then say so, but never guess.  If you
 3  do understand the question asked, then answer that
 4  question, stop and wait for the next question.  But
 5  don't keep talking because it's not responsive to the
 6  question and it will wear her hands out before the trial
 7  is over.  There has to be a question, pause, answer,
 8  pause.
 9           Do you understand those instructions?
10           THE WITNESSES:  Yes.
11           THE COURT:  All right.  Do you promise to
12  follow those instructions if you're allowed, as a
13  courtesy by the attorneys, to stay in the courtroom for
14  the trial?
15           THE WITNESSES:  Yes, sir.
16           THE COURT:  All right.  Then based on that
17  promise, you may return to your seats.
18           THE WITNESS:  Your Honor, just one thing.  I
19  would like to at least talk to her, I need to translate
20  a lot that you have just said.
21           THE COURT:  You can translate -- well, you
22  can't sit in the courtroom and translate because you
23  can't talk about the testimony.
24           THE WITNESS:  No, I'm not going to.  But
25  just some of the guidance that you just provided to us.

1          THE COURT:  Well, I'm just saying you can't

2    talk to anyone, in English or Spanish, about anything

3    you see or hear in the courtroom, including each other.

4          THE WITNESS:  Okay.

5          THE COURT:  If -- if you want to sit on the

6    very back row and would tell her what was said, that she

7    could have heard, if she understood, that normally would

8    be okay, but the problem is, no one is allowed to talk

9    in the gallery because it's distracting to the lawyers

10   and the court reporter and the jury.  So even when we

11   have interpreters for witnesses and other people, we

12   have little special equipment and headphones so that it

13   doesn't disrupt the proceeding.

14         THE WITNESS:  I understand.

15         THE COURT:  So I appreciate as a human being

16   what you want to do, but that's just one of the

17   occupational hazards of being a family member who's not

18   bilingual when the proceedings are.  And so my respects

19   to her, but you can't do that.

20         THE WITNESS:  That's fine.

21         THE COURT:  Okay.

22         THE WITNESS:  We understand.

23         THE COURT:  And the easy way, if you were to

24   hear, it wouldn't matter, so --

25         THE WITNESS:  Okay.

1          THE COURT:  -- so at least you'll be able to

2    hear.  And after the trial you can talk to her about

3    what you heard.  Okay?

4          THE WITNESS:  Thank you.

5          THE COURT:  All right.  Any other questions?

6          THE WITNESS:  No, sir.

7          THE COURT:  All right.  Then y'all can

8    return to your seats.

9              (Pause in proceedings)

10              (Jury seated in courtroom)

11          THE COURT:  If there's any time during the

12   course of the trial that you can't hear what's being

13   said because the attorneys move away from the microphone

14   or the witness does or maybe they're standing, holding

15   something up, if you can't hear, cup your hand on your

16   head and say, "I can't hear," and the attorney will

17   repeat what they said or I will tell the witness to

18   repeat the answer.  All clear on that one?

19              If there's something you can't see and it's

20   clear from their questioning or discussion that they

21   think you can, but someone's blocking it or it's too far

22   away, or on the PowerPoint, or someone's head is in way,

23   if you get your hand up here and say, "I can't see,"

24   they'll appreciate it.  They can do their job better and

25   they will either move where you can see or maybe they'll

1    bring it up closer, but they'll make the necessary

2    adjustments.  It's not only your right but your duty to

3    do that, just like if you can't hear.

4              Everyone clear on that one?

5              SEVERAL JURY MEMBERS:  Yes.

6              THE COURT:  Finally, if due to the

7    hurry-and-wait, due to what I think is pretty good

8    coffee we make in this courtroom, due to the five

9    glasses of iced tea at lunch as you wait for your food,

10   if at any time you are so physically uncomfortable, be

11   it an old football injury or fluid, and you need a break

12   because you're losing your focus, if you will raise your

13   hand and say, "short break," I will guarantee you

14   there's at least four or five other people in the

15   courtroom thinking that that don't have the guts to

16   raise their hand yet.  And that's why the jury room is

17   30 feet away.

18             We will take regular breaks.  We may take

19   more breaks than you want.  Any time I, as the umpire,

20   have to do a booth review, if you will, not to use the

21   game analogies again, but I need to talk to the lawyers

22   openly and quickly to figure out what the law allows and

23   what the law requires as the far as the direction and

24   the order of the trial, if I can't handle it shortly, I

25   send you out so we can handle it quickly.

STATE OF THOMAS OLIVAS

1    And what I talk to them in or out of the

2    courtroom, when I rule on objections, when I tell them

3    things, when they tell me things, it's not evidence and

4    it's not to be considered by you in deciding whether the

5    witness does or doesn't know what they're talking about,

6    whether they're truthful or accurate, all or neither.

7    You make that independent determination.  Don't get

8    caught up by what the little man behind the curtain is

9    doing.

10    In the same regard, you may have noticed

11    yesterday during jury selection -- because these lawyers

12    both did excellent jobs talking to you, educating you,

13    and listening to you -- I have 770 other cases besides

14    this one, which are in various states.  If you think of

15    this as an airport, some are in the hangers, some are at

16    the gate, some are on the tarmac waiting to go, go to

17    the runway, and you have taken off.  This is the most

18    important case to me, absolutely to these lawyers and

19    absolutely to you.

20    But in order that other cases can proceed in

21    an orderly fashion when it's their turn for trial, I am

22    doing things all the time.  And if people bring me

23    something from my left side or the sheriff hands me

24    something in the low pass behind my stairs, that has

25    nothing to do with this case.  That's so I can sign

```
 1    things.  That's so things can progress.  I'll respond to
 2    official e-mails and correspondence and documents that
 3    are sent to electronically sign.  I will do that all
 4    along, and it has nothing to do with your factfinding
 5    mission or respect or disrespect to these lawyers or
 6    anywhere else.  And if I happen to miss something
 7    because I'm multitasking, I have Karen here to read it
 8    back to me to make sure I get it right so I make a
 9    proper ball or strike ruling or foul or fair ruling.
10              Does that make sense?
11              SEVERAL JURY MEMBERS:  Yes.
12              THE COURT:  If at any time that multitasking
13    is distracting to you doing your job, well, you've got
14    to let me know and it will stop, and I'll stay late and
15    come in early and it will all get done.  But if it's not
16    distracting to you, I just don't want you to be
17    wondering what I'm doing that has something to do with
18    this case, which is absolutely zero, unless I'm ruling
19    on an objection to give direction to the lawyers.
20              So is everyone good with that?
21              SEVERAL JURY MEMBERS:  Yes.
22              THE COURT:  Let's go back to the blue card
23    then.
24              We read one through three.  Everyone
25    remember those?
```

```
 1              SEVERAL JURY MEMBERS:  Yes.
 2              THE COURT:  Oh, and just a point of
 3    information, did y'all read the rest of this on your own
 4    last night?
 5              SEVERAL JURY MEMBERS:  Yes.
 6              THE COURT:  We thank you.  Did you follow
 7    them to the best of your ability?
 8              SEVERAL JURY MEMBERS:  Yes.
 9              THE COURT:  We thank you even more for that.
10              Rule four, do not even discuss this case
11    among yourselves until after you have heard all of the
12    evidence, the Court's Charge -- which is a confusing
13    term, but it means the legal document charging you to
14    follow these rules, apply these definitions, apply this
15    law and reach a proper verdict.  And it has verdict
16    forms at the end for you to choose based on the results
17    of your deliberations.  I think Mr. Moore may have
18    mentioned it's often a 10- to 15-page document that has
19    all this information that you take into the jury room --
20    you've heard the attorneys' arguments -- which are at
21    the end of the trial after the evidence is presented.
22    And I expect you'll ask the State -- you'll hear the
23    State ask you to vote guilty and the Defense ask you to
24    vote not guilty and tell you why it's appropriate -- and
25    then you will be sent to the jury room and told consider
```

1    your verdict, in other words, deliberate.  That happens

2    at the tail end of the trial, the stern of the ship.

3    That happens after all the evidence is in, you have the

4    rules of law, you have the arguments of counsel ringing

5    in your ears.  And then, and only then, are you allowed

6    to talk about anything you have seen or heard during the

7    course of the trial.

8              All right.  The rules strictly require

9    deliberations to occur only when you know you have all

10   the evidence and you have the rules for deliberations.

11   And that's not how we watch football games or concerts

12   or plays or movies.  If there's an intermission, we talk

13   about what we've seen.  We comment on who's doing the

14   right or the wrong calls or whose fault the interception

15   was or who's doing a good or a bad job.  That's human

16   nature.  During the trial you can't talk about anything

17   until you can talk about everything at the same time.

18              A juror once told me I ought to look at it

19   as don't try to put the pieces -- don't try to put the

20   jigsaw puzzle together unless you're absolutely sure you

21   have all the pieces or you might head off in the wrong

22   direction and make it more complicated when you get the

23   rest of the pieces, and, plus, you waste a lot of time

24   and energy.

25              So is everyone clear on what I'm talking

1    about on this?

2              SEVERAL JURY MEMBERS:  Yes.

3              THE COURT:  I'm going to read five, six and

4    seven together.

5              Do not make any investigation about the

6    facts of this case.  Occasionally we have a juror who

7    privately seeks out information about a case on trial,

8    but this is improper.  All evidence must be presented in

9    open court so that each side may question the witnesses

10   and make proper objections if they apply.

11             If you know of, or learn anything about,

12   this case except from the evidence admitted during the

13   course of this trial, you should tell me about it at

14   once.

15             Six, do not make personal inspections,

16   observations, investigations, or experiments, nor

17   personally view premises, things or articles that are

18   not produced in court.  And do not let anyone else do

19   any of these things for you.

20             Seven, do not tell other jurors your own

21   personal experiences nor those of other persons, nor

22   relate any special information.  A juror may have

23   special knowledge of matters such as business, technical

24   or professional matters or may have expert knowledge or

25   opinions in some field or may know what happened in this

1    or some other lawsuit, but to tell the other jurors any

2    of this information is a violation of these

3    instructions.

4           Five, six and seven stand for the basic

5    proposition, you are judges of the facts.  You are not

6    witnesses for or against either side.  You're certainly

7    not expert witnesses to testify in the jury room when

8    your oath is to render a true verdict, not to tell the

9    truth in the jury room.

10          Does everyone understand that?

11          SEVERAL JURY MEMBERS:  Yes.

12          THE COURT:  You remember that Tarrant/Denton

13   County line example I gave during jury selection about

14   the property line moves because there's a dispute of

15   where it should be?  Let's say you're here in that

16   trial.  And let's just say you could drive a mile out of

17   your way going home in North Tarrant County and go out

18   and look at the place where the property line is

19   disputed.  And after you've driven from downtown Fort

20   Worth to just past Babe's in Roanoke, it would be no

21   trouble for you to just drive a little further and look

22   at what they've been talking about in the courtroom.

23   The law says don't do that.  You're making yourself a

24   witness.  Let the people whose job it is to do that come

25   in and testify about it and explain it to you, but don't

 1    go make yourself a witness.

 2              It may be that the land where this dispute

 3    is going on used to be your grandmother's farm and you

 4    used to swing in the old oak tree in the tire swing that

 5    is probably still there and you've been on that property

 6    a hundred times as a kid, but the law says don't decide

 7    where the line is based on your childhood memories.

 8    Make that decision based on what's presented in court

 9    and don't tell anyone else about the old oak tree or the

10    tire swing, because then you're testifying and not

11    judging.

12              Everyone clear on that?

13              SEVERAL JURY MEMBERS:  Yes.

14              THE COURT:  It may be you're a master

15    surveyor and you know more about surveying in one thumb

16    than any other 20 surveyors know in their whole body.

17    And it may be you're listening to testimony about

18    surveying and you understand it better and it may be

19    your reasons for trusting or not trusting what a

20    surveyor says or may be more knowledgeable than a

21    layperson who's having to listen to everything and how

22    surveying work is explained.  You can use your own

23    common sense, your life experience, your training, your

24    education in forming your own opinions.  You brought all

25    those things with you to the jury room, but you cannot

1   give surveying lessons in the jury room, because then

2   you're testifying.

3            If the lawyers need you to understand how

4   surveying works in order to present their cases, it is

5   their duty to educate the jury on how surveying works.

6   It's not another juror's duty to share specialized

7   information.

8            Does everyone understand that?

9            SEVERAL JURY MEMBERS:  Yes.

10            THE COURT:  That would be true whether the

11   field was education or medicine or surveying or anything

12   else.  You know, if there's medical testimony, if you're

13   an RN or a doctor or a medical assistant, you can't

14   forget your education, but you don't explain things to

15   other jurors who are not familiar to your profession.

16            Is everyone clear on that?

17            SEVERAL JURY MEMBERS:  Yes.

18            THE COURT:  Okay.  Are there any questions

19   about five, six or seven?

20            SEVERAL JURY MEMBERS:  No.

21            THE COURT:  All right.  Here's one more P.S.

22   on that, based upon the length of this trial.  If by

23   chance -- remember when I asked you if you knew each

24   other on jury duty?

25            SEVERAL JURY MEMBERS:  Yes.

1          THE COURT:  If some witness were to come

2    into the trial and you recognize them from some past

3    life experience, be it favorable, unfavorable or

4    neutral, whether they're a customer, a high school

5    classmate, go to your church, work at the same place you

6    do, you are to judge them based upon what happens in

7    this courtroom and not give or take away points from any

8    past or prior life experience.

9          Do you understand that?

10          SEVERAL JURY MEMBERS:  Yes.

11          THE COURT:  If a witness comes in here that

12   you just hate their guts so much or you love them so

13   much from some past life association, that they could

14   never lie, they could never be wrong, you have a duty to

15   bring that to the attention of the deputy so he can

16   bring that to the attention of me.

17          Does everyone understand that?

18          SEVERAL JURY MEMBERS:  Yes.

19          THE COURT:  But if it's someone you know,

20   familiar with and you can judge them here and not give

21   or take away points, then there's nothing wrong with

22   that, that's life.  And in little counties, that happens

23   all the time.  In urban areas it's rare, but the rules

24   are the same.  Okay?

25          SEVERAL JURY MEMBERS:  Yes.

```
 1              THE COURT:  Everyone remember eight from
 2   last night?
 3              SEVERAL JURY MEMBERS:  Yes.
 4              THE COURT:  Eight's P.S., you know, the
 5   newspaper, television, radio, media coverage was covered
 6   by eight.
 7              Everyone remember all that?
 8              SEVERAL JURY MEMBERS:  Yes.
 9              THE COURT:  All right.  At the conclusion of
10   all the evidence, I will submit to you a written charge,
11   the legal document, you know, with the law and the
12   instructions and the verdict forms.  Since you will need
13   to consider all the evidence admitted by me, it is
14   important that you pay close attention to the evidence
15   as it is presented.
16              And I'll be frank.  The longer the trial,
17   the more important it is.  Okay.  If this were a stop
18   sign, roll through a stop sign, one witness, one-and-a-
19   half-hour trial and you decide did they stop or not,
20   that rule is important, but it's easy to follow.
21   Because the jury gets picked, the evidence is put on and
22   you deliberate all in the same day, and most humans can
23   handle that.  When you know it's going to be two or
24   three weeks, you have to pay particularly good attention
25   just like when you know you're going to have to take a
```

1   test based on lectures in three weeks, you have to pay

2   careful attention in class so you don't miss anything.

3          Does everyone understand that?

4          SEVERAL JURY MEMBERS:  Yes.

5          THE COURT:  Because there is no book.  The

6   court reporter is here as a safety valve in case you

7   guys get into what the law calls a dispute.  I call it a

8   friendly and civil argument about what someone said.

9          If -- let's go back to the surveyor

10  situation, and let's say the old oak tree is next to the

11  property line and half of you think Surveyor Bob or

12  Surveyor Ann or Surveyor whoever said the Tarrant/Denton

13  property line is 8.2 blank north/northeast of the old

14  oak tree, and half of you think they said meters and

15  half of you think they said feet, and it's important for

16  you to make a fair decision whether they said meters or

17  feet, if you send me a note out that says, hey, "We're

18  in a dispute.  Some of us think it was meters.  Some say

19  it was feet that Surveyor Bob or Surveyor Ann said.  Can

20  you clarify and resolve our dispute," and the answer is

21  "Absolutely."  "Karen, go to work.  Look up Surveyor

22  Bob's testimony."  And you'll get an answer that says,

23  "Question, where was the property line located in

24  reference to the old oak tree?  Answer, 8.2 meters,

25  feet, yards, centimeters," whatever the answer was,

1    north/northeast, and that's all you get.

2            If you send out a note out and say, hey,

3    "You know, it's been three weeks, Judge, cut us some

4    slack.  We don't remember what Surveyor Bob said,"

5    you'll get an answer that says, hey, You are the

6    factfinders, not me, and certainly not Karen."  It's

7    your job to remember that.  I can resolve disagreements,

8    but I cannot just provide information because you don't

9    remember.  Might not be a fair rule, but it's been in

10   our system for 250 years and I don't have the authority

11   or the desire to change it.

12           So everyone clear on that?

13           SEVERAL JURY MEMBERS:  Yes.

14           THE COURT:  Does anyone have any questions

15   about one through eight and the court reporter rule?

16           SEVERAL JURY MEMBERS:  No.

17           THE COURT:  All right.  Then let's look at

18   the bottom of the paragraph.  I get no pleasure reading

19   this, but it is absolutely important that I do so.

20           Texas law permits proof of any violation of

21   these rules of proper jury conduct.  And by this I mean

22   that jurors and others may be called upon to testify in

23   open court about acts of jury misconduct.  So I instruct

24   you, therefore, to follow carefully all instructions

25   which I have given you, as well as any others which you

```
 1   will later receive while this case is on trial.
 2             You remember in the discussion in jury
 3   selection and someone's immigration status was discussed
 4   during deliberations by the juror and there were those
 5   concerns and I said was that in evidence and she said
 6   yes and I kind of relaxed?  Well, because if it hadn't
 7   been, that would have been jury misconduct, because it
 8   wasn't evidence, had nothing to do with the trial.  If
 9   it was in evidence, it was fair game to figure how would
10   that affect that person's ability to comply or the
11   effects of the sentence.
12             Do y'all remember that discussion?
13             SEVERAL JURY MEMBERS:  Yes.
14             THE COURT:  All right.  Well, there's a
15   reason for that.  Because you're not supposed to inject
16   stuff in the jury room that's not in the trial, whether
17   it be your life experience or testimony or evidence or
18   observations of what people do not in the hall versus
19   what they said in the courtroom.
20             So everyone good with all this?
21             SEVERAL JURY MEMBERS:  Yes.
22             THE COURT:  All right.  Excellent.  Because
23   if you follow all these rules that I give you, either
24   verbally, in writing in this blue card, in writing in
25   the lengthy document you get for deliberations, there's
```

1    two very important things that are going to result.

2    Number one is you will render a true verdict according

3    to the law.  And number two is both sides will get a

4    fair trial regardless of the ultimate decision you make

5    after you decide what are the facts and what do they or

6    do they not prove.

7            Do you have any housekeeping questions that

8    don't deal with the specific law and facts of this case?

9    Can we take notes?  No.  That's the most common

10   question.  All right.

11           Members of the jury, the trial of a criminal

12   case generally takes place in the following fashion:

13           First thing that will happen, I will ask

14   Defense Counsel and the Defendant to stand.  I will ask

15   a representative of the State to come forward and the

16   allegations or charges in each of the paragraphs of the

17   indictment will be read in open court verbatim.  And at

18   the conclusion of the reading of the indictment, I will

19   accept the Defendant's pleas individually to each

20   charging paragraph of the indictment.

21           After the Defendant has entered his pleas, I

22   have to give both sides the opportunity, if they wish,

23   to make what's known as an opening statement.  An

24   opening statement is when an attorney stands before you

25   and tells what you they expect the evidence is going to

STATE OF THOMAS OLIVAS

1    show during the presentation of their case.  I remind

2    you, as I have repeatedly, what the lawyers say, for

3    that matter what the judge says, is never evidence

4    unless you're specifically instructed that it can be.

5              An opening statement some people have

6    referred to as a roadmap of what to look for so you

7    understand it if and when it arrives and particularly

8    understand it in the context of the rest of the case.

9              After any opening statements have been

10   given, the State is called upon to present its case.

11   The State goes first.  As you recall, they have the

12   burden of proof.  When the State has presented its case,

13   when they're done, they will stand up and say the State

14   rests.  When the State rests its case, the Defense is

15   given the opportunity to present evidence, even though

16   by now you should understand they have no legal

17   obligation to do so.  They just have a right to do so,

18   if they choose.  So after the Defense presents its

19   evidence, or even if they present nothing at all, when

20   they're through, they will stand up and say the Defense

21   rests.

22             If the Defense does put on evidence, the

23   State has the right to address that evidence in what's

24   called the rebuttal phase of the trial and to put on

25   rebuttal evidence.  If the State puts on more, the

1    Defense is given the opportunity to put on more if they

2    choose to address the new evidence from the State.

3              So you could have both sides go back and

4    forth with witnesses, one or more sometimes.  It could

5    be the State puts on the only evidence you hear and your

6    job is simply to judge the character and quality of that

7    evidence.  But in any event, when both sides have

8    presented everything that will be presented, you will

9    hear them stand up and say we close.  When you hear the

10   "close" word, that's a signal to you and a signal to me

11   that all evidence has been presented.  It's particularly

12   a signal to me of "Okay, Judge, and you Karen draft the

13   Court's Charge," the law and the instructions which

14   gives the jury each and every opportunity and possible

15   consideration for charges that have been raised by the

16   evidence.

17             If the -- if the evidence is raised, like

18   the aggravated robbery example I gave yesterday, that it

19   may not be a real gun, well, the jury decides that.  If

20   there's no evidence disputing whether it's a real gun,

21   it's whether the crime happened or not, then there's

22   just one charge.  There could be a lot of charges.  You

23   remember how that works?  So it's my job to look at the

24   evidence and anything that any reasonable jury might

25   think is possible during their deliberations.  I give

1    you that option.  And so that depends on how long the

2    charge is, depending on what the evidence is.  And you

3    and I will find that out at the same time.

4           When the charge is ready and prepared, you

5    will be brought back into the courtroom.  I will have to

6    read it to you word for word, even though you take it

7    with you into the jury room.  But when I've read you the

8    law and the instructions, each side is given one last

9    opportunity to address you in what we refer to as final

10   arguments or closing statements.  And at that time I

11   expect you will hear both sides argue to you and tell

12   you why you should vote guilty or not guilty and based

13   upon the evidence that's actually been presented, not

14   what them anticipate will be presented.  Again, what

15   they say is not evidence, but they have the right and,

16   quite frankly, the duty to point out things to you that

17   they think are important for your deliberations.

18          So after the final arguments or closing

19   statements are delivered, you are then sent back into

20   the jury room.  You're given the law in your hands.

21   This 10- to 15-page document.  You're told to select a

22   presiding juror to manage your deliberations.  And then,

23   and only then, you are released from rule four and you

24   may discuss anything and everything you've heard during

25   the course of the trial, as it is your duty to do so.

1   And you deliberate for such period of time, be it

2   two minutes or two days or any other amount of time.

3   The law doesn't put a maximum or minimum.  It's when

4   your conscience and your oath says we have reached a

5   unanimous verdict consistent with the law of Texas and

6   facts as we have determined them to be.  And then you

7   sign a note and let us know when your deliberations are

8   done.  That is the procedure for a trial.

9           Are both sides ready to proceed with the

10  trial on the merits of The State of Texas versus Thomas

11  Olivas?

12          MR. ROUSSEAU:  State is ready, Your Honor.

13          MR. MOORE:  We're ready.

14          THE COURT:  All right.  Then, Counsels,

15  Mr. Olivas, if y'all will, please, stand.

16          If I may have a representative of the State

17  come forward.

18          Ms. Ray, thank you.

19          And, Mr. Moore, I am going to let Ms. Ray

20  read the indictment stem to stern and then I'll go back

21  and accept the individual pleas to each charging

22  paragraph after the entire document has been read.

23          MR. MOORE:  Yes, sir.

24          MS. RAY:  Indictment Number 1376698R, in the

25  name and by authority of the State of Texas, the grand

1    jurors of Tarrant County, Texas, duly elected, tried,

2    impaneled, sworn and charged to inquire of offenses

3    committed in Tarrant County, in the State of Texas, upon

4    their oaths do present in and so the Criminal District

5    Court No. 3, of said County, that Thomas Olivas,

6    hereinafter called Defendant, in the County of Tarrant

7    and state aforesaid, on or about the 20th day of March

8    2011, did then and there intentionally or knowingly

9    cause the death of an individual, Mechelle Gandy, by

10    cutting her or stabbing her with an item, the exact

11    nature of which is unknown to the grand jury, and during

12    the same criminal transaction the Defendant

13    intentionally or knowingly caused the death of another

14    individual, Asher Olivas, by setting fire to his body by

15    igniting a combustible or flammable material with an

16    open flame.

17            Paragraph Two.  And it is further presented

18    in and to said Court that the Defendant, in the County

19    of Tarrant and State aforesaid, on or about the 20th day

20    of March, 2011, did then and there intentionally or

21    knowingly cause the death of an individual, Mechelle

22    Gandy, but cutting her or stabbing her with an item, the

23    exact nature of which is unknown to the grand jury, and

24    during the same criminal transaction the Defendant

25    intentionally or knowingly caused the death of another

1    individual, Asher Olivas, by setting fire to a

2    combustible or flammable material, with an open flame,

3    in close proximity to the body of Asher Olivas.

4             Paragraph Three.  And it is further

5    presented in and to said Court that the Defendant, in

6    the County of Tarrant and State aforesaid, on or about

7    20th day of March, 2011, did then and there

8    intentionally or knowingly cause the death of an

9    individual, Mechelle Gandy, by cutting her or stabbing

10    her with an item, the exact nature of which is unknown

11    to the grand jury, and during the same criminal

12    transaction the Defendant intentionally or knowingly

13    caused the death of another individual, Asher Olivas, by

14    suffocating him by means unknown to the grand jury.

15             Paragraph Four.  And it is further presented

16    in and to said Court that the Defendant, in the County

17    of Tarrant and State aforesaid, on or about the 20th day

18    of March, 2011, did then and there intentionally or

19    knowingly cause the death of an individual, Mechelle

20    Gandy, by cutting her or stabbing her with an item, the

21    exact nature of which is unknown to the grand jury, and

22    during the same criminal transaction the Defendant

23    intentionally or knowingly caused death of another

24    individual, Asher Olivas, in a manner and by a means

25    which is unknown to the grand jury.

1          Against the peace and dignity of the State,

2     signed Joe Shannon, Jr., the Criminal District Attorney

3     of Tarrant County, Texas, and the foreman of the grand

4     jury.

5          THE COURT:  All right.  Thomas Olivas, in

6     Indictment Number 1376698R, to the allegations of

7     capital murder as set out in Paragraph One of this

8     indictment, what is your plea, guilty or not guilty?

9          THE DEFENDANT:  Not guilty, Your Honor.

10          THE COURT:  To the allegation of capital

11     murder as set out in Paragraph Two of the same

12     indictment, what is your plea, sir, guilty or not

13     guilty?

14          THE DEFENDANT:  Not guilty.

15          THE COURT:  To the allegation in Paragraph

16     Three of the same indictment, to the allegation of

17     capital murder as so stated, what is your plea, guilty

18     or not guilty?

19          THE DEFENDANT:  Not guilty.

20          THE COURT:  To the allegation of capital

21     murder as set out in Paragraph Four of that same

22     indictment, what is your plea, guilty or not guilty?

23          THE DEFENDANT:  Not guilty.

24          THE COURT:  Y'all may be seated.

25          Let the record reflect the Defendant entered

1   pleas of not guilty to all charging paragraphs in open

2   court, in the presence of the jury.

3            Does the State wish to make opening

4   statement?

5            MR. ROUSSEAU:  We do, Your Honor.

6            THE COURT:  You have the floor.

7            MR. ROUSSEAU:  Thank you, Judge.

8                 <u>STATE'S OPENING STATEMENT</u>

9            MR. ROUSSEAU:  Good morning, folks.

10            SEVERAL JURY MEMBERS:  Morning.

11            MR. ROUSSEAU:  This is about the last time

12   we'll get to speak to each other I suppose, and both of

13   us speak, at least for a long time because we're going

14   to buckle in now for what's going to be a pretty long

15   haul.  The judge has told you, and we've all spent a lot

16   of time yesterday explaining to you folks, that this is

17   going to be a long trial.  And during the course of the

18   next two to three weeks, however long it takes --

19   sometimes these things are very difficult to estimate,

20   because you never know how long witnesses may take.

21   Can't always anticipate delays.  And sometimes they

22   happen.  But two to three weeks I think is fair.

23            Over the course of the next two or

24   three weeks, we're going to bring you an awful lot of

25   evidence.  Some of it will be very small pieces of

1    evidence.  Some of it will be large pieces of evidence.

2    Some of it will be relatively unimportant, while others

3    is -- other bits are terribly important.  But it is

4    going to be our intention and our plan to bring you all

5    of the evidence that we can, all the evidence that we

6    have.  And we will do everything we can to explain to

7    you what efforts we have made to obtain evidence that we

8    don't have.

9            We will bring you evidence, whether it

10   directly points a finger of guilt at the Defendant or

11   whether it doesn't point at anybody at all, because we

12   want you to understand that we have done the work.  When

13   we are done here -- when we're done here, finally, one

14   of the things that I do not believe that you will be

15   thinking is:  Why didn't they do something else?  You

16   will know that much.

17           On March the 20th, 2011, around ten minutes

18   after 10:00 at night, it was a Sunday, a 9-1-1 call was

19   received by Arlington emergency folks, Arlington Police

20   Department, "There's a fire, a fire at the Presidents

21   Corner Apartments."

22           We're going to bring to you the person who

23   made that phone call, because that person is an

24   eyewitness to the events that we're going to be talking

25   about.  They're going to tell you that there was a fire,

1    a fire broke had broken out in the apartments right next

2    door to their own, that there was -- there were flames

3    shooting out the back of the apartment, and that they

4    were in an absolute state of panic because they knew,

5    they knew that their neighbor, Mechelle Gandy, and her

6    13-month-old son, Asher Rion Olivas, were in that

7    apartment.  The car was sitting out front.  They knew

8    she was -- they knew if she's home -- if that car is

9    there, she's home.  And if she's home, the baby is home.

10   And they knew there was a disaster underway.

11         You're going to hear from the firefighters

12   who responded to that scene.  They were there within

13   three and a half minutes.  The fire department, the

14   station, is just around the corner.  This little -- this

15   area -- and I apologize.  I haven't told you this.  The

16   area that we're talking about, Presidents Corner

17   Apartment, is in the northwest quadrant of the

18   intersection of Lamar Boulevard and Collins, in North

19   Arlington.  A good landmark would be Cowboys Stadium is

20   south -- just south of Interstate 30.  This is just on

21   the north side of Interstate 30, roughly, roughly

22   parallel, roughly in a line, and that's where this is

23   taking place.

24         The firefighters show up and they are then

25   faced with what can only be described as living hell.

1    The apartment was fully engulfed from the back of the

2    apartment moving into the front of the apartment.

3    Firefighters immediately entered the apartment.  One

4    group goes to the right.  They begin searching for

5    victims, while the other -- while the group right behind

6    them proceeds into the apartment with a hose, ready to

7    put out whatever fire they can.

8              You're going to hear from those

9    firefighters.  You're going to hear that the body of

10   Mechelle Gandy was discovered almost immediately in the

11   kitchen, which is just inside the front door and

12   slightly to the left.  The firefighters immediately

13   began trying to pull her out.  They got her to the front

14   door where they had to hand her off to another group of

15   firefighters, who had by then managed to rush up to the

16   door.

17             Meanwhile, the other group of firefighters

18   had already entered the apartment searching for victims,

19   had exited, and they were met with a wall of flames,

20   they could go no further than that and had to find

21   another way to enter the apartment, which they did.  It

22   took a period of minutes to get the fire knocked down

23   sufficiently to where they could at least enter safely

24   and continue their search.

25             And they did conduct a search.  They

1    searched for hours and hours and hours and hours looking

2    for Asher Olivas, because it was their understanding

3    that he was there.  Mechelle, unfortunately, had -- was

4    dead already.  Efforts to resuscitate her were

5    completely futile.  She had already been killed.

6              And you're going to hear the observations of

7    the firefighters on the scene.  It was obvious to them

8    immediately this was not a fire victim.  She was stabbed

9    to death.  They saw it immediately.  And they carried

10   her out and they laid her out of harm's way as best they

11   could.  But I'm afraid there's not a lot of dignity

12   involved.  She's just in a parking lot, just off the

13   sidewalk, in the front of her apartment.

14             Meanwhile, they know that a baby is supposed

15   to be in that apartment.  And so they're searching as

16   best they can, but hours go by and they have not found a

17   body.  They have not found little Asher.  Meanwhile,

18   police are dispatched over to the home of Mechelle

19   Gandy's parents to make notifications, and also to

20   see -- to try to find out if there's any lead, is

21   there's any other place where Asher might be.

22             In the process of doing this, in talking to

23   her parents and talking to other members of the family,

24   they come up with the name of Thomas Olivas as the

25   baby's father.  And they discover right then, that

 1    night, of an ongoing situation where Mechelle Gandy has

 2    been attempting to force Thomas Olivas to pay child

 3    support, to step up, take responsibility as the father

 4    of this child and pay child support.  This had been an

 5    ongoing situation, and they quickly discover that

 6    Mechelle Gandy has also been in communications with

 7    Thomas Olivas' live-in girlfriend, his live-in

 8    girlfriend and the mother of his child, his other child,

 9    the one that he acknowledges.

10             While the police are there, talking to her

11    family, explaining to them that the -- their daughter is

12    now deceased, that she's been murdered, they get word

13    that Asher's body has been found.  And that's at 2:45 in

14    the morning, when the police had been on the scene for

15    four and a half hours -- I'm sorry -- the firefighters

16    had been on the scene for four and a half hours.  It

17    takes that long to discover Asher's body, because it's

18    in a room, his room, the only room where he could be and

19    it's in the room that is most destroyed.  There's not a

20    single identifiable item left in that room other than a

21    hot water heater, which had been in a closet.  The

22    closet's all been burned away.  There's nothing left of

23    the hot water heater.  There's not a single identifiable

24    piece of furniture.  Nothing.  And Asher is found under

25    a layer of ashes on the springs of the mattress on his

```
 1   baby bed.
 2              And the police have to make that second
 3   notification to the family, second notification within a
 4   few hours that now, in addition to their daughter being
 5   gone, their grandson is gone, too.
 6              They begin trying to make contact with
 7   anybody, anybody that might have any contact with --
 8   might have had any contact with Mechelle who might be
 9   able to shed light on this.  And they started trying to
10   contact Thomas Olivas right away, because until they
11   found Asher, they didn't know if he was -- hope against
12   hope, he might still be alive.  He might possibly be
13   in the custody of his father.  No reason to really think
14   that would happen, but who knows.  Let's hope for the
15   best.  So they were trying.  They tried to contact
16   Thomas Olivas, but efforts to contact him failed and
17   went to voicemail.
18              But the police eventually did catch up with
19   Thomas Olivas.  They needed to talk to him and they went
20   to see him the next day.  They went to his job, where he
21   was working, at Best Buy.  You're going to hear that
22   Thomas Olivas was at that time a member of the United
23   States Air Force Reserve, that he worked at Best Buy
24   selling electronics and that he was a server at a
25   restaurant called Truluck's in Southlake.  He lived in
```

1   Grapevine.  They caught up with him as he was -- made

2   contact with him as he got back to his apartment.  He

3   was driving a vehicle that was not his, belonged to a

4   woman named Amanda Rowe.

5           Now, they eventually talked to Thomas

6   Olivas.  He voluntarily went down to the police station

7   with them.  And they -- even though this was an

8   Arlington case, out of courtesy and convenience, they

9   used the Grapevine Police Department.  The Grapevine PD

10  made their facilities available for Arlington to use and

11  an interview with Thomas Olivas occurred there at

12  Grapevine.  And they interviewed Thomas Olivas off and

13  on, but mostly on, for the better part of five hours.

14  And you're going to hear that interview, and I'm going

15  to tell you -- just warn you in advance, it's going to

16  be long, it's going to be tedious.  There will be plenty

17  of moments in there where you think this is, quite

18  frankly, pretty dull, pretty dull, but there are moments

19  that are extremely important.

20          Information comes out during that interview

21  that is extremely important.  Thomas Olivas never

22  acknowledged being the killer here.  You're going to

23  hear that.  But you're going also to hear Thomas Olivas

24  lie repeatedly about the things that he did the previous

25  night.  Remember, this is just the previous night that

1    he's talking about, about the things that he did the

2    previous night, about the vehicle that he was driving,

3    and about the reasons why that vehicle reeked of

4    gasoline.

5            You're going to later hear from the state

6    fire marshal's office who will testify that samples that

7    they tested from that fire revealed the presence of

8    gasoline.  You're going to hear that there was gasoline

9    found on the bodies of Asher and Mechelle, as well as in

10   the baby's bedroom itself, away from the body.  And

11   you're going to hear from the woman who actually owned

12   this car.  This is another woman that Rion -- that

13   Thomas had been sleeping with.  And she's going to tell

14   you about the explanation that he gave her for needing

15   to borrow a car for that weekend.

16           But you're also going to hear from Thomas

17   Olivas' now ex-girlfriend, the mother of his child.  And

18   she's going to tell you about the events over the course

19   of several months, culminating the week of the murders,

20   four days before the murders, that set this whole thing

21   off.  She's going to tell you that she had been in

22   contact with a woman named Mechelle Gandy, who at first

23   she just thought Mechelle Gandy was a crazy person who

24   was trying to pursue her boyfriend, because that was

25   Thomas' explanation to her, but over the course of

STATE OF THOMAS OLIVAS

1    several months, more and more information was given to
2    her, and finally in the week, on the Wednesday night
3    before this all happened -- and this happened on a
4    Sunday.  On the preceding Wednesday night Rebeca
5    confronted Thomas with this -- with these allegations,
6    specifically that he was, in fact, the father of this
7    woman -- he had been having an affair, that he was the
8    father of this woman's child and if he's not, then why
9    doesn't he step up and prove it, why doesn't he do
10   something about it, take responsibility one way or
11   another.
12            And she showed him messages and photographs
13   that had been forwarded on her cell phone, that had been
14   sent to her by Mechelle that could only have originated
15   from Thomas.  At that, he lost it.  The argument
16   became -- the argument did not become physically
17   violent, but it was intense.  He threw her out of the
18   apartment at about 10:00, 10:15 at night.  She takes the
19   kids and she's preparing to leave.  He takes her phone
20   out of her hand, the phone she had shown him, and he
21   throws it into the parking lot where it shatters.
22            She leaves.  She goes to her father's house,
23   who fortunately only lived maybe a half mile away, just
24   around the corner, essentially.  And she stayed there
25   and she still lives there to this day.

STATE OF THOMAS OLIVAS

1              Then you're going to hear that over the
2      course of the next few days, the Defendant made a rather
3      half-hearted suicide attempt.  He took pills,
4      medications that had been prescribed to Rebeca, that had
5      been left at the apartment.  He called a couple of
6      friends from out of town, said he wasn't doing well and
7      they offered to come up and stay with him for a day or
8      two just to make sure he's okay.  They did.  They came
9      into town.
10              And you're going to hear from one of them.
11      They're going to be here to explain to you the things
12      they did.  They left about noon or so on Sunday
13      afternoon, the day of the murders.  And then after they
14      left, from about early in the afternoon, right up until
15      about 7:00 o'clock at night, there were a series --
16      there were dozens and dozens and dozens of telephone
17      communications between Thomas and Mechelle Gandy,
18      dozens, that started with him calling her.
19              He's going to acknowledge to you in his
20      interview with the police the same things that Rebeca
21      will have said, that this -- that he was aware that
22      Mechelle had instituted legal proceedings with the
23      Attorney General's Office to force him to pay child
24      support, that she had been served with the papers.
25      That's the way it's done.  Both parties are served with

1    the papers by the Attorney General's Office.  She had

2    gotten hers and they had communicated and she had told

3    him that she had some questions about the papers, could

4    they get together and talk about it to see if they

5    could, I don't know, understand the paperwork together.

6              Arrangements were made for him to go to her

7    apartment that night.  He was supposed to meet her that

8    night.  He will acknowledge driving to her apartment

9    that night.  He will acknowledge getting to just around

10   the corner from her apartment that night, but that's as

11   far as he will go.  Instead, he told the police that he

12   drove up and down Lamar Boulevard for hours, that he

13   tried to contact her, but he just couldn't get ahold of

14   her and he finally just gave up.

15             Ladies and gentlemen, you're going to hear,

16   however, that actual -- he had actual knowledge of what

17   her actual address was, the exact apartment number.  All

18   communication between them ceased at around 7:00

19   o'clock.  All communication on his phone, outgoing,

20   ceased at around 7:00 o'clock, give or take.  I'm

21   ballparking it here.  You'll see the records.  Her

22   telephone communications ceased.  There had been 50

23   some-odd communications between them up until that time

24   that day, nothing for about that three-hour window, as

25   if they were in the same room and no longer needed to

1    communicate by telephone, until 10:07 at night.  At

2    10:07 at night he sends her a text message that says

3    words to this effect, "Sorry, I can't come.  I don't

4    have a car," 10:07 at night.

5              You're going to hear that that text message

6    was sent while it -- while his telephone was in

7    approximately -- was within about a half mile of her

8    apartment.  The cell tower that handled that call, that

9    picked up the signal to handle that -- not call, text

10   message, was the one closest to her apartment.  It says,

11   "Sorry, I can't come.  I've got no phone -- I've got no

12   car."  Three minutes later, three minutes later the

13   first 9-1-1 call came in.  The place is on fire.

14             We're going to bring it all to you, ladies

15   and gentlemen.  And, as I said, we're going to ask for

16   your patience.  We're going to ask you to pay attention

17   and I will just give you fair warning, this is going to

18   be a long trial with a lot of witnesses.  We'll do our

19   best to bring it to you in chronological order, but

20   people have schedules, witnesses can sometimes run long.

21   We will do our best.  You may have to jump back and

22   forth a little bit in your mind.  We will do our best to

23   bring it to you in a coherent and organized fashion.

24             If you pay attention closely, keep an open

25   mind -- I do invite you to keep open mind -- if you do

 1    all that, I have no doubt when this trial is over you're

 2    going to be as -- you are going to be completely

 3    convinced as to the guilt of Thomas Olivas for the

 4    capital murders of Mechelle Gandy and Asher Rion Olivas.

 5    Thank you.

 6                THE COURT:  Does Defense wish to make

 7    opening statement at this time or reserve?

 8                MS. KEENE:  We do, Judge.

 9                THE COURT:  You may proceed.

10                <u>DEFENDANT'S OPENING STATEMENT</u>

11                MS. KEENE:  I've not had a chance to talk

12    with you and I won't really get to again for another

13    couple of weeks.  But I want to start off by telling you

14    that Thomas Olivas did not kill Mechelle Gandy.  Thomas

15    Olivas did not kill that sweet baby, Asher.  He simply

16    did not do it.  They were victims of a horrific,

17    horrible crime.  And the question is, who did it?  And

18    it's not the person that's sitting over there.

19                You will not hear in the next two or three

20    weeks any evidence, any direct evidence that ties him to

21    this crime.  Not a single fingerprint, no DNA, no blood

22    on him, no blood anywhere.  None of his there.  None of

23    hers in his car, in his house, on his clothes.  You'll

24    not hear any direct evidence.  No actual gas on his

25    clothes.  No gas in the car.  No gas in his house.

1              What you are going to hear for two or

2    three weeks is a lot of inferences, a lot of things that

3    put him in the suspect column, a column he should be in.

4    Any time a woman is killed, the father, baby daddy,

5    husband, whoever, will get put in that column.  That is

6    a given.  Unfortunately, it's just the nature of who we

7    are.  But it does not always mean that they did it.

8              And the Michael Morton case itself shows

9    that.

10             MR. ROUSSEAU:  Your Honor, I'm going to

11   object to this.  This is -- she's out of line and this

12   is --

13             THE COURT:  Well, that's arguing outside the

14   trial record.

15             MR. ROUSSEAU:  It's pure argument, as well,

16   Your Honor.

17             THE COURT:  Well, sustained only to the

18   Michael Morton comment.

19             MS. KEENE:  The police confronted Thomas

20   pretty much immediately after this crime and Thomas

21   cooperated with the police.  Thomas talked to them.

22   Thomas gave them his telephone, "Here, dump it."  "Read

23   it."  "Look at it."  It's an iPhone.  It's the type of

24   phone that tells everything about you as a person.  The

25   police had that.  He gave it to them.

1          The clothes, "Here's the clothes."  "Search

2   the house."  Thomas cooperated.  Search, having pictures

3   of his body.  He contemplated should I or shouldn't I?

4   "I don't know."

5          "Search of the car?"

6          "I don't know."  But in the end he said yes

7   to everything.  "Search me."  "Look at me."  He

8   cooperated with the police.  Thomas was the suspect from

9   the get-go and he was a suspect because he was supposed

10  to meet with Mechelle Gandy.  That is a fact.  It also

11  puts him in the suspect column.  No question about it.

12         But Thomas didn't know where she lived and

13  in the text messages you'll even see where she says,

14  "Call me and I'll give you directions."  He didn't know

15  where her house was.  In fact, when you look at the cell

16  phone records, they're going to be pivotal in this case,

17  period, because they're going to show him driving up and

18  down during this time period.  He never saw her that

19  night, because he's driving around and he ends up at a

20  bar where there's some pool and beer.  And that's the

21  inference they take.  That puts him in the suspect

22  column.

23         When the police got this case, of course, he

24  becomes person of interest number one, really as he

25  should, based on the issues with the kiddo and the

1    paternity and based on him going to meet her.  And he,

2    of course, tells them he was in Arlington, he was

3    supposed to meet her, he just didn't.  So that puts him

4    in the suspect column.

5              But also what happened is the police

6    began -- very early on there's another suspect.  Bam.

7    Hits them.  Rises up very quickly.  And that is a

8    stalker that Mechelle had been having in the past

9    several months.  Mechelle worked -- the victim in this

10   case worked at the 7-Eleven.  And working at the

11   7-Eleven she had picked up a person who had come in

12   there and taken him home to have sex with him at her

13   house, at her apartment, where she was killed.  And that

14   person became a stalker and became a person to such an

15   extent that she needed to get a gun to protect herself.

16   And so that became a real suspect for the police to

17   begin to look at, too.

18             Anything that we talk about in this case,

19   the next couple of weeks, that deals with Mechelle, do

20   not take it as us trying to trash her.  Okay?  There is

21   no judgment in any -- picking someone up.  There is no

22   judgment from that, period, because that's just

23   irrelevant.  It's irrelevant if a prostitute or a nun is

24   given.  That's irrelevant.  But what is relevant is if

25   it creates suspects or if it creates the type of

1    lifestyle that you need to look at other people to see

2    if it could have been a person that killed her.

3              Mechelle picked up random guys from the

4    7-Eleven and she brought them back to her house and she

5    had sex with them.  That is a given and that is a truth

6    and that is her lifestyle.  And the police did zero

7    investigation into any of these suspects.  What you're

8    going to hear about is the police zeroed in on the

9    stalker and did what they did to say we eliminate him.

10   And once they did that, they said we're not turning over

11   any more stones.  We're not looking any deeper.  We're

12   happy with what we got on Thomas.  We're happy with the

13   inferences.  No confession.  No direct evidence.  No

14   eyewitnesses.  Just inferences.

15             What you're going to hear about is that

16   there was an incomplete, if not incompetent,

17   investigation in this case.  And you're going to hear

18   about that for three -- for the next two weeks.  The

19   crime happened on March the 20th of 2011 and within a

20   month to two months pretty much all the evidence that

21   you're going to hear in this courtroom was developed.

22   But Thomas Olivas was not arrested in March of 2011.

23   The police allowed him to continue to be free.  Thomas

24   wasn't arrested in April of 2011.  They allowed him to

25   be free.  Thomas wasn't arrested in May, June, July.  He

1   wasn't arrested in August.  He wasn't in arrested in

2   September.  Thomas wasn't arrested, with the same

3   evidence you're going to hear about, in October 2011.

4   He wasn't arrested in November of 2011.  He wasn't

5   arrested in December of 2011.

6          What you're going to hear about is that it

7   was not until November of 2012 that the police decided

8   we're going to arrest him on the same evidence they'd

9   had for the past year and a half.  This case is not

10   beyond a reasonable doubt.  They have determined based

11   on inferences that Thomas looks guilty.  And maybe he

12   does.  Maybe he does.  But looking guilty does not make

13   a person guilty.

14          And so we believe that at the end of this

15   trial you're going to have Thomas supposed to meet with

16   the victim of the crime.  No evidence that he ever did.

17   You're going to have Thomas in the vicinity, but no

18   evidence that he was actually there.  You'll have

19   evidence that Thomas had some scratches on his body or

20   some marks.  You'll have evidence that there was a smell

21   of gasoline in his car.  And based on those pieces of

22   evidence, they're going to ask you to find him guilty.

23   And I anticipate that that is going to be the sum total

24   of their case.

25          And at the conclusion of the evidence and

1  after looking at all the different folks that really

2  could have been involved in this, and maybe we could

3  make as many inferences against them, I believe that you

4  will not love your verdict, as you'll want to solve the

5  case, and everybody does, but I believe that you will

6  follow the constitution and you will say this case has

7  just not risen to the evidence of beyond a reasonable

8  doubt.  Thank you.

9          THE COURT:  Y'all approach briefly.

10         (Discussion at the bench, off the record)

11         THE COURT:  All right.  You can call and

12  identify your first witness.

13         MS. RAY:  Your Honor, we call Toni

14  Gutierrez.

15         (Witness takes the stand)

16         THE COURT:  All right.  Now, state your

17  full, legal name, please, for the court reporter and

18  members of the jury.

19         THE WITNESS:  Toni Gutierrez.

20         THE COURT:  I need you to face me and raise

21  your right hand.

22         (One witness sworn)

23         THE COURT:  Have you ever testified before

24  in district court?

25         THE WITNESS:  Yes.

*STATE of THOMAS OLIVAS*

 1                THE COURT:  Are you familiar with the rules

 2    that apply to all witnesses, where you may and may not

 3    be, who you may and may not talk to?

 4                THE WITNESS:  Yes.

 5                THE COURT:  Those rules apply in this case,

 6    as they do in most.  Just make sure that you follow

 7    them.

 8                THE WITNESS:  Yes, sir.

 9                THE COURT:  Tamla.

10                MS. RAY:  Thank you, Your Honor.

11                        TONI GUTIERREZ,

12    having been first duly sworn, testified as follows:

13                     DIRECT EXAMINATION

14    BY MS. RAY:

15       Q.  Ms. Gutierrez, could you, please, introduce

16    yourself to the jury and tell them who you work for.

17       A.  Okay.  I'm Toni Gutierrez.  I work for the City

18    of Arlington Fire Department, Dispatch Services.

19       Q.  And how long have you worked for them?

20       A.  Thirty-two years.

21       Q.  And what is your position in that organization?

22       A.  I am a communication supervisor.

23       Q.  And how long have you been a communication

24    supervisor?

25       A.  For 25 years.

1    Q.   And what job do y'all do with the -- say it

2   again.  That's a long name.  Where do you work again?

3    A.   The City of Arlington Fire Department, Dispatch

4   Services.

5    Q.   What do y'all do?

6    A.   We -- we're the dispatch center.  That's where

7   all the emergency calls come in.

8    Q.   You stated that you have been the communications

9   supervisor?

10    A.   Yes.

11    Q.   What does that entail?

12    A.   I supervise fire dispatchers, police dispatchers,

13   and 9-1-1 operators.

14    Q.   And you've held that position for 22 years?

15    A.   Twenty-five.

16    Q.   Twenty-five.  So if I live within the City of

17   Arlington and I call 9-1-1, it will be your people that

18   I'm talking to?

19    A.   Yes, ma'am.

20    Q.   When I call 9-1-1, how are calls generated and

21   recorded, generally?

22    A.   They're automatically recorded on a digital audio

23   system.

24    Q.   Is there a way for you, or anyone else, to go in

25   to the system and change a call?

```
 1      A.  No, ma'am.

 2      Q.  Even as a supervisor you can't do it?

 3      A.  No, ma'am.

 4      Q.  Do you also hold the role as custodian of

 5  records?

 6      A.  Yes.

 7      Q.  And what does that mean to be a custodian of

 8  records?

 9      A.  Custodian of records, I have to ensure that calls

10  are recorded appropriately, anything that comes out of

11  our dispatch center is authenticate, any paperwork that

12  accompanies the audio is from our center, and

13  authenticate, also.

14      Q.  About how many call takers do you supervise?

15      A.  On dayshift, because I'm a dayshift supervisor,

16  usually about seven 9-1-1 operators.

17      Q.  And do you know -- have you ever supervised

18  nightshift?

19      A.  Yes.

20      Q.  How many generally are on nightshift?

21      A.  Dayshift, the most about seven right now.  The

22  evenings about nine.  And nightshift, depending on what

23  day it is, about eight.

24      Q.  Are there more days that are busier than others?

25      A.  Yes, like Friday or Saturday nights.
```

STATE v. THOMAS OLIVAS

1    Q.   And as the custodian of records, is it part of

2    your job to -- you stated that you maintain the audio

3    caller -- calls.  Is there also a report that's

4    generated based on calls to 9-1-1?

5    A.   Yes.

6    Q.   And if you could, describe what that report looks

7    like or what is -- what the purpose is of that report.

8    A.   It's just a computer-generated printout of the

9    call into our 9-1-1 center.

10   Q.   And what sort of information is detailed in that

11   report?

12   A.   It has the date and the time that the call comes

13   in, when the units are dispatched, when they go en

14   route, when they go on scene, and any pertinent

15   information that maybe the 9-1-1 operator obtains, and

16   once it's dispatched, possibly police or fire dispatcher

17   information that they entered into the call.

18   Q.   So if someone calls 9-1-1, the information that

19   they relay to the call taker, the call taker can then

20   relay to the appropriate agency, be it fire or police;

21   is that correct?

22   A.   Correct.  Because the call comes in and it's on a

23   computer system, so they're entering the information.

24   As soon as they enter the call, the call will go to the

25   fire dispatcher and/or the police dispatcher and they

1    immediately have it to dispatch.

2              MS. RAY:  May I approach the witness, Your

3    Honor?

4              THE COURT:  You may.

5    Q.  (BY MS. RAY)  Ms. Gutierrez, I'm showing you what

6    has been previously marked as State's Exhibit 1.  Are

7    you familiar with State's Exhibit 1?

8    A.  Yes, ma'am.

9    Q.  Okay.  And State's Exhibit 1 is a CD, correct?

10   A.  Yes.

11   Q.  And have you listened to the contents of State's

12   Exhibit 1 prior to your testimony?

13   A.  Yes.

14   Q.  And when did you do that?

15   A.  Today.

16   Q.  And did you mark it so that you know that it's

17   the same CD that you listened to?

18   A.  Yes, ma'am.

19   Q.  On March 20th, 2011, did the -- did your dispatch

20   services receive a call pertaining to an incident at

21   2216 Presidents Corner Drive?

22   A.  Yes.

23   Q.  And at what time did y'all receive the call?

24   A.  The call came in at 10:10 and 52 seconds on March

25   20, 2011.

*STATE v. THOMAS OLIVAS*

1    Q.   Now, the -- State's Exhibit 1, does that contain

2    the call in reference to the incident at -- on March

3    20th, 2011, at 10:10 and 52 seconds?

4    A.   Yes, ma'am.

5    Q.   Does the call depicted on State's Exhibit 1, was

6    it kept in the regular course of business for dispatch

7    services?

8    A.   Yes, ma'am.

9    Q.   Did an employee or representative of the City of

10   Arlington dispatch services make these records or

11   transmit this information regarding acts, events,

12   conditions, opinions, or diagnosis?

13   A.   Yes.

14   Q.   Was it done at or near the time or reasonably

15   soon after the event?

16   A.   Yes.

17   Q.   Did the employee or representative who made the

18   entries have actual knowledge of the events?

19   A.   Yes.

20   Q.   Now, the call depicted on State's Exhibit 1, is

21   that an exact duplicate of the call that y'all received

22   on March 20th, 2011?

23   A.   Yes, ma'am.

24   Q.   Do you recall how many calls you received

25   pertaining to the incident at 2216 Presidents Corner?

1    A.   There were a couple of calls.

2    Q.   And the report we mentioned earlier was a report

3    generated based on the call?

4    A.   Yes.

5    Q.   And that report indicates that there were more --

6    there was more than one call?

7    A.   Yes.

8    Q.   Does the report indicate what sort of incident

9    this was, whether you needed to dispatch -- or what sort

10   of agency needed to be dispatched?

11   A.   Yes, ma'am.

12   Q.   What sort of call was it?

13   A.   It was an apartment fire.

14   Q.   And do your records indicate at what time you

15   dispatched someone to address the apartment fire?

16   A.   Yes, ma'am.

17   Q.   Can we just --

18        THE COURT:  She answered your question.  You

19   said do the records indicate...  She answered yes.

20        Your next question.

21   Q.   (BY MS. RAY)  And what time do the records

22   reflect that the fire department was dispatched?

23   A.   One alarm assignment was dispatched at 10:11 and

24   9 seconds.

25        MS. RAY:  Your Honor, may I approach the

```
 1   easel?
 2               THE COURT:  You may.
 3               (Pause in proceedings)
 4               THE COURT:  Carry on.
 5               MS. RAY:  Thank you, Your Honor.
 6        Q.  (BY MS. RAY)  Okay.  Ms. Gutierrez, at what time
 7   did y'all receive the first 9-1-1 call pertaining to the
 8   fire?
 9        A.  The first one was answered by the 9-1-1 operator
10   at 22:11 and 9 seconds.
11        Q.  I'm sorry?
12        A.  The first call?
13        Q.  Yes.
14        A.  The 9-1-1 operator received it at 10 -- well,
15   I -- did I say it in 24-hour increments?  I said 22:11
16   and 9 seconds, which is 10:11 and 9 seconds.  Sorry, I
17   was using military time.
18        Q.  No need to apologize.
19               And nine seconds?
20        A.  Yes.
21        Q.  And that would be p.m.?
22        A.  Yes.
23        Q.  And do your records indicate at what time the
24   first fire truck was dispatched to the location?
25        A.  Yes.  They were dispatched at 10:11 and
```

```
 1    23 seconds.
 2        Q.   And do you know at what time the fire department
 3    made the scene of the location?
 4        A.   They made the scene at 10:14 and 31 seconds p.m.
 5        Q.   Thirty-one seconds?
 6        A.   Yes.
 7        Q.   At some point did another agency, other than the
 8    fire department, also get dispatched?
 9        A.   Yes.
10        Q.   And at what time -- which agency was it and at
11    what time did it also get dispatched?
12        A.   The police department was requested.  And 10:19
13    and 20 seconds.
14        Q.   Who would have made such a request?  Is that
15    something based on another call or would the fire
16    department -- how would it work that an additional
17    request would be made?
18        A.   The fire department requested the police
19    department to go block a couple of streets.  That's why
20    they were requested initially.
21        Q.   Okay.  Did -- does it show -- do the records
22    indicate that a subsequent request was made?
23        A.   Yes, for the police department.  They were
24    requested at 10:34 and 18 seconds.  They requested crime
25    scene, police, for a stab victim.
```

1     Q.   You said 10:34?

2     A.   10:34 and 18 seconds p.m.

3     Q.   And do you have -- does your information indicate

4  at what time police arrived to address the crime, the

5  stabbing victim?

6     A.   I do not have -- I just have when they were

7  notified, but I do not have when they got on scene.

8     Q.   Okay.  Now, Ms. Gutierrez, you mentioned that you

9  have listened to the call that's depicted on State's

10 Exhibit No. 1?

11    A.   Yes.

12    Q.   Did you recognize the call taker?

13    A.   Yes.

14    Q.   Okay.  Who was that call taker?

15    A.   It was Patty Worley.

16    Q.   Could you spell Patty's last name?

17    A.   W-O-R-L-E-Y.

18    Q.   How long has Patty worked for y'all?

19    A.   I don't recall.

20    Q.   Okay.

21    A.   And she no longer works for our department.

22    Q.   Okay.  So you recognized her voice even though

23 she no longer worked for y'all?

24    A.   Yes.  At least ten years, but I don't have a

25 definite timeframe.

STATE v. THOMAS OLIVAS

```
 1              MS. RAY:  I pass this witness, Your Honor.
 2              MR. MOORE:  I just have a few questions.
 3              THE COURT:  Go ahead.
 4                    CROSS-EXAMINATION
 5   BY MR. MOORE:
 6      Q.  Ms. Cisernos (sic), how is it recorded what time
 7   these telephone calls come in?
 8      A.  I'm Ms. Gutierrez.
 9      Q.  Oh, I'm sorry.
10      A.  If the question is for me, I'm Toni Gutierrez,
11   and it is a digital audio system.
12              THE COURT:  You answer questions.  You don't
13   make statements in court.
14              THE WITNESS:  Okay.
15              THE COURT:  Okay.  You can do that after the
16   trial.
17              THE WITNESS:  Okay.
18              THE COURT:  Next question.
19      Q.  (BY MR. MOORE)  I'm sorry.  I was writing your
20   name down.  I got it wrong, for some reason.
21      A.  That's all right.  Gutierrez.
22      Q.  Could you explain that again?
23      A.  It's an audio system, digital audio system.
24      Q.  Okay.  And very accurate?
25      A.  Yes.
```

1    Q.   Is it checked and calibrated and made sure that

2    that's a correct time that is reflected on the records?

3    A.   Yes.

4    Q.   Ms. Ray put this 10:11:09 as the first call.

5    What was 22:10:52?  Was that the first call that came

6    in?

7    A.   No.   I -- the first call that came in was in

8    military time 22:11:09, which is --

9    Q.   Okay.   And that --

10   A.   -- 10:11 and 9 seconds p.m.

11            MR. MOORE:   May I approach?

12            THE COURT:   Yes.

13   Q.   (BY MR. MOORE)   And we're only talking a few

14   seconds here.

15   A.   I'm sorry, what was that time you gave me?

16   Q.   22:10:52.

17   A.   Oh, that's when the call initially came in to the

18   system.

19   Q.   Okay.   And we're talking the initial 9-1-1 call?

20   A.   22:10 and 52 seconds is when the system picks up

21   the call.

22   Q.   Right.

23   A.   It doesn't mean that that's when the operator

24   answered it.

25   Q.   Okay.   If I'm out there and I picked up 9-1-1 and

*STATE OF THOMAS OLIVAS*

```
 1   go 9-1-1 --
 2       A.  Uh-huh.  Exactly.
 3       Q.  -- and it rings, that's when that's recorded?
 4       A.  Yes.
 5       Q.  Okay.  Not when the operator picks it up but when
 6   the call actually connects?
 7       A.  They're all recorded.  It's all recorded.
 8       Q.  Okay.  So 22:10:52 would have been the exact time
 9   that the 9-1-1 call came in to your place?
10       A.  Correct.
11       Q.  Okay.  I'm not knit-picking.  I'm just --
12       A.  No, that's okay.
13       Q.  That's what my records showed.
14           And when it says close 6:08:48, I assume
15   that would mean that's when everybody left the scene,
16   all the firefighters?
17       A.  That's when the last person told us to close the
18   call.
19       Q.  Okay.
20       A.  Yes, sir.
21       Q.  Thank you, ma'am.
22       A.  You're welcome.
23           MR. MOORE:  That's all.
24           THE COURT:  Any redirect?
25           MS. RAY:  Yes, Your Honor.
```

STATE v. THOMAS OLIVAS

```
 1                    REDIRECT EXAMINATION
 2   BY MS. RAY:
 3       Q.  Ms. Gutierrez?
 4       A.  Yes.
 5       Q.  Just so we understand, at 22:10 -- or at 10:10
 6   and 52 seconds, what happened at 10:10 and 52 seconds?
 7       A.  That's when the call is placed to 9-1-1 and it's
 8   waiting to be answered.
 9       Q.  And at 10:11:09, that's when that call was
10   answered?
11       A.  Yes, ma'am.
12       Q.  Okay.  Ms. Gutierrez, so do I have all this
13   accurate and correct?  At 10:10 and 52 the first call
14   comes in as waiting to be answered?
15       A.  Yes.
16       Q.  And at 10:11:09 the first call is answered; is
17   that correct?
18       A.  Yes, ma'am.
19       Q.  At 10:11:23 the fire department is dispatched?
20       A.  Yes.
21       Q.  At 10:14:31 the fire department is on scene; is
22   that correct?
23       A.  Yes, ma'am.
24       Q.  At 10:19:20 the police requested -- or police are
25   requested to block the street?
```

```
 1        A.  Yes, ma'am.

 2        Q.  And then at 10:34:18 the police crime scene was

 3   requested because of a stab victim?

 4        A.  Yes, ma'am.

 5        Q.  And this, of course, is on March 20th, 2011?

 6        A.  Yes, ma'am.

 7             (Pause in proceedings)

 8        Q.  (BY MS. RAY)  Ms. Gutierrez, the -- you watched

 9   me write this information on this chart?

10        A.  Yes, ma'am.

11        Q.  And I just marked it as State's Exhibit 165.

12        A.  Okay.

13        Q.  And is State's Exhibit 165, the information that

14   I depicted, is this an accurate reflection of what you

15   told us, first, regarding the times and dates of calls

16   and the nature of the call?

17        A.  Yes, ma'am.

18             MS. RAY:  Your Honor, I offer State's

19   Exhibit No. 165, after tendering to Defense Counsel for

20   inspection.

21             MR. MOORE:  I have no objection.

22             THE COURT:  All right.  The chart marked as

23   165 is admitted as offered.

24             (State's Exhibit No. 165 admitted)

25             MS. RAY:  I pass this witness, Your Honor.
```

1          MR. MOORE:  Just one other question.

2          THE COURT:  Sure.

3                    RECROSS-EXAMINATION

4   BY MR. MOORE:

5      Q.  Ms. Gutierrez, according to the -- well,

6   according to your records that you brought here today,

7   there are some comments out to the side of these times,

8   correct?

9      A.  Yes, sir.

10     Q.  And one of them is -- I lost it.  Hang on -- at

11  22:13:02?

12     A.  Yes.

13     Q.  It says, "Complainant kicked in door.  No one is

14  coming out."  Does that -- do you see that?

15     A.  Yes, sir.

16     Q.  Who -- who puts that information in there?

17     A.  The 9-1-1 operator.

18     Q.  And how does she receive that information?

19     A.  It's the complainant talking to her.  So

20  whatever --

21     Q.  And not --

22     A.  -- whatever the person that's calling in is

23  saying, she'll type in, into the call.

24     Q.  Okay.  So at 10:13:02 -- I'm confused -- it says,

25  "Complainant kicked in door."  "Complainant" being the

```
 1   9-1-1 caller, correct?
 2      A.  Yes.  Yes, sir.
 3      Q.  And that -- and was he actually -- or that
 4   person, that complainant, talking to the 9-1-1 operator?
 5      A.  I'd have to listen to it again.
 6      Q.  Okay.
 7      A.  But I'm pretty sure they were.  But I'd have to
 8   listen to it.  I couldn't answer with certainty.
 9      Q.  Okay.  Thank you, ma'am.
10      A.  You're welcome.
11          THE COURT:  Anything else from the State?
12          MS. RAY:  No further questions for this
13   witness, Your Honor.
14          THE COURT:  May the witness be permanently
15   excused by the parties?
16          MR. MOORE:  Yes.
17          MS. RAY:  No objection, Your Honor.
18          THE COURT:  All right.  Then I'm going to
19   excuse you from trial.  You're not on call.
20          THE WITNESS:  Okay.
21          THE COURT:  And you just need to remember
22   who you may and may not talk to until you find out the
23   jury has reached a decision.  Thank you for coming in.
24          THE WITNESS:  Yes.  You're welcome.
25          (Witness excused from courtroom)
```

 1              THE COURT:  All right.  She's going that
 2    way.  Why don't y'all go that way.  Hit the buzzer when
 3    you're ready to start back.
 4              Everyone, we'll take a five- to ten-minute
 5    stretch break.  Listen for the jury buzzer.  When you
 6    hear it, return to your stations.
 7              Remember your instructions.  Now you do have
 8    something to talk about, just don't.
 9              (Break taken, 11:25 - 11:40 a.m.)
10              (OPEN COURT, DEFENDANT PRESENT, NO JURY)
11              (Witness on the stand)
12              THE COURT:  What is your full, legal name?
13              THE WITNESS:  Paul Issac -- Paul Issac
14    Lopez.
15              THE COURT:  Okay.  I need you to face me and
16    raise your right hand.
17              THE WITNESS:  Do you want me to stand up?
18              THE COURT:  Nah.
19              (One witness sworn)
20              THE COURT:  All right.  Have you ever
21    testified before?
22              THE WITNESS:  Nah.  No, sir.
23              THE COURT:  All right.  There's rules you've
24    got to follow.  Rule number one, you can't be in the
25    courtroom unless you're answering questions.  You cannot

```
 1    sit in the courtroom and listen to what other people
 2    say.
 3              Do you understand number one?
 4              THE WITNESS:  Yes, sir.
 5              THE COURT:  All right.  Number two, you
 6    cannot talk to other people about what you see or hear
 7    in the courtroom unless you're speaking in private with
 8    the attorneys for either side or their staff, at least
 9    not until the trial is over.  You answer questions in
10    court, you speak in private with the lawyers, or you
11    don't talk until you hear there's a final decision by
12    the jury.
13              THE WITNESS:  Yes, sir.
14              THE COURT:  Make sure you hear and
15    understand the question asked.  If you can't hear or
16    don't understand, then say so, but never wing it.  If
17    you do understand the question, answer that question and
18    stop and wait for the next question.  If someone asks:
19    Do you have a watch?  Say yes or no.  If they want to
20    know what time it is, they'll ask that question next.
21    But don't say yes and it says it's 3:53 or whatever.
22              THE WITNESS:  Yes, sir.
23              THE COURT:  Do you follow the difference?
24              THE WITNESS:  Yes, sir.
25              THE COURT:  Her hands have to rest between
```

1   question and answer.  It's kind of stilted, not like

2   normal conversation, but you can learn to talk normal a

3   couple of days after the trial.

4           Do you understand all these instructions?

5           THE WITNESS:  Yes, sir.

6           THE COURT:  All right.  Miss Tamla, is the

7   State ready to continue?

8           MS. RAY:  The State is, Your Honor.

9           THE COURT:  Is the Defense ready to

10  continue?

11          MR. MOORE:  Yes, sir.

12          THE COURT:  All right.  Go fetch the

13  factfinders.

14          (Jury seated in courtroom)

15          THE COURT:  State may call and identify its

16  next witness.

17          MS. RAY:  Your Honor, we call Paul Issac

18  Lopez.

19          THE COURT:  All right.  Mr. Lopez, will you

20  state your name again for Miss Karen and also for the

21  jury, please, sir.

22          THE WITNESS:  Paul Issac.  There's a "D"

23  initial.  Paul Issac D. Lopez.

24          THE COURT:  All right.  And I swore you in,

25  placed you under rules and placed you under oath while

```
 1    the jury was on break; is that correct, sir?

 2                THE WITNESS:  Yes, sir.

 3                THE COURT:  You understand that carries on

 4    until the trial ends; is that right, sir?

 5                THE WITNESS:  Yes, sir.

 6                THE COURT:  All right.  Tamla, you may

 7    proceed.

 8                MS. RAY:  Thank you, Your Honor.

 9                         ISSAC LOPEZ,

10    having been first duly sworn, testified as follows:

11                     DIRECT EXAMINATION

12    BY MS. RAY:

13       Q.  Paul Issac D. Lopez?

14       A.  Yes, ma'am.

15       Q.  And what name do you usually go by?

16       A.  I go by Issac.

17       Q.  Do mind if I call you Issac?

18       A.  No, ma'am.

19       Q.  Issac, so where do you live?

20       A.  I currently live in Lewisville.

21       Q.  Are you married?

22       A.  Yes, I am.

23       Q.  Who are you married to?

24       A.  Celia Lopez.

25       Q.  How long have you and Celia been married?
```

1   A.   About four and a half years.  Yeah, four and a

2  half years.

3   Q.   And currently y'all live up in Farmers Branch?

4   A.   No.  Lewisville.

5   Q.   Lewisville.  How long have y'all lived up there?

6   A.   Ever since -- after we left the apartment when

7  the incident happened is when we moved over there

8  closer to my job.

9   Q.   So -- and you referenced the apartment where the

10  incident happened.  Back in March of 2011 where were you

11  living?

12   A.   Presidents Corner.

13   Q.   And where is Presidents Corner?

14   A.   It's in Arlington.

15   Q.   Is that in Tarrant County?

16   A.   Yes, ma'am.

17   Q.   Do you recall which apartment you lived in at

18  Presidents Corner?

19   A.   I don't remember the number.

20   Q.   Did you live alone?

21   A.   No.

22   Q.   And who did you live with back at Presidents

23  Corner?

24   A.   It was me and my wife.

25   Q.   Celia?

STATE v. THOMAS OLIVAS

```
 1      A.   Uh-huh.

 2      Q.   Now, was she your wife back in March of --

 3      A.   No.

 4      Q.   -- 2011?

 5      A.   No.

 6      Q.   And part of the thing the judge talked to you

 7   earlier about, you're -- I know you're a little nervous,

 8   but you have to let me finish answering -- asking the

 9   question so that Karen can get everything I say before

10   you get started.

11      A.   I'm sorry.

12      Q.   No need to apologize.

13           THE COURT:  She can't type in stereo.  Only

14   one at a time.

15           THE WITNESS:  I'm sorry.

16           THE COURT:  You may continue.

17      Q.   (BY MS. RAY)  Okay.  So at the time you and Celia

18   were dating...

19      A.   Yes, ma'am.

20      Q.   Did Celia also live full-time with you or did she

21   have another apartment?

22      A.   She had another apartment.

23      Q.   How close was she living to you?

24      A.   Right across the street.

25      Q.   So were y'all pretty serious back then?
```

```
 1      A.   Yeah.
 2      Q.   You kind of locked that down?
 3      A.   Yes, I was.
 4      Q.   So do you and Celia have children?
 5      A.   Yes, we do.
 6      Q.   How many children do y'all have?
 7      A.   We have one together.
 8      Q.   Do y'all have children from prior relationships?
 9      A.   Yes.
10      Q.   So in total, between the two of y'all, how many
11   children do y'all have?
12      A.   Three.
13      Q.   Do those kids live with y'all pretty regularly?
14      A.   No.
15      Q.   Okay.  So who lived with y'all full-time?
16      A.   Her son and my -- the daughter we have together.
17      Q.   And you have another daughter from another --
18      A.   Yes, I do.
19      Q.   But she's still a part -- does she still live
20   with y'all from time to time, spend weekends?
21      A.   Yeah.
22      Q.   Back in March of 2011, where were you working?
23      A.   I was working at Meineke and Lowe's.
24      Q.   Do you still work at both of those places?
25      A.   I do not.
```

1    Q.   Where do you work now?

2    A.   I worked at -- it's a place called Alliance Dyno

3    in Keller.

4    Q.   What kind of -- I didn't understand that.

5    A.   Alliance Dyno in Keller.

6    Q.   Okay.  What kind of work did you do for Meineke?

7    A.   I was a manager at the time.

8    Q.   And how about Lowe's?

9    A.   I was just -- I unloaded trucks.

10   Q.   So you stated that even though Celia's apartment

11   was pretty close to yours, y'all spent most of your time

12   together in your apartment?

13   A.   Yes, ma'am.

14   Q.   How long did you live over at Presidents Corner

15   throughout -- how long did you live there in total?

16   A.   I don't remember.

17   Q.   Was it a lengthy amount of time, like several

18   years or...

19   A.   No, ma'am.

20   Q.   Less than a year?

21   A.   Yes, ma'am.

22   Q.   At some point did you meet a young lady by the

23   name of Mechelle Gandy?

24   A.   Yes, ma'am.

25   Q.   And how did you meet Mechelle?

```
 1      A.  She moved in next door to me.

 2      Q.  Did she move in by herself?

 3      A.  I do believe, yes, ma'am.

 4      Q.  Okay.  Did anyone live with Mechelle?

 5      A.  She had a little boy.

 6      Q.  Did you know her little boy's name?

 7      A.  Ashton or something like that.

 8      Q.  It was Ashton or something like that?

 9      A.  Yeah.

10      Q.  Do you recall how old the little boy was?

11      A.  He was -- at the time of the move-in, he was --

12  he wasn't one yet.

13      Q.  Did he turn one soon after they moved in?

14      A.  I don't remember when she moved in.

15      Q.  Do you recall, was there ever a birthday party or

16  celebration for Asher?

17      A.  Yes, there was.

18      Q.  Did you -- how did you find out about that

19  birthday party?

20      A.  She gave us bags of candy after the birthday

21  party, for my kids.  She gave it to my wife.

22      Q.  And "she" being Mechelle?

23      A.  Yes, ma'am.

24      Q.  Was she pretty particular about how you said her

25  name?
```

     1     A.   Yeah.  It's Mechelle, I do believe.

     2     Q.   What happened if you called her Michelle?

     3     A.   She corrected you.  She would correct real quick.

     4     Q.   Okay.  Was she pretty sassy?

     5     A.   A little bit.

     6     Q.   Okay.  You stated that you knew about the baby's

     7   birthday because Mechelle came by and brought you and

     8   your children -- brought gift bags for your children?

     9     A.   Yes, ma'am.

    10     Q.   And do you recall how long she had lived in the

    11   apartment --

    12     A.   I do not.

    13     Q.   -- when that happened?

    14     A.   I do not.

    15     Q.   Was she -- would it be fair to say -- did she

    16   live there a long time or did she live there less than

    17   y'all did?

    18     A.   She lived there less than us.

    19     Q.   If you could, explain to the jury how did

    20   y'all's -- how were your apartments related?  Was your

    21   apartment next to hers?  On top of hers?

    22     A.   We lived next door, downstairs.

    23     Q.   The apartments -- if you could, describe how the

    24   apartments themselves were laid out.  Were there -- was

    25   it a two-story apartment, or how did that work out?

1     A.   No. I lived in a one-bedroom.

2     Q.   You lived in a one-bedroom?

3     A.   Uh-huh.

4     Q.   And was there an apartment directly above yours?

5     A.   Yes.

6     Q.   And then Mechelle's apartment was next to yours?

7     A.   Yes, ma'am.

8     Q.   Did y'all share a walkway or a sidewalk?

9     A.   A porch, yeah.

10    Q.   You shared a porch?

11    A.   Yeah.

12    Q.   How would you describe Mechelle?  Was she pretty

13  friendly?

14    A.   Yeah.  She never -- I mean she never not passed

15  me and didn't say hi.

16    Q.   Did you really get to know her particularly well?

17    A.   No, not really.  It was just kind of hi/bye kind

18  of thing.

19    Q.   Were you working a lot at that time?

20    A.   Yeah.

21    Q.   Trying to impress Celia?

22    A.   I guess.  Yeah, I guess you could say.

23    Q.   Okay.  I want to call your attention to March

24  20th, 2011.  You refreshed it -- you referenced it

25  earlier as the incident?

```
 1        A.  Yes, ma'am.

 2        Q.  Do you recall much about that evening?

 3        A.  Yes, a little bit.

 4        Q.  Were you working that day?

 5        A.  Yes, I was.

 6        Q.  Do you recall about what time you would have

 7   gotten off of work?

 8        A.  Around 9:00.

 9        Q.  Did you -- how did you get home?

10        A.  Celia came and picked me up.

11        Q.  About what time do you recall getting to the

12   apartment?

13        A.  Around probably like 9:15.

14        Q.  At the time who would have been -- in terms of

15   the children, who was staying with y'all then?

16        A.  My son Julian -- or her son Julian.

17        Q.  Her son Julian.

18             Was your daughter there with you that

19   weekend or that day, do you recall?

20        A.  No, ma'am.

21        Q.  When you got home around 9:15, do you recall what

22   you did?

23        A.  Yes, ma'am.

24        Q.  What did you do?

25        A.  I started up a grill to cook fajitas that I had
```

```
 1   out all day long.  And they needed to be cooked so I was
 2   going to cook them.
 3        Q.   So you had some fajitas waiting for you?
 4        A.   Uh-huh, to be cooked, yes, ma'am.
 5        Q.   And at 9:15 you fired up the grill?
 6        A.   Yes, ma'am.
 7        Q.   Do you recall where you were going to cook the
 8   fajitas, in terms of inside versus outside?
 9        A.   In front, on the sidewalk, by the porch.
10        Q.   So the porch between your apartment and
11   Mechelle's apartment is where you were going to grill?
12        A.   Yes, ma'am.
13        Q.   And did you do that?
14        A.   Yes, ma'am.
15        Q.   While you were grilling, do you recall -- did you
16   see Mechelle?
17        A.   No, ma'am.
18        Q.   Did you have any reason to believe she was home?
19        A.   No, ma'am -- at least I -- well, her -- the car
20   was outside.
21        Q.   Mechelle's car was there?
22        A.   Yes, ma'am.
23        Q.   Generally speaking, if Mechelle's car was there,
24   did it mean she was there?
25        A.   I would assume.
```

1    Q.  Do you recall what Celia was doing around that

2    time?

3    A.  She was doing laundry.

4    Q.  So what was y'all's arrangement, would she bring

5    her laundry to your place or would she do laundry at her

6    place --

7    A.  She was --

8    Q.  -- or bring it back to you?

9    A.  She was getting all her stuff and moving it to my

10   apartment, clothes-wise, because, you know, slowly a

11   step forward for us.  And she went and did laundry at

12   her house.  She had the washer and dryer at her house.

13   And then she came and was doing laundry, folding it and

14   stuff at my house.

15   Q.  So, again, you were trying to lock that down

16   and --

17   A.  Yes, ma'am.

18   Q.  -- have her move in?

19   A.  Yes, ma'am.

20   Q.  You knew you had a good woman and you didn't want

21   her to get away?

22   A.  Uh-huh.

23   Q.  So while you were grilling, did anything out of

24   the ordinary happen?  Did you notice anything unusual?

25   A.  No.

1    Q.   At some point did you see anyone coming and going

2    outside of the -- around the apartments?

3    A.   Yes.

4    Q.   Tell us about that.

5    A.   I was grilling, facing my apartment, and I seen

6    somebody walk out of the breezeway into the street.

7              MS. RAY:  Your Honor, may I approach the

8    witness?

9              THE COURT:  Yes.

10   Q.   (BY MS. RAY)  Issac, I am showing you what has

11   been previously marked as State's Exhibit No. 2.  Are

12   you familiar with State's Exhibit No. 2?

13   A.   Yes, ma'am.

14   Q.   And State's Exhibit No. 2, does it appear to be a

15   blowup depicting the area surrounding your -- the

16   apartment?

17   A.   Yes, ma'am.

18   Q.   The Presidents Corner Apartments?

19   A.   Yes, ma'am.

20   Q.   And does State's Exhibit No. 2 appear to be a

21   fair and accurate depiction of an aerial view of the

22   apartment complex?

23   A.   Yes, ma'am.

24             MS. RAY:  Your Honor, I offer State's

25   Exhibit 2, after tendering to Defense Counsel for

```
 1   inspection.
 2                  MR. MOORE:  I have no objection, Your Honor.
 3                  MS. RAY:  And I'll tender it to the Court.
 4                  THE COURT:  I can see it.  Thank you.
 5                  Two is admitted, State's 2.
 6                  (State's Exhibit No. 2 admitted)
 7                  MS. RAY:  And, Your Honor, permission to
 8   publish State's 2 and have Mr. Lopez point out -- step
 9   down and point out...
10                  THE WITNESS:  Where do you want me?
11                  MS. RAY:  Right here in front of where --
12                  THE COURT:  In front of the PowerPoint.
13                  Yeah, Mr. Moore, you can move.
14                  No, no, no.  Set it right in front of the
15   PowerPoint projector.
16                  (Pause in proceedings)
17                  THE COURT:  You may continue, Counsel.
18                  MS. RAY:  Thank you, Your Honor.
19   Q.  (BY MS. RAY)  Issac, I'm handing you the laser
20   pointer.  Do you know how that works?
21   A.  Yeah.
22   Q.  Push the yellow button?
23   A.  Yeah.
24   Q.  Okay.  On State's Exhibit 2, could you indicate
25   where your apartment was at Presidents Corner?
```

1     A.   Right there.

2     Q.   So on State's Exhibit No. 2 there's a -- there

3  appears to be a white truck right there.  Is that the

4  approximate location where your apartment was back then?

5     A.   Yes.

6          MR. MOORE:  I'm sorry, Judge.  I could not

7  see that.

8          THE COURT:  Designate again.

9          All right.  For the record, you're pointing

10 almost in the dead center of the picture; is that right,

11 sir?

12         THE WITNESS:  Yes, sir.

13         THE COURT:  All right.  Members of the jury,

14 what I say isn't where it is.  You decide where it is,

15 but Karen can't write down where a red dot is on the

16 chart.

17         Does everyone understand that?

18         SEVERAL JURY MEMBERS:  Yes.

19         THE COURT:  You may continue.

20    Q.   (BY MS. RAY)  So on State's Exhibit 2 you're

21 pointing out the location directly -- pretty much in the

22 center where you can see a white truck?

23    A.   Yes, ma'am.

24    Q.   And that is where your apartment was located?

25    A.   Yes, ma'am.

1    Q.  And Mechelle's apartment, would you have been

2    just on that same porch?

3    A.  Yes, ma'am.

4    Q.  On State's Exhibit 2, if you could, indicate

5    where you were when you were grilling your fajitas?

6    A.  Right around this area.  Right here on the porch.

7    Right here.

8    Q.  So, again, on State's Exhibit 2, it would have

9    been the area right around where that white truck is?

10   A.  Yes, ma'am.

11   Q.  Now, to be fair, this white -- this photo was not

12   taken -- this is -- that photo was not taken --

13   A.  Right.

14   Q.  -- the day of, correct?

15   A.  Yeah.  I don't know that truck.

16   Q.  So that truck -- white truck was not there when

17   you were grilling?

18   A.  No, ma'am.

19   Q.  But it's a very convenient location to help us

20   point out certain --

21   A.  Yes, ma'am.

22   Q.  -- parts of your testimony?

23   A.  Yes, ma'am.

24   Q.  And so at one point you stated, before I

25   interrupted you, that while you were grilling fajitas

1   that you saw a figure, an individual?

2       A.   Yes, ma'am.

3       Q.   And where did you see that person?

4       A.   Right around here.  There's a breezeway right

5   here.  I saw him walk this way into the street, this

6   way.

7       Q.   Okay.  So that we understand, the complex where

8   you were, where your apartment was, where that white

9   truck is, there is a breezeway in between two of the

10  buildings.  There's a building that appears to be

11  slightly south of where your apartment was, correct?

12      A.   Yes, ma'am.

13      Q.   And there's a breezeway in between those two

14  buildings?

15      A.   Yes, ma'am.

16      Q.   What is that area behind your apartment complex

17  and that breezeway?  What sort of -- is it a forest, or

18  can you characterize what it's --

19      A.   Pretty much.  It's -- there's nothing but thorns

20  back there and -- I can tell you that.

21      Q.   Pretty --

22      A.   Yes.

23      Q.   -- rough stuff back there?

24      A.   My kids kick the ball over there and I had to go

25  get it and, yeah, there's thorns back there.

 1    Q.   Next time will you just leave the ball back
 2  there?
 3    A.   Pretty much.
 4    Q.   So what is back there in terms of the apartment,
 5  do y'all have backyards or how is -- what does your
 6  backyard look like in the apartment?
 7    A.   It's just a small patio.
 8    Q.   And from that breezeway could you get to
 9  Mechelle's backyard?
10    A.   It's fenced.  It -- everything is fenced.
11    Q.   There's a fence back there?
12    A.   Yeah.  It's -- it's -- yeah, it's fenced off.
13    Q.   And how would you have access to Mechelle's
14  backyard?
15    A.   I don't remember.
16    Q.   Okay.  You don't recall?
17    A.   I don't recall.
18    Q.   Do you recall a gate or a fence being broken?
19    A.   Yes, ma'am.
20    Q.   And where was that?
21    A.   It's not in the picture.  But even before she
22  moved in, it was broke.
23    Q.   And where else in that State's Exhibit 2 would
24  that fence have been?
25    A.   If you walk in the breezeway right here, I'm

```
 1   saying maybe right around here.
 2       Q.  And that would give you -- gain you access into
 3   Mechelle's backyard?
 4       A.  At the time, yeah, because it was broken.
 5       Q.  Okay.  What about your backyard, how would you
 6   get to your backyard?
 7       A.  My backyard is sealed off. It's -- it's --
 8   it's -- it's just a fence.  There's no gate or anything.
 9       Q.  So did y'all -- in order to have access to your
10   backyard, you would have to go through your apartment?
11       A.  Yes, ma'am.
12       Q.  Okay.  But hers you could have access through the
13   outside --
14       A.  Yes.
15       Q.  -- because the gate was broken?
16       A.  Yes, ma'am.
17       Q.  The figure that you saw, could you get any sort
18   of -- how close would you say you got to that person?
19       A.  I was -- can I?
20       Q.  Yes, you can point to it.
21       A.  I was sitting -- I was probably sitting around
22   this area right here.
23       Q.  Where the white truck is?
24       A.  Yes.  Maybe in between these two right here.  And
25   I seen the figure right around here, come out of the
```

```
 1   breezeway.  So from there to there.
 2       Q.  And did you say anything to this person?
 3       A.  No, ma'am.
 4       Q.  Did that person say anything to you?
 5       A.  No, ma'am.
 6       Q.  Were you able to tell whether that you were -- it
 7   was a male or a female?
 8       A.  No, ma'am.
 9       Q.  What sort of -- what time of the evening would
10   this have been?
11       A.  Maybe around, I don't know, 10:00ish or
12   something.  I don't know.
13       Q.  So --
14       A.  Maybe 9:00.  I don't know.  I couldn't tell you
15   an exact time.
16       Q.  Was it getting pretty late?
17       A.  Yes.
18       Q.  Was it dark out there?
19       A.  Yes.
20       Q.  Was there any sort of lighting or anything to
21   help you see who that person could have been?
22       A.  No, ma'am.
23       Q.  Were you able to see race or ethnicity?
24       A.  No, ma'am.
25       Q.  So based on where you were standing and the
```

 1  lighting, it was pretty hard for you to see anything

 2  other than a human being?

 3      A.   Just a figure.

 4      Q.   Figure?

 5      A.   Yes, ma'am.

 6      Q.   Do you recall anything about the -- how that

 7  figure was dressed?

 8      A.   No, ma'am.  I don't remember.

 9           THE COURT:  Are you still using the diagram

10  for your examination?

11           MS. RAY:  No.

12           Why don't you go ahead and have a seat.

13  Thank you.

14           THE WITNESS:  Yes, ma'am.

15           (Pause in proceedings)

16           THE COURT:  You may continue.

17           MS. RAY:  Thank you, Your Honor.

18      Q.   (BY MS. RAY)  Issac, at some point did you start

19  to notice something out of the ordinary?

20      A.   Yeah -- after I seen the figure?

21      Q.   Yes, sir.

22      A.   Yes.

23      Q.   What did you notice?

24      A.   Shortly after I seen the figure, I seen a glow

25  on -- like a reflection, an orange reflection, like

1   pretty much it was lit up on the other building, like

2   the reflection off of the other building.

3                  MS. RAY:  And may I approach the witness,

4   Your Honor?

5                  THE COURT:  You may.

6   Q.  (BY MS. RAY)  Issac, without stepping down, when

7   you talk about -- on State's Exhibit 2 when you say a

8   reflection on the other building, where on State's

9   Exhibit 2 are you talking?  Here's the laser pointer.

10  A.  My eyes aren't really -- actually --

11  Q.  Do you need to step closer to it to see it?

12  A.  That's the white truck right there, correct?

13  Okay.  That I said earlier, yeah.  Right here off of

14  this other building right here, on that side of the

15  wall, just right on the other side, right there.

16  Q.  So that building on the other side of the

17  breezeway you talked about earlier?

18  A.  Yes.  The reflection -- I just -- I was standing,

19  facing my building, facing my door, and I looked to the

20  left and then that's when I seen the reflection.

21  Q.  Did you smell anything?

22  A.  It smelled like burnt clothes to me.

23  Q.  So you thought someone was burning some clothes?

24  A.  I didn't know what was going on.

25  Q.  What did you do after that?

 1      A.   I went to my -- through my house to my patio and
 2   looked over and seen -- looked over the fence and seen
 3   flames coming from the apartment.
 4      Q.   Could you tell from what area of the apartment
 5   those flames were coming from?
 6      A.   The back window.  It wasn't the patio window.  It
 7   was the other window.
 8      Q.   Did you know where that back room led to, like
 9   whose window that was?
10      A.   The baby room.
11      Q.   So you knew enough about the layout of the
12   apartment to know that that was the baby's room?
13      A.   Yes, ma'am.
14      Q.   What did you do after you saw the flames coming
15   from the baby's room?
16      A.   My wife, or Celia, she was -- wherever my --
17   where the back patio sliding door is, if you're facing
18   it and you turn to the left, my closet is right there.
19   So she was in there hanging up clothes.  So I come in
20   directly and I said, "Hey, call 9-1-1.  Call 9-1-1."
21   And so she did.
22      Q.   While Celia is calling 9-1-1, what did you do?
23      A.   I went and was banging on the door and hollering,
24   made -- just, "Is anybody in there?"  "Anybody in
25   there," to the front door.  And then I went to the front

1  window and tried looking in it and it was hot.  The

2  window was hot.  And I was -- I still tried to bang on

3  the window, and nothing.

4            MS. RAY:  Your Honor, may I approach the

5  witness?

6            THE COURT:  You may.

7     Q.  (BY MS. RAY)  Issac, I'm showing you what has

8  previously been marked as State's Exhibit 9 and State's

9  Exhibit 13.

10           State's Exhibit 9, does it appear to be a

11  photograph of the apartment complex?

12    A.  Yes, ma'am.

13    Q.  And State's Exhibit 13, the same, does it appear

14  to be a photograph of the apartment complex?

15    A.  Yes, ma'am.

16    Q.  And State's Exhibit 9, is it a fair and accurate

17  depiction of a part of the apartment where you -- when

18  you talked about the window --

19    A.  Yes, ma'am.

20    Q.  -- and that sort of thing?

21    A.  That's the window, yes, ma'am.

22    Q.  Okay.  So State's Exhibit 9 is a fair and

23  accurate depiction of the apartment?

24    A.  The window, yes, ma'am.

25    Q.  Okay.  And State's Exhibit 13, is it a fair and

1   accurate depiction of the apartment in terms of the

2   doors, the front doors?

3       A.  Yes, ma'am.

4               MS. RAY:  Your Honor, I offer State's

5   Exhibit 9 and 13, after tendering to Defense Counsel for

6   inspection.

7               MR. MOORE:  We have no objection.

8               MS. RAY:  Tender to the Court.

9               THE COURT:  All right.  State's 9, State's

10  13, each admitted.

11              (State's Exhibit No. 9 and 13 admitted)

12              MS. RAY:  And, Your Honor, permission to --

13              THE COURT:  Hold on.  Let her --

14              MS. RAY:  Oh, sorry.

15              THE COURT:  To?  Permission to?

16              MS. RAY:  Your Honor, permission to publish

17  via the ELMO?

18              THE COURT:  Technically speaking, ELMO or

19  PowerPoint of a computer-generated image are the same

20  thing.  Are you going to just use the ELMO and put it on

21  the ELMO, or are you using it through the PowerPoint

22  projector?  Because people interchange those.

23              MS. RAY:  I'm putting it on the ELMO.

24              THE COURT:  Perfect.

25              The overhead projector, you're using the

 1   actual exhibit that has been admitted in court, not a

 2   reproduction thereof.

 3            You may continue -- off the record.

 4            (Discussion off the record)

 5   Q.   (BY MS. RAY)   Issac, if you could, on State's

 6   Exhibit 9 that is now published on the ELMO right where

 7   the jury can see, can you, please, indicate where --

 8   which window you're talking about in terms that you were

 9   banging on.

10   A.   This one right here.

11   Q.   Okay.   So it's the window that's pretty much dead

12   in the center of State's Exhibit 9?

13   A.   Yes, ma'am.

14   Q.   And earlier you talked about seeing -- you talked

15   about a breezeway?

16   A.   Yes, ma'am.

17   Q.   Can you now see the breezeway better in State's

18   Exhibit 9?

19   A.   Yes, ma'am.

20   Q.   What breezeway are you talking about?

21   A.   Right here.

22   Q.   So in State's Exhibit 9 pretty much in the center

23   between those two buildings?

24   A.   Yes, ma'am.

25   Q.   And from that breezeway you can have access to

1    Mechelle's backyard?

2        A.   Yes, ma'am.

3        Q.   And on State's Exhibit 9 can you indicate where

4    you first saw that -- where that figure was when you saw

5    him, or her?

6        A.   Right around here.

7        Q.   And on State's Exhibit 9 can you point to -- when

8    you pointed to where that figure was, you pointed to

9    that breezeway, correct?

10       A.   Yes, ma'am.

11       Q.   About the middle tree in the breezeway?

12       A.   Right -- maybe right there.  That tree right

13   there, maybe.

14       Q.   And on State's Exhibit 9 you can see four trees,

15   would that be fair to say, four trunks?

16       A.   Yes, ma'am.

17       Q.   So it would be -- if we're counting from left to

18   right, it would be that second tree?

19       A.   Yes, ma'am.

20       Q.   Okay.  Where about on State's Exhibit 9 were you

21   standing when you first saw that figure?

22       A.   Like right around -- right on the other side of

23   the fire truck.

24       Q.   On the other side of the fire truck?

25       A.   Yes, ma'am.

1    Q.   And, obviously, that fire truck was not there

2    when you saw that figure; is that right?

3    A.   Yes, ma'am.

4    Q.   Now, on State's Exhibit 13 -- let me bring it

5    closer to you so you can see it.  Would you, please,

6    indicate on State's Exhibit 13 where the door to your

7    apartment is.

8    A.   Right here.

9    Q.   And earlier you stated you didn't remember what

10   apartment it is?

11   A.   Uh-huh.

12   Q.   Now it appears that it's Apartment 603?

13   A.   Yes, ma'am.

14   Q.   Okay.  And where was Mechelle's apartment?

15   A.   Right there.

16   Q.   Okay.  And was -- when you were knocking on the

17   door, which door were you knocking on?

18   A.   This one right here.

19   Q.   Now, as you're knocking on the door, would it be

20   fair to say were you knocking on it, or were you banging

21   on it?

22   A.   I was beating on the door.

23   Q.   Were you concerned that Mechelle and the baby

24   were still in that apartment?

25   A.   Yes, ma'am.

1    Q.   Did you at any time see any smoke or anything
2   coming from that door?
3    A.   I don't recall.
4    Q.   Okay.  Did you just continue to bang on it or did
5   you do anything else?
6    A.   I kicked in the door.
7    Q.   You kicked in the door?
8    A.   Yes, ma'am.
9    Q.   Why did you kick in that door?
10    A.   It was just a reaction.  I don't know.  Just
11   something I felt like I had to do, if I could do
12   something.  I don't know.
13    Q.   On State's Exhibit 13 we can see a little bit of
14   a white vehicle parked in front of those apartments.
15   Whose vehicle is that?
16    A.   It appears to be Mechelle's.
17    Q.   After you kicked in that door, what happened?
18    A.   The smoke covered my face and just smoke came
19   gushing out the door.
20    Q.   Did you try to run into the apartment?
21    A.   No.  I was choking.
22    Q.   Did you see anybody?
23    A.   No.
24    Q.   Could you hear anybody?
25    A.   No.

1    Q.  After the -- you kicked in the door and smoke

2    rolls out, what did you have to do next?

3    A.  We went -- me and my wife, we went to bang on

4    everybody's door to get to -- to see if anybody was

5    home, to get them out of the apartments around us.

6    Q.  Okay.  So y'all checked on the -- your upstairs

7    neighbors?

8    A.  Yes, ma'am.

9    Q.  Did y'all -- was there anyone in those upstairs

10   apartments?

11   A.  Yes.

12   Q.  Did you -- so you got them out?

13   A.  Yes, ma'am.

14   Q.  At some point did help arrive, people from 9-1-1?

15   A.  Yes, ma'am.

16   Q.  Who arrived?

17   A.  The fire department.

18   Q.  Did y'all have to do anything in terms of moving

19   your cars or anything when the fire department arrived?

20   A.  Yes, ma'am.

21   Q.  What did y'all do?

22   A.  I moved my car from the front, my parking -- or

23   the parking spot that I was in and I just backed the car

24   up as fast as I could.

25   Q.  Why did you do that?

1    A.   Because my wife had an incident where she -- with

2  another fire, or whatever, when she was young and her

3  dad was trying to get the car out, so she told me to get

4  the car because if not, it's going to be -- it's going

5  to be closed off and nobody will allow us to get the

6  vehicle.  So she said, "Hurry up and move the vehicle,"

7  so I did.

8    Q.   So y'all moved your cars out of the way so that

9  when the first responders come, y'all would be out of

10 the way?

11   A.   Yes, ma'am.  Yes, ma'am.

12   Q.   Did you -- were you there when the police -- when

13 the firefighters arrived?

14   A.   Yes, ma'am.

15   Q.   Okay.  What did you see?

16   A.   I seen a lot of people moving.

17   Q.   Did you ever see Mechelle?

18   A.   Yes, I did.

19   Q.   What did you see happen with Mechelle?

20   A.   They pulled her out of the apartment and started

21 CPR on her.

22   Q.   Did you -- when they pulled her out of the

23 apartment, did you see where they laid her down?

24   A.   Yes, ma'am.

25   Q.   Where did they lay her?

```
 1        A.   Right next to her car.

 2        Q.   You said you saw them doing CPR?

 3        A.   Yes, ma'am.

 4        Q.   How long did you -- how long did they do --

 5        A.   I don't --

 6        Q.   -- CPR on her?

 7        A.   I don't recall.

 8        Q.   Do you recall how Mechelle was dressed?

 9        A.   Yes, ma'am.

10        Q.   What was Mechelle wearing?

11        A.   She was only in underwear.

12        Q.   And when we're talking about underwear, we're

13   talking about panties?

14        A.   Yes, ma'am.

15        Q.   So did she have any top on?

16        A.   No, ma'am.

17        Q.   And you watched them do the CPR on her?

18        A.   Yes, ma'am.

19        Q.   Were you there when they stopped performing CPR

20   on Mechelle?

21        A.   Yes, ma'am.

22        Q.   Did you know what that meant?

23        A.   Pretty much.

24        Q.   What about the baby, did you see or hear anything

25   about the baby while they were working on Mechelle?
```

1    A.  I know we -- me and my wife, we kept asking the

2    fire department about the baby.  My wife was crying.

3    She was like the baby is -- "Did y'all find the baby?"

4    "Did y'all find the baby?"  And nobody would answer us.

5    So we didn't know.  It was just something that -- we

6    just had to wait until somebody said something so...

7              And we still -- we never did find out that

8    night if they found...

9    Q.  I'm sorry?

10   A.  We never found out if they did or didn't that

11   night.

12   Q.  So how long did y'all hang around the scene that

13   night before y'all left?

14   A.  I don't recall what time it was.  It was pretty

15   late that night.

16   Q.  Y'all stayed there pretty late.  And when y'all

17   left the scene they still hadn't found the baby?

18   A.  Correct.  Or they -- no, nobody told us anything.

19   Q.  Did you ever see them bring the baby out?

20   A.  No, ma'am.

21   Q.  Do you recall the last time it was before you --

22   the last time you saw Mechelle before that fire?

23   A.  I don't remember.

24   Q.  Did you ever see her there without her baby?

25   A.  No, ma'am.

```
 1                MS. RAY:  I'll pass this witness, Your
 2   Honor.
 3                THE COURT:  Defense may cross.
 4                MR. MOORE:  Thank you.
 5                     CROSS-EXAMINATION
 6   BY MR. MOORE:
 7      Q.  Good afternoon, Mr. Lopez.
 8                As I understand it, you lived in that
 9   apartment at Presidents Corner before Mechelle Gandy
10   moved in, correct?
11      A.  Yes, sir.
12      Q.  And you didn't know her real well, correct?
13      A.  No, sir.
14      Q.  Didn't socialize with her?
15      A.  No, sir.
16      Q.  You work during the day, correct?
17      A.  Yes, sir.
18      Q.  She worked at night.  Is that your understanding?
19      A.  I don't recall.
20      Q.  Okay.  But regardless, you -- you didn't know
21   anything about her private life?
22      A.  No, ma'am -- I mean -- no, sir.  Sorry.
23      Q.  Okay.  You just know that you lived in an
24   apartment adjacent to her?
25      A.  Yes, sir.
```

1    Q.   Meaning your apartment shared a common wall with

2    her, correct?

3    A.   Yes, sir.

4    Q.   You could hear between the apartments, like most

5    apartments, couldn't you?

6    A.   Yes, sir.

7    Q.   On March 20th of 2011 --

8            MR. MOORE:  May I use the easel, Your Honor?

9            THE COURT:  Yes.  Do you need it with the

10   diagram?  Which easel do you need, the write-on easel or

11   the --

12           MR. MOORE:  I need the -- I need the

13   write-on.

14           THE COURT:  All right.

15           (Pause in proceedings)

16   Q.   (BY MR. MOORE)  I believe you testified, the best

17   of your memory, on March 20th of 2011 you were working

18   at Lowe's, correct?

19   A.   Yes, sir.

20   Q.   What Lowe's were you working at?

21   A.   Off of Eastchase in Fort Worth, I guess.

22   Q.   Okay.  And your shift was over at 9:00 p.m.,

23   correct?

24   A.   Yes, sir.

25   Q.   And is that when Celia picked you up?

1    A.  Yes, sir.

2    Q.  Y'all drove straight home?

3    A.  Yes, sir.

4    Q.  Straight to your apartment in Arlington?

5    A.  Yes, sir.

6    Q.  How long does that take?

7    A.  I would guess around 15 minutes, 10, 15 minutes.

8    Q.  Okay.  Because you've testified that you were

9    home at 9:15, correct?

10   A.  Yes, sir.  Around 9:15 or so.

11   Q.  Okay.  And when you get to your apartment there

12   at the Presidents Corner, it's light -- I mean -- it's

13   night and not light outside, correct?

14   A.  Uh-huh.

15   Q.  You don't see Mechelle Gandy when you come home?

16   A.  No.

17   Q.  You don't hear anything coming from her

18   apartment?

19   A.  No, sir.

20   Q.  You don't see any smoke coming out of her

21   apartment at that point in time?

22   A.  No, sir.

23   Q.  It was just dark over there, correct?

24   A.  Yes, sir.

25   Q.  So you start cooking fajitas, because it's late

```
 1  and y'all are hungry, I would imagine, correct?
 2      A.  And they'd been sitting out all day, yes, sir.
 3      Q.  And so at 9:15 you arrive home and fire up the
 4  grill, correct?
 5      A.  Yes, sir.
 6      Q.  Let me show you what's been marked for
 7  identification purposes as Defendant's Exhibits 1, 2 and
 8  3, and ask you if you recognize what's depicted in those
 9  pictures.
10      A.  What do you mean?
11      Q.  Well, that's your apartment that you lived in,
12  correct?
13      A.  Yes.
14      Q.  Okay.  In 1, 2 and 3?
15      A.  Yes.
16      Q.  And those truly and accurately depict the
17  apartment as -- when you lived in it?
18      A.  Yes.
19              MR. MOORE:  Okay.  We'd offer Defendant's
20  Exhibit No. 1, 2 and 3.
21              MS. RAY:  No objection.
22              THE COURT:  Defendant's Exhibit No. 1, 2 and
23  3 are each admitted.
24              (Defendant's Exhibit No. 1 - 3 admitted)
25      Q.  (BY MR. MOORE)  Well, let me start off with --
```

```
 1              (Pause in proceedings)

 2              THE COURT:  Then carry on.

 3              MR. MOORE:  Can y'all see that okay?

 4              SEVERAL JURY MEMBERS:  Yes.

 5              (Pause in proceedings)

 6     Q.   (BY MR. MOORE)  Well, looking at Defendant's

 7   Exhibit No. 3, that would represent the front of the

 8   apartment where you lived, correct?

 9     A.   Yes, sir.

10     Q.   And you were out cooking in front of there at

11   9:15 on March 20th of 2011 and I believe you were about

12   where that white truck is?

13     A.   Yes, sir.

14     Q.   Would that -- and what were you doing out there?

15     A.   I was my -- me and my son were out there.  We

16   were cooking.

17     Q.   Okay.  And you were out there the whole time

18   that -- cooking, right?

19     A.   Yes, sir, pretty much.

20     Q.   You never went inside?

21     A.   Not that I remember.

22     Q.   Well, do you remember after this incident

23   happened, you went down and talked to Detective Stewart?

24     A.   Yes, sir.

25     Q.   And that would have been on March 24th of 2011,
```

```
 1    around 6:00 o'clock in the afternoon.  Do you remember

 2    that?

 3        A.  Yes, sir.

 4        Q.  Do you remember going and talking to him?

 5        A.  Uh-huh.

 6        Q.  Do you remember telling him that you stayed out

 7    there in front cooking from about 9:15 until you started

 8    seeing smoke?

 9        A.  I don't remember what time I told him, but if

10    that's what I said, then -- I don't remember.

11        Q.  You'd agree with that?

12        A.  Sure.  Yeah.

13        Q.  That you were out there the whole time?

14        A.  Uh-huh.

15        Q.  Yes?  Is that --

16        A.  Yes, sir.

17        Q.  Okay.

18            THE COURT:  She can't write down uh-huh,

19    huh-uh.

20            THE WITNESS:  Sorry.

21            THE COURT:  You've got to use words.

22            THE WITNESS:  Yes, sir.

23        Q.  (BY MR. MOORE)  And I believe you -- when you

24    were talking to Detective Stewart, to get some time

25    references, you had received some text messages from a
```

```
 1    coworker, hadn't you?
 2        A.  Yes, sir.
 3        Q.  And one of those text messages was at 9:35 p.m.,
 4    because you showed him your phone, do you remember that?
 5        A.  I -- yes.
 6        Q.  So at 9:35, that was your first text from your
 7    coworker, right?
 8        A.  I do believe, yes, sir.
 9        Q.  He was wanting to know -- or something about if
10    you were going to work the next day?
11        A.  I don't remember what it -- I don't remember what
12    the text message was.
13        Q.  Okay.  Do you remember telling Detective Stewart
14    when you talked to him that day that that's what he
15    wanted, was to see if you were going to work the next
16    day?
17        A.  I remember the -- I remember saying something
18    about the text messages, but I don't remember what was
19    said.
20        Q.  Okay.  And then, also, to kind of get this all
21    in a time context, you showed him your phone again and
22    you received another text message from him at 9:46 p.m.,
23    correct?
24        A.  Yes, sir.
25        Q.  Okay.  And you're still outside during this time
```

1   watching the fire and playing with your son?

2      A.   Yes, sir.

3      Q.   And still you had heard nothing coming from

4   Mechelle Gandy's apartment?

5      A.   No, sir.

6      Q.   Didn't hear any scuffling or fighting or

7   anything?

8      A.   No, sir.

9      Q.   Not a peep?

10     A.   No, sir.

11     Q.   And so you're still sitting outside, and shortly

12   after you get this text as 9:46, that's when you see

13   this figure walk out from behind; is that correct?

14     A.   Yes, sir.

15     Q.   Do you recall about how long after that 9:46 text

16   that you saw this figure walk out from behind there?

17     A.   No, sir.  I don't remember the exact time.

18     Q.   Do you remember if it was just a short time

19   later?

20     A.   Yes, sir.

21     Q.   Okay.  In fact, you remember -- do you remember

22   telling Detective Stewart, when you talked to him --

23   well, let me back up a little bit.

24          Before you saw this person walk from -- or

25   figure walk from behind that apartment, not only had you

```
 1   not heard anything from inside that apartment, you
 2   didn't see anybody go in that apartment, did you?
 3       A.  No, sir.
 4       Q.  You didn't see -- and you would have been able to
 5   see somebody go in that apartment if they had, wouldn't
 6   you?
 7       A.  Yes, sir.
 8       Q.  Regardless of whether it was around here or in
 9   the front door, you would have seen them?
10       A.  Yes, sir.
11       Q.  And, in fact, you even mentioned to Detective
12   Stewart when you talked to him that there was a dog
13   there, that if somebody had been around there, they
14   would have barked?
15       A.  Yes, sir.
16       Q.  That was your dog, correct?
17       A.  Yes, sir.
18       Q.  And your dog did not bark, did --
19       A.  No, sir.
20       Q.  So you were fairly certain that from 9:15, when
21   you got home, to 9:46, seeing that figure -- or shortly
22   after 9:46, seeing that figure walk out, that nobody
23   entered Mechelle Gandy's apartment?
24       A.  Correct.
25       Q.  Okay.  And when we talk about that apartment
```

1    complex and behind it, there's a fence that runs along

2    the whole back side of that apartment complex, isn't

3    there?

4        A.   Correct.

5        Q.   And it's, what, about an eight-foot fence?

6    Taller than we are, isn't it?

7        A.   Yes.  Yes.

8        Q.   And beyond that fence is a deep ravine, isn't it?

9        A.   Yes, sir.

10       Q.   I'm talking 20-, 30-feet deep, isn't it?

11       A.   I don't remember how deep it was.

12       Q.   Okay.  It was pretty --

13       A.   I just know there were thorns.

14       Q.   That -- it's not a place where people walk around

15   back there?

16       A.   Oh, no, not at all.

17       Q.   Okay.  And so when you see this person walk from

18   behind, shortly after you get this text, then you start

19   seeing smoke; is that correct?

20       A.   Shortly after.

21       Q.   Or the glow, I'm sorry.

22       A.   Shortly after.

23       Q.   Shortly after.  And do you remember telling

24   Detective Stewart, back when you talked to him, that

25   when you heard this person, that was maybe two to

1    three minutes after you saw the -- it was two or

2    three minutes until you saw the smoke?

3        A.   Yes, sir.

4        Q.   Okay.

5        A.   Which I seen the glow.

6        Q.   The glow?

7        A.   Yes, sir.

8        Q.   I'm sorry.  Okay.

9             And, again, you had seen nobody enter that

10   apartment up until that period of time?

11       A.   No, sir.

12       Q.   And you'd been out there the whole time?

13       A.   Yes, sir.

14       Q.   You would have seen someone if they had gone in

15   that apartment?

16       A.   Yes, sir.

17       Q.   In fact, you told Detective Stewart that somebody

18   had to have been in that apartment while you were out

19   there because you certainly didn't see anybody come?

20       A.   I didn't see nobody go in or out.

21       Q.   Exactly.  Now, so when you --

22            MR. MOORE:  I promise, y'all, it's harder

23   than it looks.

24            Well, let me do this.

25       Q.   (BY MR. MOORE)  Referring back to State's Exhibit

```
1    No. 2, the aerial picture of this apartment complex,
2    this white truck is where you testified your and
3    Mechelle Gandy's apartment was, correct?
4        A.  Yes, sir.
5        Q.  And back here we see -- this is that ravine I was
6    asking you about, isn't it, with all the trees and --
7        A.  Yes, sir.
8        Q.  And there's a fence back here you can't see, but
9    there's a fence that runs all the way down this
10   property, correct?
11       A.  Yes, sir.
12       Q.  I believe you testified that this area right in
13   here between these apartments is where you first saw
14   this person and this -- you didn't know whether it was a
15   male or a female, did you?
16       A.  No, sir.
17       Q.  It could have been a woman?
18       A.  Yes, sir.
19       Q.  Don't know what race they were?
20       A.  No, sir.
21       Q.  Did you see anything -- did they say anything?
22       A.  No, sir.
23       Q.  Were they running?
24       A.  No, sir.
25       Q.  Just walking?
```

```
 1        A.  Yes, sir.
 2        Q.  So you really don't know whether they came out of
 3   her apartment or not, do you?
 4        A.  No, sir.
 5        Q.  They just came out from that area?
 6        A.  Yes, sir.
 7        Q.  Shortly after the smoke?
 8        A.  Yes, sir.
 9        Q.  And this person walked this way, correct?
10        A.  Kind of -- yes, in this direction.  Yes.
11        Q.  They didn't walk down this way, they didn't
12   walk --
13        A.  No.  No.
14        Q.  If -- this is north, correct?
15        A.  Yes.
16        Q.  And this is south?
17        A.  Yes.
18        Q.  They walked in the south --
19        A.  Yeah, just like that.
20        Q.  -- direction --
21        A.  No --
22             THE COURT:  One at a time.
23             THE WITNESS:  Sorry.
24        Q.  (BY MR. MOORE)  Over here is the entrance to the
25   apartments, correct?
```

```
 1       A.   Yes.

 2       Q.   And so this person that you saw walking was

 3  walking southeasterly towards the front of the

 4  apartment?

 5       A.   Correct.

 6       Q.   Did you see -- where -- when did you lose sight

 7  of this person?

 8       A.   I really didn't pay -- I just seen the direction

 9  he was walking and that was it.  I went about my

10  business.

11       Q.   Okay.

12            MR. MOORE:  If I can have just a second,

13  Your Honor?

14            THE COURT:  Yes, sir.

15            (Pause in proceedings)

16       Q.   (BY MR. MOORE)  Just couple more questions,

17  Mr. Lopez.

18            The person that you saw walking out from

19  behind there, do you remember what they were wearing?

20       A.   No, sir.

21       Q.   Do you remember telling Detective Stewart they

22  were wearing some kind of a hoodie?

23       A.   Yes, sir.

24       Q.   Okay.  The -- and you talked to Detective Stewart

25  shortly after this happened, didn't you?
```

1      A.  Yes, sir.

2      Q.  And you certainly would have had a better memory

3  about it then than you do now, wouldn't you?

4      A.  Correct.

5      Q.  And that's understandable because it's been three

6  and a half years or so.

7           And, again, you lived in those apartments.

8  Do you remember telling Detective Stewart that if there

9  had been some kind of a disturbance in that apartment,

10  you would have heard something?

11     A.  Yes, sir.

12     Q.  You -- because you told him that you could even

13  hear the TV coming from that apartment at times,

14  correct?

15     A.  The walls are thin.

16     Q.  They were -- it's just a matter of fact, they

17  were thin walls.

18          Well, thank you, Mr. Lopez.

19              MR. MOORE:  I'll pass the witness.

20              Oh, I'm sorry, Judge.  One more thing.

21              Judge, we would offer Defendant's Exhibit

22  No. 4.

23              THE COURT:  Tamla, any objection to

24  Defendant's 4, the chart?

25              MS. RAY:  No, Your Honor.

```
 1              THE COURT:  It will be admitted as offered.
 2              (Defendant's Exhibit No. 4 admitted)
 3              MR. MOORE:  And I pass the witness.
 4              THE COURT:  All right.
 5                         REDIRECT EXAMINATION
 6   BY MS. RAY:
 7      Q.  Now, Issac, you stated that you get home about
 8   9:15ish?
 9      A.  Around that time, yes, ma'am.
10      Q.  And you had to get those fajitas on the grill?
11      A.  Yes, ma'am.
12      Q.  They had been, I guess, just sitting in your
13   kitchen all day defrosting?
14      A.  In the refrigerator, yes, ma'am.
15      Q.  I'm sorry?
16      A.  In the refrigerator.
17      Q.  So is that why you were concerned about getting
18   those on the grill before they went bad?
19      A.  Yes, ma'am.
20      Q.  About how long from the time you -- how long
21   would it have taken you to get set up to get those on
22   the grill?
23      A.  Around 15 minutes, maybe.  Ten, 15 minutes.  I
24   don't know.
25      Q.  Okay.  So for those 10 or 15 minutes, I'm
```

```
 1    assuming you were in your kitchen getting those
 2    together?
 3         A.   Yes.
 4         Q.   So do you season your --
 5         A.   No.  They were already marinated.  I got them
 6    from the meat market.
 7         Q.   So it took you 15 minutes inside the apartment to
 8    get them ready to actually get them on the grill?
 9         A.   No.
10         Q.   How long would you say it took you --
11         A.   They were -- oh, sorry.
12         Q.   How long would you say it took you to get those
13    from the refrigerator to the grill?
14         A.   They were already in a bowl.  I just pretty much
15    had to wait for the coals to die down so I could put
16    them on.  Just grab the bowl and put them on.
17         Q.   Well, tell me about that.  The -- was the grill
18    on the entire day while you were gone?
19         A.   No.
20         Q.   Okay.  So when did you turn the grill on?
21         A.   As soon as I got home.
22         Q.   Okay.  So how long would it have taken that grill
23    to get ready?
24         A.   It usually takes like ten minutes.
25         Q.   And you mentioned your son was out there with
```

1    you?

2        A.   Yes.  The chalk is his.

3        Q.   The chalk on State's Exhibit 13?

4        A.   If that's the one facing the door.  Yeah, all

5    that in front of the front door, that's my son.

6        Q.   That was all Julian's handiwork?

7        A.   Yeah.

8        Q.   When did Julian do all that?

9        A.   We were outside together.  We -- he was out there

10   with me and that's what he was doing when we were

11   outside.

12       Q.   So while you were out there on the grill, that's

13   what Julian was doing?

14       A.   Yes, ma'am.

15       Q.   So were you watching him do that?

16       A.   Yeah.  Yes, ma'am.  Right.

17       Q.   Was he doing the whole "Daddy, look at this."

18   "Daddy, look at that"?

19       A.   Yeah, pretty much.

20       Q.   Pulling your attention the way kids do to look at

21   their masterpieces.

22            And in State's Exhibit 13 we can see a grill

23   next to that window.  Is that the grill you were doing

24   your fajitas?

25       A.   No.  That's -- it's just a little, kind of like a

```
 1   fire -- like a -- kind of like a fire pit, kind of, like
 2   a little one my wife bought me.
 3       Q.   So that's not --
 4       A.   Not -- no, that's not even a grill.
 5       Q.   What did you end up doing with the grill that you
 6   were using?
 7       A.   The fajitas never came off of it and I just moved
 8   it to the side out of the way from -- so the fire
 9   department can go through it and stuff.
10       Q.   You didn't end up --
11       A.   No, I didn't get to --
12            THE COURT:  One at a time.
13            THE WITNESS:  Sorry.
14       Q.   (BY MS. RAY)  You end up wasting those fajitas
15   after all that work?
16       A.   Yes, ma'am.
17       Q.   Now, earlier with Mr. Moore, you said -- he asked
18   you a question about how -- what was the relationship
19   between the time when you saw the figure and you saw
20   the -- and you smelled smoke.
21            Did you smell smoke before or after you saw
22   that figure?
23       A.   After.
24       Q.   Okay.  So you see the figure then you smelled
25   smoke?
```

```
 1        A.   I seen the figure, then I seen the glow, then I
 2   smelled the smoke.
 3        Q.   So the glow and smoke are afterwards?
 4        A.   Yes, ma'am.
 5             MS. RAY:  One second, Your Honor.
 6             (Pause in proceedings)
 7        Q.   (BY MS. RAY)  Now, Issac, when you're looking at
 8   State's Exhibit 13, can you -- well, let me ask you
 9   this.  While you were grilling, were you just standing
10   grilling or were you seated next to it?  How were --
11   what was your setup?
12        A.   I was leaning on my car, on the front.  And the
13   grill was in -- on the sidewalk and my son was playing
14   right there.
15        Q.   And your son?
16        A.   My son was playing right there in the -- on
17   the porch.
18        Q.   Can you point on -- well, let me ask you this.
19   Can you see on State's Exhibit 13 where your grill would
20   have been?
21        A.   No.
22        Q.   Okay.  So State's Exhibit 13 -- let me move this
23   stuff out of the way.
24             Where on State's Exhibit 13 -- you said you
25   can't -- you cannot see where the grill would have been?
```

```
1        A.  No, ma'am.
2        Q.  Okay.  If you can point on the screen
3   generally -- why can you not see it?  Where --
4        A.  It's --
5        Q.  -- is it cut off?
6        A.  Right around this area, like over here in front
7   of my door.  Like right here.
8        Q.  So the grill was not on the porch?
9        A.  No.
10        Q.  And you stated when you saw the figure, you
11   stated that your dog was with you and your dog did or
12   did not bark when your dog saw the figure?
13        A.  Did not.
14        Q.  So when that figure walked past, that you saw,
15   your dog didn't bark then?
16        A.  No, ma'am.
17             MS. RAY:  Pass this witness, Your Honor.
18             MR. MOORE:  Just a few more questions.
19                   RECROSS-EXAMINATION
20   BY MR. MOORE:
21        Q.  Mr. Lopez, you remember when you talked to
22   Detective Stewart shortly after this incident and you
23   told him that you had seen is a Lincoln vehicle in
24   the -- going through the parking lot?
25        A.  Yes, sir.
```

1     Q.   And that was a strange vehicle to the area?

2     A.   It was the only vehicle that I seen drive through

3  the apartments.

4     Q.   Okay.  And when did you see that drive through

5  the apartment complex?

6     A.   Right before -- it was just right -- like right

7  after I got home.

8     Q.   Okay.  And where was that car going, which

9  direction?

10    A.   Coming out of the apartments, like to leave out

11  the front of the apartments, on the south part of the

12  picture.

13    Q.   Okay.  And you also remember telling Detective

14  Stewart about an incident where some guy kicked in

15  her -- Mechelle Gandy's door?

16    A.   No.

17    Q.   You don't recall telling him that?

18    A.   No.  It was my wife's door.  I told him an

19  incident about something that happened in the past with

20  my wife.

21    Q.   Oh, okay.  But you do remember telling Detective

22  Stewart that you were out -- outside the whole time

23  between when you got home and saw the smoke, you

24  remember that?

25    A.   Pretty much, yes.

1    Q.  And you also remember telling him, telling

2  Detective Stewart, that in your opinion somebody had to

3  have been in there the whole time because you didn't see

4  them come or go?

5    A.  Yes.

6    Q.  Okay.  Thank you, sir.

7          MR. MOORE:  I'll pass the witness.

8          MS. RAY:  Briefly, Your Honor.

9          <u>FURTHER REDIRECT EXAMINATION</u>

10 BY MS. RAY:

11   Q.  The Lincoln that you were talking about, what

12 sort of -- was it a sedan or an SUV?  What kind of

13 Lincoln are you talking about?

14   A.  It was like an older model.  Like a '96 model.

15   Q.  '96 model of --

16   A.  Because I can -- yeah.  I work on cars.  It was

17 about a '90 -- it was like a '96 four-door.

18   Q.  Four-door?

19   A.  Yeah.

20   Q.  Sedan?

21   A.  Yeah.

22   Q.  And do you recall describing the figure as being

23 a little by bit taller than you?

24   A.  Yes.

25   Q.  Little beefier than you?

STATE v. THOMAS OLIVAS

```
 1      A.  Yes.

 2      Q.  How tall are you?

 3      A.  I'm 5'9.

 4             MS. RAY:  I pass the witness, Your Honor.

 5             MR. MOORE:  Judge, I have no other questions

 6      of this witness.

 7             THE COURT:  May this witness be permanently

 8      excused from these proceedings, if you have no other

 9      questions?

10             MR. MOORE:  We would just like him subject

11      to recall.

12             THE COURT:  Just to be available on

13      reasonable notice?

14             MR. MOORE:  Yes.

15             THE COURT:  All right.  You still live in

16      this area?

17             THE WITNESS:  I live in Lewisville.

18             THE COURT:  Lewisville.  But, I mean, if

19      someone told you they need you back tomorrow, the judge

20      will get you a letter if you need to back, if they call

21      you.

22             THE WITNESS:  Yeah.  I just --

23             THE COURT:  That would be better than

24      sitting in the hall for a couple weeks, wouldn't it?

25             THE WITNESS:  I started a new job, so it's
```

```
 1   kind of --
 2              THE COURT:  Listen to me carefully.  Would
 3   that be better than having to sit in the hall and wait
 4   to see if they need you?
 5              THE WITNESS:  Yes, sir.
 6              THE COURT:  All right.  Is -- your employer,
 7   you can tell them you're a witness in a criminal trial,
 8   the judge is releasing you to work.  But you -- if you
 9   get notified the day before you're needed back -- you
10   need to be back, you need to be back.  And if he has a
11   problem with it, he needs to call me.  Okay?  And if he
12   needs a letter to verify you had to be back, I can take
13   care of that for you.
14              THE WITNESS:  Yes, sir.
15              THE COURT:  They might not need you back.
16   They know how to get ahold of you.  If they don't call
17   you, you don't worry about it.  But if they call you,
18   they will call you the day before you're needed back.
19   So it won't be like "be here in an hour".
20              Does that make sense?
21              THE WITNESS:  Yes, sir.
22              THE COURT:  Okay.  All right.  I do thank
23   you for coming in.  Remember those instructions.
24              THE WITNESS:  Would --
25              THE COURT:  If you've got a question, go
```

```
 1   ahead.
 2               THE WITNESS:  Would it be like a -- they'll
 3   let me know a day before, correct?
 4               THE COURT:  Well, if they needed you on
 5   Thursday, they would call you on Wednesday and say we
 6   need you on Thursday.  They won't call you Thursday at
 7   9:00 and say be here at 11:00.
 8               THE WITNESS:  Yes, sir.
 9               THE COURT:  Okay.  Does that make sense?
10               THE WITNESS:  Yes, sir.
11               THE COURT:  All right.  Thanks for coming in
12   and you're excused as a witness for -- but you're on
13   call if needed.
14               THE WITNESS:  So I'm able to leave after --
15               THE COURT:  That means you can go wherever
16   you want right now.  Just make sure I can get you back
17   if I need you.
18               THE WITNESS:  Yes, sir.
19               THE COURT:  All right.  Thanks for coming
20   in.
21               (Witness excused from courtroom)
22               THE COURT:  Members of the jury, you can go
23   have lunch.  Be back in an hour and 15 minutes from
24   whatever time you walk out the jury room door, after --
25   if anyone needs to powder their nose or whatever, and
```

```
1    the sheriff will let us know.

2              Everyone else be back in an hour and ten

3    minutes from whatever time that the sheriff tells you

4    the jury has left the floor.  Everyone remain in the

5    courtroom until the jury has left the hall.

6              (Lunch break, 12:50 - 2:10 p.m.)

7              (OPEN COURT, DEFENDANT PRESENT, NO JURY)

8              (Witness on the stand)

9              THE COURT:  State your full, legal name for

10   Karen.

11             THE WITNESS:  Celia Lopez.

12             THE COURT:  Face me and raise your right

13   hand.

14             (One witness sworn)

15             THE COURT:  There's some rules you have to

16   follow until the trial is over.  Number one, you can

17   only be in the courtroom when you're answering

18   questions.  You can't sit in and listen to other people.

19             Still with me?

20             THE WITNESS:  Uh-huh.

21             THE COURT:  Is that a "yes" uh-huh?

22             THE WITNESS:  Yes, sir.

23             THE COURT:  Rule 1.1 is you've got to answer

24   out loud.  She can't write nods and shakes and uh-huhs.

25   You've got to use words.  Okay?
```

*STATE v. THOMAS OLIVAS*

1          THE WITNESS:  Yes, sir.

2          THE COURT:  You can't talk to anyone about

3   anything that has to do with the trial or the people

4   involved, including -- I think your husband was here a

5   few minutes ago.

6          THE WITNESS:  Yes, sir.

7          THE COURT:  You can't talk to him about

8   anything that has to do with the trial until the trial

9   is over.  You may only talk about what goes on in the

10   courtroom or what went on at the time of the events

11   giving rise to the trial, if you're speaking in private

12   with these lawyers or their staff or you're answering

13   questions in open court in the presence of the jury or

14   the judge.

15          Still with me?

16          THE WITNESS:  Yes, sir.

17          THE COURT:  Make sure you hear and

18   understand any question.  And if you can't hear or don't

19   understand, just say so.  Make them word it where you

20   know what you're being asked, but never wing it.

21          Do you understand?

22          THE WITNESS:  Yes, sir.

23          THE COURT:  And make sure -- and you're

24   doing this very well.  Make sure whoever is talking

25   stops before you answer because she cannot type two

1    people talking at the same time.  So if someone says

2    slow down, one a time, speak up, they're not picking on

3    you.  They're helping her do her job.

4                    Do you understand?

5                    THE WITNESS:  Yes, sir.

6                    THE COURT:  If she can't hear and write it,

7    the jury can't hear and understand it.  That's kind of

8    what lawyers slowly figured out over time and that court

9    reporters have always known.  They teach them that in

10   school.

11                   You good to go?

12                   THE WITNESS:  Yes, sir.

13                   THE COURT:  State, good to go?

14                   MR. ROUSSEAU:  Yes, Your Honor.

15                   THE COURT:  Defense good to go?

16                   MR. MOORE:  We're good to go.

17                   THE COURT:  Well, the jury apparently is not

18   good to go, so we will stand down for a minute.

19                   For the record, the jury returned from lunch

20   and they've asked for a few more minutes to freshen up.

21                   (Pause in proceedings)

22                   (Jury seated in courtroom)

23                   THE COURT:  You may call and identify your

24   next witness.

25                   MS. RAY:  Your Honor, we call Celia Lopez.

```
 1                    THE COURT:  Will you say your name out loud
 2   for me one more time and for Karen and also for these
 3   people on the jury.
 4                    THE WITNESS:  Celia Lopez.
 5                    THE COURT:  And I swore you in, placed you
 6   under oath -- O-A-T-H, Karen -- explained the rules
 7   of -- witnesses have to follow while a trial is in
 8   progress, and that was all done when they were at lunch;
 9   is that right?
10                    THE WITNESS:  Yes, sir.
11                    THE COURT:  All right.  Then you may
12   proceed.
13                    MS. RAY:  Thank you, Your Honor.
14                          CELIA LOPEZ,
15   having been first duly sworn, testified as follows:
16                       DIRECT EXAMINATION
17   BY MS. RAY:
18       Q.  Celia, you are currently married to Paul -- or --
19   Issac, correct?
20       A.  Yes, ma'am.
21       Q.  And how long have you and Issac been married?
22       A.  A year.
23       Q.  It's a test.
24       A.  Well, I didn't --
25       Q.  He apparently thinks y'all have been married four
```

```
 1   and a half years.
 2        A.   No.  We -- our wedding was -- was last July.
 3        Q.   Okay.  But y'all have been together for a very
 4   long time?
 5        A.   Yes.
 6        Q.   Must be flattering to know that he's considered
 7   you his wife since the moment he met you, apparently.
 8        A.   Yes.
 9        Q.   Okay.  Do y'all have children?
10        A.   Yes.
11        Q.   Three children, I believe?
12        A.   Yes.
13        Q.   And y'all currently live in Lewisville?
14        A.   Yes.
15        Q.   Now, what do you currently do?
16        A.   I'm a schoolteacher.
17        Q.   So you are missing out on what grade?
18        A.   Seventh grade math.
19        Q.   Seventh grade math.  How are those kids treating
20   you?
21        A.   There's 150 them.
22        Q.   You don't teach -- you don't teach 150 children
23   all at once, correct?
24        A.   No.  Like 30 at a time.
25        Q.   Okay.  Thirty at a time.
```

```
 1              Do you enjoy that work?
 2      A.  Yes.
 3      Q.  How long have you been a teacher?
 4      A.  Three years now.
 5      Q.  Three?
 6      A.  Yes.
 7      Q.  Back in 2011 were you and Paul still -- y'all
 8   were dating then?
 9      A.  Yes.
10      Q.  Do you recall where y'all were living?
11      A.  We both had our own apartments, but we really
12   stayed at his apartment.
13      Q.  So y'all both had separate apartments, but you
14   were generally at his apartment?
15      A.  Yes.  And they were across the street from each
16   other.
17      Q.  And do you recall the name of his apartment
18   complex?
19      A.  Yes.
20      Q.  What were his apartments called?
21      A.  Presidents Corner.
22      Q.  And how close was your apartment to his?
23      A.  Across the street.
24              MS. RAY:  Your Honor, may I approach the
25   witness?
```

STATE v. THOMAS OLIVAS

```
1                    THE COURT:  You may.
2       Q.  (BY MS. RAY)  Celia, I'm showing you what's been
3   admitted as State's Exhibit 2.  Are you familiar with
4   what State's Exhibit 2 depicts?
5       A.  The picture?
6       Q.  Yes.
7       A.  Yes.
8       Q.  Okay.  And these are the apartment complexes --
9   the apartment complex where Issac lived back in March of
10  2011?
11      A.  Yes.
12      Q.  Can you see the complex where you were living at
13  the time?
14      A.  Yes.
15      Q.  Okay.  If you could, mark on State's Exhibit 2
16  where you were living back in March of 2011?
17      A.  My apartment or his?
18      Q.  Your apartment.
19      A.  My apartment was in Oak Forest, over here.
20      Q.  So across the street?
21      A.  Yes, ma'am.
22      Q.  Okay.
23                    THE COURT:  For the record, are you pointing
24  on the far right side of that picture?
25                    THE WITNESS:  Yes, sir.
```

```
 1                    THE COURT:  In the -- kind of in the middle?
 2                    THE WITNESS:  It's -- actually, there's a
 3   little road this way.  It's not on the picture itself.
 4   Like it's not one of these buildings right here.  It's
 5   in a building over here, in space.
 6                    THE COURT:  You're pointing off to the right
 7   of the picture?
 8                    THE WITNESS:  Yes, sir.
 9                    THE COURT:  For the purpose of the court
10   reporter.
11                    Okay.  You may continue.
12                    Because I couldn't see the little dot
13   because it wasn't on the picture.
14                    THE WITNESS:  Okay.
15                    THE COURT:  Is that why?  Okay.
16      Q.  (BY MS. RAY)  So it didn't take you too long to
17   get back and forth between your -- those two apartments?
18      A.  No, ma'am.
19      Q.  And I believe at the time you had a son from a
20   prior relationship?
21      A.  Yes, ma'am.
22      Q.  Julian?
23      A.  Yes, ma'am.
24      Q.  How old was Julian back in 2011?
25      A.  He was four.
```

```
 1      Q.  And --
 2      A.  Sorry, five.  Because he was born in '06.  He
 3  was -- he had just turned five.  He was five years old.
 4      Q.  Did he live with you full-time?
 5      A.  Yes.
 6      Q.  And I understand that Issac also has a daughter
 7  from another relationship?
 8      A.  Yes.
 9      Q.  Do you remember how old she was?
10      A.  Seven.
11      Q.  Okay.  Did she live with y'all full-time or was
12  she there on weekends?
13      A.  Weekends.
14      Q.  Weekends?
15      A.  Uh-huh.
16      Q.  Do you recall ever meeting a woman by the name of
17  Mechelle Gandy?
18      A.  Yes.
19      Q.  And what -- when did you meet Mechelle?
20      A.  I only met her a couple of times, but I'd seen
21  her that same month.
22      Q.  The same month?
23      A.  In March.
24      Q.  Okay.  Of -- the same month that she died?
25      A.  Yes.
```

```
 1      Q.   And was that the first time you had seen her, in
 2  March?
 3      A.   I don't remember.
 4      Q.   Had Issac lived in that apartment complex very
 5  long?
 6      A.   No.
 7      Q.   About how long, less than a year?  More than a
 8  year, would you think?
 9      A.   Less than a year.
10      Q.   Much less?  Like less than six months?
11      A.   I think he moved in around December-ish.  I don't
12  remember if it was before Christmas or what, but...
13      Q.   But it was around Christmastime?
14      A.   Yes.
15      Q.   Of -- I guess Christmas of 2010?
16      A.   Yes.
17      Q.   And did Mechelle, did she live there before Issac
18  got there or did she move in afterwards?
19      A.   I don't know.
20      Q.   Did you know Mechelle's family situation in terms
21  of did you know if she had any children?
22      A.   Yes.
23      Q.   And how many children did she have?
24      A.   One.
25      Q.   And a boy or girl?
```

```
 1        A.   Boy.

 2        Q.   And his name?

 3        A.   Asher.

 4        Q.   Had you met Asher?

 5        A.   Yes.

 6        Q.   Were you around when Asher had his birthday

 7   party?

 8        A.   I wasn't around at the birthday party, but I had

 9   seen him -- it was either after or before.  He was

10   walking.

11        Q.   He was walking?

12        A.   Well, she had him on her fingers.  Like he was

13   holding her fingers, last I remember.

14        Q.   So that's your last memory of Asher?

15        A.   Uh-huh.  Yes, ma'am.

16        Q.   Would it be fair to say that Mechelle was a

17   pretty friendly neighbor?

18        A.   Yes, ma'am.

19        Q.   On -- back in March, where was Issac working?

20        A.   At Lowe's.

21        Q.   Do you remember what time it would have been when

22   he got off work?

23        A.   Around 9:00 o'clock.

24        Q.   On March 20th, 2011, that was the night of the

25   fire, do you recall if Issac would have been working
```

```
 1    that evening?
 2        A.   Yes.
 3        Q.   And would he have gotten off at the same --
 4    around the same time?
 5        A.   Yes.
 6        Q.   Which Lowe's was he working at?
 7        A.   The one on Eastchase.  Right down the street from
 8    the apartment.
 9        Q.   Pretty -- fairly close to y'all -- where y'all
10    were living?
11        A.   Yes.
12        Q.   Do you recall if or when you would have picked
13    him up from work?
14        A.   I would have been there like right on time.  So
15    probably been there at 9:00.
16        Q.   At 9:00.  And did y'all come straight home?
17        A.   I believe so.
18        Q.   About how long would it have taken you to get
19    home?
20        A.   Ten, 15 minutes.
21        Q.   When you got home, what do you recall y'all
22    doing?
23        A.   Him and my son -- he was grilling and my son was
24    drawing with chalk, but I was doing laundry.
25        Q.   So where were you doing laundry?
```

```
1        A.   I had done the laundry at my house, so I had just

2   brought it over from my house and I was hanging up all

3   the wet clothes in his house to dry.

4        Q.   And when you first got home from the Lowe's, did

5   you drop Issac and your boy off and then go get your

6   clothes?

7        A.   Most likely.  But I don't remember.

8        Q.   But by the time you came back with your clothes,

9   Issac was grilling.  Is that what you just said?

10       A.   Yes.

11       Q.   And what about Julian, what was Julian doing?

12       A.   He was playing with chalk.  He was drawing on the

13  ground.

14       Q.   What did you do when you got back to the

15  apartment?

16       A.   I was hanging up the clothes in the back, the

17  back closet.

18       Q.   If you could, describe the layout of Issac's

19  apartment back then?  Was it a large apartment?

20       A.   No.  It was just one bedroom.  And it didn't have

21  any furniture, really, in it.

22       Q.   It didn't have any furniture in it?

23       A.   Not really.  He had a couch and two blowup

24  mattresses.

25       Q.   Okay.  So he --
```

```
1      A.   All the furniture was at my apartment.  He was a
2   single guy so he just had --
3      Q.   Okay.  Did you change that?
4      A.   When we moved back to my apartment.
5      Q.   So when y'all finally got together, made it
6   serious, you moved him back to your apartment?
7      A.   Yes.
8      Q.   Where there was furniture?
9      A.   Yes.
10     Q.   Like a proper adult?
11     A.   Yes.
12     Q.   Okay.  So while -- so Issac's apartment is a
13  one-bedroom apartment?
14     A.   Yes, ma'am.
15     Q.   With --
16          MS. RAY:  May I approach, Your Honor?
17          THE COURT:  Yes, ma'am.
18     Q.   (BY MS. RAY)  Showing you what's already been
19  admitted as State's Exhibit 13.  Take a look at State's
20  Exhibit 13.  And State's Exhibit 13, is that a picture
21  of the doorway to Issac's apartment and Mechelle's
22  apartment?
23     A.   Yes.
24     Q.   And there's a window in between?
25     A.   Yes.
```

 1     Q.   That window went to which apartment?

 2     A.   To Issac's.

 3     Q.   And do you know that window -- what room would

 4   that have been?

 5     A.   That's the living room.

 6     Q.   You stated earlier that Julian was drawing on the

 7   sidewalk.  Is that what's depicted in 13?

 8     A.   Yes.  Yes.

 9     Q.   When Julian was out there doing these kind of

10   masterpieces, did he require attention?  Did he want

11   people to watch him and see his work as it unfolded?

12     A.   If he did, it would have been Issac's job.

13     Q.   Okay.  Issac was in charge of watching Julian?

14     A.   Yes, because I was busy with the clothes.

15     Q.   Okay.  Training him up and testing him out to see

16   if he was going to be a good dad.

17              The -- so you're in the apartment.  Which

18   part of the apartment were you when you were hanging up

19   the clothing?

20     A.   I was in the one bedroom that they have, in the

21   back closet.

22     Q.   So is that close to where that living -- is

23   that -- where -- close to where that window is, or is it

24   in the back of the apartment?

25     A.   No.  It goes the window and then the living room

1    and then the room.  And against the back window, sliding

2    glass door thing, is where the closet is.  And I was in

3    the closet hanging up, because it was a big closet.

4        Q.   So were you aware of any comings and goings in

5    the apartment?

6        A.   No.

7        Q.   At some point were you made aware that

8    something was going wrong or something had happened?

9        A.   Yes.

10       Q.   What happened?

11       A.   Issac came in saying -- asking me if I smell that

12   and I was like no.  And then he -- they have plastic

13   blinds and he had pulled the plastic blinds back and

14   when he pulled the plastic blinds back, you just saw

15   gulfs of flames.

16       Q.   Could you see where those gulfs of flames were

17   coming from?

18       A.   It was so bright.  It was right there where his

19   room is.

20       Q.   Where whose room is?

21       A.   Asher's.

22       Q.   Did you -- you had an idea of how Mechelle's

23   apartment was laid out?

24       A.   Yes.

25       Q.   So you knew which room belonged to Asher?

```
 1        A.  Yes.
 2        Q.  Now, when y'all first got to the apartment, did
 3   you see -- or -- did you see Mechelle or Asher when you
 4   first got home?
 5        A.  No.
 6        Q.  Did you have reason to believe that Mechelle was
 7   home?
 8        A.  When I saw her car.
 9        Q.  And when you saw that Asher's bedroom was on
10   fire, what did you do?
11        A.  I called 9-1-1.
12             MS. RAY:  May I approach the witness, Your
13   Honor?
14             THE COURT:  Yes.
15        Q.  (BY MS. RAY)  Celia, I'm showing you what's been
16   marked as State's Exhibit 1.  Are you familiar with
17   State's Exhibit 1?
18        A.  Yes.
19        Q.  Okay.  And it is a CD?
20        A.  Yes.
21        Q.  And do you recall what is depicted on State's
22   Exhibit 1?
23        A.  Yes.
24        Q.  And what is on State's Exhibit 1?
25        A.  The 9-1-1 phone call I made.
```

```
 1      Q.   And you've listened to State's Exhibit 1 before?

 2      A.   Yes.

 3      Q.   Looks like you've initialed and dated it when you

 4   listened to it?

 5      A.   Yes, ma'am.

 6      Q.   And does it appear to be an accurate copy of the

 7   9-1-1 call you made?

 8      A.   Yes, ma'am.

 9      Q.   You recognize your voice?

10      A.   Yes, ma'am.

11           MS. RAY:  Your Honor, I offer State's

12   Exhibit 1, after tendering to Defense Counsel for

13   inspection.

14           MR. MOORE:  I have no objection, Your Honor.

15           THE COURT:  All right.  State's 1 is

16   admitted.

17           (State's Exhibit No. 1 admitted)

18      Q.   (BY MS. RAY)  Celia, while you were on the --

19   Celia, while you were on the phone with dispatch, what

20   was Issac doing?

21      A.   He kept asking me to ask them if they want him to

22   kick in the door.

23      Q.   And what were you doing, did you relay that to

24   the 9-1-1 dispatch?

25      A.   Yes, but they didn't answer me fast enough.  He
```

```
 1    had already kicked in the door.
 2        Q.  So before you could even get an answer, Issac is
 3    kicking in the door?
 4        A.  Yes, because he was afraid about the baby.
 5        Q.  I'm sorry?
 6        A.  He was worried about the baby.
 7        Q.  How about you, were you concerned?
 8        A.  Yeah.  Because it was massive flames.  It was...
 9            MS. RAY:  Your Honor, at this time I would
10    ask permission to publish State's Exhibit 11 -- or
11    sorry -- State's Exhibit No. 1.
12            THE COURT:  Do you intend to do that by
13    playing it through the audio/visual equipment in the
14    courtroom?
15            MS. RAY:  Yes, Your Honor.
16            THE COURT:  Using your laptop?
17            MS. RAY:  Yes, Your Honor.
18            THE COURT:  You may do so.
19            (State's Exhibit No. 1 played in open court)
20        Q.  (BY MS. RAY)  Now, Celia, parts of that call, of
21    course, are hard -- somewhat difficult to understand.
22    While you were on the phone, I can hear some banging in
23    the background.  What was that?
24        A.  It was -- it would have been him banging on the
25    door, or I went around and was telling -- and seeing if
```

 1   any of the neighbors were upstairs to tell them to get

 2   out of the apartments, as well.

 3       Q.   So while you're on the phone with 9-1-1 dispatch,

 4   you're also running around trying to warn your

 5   neighbors?

 6       A.   Yes.

 7       Q.   And what is -- what was Julian doing at the time?

 8       A.   I tried to get Julian and the dog into the car,

 9   but I don't remember when I did that.

10       Q.   You were trying to get them out of harm's way?

11       A.   Uh-huh.

12       Q.   At some point did the firefighters get there, the

13   fire department?

14       A.   Yes, ma'am.

15       Q.   About how long did it seem to take for the fire

16   department to get there?

17       A.   I don't think very long.  It was just right down

18   the street.

19       Q.   The fire department was down the street from you

20   guys?

21       A.   Yes, ma'am.

22       Q.   It sounds like we can hear some sirens on that

23   recording.  Would that have been the fire department?

24       A.   Possibly.

25       Q.   Did you watch when the fire department arrived?

```
 1        A.   Yes, ma'am.

 2        Q.   What did you see them do?

 3        A.   I saw them bring Mechelle out.

 4        Q.   You saw them bringing Mechelle out?

 5        A.   Uh-huh.

 6        Q.   And where did they carry Mechelle?

 7        A.   Right in front of where Julian was doing the

 8   chalk.

 9        Q.   Did you see how she was dressed?

10        A.   Yes, ma'am.

11        Q.   What was she wearing?

12        A.   She had no clothes on.

13        Q.   Did she appear to be conscious?

14        A.   No, ma'am.

15        Q.   Did you watch as they tried to save Mechelle's

16   life?

17        A.   Yes, ma'am.

18        Q.   How long did it appear that they tried to save

19   her?

20        A.   I don't know.

21        Q.   Did it seem like a long time?

22        A.   I don't know.

23        Q.   At that time did you know what, if anything, had

24   happened to Asher?

25        A.   No.   I kept telling the fire department that
```

 1   there was a baby in there.

 2      Q.   Did they appear to be responding to you when you

 3   told them there was a baby in there?

 4      A.   I told everyone that came out that there was a

 5   baby, because they couldn't tell me where the baby was.

 6   And they kept saying maybe the baby wasn't there, maybe

 7   he was with family.  And I told them that if the car was

 8   there, the baby was there.

 9      Q.   So you're asking them where is the baby and

10   they're telling you, well, we're not even sure there's a

11   baby in there?

12      A.   Yes, ma'am.

13      Q.   And you told them that if that car is there,

14   Mechelle is there and that baby is there?

15      A.   Yes, ma'am.

16      Q.   Were you there when they stopped working on

17   Mechelle?

18      A.   Yes, ma'am.

19      Q.   Were you there when they declared her dead?

20      A.   Yes, ma'am.

21      Q.   Did you ever see Asher?

22      A.   No, ma'am.

23      Q.   Did you ever find out what had happened to Asher

24   that night?

25      A.   We did find out.  I don't remember if it was that

1   night or early that morning.

2       Q.  At some point did you leave the apartment to go

3   to your apartment?

4       A.  Yes, ma'am.

5       Q.  By the time you left to go to your apartment, had

6   you heard any news about Asher?

7       A.  No, ma'am.

8           MS. RAY:  I'll pass this witness, Your

9   Honor.

10          THE COURT:  Defense may cross.

11          MR. MOORE:  Judge, I don't have any

12   questions.

13          THE COURT:  May this witness be excused?

14          MR. MOORE:  She may.

15          THE COURT:  Ditto?

16          MS. RAY:  No objections, Your Honor.

17          THE COURT:  Then you're going to be excused

18   from the trial.  You're not on call.  You don't have to

19   come back.  But you can't talk to anyone about anything,

20   including your husband, until you find out the trial is

21   over, if it relates to anything having to do with court,

22   versus kids or baseball or whatever.

23          Do you understand the difference?

24          THE WITNESS:  Yes, sir.

25          THE COURT:  All right.  Thank you for coming

```
 1   in.  And take your water with you, too.

 2            THE WITNESS:  Will y'all let us know when

 3   it's over?

 4            THE COURT:  I think the lawyers will try to

 5   keep up with you.  If there's any doubt you have, call

 6   the court number and ask one of the staff if it's over

 7   or not.  The number -- get one of the deputies in the

 8   back to give you the phone number.  Okay?

 9            THE WITNESS:  Thank you.

10            (Witness excused from courtroom)

11            THE COURT:  You may call your next witness.

12            MR. ROUSSEAU:  Your Honor, we're going to

13   call Officer Arias, A-R-I-A-S.

14            (Witness takes the stand)

15            THE COURT:  State your full, legal name out

16   loud.

17            THE WITNESS:  Jason Michael Arias.

18            THE COURT:  I need you to face me and raise

19   your right hand.

20            (One witness sworn)

21            THE COURT:  Have you ever testified before?

22            THE WITNESS:  No, sir.

23            THE COURT:  There are certain rules you need

24   to know about that will apply pretty much in any

25   district court trial.  The first rule is you cannot be
```

1   in the courtroom when other people are answering

2   questions, only when it's your turn to testify.  For the

3   same reason, you're not allowed to talk to those people

4   during the trial about anything you know or they know

5   about anything that has to do with the trial or the

6   people involved.  The rule says you cannot discuss your

7   testimony with other witnesses.

8              Are you still with me?

9              THE WITNESS:  Yes, sir.

10             THE COURT:  You may speak in private with

11  the attorneys for either side or their staffs so they

12  know what questions to ask you or to respond to their

13  requests, but you must make sure other witnesses cannot

14  listen in on your conversations.  Make sure you hear and

15  understand the question asked and if you can't hear or

16  don't understand, then just say so, but never wing it.

17  Don't guess.  And if you do understand the question,

18  answer that question, stop, wait for the next question.

19  Don't volunteer information, because her hands have to

20  rest and she can't write it down if we're all talking at

21  the same time, and she doesn't like it when we're all

22  talking as fast as I am right now.

23             Do you understand?

24             THE WITNESS:  Yes, sir.

25             THE COURT:  Kevin.

```
 1                    JASON ARIAS,

 2    having been first duly sworn, testified as follows:

 3                  DIRECT EXAMINATION

 4    BY MR. ROUSSEAU:

 5        Q.   Good afternoon.  Well, as I was just about call

 6    your name as our next witness, I realized I am very

 7    familiar with calling officers, police officers, as

 8    officer so and so.  What would be the appropriate term

 9    for you?  What is your title?

10        A.   I'm an engineer.  It's a fancy word for a driver.

11        Q.   Fancy word for driver.

12                  You work for the Arlington Fire Department,

13    correct?

14        A.   Yes, sir.

15        Q.   And "engineer," it may speak for itself, but tell

16    the jury exactly what that means.

17        A.   My responsibility, I'm a driver/operator.  I

18    drive the fire truck.  We respond to emergencies.  I'm

19    responsible for getting the truck there safely.  On the

20    fire ground I'm responsible for the tool and equipment

21    on the truck.  I'm responsible for assuring that my

22    crews inside have water.

23        Q.   Okay.  And how long have you been -- I'm going to

24    refer to the term -- use the term "firefighter"

25    generally to speak about your career with the Arlington
```

```
 1   Fire Department.  If I've got -- if I -- if that's an
 2   incorrect term, let me know if it needs to be corrected.
 3   Okay?
 4       A.  Yes, sir.
 5       Q.  And how long have you been a firefighter with the
 6   City of Arlington?
 7       A.  Almost six years.
 8       Q.  And did you do that type of work anywhere else
 9   before joining the City of Arlington?
10       A.  Yes, sir.
11       Q.  With whom?
12       A.  The City of Keller.
13       Q.  Altogether how long have you been a firefighter?
14       A.  About ten years.
15       Q.  During that time -- well, how do you go about
16   becoming a firefighter?  What type of educational
17   requirements did you have?
18       A.  I hold a State of Texas Fire Commission
19   certification which allows me to be firefighter in the
20   state of Texas.  I also hold a paramedic certificate
21   through the State of Texas which allows me to practice
22   as a paramedic on sick and injured people.  On top of
23   that, I've had some training for my job specifically as
24   a driver/operator.  I'm also certified as a hazard --
25   hazardous materials technician through the State of
```

STATE v. THOMAS OLIVAS

```
1    Texas, as well as an instructor.
2        Q.   And as a starting point for all of that, did you
3    have to -- was there -- were there any formal
4    educational requirements to get your first job?
5        A.   Just to be certified through the State of Texas.
6        Q.   Okay.  And you've been with the City of Arlington
7    for about six years now?
8        A.   Almost.
9        Q.   You said that your -- and your current position
10   is that of an engineer, correct?
11       A.   Yes, sir.
12       Q.   Is that a rank, as well as just a job?
13       A.   Yes, sir.
14       Q.   Okay.  And is that a rank that is higher than you
15   held back in March of 2011?
16       A.   That's correct.
17       Q.   In March of 2011, what was your job title then?
18       A.   Firefighter.
19       Q.   And it may speak for itself, but why don't you
20   tell the jury what the job of a firefighter is.
21       A.   So on fire truck there are different roles and
22   responsibilities.  As a driver, I drive now.  At the
23   time of the incident, I was a firefighter.  Typically
24   those are the guys riding in the back.  The guys in the
25   back are responsible for -- if we arrive to a fire,
```

1  those are the guys going inside typically on the

2  hoseline.  They'll be going in, along with the officer

3  on that fire truck, which is the lieutenant.  So during

4  this incident I was a firefighter, riding backwards, who

5  arrived on the scene and our job was to make entry on

6  the hoseline with our lieutenant.

7      Q.  Well, let's start with, where were you

8  stationed -- well, if I use -- maybe I'm not phrasing

9  that very well.  Are -- as a firefighter, were you

10  assigned to a specific fire station?

11     A.  Yes, sir.

12     Q.  Okay.  And where was that fire station?

13     A.  That particular night?

14     Q.  Yes, sir.

15     A.  That particular night, it was Station 8.

16     Q.  Station what?

17     A.  Station No. 8.

18     Q.  Station No. 8.

19     A.  Yes, sir.

20     Q.  And in -- and where in proximity to the location

21  of this fire was Station 8 located?

22     A.  Station 8 is southeast of the location by

23  about -- I don't know the exact distance.

24     Q.  If you're in a car drive -- normal driving, how

25  long would it take you to get there?

1    A.   Two minutes.

2    Q.   So you're just down the street?

3    A.   Yes, sir.

4    Q.   How did you first become aware that you were

5    being -- that you were -- your services were needed at

6    this location?

7    A.   We got the tones for the emergency, came in as a

8    structure fire.  And we responded, like we do for any

9    structure fire.  I got on the truck and started to bunk

10   out, which is putting our gear on and getting ready.  We

11   knew that it was in our district so we knew the

12   likelihood of us being first on was very good.  And then

13   en route was -- when actually en route, we could see a

14   column of smoke so we knew that it was probably going to

15   be a legitimate fire.

16   Q.   So let's -- well, what time of the night was this

17   when you got this call?

18   A.   I don't remember the exact numbers.  It was

19   around 10:30, give or take, p.m.

20   Q.   Okay.  Do you -- after everything was over and

21   done that night, did you go back to the fire station or

22   somewhere and write out a -- the narrative of your

23   experiences that night?

24   A.   Yes, sir.

25   Q.   Okay.  And have you had a chance to review that?

 1    A.   Yes, sir.

 2    Q.   Do you have a copy of it with you, by any chance?

 3    A.   No.  No, sir, I don't.

 4    Q.   Okay.  If I told you that you had written

 5  22:11:23 hours as the time of dispatch, would that be --

 6  would that jibe with your memory?

 7    A.   That sounds pretty close.

 8    Q.   That would be -- in civilian speak, that would be

 9  about ten hours -- 10:00 o'clock and 11 minutes, right?

10    A.   Yes.

11    Q.   10:11 at night?

12    A.   Yes, sir.

13    Q.   Okay.  So you said you could see a column of

14  smoke while you were en route?

15    A.   Yes, sir.

16    Q.   Tell me, as a firefighter, what does that

17  indicate to you.

18    A.   It indicates that something is actually burning

19  and that the call for our service is probably

20  legitimate.

21    Q.   Is there a -- is it -- so you're on your way over

22  there, you could already see the smoke, correct?

23    A.   Yes, sir.

24    Q.   When you arrived, tell me what your initial

25  observations were.

1    A.  There was a first floor corner unit that was --

2    had thick black smoke pushing from it.  I don't recall

3    if the second floor was on fire.  I do know that the

4    first floor was on fire for sure.

5    Q.  Okay.  Common or uncommon to have a fire like

6    that in an apartment in Arlington?

7    A.  I mean, I've made several of them, so just

8    depends on by whose standards.

9    Q.  As -- well, as these -- as fires go, as your --

10   in your experience as an Arlington firefighter, would

11   this be a --

12   A.  Fairly common.

13   Q.  -- would this be a big incident or fairly common?

14   A.  No, it's fair -- I would say fairly common.

15   Q.  Okay.  So as you got there, did you already --

16   you said you were bunked out?

17   A.  Yes, sir.

18   Q.  Tell the jury what that means.

19   A.  By the time we arrived on scene, fully bunked out

20   means that we're stepping off the truck with all our

21   gear on, including coat, pants, mask, helmet, air pack,

22   gloves.  The only thing that we lack is getting to the

23   front door and clicking in to our air.  We wait until

24   the last second to put on our air on so that we conserve

25   all that air for when we need it.  So fully bunked out

1    is everything minus the air until we get to that front

2    door.

3       Q.   And that's ready to go?

4       A.   Yes, sir.

5       Q.   What are your -- what was your initial

6    responsibilities when you got there?  You told us you

7    stepped off the truck, what was your initial

8    responsibility?

9       A.   My responsibility, I went around to the driver's

10   side of the engine and pulled a hoseline and we extended

11   the hoseline to the front door.  The engineer at the

12   time charged the hoseline, means they basically just

13   filled it with water for us to make entry.

14      Q.   Is that water carried on the truck?

15      A.   Yes, sir.

16      Q.   Go ahead.

17      A.   And the hoseline was charged and we were just

18   about to make entry into that first floor unit.

19      Q.   Do you recall if the front door was open or if

20   you had to open it?

21      A.   It was already open.

22      Q.   Standing open?

23      A.   Yes, sir.

24      Q.   As you're standing there in the front door, can

25   you see fire?

1    A.   Fire, no; smoke, yes.

2    Q.   Okay.  So what did you do?

3    A.   We go through a process whenever we charge our

4  hoseline, fill it with water, where we bleed it off, the

5  air, so that when we get inside, we open a nozzle, we

6  have water, we don't have to wait for the water through

7  the air.  So I was bleeding off the hoseline.  And my

8  partner who was with me, about to make entry with me,

9  was knelt down, starts hitting me on my leg.  So I

10  looked down at him and that's when he told me that we

11  had a victim inside the front door.  His job is to gain

12  access through the front door if it -- if it's

13  already -- if it's closed still, which it was not, and

14  then do a primary sweep with a tool inside the front

15  door.  The majority of our victims are found within a

16  few feet from the front door.  So that's what he did and

17  that's when he struck the victim's leg.

18    Q.   So once you -- once he alerted you to the fact

19  that you had a victim very near the front door, what's

20  the next thing that you did?

21    A.   Dropped the hoseline.  She was close enough that

22  we could gain access to her.  There was no need for the

23  hoseline.  So we made entry into the kitchen area and we

24  just brought her outside.

25    Q.   Okay.

1          MR. ROUSSEAU:  Your Honor, may I step around

2    here just for a moment?

3          THE COURT:  Yes, you may.

4       Q.  (BY MR. ROUSSEAU)  If I am standing in the front

5    door, standing ready to enter the apartment front door,

6    okay, I guess you would be inside the apartment, where

7    in relation to my location would this victim have been?

8       A.  Probably halfway between me and you.

9       Q.  Okay.  Would she have been directly ahead of --

10   directly between me and you?  Would she have been off to

11   the left or off to the right?

12      A.  Directly in line with me.

13      Q.  Okay.  And that's where you found her?

14      A.  Yes, sir.

15      Q.  Okay.  Did you -- were you able -- while you were

16   still inside the apartment with her, were you able to

17   notice anything, anything about her condition?

18      A.  Yes.

19      Q.  What was that?

20      A.  For starters, she was not clothed.  And then once

21   we started dragging her out of the apartment, I made --

22   I noticed that there was blood, which I did not expect.

23   My initial, I guess, thought was that maybe she had been

24   overcome by smoke and that's why she was down in the

25   kitchen.  While we were dragging her out, I noticed

1   there was blood.  I remembered thinking that that was

2   odd.  And then didn't think anything else past that

3   because of what else transpired.

4       Q.  So you began dragging her out, I assume with the

5   help of your partner?

6       A.  Yes, sir.

7       Q.  Did you get her all the way outside?

8       A.  We got her to the threshold of the front door.

9       Q.  And what happened at the threshold of the front

10  door?

11      A.  We passed her off to another crew that was

12  outside.

13      Q.  Did you have to set her down for a minute to do

14  that?

15      A.  Yes, sir.

16      Q.  So there was another team of firefighters just

17  outside the door?

18      A.  Yes, sir.

19      Q.  And when she -- you handed her off to them,

20  what's the next thing that you did then?

21      A.  We took the hoseline and went back inside to a...

22      Q.  That's the thing you had -- were originally

23  prepared to do, correct?

24      A.  Yes, sir.

25      Q.  So you went back to your original responsibility?

1    A.  Yes, sir.

2    Q.  All right.  By this time did you have -- had you

3    turned on your air supply?

4    A.  The air supply was already on when we made entry

5    to drag her out.

6    Q.  Okay.  Thank you.  About -- what's the extent of

7    the air supply, how long do you have?  I guess does it

8    depend on the amount of physical activity you're doing?

9    A.  It does.  It -- the air bottles that we wear are

10   rated for 30 minutes.  That's sitting still, breathing

11   slowly and controlled breathing.  Typically on a working

12   fire, adrenaline is running, we're breathing fast, we're

13   working, they're probably good for 15 minutes.

14   Q.  All right.  So you grab the hose and you went

15   into the apartment.  Once you were able to get in there

16   and start seeing the conditions that existed, what did

17   you see?

18   A.  We encountered a lot of smoke and heat in the

19   front living room area.  Zero visibility.  The heat was

20   moderate.  We made our way back to the hallway leading

21   to the back bedroom, and that's where we entered a lot

22   of fire and a lot of heat.

23   Q.  You say "we," who was with you?

24   A.  My partner on engine eight.

25   Q.  Do you remember that partner's name?

1       A.   Yes, sir.

2       Q.   Who was that?

3       A.   A.J. Keeling.

4       Q.   A.J. Keeling?

5       A.   Keeling, yes, sir.

6       Q.   Would that be K-E-E-L-I-N-G?

7       A.   That's correct.

8       Q.   And were -- was an Officer Kornegay with you,

9  also, that night?

10      A.   Firefighter Kornegay on that particular incident

11  was on Quint 8, which is a separate fire apparatus.

12      Q.   And is he with you here today?

13      A.   He is.

14      Q.   And I don't mean with you, but --

15      A.   Yes, sir.

16      Q.   -- you guys were sitting in the back together?

17      A.   Yes, sir.

18      Q.   And Firefighter Kornegay was on a second -- I'm

19  going to call it a truck, but you call it a separate

20  piece of equipment?

21      A.   Yes, sir.

22      Q.   Was he there fighting the fire inside that

23  apartment at the same time you were?

24      A.   At one point, yes, but that's not his initial.

25  His initial responsibilities are different from what our

 1    responsibilities were.

 2        Q.  Okay.  Well, we'll talk to him in a minute

 3    about --

 4        A.  Okay.

 5        Q.  -- about his responsibilities.  But you do recall

 6    seeing him there that night?

 7        A.  Yes, sir.

 8        Q.  Okay.  Once you were able to -- your hoseline was

 9    running in the front door, correct?

10        A.  Yes, sir.

11        Q.  Did you -- where did you first encounter fire

12    that you actually had to utilize that firehose in order

13    to knock the fire down?

14        A.  It was in that hallway leading to the back

15    bedroom.

16        Q.  And after that, where did you progress, where did

17    you proceed to?

18        A.  We stayed in that hallway for, I'd say probably,

19    about a minute to two minutes fighting fire before we

20    could knock it down enough to move into the back

21    bedroom.

22        Q.  And that -- is that just you with your firehose

23    or was there another one going, that you were aware of,

24    by then?

25        A.  That was me with my partner on one hose and at

1   that same time, another hoseline had come in from a

2   different bedroom window with another crew who was also

3   attacking that fire.

4        Q.   So there are two firehoses now running inside

5   this apartment, correct?

6        A.   That's correct.

7        Q.   Would you call it a large apartment?

8        A.   I wouldn't say large.

9        Q.   The area where you were paused having to fight

10  this fire, describe it for us.

11       A.   We had had to fight some furniture coming in to

12  get to that point.  There was a --

13       Q.   What does that mean?

14       A.   Well, with zero visibility, it's sometimes

15  difficult, as it is, just trying to make way around the

16  unit.  There's couches, there's tables, there's -- you

17  know, depending on what they have in the unit, sometimes

18  it can be difficult to get -- maneuver past all that

19  stuff.  You have to kind of feel around and use your

20  senses to figure out what it is and what -- where it is.

21  So, you know, it takes us a second to, if we bump into a

22  couch, to figure out which way it's going and maneuver

23  around it.  On top of that, we can't see and we've got a

24  hoseline that we're dragging in, as well, so...

25       Q.   All right.  So the area where you were, where you

1   were having to stop and knock the fire down before you

2   could do anything else, describe that for us.

3       A.   That area is probably halfway between the front

4   door and the hallway.  If you're walking in the unit

5   from the front door, the living room -- living room

6   opens to the right.  On the left, I believe, there was a

7   bar that kind of comes out from the kitchen.  And right

8   there in that little walkway, there's a couch, I think,

9   that was sitting there, that we had run into.

10      Q.   Okay.  Is that where you had to pause to fight

11  the fire?

12      A.   Negative.

13      Q.   Okay.  Where was that?

14      A.   That was once we made it past the couch into the

15  hallway to the bedroom, going to the right, that's where

16  we stopped to fight fire.

17      Q.   Okay.  You were in a -- it sounds like it was a

18  fairly enclosed space?

19      A.   Uh-huh.  Yeah.  It's kind of a small hallway area

20  where it comes in from the living room.  It breaks off

21  to another bedroom and then the little hallway going to

22  the back bedroom.

23      Q.   The little hallway going to the back bedroom,

24  were you able to proceed down that hallway?

25      A.   Yes.

1    Q.   And what did you find when you got down there?

2    A.   We found that there wasn't a door where there

3    should have been a door.  I believe that door burned

4    off.  And then once we got into the bedroom, there

5    was -- we noticed some tracking on the right-hand side

6    of the bedroom, which we figured out later was where was

7    a closet had been.

8    Q.   You say "tracking," you mean like metal tracking

9    attached to the floor?

10   A.   That's correct, where maybe a sliding door had

11   been on the tracking, but there were no doors.  So

12   pretty sure those had burned off.  Everything in that

13   back room had burned off, as far as the doors go.

14   Q.   Were there any identifiable structures left in

15   that back room?

16   A.   Negative.

17   Q.   How long did it take -- well, were you able to

18   knock the fire down completely, I mean at least

19   sufficiently to be able to go in and out of the house

20   safely before running out of the oxygen, or did you have

21   to go and replenish?

22   A.   We were able to do it on our first tank.

23   Q.   There's a term in your report -- I say -- I'm

24   calling it your report.  It's actually a narrative that

25   you typed up.  There's a term called "hydraulic

1    ventilation".  Can you tell us what that means?

2        A.   Uh-huh.  There's a couple different types of

3    ventilation.  The most noticeable -- I don't know if

4    you've ever seen -- is firefighters just basically

5    setting a fan in the front door, you open a front door

6    and you open a back door, or a back window, or some sort

7    of opening, turn the fan on and it ventilates the

8    structure or the compartment that we're working in.

9    That's mechanical ventilation, is what we consider it.

10            Hydraulic ventilation, what he's referring

11   to, is actually using our hoseline with the water and

12   the nozzle to ventilate a structure.  So what we do is

13   go to a window, which we went to the back window in the

14   back bedroom, open up your nozzle and basically flow

15   water out the window.  You open up your pattern as to a

16   wide kind of fog and what that does is it sprays water

17   out the window and the air movement comes in from behind

18   and creates a Venturi effect and pulls the air -- draws

19   the air out of the room that you're in.  That's

20   hydraulic ventilation.  Maybe we don't have time to wait

21   for somebody to set a fan.  We can do it real quick

22   right there where we are and it quickly betters the

23   conditions for us inside in what we're trying to do.

24       Q.   Is this something you do after you've got the

25   fire knocked down a bit?

1      A.   That's correct.

2      Q.   And it essentially clears the area of the smoke?

3      A.   That's correct.  Yeah.  We do that after the

4   fire.  We don't do it before we put water on the fire.

5   And reason for that is we can draw the fire in the wrong

6   direction if we don't have a good hold on the fire yet,

7   because it interferes a lot with airflow.

8      Q.   You've already told us that you passed the female

9   victim off to another team of firefighters and then you

10   went back to fighting the fire.  Did you have any more

11   responsibilities regarding the female victim?

12      A.   Once we passed her off to the other crew, we

13   were -- our job with her was complete.

14      Q.   Did you have an occasion to check on her status

15   while you were there on scene, whether it was your

16   responsibility or not?

17      A.   We didn't have -- we weren't assigned to check on

18   her or any job specifically with her.  I just -- I do

19   remember, you know, talking with other crews as we came

20   out and them telling us what they had -- you know, what

21   had progressed with her after we had brought her out.

22      Q.   You are trained at -- in addition -- you already

23   told us, in addition to being a firefighter, you are

24   also a trained paramedic, correct?

25      A.   Yes, sir.

1    Q.  And an EMT?

2    A.  Yes, sir.

3    Q.  And as -- in that capacity would it be your

4    responsibility, under other circumstances, to try to

5    save the life of a victim such as her?

6    A.  Yes, sir.

7    Q.  Have you done that on other occasions?

8    A.  Yes, sir.

9    Q.  And do you know whether or not that was done on

10   this occasion?

11   A.  I don't know the specifics of what was done with

12   her once we handed her off.

13   Q.  Do you know if lifesaving measures were

14   attempted?

15   A.  I honestly don't know.  I honestly don't know

16   what they did once --

17   Q.  You were occupied, weren't you?

18   A.  Yeah, I was.  Yes, sir.

19   Q.  Okay.

20        MR. ROUSSEAU:  May I approach, Your Honor?

21        THE COURT:  Yes.

22   Q.  (BY MR. ROUSSEAU)  I'm going to show you what

23   I've had marked as State's Exhibit No. 3.  You recognize

24   this chart?

25   A.  Yes, sir.

```
 1      Q.  You had a chance to look at this earlier down
 2   today in my office; is that correct?
 3      A.  Yes, sir.
 4      Q.  Do you recognize this as a diagram showing the
 5   layout of the apartment that we've been talking about?
 6      A.  Yes, sir.
 7      Q.  Okay.  Other than the fact that it may or may not
 8   be to scale, does it fairly and accurately depict the
 9   general layout of the apartment?
10      A.  Yes, sir.
11      Q.  And does it show the locations that you've been
12   describing in your testimony so far?
13      A.  Yes, sir.
14      Q.  Do you recognize the various -- the -- there
15   aren't very many labels on here, but do you recognize
16   the locations, less indicated by the labels, as being
17   accurate?
18      A.  Yes, sir.
19              MR. ROUSSEAU:  Your Honor, I will offer
20   State's Exhibit No. 3, subject to any objection by
21   Defense.
22              MR. MOORE:  Judge, we don't have any
23   objection.
24              THE COURT:  All right.  State's 3 is
25   admitted.
```

```
 1              (State's Exhibit No. 3 admitted)
 2      Q.  (BY MR. ROUSSEAU)  Can you see this, Engineer
 3  Arias?
 4      A.  Yes, sir.
 5      Q.  Can you see this okay?
 6      A.  Yes, sir.
 7      Q.  There's a yellow button right in the middle of
 8  that --
 9              THE COURT:  Do you see that?  That makes
10  the laser point --
11      Q.  (BY MR. ROUSSEAU)  -- remote --
12              THE COURT:  Yeah.
13      Q.  (BY MR. ROUSSEAU)  Why don't you point it out
14  over there and test it out.  I think you'll find that
15  the laser works.  Okay.
16              THE COURT:  There you go.
17      Q.  (BY MR. ROUSSEAU)  Why don't you point out for us
18  the location of the front door.
19      A.  The front door is right here.
20      Q.  Okay.  And where did you find the victim in
21  relation to that front door?
22      A.  The victim was right here in the kitchen.
23      Q.  Okay.  So the door is here, so right -- pretty
24  much dead ahead?
25      A.  Yes, sir.
```

1    Q.   Okay.  And you said your partner had some sort of

2    a tool that he swept -- did a sweep of the floor and

3    that's how he found her, correct?

4    A.   Correct.

5    Q.   Okay.  Was it that -- were the conditions that

6    black inside there that you could not see that far in

7    front of you without using a tool?

8    A.   That's correct.

9    Q.   So you guys were essentially blind at that point?

10   A.   Correct.

11   Q.   All right.  So would this be the same door -- I'm

12   pointing now to the door you just pointed at, correct?

13   A.   That's correct.

14   Q.   Would this be the same -- would that be the

15   threshold where you had to set her down --

16   A.   That's --

17   Q.   -- while you handed her off to another team?

18   A.   That's correct.

19   Q.   Now, out here in the parking lot there's -- the

20   word "decedent" is written.  Does that accurately show

21   the location where she ultimately came to be laid in the

22   parking lot?

23   A.   That's correct.

24   Q.   Okay.  You saw her there after you were able --

25   A.   I did.

STATE v. THOMAS OLIVAS

```
 1      Q.  -- to step back and catch your breath?
 2      A.  Yes, sir.
 3      Q.  Okay.  Wait for me to finish because she's having
 4   trouble taking us both --
 5      A.  I'm sorry.
 6      Q.  -- down.
 7           You're doing great, but it's not a normal
 8   conversation.  You have to take turns.  Let's see.
 9   Point on here, if you would, the area where you had to
10   pause to knock that fire down, you said for a minute,
11   minute and a half, before you could proceed any farther.
12   Where was that?
13      A.  That was right here.
14      Q.  Right in there.  Okay.  I see the words "dryer
15   and washer", and that's just so -- it would be just to
16   the right of that as you're facing this chart?
17      A.  Right and down enough that we could look down the
18   hallway.
19           JUROR:  Judge --
20           THE COURT:  I'm sorry.
21           JUROR:  -- we're having trouble seeing --
22           MR. ROUSSEAU:  Oh --
23           THE COURT:  You're blocking --
24           JUROR:  -- with the --
25           THE COURT:  -- the projector.
```

```
1              JUROR:  -- projector.
2              MR. ROUSSEAU:  I'll move this.
3              THE COURT:  Yeah.  Why don't you pull it up
4    closer.  That's a good idea.
5              (Pause in proceedings)
6    Q.  (BY MR. ROUSSEAU)  Step down here, Engineer.
7    Yeah, that -- you're in a good enough spot.
8              Point out for us, please, the location then
9    where you were having to -- where you had to stop to
10   fight -- to knock the fire down before going any
11   further.
12   A.  It would have been here.
13   Q.  Right in there.  Okay.  Now, there's a big space
14   right here in the lower right-hand, I guess, as you're
15   facing it and then there's a big open space in the lower
16   left-hand as you're facing it.  It would be -- the
17   left-hand would be west, the right-hand would be east,
18   according to this little diagram.
19             Where -- did one of these rooms seem to be
20   the point of origin for the fire?
21   A.  Yes, sir.
22   Q.  And how can you tell the point of origin?
23   A.  It was where the majority of the body of the fire
24   was.
25   Q.  Is -- and which room was that?
```

1      A.   This one.

2      Q.   Okay.  You're pointing to the area -- the room on

3    the west side, according to this diagram, correct?

4      A.   That's correct.

5      Q.   Now, there's a line, a green line, that runs

6    across that room at the top of that room, the north end

7    of that room.  What would that line indicate?

8      A.   That line is the metal track that we saw when we

9    came in the room, where the sliding closet doors may

10   have been.

11     Q.   And there's a detail on the drawing right here,

12   again on the far western wall, right in the middle of

13   the wall.  It appears to be a little bit thick -- the

14   line appears to be thicker than the others.  Would you

15   tell me what that line might indicate?

16     A.   That line is the exterior window to that bedroom

17   where we performed the hydraulic ventilation.

18     Q.   That's the window where you were spraying water

19   out at a high rate to draw that smoke out, correct?

20     A.   That's correct.

21     Q.   Did it work?

22     A.   Yes, sir.

23     Q.   Do you recall any -- does anything about this

24   open area outside of the bedroom, do you remember

25   anything that might have been going on out there?

*STATE v. THOMAS OLIVAS*

```
 1      A.  No, sir.

 2      Q.  Okay.  Thank you.  You can have a seat.

 3      A.  Sure.

 4      Q.  Officer, do you recall how many pieces of

 5  equipment were ultimately dispatched to this scene?  If

 6  you don't, that's fine.

 7      A.  I can tell you what was dispatched initially.

 8  It's -- our initial response procedures are one ladder

 9  truck -- at the time, one ladder truck, a battalion

10  chief, three engines -- I'm sorry -- four engines, and

11  that was it.

12      Q.  Is --

13      A.  I'm sorry -- excuse me -- they've changed since

14  then.  So it was about a battalion chief, one ladder

15  truck and four engines.

16      Q.  So that's six different, for lack of a better

17  term, fire trucks?

18      A.  Five, with the battalion chief.  It's a Suburban

19  with a chief on it, commanding officer.

20      Q.  And then would the chief be in charge of

21  the whole -- the entire scene?

22      A.  That's correct, ultimately.

23      Q.  Ultimately.  Sounds like you guys have an awful

24  lot of autonomy as you go about your business; is that a

25  fair assessment?
```

1      A.  Yes, sir.

2      Q.  Because you have to because you're in

3  life-threatening situations?

4      A.  Yes, sir.

5      Q.  Thank you very much.

6           MR. ROUSSEAU:  I'll pass the witness.

7           THE COURT:  Defense may cross.

8                 <u>CROSS-EXAMINATION</u>

9  BY MR. MOORE:

10     Q.  Engineer Arias, you testified that your fire

11  station is just minutes away from the fire or where the

12  apartment was on fire, correct?

13     A.  Yes, sir.

14     Q.  You -- in your report you're dispatched at

15  2211 hours and you arrived at the fire at 2214 hours; is

16  that correct?

17     A.  I don't know the exact numbers.  That sounds

18  correct.

19     Q.  That's in your report.  I mean...

20     A.  Yes, sir.

21     Q.  Okay.  So it took about 13 minutes from the call

22  being dispatched to you arriving?

23     A.  Three.

24     Q.  My math again.  Three minutes.

25     A.  Yes, sir.

1      Q.   So y'all are there just -- I mean, three minutes

2   is nothing, isn't it?  I mean, that quick.

3      A.   Yes, sir.

4      Q.   And if the call had come in at ten after,

5   then -- well, I guess my point is this.  You're the

6   first one on the scene, correct?

7      A.   Correct.

8      Q.   And the door is already opened and the body --

9   you find the body of Mechelle Gandy in the kitchen,

10  correct?

11     A.   Correct.

12     Q.   Is -- are -- is she laying with her feet out

13  towards the door?

14     A.   Correct.

15     Q.   And her head is laying inside the kitchen?

16     A.   Correct.

17     Q.   Okay.  You had your hose with you at that point

18  in time when you entered the apartment, correct?

19     A.   Negative.

20     Q.   No?

21     A.   We dropped the hoseline at the front door when we

22  realized we had a victim inside the kitchen.

23     Q.   Right.  Right.  But you were carrying the hose

24  in?

25     A.   We left it outside when we made entry to bring

```
 1   her out of the kitchen.
 2        Q.   Okay.  You didn't spray water in there?
 3        A.   No, sir.
 4        Q.   She was brought out within minutes of y'all
 5   arriving on the scene, correct?
 6        A.   Correct.
 7        Q.   And is it standard procedure to hand -- if you
 8   find somebody, to hand them off to some other
 9   firefighters to take them out?
10        A.   That's not a standard procedure.  Every scenario
11   is different.  That's just what worked best for that
12   particular scenario.
13        Q.   Okay.  But as far as you know, she was in the
14   same condition when she was brought out and laid there
15   in the parking lot, nothing had changed about her
16   condition?
17        A.   Her responsiveness, is that what you're asking?
18        Q.   Yeah.
19        A.   Correct, nothing changed.
20        Q.   And besides you -- you and your fellow
21   firefighters carrying her, I assume by her arms and
22   legs?
23        A.   That's correct.
24        Q.   She was removed from that apartment immediately
25   and nobody disturbed her in any way?
```

1      A.   Correct.

2      Q.   Okay.  You went further into the apartment and

3  that's when you encountered flames, when you got into

4  the hall?

5      A.   Correct.

6      Q.   Correct.  That's when you started using any kind

7  of water to douse the fire out?

8      A.   Correct.

9      Q.   Okay.  Thank you.

10          Oh, do you know if -- was she laying

11  facedown or face up when she was --

12     A.   She was laying supine, which is face up.

13     Q.   Face up?

14     A.   Correct.

15     Q.   Thank you, sir.

16          MR. MOORE:  I'll pass the witness.

17          MR. ROUSSEAU:  I have no further questions,

18  Your Honor.

19          THE COURT:  All right.  May this witness be

20  permanently excused?

21          MR. ROUSSEAU:  As far as we're concerned,

22  yes, Your Honor.

23          MR. MOORE:  Yes.

24          THE COURT:  All right.  You're released from

25  the trial.  You're not on call, but you can't talk to

```
 1    anyone about what goes on here until you find out the
 2    trial is over.
 3              THE WITNESS:  Yes, sir.
 4              THE COURT:  Thanks for coming in.
 5              (Witness excused from courtroom)
 6              THE COURT:  You may call and identify your
 7    next witness.
 8              MR. ROUSSEAU:  I'll try to get the term --
 9    the title right, Your Honor, but it's Firefighter
10    Kornegay.
11              THE COURT:  Off the record.
12              (Discussion off the record)
13              (Witness takes the stand)
14              THE COURT:  State your full, legal name out
15    loud for the court reporter, and if she needs spellings,
16    she'll ask.
17              THE WITNESS:  Robert Daniel Kornegay.
18              THE REPORTER:  Could you spell your last
19    name?
20              THE WITNESS:  K-O-R-N-E-G-A-Y.
21              THE COURT:  Thank you.
22              And face me and raise your right hand.
23              (One witness sworn)
24              THE COURT:  All right.  Put your hand down.
25              Have you ever testified before?
```

 1              THE WITNESS:  No, sir.

 2              THE COURT:  All right.  There's rules you

 3    have to know about and they will apply any time you

 4    testify in a district court.  The first rule is you may

 5    only be in the courtroom when you are actually

 6    testifying.  You cannot sit in the courtroom and listen

 7    to other witnesses when they testify.  Clear?

 8              THE WITNESS:  Okay.

 9              THE COURT:  All right.  Rule two, you cannot

10    talk to other witnesses, whether you know them or

11    they're strangers, about anything you or they know about

12    anything that has to do with what's being asked about in

13    court.  You cannot discuss your testimony with other

14    witnesses.

15              Still clear?

16              THE WITNESS:  Yes, sir.

17              THE COURT:  You may speak in private with

18    the attorneys for either side or their investigators or

19    staffs about what you know so they can be prepared to

20    know what questions to ask you in court, but you must

21    make sure other witnesses cannot overhear your

22    conversations with the lawyers.

23              Still clear?

24              THE WITNESS:  Yes, sir.

25              THE COURT:  Make sure you hear and

1    understand the questions asked.  And if you can't hear

2    or don't understand what you're being asked, look them

3    in the eye and say so.  They'll rephrase it.  If you do

4    understand the question, answer that a question, stop,

5    wait for the next question.  Don't just keep talking.

6    Do not explain something unless you're asked to explain.

7    There can always be a followup question.

8                   THE WITNESS:  Okay.

9                   THE COURT:  All good?

10                  THE WITNESS:  Yes, sir.

11                  THE COURT:  All right.  These rules stay in

12   effect until the trial is over, which will be a couple

13   of weeks, even if you're allowed to leave after your own

14   testimony.  So keep that in mind.  Thanks for coming in.

15                  All right.  Kevin.

16                  MR. ROUSSEAU:  Thank you, Judge.

17                        ROBERT KORNEGAY,

18   having been first duly sworn, testified as follows:

19                      DIRECT EXAMINATION

20   BY MR. ROUSSEAU:

21      Q.  You are Robert Kornegay, correct?

22      A.  Yes, sir.

23      Q.  Would you, please -- what is your current rank

24   within the Arlington Fire Department?

25      A.  I'm an engineer apparatus operator.

```
1     Q.   Okay.  I'm having to get used to -- I'm used to
2  talking to police officers so if I say "officer," please
3  bear with me.
4     A.   Okay.
5     Q.   How long have you been with Arlington Fire
6  Department, sir?
7     A.   Just over seven years.
8     Q.   Were you a firefighter anywhere else before that?
9     A.   Yes, sir.
10    Q.   Where else?
11    A.   I started off with the Ranger Fire Department and
12 then Forest Hill and then Mansfield.
13    Q.   That sounds like definite progression upward to
14 me.
15    A.   Thank you.
16    Q.   And you've been with Arlington for seven years?
17    A.   Yes, sir.
18    Q.   So altogether how many years as a firefighter?
19    A.   Almost 16.
20    Q.   And are -- do you have any other certifications
21 that come into play in your job?
22    A.   I do special operations within the department.  I
23 do trench rescue, high and low rescue, confined space
24 rescue, swift water rescue, dive rescue, hazmat.
25    Q.   Sounds like --
```

STATE v. THOMAS OLIVAS

1      A.   And structural collapse.

2      Q.   Sounds like you have an extremely dangerous job,

3  and I want to talk to you about exactly the things you

4  did in connection with that job on one night in

5  particular.

6           I want to turn your attention to March the

7  20th of 2011.  Were you assigned to a particular fire

8  station that night?

9      A.   Station 8.

10      Q.   And is that -- and where in -- this -- we're

11  talking about an incident that happened in an apartment

12  called Presidents Corner -- apartment complex called

13  Presidents Corner.

14           How far from Presidents Corner would Station

15  8 have been?

16      A.   Maybe just over a mile.  Just down the road.

17      Q.   Pretty quick?

18      A.   Pretty quick.

19      Q.   Pretty quick.  Do you recall receiving a dispatch

20  to go to that location?

21      A.   Yes, sir.

22      Q.   Do you recall about what time that was?

23      A.   Just after 10:00 o'clock at night.

24      Q.   And what -- how did you get from the fire station

25  to the location of the fire?

1    A.   I was riding backwards, getting dressed, ready to

2    go to the fire.  I didn't watch the driver.

3    Q.   That's what I meant.  How -- you were transported

4    there, you rode on a fire truck, correct?

5    A.   Yes, sir.

6    Q.   What type of engine were you driving -- what type

7    of truck were you on?

8    A.   I was on Quint 8, which is a ladder truck.

9    Q.   Quint 8?

10   A.   Yes, sir.

11   Q.   So when you got to the fire, the location of the

12   fire, was there -- well, let me back up just a moment.

13           While you were en route to the fire, did

14   you -- were you able to make any observations?  Could

15   you see any smoke coming the -- any smoke in the

16   direction you were headed?

17   A.   I didn't look that way.

18   Q.   Didn't really have time, did you?

19   A.   No, sir.

20   Q.   Once you got there, what were your initial

21   observations?

22   A.   There was fire coming out of the unit, the

23   apartment unit that was affected, and smoke.

24   Q.   Where did you -- where did this fire -- where was

25   the fire coming from, what part of the structure?

 1     A.   You could see it from the front windows we passed
 2   and then the front door.
 3     Q.   What did you do when you first got there?  What
 4   were your initial responsibilities?
 5     A.   Search and rescue is our first responsibility on
 6   that.
 7     Q.   So did you take a -- did you grab a firehose and
 8   run it to the door -- house yourself?
 9     A.   No, sir.
10     Q.   So you had a different responsibility?
11     A.   Yes, sir.
12     Q.   Did you have a partner, or were you working
13   alone?
14     A.   There were two of us.
15     Q.   And -- so tell us what you actually did.
16     A.   When we got off the rig, we were walking up to
17   the door and heard some bystanders talking to us and
18   telling us that there was a -- potentially a mother and
19   a baby inside and if there was a baby, where that baby
20   was at.  We walked up to the door -- the door was
21   already opened and we went in, pushed the door open.
22   There was smoke about halfway down and then --
23     Q.   When you say halfway down, what --
24     A.   Halfway --
25     Q.   -- could you explain to the jury what you're

STATE V. THOMAS OLIVAS

1  talking about?

2      A.  Halfway from the ceiling to the floor.

3      Q.  Okay.  So getting into the range of below the

4  level of your head, correct?

5      A.  Correct.

6      Q.  All right.

7      A.  Then we started a right-handed search, which --

8      Q.  What does that mean?

9      A.  Means when we walk in the door, we stay on a wall

10  because the visibility is so poor in there that you --

11  and without a hoseline, we have no way getting back out

12  without knowing where we're oriented in the -- inside

13  the structure.  So we start down a wall and we stay on

14  that wall or stay close to each other so that we have a

15  way to get back out if we had to, all we have to do is

16  turn around, or essentially follow the right hand, to go

17  back to the door.

18      Q.  So unless you do something like that, unless you

19  keep to the right -- keep your hand -- essentially

20  keeping your hand on the wall, correct?

21      A.  Correct.

22      Q.  If you don't do that or if you don't have a

23  firehose to track your way back out, you can actually

24  get lost even inside a small structure?

25      A.  Very easy.

1      Q.   Why is that?

2      A.   Because if you get -- you can't see.  Pretty

3   simple.  I mean...

4      Q.   It's smoke, correct?

5      A.   Correct.

6      Q.   And also nighttime, correct?

7      A.   Correct.

8      Q.   All right.  So you went inside and you're doing a

9   right-handed search.  What's the first room that you

10  recall observing?

11     A.   It appeared to be a living room.  There was some

12  sofas in there, a fireplace, and like a sliding glass

13  door.  And that was the only room that we made it to on

14  the initial entry before we made it to the hallway.

15     Q.   When you got to the hallway, what did you -- did

16  something cause you to stop?

17     A.   The heat picked up when we got to the hallway.

18  It feels like just -- just more heat coming at you.  And

19  then there was a lot of fire right there and so we got

20  down even lower, we were crawling, and had to stop a

21  couple feet into that.  The fire got lower to the ground

22  and paint -- you could see the paint on the wall was

23  bubbling and kind of the steam or off-gassing of the

24  carpet was coming up.

25     Q.   So from where you were, can you tell us what

```
 1    we -- we've had the opportunity to see a diagram by now
 2    so we have --
 3        A.  Okay.
 4        Q.  -- some familiarity with the layout.  And I'll
 5    show it to you in a minute.
 6              But where approximately would you have been
 7    when you were on your hands and knees?
 8        A.  In the hallway just off the living room, right at
 9    the beginning of the hallway.
10        Q.  And you said there was -- the fire was visible,
11    the actual flames were visible?
12        A.  Yes.
13        Q.  Where were they?
14        A.  They were above us and coming down, just banking
15    down like the smoke would.
16        Q.  All --
17        A.  From the ceiling --
18        Q.  Ceiling high and coming down?
19        A.  Yes.
20        Q.  Okay.  And you were on your hands and knees?
21        A.  Yes.
22        Q.  And so you've already described -- said that the
23    place was very, very smoky.  And this is flames coming
24    through the smoke?
25        A.  It's flames prior -- yeah, it's going to be what
```

1    would be prior to the smoke.

2        Q.   Prior to the smoke?

3        A.   Yes, sir.

4        Q.   And you said something about the carpet.  Explain

5    that again.

6        A.   Whenever synthetics melt or get to a certain

7    temperature, they start to off-gas and it's right before

8    they combust.

9        Q.   So --

10       A.   So you can see that.

11       Q.   -- you can see these gases coming off of the

12   carpet?

13       A.   Yes, sir.

14       Q.   What does it look like?

15       A.   Look likes steam or like a light smoke coming

16   off.

17       Q.   When you have -- when those gases come into

18   contact with flame, open flame, what happens?

19       A.   It's about to be -- about to flashover.

20       Q.   And what does that mean?

21       A.   That means all the room, that whole area and

22   contents would be fully engulfed in flames.

23       Q.   Including you?

24       A.   Including us.

25       Q.   When you see flames coming down the wall and you

```
1    see gases coming off the carpet, how long do you have
2    before everything starts into a fireball?
3        A.   Seconds.
4        Q.   What did you do when you saw this condition?
5        A.   We -- I grabbed my partner and we backed up, got
6    back to the living room.
7        Q.   When you get back to the living room, did you
8    note -- did anything catch your attention?
9        A.   We were down low enough and could see the crew
10   working at the door and we headed straight towards the
11   door instead of following the wall back out.  And when
12   we got there, there was a crew removing the body.
13       Q.   Did you have any opportunity to make any
14   observations of that body?
15       A.   I know that there was a minimum amount of
16   clothing on the body and then that crew was dragging her
17   out.
18       Q.   What did you do next?
19       A.   I went to another entry point, which was a front
20   window, where I could see flames visible from and I took
21   my tool and broke out the window.  Got in --
22       Q.   What kind of a tool?
23       A.   It's called a New York hook.  It's about a
24   four-foot-long steel hook that has some different pry
25   points on it so we can force entry or aid us and assist
```

1   with search.  Grabbed an additional hoseline off the

2   engine so that we could push the flames back to try to

3   make it to the back bedroom where the baby was reported.

4        Q.  You said you grabbed an additional hoseline.  Did

5   you go in through that window that you talked about

6   breaking out?

7        A.  Yes, sir.

8        Q.  When you get inside the apartment, did you --

9   with that secondary -- second hoseline, was there -- did

10  you come into contact with the other firefighters who

11  are already in there with a hose?

12       A.  Not initially.  But we did a quick search on that

13  room there, where we look under the bed, over the top,

14  and the closets and so forth and then try to push back

15  towards the back bedroom.  Then we came in contact with

16  them in the hallway.

17       Q.  So you searched the room that you initially made

18  entry in from the outside?

19       A.  On our second entry, yes.

20       Q.  Okay.  Did you have an opportunity while the fire

21  was still -- and still going strong -- did you have an

22  opportunity to see the fire in the back bedroom?

23       A.  Yes, sir.

24       Q.  Describe what you saw.

25       A.  It was flames from the ceiling to the floor, wall

```
 1    to wall.  It was almost like daylight there was so much
 2    fire.
 3         Q.   How did you manage to get the fire under control
 4    or put out?
 5         A.   Well, we took both hoselines and the engine crew
 6    was pushing back the fire towards that back bedroom and
 7    putting it out.  We got into the hallway and the heat
 8    was so much that my partner and I got into the bathroom
 9    adjacent -- just right on the other side of the wall
10    from the bedroom while they put more water on it to try
11    to cool it down more so we could get in there and
12    search.  We didn't know if we were going to be able to
13    make entry with them there or if they would be able to
14    hold back.  So we started to breach that wall to try to
15    make another entry point to that room.
16         Q.   What do you mean by "breach that wall"?
17         A.   Started breaking the Sheetrock to get through the
18    bathroom to the room.
19         Q.   Was it -- ultimately was it necessary to utilize
20    that hole to go into the other room?
21         A.   It could have been.
22         Q.   Were they able to get the fire under control
23    before that became necessary?
24         A.   Yes.
25         Q.   Were -- at any one time were there two firehoses
```

1   running into that bedroom?  When I say running in, I

2   mean spraying water into that bedroom?

3       A.  Yes.

4       Q.  A lot of water comes out of a firehose, right?

5       A.  Yes, sir.

6       Q.  And they had sprayed water also in the hallway;

7   is that correct?

8       A.  Correct.

9       Q.  What about in the front room, in the front -- in

10  the living room, do you know if any water was sprayed in

11  there?

12      A.  I don't know.  I would -- I don't know what they

13  did in the front bedroom -- or the front room we come

14  in.

15      Q.  How about the front bed -- the bedroom you

16  initially made entry into from the parking lot, did you

17  have to spray any water in there?

18      A.  We had to spray water from that bedroom down the

19  hall to get down the hall.

20      Q.  Which is obviously not a clean maneuver.  It

21  makes a mess, correct?

22      A.  Correct.

23      Q.  You said you wanted to get into that back bedroom

24  to continue the search.  What were you searching for?

25      A.  A baby.

```
 1      Q.  Did you find the baby?

 2      A.  I did not find the baby.

 3              MR. ROUSSEAU:  May I approach the easel,

 4  Your Honor?

 5              THE COURT:  Sure.

 6      Q.  (BY MR. ROUSSEAU)  Get to you step down just a

 7  moment.  I would like to -- this is Exhibit No. 3 and

 8  it's already in evidence.  You can see this is a laser

 9  pointer, this yellow dot, yellow button right there.

10  Step back a little bit so the jury can see.

11              And we've already had the benefit of Officer

12  Arias testifying, so we have an understanding, generally

13  speaking, of what we're looking at.

14              But would you, please, point out for us the

15  room -- the window through which -- the window that you

16  had to break out in order to gain entry a second time?

17      A.  This window right here.

18      Q.  Okay.  And it's a -- you're pointing to an area

19  on the bottom right-hand side of the diagram and it's

20  a -- appears to be double lines in an otherwise solid

21  wall, correct?

22      A.  Correct.

23      Q.  Okay.

24      A.  There's two windows there.

25      Q.  It indicates the windows.  And it's on the far
```

STATE V. THOMAS OLIVAS

1    east end of the apartment, correct?

2         A.   Yes, sir.

3         Q.   Okay.  And where would the area -- the room that

4    you were talking about that had all the fire in it, the

5    fire that was from ceiling to the floor and wall to

6    wall, which room would that have been?

7         A.   This room right here.

8         Q.   You're pointing to an area on the other end, the

9    east -- the west end of the apartment, correct?

10        A.   Yes, sir.

11        Q.   Was it your understanding that was the baby's

12   room?

13        A.   Yes, sir.

14        Q.   Now, you had a chance to review this in my office

15   earlier today, correct?

16        A.   Yes, sir.

17        Q.   Was there some other structures or some items

18   that you recall that -- being in the apartment that did

19   not show up on this diagram?

20        A.   On this diagram there is -- it's missing a --

21   another sofa somewhere in here.  And then the bedroom,

22   bed -- a big bed was in here.  And that's -- and then

23   right here, while we were going through, the A/C and

24   heating unit fell down on us.

25        Q.   Okay.  Earlier you talked about another sofa and

1    you were pointing to the area in the top left-hand
2    corner of the diagram that's -- has a fireplace marked
3    in there -- that room, correct?
4        A.  Yes, sir.
5        Q.  Okay.  And when you said there was a bed that you
6    were calling a bed that was not shown in this diagram,
7    that was in the eastern -- east bedroom where you said
8    you made entry from the -- through the window, correct?
9        A.  Yes, sir.
10       Q.  All right.  Now, you said something about this
11   area right here, the hallway adjacent to -- basically
12   adjacent to the washer/dryer area.
13       A.  Okay.
14       Q.  What was it you just now talked there, happening
15   there?
16       A.  The A/C and heating unit fell down, came through
17   the ceiling.
18       Q.  So it was in the ceiling and it fell down?
19       A.  Yes, sir.
20       Q.  Okay.  Were you in the room when that happened?
21       A.  We were in the hall when it happened.
22       Q.  Did it hit you?
23       A.  It came down on us.  I don't know if it was it or
24   Sheetrock or whatever, but...
25       Q.  Okay.  Did you end up -- did you receive any

1   injuries the night that this -- you were fighting this

2   fire?

3       A.   This fire burned my ears and my partner's face.

4       Q.   How severely burned?

5       A.   Mine were first-degree and his were second.

6       Q.   It required medical attention?

7       A.   Not for myself.

8       Q.   Did you get into any kind of trouble for that?

9       A.   No, sir.

10      Q.   Are you supposed to stay in a room that's on fire

11  long enough to get burned yourself?

12      A.   No, sir.

13      Q.   Why did you stay?

14      A.   We had a mission to accomplish, to save a baby.

15      Q.   Thank you.  You can sit down.

16           Thank you, Engineer Kornegay.

17           MR. ROUSSEAU:  I'll pass the witness, Your

18  Honor.

19                  <u>CROSS-EXAMINATION</u>

20  BY MR. MOORE:

21      Q.   Do y'all prefer to go by firefighter, engineer?

22  What do you prefer?

23      A.   Engineer.

24      Q.   Engineer?

25      A.   Yes, sir.

STATE v. THOMAS OLIVAS

1    Q.   I have just a few questions, Engineer Kornegay.

2    You've been a firefighter 16 years in all, correct?

3    A.   Coming up on it, yes, sir.

4    Q.   Been to a lot of fires?

5    A.   Yes, sir.

6    Q.   They're all dangerous, aren't they?

7    A.   Yes, sir.

8    Q.   You made a report after this incident, correct?

9    A.   Yes, sir.

10   Q.   And have you reviewed that report before you

11   testified here today?

12   A.   Not today, sir.

13   Q.   But before you testified, you reviewed it?

14   A.   Yes, sir.

15   Q.   The -- I'm -- I have one area I'd like to clear

16   up.  You testified that at one point in time you were

17   down on your knees crawling, correct?

18   A.   Yes, sir.

19   Q.   Where in the apartment was that?

20   A.   That was from the living room to the hallway.

21   Q.   Okay.  And I believe you testified -- and that

22   wasn't in your report, though, was it?

23   A.   I'm not sure, sir.

24   Q.   Okay.  I just didn't see it in there.  I wanted

25   to clear it up.  And you were on your knees, I assume,

1  crawling to go into the hall?

2      A.  Yes, sir.

3      Q.  And where did you see the gases coming off the

4  floor?

5      A.  Right in front of me, in the carpet right in

6  front of me.

7      Q.  Which would be in the hall?

8      A.  Yes, sir.

9      Q.  Right before the bedroom?

10     A.  Right before the first bedroom, it would have

11  been.

12     Q.  Right.  And we would call that the --

13     A.  East bedroom.

14     Q.  -- east bedroom?

15     A.  Yes, sir.

16     Q.  And I believe you testified that when you saw

17  those gases coming up, there was also a whole bunch of

18  smoke from the ceiling to the -- almost to the floor

19  that just couldn't -- you couldn't see in there,

20  correct?

21     A.  No, sir.  The smoke was in the living room.

22     Q.  Okay.  Was there no smoke in the hall?

23     A.  No, sir.  It was fire.

24     Q.  Just fire?

25     A.  Yes, sir.

STATE V. THOMAS OLIVAS

1    Q.   And I believe you testified that when the fire

2  and gases meet, that's called -- you called that -- it

3  was fixing to...

4    A.   Flashover.

5    Q.   A flashover?

6    A.   Yes, sir.

7    Q.   Okay.  What is a flashover?

8    A.   A flashover is when everything in a room reaches

9  ignition temperature and ignites.

10    Q.   Okay.  So obviously that area had not reached

11  that point of flashover, correct?

12    A.   Not at the time that we entered.

13    Q.   Right.  There was still gases coming up and

14  flames coming down that had not met to cause a

15  flashover, right?

16    A.   Correct.

17    Q.   Did it ever flashover?

18    A.   Not with me in it.

19    Q.   Okay.  Did it flashover with you not in it?

20    A.   I'm not aware.

21    Q.   Well, y'all were putting the fire out, weren't

22  you?

23    A.   No, sir.  I went back outside the structure and

24  got another hoseline and made entry.

25    Q.   Okay.  So you don't know whether there was a

1   flashover or not?

2       A.   Not at that particular time.

3       Q.   Okay.  But there was certainly an abundance of

4   smoke in the other part of the apartment?

5       A.   Yes, sir.

6       Q.   Enough where you couldn't breathe?

7       A.   Yes, sir.

8       Q.   Okay.  Thank you.

9                MR. MOORE:  I'll pass the witness.

10               MR. ROUSSEAU:  I don't have any further

11  questions, Your Honor.

12               THE COURT:  May this witness be permanently

13  excused?

14               MR. ROUSSEAU:  He may, Your Honor.

15               MR. MOORE:  He may.

16               THE COURT:  All right.  You're permanently

17  excused from these proceedings just subject to those

18  witness rules.  Remember who you can and cannot talk to

19  until you find out the trial is over, which will be

20  probably several weeks from now.

21               THE WITNESS:  Okay.

22               THE COURT:  And thank you for coming in.

23               THE WITNESS:  Yes, sir.

24               THE COURT:  You're not on call.

25               THE WITNESS:  Okay.

```
 1                   (Witness excused from courtroom)
 2                   MR. ROUSSEAU:  Judge, may we approach?
 3                   THE COURT:  Yes.
 4                   (Discussion at the bench, off the record)
 5                   THE COURT:  All right.  Y'all go take a
 6      short stretch break.
 7                   (Break taken, 3:55 - 4:10 p.m.)
 8                   (OPEN COURT, DEFENDANT PRESENT, NO JURY)
 9                   THE COURT:  Officially, for the record,
10      state your full, legal name out loud.
11                   THE WITNESS:  Lester Warren Hicks.
12                   THE COURT:  And if you'll face me and raise
13      your right hand.
14                   (One witness sworn)
15                   THE COURT:  All right.  There's certain
16      rules that apply to all witnesses in a trial.  We're
17      going to bend them a little bit --
18                   THE WITNESS:  Okay.
19                   THE COURT:  -- out of respect, the lawyers
20      for both sides have agreed to have family members who
21      don't really know anything as far as being witnesses of
22      what happened, to sit and watch the trial as long as
23      they can keep their emotions together.
24                   THE WITNESS:  Okay.
25                   THE COURT:  As long as they can sit and
```

1    listen, keep on their poker face, watch the trial and

2    not talk to anyone about it unless they're speaking in

3    private with the DA or defense attorneys or their staff,

4    but you can't talk to anyone else about what you see or

5    hear in the courtroom if we let you stay in.

6                    Can you make that promise, sir?

7                    THE WITNESS:  Yes, sir.  Absolutely.

8                    THE COURT:  Well, here's the rules that

9    apply to everyone.  You can't normally be in the

10   courtroom when anyone else is testifying.  You can only

11   be here when you do.  We're going to let you stay in the

12   courtroom after your testimony to watch the trial and

13   sit with the family, as long as you do not talk to

14   anyone about anything that you see or hear, except in

15   private with the officers of the court.

16                   THE WITNESS:  Okay.

17                   THE COURT:  Good so far?

18                   THE WITNESS:  Yes, sir.

19                   THE COURT:  No witness is allowed to talk to

20   anyone else about anything they say or hear in the

21   courtroom, much less anything they know about the case

22   or the people involved, while the trial is in progress.

23   That's the rule for everyone, not just for you.  The

24   other people don't get the opportunity to see and hear,

25   so that's where I give you a little bit more of a riot

```
 1  act than I just would anyone.  Okay?
 2              THE WITNESS:  Okay.
 3              THE COURT:  Make sure you hear and
 4  understand the question asked.  And if you can't hear or
 5  you don't understand, just say so, but you never wing
 6  it.  You never guess.
 7              THE WITNESS:  Okay.
 8              THE COURT:  If they don't speak plain
 9  English, then you say I'm not sure what your question
10  is, will you run it by me again.  If you do understand
11  the question, though, you answer that question, you
12  stop, you wait for the next question.
13              THE WITNESS:  Okay.
14              THE COURT:  You never talk at the same time
15  as anyone else because her hands can't keep up with it.
16  She's good, but she can't type in stereo.  Okay?
17              THE WITNESS:  Okay.
18              THE COURT:  If someone asks you do you have
19  a watch, you say yes.  If they want to know where you
20  got it, what time is it or any other stuff, they'll ask
21  about your watch.  Otherwise, "yes" or "no" if that
22  answers the question, answer, wait for the question.
23              THE WITNESS:  All right.
24              THE COURT:  They can ask all the questions
25  they need to do their job.  It's not going to be a
```

```
 1   problem.
 2               THE WITNESS:  Okay.
 3               THE COURT:  Do you have any questions about
 4   these rules?
 5               THE WITNESS:  No, sir.
 6               THE COURT:  And you promise to follow them?
 7               THE WITNESS:  Yes, sir.
 8               THE COURT:  And they go on until the jury
 9   makes their last decision.
10               THE WITNESS:  Okay.
11               THE COURT:  Even after your testimony.
12               THE WITNESS:  Okay.
13               THE COURT:  So if you want to, you can have
14   a seat right here and wait for them to come back in.
15   You can go have a seat by David, do whatever you want.
16               Off the record.
17               (Break taken, 4:08 - 4:15 p.m.)
18               (OPEN COURT, DEFENDANT AND JURY PRESENT)
19               (Witness on the stand)
20               THE COURT:  You may call and identify your
21   next witness.
22               MR. ROUSSEAU:  Thank you, Judge.  We'll call
23   Lester Hicks.
24               THE COURT:  And if you will state your name
25   one more time for Miss Karen and also for the members of
```

1    the jury, please.

2              THE WITNESS:  Lester Hicks.

3              THE COURT:  And, Mr. Hicks, while the jury

4    was on break, I brought you into court, swore you in,

5    placed you under rules and all that stuff; is that

6    correct?

7              THE WITNESS:  Yes, sir.

8              THE COURT:  I guess so the jury is not

9    confused, one of the rules that most people are under is

10   that you can't be in the courtroom to watch the trial,

11   but because of your role in the case and you're an

12   immediate family member, the parties have agreed that

13   after your testimony you may remain in the courtroom and

14   you're not breaking any rule.  But you can't talk to

15   anyone about what you see or hear in the courtroom until

16   the trial is over.  You understood that?

17             THE WITNESS:  Yes, sir.

18             THE COURT:  All right.  Kevin.

19                   LESTER HICKS,

20   having been first duly sworn, testified as follows:

21                 DIRECT EXAMINATION

22   BY MR. ROUSSEAU:

23      Q.  Good afternoon.

24      A.  Good afternoon, sir.

25      Q.  You are Lester Hicks; is that correct?

Case 4:22-cv-00385-O   Document 16-7   Filed 08/16/22   Page 215 of 303   PageID 788

1        A.   That's correct.

2        Q.   Mr. Hicks, what do you do for a living?

3        A.   I'm a supervisor for the DART light rail,

4    maintenance department.

5        Q.   What does that mean, exactly?

6        A.   All the maintenance that gets done to the trains,

7    I help bring them in, schedule all the maintenance that

8    gets repaired to them.

9        Q.   Before you became a supervisor, what did you do?

10       A.   I was also a mechanic before then on GSA

11   equipment, the stuff that the -- loads airplanes.  And

12   before that, I was also a mechanic.

13       Q.   Pretty much been a mechanic your whole life?

14       A.   Yes, sir.

15       Q.   Are you originally from Texas?

16       A.   No, sir.  I'm originally from California.

17       Q.   How long have you lived in Texas?

18       A.   Approximately 22, 24 years, something like that.

19       Q.   Did you serve any time in the military?

20       A.   Yes, sir.  I served four years in the Marine

21   Corps.

22       Q.   How is it that you are connected to Mechelle

23   Gandy and Asher Olivas?

24       A.   Mechelle was my daughter and Asher was my

25   grandson.

```
 1        Q.  Was Mechelle your natural daughter?

 2        A.  No, sir.  She was my stepdaughter.

 3        Q.  And how long -- how -- you referred to her as

 4   your daughter?

 5        A.  Yes, sir.

 6        Q.  How long were you her father?

 7        A.  Since she was about two and a half, three years

 8   old.

 9        Q.  So you raised her from that age?

10        A.  Yes, sir.

11        Q.  And during the time that she was growing up,

12   where did the family live?

13        A.  We started off in California, but after I joined

14   the Marine Corps, we moved here to Dallas, Fort Worth

15   area.

16        Q.  And does -- do you -- does Mechelle have family

17   from her -- that is from her natural father's family

18   still out in California?

19        A.  Yes, sir.  That's correct.

20        Q.  And are there some family members living in Reno,

21   Nevada, as well?

22        A.  Yes, sir.  That's correct.

23        Q.  What type of a -- well, first of all, at the time

24   of her death, how old was Mechelle?

25        A.  Twenty-eight, I believe.  I don't know.
```

```
 1    Twenty-six, I believe.
 2        Q.   That's okay.
 3        A.   Yeah.
 4        Q.   I didn't tell you I was going to ask you that.
 5    I'm sorry.
 6             And did she -- you said y'all moved here
 7    after just a few years in California.  Did she do most
 8    of her growing up in Arlington?
 9        A.   Yes, sir.
10        Q.   Did she go to Arlington schools?
11        A.   Yes, sir.
12        Q.   Did -- was she ever married?
13        A.   No, sir.
14        Q.   What type of girl was Mechelle?
15        A.   Mechelle is, I want to say, a typical teenager.
16    She grew up, high school, did typical teenager things.
17    I had to wake her up, had to get her up to go to school.
18    Make her get up.  Make her go.  You know, that's --
19    that -- as -- as a teenager.  As she got older, she got
20    better.  I mean, we all do.  We all grow up, so...
21        Q.   So for those of us with teenagers, there is hope?
22        A.   There is hope.
23        Q.   What type of work did Mechelle do?
24        A.   Mechelle mainly was a -- a waitress and a
25    bartender.
```

 1        Q.   Do you know if she ever worked any retail jobs?

 2        A.   Yes, at 7-Eleven.  She also worked there, too.

 3        Q.   What part of town -- just generally speaking,

 4   what part of town did you and Mechelle's mom live in?

 5        A.   The southeast part of Arlington.

 6        Q.   Okay.  I'm going to use some -- a lot of us are

 7   familiar with some of the major streets there.  In

 8   relation to, say, New York, where would that -- where

 9   would y'all live?

10        A.   New York where?

11        Q.   New York Avenue, I'm sorry.

12        A.   Right.  Right.  What part of New York Avenue?

13        Q.   Oh, down -- down in Southeast Arlington.

14        A.   We lived west of New York Avenue.

15        Q.   And I'm not trying to get exact.

16        A.   Right.

17        Q.   Did -- the 7-Eleven where Mechelle worked, was

18   that somewhere in that general vicinity?

19        A.   Yes, sir.

20        Q.   So we've been talking about Mechelle quite a

21   been.  Tell us about Asher.

22        A.   Very good kid.  Very quiet.  Always smiling.

23   Yeah.

24        Q.   Did he --

25        A.   A bundle of joy.

1      Q.   Did you spend a lot of time with him?

2      A.   Yes.

3      Q.   Did he spend time -- did he have a room at your

4   house?

5      A.   Yes, sir.

6      Q.   Did he have a lot of toys at your house?

7      A.   Yes, sir.

8      Q.   Were there -- was there a period of time when he

9   and Mechelle actually lived at your house?

10     A.   Yes, sir.

11     Q.   Did he have a bed there?

12     A.   I'm sorry?

13     Q.   Did he have a bed there?

14     A.   Yes, sir.

15     Q.   Can you tell me, did Mechelle have a job working

16   in Grapevine, Texas, as far as you know?

17     A.   Yes, sir.  She had a job there, yes.

18     Q.   Do you know the name of the place where she

19   worked?

20     A.   She worked at Red Robin at one point and Pluckers

21   at one point.

22     Q.   And what is Pluckers?

23     A.   It is a wing place.  A wing place.

24     Q.   Did she ever work at a place called Boston's?

25     A.   I can't tell you that for sure, sir.

1     Q.   Or do you know if she -- if it was a place that
2   she ever just went to and hung out?
3     A.   I know she went there and hung out.
4     Q.   Did she have a -- did she have many friends?
5     A.   Yes, sir, a lot of friends.
6     Q.   Pretty large circle of friends?
7     A.   Yes, sir.
8     Q.   Was she a social person?
9     A.   Absolutely.
10    Q.   Did Mechelle ever have any other children?
11    A.   Not that I'm aware of.
12    Q.   You were in a position to know?
13    A.   Yes, sir.
14    Q.   Asher was her only child?
15    A.   Yes, sir.
16    Q.   I want to turn your attention to the time --
17  well, let me -- maybe we can just work backward.  At the
18  time of the fire, which was March the 20th of 2011, how
19  old was Asher?
20    A.   Just over one year old.
21    Q.   If I said 13 months, would that be about right?
22    A.   Yes, sir.
23    Q.   So if my math is correct, backing up, that would
24  have had Mechelle getting pregnant with him sometime in
25  late spring, early summer of 2009?

*STATE v. THOMAS OLIVAS*

1    A.   Yes, sir.

2    Q.   Was she living in your house at that time?

3    A.   Yes, sir.

4    Q.   Did you know the father?  The -- who was supposed

5    to be the father, did you know who that was?

6    A.   I didn't know him personally.  I knew his name.

7    Q.   And what was that?

8    A.   Thomas Olivas.

9    Q.   And how did you know that name?

10   A.   Mechelle had told me that.

11   Q.   And was there ever a time when -- well, did the

12   fact -- was there any friction between yourself and, I

13   guess, Mechelle's mother -- by the way, what is

14   Mechelle's mother's name?

15   A.   Georgia Hicks.

16   Q.   Was there any friction between yourself and

17   Georgia and Mechelle that evolved from her pregnancy?

18   A.   Yes, sir.

19   Q.   And what was -- describe that for us.

20   A.   Mechelle was living with us whenever she had

21   Asher and me and her mother took care of them, so...

22   Q.   You mean financially?

23   A.   Financially and babysitting and feed and -- until

24   Mechelle got her job.  She was working two jobs as a

25   single mom and we were just thinking that she shouldn't

 1  be doing that by herself.  So we thought the father

 2  should be responsible for helping her so she wouldn't

 3  have to work two jobs and never see her child and us

 4  always being her babysitter.  So it definitely caused

 5  friction for us.

 6      Q.  Well, I can understand why it would -- why you

 7  would want her to not have to go through all that pain.

 8  But why was -- what was the friction?  Was she resistant

 9  to something?

10      A.  Yes --

11          MS. KEENE:  Your Honor, I'm going to object

12  to any hearsay.

13          THE COURT:  What's your response to her

14  hearsay objection?

15          MR. ROUSSEAU:  I can rephrase the question,

16  Your Honor.

17          THE COURT:  I'll allow you to do that.

18      Q.  (BY MR. ROUSSEAU)  Was there anything that you

19  desired for Mechelle to do in regard to this child?

20      A.  Yes, sir.  I wanted her to file the proper

21  paperwork to get support from the father.

22      Q.  And did you ever -- was that a part of the -- was

23  that a source of the friction between you?

24      A.  Yes, sir.  That was a big part of the friction.

25      Q.  Was she resistant to that idea?

1      A.  Yes, sir.

2      Q.  Was there ever a time before Asher was born when

3   you actually met the person you refer to Thomas Olivas?

4      A.  Yes, sir.

5      Q.  Describe that for us.  Tell us about that

6   encounter.

7      A.  Which one, the first one or the second one?

8      Q.  The first one.  The first time you -- and by the

9   way, you ended up meeting the person, correct?

10      A.  Yes, sir.

11      Q.  Do you see that person present in the courtroom

12   today?

13      A.  Yes, sir.

14      Q.  Could you point him out and describe something

15   that he's wearing, please?

16      A.  Sitting right here with a blue tie on.

17      Q.  Okay.

18      A.  At the end of this table.

19      Q.  This gentleman right here --

20      A.  Yes, sir.

21      Q.  -- that I'm pointing at?

22              MR. ROUSSEAU:  May the record reflect the

23   witness has identified the Defendant?

24              THE COURT:  The record will reflect he

25   pointed at the Defendant in open court and accurately

1    described his clothing.

2        Q.  (BY MR. ROUSSEAU)  Where did you meet him and

3    under what conditions?

4        A.  Met him at the front of my house, and he had come

5    over to talk to Mechelle.  That's when I met him.

6        Q.  And was this before Asher was born?

7        A.  Yes, sir.

8        Q.  Is this a period of time -- was this early in her

9    pregnancy or late?

10       A.  Yes, sir.  It was early in the pregnancy.

11       Q.  It was early.  Was there ever any possibility of

12   Mechelle not giving birth to that child, that is, ending

13   in -- ending her pregnancy by abortion?  Was there

14   ever -- was that ever even a possibility?

15       A.  Not that I'm aware of, no.

16       Q.  When -- you said that you met Thomas early in her

17   pregnancy outside of your house, correct?

18       A.  Yes, sir.

19       Q.  Was it day or night?

20       A.  It was nighttime, sir.

21       Q.  And describe the encounter.  Tell us what

22   happened.

23       A.  That night I had gotten home from work, because I

24   work evening shift and --

25       Q.  About what time do you get home -- did you get

1    home then?

2        A.   Approximately 12:00 o'clock at night.

3        Q.   Okay.  Go ahead.  I'm sorry.

4        A.   And typical thing, come in and start winding down

5    from work.  Noticed that Mechelle was up getting

6    dressed, which was odd.  Started talking to Mechelle to

7    find out what was going on and she let me know that

8    Thomas was coming over to the house, that they were

9    talking about the pregnancy.

10       Q.   How did that sit with you?

11       A.   At that time I thought it was a good thing

12   because I didn't know the person.  So at that time, I

13   mean, good, taking care of business.

14       Q.   So did you meet him that night?

15       A.   Yes, sir.

16       Q.   Did he come into your home?

17       A.   No, sir.

18       Q.   Where did you meet and talk to him?

19       A.   I went outside and they were -- I have a two-car

20   garage and they were on the farthest north side of the

21   two-car garage, outside by the vehicles, speaking, and

22   that's when I met him.

23       Q.   Okay.  Was the encounter pleasant?

24       A.   Yes, sir.  The first encounter was pleasant.

25   Shook his hand.  We introduced each other and I was

1    planning on asking him what he was doing there.  He said

2    he was there to take care of business.

3       Q.  He said he was what?

4       A.  He was there to take care of business.

5       Q.  Do you know what that meant?

6       A.  I don't know for sure what it meant, but I was

7    taking it he was there to make arrangements due to the

8    fact that Mechelle was pregnant.

9       Q.  Did he give you any understanding or did he

10   explain at all who he was, what he did for a living,

11   anything like that?

12      A.  No, sir.

13      Q.  So I take it the conversation was pretty short?

14      A.  Yes, sir, it was pretty short.

15      Q.  Did you basically shake hands, introduce yourself

16   and then go back in the house?

17      A.  That's correct.

18      Q.  Well, that was early in her pregnancy, right?

19      A.  Yes, sir.

20      Q.  When is the next time that you encountered Thomas

21   Olivas?

22      A.  I can't remember for sure of the exact day, but

23   it was a couple of months later.  At the house, also.

24      Q.  Where was that?

25      A.  At the house, also.

```
 1      Q.   Same sort of situation?

 2      A.   Sort of.  I mean, me and Mechelle were talking.

 3   At this time I had came home and me and Mechelle were

 4   talking on the couch and all of sudden she received a

 5   text and she pretty much just ended our conversation and

 6   was anxious.  And I was trying to find out what was

 7   going on.  And as it turned out, Thomas was coming over

 8   again that night.

 9      Q.   Did that trouble you in any way?

10      A.   Yes, because of the timing.  Yes, sir.

11      Q.   What do you mean "the timing"?

12      A.   It was closer to 2:00 o'clock in the morning at

13   that point.

14      Q.   And did he -- when he came over, did he come up

15   and knock on the door?

16      A.   No, sir.

17      Q.   How did you know that he was there?

18      A.   Mechelle had went outside to meet him.

19      Q.   Did you go outside and meet him, also?

20      A.   At first I didn't.  After a little bit, I did go

21   out there.

22      Q.   Why did you go out there?

23      A.   Because I didn't like the fact that he came to my

24   house at 2:00 o'clock in the morning.

25      Q.   Did you explain that to him when you went out
```

1    there?

2        A.  Yes, sir.

3        Q.  How did you explain that to him?

4        A.  I asked Mr. Olivas that if he did not have enough

5    respect for my daughter to come in the daytime, that he

6    shouldn't come to -- excuse my language -- but don't

7    come to my fucking house at 2:00 o'clock in the morning.

8        Q.  That's fine.  And, by the way, here, you can use

9    the language that happened, that you used at the time.

10   That's okay.

11       A.  Okay.

12       Q.  It sounds like you were a little angry?

13       A.  Yes, sir.

14       Q.  And how did he respond when you said that?

15       A.  He responded that that's the only time he could

16   come because he had school and he had to work.

17       Q.  He said he was in school?

18       A.  Yes, sir.

19       Q.  Did he say where he was in school?

20       A.  No, sir.

21       Q.  Did he say what type of job he had?

22       A.  No, sir.

23       Q.  Did he say what hours -- what his hours were?

24       A.  No, sir.

25       Q.  Just that he goes to school and he goes to work

```
 1   and this is the only time he can come?
 2       A.   Yes, sir.
 3       Q.   How long did that encounter between the two of
 4   you last?
 5       A.   Less than five minutes.
 6       Q.   Have you pretty much described the conversation
 7   for us?
 8       A.   Yes, sir.
 9       Q.   Did it get heated?  Was there ever any chance of
10   it turning into a fight or anything like that?
11       A.   No, sir.
12       Q.   Was there ever another time when you came into
13   contact with him?
14       A.   No, sir.
15       Q.   So Mechelle at that time was still pregnant?
16       A.   Yes, sir.
17       Q.   Farther along, obviously?
18       A.   Yes, sir.
19       Q.   And Asher had not yet been born?
20       A.   No, sir.
21       Q.   So did Mechelle continue to live at your house
22   throughout her pregnancy?
23       A.   Yes, sir.
24       Q.   Did -- to your knowledge, to your knowledge, did
25   Thomas Olivas come to your house any more while she was
```

```
 1   pregnant?
 2       A.   Not that I'm aware of.
 3       Q.   To your knowledge, did Mechelle meet him anywhere
 4   away from your house?
 5       A.   Not that I'm aware of.
 6       Q.   It was not reported to you?
 7       A.   No, sir.
 8       Q.   Did she ever -- I'll pass on that.
 9               Before Asher was born, how many jobs was
10   Mechelle working?
11       A.   Two, I believe.
12       Q.   Did she continue working two jobs after he was
13   born?
14       A.   Yes, sir.
15       Q.   And she continued living at your house?
16       A.   Yes, sir.
17       Q.   Did -- to your knowledge, did Mechelle ever
18   receive any financial support from Thomas?
19       A.   No, sir.
20       Q.   Was there ever a time when Mechelle actually
21   moved out of your house with Asher?
22       A.   Yes, sir.
23       Q.   And when was that?
24       A.   It would have been, I believe, around November,
25   December of 2012, I believe.
```

STATE v. THOMAS OLIVAS

1    Q.   And what was the reason for her moving out?

2    A.   Not '12.  It was the child support thing.  She

3   would -- just never acted on trying to get the paperwork

4   done and it turned into, you know, as you said, friction

5   and she opted to move out.

6    Q.   Okay.  You and your wife basically took a hard

7   line and said this is something you must do?

8    A.   Yes, sir.

9    Q.   Did she ever flatly refuse to do it?

10             MS. KEENE:  Objection to hearsay, Judge.

11             THE COURT:  Read the prior question and

12   answer back.

13             THE REPORTER:  "Okay.  You and your wife

14   basically took a hard line and said this is something

15   you must do?"

16             "Yes, sir."

17             "Did she ever flatly refuse to do it?"

18             THE COURT:  Overruled to that one question.

19   Yes or no is the answer based on the state of the

20   record.

21             MR. ROUSSEAU:  Should I ask the question

22   again, Judge?

23             THE COURT:  Do you remember the question?

24             THE WITNESS:  Actually, I didn't hear the

25   whole thing.

STATE v. THOMAS OLIVAS

```
1              THE COURT:  Read it back to him.  Read the
2    question and answer and the followup question.
3              THE REPORTER:  "Okay.  You and your wife
4    basically took a hard line and said this is something
5    you must do?"
6              "Yes, sir."
7              "Did she ever flatly refuse to do it?"
8              THE COURT:  And the answer is yes or no to
9    that question.
10             THE WITNESS:  No, sir.
11             THE COURT:  All right.
12   Q.  (BY MR. ROUSSEAU)  And a moment ago I asked you
13   when did she -- when was it that she moved out of your
14   house and I think you said 2012?
15   A.  That's not correct.  I'm trying to get that date
16   in my head.  I know it was in November.  2010?
17   Q.  How about this.  Our offense date is March of
18   2011.
19   A.  Yes, then it would be 2010, sir.
20   Q.  Well, did Mechelle ever go to visit relatives in
21   California, with Asher?
22   A.  I don't know about California for sure, but I
23   know that she went to Nevada.
24   Q.  And I apologize.  That is the trip that I'm
25   talking about.
```

```
 1        A.   Yes, sir.
 2        Q.   And about what period of time would that have
 3   been?
 4        A.   That would have been Christmas of the same year.
 5        Q.   Once she returned, did -- eventually was she able
 6   to get an apartment?
 7        A.   Yes, sir.
 8        Q.   Now, did she suddenly come into a lot of money or
 9   did she find someone to help her?
10        A.   No, sir.  Her aunt and grandmother helped her.
11        Q.   And who are they?
12        A.   Regina Scambler and Gail Wickman.
13        Q.   Say last name again, please.  The last -- Gail,
14   I'm sorry.
15        A.   Wickman, I believe it is.
16        Q.   Regina Scambler.  And that's S-C-A-M-B-L-E-R; is
17   that correct?
18        A.   Yes, sir.
19        Q.   Okay.  A little bit of an unusual name.  That's
20   why I thought I should spell it.
21             Did Mechelle have a cell phone?
22        A.   Yes, sir.
23        Q.   Did Mechelle pay for the phone herself?
24        A.   No, sir.
25        Q.   Whose name would that phone have been under?
```

 1     A.   It would be under Regina Scambler's.

 2     Q.   Tell me, when Mechelle got back from Nevada and

 3  eventually moved into her apartment, do you recall

 4  approximately when it might have been that she moved

 5  into that apartment?

 6     A.   It had to be early January, early to mid January,

 7  pretty quick.

 8     Q.   She had not -- had she been living there very

 9  long when this happened?

10     A.   No, sir.

11     Q.   Was there a date in -- well, do you know when

12  Asher's birthday was?

13     A.   March 25th, the 25th of March.

14     Q.   Okay.  He was 13 months old at the time of his

15  death in March.  Would his birthday have been in

16  February?

17     A.   Yes, I'm sorry.  Yes.

18     Q.   The 25th?

19     A.   Yes, sir.

20     Q.   Okay.  And did you attend a birthday party for

21  him?

22     A.   Yes, sir.

23     Q.   A one-year-old birthday party?

24     A.   Yes, sir.

25     Q.   And where did that party take place?

```
 1      A.   At Mechelle's apartment, Mechelle and Asher's
 2   apartment.
 3      Q.   The same one that burned?
 4      A.   Yes, sir.
 5      Q.   Okay.  Did you ever -- well, describe that
 6   complex.  Is it a complex that you felt comfortable her
 7   living in?  I mean, there are good neighborhoods and
 8   bad.  That's what I'm getting at.
 9      A.   The neighborhood appeared okay; the complex,
10   maybe not so much.
11      Q.   Did you have any concerns about their safety?
12      A.   Not really.  Not safety.  But the complex just, I
13   mean...
14      Q.   You would prefer to see them live somewhere
15   nicer?
16      A.   Sure.
17      Q.   Okay.  Did you ever provide Mechelle with a
18   weapon of any sort for her own protection?
19      A.   Yes, sir.
20      Q.   And what was that weapon?
21      A.   It was a 20-gauge shotgun, single-shot.
22      Q.   Single-shot, 20-gauge shotgun?
23      A.   Yes, sir.
24      Q.   Is it one that you already own?
25      A.   Yes, sir.
```

*STATE v. THOMAS OLIVAS*

1    Q.   Was there a particular reason that you gave it to

2    her, any reason in particular?

3    A.   Because I believe in guns and think you should

4    have one to protect yourself.

5    Q.   And what I'm asking is, was there a specific

6    reason, I guess I should say?  For example, I'm afraid

7    of a person, a specific person who's trying to hurt me,

8    anything like that?  Was there a specific threat that

9    you were concerned about?

10   A.   No, sir.

11   Q.   Okay.  Just generally speaking, you felt that she

12   needed a weapon in the home?

13   A.   Yes, sir.

14   Q.   Did she know how to use it?

15   A.   Yes, sir.

16   Q.   Had you taught her?

17   A.   Yes, sir.

18   Q.   Did you eventually recover that weapon?  Did

19   someone bring it back to you?

20   A.   No, sir.  The City of Arlington -- the police

21   department recovered it.

22   Q.   But they never gave it back to you?

23   A.   No, sir.

24   Q.   I want to move -- turn your attention now to the

25   date of March 20th, 2011.  Did you see Mechelle and

```
 1   Asher that day?
 2      A.  No, sir.
 3      Q.  Were you -- that was a Sunday.  Were you working
 4   that day?
 5      A.  I was actually going to go in early.  So I was
 6   sleeping quite a bit in the afternoon because I had to
 7   go in at 3:00 o'clock in the morning.
 8      Q.  Were they at your house?
 9      A.  Yes, sir.
10      Q.  Mechelle and Asher were at your house that day,
11   but you were asleep?
12      A.  Yes, sir.  Asher was there.  My wife was taking
13   care of him.  And Mechelle came to pick him up.  Yes,
14   sir.
15      Q.  Did -- so you never saw Asher or Mechelle that
16   day?
17      A.  No, sir.
18      Q.  When is the -- how did you find out that
19   something had happened?
20      A.  I had got up to get ready for work and a police
21   officer had called our home phone and left a message on
22   the recorder saying that they needed to speak with us.
23      Q.  Did you return the call?
24      A.  I did not at the time.  I just walked outside,
25   walked back in, and they called again.  I was able to
```

 1   answer the phone at that time.

 2       Q.   And eventually did the policer officer come to

 3   your home?

 4       A.   Yes, sir.

 5       Q.   There were two police officers?

 6       A.   Yes, sir.

 7       Q.   And did they explain to you at that time that

 8   something had happened to Mechelle?

 9       A.   Yes, sir.

10       Q.   Did you know yet -- did they know yet whether or

11   not Asher was okay?

12       A.   They did not know there was a child in that

13   apartment.

14       Q.   Did you inform them that there should have been a

15   child in that apartment?

16       A.   Yes, sir.

17       Q.   Did you do anything or did anyone in your family

18   do anything to try and help the police locate Asher?

19       A.   Yes, sir.

20       Q.   What did y'all do?

21       A.   We got ahold of one of the people that may watch

22   Asher on occasion to see if Mechelle had dropped him off

23   over there.  And we also got ahold of one -- a couple of

24   her friends to see if maybe they had Asher.

25       Q.   Would the person who watched Asher, would her

 1   name by Lana Murphy?

 2      A.  Yes, sir.

 3      Q.  Did Ms. Murphy eventually come to the house?

 4      A.  Yes, sir.

 5      Q.  And did any -- did the police obtain any -- were

 6   they able to obtain any -- to your knowledge, and if you

 7   don't know that's fine, were they able to obtain any

 8   phone numbers to call individuals that might know where

 9   Asher had been, or where Asher was?

10      A.  I don't know for sure if they obtained them.  I

11   believe they went to somebody's house.

12      Q.  Okay.  But that's just something you would have

13   been told, correct?

14      A.  I'm sorry?

15      Q.  That's just something you would have been told,

16   correct?

17      A.  Yes.

18      Q.  Okay.  We'll pass on that topic for now.

19      A.  Okay.

20          MR. ROUSSEAU:  May I approach, Your Honor?

21          THE COURT:  Yes.

22      Q.  (BY MR. ROUSSEAU)  I want to show you what I've

23   had marked as State's Exhibit No. 164 and ask you if you

24   recognize this photograph?

25      A.  Yes, I do.

1      Q.   Who is depicted in that photograph?

2      A.   That's Mechelle and Asher.

3      Q.   Is it a fair and accurate depiction of Mechelle

4   and Asher as they looked shortly before their death?

5      A.   Yes, sir.

6      Q.   Deaths?

7      A.   Deaths, yes, sir.

8      Q.   Do you know where this photograph was taken?

9      A.   Yes, sir.  It was taken in Nevada at her

10   grandma's house.

11      Q.   At Christmastime?

12      A.   Yes, sir.

13           MR. ROUSSEAU:  I'll offer State's Exhibit

14   No. 164, subject to any objection by Defense.

15           MS. KEENE:  No objection, Judge.

16           THE COURT:  State's 164 is admitted.

17           (State's Exhibit No. 164 admitted)

18           MR. ROUSSEAU:  May I publish, Your Honor?

19           THE COURT:  Yes, you may.

20      Q.   (BY MR. ROUSSEAU)  Mr. Hicks, was there a

21   memorial service held for Mechelle and Asher?

22      A.   Yes, sir.

23      Q.   Did you attend?

24      A.   Yes, sir.

25      Q.   Where was that?

1     A.   At Wade Funeral Home in Arlington.

2     Q.   Was there a lot of people there?

3     A.   Standing room only, sir.

4     Q.   Sir, I forgot to ask you something and I realize

5  you're feeling a little bit upset right now.

6     A.   Yeah.

7     Q.   So -- and I should have asked you this earlier.

8  I apologize.  I need to do this before I pass you over

9  to the Defense.

10          Do you know Georgia's, your wife's, do you

11  know her cell phone number?

12     A.   Yes, sir.

13     Q.   And what number would that have been?

14     A.   269-1226.

15     Q.   269-1226.  Do you know what area code that is?

16     A.   817.

17     Q.   And do you know what Mechelle's phone number was?

18     A.   I can't recall right offhand.

19     Q.   Okay.  Who was paying for her phone again?

20     A.   Her Aunt Regina was.

21     Q.   Would it have -- and the name on the account

22  would have been what?

23     A.   Regina Scambler.

24     Q.   Regina Scambler?

25     A.   Scambler.

```
 1       Q.   Just one moment, please.

 2                 Thank you very much, sir.

 3                 MR. ROUSSEAU:  I'll pass the witness, Your

 4       Honor.

 5                 THE COURT:  Defense may cross.

 6                      CROSS-EXAMINATION

 7       BY MS. KEENE:

 8       Q.   Are you doing okay, sir?

 9       A.   Yeah.

10       Q.   If you need a break, it doesn't mean you're not a

11       tough person.

12       A.   No, I'm good.

13       Q.   Are you okay?

14       A.   Yeah.

15       Q.   My name is Joetta Keene and I represent Thomas

16       Olivas.  You and I have never met, have we?

17       A.   No, ma'am.

18       Q.   Is it okay if I ask you some questions about your

19       stepdaughter?

20       A.   Yes, ma'am.

21       Q.   Did you ever go meet with the police and give

22       them a statement?

23       A.   Concerning?

24       Q.   This case, the death of your stepdaughter.

25       A.   I never went and met with them and gave them a
```

```
 1    statement.  I met with him.

 2        Q.  All right.  When did -- who do you meet with?

 3        A.  Detective Stewart.

 4        Q.  When did you meet with Detective Stewart?

 5        A.  The first time I met Detective Stewart was about

 6    5:00 o'clock the morning of the death.

 7        Q.  5:00 a.m.?

 8        A.  Yes, ma'am.

 9        Q.  So the first person you talked to that was a

10    police officer was one that called you on the telephone?

11        A.  Yes, ma'am.

12        Q.  And was that an Officer Mathews, if you remember?

13        A.  I don't recall.

14        Q.  About how long was the conversation you had with

15    the police officer on the telephone?

16        A.  Just long enough to let me know that they were

17    coming over.

18        Q.  And then they came over?

19        A.  Yes, ma'am.

20        Q.  And did they come over with Detective Stewart or

21    did they come over, police officers in uniform?

22        A.  Two police officers in uniform came over.

23        Q.  And were they male or female?

24        A.  They were male.

25        Q.  Do you remember either of their names?
```

1    A.  No, ma'am.

2    Q.  And about how long did you talk with the two male

3  police officers at your house that early morning?

4    A.  We talked at -- for a while, until they realized

5  that there should be a baby in that place and then they

6  kind of stepped aside and started calling other people.

7    Q.  Did they ever talk to you about a person by the

8  name of Timothy, as opposed to Thomas?

9    A.  No.  No, ma'am.

10    Q.  Was there ever a time in which you told them, you

11  or your wife whenever you were present, about Timothy?

12    A.  No, ma'am.

13    Q.  Was there ever a time that you told Officer

14  Mathews, or this other male officer, or Detective

15  Stewart about this boy named Timothy was really stalking

16  Mechelle in the two weeks prior?

17    A.  No, ma'am.

18    Q.  Was there ever a time that you told them that you

19  had given the shotgun because of the stalking of Timothy

20  two weeks earlier?

21    A.  No, ma'am.

22    Q.  Were you present when your wife told them

23  anything about the shotgun and about stalking or

24  anything like that?

25    A.  No, ma'am.

1    Q.  Did you have any idea where Officer Mathews would

2    have obtained information that says that you were

3    very --

4              MR. ROUSSEAU:  Objection, Your Honor.  She's

5    reading from a report not in evidence.  It's hearsay.

6              THE COURT:  It sounds like it.

7              MS. KEENE:  I'm --

8              THE COURT:  Or asking what -- why --

9    sustained on other grounds of why someone else would

10   have done something.  That's not in evidence.

11   Q.  (BY MS. KEENE)  Is that just something you've

12   never heard of until today?

13   A.  Correct.

14   Q.  Okay.  Did you know your daughter's boyfriends?

15   A.  Boyfriends?

16   Q.  Yes.

17   A.  I don't know that my daughter had boyfriends.

18   Q.  Did she have a boyfriend, one?

19   A.  I don't recall my daughter having a boyfriend,

20   period.  She had a lot of acquaintances but no

21   boyfriends.

22   Q.  Okay.  What is an acquaintance to you?

23   A.  A friend, from work.  I mean...

24   Q.  Did you ever get in any conflicts with any of the

25   other males, friends of hers, acquaintances?

1       A.  No.

2       Q.  Did you ever get any conflict with a male,

3   an acquaintance of hers, named Christopher Gant?

4       A.  Say that again.

5       Q.  An acquaintance by the name of Christopher Gant?

6       A.  Any conflict?

7       Q.  Yeah.  Any sort of dispute, argument?

8       A.  Yes.

9       Q.  Is that somebody that you believed was having a

10  relationship with Mechelle?

11      A.  No.

12      Q.  That was just a friend?

13      A.  Yes.

14      Q.  Was there any other persons -- or were there any

15  persons that you got into a conflict or verbal argument

16  with that you believed was more than just a friend of

17  hers?

18      A.  No.

19          MR. ROUSSEAU:  Your Honor, I'm going to

20  object to relevance.

21          THE COURT:  He said no to that question, so

22  at this point I'll overrule to that, if there was any

23  conflict.  He said no.  You may move forward.

24          MS. KEENE:  Thank you, Judge.

25      Q.  (BY MS. KEENE)  Did Mechelle live with y'all

```
 1   until she moved out in November or December 2010?
 2      A.  Yes.
 3      Q.  Was that the first time that she had moved out of
 4   your house?
 5      A.  No.
 6      Q.  When had she moved back into your house?  Do you
 7   understand that question?
 8      A.  Yeah.  I understand.  I cannot give you an exact
 9   date whenever she moved back in.
10      Q.  Can you give us an idea?
11      A.  I can give you no idea when she moved back in.
12      Q.  What -- had she been living with y'all for a
13   year?
14      A.  I don't recall, ma'am.
15      Q.  So you can't even give us an idea if it was a
16   month or a year or five years?
17      A.  I can't recall exactly.
18      Q.  Okay.  Is it safe to say that you don't know very
19   much about your -- the personal dealings with -- of your
20   daughter?
21      A.  Yes.
22      Q.  I mean, you're stepfather, correct?
23      A.  By name, yes.
24      Q.  Okay.  You're father?
25      A.  Yes.
```

*STATE V. THOMAS OLIVAS*

```
1        Q.  We'll leave it at that.  Because you are.  You
2   raised her since she was two.
3              And I'm sorry I'm asking you hard questions,
4   but you understand why I have to, don't you?
5        A.  Yes.
6        Q.  Okay.  Y'all had to take Asher, did you not?
7        A.  Excuse me?
8        Q.  Child Protective Services had to take --
9              MR. ROUSSEAU:  Your Honor, I am going to
10  object to that.
11             THE COURT:  Members of the jury -- time
12  out -- we need to take a short recess.  If y'all will go
13  to the jury room, reload your coffee, we'll be right
14  back with you.
15             (Jury excused from courtroom)
16             THE COURT:  The jury is out.  I'm not
17  exactly sure where you're going.  I'm not exactly
18  remembering ruling on specific motions in limine on that
19  point, but discretion, valor, I'll let you ask the
20  questions and then I'll make a ruling on --
21             MS. KEENE:  Okay.
22             THE COURT:  -- whether or not it has
23  anything to do with this trial, outside the jury's
24  presence.
25             MR. ROUSSEAU:  I don't believe there has
```

1  been a motion in limine on that topic, Your Honor,

2  specifically because I ask Ms. Keene if she was going to

3  go into it with this witness and she told me no.  That's

4  why there's no motion in limine on this topic.

5        THE COURT:  Well, and I will just say I'll

6  allow the questions to be asked and answered outside the

7  jury's presence and we'll go from there.

8        MS. KEENE:  Judge, this is in response to

9  his questions, just so you know, as you're thinking

10  about the questions I'm going to ask, where he said

11  could you tell us the type of -- what type of girl was

12  Mechelle.

13        THE COURT:  Well, and I will just say this.

14  Under the discretion and valor rule of officers of the

15  court, of the standing and quality and character of

16  those involved in this trial, I might have expected you

17  to approach, "Look, I'm fixing to go into this and I'm

18  just giving you a heads-up as the umpire," even if the

19  witness isn't entitled to one because he's fair game on

20  the witness stand, as is proper.  But there wasn't a

21  specific motion and so I don't have a dog in this fight

22  directly.  But you can ask your questions and I'll

23  determine if they're relevant.

24        MS. KEENE:  And I apologize, Judge.  I do.

25        <u>VOIR DIRE EXAMINATION</u>

```
 1   BY MS. KEENE:
 2       Q.  When Asher was born, he was born with narcotics
 3   in his system; is that correct?
 4       A.  Possibly.
 5       Q.  And Child Protective Services was notified,
 6   really, to come to the hospital when he was born by the
 7   hospital?
 8       A.  I can't tell you who notified who on that.
 9       Q.  Did you meet with Child Protective Services at
10   the hospital or within days after Asher was born?
11       A.  I don't recall meeting with them there, no,
12   ma'am.
13       Q.  Did you meet with Child Protective Services at
14   all in the -- let's say, a week, within that vicinity,
15   after Asher was born?
16       A.  I don't believe it was a week.  I believe it was
17   a little bit longer than that.
18       Q.  And were you and your wife directed to be
19   supervisors of Asher?
20       A.  That's correct.
21       Q.  And that was because of the narcotics in his
22   system?
23       A.  Possible narcotics, yes.
24       Q.  And after several months of working with Child
25   Protective Services and y'all being the supervisors,
```

1    Child Protective Services left Asher in the care of your

2    daughter, they got out of her life?

3         A.   I don't think that's the correct statement.  I

4    don't believe -- there was no working with them.  I

5    believe they came out to our house for one visit to see

6    exactly what was going on and right after that visit

7    everything was determined to be okay.

8         Q.   Okay.  But did you not testify that they wanted

9    you to be the supervisor, you and your wife to be the

10   supervisors, of Asher in regards to Mechelle?

11        A.   I did say that.

12        Q.   Okay.  When was that?

13        A.   That was so we could get Asher out of the

14   hospital.

15        Q.   Okay.  So they came to the hospital and said

16   basically the grandparents need to take custody of the

17   child until we do a further investigation?

18        A.   I can't tell you for sure on that because I

19   wasn't there during that part of it.  But I did have to

20   sign him out of the hospital, yes.

21        Q.   And then within a month or so they released --

22   they got you guys out of it?

23        A.   It was pretty fast after they came to our house

24   and had an interview with our whole family, yes.

25        Q.   And so it's your testimony that they did not stay

1  involved in the case after that interview?

2      A.   That's correct.  They did not stay involved.

3                MS. KEENE:  Well, Judge, then I would --

4                THE COURT:  Time out.

5                MS. KEENE:  Sorry, Judge.

6                THE COURT:  Will you walk out with the

7  sheriff, outside the earshot of the lawyers for just a

8  second.

9                (Witness excused from courtroom)

10                THE COURT:  Question one, what of that do

11  you want to ask in the presence of the jury?  Of

12  everything you just asked outside the jury's presence,

13  what do you want to ask in the presence of the jury?

14                MS. KEENE:  All of it.

15                THE COURT:  All right.  And do you have

16  objection to any or all of it?

17                MR. ROUSSEAU:  Every bit of it, Your Honor.

18                THE COURT:  All right.  And your legal

19  objection is?

20                MR. ROUSSEAU:  The legal objection is

21  character assassination.  It's irrelevant and any

22  relevance is currently outweighed by the danger that it

23  might be prejudice.  And I did not open the door.  I

24  said what type of person was she, generally speaking,

25  what type of person was she.  And his answer is

1    essentially she's a decent person.  And Ms. Keene --

2              THE COURT:  Well, she hasn't given her

3    reasons yet.  You don't have to respond to her reasons,

4    even if you're anticipating them.

5              MR. ROUSSEAU:  Well, I do need to respond to

6    address her questions themselves, though, Your Honor.

7              THE COURT:  Okay.

8              MR. ROUSSEAU:  Because Ms. Keene is working

9    from the same set of records that I have and the

10   narcotics that she's referring to --

11             THE COURT:  Uh-huh.

12             MR. ROUSSEAU:  -- this lifelong veteran of

13   the criminal justice system, the narcotics that she's

14   referring to is marijuana, a trace of marijuana, at the

15   time the baby was born.  That's the question she wants

16   to ask in front of the jury, is narcotics.

17             THE COURT:  Well, that would explain why one

18   home visit and we're all done, versus meth or heroin or

19   lots of other things.  That would clearly explain that

20   if this were a child welfare hearing.  But having said

21   that, yeah, I might expect more, too, personally, but

22   professionally I've listened to 30-year veterans,

23   narcotics officers, call marijuana narcotics.  And

24   that's not what I, as a chemistry major with

25   pharmacology, would call narcotics, but I hear it all

STATE v. THOMAS OLIVAS

1    the time, whether I should be hearing it here or not, in

2    the form of questions, versus just saying marijuana.

3    And if I allow the questions, I'll allow you to go back

4    and point that out.

5                But, Joetta, why is this relevant based on

6    current state of the record?  Your turn.

7                MS. KEENE:  The -- that he's opened the door

8    to her character when he asked what type of girl was

9    Mechelle.  And they talked about how -- the reason they

10   had been watching the child is because she's working all

11   these jobs, et cetera.  And this is just to rebut what

12   he's already brought out.  You know, quite frankly, it's

13   not relevant to talk about what type of girl she is in a

14   general sense.  So just to rebut that alone, it is

15   admissible, in my opinion.

16               THE COURT:  All right.  Accepting at face

17   value that it's arguably relevant to the generic

18   question of what kind of girl, what kind of daughter --

19               MS. KEENE:  He said girl.

20               THE COURT:  -- based upon the type of girl

21   in the context of the statement, his daughter, what kind

22   of girl, she lived with you, I think it's way overkill,

23   403, the objection is sustained.

24               MS. KEENE:  Well --

25               THE COURT:  Is there anything else of this

1  nature you feel obligated to explore with him so we

2  don't have the jury come in and out, in representing

3  your client, if there's any other --

4          MS. KEENE:  Yeah, I --

5          THE COURT:  -- of those kind of things?

6          MS. KEENE:  -- I don't have to explore --

7  I -- well, I won't say it in front of him, but I --

8  there's another subject matter that you can rule on.  I

9  would proffer that, Judge, she has been to a rehab for

10  methamphetamine addiction.

11          THE COURT:  Uh-huh.

12          MS. KEENE:  And I would like to ask him

13  about his knowledge of that, since he was talking about

14  this type of girl that she was and the struggle that

15  they have had with her that is beyond just a struggle of

16  whether or not she's going to get the money out of the

17  baby daddy.  This has been a struggle about whether or

18  not she's going to quit using methamphetamine, which is

19  actually why the marijuana became even a bigger issue

20  when the baby was born that way.

21          THE COURT:  Well, let me just ask you this.

22  The postmortem examination, toxicology, are there any

23  drugs in her system?

24          MR. ROUSSEAU:  No, sir.

25          MS. KEENE:  I believe there was marijuana.

```
 1                    THE COURT:  I mean meth, is what I meant.
 2      That's what --
 3                    MS. KEENE:  I don't believe there's
 4      methamphetamine, Judge.
 5                    THE COURT:  Okay.  Do you have any idea of
 6      when this rehab would have been?
 7                    MS. KEENE:  I do not.
 8                    THE COURT:  Okay.  I'll allow you to bring
 9      him in, ask him has she ever been to a meth rehab, do
10      you know when it was, what did you know about it, what
11      was your involvement, and then I'll send him back out
12      and then we'll talk.
13                    MR. ROUSSEAU:  You want to do that outside
14      the presence --
15                    THE COURT:  Yes.  Yeah.  That's why I
16      said -- that's what I was telling her, if there's any
17      other, let's get it out of the way so the jury isn't
18      playing jack-in-the-box or pop-goes-the-weasel.
19                    All right.
20                    (Witness retakes the stand)
21                    THE COURT:  Okay.  While the jury is out,
22      there's some other issues I'm going to let them talk
23      about and see if it's any of the jury's business or has
24      anything to do with the trial.
25                    So while you're still here, she has some
```

1    more questions, and pull your microphone back, please.

2         All right.

3              VOIR DIRE EXAMINATION

4    BY MS. KEENE:

5    Q.  Do you have knowledge about whether or not

6    Mechelle ever went to drug rehabilitation or drug rehab?

7    A.  Not to my knowledge.

8    Q.  Okay.

9         MS. KEENE:  Then that really answers --

10        THE COURT:  That keeps that simple.

11        MS. KEENE:  It does keep it simple.

12        THE COURT:  Yep.

13   Q.  (BY MS. KEENE)  Did you have problems with her

14   with using methamphetamine?

15   A.  Not to my knowledge.

16   Q.  Okay.

17        MS. KEENE:  That keeps it simple.  I won't

18   ask those questions just to get a no.  It's silly.

19        THE COURT:  Well, no.  Now you know that's

20   not an issue.  All right.  All right.

21        MS. KEENE:  And, Judge, in talking to my

22   co-counsel, really additional reason of bringing up the

23   Child Protective Services is that at this point she's

24   been painted as this -- as a person who's working hard,

25   working all these jobs and the character of her is being

1   presented as one way, when, if she has had a baby,

2   whatever the drugs are in it, it is still to the level

3   that Child Protective Services is not going to let her

4   take the child home from the hospital.

5          THE COURT:  Well, let me tell you that, and

6   if this baby had died at five weeks old, I might say you

7   have a point, but the 403 objection is still sustained.

8          MS. KEENE:  Okay.

9          THE COURT:  But I note your additional

10  argument and reconsider my rulings and it remains the

11  same, all right, at least based on the current state of

12  the record.  403 objections, ruled for or against either

13  side, are always subject to change when balanced against

14  the entire record.  But as of right now, I'm very

15  comfortable with the decision I have made as a matter of

16  fact and law.

17         Do any of -- either of y'all, any of y'all,

18  need two minutes to run get --

19         MR. ROUSSEAU:  No, sir.

20         MS. KEENE:  We're good, Judge.

21         THE COURT:  -- coffee?

22         Everybody good.  All right.  Go get them.

23         (Jury seated in courtroom)

24         THE COURT:  All right.  Members of the jury,

25  this is the kind of thing when I do my job then you have

1    to do your job where the rubber meets the road.  You

2    will ignore the last question that was asked.  I've

3    sustained the objection to the question.  It didn't

4    happen.  You will not consider or talk about it when you

5    make your decision of what are the facts of the case.

6                  Does everyone understand my instruction?

7                  SEVERAL JURY MEMBERS:  Yes.

8                  THE COURT:  You may continue, Counsel.

9                  MS. KEENE:  We pass the witness, Judge.

10                 MR. ROUSSEAU:  No further questions, Your

11   Honor.

12                 THE COURT:  All right.  May this witness be

13   excused under the prior agreement but allowed for recall

14   if needed?

15                 MS. KEENE:  Yes.

16                 THE COURT:  All right.  You can have a seat

17   with the family.  Just remember, you cannot talk to

18   anyone about anything that happens during the course of

19   the trial.

20                 THE WITNESS:  Thank you.

21                 THE COURT:  And thank you for coming in.

22                 (Witness excused from the stand)

23                 MR. ROUSSEAU:  We'd call Officer Mathews.

24                 (Witness takes the stand)

25                 THE COURT:  Then state your full, legal name

*STATE v. THOMAS OLIVAS*

```
 1   for the court reporter and members of the jury, please.
 2             THE WITNESS:  Jamon Mathews.
 3             THE COURT:  All right.  Corporal Mathews, I
 4   need you to face me and raise your right hand.
 5             (One witness sworn)
 6             THE COURT:  Have you testified in district
 7   court?
 8             THE WITNESS:  Yes, sir.
 9             THE COURT:  Are you familiar with all the
10   rules that apply to witnesses in a criminal trial, who
11   you may and may not talk to, where you may and may not
12   be when testimony is being conducted?
13             THE WITNESS:  Yes, sir.
14             THE COURT:  Those rules apply in this case
15   as they do in most.  Make sure you follow them.
16             THE WITNESS:  Yes, sir.
17             THE COURT:  All right.  Kevin.
18             MR. ROUSSEAU:  Thank you, Judge.
19                 CORPORAL JAMON MATHEWS,
20   having been first duly sworn, testified as follows:
21                   DIRECT EXAMINATION
22   BY MR. ROUSSEAU:
23     Q.  Would you, please, introduce yourself to the
24   jury.
25     A.  Officer -- or -- Corporal Jamon Mathews with the
```

STATE v. THOMAS OLIVAS

1    Arlington Police Department.

2        Q.  Is it a recent promotion?

3        A.  Do what, sir?

4        Q.  Is it a recent promotion?

5        A.  About a year.

6        Q.  Okay.  You're with the Arlington Police

7    Department, correct?

8        A.  Yes, sir.

9        Q.  How long have you been with the Arlington PD?

10       A.  About seven years.

11       Q.  Is that the totality of your police experience?

12       A.  No.  I had four years prior.

13       Q.  Where was that?

14       A.  I was with Irving Police Department and Iowa Park

15   Police Department.  It's right beside Wichita Falls.

16       Q.  What is your current assignment in Arlington

17   Police Department?

18       A.  I'm assigned as a corporal to North District on

19   the midnight shift and I'm also assigned to S.W.A.T. as

20   a sniper.

21       Q.  As a -- your primary responsibility being a

22   corporal in the Northern District, is that related to

23   patrol?  You are a patrol supervisor?

24       A.  A patrol -- yes, I'm a training officer.

25       Q.  Training officer.  And have you been -- have you

 1   worked in patrol most of the time you've been with

 2   Arlington Fire Department -- Arlington Police

 3   Department?  I apologize.

 4        A.  Yes, sir.

 5        Q.  And in March of 2011 were you assigned to patrol

 6   at that time?

 7        A.  I was.

 8        Q.  And what shift were you working?

 9        A.  I was working the midnight shift, which starts at

10   2300 hours, or 11:00 o'clock p.m., and it ends at the

11   0700 hours, or 7:00 a.m.

12        Q.  What are the duties of a patrol officer?

13        A.  Patrol officers, our main responsibility is to --

14   once dispatch calls, we answer calls for service, 9-1-1

15   calls for services.  We also conduct investigations,

16   whether we view them ourselves or we get dispatched.

17   And then we also respond to -- or also conduct traffic

18   stops, as well.

19        Q.  Okay.  So if somebody calls 9-1-1, you're the one

20   who shows up?

21        A.  Correct.

22        Q.  At least back then?

23        A.  Yes.

24        Q.  Were you working the same part of town back then?

25        A.  Yes, sir.

1    Q.  Well, I want to -- we're here talking about an

2    incident that happened on March 20th of 2011, starting

3    just after 10:00 o'clock at night.  Did you become

4    involved in the -- did you respond to, become involved

5    in the subsequent investigation revolving around a fire

6    and two victims that occurred at Presidents Corner

7    Apartment on that day?

8    A.  I did.

9    Q.  Tell us how you came to be involved in that case.

10   A.  Officers were dispatched initially for -- because

11   there was -- for the assistance of the fire department,

12   because they had firehoses and stuff in the roadway and

13   we generally go to assist them, to either make sure

14   their hoses don't get ran over and we also get

15   dispatched to assist on a fire as far as helping out

16   with other victims and relocation and stuff like that.

17   Q.  And so when you first got to the scene, what did

18   you do?

19   A.  When we were first dispatched, we were advised

20   that the fire department had located a body there at the

21   scene.

22   Q.  And was there anything -- I mean, is that unusual

23   in a fire?

24   A.  It's very unusual, yes.

25   Q.  Was there anything that immediately required the

1    attention of the police department regarding that body?

2      A.   Yeah.   The fact that the body was not burned.

3    The fact that the body appeared to have been stabbed and

4    was bleeding.

5      Q.   What did you do when you found that out?

6      A.   Myself and the other officer, we made the scene

7    and began speaking with potential witnesses that might

8    have seen what happened with the fire investigation.

9      Q.   And is that even though -- you're not a homicide

10   detective, correct?

11     A.   Right.

12     Q.   But would that -- is that the role of a patrol

13   officer to at least help out in the very initial

14   investigation, that is, asking questions of people who

15   are immediately on the scene?

16     A.   It is.

17     Q.   Okay.   So did you talk to a woman named Celia

18   Murillo?

19     A.   I did.

20     Q.   How long had you been on duty when this all

21   started?

22     A.   In 2011, approximately a little over four years.

23     Q.   No, I'm sorry, on duty that night.

24     A.   Oh.   I had -- our shift actually started at 2200,

25   at 11:00 o'clock.

1    Q.   Okay.

2    A.   We were actually notified at briefing what was

3    going on.

4    Q.   Well, once you got there and you found out that

5    there was a victim of an apparent homicide and you

6    started -- you conducted your initial canvassing, your

7    initial investigations, was there another duty that you

8    were asked to fulfill?

9    A.   Yes, sir.  We had located family members of the

10   deceased female and I was requested to go make contact

11   with them and make the death notification.

12   Q.   Do you remember how y'all were able to find

13   out -- how you were able to come up with a number of

14   family members?

15   A.   We had gotten the name from the neighbor and we

16   did some research and discovered her name associated

17   with her family's name through our computer system.

18   Q.   So did you go to that house?

19   A.   We did.

20   Q.   Did you call first?

21   A.   I did.  I called to make sure we did have the

22   right location, being the address, and that also it was

23   the correct family members so we weren't making a

24   mistake.

25   Q.   Not a mistake you want to make, is it?

*STATE v. THOMAS OLIVAS*

1    A.   No, sir.

2    Q.   So did you go to that home?

3    A.   We did.

4    Q.   And when you got there, who did you meet with?

5    A.   I made contact there at the parents' address and

6    I spoke with a Georgia Hicks, who is the biological

7    mother of Mechelle, the deceased, and also Lester Hicks,

8    who's the father.

9    Q.   Has it ever been your responsibility before to

10   have to notify someone that a family member has died?

11   A.   Yes, several times.

12   Q.   What's the normal routine when you have to do

13   something like that?

14   A.   Normally on the nightshift, it's a little bit

15   different.  We contact a chaplain, victim service, to

16   assist them if they have family that has any questions,

17   as far as funeral arrangements, what to do with the

18   deceased, stuff like that.  Midnight shift it's a little

19   different because those type people aren't on duty, or

20   not available to us.  So we call and we just have

21   to either sometimes do it by ourselves or that

22   assistance will show up later.

23   Q.   Did you have a chaplain with you this time?

24   A.   He showed up after the fact, I believe.

25   Q.   So when you walked into this -- these people's

1  home, did you know yet whether or not there was a baby

2  who was missing?

3      A.  We knew there was a baby missing.  We believed

4  that there was a baby missing, just due to the fact we

5  couldn't locate the child at the time.

6      Q.  So it was your understanding already that there

7  was -- there should have been a baby in the apartment?

8      A.  Yes.  Correct.

9      Q.  Did you personally notify the parents of Mechelle

10  that she had passed away?

11      A.  I did.

12      Q.  Okay.  And what was their response?

13      A.  Crushed, as you can imagine.  Their daughter had

14  just been over there a couple hours ago with the son and

15  they were pretty well devastated.

16      Q.  Did you make any -- did you do anything, any

17  investigation to try to locate anybody who might have

18  Asher?

19      A.  Yeah.  We -- I contacted the babysitter to see if

20  she might have Asher, being the one-year-old.  We also

21  spoke with the parents and asked if anybody -- who the

22  father of the child was and, also, if there were any

23  more contacts of people who might know or have Asher.

24      Q.  Did you -- at any time were you able to obtain

25  the telephone number for -- well, let me ask you, did a

```
 1   person by the name of -- did the name Timothy pop up in
 2   your investigation?
 3       A.   It did.
 4       Q.   And how did you come up with the name Timothy?
 5   And if you need to refer to your report at any time,
 6   please do so, if it will help you remember.
 7       A.   We located Timothy's name through an old cell
 8   phone number that the victim had had through Ms. Hicks.
 9       Q.   Was it an actual old cell phone?
10       A.   It was.
11       Q.   So you're actually -- you picked the phone up and
12   scrolled through the contacts?
13       A.   Correct.
14       Q.   All right.  So you came up with this name
15   Timothy.  Did you make contact with the person named
16   Timothy?
17       A.   I did.  I called him once and then -- through
18   that cell phone and then he called back.
19       Q.   You called on that phone that you found his
20   number in?
21       A.   Correct.
22       Q.   So this was a phone that Mechelle had previously
23   used but was no longer using?
24       A.   Right.  But it was still working.
25       Q.   Okay.  And you had to leave a message for him at
```

```
 1   first?
 2       A.  I did.
 3       Q.  And he called back?
 4       A.  He did.
 5       Q.  I'm not going to go into all the details of what
 6   he had to say to you, but I will ask you this.  Was it a
 7   pleasant conversation?
 8       A.  It was not.
 9       Q.  Was he abusive, verbally abusive?
10       A.  Verbally, yes.
11       Q.  Did he use profanity?
12       A.  He did.
13       Q.  Did he -- was his mood -- would you describe his
14   mood as calm or agitated?
15       A.  Extremely agitated.
16       Q.  Could you hear anything in the background?
17       A.  It was like loud music or just kind of loudness
18   in the background.
19       Q.  Okay.  Could you tell -- did you have an
20   impression one way or another about whether or not he
21   was having difficulty hearing you?
22       A.  I don't know if he had difficulty hearing me, but
23   I could tell it was extremely loud, which would cause a
24   normal person to have difficulty.
25       Q.  Okay.  Did you have a meaningful conversation in
```

 1  any way with him?

 2     A.  No.  It was not a good conversation.

 3     Q.  Okay.  How did you end the conversation?

 4     A.  After the continued profanity, I saw we were not

 5  getting anywhere so I told him that somebody else would

 6  be contacting him and I hung up the phone.

 7     Q.  Did you have a sense one way or another whether

 8  or not the person on the end of the line might have been

 9  intoxicated?

10     A.  Could have been.

11     Q.  Did that even occur to you, is what I'm saying.

12  I don't want you to agree with me for --

13     A.  I mean, his speech was slurred, but I really

14  didn't know him from anybody else so I couldn't testify

15  whether or not I believed he was.

16     Q.  Okay.  Did the name "Thomas" come up?

17     A.  It did.

18     Q.  And how did you -- how did that name come up?

19     A.  It came up through the parents of Mechelle saying

20  that that was the --

21           MS. KEENE:  Objection to hearsay, Judge.

22           THE COURT:  All right.

23           Read the question back.

24           THE REPORTER:  "And how did you -- how did

25  that name come up?"

```
1              THE COURT:  Rephrase your question.
2       Q.  (BY MR. ROUSSEAU)  At some point in time did you
3   become aware of the name Thomas?
4       A.  I did.
5       Q.  As -- and was that person potentially significant
6   to you in your investigation?
7       A.  It was.
8       Q.  Did you -- were you able to obtain a telephone
9   number for Thomas?
10      A.  I did.
11      Q.  And did you dial that telephone number, or I
12  guess I should say, punch it in?
13      A.  I did.
14      Q.  And what phone did you use, if you recall?
15      A.  I believed I used the house phone of the parents.
16      Q.  When you called the number of Thomas, do you
17  recall talking to a family member of Mechelle's, that
18  is, Mechelle Gandy, the victim?  Do you recall talking
19  to family member by the name of Regina Scambler on the
20  telephone?
21      A.  Yes.  That was the aunt.
22      Q.  Okay.
23      A.  Who also was the one paying for the cell phone.
24      Q.  After talking to her, did you have -- were you
25  able to -- did you obtain the telephone number that's --
```

```
 1  for Thomas?
 2      A.  I did.
 3      Q.  And is that -- so you called the number that she
 4  gave you?
 5      A.  I did.
 6      Q.  And when you called the number, did you actually
 7  make contact with a live human being on the other end?
 8      A.  No.  It was like somebody picked up and hung up
 9  real quick.
10      Q.  Do you recall receiving -- do you recall
11  getting -- having to leave a voice message?
12      A.  I didn't.
13      Q.  You did not, okay.  I want to turn your
14  attention, please, to page four of your report.  It's
15  going to be the second full paragraph down.
16      A.  Okay.
17      Q.  And your report, it's the original, correct?
18      A.  Yes, it is.
19      Q.  Arlington police report.
20          The second full sentence, and just read it
21  to yourself, please, beginning with "I then
22  contacted..."
23      A.  Uh-huh.
24      Q.  The number that you called, did you get a
25  recording?
```

1     A.  I did.

2     Q.  And was there a name that was announced during

3     that recording?

4     A.  It was.

5     Q.  And what was that name?

6     A.  Thomas Olivas.

7     Q.  At any point in time did you make contact with a

8     woman named -- well, why did you want to contact Thomas

9     Olivas?

10    A.  To see if we could locate Asher's whereabouts,

11    due to the fact that he was the father of the child.

12    Q.  Was there any -- other than the fact he was the

13    father of the child, was there any reason to suspect

14    that he might have been with him?

15    A.  No.

16    Q.  You were just checking everything?

17    A.  Right.

18    Q.  Did you have any contact at any point with a

19    woman named Rebeca?

20    A.  I did.

21    Q.  How did you come into contact with her?

22    A.  I was given that cell phone number by the aunt,

23    as well.

24    Q.  And this is -- you're getting this information

25    from the aunt in a telephone call, correct?

1        A.   Correct.

2        Q.   So you called this woman named Rebeca.  And did

3    you make contact with her?

4        A.   I did.

5        Q.   While you were speaking with Rebeca, can you tell

6    us, describe whether -- well, were you able to get a

7    sense of what her mental state was during that telephone

8    call?

9        A.   Yes.  She was -- when I asked her about Thomas

10   and his whereabouts and what I was calling about, she

11   became very nervous, extremely afraid.

12       Q.   How did -- how were you able to tell that she was

13   extremely afraid?

14       A.   She was just -- her voice was breaking up.  She

15   was extremely -- kind of like "what's going on," asking

16   basically a thousand questions about, you know, what was

17   happening, to the point she was so afraid I actually had

18   to dispatch officers over to her residence due to the

19   fact she feared for her safety so much.

20       Q.   Would they have been Arlington officers?

21       A.   No, sir.

22       Q.   Tell us what you had to do.

23       A.   I had to contact Grapevine PD and actually have

24   them dispatched over there.

25       Q.   And did you hang up the phone and let it go at

1   that, after requesting the dispatch?

2       A.  No.  I actually stayed on the phone with her

3   until Grapevine PD arrived on scene.

4       Q.  And I'm not going to go into all the things that

5   Rebeca might have told you, but did you come away from

6   it with the understanding that there was some connection

7   between Rebeca and Thomas Olivas?

8       A.  Yes, there was.

9       Q.  Did you come away from it with an understanding

10  that there was some connection between Rebeca and

11  Mechelle Gandy?

12      A.  Yes.

13      Q.  Did she tell you what she was afraid of?

14          MR. MOORE:  Your Honor, I --

15          MS. KEENE:  Object --

16          MR. MOORE:  -- object to that.  That's

17  hearsay.

18          THE COURT:  Sustained in the -- based on the

19  current record.

20          MR. ROUSSEAU:  Give me just a moment.

21          (Pause in proceedings)

22      Q.  (BY MR. ROUSSEAU)  At some point in time did you

23  become aware that the body of Asher Olivas had been

24  located?

25      A.  I did.

1    Q.   How did you become aware of that, sir?

2    A.   I was made aware by Arlington arson investigators

3    that Asher had been found there in his room.

4    Q.   Where were you at the time you found that out?

5    A.   I was at Mechelle's parents' house, the Hicks.

6    Q.   What did you do when you found out?

7    A.   I went outside and spoke with the chaplain and

8    also victim assistance, along with the other officer

9    that was there, and made aware of what I was about to

10   tell the family, that we had located Asher.

11   Q.   Then what did you do?

12   A.   Due to the fact that I had -- made some, I guess,

13   some camaraderie or, I guess, made relationship with the

14   family, I went ahead and made the notification to both

15   of the parents.

16   Q.   And what happened when you made that

17   notification?

18   A.   Ms. Hicks collapsed to the floor.  She was very

19   distraught.  Mr. Hicks went to a table, basically

20   started kind of pounding his fists on the table and put

21   his head down.  They were both uncontrollably sobbing.

22   Q.   Was there anything about their house that caught

23   your attention?

24   A.   Yeah.  All of Asher's -- all of the baby toys,

25   diapers, clothes, stuff like that, was still there in

```
 1    the living room when we made the notification, as if
 2    they had just left.
 3                MR. ROUSSEAU:  I'll pass the witness, Your
 4    Honor.
 5                       CROSS-EXAMINATION
 6    BY MS. KEENE:
 7       Q.  How are you doing?
 8       A.  Well, ma'am.
 9       Q.  Did you bring your report with you?
10       A.  Yes, ma'am.
11       Q.  Is it five pages long?
12       A.  Yes, ma'am.
13                MS. KEENE:  Can I approach him just to make
14    sure it's the same report, Judge?
15                THE COURT:  Yes.
16                MS. KEENE:  And may I approach the board,
17    Judge?
18                THE COURT:  Yes.  The write-on-it board?
19                MS. KEENE:  The write-on-it board, Judge.
20                THE COURT:  All right.  Sheriff, will you
21    get the write-on-it board up here, please.
22                MS. KEENE:  Thank you, Judge.
23                (Pause in proceedings)
24       Q.  (BY MS. KEENE)  About what time did you get the
25    call to respond on this call, on this case?
```

1      A.   2300 hours, being 11:00 p.m.

2      Q.   About 11:00 p.m.  And at 11:00 p.m. where did you

3  go?

4      A.   I went straight to the apartments.

5      Q.   So you went to the -- what would you --

6  Presidents --

7      A.   The Presidents Corner apartment complex.

8      Q.   Presidents Corner Apartments.

9            And at Presidents Corner Apartments did you

10  talk to any potential witnesses or anybody in

11  particular?

12     A.   Yes, ma'am.  I spoke with the neighbor at

13  Apartment 603.

14     Q.   And who was that that you talked to?  What

15  neighbor?  What was her name?

16     A.   Her name was Celia Murillo.

17     Q.   C-E-L-I-A and M --

18     A.   M-U-R-I-L-L-O.

19     Q.   L-L-O.  And I believe you testified it was Celia

20  that gave you the parents' phone number?

21     A.   No.  They didn't give me the phone number.  They

22  just gave me Mechelle's name, and then we located the

23  family contact with our computer system.

24     Q.   I understand.  So the neighbor told you the young

25  lady who is deceased, what her -- identified her for you

STATE v. THOMAS OLIVAS

1    to figure out who her family member was?

2        A.  Yeah.  Just her name and about how old she was

3    and then we found the parents and...

4        Q.  And was there anybody else that you talked to at

5    the scene?

6        A.  No.

7        Q.  When you got there at 11:00 o'clock, was Mechelle

8    still there?

9        A.  She was.

10       Q.  Had she already been declared deceased?

11       A.  She had.

12       Q.  So what did the scene look like?

13       A.  There was fire department people everywhere.  A

14   bunch of people were outside.  Mechelle was there laying

15   in the parking lot with a white sheet over her.

16       Q.  And were -- are you the first officer on the

17   scene?

18       A.  One of the first.  Probably three.  Three or

19   four.

20       Q.  What do you do as a police officer to preserve a

21   crime scene if there's been a crime that took place,

22   which clearly there had been in this case?

23       A.  I mean, you start contacting witnesses and stuff

24   and if there's an area to be blocked off, then you block

25   it off with crime scene tape.

*STATE v. THOMAS OLIVAS*

1    Q.  And was that done in this case?

2    A.  I'm not sure.

3    Q.  Was that your duty?

4    A.  That was not my duty, no.

5    Q.  How -- explain to the jurors just in a brief way,

6    how do those duties -- how is that determined?

7    A.  Normally when a -- like the beat officer, or the

8    person that's the initiating officer that's actually

9    responsible for the scene, they might start divvying up

10   duties.  Sometimes the senior officer or sometimes a

11   corporal will also start divvying up duties, along with

12   the sergeant, once they arrive on the scene.

13   Q.  Who in this case was responsible for -- for

14   preserving the crime scene, if you know?

15   A.  I'm not sure who was in charge of preserving the

16   crime scene.

17   Q.  So what were your duties out there that night?

18   A.  My duty, I made contact with the witness next

19   door.  And then once locating the parents and where they

20   lived, I went over there to make contact with them.

21   Q.  When you talked to Celia, was she there with her

22   boyfriend, Mr. Lopez?

23   A.  She was.  She said she was staying there with

24   him.

25   Q.  Did you physically see Mr. Lopez?

```
 1      A.   I believe I saw him -- I can't recall.
 2      Q.   Do you recall whether or not -- certainly from
 3   your report you did not get a statement from him?
 4      A.   No, I did not.
 5      Q.   Do you know whether or not he had been taken
 6   anywhere else to give a statement at that point?
 7      A.   I'm not sure.
 8      Q.   Okay.  At the scene is there anybody else that
 9   you talked to other than Celia?
10      A.   No.
11      Q.   All right.  So now this is 11:00 o'clock.  About
12   how long -- and you don't have to be perfect because I
13   know you didn't document the times exact, but about how
14   long are you at the scene?
15      A.   I'm not sure.
16      Q.   About what time do you end up at the Hicks'
17   house?  Is that the next place you went?
18      A.   Yes, ma'am, it was.
19      Q.   Can you --
20      A.   I don't know exactly what time I went over there,
21   no.
22      Q.   After midnight-ish?
23      A.   I don't really recall.
24      Q.   So just the next -- can we just call it the next
25   thing you did?
```

1      A.   Yes, ma'am.

2      Q.   And you did not document that in your report, did

3  you?

4      A.   No, not the time what I went over there.  I'm

5  sure that's in the call history, of the call.

6      Q.   How would that be in the call history so that we

7  could -- rather than saying next thing you did, actually

8  have a time for it?

9      A.   I guess, you would have to get records or

10  something.  I'm not really sure how you would obtain

11  that information.

12      Q.   Is that something that you normally put in

13  your reports, the times and the people you talk to?

14      A.   No, because it's handled through dispatch.

15      Q.   Okay.  Is that something that you can get your

16  hands on, though?

17      A.   I don't -- it expires after a certain number of

18  years, I'm sure.

19      Q.   Okay.  So we just have no idea what time you did

20  anything then except for 11:00 o'clock?

21      A.   Correct.

22      Q.   Okay.  All right.  So the next thing that you did

23  was go to the Hicks' house; is that correct?

24      A.   That's correct.

25      Q.   And at the Hicks' house you talked to both of her

```
 1    parents; is that correct?
 2        A.  Yes, ma'am.
 3        Q.  Is there anybody else you talked to at the Hicks'
 4    house?
 5        A.  I believe the babysitter, as well.  She ended up
 6    showing up later.
 7        Q.  All right.  And what was the babysitter's name?
 8    So the babysitter shows up at the Hicks' house?
 9        A.  Yes, after I contacted her.  Lana Murphy.
10        Q.  So you talked to -- well, we might as well put
11    all their names now.  Georgia Hicks; is that correct?
12        A.  Yes.
13        Q.  You talked to Lester Hicks?
14        A.  Yes, ma'am.
15        Q.  And then about how long were you there before the
16    babysitter showed up, Lana Murphy?
17        A.  I don't know.
18        Q.  Do you have any idea?
19        A.  No.
20        Q.  Okay.
21        A.  It was after I contacted her on a cell phone she
22    showed.
23        Q.  So you talked to the Hicks and from the Hicks you
24    then called the babysitter?
25        A.  Yeah.  And it's Lana, L-A-N-A.  I don't know if
```

```
1    that makes a difference.
2        Q.  All right.  Well, do you notice on page one you
3    wrote it L-Y-N-A?
4        A.  Well, it's called in through data entry, so...
5        Q.  All right.
6        A.  It's at the bottom.  It's L-A-N-A Murphy.
7        Q.  So you think her name is spelled L-A-N-A?
8        A.  I believe so.
9        Q.  Do you care?
10       A.  She might.
11       Q.  Okay.  Well, this is your report where it's
12   L-Y-N-A.
13       A.  Right.  Well, like I said, we call in our report,
14   so that might have been data entry --
15       Q.  Okay.
16       A.  -- missing it --
17       Q.  All right.  So after "next thing you did," you go
18   to the Hicks' house, you talked to the Hicks, you talked
19   to Lana, and got information from all of them, correct?
20       A.  Yes, ma'am.
21       Q.  Do you recall, from any of these folks, so far,
22   did you receive any information about a shotgun or a
23   shotgun being present at the crime scene?
24       A.  Yes.  Lester Hicks advised me that --
25       Q.  Not what he advised you, but -- so it was Lester
```

1    Hicks that gave you information about the shotgun?

2        A.  Yes, ma'am.

3        Q.  It was not Georgia Hicks or Lana Murphy?

4        A.  No, ma'am.

5        Q.  Okay.  And what did Lester Hicks tell you about

6    the shotgun?

7        A.  That he had given it to his daughter, Mechelle,

8    for protection from Thomas, Timothy and the fact that

9    she lived in Presidents Corner, which is a rougher

10   neighborhood.

11       Q.  And about how long prior to the date that you're

12   there, in which she's been murdered, had he given her

13   that shotgun?  Page five.

14       A.  Approximately two weeks ago.

15       Q.  All right.  So about two weeks prior to her being

16   murdered basically her father is giving her a shotgun

17   for protection from a couple of individuals?

18       A.  Yes, ma'am.

19       Q.  As well as his concern about the apartment

20   complex?

21       A.  Yes, ma'am.

22       Q.  And so the name Timothy and Thomas, you had two

23   different names and then you had just a generic idea

24   about the apartment complex?

25       A.  Yes, ma'am.

1    Q.   And based on the next -- what was the next thing

2   you did after you talked to these folks and Ms. Lana

3   Murphy?

4    A.   Correct.

5    Q.   What did you do next?

6    A.   After he talked about the shotgun is when we

7   found out about Asher being deceased.

8    Q.   Okay.  So that's when you got the notification

9   and you're no longer looking for -- which is really Lana

10   Murphy -- looking for the baby, correct?

11    A.   Right.  We were looking for, you know, Asher the

12   entire time.

13    Q.   Right.  So I'm getting that.  You guys leave

14   and you want to know where is the baby, we see

15   it clearly as someone who's been murdered?

16    A.   Correct.

17    Q.   And she has a baby and where is the baby, so

18   you're going to the grandparents, you're going to the

19   babysitter?

20    A.   The aunt.  Everybody.

21    Q.   Aunt?

22    A.   Yes, ma'am.

23    Q.   Anybody that could potentially have the child so

24   you can just find it, correct?

25    A.   Yes, ma'am.

1    Q.   Along the way you're also hearing other

2    information; is that correct?

3    A.   Yes, ma'am.

4    Q.   And after you get the notification about Asher,

5    them finding his body, did you do anything else in this

6    case?

7    A.   I made the notification to the family.

8    Q.   You said you talked to somebody that had a

9    relationship with Thomas?

10   A.   With -- oh, yes.  The -- I guess he had -- it

11   was -- he was the father of two children.

12   Q.   What was that person's name?

13   A.   Celia.

14   Q.   And so you testified earlier that her name was

15   Rebeca, but in your police report the name is Celia; is

16   that correct?

17   A.   Where are you saying the Rebeca reference is at?

18   Q.   I don't see a Rebeca reference.  That's why I'm

19   asking you.  You testified her name was Rebeca.  In the

20   police report, on page five, the only name I see is

21   Celia.  And I don't see a last name.

22   A.   Celia Murillo.

23   Q.   All right.  Do you believe that Celia Murillo was

24   the person that was hysterical on the phone that you

25   called and talked to?

1      A.  Yes, ma'am.

2      Q.  Okay.  And so after you talked to her at the

3  scene, you then later called her and talked to her?

4      A.  Yeah.  She actually called me back.

5      Q.  Okay.  I just feel like we're on two different

6  pages.  Okay?  Celia Murillo is the person who was at

7  the scene and was the neighbor.  Okay?

8              THE COURT:  Is that a question?

9              MS. KEENE:  Well, I'm -- yeah, that's a

10  question.  Is that a -- that is a question.

11             THE COURT:  Is that correct?

12             THE WITNESS:  Okay.  Yeah.  Celia had called

13  me, but Celia is clearly not the girlfriend, or

14  whatever, of Thomas.  It was -- Celia was the neighbor.

15  The other female was Rebeca.

16     Q.  (BY MS. KEENE)  Okay.  Where do you see that in

17  the report that her name is Rebeca?

18     A.  Okay.  I don't see it in my report.

19     Q.  In the report she's called Celia without a last

20  name; is that correct?

21     A.  Yes, she is.

22     Q.  All right.  So -- and it's a long night and

23  you're dealing with a difficult case.  I understand

24  that.  But in your report you called her Celia?

25     A.  Yes, that's correct.

```
 1        Q.   And so there was another person that was
 2    different than the neighbor that you talked to on the
 3    telephone?
 4        A.   Correct.
 5        Q.   Celia.  And this Celia I believe you described as
 6    being upset; is that correct?
 7        A.   Yes.
 8        Q.   Nervous.  In the police report you actually
 9    describe her as being hysterical?
10        A.   That's correct.
11        Q.   And she was hysterical without you telling her
12    what had happened; is that correct?
13        A.   That's correct.
14        Q.   And so that concerned you, or at least that was
15    enough to you for you to note it in your police
16    report --
17        A.   Yes, ma'am.
18        Q.   -- as being important; is that correct?
19        A.   Yes, ma'am.
20        Q.   And basically you pick up the phone and you call
21    somebody named Celia, Rebeca, or whatever, somebody
22    that's related to Thomas, seems to be a baby mama, and
23    she becomes very hysterical?
24        A.   Correct.
25        Q.   Okay.  To the point that you get the Grapevine
```

1  Police Department to go see her, correct?

2      A.  That's correct.

3      Q.  And this person named Celia, Rebeca, whatever,

4  you stay on the phone with until Grapevine shows up?

5      A.  That's correct.

6      Q.  Did you have any information from Grapevine or

7  anybody about this person named Celia, Rebeca, that

8  you're talking to on the phone?

9      A.  Okay.  I mean, it's not the neighbor Celia.  So I

10  misspoke in my report as far as either the name or it

11  was copied down wrong by data entry.

12     Q.  And that's why -- I'm putting "Celia" because you

13  said it there, but it -- basically it's the girlfriend?

14     A.  Right.

15     Q.  Thomas' girlfriend?

16     A.  Yes, ma'am.

17     Q.  Whatever her name is?

18     A.  Yes, ma'am.

19     Q.  Your report is a mess when it's dealing with this

20  name, correct?

21     A.  Yeah, just that name.

22     Q.  Well, and some other names, as well, but we'll

23  leave you alone.  Okay?

24     A.  Okay.

25     Q.  This is basically, though, Thomas' girlfriend,

 1  how about we just do that.  Right?

 2      A.  That will work.

 3      Q.  All right.  So after you talked to Thomas'

 4  girlfriend, was the last thing that you did on the case?

 5      A.  Yes, ma'am.

 6      Q.  All right.  When did you talk to this person by

 7  the name of Timothy?

 8      A.  While I was over there at the parents' address,

 9  the --

10      Q.  So at --

11      A.  -- Hicks' address.

12      Q.  -- at the Hicks you actually called and talked to

13  Timothy?

14      A.  Yes, ma'am.

15      Q.  And this is when he was very verbally abusive to

16  you, correct?

17      A.  Yeah.  He was upset that I had called him after

18  midnight.

19      Q.  And he called you names and whatever.  So y'all

20  did not have a productive conversation?

21      A.  No, we did not.

22      Q.  Did you have an understanding that this was the

23  same Timothy that Lester had talked about, that you were

24  calling the right Timothy?

25      A.  Yeah.  Based on the phone number that I had

```
 1    gotten from the aunt, or based on the phone number I'd
 2    gotten off the cell phone.
 3        Q.   Okay.
 4        A.   The old cell phone.
 5        Q.   And other than talking to Timothy and -- was
 6    there anybody else you called while there -- well, you
 7    said the aunt?
 8        A.   Yeah.  I'd spoken with the aunt, along with the
 9    babysitter, as well, on the cell phone.
10        Q.   Okay.  Did you get a last name for Timothy?
11        A.   I did not.  He wouldn't give it to me.
12        Q.   What about -- well, that's true.  He wouldn't
13    talk to you, really.
14             What about the aunt, what is the aunt's
15    name?  Because you talked to them also at the house; is
16    that correct?
17        A.   Yes, ma'am.
18        Q.   All right.  What's the aunt's name?
19        A.   Lana Murphy.
20        Q.   Okay.  Lana Murphy.
21        A.   No, that's the babysitter.
22        Q.   Babysitter.  Exactly.
23        A.   That's the babysitter.
24        Q.   What's the aunt's name?  How about Regina
25    Scrambler (sic)?  Does that help?
```

```
 1        A.   Let me find it so I don't misspeak.
 2             That's correct.
 3        Q.   All right.  And do you have any idea about what
 4   time you talked to Regina Scrambler?
 5        A.   It was sometime after midnight.
 6        Q.   So that's after midnight?
 7        A.   Yes, ma'am.
 8        Q.   And, really, what Regina is doing is she's --
 9   she pays for Mechelle's cell phone, correct?
10        A.   Correct.
11        Q.   So she could go online and look at the phone
12   bill, correct?
13        A.   Yes.
14        Q.   Realtime?
15        A.   Yes, ma'am.
16        Q.   And so she could give you names and phone numbers
17   of people that she thought may be relevant for you to
18   look at now that she knew her niece was deceased?
19        A.   Correct.
20        Q.   Whether that's somebody that talked to her that
21   day or phone numbers as she's looking at the thing, that
22   seemed to matter to her?
23        A.   Correct.
24        Q.   And so you made some of those phone calls,
25   whether it be to Timothy, whether it be to Thomas'
```

```
 1   girlfriend or whoever, correct?
 2       A.  Correct.
 3       Q.  And also to Thomas?
 4       A.  Yes.
 5       Q.  Was Thomas the last person that you talked to or
 6   was it -- or tried, attempted to talk to or was it
 7   Celia?
 8       A.  No.  It was the -- it was Thomas' girlfriend.
 9       Q.  Thomas' girlfriend is the last person that you
10   talked to?
11       A.  Yes, ma'am.
12       Q.  When did you attempt to call Thomas Olivas?
13       A.  I don't know if it was before or after I
14   attempted to contact Timothy.
15       Q.  Was it at the Hicks' house?
16       A.  It was.
17       Q.  Okay.  So also up here is Thomas.  So sometime
18   after midnight or after -- between 11:00 o'clock -- but
19   now we're getting into midnight.  You begin contacting
20   Timothy, Thomas and Thomas' girlfriend?
21       A.  Correct.  It was between probably midnight and
22   about 2:00 a.m. when I was trying to contact Timothy and
23   Thomas.
24       Q.  These two are between midnight and 2:00 a.m.?
25       A.  I believe so.  Yes.  So...
```

1    Q.  All right.  That's between 12:00 and 2:00 a.m.;

2    is that correct?

3    A.  Yes, ma'am.

4    Q.  All right.  What time did you finish with

5    everything that you did on this case, basically by

6    ending up out at Grapevine Police Department?

7    A.  I never went to Grapevine Police Department.

8    Q.  You did not?

9    A.  No, ma'am.

10   Q.  You just stayed on the telephone with them?

11   A.  Yes, ma'am.

12   Q.  Until Grapevine arrived?

13   A.  Yes, ma'am.

14   Q.  And then you were done with this case?

15   A.  Yes, ma'am.

16   Q.  You went home and called in the report?

17   A.  I called it there at the police station.

18   Q.  Okay.

19           MS. KEENE:  Judge, we'd offer in Defense

20   Exhibit No. 5.

21           MR. ROUSSEAU:  I have no objection, Your

22   Honor.

23           THE COURT:  You want to identify for the

24   record what it is?

25           Do you want to identify for the record what

```
 1   it is that you're offering?
 2               MS. KEENE:  Yes.  It is a summary and
 3   timeline of Officer Mathews, the witnesses he talked to,
 4   the chicken scratch that I put on the board.
 5               THE COURT:  Oh, what you've been writing on,
 6   all right.
 7               MS. KEENE:  Yes.
 8               THE COURT:  No objection.  It's admitted.
 9               (Defendant's Exhibit No. 5 admitted)
10               THE COURT:  What I'll call -- I've been
11   calling them posters.  They're actually individual
12   pages of the Court's easel and each side has been
13   marking as they've written on them.  And they'll be
14   separately, preserved at the conclusion of testimony.
15               You may continue.
16               MS. KEENE:  Judge, that's all I have.  I'll
17   pass the witness.
18                       REDIRECT EXAMINATION
19   BY MR. ROUSSEAU:
20      Q.  I need to clarify a couple of things, because I
21   think it might a little confusing.
22               You went to the scene originally, correct?
23      A.  To Presidents Corner, yes.
24      Q.  To Presidents Corner.  I mean the scene of the
25   murders?
```

```
 1        A.   Yes.

 2        Q.   And you made initial contact with a witness named

 3   Celia Murillo, correct?

 4        A.   Yes, sir.

 5        Q.   And this is not the person that you later talked

 6   to on the phone, right?

 7        A.   No, it's not.

 8        Q.   Okay.  The person you later talked to on the

 9   phone, who you indicated in your report was named Celia,

10   was actually the girlfriend of Thomas Olivas, correct?

11        A.   Correct.  She gave her address and everything.

12        Q.   And what is the address that she gave?

13        A.   She gave 214 Brookside in Grapevine, Texas.

14        Q.   Grapevine, Texas?

15        A.   Yes, sir.

16        Q.   214 Brookside?

17        A.   Yes, sir.

18        Q.   And did she indicate clearly that she knows

19   Thomas Olivas?

20        A.   She did.

21        Q.   Did she indicate clearly that they were -- had

22   been a live-together couple?

23        A.   Yes, sir.

24        Q.   Okay.  Did she indicate clearly that she was

25   afraid?
```

1          MS. KEENE:  Your Honor, I'm going to object

2   to this, Judge.  I mean, we've identified it's Thomas'

3   girlfriend, even on the board, he made a mistake on the

4   name and identified as Thomas' girlfriend.  We don't --

5   didn't get to go into every single hearsay statement.

6          THE COURT:  What about Rule 106 and 107,

7   Texas Rules of Criminal Evidence?

8          MS. KEENE:  106 and 107?

9          THE COURT:  Optional completeness, part and

10  parcel of a conversation.

11         MS. KEENE:  I disagree with that.

12         THE COURT:  Huh?

13         MS. KEENE:  Based on what?

14         THE COURT:  Y'all approach.

15         Members of the jury, ignore the little man

16  behind the curtain.  Let me talk to the lawyers a

17  minute.

18         (Discussion at the bench, off the record)

19         THE COURT:  I will allow a limited fleshing

20  out of a conversation that's already in evidence from

21  both sides, or parts of which.

22         Within the limits of Rule 403, you may

23  proceed.

24  Q.  (BY MR. ROUSSEAU)  Okay.  In any event, you did

25  talk to this person and you stayed on the scene -- you

1    stayed on the phone with her long enough for police

2    officers from Grapevine to arrive at her location,

3    correct?

4        A.   Yes, sir.

5        Q.   And how is it that you knew they had arrived at

6    her location?

7        A.   Because I spoke with Grapevine PD on the phone.

8        Q.   Okay.

9        A.   And advised him of kind of what was going on.

10       Q.   All right.  You were aware that they had actually

11   gotten to where she was?

12       A.   Yes, sir.

13       Q.   Okay.  Now, there was an issue regarding Lana

14   versus Lana -- I mean -- I'm sorry -- Lana versus Lyna.

15   I believe your -- in your report the name was listed as

16   L-Y-N-A at some point.

17            Tell the jury how the -- this report is

18   made.

19       A.   In Arlington we call in our reports to a computer

20   system and then they're later pulled off of the system

21   by what's called data entry personnel.  And then they

22   sit there on headphones and they type up the reports of

23   what officers called in.

24       Q.   All right.  So this issue with is her name Lana,

25   L-A-N-A; Alana, A-L-A-N-A, or Lyna, L-Y-N-A, could

STATE v. THOMAS OLIVAS

```
 1   simply be the product of someone not understanding your
 2   spoken word?
 3       A.  Correct.
 4       Q.  All right.  In any event, would that person be
 5   the babysitter of Asher Olivas?
 6       A.  They are.
 7       Q.  And did you speak to that person?
 8       A.  I did.
 9       Q.  And was that person helpful to you in the
10   investigation that you were conducting that night?
11       A.  She was.
12       Q.  And you talked to on the -- you talked to
13   Ms. Regina Scambler, also, correct?  Regina Scambler
14   being the aunt of the victim?
15       A.  Yes, sir.
16       Q.  And you were able to verify that she was, in
17   fact, the victim's aunt, correct?
18       A.  Yes, sir.
19       Q.  And she provided the victim's cell phone?
20       A.  Yes, sir.
21       Q.  That's why she had these records to go through,
22   right?
23       A.  Yes, sir.
24       Q.  And she -- you have in your report that it's
25   a Verizon account; is that correct?
```

*STATE v. THOMAS OLIVAS*

```
 1        A.  Yes, sir.
 2               MR. ROUSSEAU:  That's all I have, Your
 3    Honor.  I'll pass the witness.
 4               MS. KEENE:  I don't have anything, Judge.
 5               THE COURT:  May this witness be excused?
 6               MS. KEENE:  Subject to recall, Judge.
 7               THE COURT:  All right.  Not to stay down
 8    here but back on reasonable notice?
 9               MS. KEENE:  Absolutely.
10               THE COURT:  All right.
11               All right.  You won't have to be on --
12    you'll be on call.  You don't have to be here.  If they
13    need you back, they'll give you at least a half days'
14    a notice of when to be back.  Hopefully more than that.
15    Otherwise just -- you're going to be in town for the
16    next two weeks?
17               THE WITNESS:  Yes, Judge.  Yes, Judge.
18               THE COURT:  That will be good.  Then you're
19    excused tonight, subject to witness rules, and thanks
20    for coming in.
21               THE WITNESS:  Thank you, Judge.
22               THE COURT:  Do me a favor.  Hold tight.
23               Members of the jury, tomorrow morning be at
24    your pickup point at a quarter till.  We'll start at
25    9:00.  Thank you for a long time day.
```

STATE v. THOMAS OLIVAS

1                 (Recessed for the day at 5:55 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              COURT REPORTER'S CERTIFICATE
 2   THE STATE OF TEXAS          )
 3   COUNTY OF TARRANT           )
 4      I, Karen B. Martinez, Official Court Reporter in and
 5   for the 372nd District Court of Tarrant County, State of
 6   Texas, do hereby certify that the above and foregoing
 7   contains a true and correct transcription of all
 8   portions of evidence and other proceedings requested in
 9   writing by counsel for the parties to be included in
10   this volume of the Reporter's Record, in the
11   above-styled and numbered cause, all of which occurred
12   in open court or in chambers and were reported by me.
13      I further certify that this Reporter's Record of the
14   proceedings truly and correctly reflects the exhibits,
15   if any, admitted by the respective parties.
16      I further certify that the total cost for the
17   preparation of this Reporter's Record is **located at the
18   end of Volume 21**.
19      WITNESS MY OFFICIAL HAND this the 30th day of March,
20   2015.
21                       /s/ Karen B. Martinez
22                       Karen B. Martinez, Texas CSR 6735
                         Expiration Date:  12/31/2015
23                       Official Court Reporter
                         372nd District Court
24                       Tarrant County, Texas
                         (817)884-2996
25                       kbmartinez@tarrantcounty.com
```