REPORTER'S RECORD

VOLUME 8 OF 21 VOLUME(S)

TRIAL COURT CAUSE NO. 1376885

COURT OF APPEALS CASE NO. 02-14-00412-CR

FILED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS
3/27/2015 12:36:05 PM
DEBRA SPISAK
Clerk

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE 372ND JUDICIAL |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| VS. | ) | DISTRICT COURT |
| | ) | |
| | ) | |
| | ) | |
| THOMAS OLIVAS | ) | TARRANT COUNTY, TEXAS |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

TRIAL ON MERITS CONTINUES

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

    On the 11th day of September, 2014, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Scott Wisch, Presiding Judge, held in Fort Worth, Tarrant County, Texas;
    Proceedings reported by computerized machine shorthand with assisted realtime transcription.


KAREN B. MARTINEZ, CERTIFIED SHORTHAND REPORTER
Official Court Reporter
372nd Judicial District Court
Tarrant County, Texas

```
 1   APPEARANCES:

 2   ATTORNEYS FOR THE STATE:

 3      HONORABLE R. KEVIN ROUSSEAU
        SBOT NO: 17324950
 4      HONORABLE TAMLA S. RAY
        SBOT NO: 24046687
 5      Assistant Criminal District Attorneys
        Tim Curry Criminal Justice Center
 6      Fort Worth Texas  76196
        Phone: 817-884-1400
 7      Fax:   817-884-3333

 8   ATTORNEYS FOR THE DEFENDANT:

 9      HONORABLE TIM MOORE
        SBOT NO: 14378300
10      Attorney at Law
        115 West 2nd Street, Suite 202
11      Fort Worth, Texas  76102
        Phone: 817-332-3822
12      Fax:   817-332-2768

13          - AND -

14      HONORABLE JOETTA L. KEENE
        SBOT NO: 11165800
15      Attorney at Law
        204 South Mesquite Street
16      Arlington, Texas  76010
        Phone: 817-275-6611
17      Fax:   817-275-6621

18

19

20

21

22

23

24

25
```

```
 1              CHRONOLOGICAL INDEX

 2                Volume 8 of 21

 3           TRIAL ON MERITS CONTINUES

 4    September 11, 2014              Page Vol.

 5    Trial on Merits Continues...................  11   8

 6    STATE'S WITNESSES
                         Direct   Cross    Voir
 7                                         Dire    Vol.

      Johnson, Officer Craig   12,42   26,43    --      8
 8
      Fallentine, Shannon      45,58,  --       57,140,  8
 9                             141,147,         144,153,
                               155,158,         156,160,
10                             161,167,         166,168,
                               169,171          171,172
11
      Recessed for the Day.........................  175   8
12
      Court Reporter's Certificate..................  176   8
13

14          ALPHABETICAL LISTING OF WITNESSES

15                                         Voir
                         Direct   Cross    Dire    Vol.
16
      Fallentine, Shannon      45,58,  --       57,140,  8
17                             141,147,         144,153,
                               155,158,         156,160,
18                             161,167,         166,168,
                               169,171          171,172
19
      Johnson, Officer Craig   12,42   26,43    --      8
20

21

22

23

24

25
```

```
 1                        EXHIBITS
 2    STATE'S
      NO.    DESCRIPTION              OFFERED  ADMITTED  VOL.
 3
        4    Large Diagram              57       57       8
 4
        8    Photograph                 26       26       8
 5
       10    Photograph                 64       65       8
 6
       11    Photograph                 64       65       8
 7
       12    Photograph                 64       65       8
 8
       14    Photograph                 64       65       8
 9
       15    Photograph                 64       65       8
10
       16    Photograph                 64       65       8
11
       17    Photograph                 64       65       8
12
       18    Photograph                 64       65       8
13
       19    Photograph                 64       65       8
14
       20    Photograph                 64       65       8
15
       21    Photograph                 64       65       8
16
       22    Photograph                 64       65       8
17
       23    Photograph                 64       65       8
18
       24    Photograph                 64       65       8
19
       25    Photograph                 64       65       8
20
       26    Photograph                 64       65       8
21
       27    Photograph                 64       65       8
22
       28    Photograph                 64       65       8
23
       29    Photograph                 64       65       8
24
       30    Photograph                 64       65       8
25
```

| 1  | 31 | Photograph | 64 | 65 | 8 |
| 2  | 32 | Photograph | 64 | 65 | 8 |
| 3  | 33 | Photograph | 64 | 65 | 8 |
| 4  | 34 | Photograph | 64 | 65 | 8 |
| 5  | 35 | Photograph | 64 | 65 | 8 |
| 6  | 36 | Photograph | 64 | 65 | 8 |
| 7  | 37 | Photograph | 64 | 65 | 8 |
| 8  | 38 | Photograph | 64 | 65 | 8 |
| 9  | 39 | Photograph | 64 | 65 | 8 |
| 10 | 40 | Photograph | 64 | 65 | 8 |
| 11 | 41 | Photograph | 64 | 65 | 8 |
| 12 | 42 | Photograph | 64 | 65 | 8 |
| 13 | 43 | Photograph | 64 | 65 | 8 |
| 14 | 44 | Photograph | 64 | 65 | 8 |
| 15 | 45 | Photograph | 64 | 65 | 8 |
| 16 | 46 | Photograph | 64 | 65 | 8 |
| 17 | 47 | Photograph | 64 | 65 | 8 |
| 18 | 48 | Photograph | 64 | 65 | 8 |
| 19 | 49 | Photograph | 64 | 65 | 8 |
| 20 | 50 | Photograph | 64 | 65 | 8 |
| 21 | 51 | Photograph | 64 | 65 | 8 |
| 22 | 52 | Photograph | 64 | 65 | 8 |
| 23 | 53 | Photograph | 64 | 65 | 8 |
| 24 | 54 | Photograph | 64 | 65 | 8 |
| 25 | 55 | Photograph | 64 | 65 | 8 |

| 1 | 56 | Photograph | | 64 | 65 | 8 |
|---|---|---|---|---|---|---|
| 2 | 57 | Photograph | | 64 | 65 | 8 |
| 3 | 58 | Photograph | | 64 | 65 | 8 |
| 4 | 59 | Photograph | | 64 | 65 | 8 |
| 5 | 60 | Photograph | | 64 | 65 | 8 |
| 6 | 61 | Photograph | | 64 | 65 | 8 |
| 7 | 62 | Photograph | | 64 | 65 | 8 |
| 8 | 63 | Photograph | | 64 | 65 | 8 |
| 9 | 64 | Photograph | | 64 | 65 | 8 |
| 10 | 65 | Photograph | | 64 | 65 | 8 |
| 11 | 66 | Photograph | | 64 | 65 | 8 |
| 12 | 67 | Photograph | | 64 | 65 | 8 |
| 13 | 68 | Photograph | | 64 | 65 | 8 |
| 14 | 69 | Photograph | | 64 | 65 | 8 |
| 15 | 70 | Photograph | | 64 | 65 | 8 |
| 16 | 71 | Photograph | | 64 | 65 | 8 |
| 17 | 72 | Photograph | | 64 | 65 | 8 |
| 18 | 73 | Photograph | | 64 | 65 | 8 |
| 19 | 74 | Photograph | | 64 | 65 | 8 |
| 20 | 75 | Photograph | | 64 | 65 | 8 |
| 21 | 76 | Photograph | | 64 | 65 | 8 |
| 22 | 77 | Photograph | | 64 | 65 | 8 |
| 23 | 78 | Photograph | | 64 | 65 | 8 |
| 24 | 79 | Photograph | | 64 | 65 | 8 |
| 25 | 80 | Photograph | | 64 | 65 | 8 |

STATE v. THOMAS OLIVAS

| | | | | | |
|---|---|---|---|---|---|
| 1 | 81 | Photograph | 64 | 65 | 8 |
| 2 | 82 | Photograph | 64 | 65 | 8 |
| 3 | 83 | Photograph | 64 | 65 | 8 |
| 4 | 84 | Photograph | 64 | 65 | 8 |
| 5 | 85 | Photograph | 64 | 65 | 8 |
| 6 | 86 | Photograph | 64 | 65 | 8 |
| 7 | 87 | Photograph | 64 | 65 | 8 |
| 8 | 88 | Photograph | 64 | 65 | 8 |
| 9 | 89 | Photograph | 64 | 65 | 8 |
| 10 | 90 | Photograph | 64 | 65 | 8 |
| 11 | 91 | Photograph | 64 | 65 | 8 |
| 12 | 92 | Photograph | 64 | 65 | 8 |
| 13 | 93 | Photograph | 64 | 65 | 8 |
| 14 | 94 | Photograph | 64 | 65 | 8 |
| 15 | 95 | Photograph | 64 | 65 | 8 |
| 16 | 96 | Photograph | 64 | 65 | 8 |
| 17 | 97 | Photograph | 64 | 65 | 8 |
| 18 | 98 | Photograph | 64 | 65 | 8 |
| 19 | 99 | Photograph | 64 | 65 | 8 |
| 20 | 100 | Photograph | 64 | 65 | 8 |
| 21 | 101 | Photograph | 64 | 65 | 8 |
| 22 | 102 | Photograph | 64 | 65 | 8 |
| 23 | 103 | Photograph | 64 | 65 | 8 |
| 24 | 104 | Photograph | 64 | 65 | 8 |
| 25 | 105 | Photograph | 64 | 65 | 8 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | 106 | Photograph | 64 | 65 | 8 |
| 2 | 107 | Photograph | 64 | 65 | 8 |
| 3 | 108 | Photograph | 64 | 65 | 8 |
| 4 | 109 | Photograph | 64 | 65 | 8 |
| 5 | 110 | Photograph | 64 | 65 | 8 |
| 6 | 111 | Photograph | 64 | 65 | 8 |
| 7 | 112 | Photograph | 64 | 65 | 8 |
| 8 | 113 | Photograph | 64 | 65 | 8 |
| 9 | 114 | Photograph | 136 | 136 | 8 |
| 10 | 115 | Photograph | 136 | 136 | 8 |
| 11 | 116 | Photograph | 136 | 136 | 8 |
| 12 | 117 | Photograph | 136 | 136 | 8 |
| 13 | 166 | Swab of Beer Can in Package | 140 | 141 | 8 |
| 14 | *166A | Evidence Box | 140 | 141 | 8 |
| 15 | *166B | Evidence Sack | 140 | 141 | 8 |
| 16 | 167 | Swab of Lighter in Package | 142 | 143 | 8 |
| 17 | *167A | Evidence Box | 142 | 143 | 8 |
| 18 | *167B | Evidence Sack | 142 | 143 | 8 |
| 19 | *168 | Swab of Lighter Fluid Cap in Package | 144 | 145 | 8 |
| 20 | *168A | Evidence Box | 144 | 145 | 8 |
| 21 | *168B | Evidence Sack | 144 | 145 | 8 |
| 22 | 169 | Blood Swabs in Package | 148 | 149 | 8 |
| 23 | *169A | Evidence Box | 148 | 149 | 8 |
| 24 | *169B | Evidence Sack | 148 | 149 | 8 |
| 25 | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 170 | Swab of Lighter in Package | 150 | 150 | 8 |
| *170A | Evidence Box | 150 | 150 | 8 |
| *170B | Evidence Sack | 150 | 150 | 8 |
| 171 | Control Swabs in Package | 151 | 151 | 8 |
| *171A | Evidence Box | 151 | 151 | 8 |
| *171B | Evidence Sack | 151 | 151 | 8 |
| 172 | Swab of Red Stain in Package | 152 | 152 | 8 |
| *172A | Evidence Box | 152 | 152 | 8 |
| *172B | Evidence Sack | 152 | 152 | 8 |
| *173 | Swab of Blood in Package | 153 | 155 | 8 |
| *173A | Evidence Box | 153 | 155 | 8 |
| *173B | Evidence Sack | 153 | 155 | 8 |
| 174 | Swab of Blood in Package | 156 | 157 | 8 |
| *174A | Evidence Box | 156 | 157 | 8 |
| *174B | Evidence Sack | 156 | 157 | 8 |
| 175 | Swab of Blood in Package | 158 | 159 | 8 |
| *175A | Evidence Box | 158 | 159 | 8 |
| *175B | Evidence Sack | 158 | 159 | 8 |
| *176 | Swab of Lighter in Package | 160 | 161 | 8 |
| *176A | Evidence Box | 160 | 161 | 8 |
| *176B | Evidence Sack | 160 | 161 | 8 |
| 177 | Swab of Blood in Package | 162 | 162 | 8 |
| *177A | Evidence Box | 162 | 162 | 8 |
| *177B | Evidence Sack | 162 | 162 | 8 |

| 1 | 178 | Swab of Blood in Package | 163 | 163 | 8 |
| 2 | *178A | Evidence Box | 163 | 163 | 8 |
| 3 | *178B | Evidence Sack | 163 | 163 | 8 |
| 4 | 179 | Swab of Blood in Package | 164 | 164 | 8 |
| 5 | *179A | Evidence Box | 164 | 164 | 8 |
| 6 | *179B | Evidence Sack | 164 | 164 | 8 |
| 7 | 180 | Swab of Blood in Package | 165 | 165 | 8 |
| 8 | *180A | Evidence Box | 165 | 165 | 8 |
| 9 | *180B | Evidence Sack | 165 | 165 | 8 |
| 10 | 181 | Control Swabs in Package | 166 | 167 | 8 |
| 11 | *181A | Evidence Box | 166 | 167 | 8 |
| 12 | *181B | Evidence Sack | 166 | 167 | 8 |
| 13<br>14 | 182 | Swab of Lighter Fluid Cap<br>in Package | 168 | 169 | 8 |
| 15 | *182A | Evidence Box | 168 | 169 | 8 |
| 16 | *182B | Evidence Sack | 168 | 169 | 8 |
| 17 | 183 | Swab of Blood in Package | 170 | 170 | 8 |
| 18 | *183A | Evidence Box | 170 | 170 | 8 |
| 19 | *183B | Evidence Sack | 170 | 170 | 8 |
| 20 | 184 | Beer Can with Packaging<br>in Ziploc | 172 | 174 | 8 |
| 21 | *184A | Evidence Sacks with Ruler | 172 | 174 | 8 |
| 22 | 201 | Chart on Easel Paper | 26 | 26 | 8 |

23  (*) Denotes an exhibit designated for the record only.

24

25

```
 1                    P R O C E E D I N G S
 2              Thursday, September 11, 2014   9:40 a.m.
 3                   (OPEN COURT, DEFENDANT AND JURY PRESENT)
 4                   (Witness on the stand)
 5                   THE COURT:  Good morning, members of the
 6   jury.
 7                   SEVERAL JURY MEMBERS:  Morning.
 8                   THE COURT:  Does everyone recognize what I'm
 9   holding up, the now infamous blue card.
10              Did you all follow these instructions since
11   you left last evening until you returned today?
12                   SEVERAL JURY MEMBERS:  Yes.
13                   THE COURT:  Again, we thank you.  Every day
14   it is more important that you do so.
15              Who will be the State's next witness?
16                   MS. RAY:  Mr. Craig Johnson, Your Honor.
17                   THE COURT:  All right.  State your full,
18   legal name for the jury and the court reporter, please.
19                   THE WITNESS:  My name is Craig Johnson.
20                   THE COURT:  I need you to face me and raise
21   your right hand.
22                   (One witness sworn)
23                   THE COURT:  Are you familiar with the rules
24   that apply to witnesses during the course of a criminal
25   trial?
```

```
 1              THE WITNESS:  Yes, sir, I am.

 2              THE COURT:  All right.  So you understand

 3    where you may and may not be, who you may and may not

 4    talk to, et cetera?

 5              THE WITNESS:  Yes, sir, I do.

 6              THE COURT:  Make sure you follow those rules

 7    until you find out there has been a final decision by

 8    the jury, even if you're released after your own

 9    testimony.

10              THE WITNESS:  Yes, sir.

11              THE COURT:  All right.

12              Tamla.

13              MS. RAY:  Thank you, Judge.

14                  HONORABLE CRAIG JOHNSON,

15    having been first duly sworn, testified as follows:

16                    DIRECT EXAMINATION

17    BY MS. RAY:

18       Q.  Mr. Johnson, could you, please, introduce

19    yourself to the jury and tell them where you work.

20       A.  My name is Craig Johnson.  I'm a retired

21    Grapevine police officer and I am currently a justice of

22    the peace in Wise County.

23       Q.  So it'd be appropriate for me to call you Judge

24    Johnson, correct?

25       A.  Yes.
```

1    Q.   But I won't so that I won't get judge mixed up

2    with Judge Wisch.

3    A.   Yes.  Thank you.

4    Q.   Okay.  So you under -- I will call you

5    Mr. Johnson and you're fine with that?

6    A.   Yes, ma'am.

7              THE COURT:  I'm not.

8              MS. RAY:  You're not?

9              THE COURT:  No.

10             MS. RAY:  You want me to call him Judge,

11   Judge?

12             THE COURT:  I'll -- we'll work through this.

13   You may call him -- you may do what your instincts tell

14   you.  You may refer to him as Judge Johnson.  And if you

15   say Judge Wisch -- you can add my name while this

16   witness is on the stand.

17             MS. RAY:  Okay.

18             THE COURT:  All right.  Carry on.

19             MS. RAY:  Thank you, Judge Wisch.

20             THE COURT:  Very good.

21             THE WITNESS:  Thank you, sir.

22   Q.   (BY MS. RAY)  Okay.  Judge Johnson, you stated

23   that you used to be with the Grapevine Police

24   Department?

25   A.   Yes, ma'am.

1    Q.   What role did you play with Grapevine?

2    A.   At what time specifically?

3    Q.   Let's start -- let's work with most recent and

4  then work your way back.  When you left the department,

5  what rank were you?

6    A.   Senior officer.

7    Q.   And what role did you play?

8    A.   That was very wide-ranging.  From patrol officer

9  to field training officer to mentor to other young

10  officers who are out of the training program.  I was a

11  team leader, hostage negotiation team, and that's just a

12  few of the ones.

13    Q.   How long were you with Grapevine Police

14  Department?

15    A.   A little over 18 and a half years.

16    Q.   And you stated when you left you were a senior

17  officer?

18    A.   Yes.

19    Q.   And prior to being a senior officer, what would

20  your rank have been?

21    A.   The rank was senior officer for a number of

22  years.  However, the title before I went back to

23  strictly senior officer was detective.

24    Q.   And when you were a detective, what area did you

25  work?

STATE v. THOMAS OLIVAS

 1    A.   Again, that was wide-ranging.  It was everything

 2  from simple misdemeanor thefts to murder investigations.

 3    Q.   And some of the larger agencies like in Arlington

 4  or Fort Worth, they have a dedicated homicide division.

 5  Was it the same way in Grapevine?

 6    A.   No, ma'am.  At the time Grapevine Police

 7  Department was not big to have -- big enough to have a

 8  dedicated homicide investigation unit.

 9    Q.   So if you were a detective, you would work,

10  whichever, a wide range of cases that were assigned to

11  you?

12    A.   Yes.

13    Q.   Back in March 21st, 2011, were you a senior

14  officer, or were you a detective then?

15    A.   Senior officer.

16    Q.   And were you assigned to a particular

17  geographical unit, or how was your assignment -- where

18  were your assignments?

19    A.   Yes.  I was assigned to roughly the northwest

20  part of the city of Grapevine.

21    Q.   On March 21st, 2011, at about 6:49 a.m. were you

22  dispatched to a particular location?

23    A.   Yes, we were.

24    Q.   And you say "we".  Who were -- who encompasses

25  "we"?

```
 1        A.   That would include myself, Sergeant Mark
 2   Shimmick, Officer -- and Officer Charles Day.
 3        Q.   Where were y'all dispatched to?
 4        A.   That would have been 214 Brookside.
 5        Q.   And what was the relation of that call?
 6        A.   We had been requested by the Arlington Police
 7   Department to do a welfare check on a subject that lived
 8   at Brookside.
 9        Q.   Do you recall the name of that subject?
10        A.   Yes, ma'am.  It was Rebeca Raudry.
11        Q.   And what is a welfare check?
12        A.   It is to check the general well-being, the
13   safety, the condition, basically in a very general sense
14   to make sure that everything is okay and everybody is
15   unharmed, uninjured and not in need of immediate
16   assistance.
17        Q.   Now, you stated that this request had come from
18   Arlington Police Department?
19        A.   Yes.
20        Q.   Did you make contact with anyone from Arlington
21   while you were on your -- en route to the Brookside
22   address?
23        A.   Yes, I did.
24        Q.   Who did you make contact with?
25        A.   A Detective Stewart.
```

1    Q.   And why did you make contact with Detective

2  Stewart?

3    A.   Detective Stewart had requested that we contact

4  him so he could provide additional details about why he

5  was requesting a welfare check at 214 Brookside.

6    Q.   And why was he requesting the welfare check?

7    A.   He was requesting a welfare check because he was

8  investigating a homicide in Arlington, which had

9  occurred the previous night, and the subject that lived

10 at 214 Brookside had been the girlfriend of a person of

11 interest in that case.

12   Q.   And who was the person of interest?

13   A.   He identified the subject by name only of a

14 Thomas Olivas.

15   Q.   And the girlfriend's name, did you have it at

16 that time?

17   A.   Which one?

18   Q.   The ex-girlfriend, did you know -- the person you

19 were going to go check on, did you have her name?

20   A.   Yes.

21   Q.   And that was Rebeca Raudry?

22   A.   Yes.

23   Q.   At about what time did you arrive at the address,

24 the Brookside address?

25   A.   At approximately 7:15.

1     Q.   And what happened when you got there?

2     A.   I approached the residence and immediately I saw

3   a woman who identified herself as Ms. Raudry just crying

4   hysterically.  She appeared to be talking to someone on

5   the phone.  She later said that was -- I believe it was

6   Detective Stewart, someone from the Arlington Police

7   Department.  And she was hysterical.  I approached her

8   and began to talk to her.  And she was visibly shaken,

9   visibly scared for herself and also for her two small

10  children.

11    Q.   Once you encountered her in this state, what did

12  you do?

13    A.   Talked to her briefly and then myself and

14  Sergeant Shimmick checked the inside of her residence,

15  214 Brookside, at her request.  We didn't find anybody

16  else in there other than her two children.  We didn't

17  see any signs of any forced entry into the house.

18  Everything appeared to be okay, as she described it and

19  as we saw.

20    Q.   Did you talk to Rebeca about why she was

21  concerned or why she asked that you guys come out and

22  check on her?

23    A.   Yes.

24    Q.   And she gave you a little bit background about

25  her relationship with Thomas Olivas?

1       A.   She did.

2       Q.   What, if anything, did you do with that

3    information?

4       A.   We had also been requested by Detective Stewart

5    to let him know, once we'd arrived at Brookside and

6    spoke to Ms. Raudry, what we had found out or what we

7    had seen there.  I did that and advised him of what we

8    saw and found.

9       Q.   Did Detective Stewart make any other request of

10   you?

11      A.   He did.

12      Q.   What did he request?

13      A.   He asked that we perform a welfare check at 601

14   Park, Apartment 208.

15      Q.   And what was your understanding of whose

16   residence address was 601 -- or 601 Park, Apartment 208?

17      A.   That had been the location and the apartment

18   where Mr. Olivas and Raudry lived together until

19   recently when they ended their relationship and she

20   moved to the Brookside address.  She indicated she was

21   still in the process of moving out, still had belongings

22   in the apartment and still had a key to the apartment

23   and name was still on the lease.

24      Q.   At some point was the decision made to go to that

25   apartment to check and see -- check on Mr. Olivas'

```
 1   welfare?
 2       A.  Yes.
 3       Q.  How did you go about doing that?
 4       A.  Are you asking about the discussion involved in
 5   going there, or what was your question specifically?
 6       Q.  Did -- what -- whose consent did you have to go
 7   to the apartment?
 8       A.  Ms. Raudry's.
 9       Q.  And how did she give you or convey consent?
10       A.  She told us that we had her permission to go into
11   the residence, handed us her key to the apartment and
12   advised us we were -- could use that to enter the
13   apartment.
14       Q.  And did you do that?
15       A.  Yes, we did.
16       Q.  Who did you -- when you say "we," who's the "we"
17   that went to the apartment?
18       A.  Myself and Sergeant Mark Shimmick and Officer
19   Charles Day.
20           MR. MOORE:  I'm sorry, I didn't hear that
21   last name.
22           THE COURT:  The last name, Officer Charles
23   Day, is that what you said?
24           THE WITNESS:  Yes, sir.  Officer Charles
25   Day.  Yes, sir.  My apologies.
```

 1      Q.   (BY MS. RAY)   At what time did you get to the
 2  apartment?
 3      A.   Shortly after 7:53 a.m.
 4      Q.   Now, what was the distance between the Brookside
 5  residence and the apartment complex that you were
 6  dispatched to?
 7      A.   Approximately a quarter of a mile, if that.
 8      Q.   So very short driving distance?
 9      A.   Yes.
10      Q.   When you got to the apartment, what, if any,
11  observations did you make?
12      A.   We saw that there didn't appear to be any
13  evidence of any forced entry into the apartment.
14  Visible damage -- it was a second-floor apartment, no
15  visible damage to -- that we could see from the ground
16  of the second-floor balcony door or the front door to
17  the residence.   Just appeared to be a normal apartment
18  building for that complex and nobody around.
19      Q.   Did you ever make entrance into the apartment?
20      A.   Yes, we did.
21      Q.   Did you -- how did you go about that?
22      A.   Myself and Sergeant Shimmick and Officer Day
23  approached the front door.   We knocked several times.
24  And after we did not receive any response after the
25  repeated attempts, we used the key to -- or I then used

1 the key to open the door.  Opened the door, called

2 Mr. Olivas' name, announced our presence and did not

3 receive any response.

4  Q.  What did you do next?

5  A.  We went into the apartment, made a sweep-through

6 there trying to find Mr. Olivas or anybody else in the

7 apartment that may have been injured or in need of

8 assistance.

9  Q.  Did you find anyone in the apartment?

10  A.  We did not.

11  Q.  Did you make any observations about the condition

12 of the apartment?

13  A.  Yes.  The apartment appeared to be fairly an

14 orderly apartment, didn't have things just laying all

15 over, all over the place.

16  Q.  Did you make any observations that led you to

17 believe whether or not a person had -- whether or not

18 the apartment had been recently occupied?

19  A.  Yes.  As we went through the area that I believed

20 to be the master bedroom, there were some black clothes

21 laying on a chair in the room.  And as we passed through

22 the master bedroom into the bathroom, there was a shower

23 and I pushed back the shower curtain and saw that there

24 was water on the shower walls and inside the shower

25 curtain, appeared that it had been used in not too

 1  distant past, in the last few hours.

 2      Q.   And what next did you do in the apartment?

 3      A.   We continued making our sweep through the

 4  apartment.  We went back to the front door.  I called

 5  Detective Stewart, let him know what we had found and

 6  what our observations were as we passed through, that we

 7  did not locate Mr. Olivas or anybody else.  And he

 8  requested that we secure the apartment while he obtained

 9  a search warrant.

10      Q.   And when you say "secure the apartment," what

11  does that mean?

12      A.   That means, practical application, we're going

13  to -- or closed it up, locked the door and maintained

14  our presence there to ensure nobody came in and out.

15      Q.   Do you recall what time it was that you left the

16  scene of the apartment, where you no longer had a

17  presence at the apartment?

18      A.   It was after 12:00 to 12:30, somewhere in that

19  area.  I believe 12:23.

20      Q.   And, Judge Johnson, I know looking through your

21  report, we discussed earlier that you noticed some parts

22  where you had some discrepancies or typos?

23      A.   Yes, ma'am.  That's correct.

24      Q.   In your report you have something -- you wrote

25  that "Thomas was concerned for Raudry's safety."  Was

```
 1    that a misprint?
 2        A.   That was.  That have should read "Stewart".
 3        Q.   And I believe also there's another paragraph
 4    where you wrote, "I also told Olivas about the clothing
 5    seen in the master bedroom"?
 6        A.   Yes, ma'am.  Again, that should read "Stewart".
 7        Q.   Do you recall when it was that you typed out this
 8    narrative?
 9        A.   It was after we left the apartment, while I was
10    in my vehicle, you know, maintaining the police
11    presence, securing the apartment.
12             MS. RAY:  May I approach the easel, Your
13    Honor?
14             THE COURT:  Yes.
15        Q.   (BY MS. RAY)  Judge Johnson, I wanted to just
16    make sure I had some of the timestamps correct for your
17    testimony today.  Okay?
18        A.   Yes, ma'am.
19        Q.   So what time was it that you were dispatched to
20    the Brookside address?
21        A.   That would have been -- the first notification of
22    it via dispatch over the radio was at 6:49.
23        Q.   And at what time did you arrive at 214 Brookside?
24        A.   7:15.
25        Q.   a.m., correct?
```

1     A.  Yes, ma'am.

2     Q.  And what time were you dispatched to the

3 apartment?

4     A.  We weren't dispatched there, per se.  We checked

5 in en route to there ourselves.

6     Q.  And --

7     A.  And that would have been at 7:52 a.m.

8     Q.  And what time did you arrive at the apartment?

9     A.  7:53 a.m.

10    Q.  Did you log or note when you actually cleared the

11 apartment, where you physically left the inside of

12 Apartment 208?

13    A.  Yes.  At 8:09 I was out of the apartment, the

14 apartment was secured and I was back at my vehicle.

15    Q.  And you stated earlier that you remained in your

16 vehicle parked outside of the apartment?

17    A.  Yes.

18    Q.  Okay.  And what time was it that you left the

19 parking lot of the apartment?

20    A.  12:23.

21    Q.  p.m.?

22    A.  Yes.

23    Q.  Judge Johnson, I have just marked the chart, as

24 you was testifying to times.  Did you see I was writing

25 down the times and brief description of what happened at

```
 1   those times?
 2       A.  Yes, ma'am, I did.
 3       Q.  And State's Exhibit No. 201, is this an accurate
 4   recitation of the times that you gave?
 5       A.  Yes.
 6               MS. RAY:  Your Honor, I offer State's
 7   Exhibit 201, after tendering to Defense Counsel.
 8               MR. MOORE:  No objection.
 9               THE COURT:  All right.  State's 201 is
10   admitted as offered.
11               (State's Exhibit No. 201 admitted)
12       Q.  (BY MS. RAY)  Now, Judge Johnson, as you remained
13   on the scene, did anyone ever come or go from that
14   apartment complex -- or I'm sorry -- not the apartment
15   complex, from Apartment 208?
16       A.  No.
17               MS. RAY:  One moment, Your Honor.
18               (Pause in proceedings)
19               MS. RAY:  I pass this witness, Your Honor.
20                      CROSS-EXAMINATION
21   BY MR. MOORE:
22       Q.  Good morning, Judge Johnson.
23       A.  Good morning, sir.
24       Q.  My name is Tim Moore.  I don't think we've ever
25   met, have we?
```

1        A.   No, sir.

2        Q.   How long have you been a justice of the peace up

3   in Wise County?

4        A.   Since May 15th.

5        Q.   Of this year?

6        A.   Yes, sir.

7        Q.   Elected?

8        A.   I was appointed.

9        Q.   Appointed, okay.  Are you enjoying it?

10       A.   I certainly am.  Certainly am.

11       Q.   Good.  You were a police officer for 18 and a

12  half years and you have been a justice of the peace now,

13  so you are certainly familiar with the term "probable

14  cause," aren't you?

15       A.   Yes.

16       Q.   And probable cause is a standard that is in our

17  legal system that -- it kind of means what it says, that

18  there's probably a reason to arrest somebody, correct?

19       A.   Yes.

20       Q.   We also use it to -- in search -- you sign search

21  warrants, don't you?

22       A.   Yes, I have the ability.  No, I have not done

23  that yet.

24       Q.   Okay.  But as a justice of the peace, you have

25  the ability to sign a search warrant, correct?

1      A.   Yes.

2      Q.   And a search warrant is also a legal instrument

3    based on probable cause, isn't it?

4      A.   Yes.

5      Q.   That probably there's something in wherever they

6    want to search that is of value to the investigation;

7    would that be correct?

8      A.   Yes.

9      Q.   And what happens is, to get a search warrant or

10   an arrest warrant, like Detective Stewart was going to

11   do, you have to -- a police officer, or detective, has

12   to write out an affidavit and swear to it.  And in that

13   affidavit there has to be facts sufficient to establish

14   probable cause to do what the warrant says.  Would that

15   be correct?

16     A.   Yes.

17     Q.   Whether it's to arrest somebody or search some

18   building or house or car.  A judge has to read that and

19   go over it and decide in their judicial capacity that,

20   indeed, there's enough reason to do what the officer

21   wants and they sign off on it.  Isn't that how it works?

22     A.   Yes.

23     Q.   Okay.  And I assume, on March 21st of 2011, early

24   in the morning, you were just patrolling the streets of

25   Grapevine when this call came in; is that correct?

```
 1        A.   We were still in briefing when the call came in.

 2        Q.   Okay.  About to go out on patrol?

 3        A.   Yes.

 4        Q.   You hadn't heard anything about a fire or a

 5   homicide that happened in Arlington, Texas, earlier that

 6   evening, had you?

 7        A.   No.

 8        Q.   Okay.  When you got the call to go over to 214

 9   Brookside, that was the first that you had heard about

10   this incident.  Would that be correct?

11        A.   Generally, yes.

12        Q.   Okay.  And did you know Rebeca Raudry before this

13   encounter with her that morning?

14        A.   No.

15        Q.   Did you know Thomas Olivas before that morning?

16        A.   No.

17        Q.   Had never had any kind of dealings with either

18   one of them in the past in Grapevine?

19        A.   I had not.

20        Q.   Okay.  So you didn't know anything about Rebeca

21   Raudry the person, correct?

22        A.   No.

23        Q.   Okay.  What was the sum total of information that

24   you had at that point in time to do a welfare check?

25        A.   At which point in time are you referring to?
```

1    Q.   When you were dispatched to go do the welfare

2    check.

3    A.   At the specific time we were dispatched, we were

4    just advised to conduct a welfare check.

5    Q.   Okay.  No reason?

6    A.   Not from our dispatchers, not until I talked to

7    Detective Stewart.

8    Q.   Okay.  You were dispatched, I believe you

9    testified, at 6:49 a.m., correct?

10   A.   Yes.

11   Q.   And when did you talk to Detective Stewart?

12   A.   Between that time and the time we arrived on

13   scene.

14   Q.   Okay.  That was 7:15, correct?

15   A.   Yes.

16   Q.   So sometime in that 26 -- 25 minutes you had a

17   conversation with Detective Stewart about this incident,

18   correct?

19   A.   Yes.

20   Q.   And did the information that Detective Stewart

21   provide to you, did that establish in your mind the need

22   for a welfare check?

23   A.   On Ms. Raudry, yes.

24   Q.   Okay.  But you learned that when you got to

25   Ms. Raudry's residence and encountered her and spoke

1  with her, she was hysterical, correct?

2      A.  Yes.

3      Q.  And she was scared, correct?

4      A.  Yes.

5      Q.  And you went in and checked the house, did a

6  search, made sure that everything was just fine,

7  correct?

8      A.  Yes.

9      Q.  And everything was fine, wasn't it?

10     A.  At her house, yes.

11     Q.  Okay.  And she had had no contact with Thomas

12 Olivas, had she?

13     A.  That's correct.

14     Q.  So as far as her being hysterical and scared and

15 afraid, as a police officer, there wasn't any reason

16 that you could see to put her in that condition, was

17 there?

18     A.  No, I disagree with that.

19     Q.  What condition existed to put her in a hysterical

20 situation?

21     A.  She was just out of a relationship with a person

22 who may or may not have been involved in a homicide of a

23 girl -- of Mr. Olivas' current girlfriend and that small

24 child and she was scared because she had two small

25 children and she lived very close to Mr. Olivas, so as

```
 1    an officer, yes, I would believe that she had grounds to
 2    be scared.
 3         Q.   Just based on that?
 4         A.   Based on that, yes.
 5         Q.   There was no threat made by Thomas Olivas to her,
 6    was there?
 7         A.   No.
 8         Q.   There was no contact by Thomas Olivas with her,
 9    was there?
10         A.   No.
11         Q.   She was just scared to be scared, wasn't she?
12         A.   She was just scared.
13         Q.   And she even told you that she didn't even know
14    where he might be, didn't she?
15         A.   That's correct.
16         Q.   She didn't have any idea where he was?
17         A.   That's correct, and that's part of the reason she
18    was scared.
19         Q.   Okay.  And you were also informed that the victim
20    had been stabbed, correct?
21         A.   No.
22         Q.   Well, okay, you were informed that the victim --
23    that there may have been a knife or some kind of cutting
24    instrument used, correct?
25         A.   Yes, sir.
```

STATE OF THOMAS OLIVAS

 1    Q.   Those are your words in your report, correct?

 2    A.   Yes, sir.

 3    Q.   And Detective Stewart is the one that informed

 4  you of that, isn't he?

 5    A.   Yes.

 6    Q.   And he also told you that Olivas may have been at

 7  the murder scene and may have been injured, didn't he?

 8    A.   He did.

 9    Q.   And did he give you a basis for that information?

10    A.   That was his observations of the crime scene he

11  had worked the night before.

12    Q.   Okay.  Did -- but did he tell you the basis of

13  those observations?

14    A.   No.  I don't recall that at all.

15    Q.   Okay.

16    A.   We did not go into specifics about injuries,

17  other than it appeared a knife or some type of cutting

18  instrument had been used.  As far as detailed

19  conversation about injuries, methodologies or anything

20  of that nature, no, we did not do that.

21    Q.   But he specifically told you that Olivas may have

22  been at the scene and may have been injured, correct?

23    A.   Yes.

24    Q.   But gave you no factual basis for why he thought

25  he may have been injured, or even at the scene, correct?

1    A.   That was just his observations, so, yes, I

2    suppose that would be factual.

3    Q.   Well, and I -- what I mean is he didn't tell you

4    somebody saw him running off bleeding or any of those

5    kind of facts, did he?

6    A.   No.  No, sir.

7    Q.   Okay.  But it was on the basis of that, that he

8    may have been injured, that you wanted to go over and do

9    a welfare check on him at his apartment, correct?

10   A.   Yes.

11   Q.   And that -- his apartment was not very far from

12   where Ms. Raudry was living.  She was living with her

13   father, correct?

14   A.   Yes.

15   Q.   Okay.  So y'all are concerned about Mr. Olivas,

16   his welfare, and you go and basically search his

17   apartment, correct?

18   A.   No, we did not perform a search of his apartment.

19   Q.   Okay.  Let me rephrase that.

20        Ms. Raudry gave you consent, because you had

21   learned that she had been living there with Thomas

22   Olivas and some of her things may have still been in

23   that apartment, so she gave you consent to search,

24   correct?

25   A.   She gave us to consent to go check his welfare

```
 1   there.
 2       Q.   Okay.  And you did that, you went to his
 3   apartment, which was a second-floor apartment over in
 4   Grapevine, and entered using a key and looked around the
 5   apartment, correct?
 6       A.   Yes.
 7       Q.   And in that apartment you found some black
 8   clothes; is that correct?
 9       A.   Yes, sir.
10       Q.   Did you pick them up and look at them?
11       A.   No.
12       Q.   What kind of clothes were they?
13       A.   Just black clothes.
14       Q.   Well, was it pants, shirt, sweater?  Do you
15   remember?
16       A.   No, sir.  Again, we didn't pick things up, search
17   the apartment.  We just checked the apartment for
18   Mr. Olivas in the case or the event he would have been
19   injured and we were checking his welfare.
20       Q.   Okay.
21       A.   Which is drastically different than a search.  We
22   didn't pick the clothes up.  I didn't pick the clothes
23   up.  They were just black clothing.
24       Q.   Just noticed the black clothing?
25       A.   Yes.
```

1      Q.   Okay.  And then you went in and looked in the

2   shower, correct?

3      A.   Yes.

4      Q.   And it appeared somebody had taken a shower

5   recently?

6      A.   Yes.

7      Q.   Did you see any blood in the shower?

8      A.   I did not.

9      Q.   Did you see any blood droppings in the bathroom

10   anywhere?

11      A.   I did not.

12      Q.   Did you see any knives or cutting instruments

13   laying around?

14      A.   No, we did not.

15      Q.   Did you see any footprints -- was there carpet in

16   the house?

17      A.   Yes, there was.

18      Q.   Was there any footprints that you noticed that

19   may have had blood on them?

20      A.   There appeared to have been some evidence of foot

21   traffic through the apartment, on the carpet, but as far

22   as bloody footprints, if that's what you're asking, no,

23   sir.

24      Q.   That's exactly what I'm asking.  You didn't see

25   that indicated that?

 1      A.  No, sir.

 2      Q.  Okay.  Now, he -- as far as you knew, he lived in

 3  No. 208; is that correct?

 4      A.  Are you referring to Mr. Olivas as "he"?

 5      Q.  I'm sorry.  Yes.

 6      A.  Yes.

 7      Q.  And that was a second-floor apartment and y'all

 8  spoke with a neighbor that lived in No. 207; is that

 9  correct?

10      A.  Yes.

11      Q.  And -- was that directly below No. 208?

12      A.  I don't recall.  It's been some time since I've

13  been there.

14      Q.  Okay.

15      A.  And I would have to see the layout of the complex

16  again, a map of the complex, to give you an accurate

17  answer to that.

18      Q.  It -- but it was in close proximity.  Number 207,

19  208, they got to be neighbors, don't they?

20      A.  Yes, it was very close.

21      Q.  Okay.  And did you get the name of that neighbor?

22      A.  I did not.

23      Q.  Okay.  Did you talk to the neighbor?

24      A.  Yes.

25      Q.  And was that a male or female?

```
 1      A.  I don't recall specifically.

 2      Q.  But that person told y'all that they had heard

 3   some loud noises coming from Apartment 208 between 2200

 4   and 2300 hours the night before, didn't he?

 5      A.  Yes.

 6      Q.  Okay.  And 2200 hours is 10:00 o'clock; is that

 7   correct?

 8      A.  Yes.

 9      Q.  Military time that would be between -- I mean

10   civilian time.  That would be between 10:00 and 11:00

11   o'clock, last night, would have been March 20th,

12   correct?

13      A.  That -- the time would have been 10:00 p.m. to

14   11:00 p.m.

15      Q.  Right.

16      A.  The previous night.

17      Q.  Of March 20th, that would have been March 20th,

18   correct?

19      A.  Yes.

20      Q.  Okay.  And he had heard loud noises coming from

21   Thomas Olivas' apartment?

22      A.  Yes.

23      Q.  Did you ask him any -- did you ask him to write a

24   statement out or explain anything further about that

25   incident?
```

1      A.  Explain to who?

2      Q.  To you.  I mean, you were a policeman and he said

3   I heard loud noises coming.  Did you say, Well, was

4   there screaming, was there thumps on the wall, what kind

5   of loud noises were there?

6      A.  Couldn't elaborate.  Only loud noises.  And we

7   let him know that detectives would likely want to talk

8   to him at some later time.

9      Q.  Sure.  That would be an important witness,

10  wouldn't it?

11     A.  Yes.

12     Q.  And as a police officer, you would want to get

13  the name of that witness and thoroughly interview that

14  witness, wouldn't you?

15     A.  Yes.

16     Q.  And so to conclude, you secured the apartment, as

17  per Detective Stewart's instructions, basically by

18  sitting in close proximity in your car and making sure

19  nobody came in and out, correct?

20     A.  Yes.

21     Q.  And when you left at 12:23, did somebody take

22  over for you?

23     A.  I believe Detective Easley had arrived on scene.

24  And that's been over three years ago.

25     Q.  Okay.

STATE OF THOMAS OLIVAS

1    A.  So I don't specifically remember who was there.

2  I would not have left it unattended if they were still

3  waiting to obtain a search warrant.

4    Q.  Because Detective Stewart was going to some judge

5  and getting a search warrant to search Mr. Olivas'

6  apartment, correct?

7    A.  I didn't have that specific conversation with

8  Detective Stewart.  That would be the normal procedure

9  to obtain a search warrant.  Now, exactly what he was

10  doing in preparation to obtain that, I don't know.

11    Q.  Well, I'm just going by your testimony where you

12  said Detective Stewart told you to secure the apartment

13  while he went and got a search warrant.  That was your

14  understanding is that Detective Stewart was going to get

15  a search warrant, correct?

16    A.  Yes, sir.

17    Q.  And you-all at the Grapevine Police Department

18  made sure that nobody entered that apartment of

19  Mr. Olivas to disturb anything inside there?

20    A.  That's correct.

21    Q.  And that was done, correct?  That was done

22  until -- you weren't there when Detective Stewart

23  arrived with the actual search warrant, were you?

24    A.  No.

25    Q.  Okay.  But you know it was secured until he

1   arrived with that search warrant?

2      A.   I know I secured it until I was relieved.

3      Q.   Okay.

4      A.   Now, at what time he arrived with a search

5   warrant, if he did, I don't know.

6      Q.   You -- but you just know that Grapevine police

7   secured it until it was searched?

8      A.   Yes, sir.

9      Q.   Okay.  Couple more questions.

10          Judge Johnson, when you went and talked with

11   Rebeca Raudry at her father's home, did -- was she aware

12   that there had been a double homicide in Arlington?

13      A.   Yes.

14      Q.   You didn't tell her that?

15      A.   No.

16      Q.   How did -- do you know how she knew?

17      A.   I believe she had already spoken with Detective

18   Stewart.  I don't specifically under -- or recall how

19   she first became aware of it.  I only knew that she was

20   aware of it.

21      Q.   Okay.  And did she talk to you any about having

22   discussions the night before or conversations or e-mails

23   with Mechelle Gandy?

24      A.   No, I don't recall that.

25      Q.   Okay.  You brought your report with you here

```
1    today, didn't you?
2       A.  Yes, sir.
3              MR. MOORE:  Judge, may I approach --
4              THE COURT:  Sure.
5              MR. MOORE:  -- and take it look?
6       Q.  (BY MR. MOORE)  Can I see your report?
7              Have you reviewed the entire Grapevine
8    police report before you testified here?
9       A.  No.
10      Q.  Okay.  Thank you, Judge.
11             MR. MOORE:  I pass the witness.
12                  REDIRECT EXAMINATION
13   BY MS. RAY:
14      Q.  I have a few questions, Judge Johnson.
15             You stated earlier that you're a Grapevine
16   police detective -- or officer for a number of years,
17   investigated a number of offenses?
18      A.  Yes.
19      Q.  Would it be expected that if someone -- that
20   someone could sustain injuries to themselves if they
21   were -- if they had been stabbing or using some sort of
22   cutting or stabbing instrument?
23      A.  Yes.
24      Q.  Would it be expected that someone may have
25   injuries that would require a welfare check?
```

STATE OF THOMAS OLIVAS

1      A.   Yes.

2           MS. RAY:   I'll pass this witness, Your

3  Honor.

4                  RECROSS-EXAMINATION

5  BY MR. MOORE:

6      Q.   Just one quick question.

7           In the Grapevine Police Department report,

8  there's some phone numbers listed in there.  Do you know

9  who acquired those phone numbers?

10     A.   Which phone numbers are you speaking about?

11     Q.   I'm talking about the phone numbers on page three

12  of the general report, the 940-600-0297, cell.  Do you

13  know?

14     A.   I don't know who obtained those.

15     Q.   Or the 817-265-8970, home?

16     A.   Don't know.

17     Q.   You don't know if that -- or the 817-481-1214,

18  home, you don't know?

19     A.   I don't know specifically.

20     Q.   Or the 817-343-1808, cell, do you know who gave

21  the Grapevine Police Department those numbers to put in

22  this report?

23     A.   I do not.

24     Q.   Do you know who at the Grapevine Police

25  Department would have taken this information?

```
 1        A.   It could have been any number of the officers --
 2   any one of the officers involved in our portion of this
 3   investigation.   It could have been myself, it could have
 4   been one of the other -- any of the detectives or other
 5   officers involved.   But specifically I don't remember.
 6        Q.   Okay.   Thank you, sir.
 7              MR. MOORE:   I'll pass the witness.
 8              MS. RAY:   No further questions for this
 9   witness, Your Honor.
10              THE COURT:   May the witness be excused
11   permanently?
12              MS. RAY:   No objection, Your Honor.
13              MR. MOORE:   No objection.
14              THE COURT:   All right.   Judge Johnson, I
15   hope it rains all the way home.
16              THE WITNESS:   Thank you, Judge.   I certainly
17   hope it does, too.
18              THE COURT:   All right.   Thank you for coming
19   in.
20              THE WITNESS:   Thank you.   I appreciate it.
21              (Witness excused from courtroom)
22              THE COURT:   Who will be your next witness?
23              MS. RAY:   Shannon Reeves.
24              (Witness takes the stand)
25              THE COURT:   State your full, legal name for
```

```
 1    the court reporter and the jury, as well, please.

 2              THE WITNESS:  Shannon Tiffany Fallentine.

 3              THE COURT:  Thank you.  And face me and

 4    raise your right hand.

 5              (One witness sworn)

 6              THE COURT:  All right.  Have you testified

 7    before in criminal district court?

 8              THE WITNESS:  Yes, I have.

 9              THE COURT:  Are you familiar with all the

10    rules that apply to all witnesses while a trial is in

11    progress?

12              THE WITNESS:  Yes, I am.

13              THE COURT:  Those rules apply in this case

14    as they do in most.  The one the court reporter will ask

15    me to remind you of is speak slowly, speak clearly and

16    one at a time.

17              THE WITNESS:  Yes, sir.

18              THE COURT:  All right.

19              And with that, State may proceed.

20              MS. RAY:  Thank you, Judge.

21              INVESTIGATOR SHANNON FALLENTINE,

22    having been first duly sworn, testified as follows:

23              DIRECT EXAMINATION

24    BY MS. RAY:

25        Q.  Ms. Fallentine, could you, please, introduce
```

1   yourself to the jury and tell them where you work.

2       A.   Yes, I am a crime scene investigator for the City

3   of Arlington Police Department.

4       Q.   And as the jury probably sees, you have "Reeves"

5   on your uniform.

6       A.   Yes.

7       Q.   You used to be known as Shannon Reeves?

8       A.   Formerly known as, yes.

9       Q.   Formerly known as Shannon Reeves.  So, please,

10  forgive me.  I know you as Shannon Reeves and I might

11  forget and call you Ms. Reeves.

12      A.   That is fine.

13      Q.   How long have you been with Arlington,

14  Ms. Fallentine?

15      A.   I have been there for six years.

16      Q.   And what position do you hold for the Arlington

17  Police Department?

18      A.   I am a crime scene investigator with the CSU,

19  crime scene unit.

20      Q.   And is that the position you've held during the

21  six years you've been with Arlington?

22      A.   Yes, it is.

23      Q.   Prior to being in Arlington, did you have any

24  other crime scene experience?

25      A.   I did.  I worked as a crime scene investigator

```
 1   for the Gwinnett County Police Department, which is just
 2   outside of Atlanta, Georgia.
 3      Q.   And how long were you there?
 4      A.   I was there for one year.
 5      Q.   Any other experience?
 6      A.   No.
 7      Q.   So you had a year in Gwinnett and then six years
 8   here in Arlington?
 9      A.   That's correct.
10      Q.   I know a lot of us think we know what it means to
11   be a crime scene investigator, but, if you could,
12   describe what your job entails.
13      A.   The job of a crime scene investigator in
14   Arlington, Texas, is to respond to violent persons
15   crimes, document the scenes, search for evidence, take
16   measurements, take photographs, and basically just
17   prepare for court, to introduce scenes to a jury, and
18   then to try to preserve the integrity of any evidence
19   that we collect, as well as processing it for latent
20   print evidence when necessary.
21      Q.   I didn't hear you mention going to scenes and
22   interviewing suspects.  Is that not part of what you do?
23      A.   No.
24      Q.   Okay.  You don't get to drive around in Hummers,
25   with cool -- like, having The Who playing in the
```

1   background?

2       A.   Thankfully, no.

3       Q.   Not a fan of The Who?

4       A.   Not a fan of Hummers.

5       Q.   And, Ms. Fallentine, what sort of training do you

6   have that enables you to do your job?

7       A.   I have a bachelor's degree in criminal justice

8   from Jacksonville State University, with a concentration

9   on forensic investigation and a minor in biology, as

10  well as over 500 classroom hours in the field of

11  forensic science.

12      Q.   And are there certain certifications and

13  qualifications you have to maintain in order for you to

14  do your job?

15      A.   We are proficiency tested at the City of

16  Arlington every year to ensure that we are living up to

17  the standard that's required for that department.

18      Q.   And I assume, are you passing your proficiency

19  test?

20      A.   I am.

21      Q.   Back on March 20th, 2011, what was your

22  assignment back then in terms of what was your shift?

23      A.   It was the same as it currently is.  I work the

24  midnight shift.  I show up for work at 2300 hours and I

25  get off work at 7:00 a.m.

STATE OF THOMAS OLIVAS

1    Q.   And 2300 hours is 11:00 p.m.?

2    A.   Yes, sorry.

3    Q.   No need to apologize.

4         At some point that evening were you made

5    aware of a call at the Presidents Corner Apartments?

6    A.   Yes, I was.  I was made aware upon arriving to

7    work that evening.

8    Q.   So shortly after 11:00 o'clock you were told that

9    there was a scene that you would be dispatched to?

10   A.   That's correct.

11   Q.   What sort of details were you given about the

12   scene?

13   A.   I was told that there was a death investigation

14   at that location regarding a female victim who had not

15   survived her injuries, who was located in a burning

16   structure.

17   Q.   And what did you do with that information?

18   A.   I then proceeded to contact my sergeant, as well

19   as my coworker on scene -- or excuse me -- in the office

20   with me at that time, CSI Tricksey, and request that

21   they both respond to the scene with me to assist.

22   Q.   And so what happened next?

23        THE WITNESS:  May I ask for permission to

24   refer to my report as I testify?

25        THE COURT:  You can refer to your report any

1  time you need to refresh your memory.  You may not read

2  directly from your report unless specifically asked to

3  do so.

4              THE WITNESS:  Thank you.

5              I began collecting all of our equipment that

6  we would require to process the scene and then did

7  arrive on scene at 2342, or 11:42 p.m.

8      Q.  (BY MS. RAY)  So it took you about 40 minutes to

9  get to the location?

10     A.  Correct.

11     Q.  If you could, describe the scene as you saw it

12  when you first got to the Presidents apartment.

13     A.  Arriving on scene, the building itself, No. 2216,

14  was cordoned off with multiple fire trucks, police

15  vehicles, crime scene barrier tape, and patrol officers.

16  It was evident from the exterior of the apartment that

17  it had been on fire.  And it appeared that the bottom

18  unit in the corner of the apartment was the actual

19  source of the fire.

20     Q.  Do you recall what that apartment number was?

21     A.  I was dispatched to No. 605.  Upon arrival, we

22  rely heavily on markings on the doors of the apartment

23  in these larger apartment complexes to determine the

24  number.  It was destroyed, unfortunately, and so I

25  referred to it in my report as 605.

1    Q.   When you got to the location, what did you do?

2    A.   I began by meeting with officers, who are first

3    responders on the scene, and then began documenting the

4    exterior of the building photographically.

5    Q.   And you stated earlier that it was quite apparent

6    which apartment was going to be the place that you were

7    going to do the bulk of the work?

8    A.   Yes.   There was heavy charring and soot all along

9    the exterior of a large front window facing out into the

10   parking lot area, as well as a decedent underneath a

11   white sheet located just outside the door.

12   Q.   Was the apartment still actively burning when you

13   arrived?

14   A.   It was not.

15   Q.   What other observations did you make?

16   A.   I also noted that the general air in the vicinity

17   of the apartment was very hazy and there was a very

18   predominant smell of soot and char in the air.

19   Q.   When you -- you stated that you saw a decedent

20   laying in the doorway when you first arrived?

21   A.   No.   She was actually in the parking lot area,

22   just outside the front door of the apartment.

23   Q.   Did you make any observations about her?

24   A.   I did note she was covered with a sheet.   There

25   were multiple medical equipment surrounding her.   I did

1    proceed to document her condition upon my arrival,

2    without manipulating the body in any way.

3        Q.   And when you say that, why did you not manipulate

4    the body?

5        A.   We never do so before the Tarrant County Medical

6    Examiner investigator arrives on scene.  The body is

7    property of the Medical Examiner's Office and it is not

8    our place to modify or manipulate it in any way.

9        Q.   So you just make observations as you can without

10   touching the body?

11       A.   Correct.

12       Q.   Did you have an idea of who it was, what the

13   decedent's name was?

14       A.   Officer Eilrich, when I arrived on scene, had

15   briefed me and given me the name as Mechelle Gandy as a

16   tentative ID.  However, those are only tentative until

17   verified by TCME.

18       Q.   And at any point at your -- upon your initial,

19   did -- was the white sheet removed from her?

20       A.   Yes, it was so I could take photographs of any

21   visible injuries, without manipulating the body at all.

22       Q.   And what, if any, injuries did you note?

23       A.   I did observe some, several, stab and/or incise

24   wounds mainly located on the torso.  She was clothed in

25   a pair of white shorts and she had one sock on her left

1  foot.  Her right foot being bare.

2      Q.  You stated earlier that you noticed incise

3  wounds.  What does that mean?

4      A.  I steer away from calling things stab wounds

5  because I'm not a medical examiner.  I'm not performing

6  the autopsy.  It can be difficult to determine how deep

7  a wound is without actually doing an autopsy.  So I will

8  refer to them as stab and/or incise wounds just to

9  alleviate any confusion that I'm trying to make a

10  determination of what caused them.

11      Q.  So for you, "incise" just is cutting?

12      A.  Correct.

13      Q.  At that time were you made aware of another

14  potential victim that the authorities were looking for?

15      A.  I was also advised by Officer Eilrich that a

16  minor child, an infant, belonging to Ms. Gandy was at

17  the time missing and had not been located inside the

18  apartment, as of that time.

19      Q.  After your initial observations of Ms. Gandy,

20  what did you do next?

21      A.  At approximately 1:00 a.m. I met with Detective

22  Byron Stewart and Arlington Fire Department

23  Investigator Lea.  I briefed them, let them know what I

24  had been told upon my arrival and at this time we then

25  began documenting the interior of the apartment.

1    Q.   So from 11:42, when you first arrived, to

2  1:00 a.m., what would you have been doing during that

3  time?

4    A.   Documenting all the exterior grounds and

5  documenting the decedent, Mechelle Gandy.  I also did

6  document a white Honda that I was told belonged to the

7  decedent in this case.

8    Q.   And after 1:00 a.m. you then made contact with

9  Detective Byron Stewart?

10    A.   Correct.

11    Q.   Now, when you're on a crime scene such as this,

12  what is the relationship between you and the detective?

13    A.   I like to have an open line of communication

14  wherein I can relay information about the interior of

15  the scene to the detective, as well as receive

16  information that they may garner from talking to

17  witnesses or other people involved in these offenses.

18  It just makes it easier to collectively process the

19  scene appropriately.

20          (Pause in proceedings)

21    Q.   (BY MS. RAY)  So when it comes to documenting or

22  working on the interior of a scene, you prefer to have

23  your detective there to help you to point out different

24  items of interest to the detective in order to help you

25  do your job?

STATE OF THOMAS OLIVAS

1    A.  Yes, I do.

2    Q.  What additional information, if any, did

3  Detective Stewart give you upon your meeting with him?

4    A.  Detective Stewart advised that he was interested

5  in any electronic items, such as laptop computers, cell

6  phones, as well as any court paperwork that I might

7  recover from inside of the apartment that was not

8  damaged.

9    Q.  Did Detective Stewart stay on the scene with you?

10   A.  No, he did not.  He focused his energy on

11 locating the minor child at this time.

12   Q.  At that time there was an Amber Alert for the

13 baby, for Asher?

14   A.  Correct.

15   Q.  Did you work with Investigator Lea at all?

16   A.  Yes, I did.  On fire scenes, arson scenes, it's

17 very important to have a collaboration between fire

18 investigators and crime scene investigators.  I am no

19 expert in what they do and they are no expert in what I

20 do; therefore, a joint effort is mandatory.

21   Q.  After the detective left to go look into the

22 issue involving Asher, what did you do?

23   A.  I began to do a walkthrough of the apartment,

24 notating anything of evidentiary interest that I might

25 have observed.  I then began photographic documentation

1    of the interior.

2       Q.   If you could, describe what the -- in a general

3    sense, what was the interior of that apartment like?

4       A.   The interior was very dark, very charred,

5    evidence of extreme heat and fire damage.  Just inside

6    the doorway to the apartment, there was a great deal of

7    apparent blood noted on the floor of the kitchen.  The

8    intensity of the burn patterns, in my opinion, seemed to

9    increase as I worked my way from the front door into the

10   residence, into the two bedrooms of the apartment,

11   specifically the bedroom indicated to belong to the

12   infant child.

13            MS. RAY:  Your Honor, may I approach the

14   witness?

15            THE COURT:  Yes.

16      Q.   (BY MS. RAY)  Investigator Fallentine, I'm

17   showing you what has been marked as State's Exhibit 4.

18   Are you familiar with State's Exhibit 4?

19      A.   Yes, I am.

20      Q.   And what is State's Exhibit 4?

21      A.   It is a diagram that was created by CSI Tricksey

22   to demonstrate the overall layout and areas of evidence

23   within the apartment.

24      Q.   And the areas of evidence within the apartment,

25   are these items of evidence that you collected?

1        A.  Yes, they are.

2        Q.  And are you familiar with the layout and the

3    markings indicated on State's Exhibit 4?

4        A.  Yes, I am.

5        Q.  Does State's Exhibit 4 fairly and accurately

6    depict the apartment, as you recall it, in terms of the

7    placing of the markers and items of evidence and the

8    furniture?

9        A.  Yes, it does.

10              MS. RAY:  Your Honor, I offer State's

11   Exhibit 4, after tendering to Defense Counsel

12   for inspection.

13              MS. KEENE:  I would like to take the witness

14   on voir dire for just one question, Judge.

15              THE COURT:  Yes.

16                 <u>VOIR DIRE EXAMINATION</u>

17   BY MS. KEENE:

18       Q.  Is this the same diagram that was produced to us

19   prior to?  Is this the same one that you've seen?

20       A.  Yes, it is.

21       Q.  With no additions or anything?

22       A.  Not to my knowledge, no.

23              MS. KEENE:  Then I have no objection, Judge.

24              THE COURT:  All right.  Four, State's 4, is

25   admitted.

1              (State's Exhibit No. 4 admitted)

2              THE COURT:  All right.

3                   <u>DIRECT EXAMINATION CONTINUES</u>

4    BY MS. RAY:

5        Q.   Okay.  Now, Investigator Fallentine, you were

6    giving us a description of some of your initial

7    observations once you entered inside the apartment?

8        A.   Yes.

9        Q.   Now, on State's Exhibit 4 we have the apartment

10   listed as 605?

11       A.   Correct.

12       Q.   And that was your understanding of what this

13   apartment number is?

14       A.   Correct.

15       Q.   So starting with, I guess, at the beginning, when

16   you first step into the apartment, describe the layout

17   of what we're looking at.

18       A.   Upon first entering the entire area, our decedent

19   would have been located here next to a vehicle.  This is

20   the white Honda belonging to the decedent.  In this

21   area, these two circles, each of these circles is

22   indicating an evidence marker number.  I use evidence

23   markers for demonstrative purposes to make it easier for

24   everyone to follow along with what the photographs are

25   depicting.

1           These two items are two bottles of charcoal

2   lighter fluid, but I don't want to forget to mention

3   them because they are not inside the apartment.  Moving

4   inside, just inside the door, we have a galley kitchen.

5       Q.  And, Ms. Fallentine, let me slow down for a

6   second.

7           Earlier you were talking about two markers.

8   You're talking about the markers that are 40 and 39,

9   that those were -- can you see those?

10      A.  Correct.  Yes.

11      Q.  And you say that those were charcoal lighter

12  fluid?

13      A.  Correct.

14      Q.  And before we go through each detail, let's just

15  get a general idea of the layout of the apartment.  So

16  when you go through the front door of the apartment,

17  which is near where the marker reads 38?

18      A.  Correct.  This is the front door opening into a

19  small kitchen area and the living room of the unit.

20  There's a sliding glass door to a patio, a small hallway

21  which leads to both the master bedroom, master bath,

22  spare bathroom, and the spare bedroom.  A small laundry

23  area located here off of that hallway.

24      Q.  And you stated earlier that the spare bed -- or

25  let me ask you this.  Between the spare bedroom and the

1   master bedroom, which area had the most apparent fire

2   damage?

3       A.   The highest degree of fire damage would have been

4   located in this spare bedroom here.

5       Q.   And I see on State's Exhibit 4 the room we're

6   calling the spare bedroom has, I guess, its wall listed

7   as G and F?

8       A.   Correct.

9       Q.   The -- how would you describe the progression of

10  the fire damage starting at the back of the apartment to

11  the front of the apartment?

12      A.   The heaviest amount of fire damage was notated,

13  again, as we said in this room.  This spare bathroom was

14  also heavily damaged.  The wall separating these two had

15  a large hole in it.  Damage was significant through this

16  hallway, and along the living room area, it began to

17  fade out in severity as you moved toward the kitchen

18  area and fade in severity in the master bedroom itself.

19      Q.   And when you look into the -- I guess, when you

20  first get through the front door in the kitchen area,

21  would you characterize that you noticed a lot of fire

22  damage?

23      A.   There were some protected areas.  There was

24  significant fire damage on the bar separating the

25  kitchen and the living room, significant fire damage on

1    the countertops itself.  The floor was somewhat

2    protected in this area by fluorescent light plastic,

3    the plastic sheeting that covers it, which had fallen

4    down onto the floor, had melted and fallen down onto the

5    floor, thereby protecting the floor in that area and

6    apparent blood that was located in that area.

7        Q.  You mentioned apparent blood.  Was -- how would

8    you quantify or how would you qualify the amount of

9    blood in the front of the apartment?

10       A.  There was a very significant amount of blood on

11   the kitchen floor and in this small entryway.  It

12   decreased as you moved into the living room area and was

13   nonexistent, as far as I could tell, in this half of the

14   apartment.

15       Q.  Investigator Fallentine, after you first walk

16   through a scene and you make your observations, what's

17   the next step you take after making your observations?

18       A.  The next step is to document the scene as it was

19   upon my arrival.  I document it photographically so that

20   there is an accurate representation of the way that it

21   looked.

22       Q.  Now, are there any special challenges that come

23   with documenting a scene of a fire?

24       A.  It is very challenging based on the dark nature

25   of these scenes.  The black soot absorbs light from a

1    flash very, very readily.  It is difficult to get proper

2    exposure out of photographs like this, just as it's

3    difficult to actually know what you're looking at when

4    things are melted into the top of a bar.  It can be

5    challenging to even discern what it is that you are

6    looking at.  Photographing it makes it even more

7    difficult.

8              I was also not able to use a tripod in this

9    scene due to the standing water in a lot of areas along

10   the floor from the fire extinguishing efforts and, also,

11   because I did not want to put my tripod down on evidence

12   that I might discover after, you know, doing a more

13   thorough investigation.  It was very challenging.

14   Q.   Why would you prefer -- why would you even want

15   to use a tripod?  Why is that your preferred method?

16   A.   You learn really quick when you work at night

17   that no matter how still you think you can stand, there

18   is an inherent shutter that runs through every human

19   person.  And you are unable to hold a camera steady for

20   the length of time it will take with an extended

21   exposure and extended shutter speed.  Having a tripod

22   and a shutter release cable removes that shutter and

23   allows you to get a nice clean photograph without any

24   jittering.

25             In this case, I had to use a higher --

1    faster shutter speed just to be able to avoid that

2    shutter, but that does usually end up with a darker

3    photograph.

4       Q.   And you stated something about the condition of

5    the floor.  What was the ground like that you were

6    walking on?

7       A.   Any carpet had been completely destroyed.  It was

8    wet in some places.  Standing water was evident.  There

9    was soot, char, burned debris all over the floor.  It

10   was a mess.

11      Q.   Investigator Fallentine, I am showing you what

12   has previously been marked as State's Exhibit 8, State's

13   Exhibit 10, State's Exhibit 11, State's Exhibit 12, and

14   then State's Exhibits 14 through 113, inclusive.  Could

15   you please look at these items.

16            THE COURT:  You know what, why don't y'all

17   take a stretch break and she can take her time going

18   through the stack of pictures, so we don't stare at each

19   other and watch paint dry.  While she does her job,

20   y'all can take a stretch.

21            (Break taken, 11:10 - 11:35 a.m.)

22            (OPEN COURT, DEFENDANT AND JURY PRESENT)

23            (Witness on the stand)

24            THE COURT:  You may continue.

25      Q.   (BY MS. RAY)  Investigator Fallentine, during a

STATE OF THOMAS OLIVAS

1    break you had an opportunity to look at the exhibits, 8,

2    10, 11, 12, and then 14 through 113, inclusive?

3        A.   Yes, I did.

4        Q.   And are these photographs you took at the scene,

5    at Presidents Corner, Apartment 605?

6        A.   Yes, they are.

7        Q.   And do they fairly and accurately depict the

8    scene as you documented it that evening?

9        A.   Yes, they do.

10               MS. RAY:   Your Honor, I'd offer State's

11   Exhibit No. 8, 10, 11, 12, and 14 through 113,

12   inclusive, for all purposes, after tendering to Defense

13   Counsel for inspection.

14               THE COURT:   Fourteen through a hundred and

15   what?

16               MS. RAY:   Thirteen.

17               THE COURT:   One hundred and thirteen.   Thank

18   you.

19               MS. KEENE:   And, Judge, during the break I

20   looked at each one of these and we do not have an

21   objection to the numbers.

22               THE COURT:   All right.

23               MS. KEENE:   Or exhibits.

24               THE COURT:   And I thank everyone for going

25   through all this while the jury was on break so we

1   wouldn't have to pause two or three times to look at
2   each individual exhibit.
3          All right.  State's 8, 10, 11, 12 are each
4   admitted.  Y'all get comfortable.  State's Exhibit 14,
5   15, 16, 17, 18, 19, and 20 are each admitted.  State's
6   21, 22, 23, 24, 25, 26, 27, 28, 29, and 30 are each
7   admitted.  State's 31, 32, 33, 34, 35, 36, 37, 38, 39,
8   40 are each admitted.  State's 41, 42, 43, 44, 45, 46,
9   47, 48, 49, and 50 are each admitted.
10          State's 51, 52, 53, 54, 55, 56, 57, 58, 59,
11   60 are each admitted.  State's 61, 62, 63, 64, 65, 66,
12   67, 68, 69, and 70 are each admitted.  State's 71, 72,
13   73, 74, 75, 76, 77, 78, 79, and 80 are each admitted.
14   State's 81, 82, 83, 84, 85, 86, 87, 88, 89, and 90 are
15   each admitted.  State's 91, 92, 93, 94, 95, 96, 97, 98,
16   99, and 100 are each admitted.  State's 101, 102, 103,
17   104, 105, 106, 107, 108, 109, 110, 111, 112, and 113 are
18   each admitted.
19          (State's Exhibit No. 8, 10-12, 14-113
20           admitted)
21          MS. RAY:  And, Your Honor, these exhibits
22   have all been downloaded into a PowerPoint presentation
23   and I ask permission to publish these exhibits via our
24   PowerPoint?
25          THE COURT:  Is the exhibit number visible on

1   the face of the PowerPoint image?

2               MS. RAY:  Yes, Your Honor.

3               THE COURT:  Then you may do so.

4               And, Tamla, make sure each time you go to an

5   exhibit you make sure you put the number in the record

6   which one you're talking about.  With that many,

7   sometimes it's easy to lose track.

8               MS. RAY:  Yes, Your Honor.

9               THE COURT:  Does Defense have any objection

10  to PowerPoint use for purposes of presentation?

11              MS. KEENE:  We do not, Judge.

12              THE COURT:  All right.

13              MS. RAY:  And, Your Honor, may Investigator

14  Fallentine also step down to view the State's Exhibit 4

15  while we talk about the exhibits on PowerPoint?

16              THE COURT:  Yes.

17              (Pause in proceedings)

18              THE COURT:  All right.  You may proceed.

19              MS. RAY:  Thank you, Your Honor.

20  Q.   (BY MS. RAY)  Investigator Fallentine, we're now

21  looking at State's Exhibit No. 8.  Seems pretty

22  self-explanatory.  But if you could, explain what it is.

23  A.   It is a picture of the front of the apartment

24  complex depicting the name of the apartment complex,

25  Presidents Corner.

1    Q.   Now, as we get through it, we'll notice that the

2    time of day changes throughout some of these photos?

3    A.   Correct.

4    Q.   Why is that?

5    A.   This was taken as I was leaving the scene, which

6    was I believe around 1:45 that afternoon, that next

7    afternoon.

8    Q.   So you worked this scene over 12 hours, I guess

9    close to 14?

10   A.   Over 14 hours.

11   Q.   Now, looking at State's Exhibit 9, which is --

12   was a prior admitted exhibit.  But did you take State's

13   Exhibit 9?

14   A.   Yes, I did.

15   Q.   And if you could, tell us what we're looking at

16   in State's Exhibit 9.

17   A.   On the right side of the screen is the unit in

18   question.  This is going to be the apartment that we are

19   discussing here today, 605, as I knew it, 601 as perhaps

20   everyone else seems to know it.

21   Q.   Apparently we notice that the dispatch records

22   refer to it as 601?

23   A.   Correct.

24   Q.   But it was your understanding that it was

25   Apartment 605?

1    A.  I am dispatched telephonically through our

2   dispatch services.  The person who dispatched me on the

3   phone said 605.  I know that because it gets put in my

4   notes immediately as I'm dispatched.  I believe it was

5   simply an error on that person's part.

6    Q.  And despite the discrepancy about which apartment

7   number, it was pretty readily apparent which apartment

8   that you were being dispatched to?

9    A.  Yes.  It was very obvious that this was the

10   apartment that had been on fire.

11    Q.  State's Exhibit 10, what are we looking at in

12   State's Exhibit 10?

13    A.  This is a different view of that same apartment.

14   This is the master bedroom window off the master

15   bedroom.  The front door is in this area, recessed here.

16   And the decedent, the female decedent, is here on the

17   ground.

18    Q.  And on the right side of a white Honda?

19    A.  Correct.  If we're looking at our diagram, we're

20   now in this location here.

21    Q.  And "the diagram" being State's Exhibit 4?

22    A.  Correct.

23    Q.  And you circled the area that reads "decedent

24   one"?

25    A.  Correct.

1      Q.   And is this how Mechelle Gandy was when you got

2  on the scene?

3      A.   Yes.

4      Q.   State's Exhibit No. 11, what are we looking at?

5      A.   This is another view of the master bedroom

6  window.  Again, if we're looking at our diagram here, it

7  is this window.

8      Q.   And on State's Exhibit 4 you pointed to the

9  window on the -- it's the southeast portion of the

10  apartment?

11      A.   Correct.

12      Q.   State's Exhibit No. 12, what are we looking at?

13      A.   This is a view of Ms. Gandy as she appeared upon

14  my arrival.  This picture was taken to depict all the

15  medical equipment and fire equipment that was

16  surrounding her when I arrived.

17      Q.   And the apartment that we can see, which -- what

18  doors are we looking at?

19      A.   This would be Apartment 603, and 605 is recessed

20  in behind this little wall here.  It's a north-facing

21  door, as opposed to an east-facing door like this one.

22      Q.   Did you -- the apartment, the second-floor

23  apartment, did you have reason to go up there and search

24  those?

25      A.   I did not.

1    Q.   Was it your understanding that they did not

2    contain part of this crime scene?

3    A.   That's correct.

4    Q.   State's Exhibit 13 is one that was previously

5    admitted before you, but did you take State's Exhibit

6    13?

7    A.   Yes, I did.

8    Q.   And what are we looking at in State's Exhibit 13?

9    A.   This is the front door to Apartment 605.  This is

10   603.  Again, this is the front of the white Honda here.

11   And this is a little grill with two bottles of charcoal

12   lighter fluid, which are depicted in our State's Exhibit

13   4 as being against the eastern-facing wall outside

14   Apartment 603.

15   Q.   And what markers were those?

16   A.   Markers 39 and 40.

17   Q.   State's Exhibit 14, are we looking at a closer

18   view of the -- is it 39 and 40?

19   A.   Correct.

20   Q.   And next to 39 and 40 there is a small, I guess,

21   barbecue grill?

22   A.   Yes.

23   Q.   Could you -- if you could, describe to the jury

24   what that barbecue grill looked like.

25   A.   The barbecue grill itself wasn't -- didn't appear

1   hot.  It had sand in it.  Did not have the appearance of
2   having been cooked on anytime recently.
3      Q.  Did it look like anyone was making fajitas on
4   that grill?
5      A.  Not to me, no.
6      Q.  State's Exhibit 15, what are we looking at?
7      A.  Looking at the front door to Apartment 605.
8   Again, the damage is significant, the paint peeling off
9   from the extreme heat.  I was unable to determine the
10  actual unit number.  Had I seen 601, I would have then
11  made notation in my notes that I was given the incorrect
12  information.
13     Q.  Any other observations about State's Exhibit 15?
14     A.  It is somewhat difficult to see, but the
15  dead-bolt assembly, there is damage to the door frame in
16  that location right here, which I was told was done as
17  rescue efforts were made to gain entry into the
18  apartment.
19     Q.  Did it appear to you that the damage was
20  consistent with that door having been kicked in or
21  forced in?
22     A.  Yes, it did.
23     Q.  Also, in State's Exhibit 15 there's something
24  right here in the doorjamb.  What was that?
25     A.  That is a plastic soup ladle from -- I'm assuming

1    from this kitchen, used to prop the door open, I'm

2    assuming in an attempt to aerate the unit.

3        Q.  State's Exhibit 16, what are we looking at?

4        A.  This is the view into the kitchen from standing

5    outside of the front door.  You can better visualize now

6    the damage to that dead-bolt assembly.  If we are in

7    State's Exhibit 4, we are now standing in this location

8    looking in at the kitchen.

9        Q.  And if you could, give us a little -- some of the

10   markings by the door.  Were -- what marking is that by

11   the front door?

12       A.  We have -- are you wanting the evidence marker

13   number?

14       Q.  Just something to help the record reflect where

15   the front door is.

16       A.  The front door is a north-facing unit, so we are

17   on the northeast corner of the apartment now.

18       Q.  State's Exhibit 17, what are we looking at?

19       A.  We are still standing outside the front door of

20   the apartment taking photographs to depict the interior

21   landing.  Just inside the front door, as you can see,

22   areas of apparent blood were visualized here on floor,

23   as well as on a small wall which separated the kitchen

24   from the living room.  So we are looking in at the

25   kitchen again and this wall area here.

1    Q.   And what's one of the markings on State's Exhibit

2    4, that wall?

3    A.   Go with evidence marker 25.

4    Q.   Now, earlier when you described Ms. Gandy, how

5    was she dressed?

6    A.   She was clothed in a pair of white shorts and she

7    had one sock on her left foot.

8    Q.   And what did -- do you recall what color that

9    sock was?

10   A.   It was a black and white ankle sock.

11   Q.   State's Exhibit 18, what are we looking at?

12   A.   This is a view of the kitchen from the

13   perspective of the front door.

14   Q.   On State's Exhibit 18, I believe you testified

15   earlier about some plastic sheeting that appeared to be

16   from the overhead lighting?

17   A.   Yes.  It's, again, a little bit difficult to see,

18   but you can make out the framework of the fluorescent

19   lighting panels at the top of the photograph.  And where

20   you see what appears to be tread patterns from boots,

21   this is a tread pattern made in the soot deposit on top

22   of plastic sheeting, which I believe has melted and

23   fallen from the ceiling.

24   Q.   And what was under that plastic sheeting?

25   A.   The floor beneath it was very bloody and that

1   blood was protected to a certain extent from fire and

2   rescue efforts, like the water and things they use to

3   extinguish the fire, was protected by that plastic

4   sheeting.

5       Q.   And State's Exhibit 19?

6       A.   We are looking at the kitchen counter.  This

7   would be the kitchen counter on the west side of the

8   kitchen, so our sink is here.  So, again, we are looking

9   from the perspective of the front door into the unit.

10      Q.   So the front door is still at your back?

11      A.   Correct.

12      Q.   Was this a particularly large area?

13      A.   It is not.  I have the exact measurements, but I

14  believe it's approximately three-and-a-half feet wide.

15      Q.   State's Exhibit 20?

16      A.   We've now switched our position.  Our back is now

17  to the back of the kitchen looking out towards the front

18  door, which is depicted here.  So now we're looking at

19  the east side of the kitchen which had our range and

20  stovetop areas.  The pantry area would be to our back

21  now.

22      Q.   How would you characterize the damage that you

23  noticed in the kitchen and in terms of fire versus

24  smoke?

25      A.   It was heavily charred and sooted to the west

1    side.  The bar and the kitchen counter near the sink was

2    definitely damaged.  A lot of paint had bubbled up along

3    the -- what would be considered the southern wall of the

4    kitchen.  However, there were items in the kitchen which

5    strangely appeared untouched, which is -- as this cereal

6    box.  You can make it out quite clearly that it's a

7    cereal box.  That's, once again, one of the interesting

8    facets of arson that -- it's not my expertise so I can't

9    explain that.

10       Q.   State's Exhibit 21?

11       A.   We are still in the kitchen with our back to the

12   pantry.  We are now looking at the western side of the

13   kitchen, the sink.  There were items, just your

14   miscellaneous normal household items, cell phone

15   charger, cutlery.  You can see some infant -- a baby

16   sippy cup, for lack of a better term, here.  You'll

17   notice how the paint has bubbled and peeled here on the

18   northern retaining wall of the kitchen.  And for

19   perspective, this is going to be outside of the front

20   door, this fireman here.

21       Q.   State's Exhibit No. 22, what are we looking at?

22       A.   This is a knife block, which was obviously

23   located here next to the sink.  The evidence marker

24   number given to this knife block would be 35, so --

25   forgive my shaking hand, but it's right here.

1    Q.   On State's Exhibit No. 34, where was it -- I'm

2    sorry -- on State's Exhibit 4?

3    A.   State's Exhibit 4, it is right in the

4    southwestern corner of the kitchen.

5    Q.   And what was the item marker for that?

6    A.   Marker 35.

7    Q.   Did you ultimately collect the knife block

8    depicted in State's Exhibit 22?

9    A.   Yes, I did.

10   Q.   State's Exhibit No. 23, what are we looking at?

11   A.   This is the kitchen counter, just next to the

12   knife block.  Again, if you're looking at an evidence

13   marker number, it's going to be 36 in the southwestern

14   corner of the kitchen.  On this wet rag, all of this

15   entire area, again, saturated from rescue efforts.  Two

16   brown handled paring-style knives.  Again, they're a

17   little bit difficult to make out in the photograph, but

18   they are in this location here.

19   Q.   Did you ultimately collect those?

20   A.   I did.

21   Q.   State's Exhibit No. 24, what are we looking at?

22   A.   This was an item that was on the bar top.  It's a

23   pair of infant shoes.  It would have been located closer

24   to the middle section of the bar separating the kitchen

25   and the living room, in this area here.

1      Q.   State's Exhibit 25, what are we looking at?

2      A.   This photograph is to depict the plastic sheeting

3   we were talking about which was covering portions of the

4   kitchen floor, thereby somewhat protecting the areas

5   underneath.  It is -- if we are trying to orient the

6   front door up here in the top of the photograph and the

7   oven and stovetop, it's going to be our right.  If we're

8   in State's Exhibit 4, we're basically in the central

9   floor of the kitchen area here.

10      Q.   Now, earlier you stated that the floor had a

11   combination of -- some parts of the floor were

12   particularly saturated, wet.  Other parts of the floor

13   in the apartment were bloody and then others -- still

14   others were completely burned beyond recognition.

15   State's Exhibit 5 (sic), how would you character that

16   as -- was this the bloodiest area of the apartment?

17      A.   State's Exhibit 25 is depicting what I would

18   consider to be the largest pool of apparent blood from

19   within the apartment.

20      Q.   Did it appear consistent with a body having laid

21   there and bleeding for some time?

22      A.   Depending on the wounds, it does indicate that

23   they -- the person would have been there for some period

24   of time, yes.

25      Q.   State's Exhibit 25 -- or 26.  What are we looking

```
 1   at?
 2      A.   Just to orient ourselves, this is the front door
 3   again.  You can see a little bit of the damage we talked
 4   about.  This is a small closet that was directly behind
 5   the front door.  If we are in State's Exhibit 4, we are
 6   now looking at this area right here.  It is the
 7   northeast quadrant of the kitchen.  We can see apparent
 8   blood transfer patterns on the closet door itself,
 9   including some directional spatter over to the left of
10   the doorknob and midway down the door.
11      Q.   Investigator, as part of your training in crime
12   scene, do you undergo any sort of training in blood
13   spatter analysis?
14      A.   We do.  There are different levels of blood
15   spatter analysis.  Every crime scene investigator is
16   trained to recognize certain pattern types,
17   directionality, per se, high velocity blood spatter,
18   which looks like aerated blood.  I am not trained to
19   reconstruct blood spatter, so the best that I can do is
20   to indicate the general type, meaning, a transfer
21   pattern where something what -- that was bleeding has
22   come in contact with a surface, versus directionality
23   castoff patterns, say, from a weapon or female's hair or
24   something to that extent.  But definitely having
25   directionality to it, as opposed to simply making
```

1    contact with an actual surface.

2       Q.   And you also stated something about aerated.

3    What do you mean by aerated blood?

4       A.   High velocity blood spatter in the instance of,

5    say, a gunshot wound, high velocity blood spatter

6    appears almost like a mist, very small droplets, which

7    we don't see here.  What you see here is more of

8    evidence of a large quantity of blood making contact

9    with a surface, enough quantity to then run down --

10   in -- in rivulets down the wall, so a significant

11   amount.

12      Q.   And State's Exhibit 27?

13      A.   This is a closer view of that same transfer

14   pattern.

15      Q.   Now, you stated earlier that when you first got

16   to the scene and you made your observations of

17   Ms. Gandy, you did not manipulate her body because that

18   was something -- a job for the medical investigator,

19   correct?

20      A.   Correct.

21      Q.   But you did make observations of incise or knife

22   wounds on her chest, on the part of the body that you

23   could see?

24      A.   Correct, on her torso, generally speaking.  I do

25   believe she possibly had an injury below her midline,

1   but the majority of them appeared to be on the upper

2   body.

3       Q.   At some point were you able to notice injuries on

4   the other -- on other parts of her body?

5       A.   Yes.   I would have to refer to my report for the

6   specific time, but I want to say approximately 2:15 the

7   Medical Examiner Investigator Greenwell arrived on scene

8   and he then began documenting Ms. Gandy, at which time

9   he did lift her so that we could photograph her back and

10  she did have additional injuries to her back that were

11  similar to the ones to her front.

12      Q.   Now, using that information that you gleaned when

13  y'all looked at her back and side to the transfer

14  patterns we're seeing on State's Exhibit 27, did it

15  appear to you that State's Exhibit 27 was, you know,

16  consistent with, say, a bleeding wound from a back being

17  up against the door or wall?

18      A.   That might be outside my expertise.

19      Q.   Okay.   State's Exhibit 28, what are we looking

20  at?

21      A.   This is the precipice interior and exterior of

22  the front door to the apartment.   You can see a good

23  deal of apparent blood which has begun to coagulate

24  even, which is a -- the quantity we're talking about is

25  fairly significant.   This, at the top of your screen,

1    top of the photograph is a black and white sock similar

2    to the one that was on her left -- Ms. Gandy's left

3    foot.  If we're orienting ourselves in our diagram, the

4    sock is number 38, just inside the door there.

5        Q.  Would you say, if you recall, would the blood

6    pool on State's Exhibit 28 be more or less than the

7    blood pool you observed in the kitchen?

8        A.  It is a lesser quantity than the one in the

9    kitchen.

10       Q.  State's Exhibit 29, we're looking at a closer

11   view of the black and white sock?

12       A.  Yes.  That's, again, number 38, right here.

13       Q.  State's Exhibit 30, what are we looking at?

14       A.  This is a photograph of the wall separating the

15   kitchen from the living room areas, so this surface

16   here, for directionality in State's Exhibit 4, it would

17   be at the northeast corner of the kitchen area, just

18   south of the front door.  In the picture it's evident

19   that -- it is apparent blood transfer pattern beginning

20   up -- probably up about midway on the wall.  And again,

21   if we're discussing quantities of blood, significant

22   enough to cause runoff down the wall after it was

23   transferred.

24       Q.  State's Exhibit 31, what are we looking at?

25       A.  This is going to be, let's see, the wall opposite

1    the retaining wall in between the kitchen and the living

2    room.  So we're talking about this wall area here.

3    State's Exhibit 4, it's going to be the wall just west

4    of the front door.  It also depicts a pattern --

5    transfer pattern of some type, again, with runoff.

6    However, due to the heat -- and you can see what we call

7    a demarcation line, indicating extreme heat at the top,

8    and a lesser heat, less discoloration at the bottom.

9            But as we can see here, regardless, it was

10   enough to remove -- if this is, indeed, apparent blood,

11   which I am unsure of, but if it is, it has actually

12   transferred and discolored this blood to a grayish and

13   blackish color, instead of the oxygenated red blood as

14   we saw before.

15   Q.   And State's Exhibit 32?

16   A.   State's Exhibit 32 is going to be marker number

17   24.  And let's see, right here, and is going to be at

18   the northwest corner of the door, front door here.

19   Q.   When we look at State's Exhibit 31, the -- where

20   on State's Exhibit 31 is the --

21   A.   We are right here, so front door, and we are,

22   again, northwest corner of the door.

23   Q.   And there's our closer view of it.

24   A.   And this, again, is an apparent blood transfer

25   pattern of some sort.  Again, we can tell the difference

1    here with the red color, as opposed to that grayish

2    blackish color that we saw in the last photograph.

3        Q.   Now, when we talk about the -- on State's Exhibit

4    4, we just saw quite a few pictures indicating blood

5    spatter and blood evidence in this corner -- in this

6    area, the foyer, if you will, of the apartment.  How

7    would you -- would it be fair to say that the large --

8    the most blood found in that apartment was clustered in

9    this area?

10       A.   Yes.  In fact, most of the evidence collected, as

11   indicated by the evidence marker circles that you see

12   here, did come from the kitchen and small entryway area

13   of the residence.

14       Q.   Now, in State's Exhibit 33, what are we looking

15   at?

16       A.   State's Exhibit 33 is a photograph of the desk

17   that was located just west of the front door.  It's this

18   desk here.  This photograph was specifically taken to

19   demonstrate the use of fire department equipment.  This

20   is a light that they utilize.  It's very high-powered.

21   As you can see, it didn't light the area all that much.

22   But I like to take photographs to show -- if there is

23   any intervention to a crime scene, any equipment left, I

24   always take photographs to depict it for the jury to see

25   how it looked when I arrived.  So that's what we're

1    looking at there.

2         Q.   And State's Exhibit 34?

3         A.   We are, again, the same equipment here, same

4    desk, looking into the living room.  This is a good

5    demonstration of how dark the scene actually was.  I

6    have a light source and my flash and this is the best

7    that -- exposure that I could achieve.  But in State's

8    Exhibit 4 we are now standing just at the southeast

9    corner of the desk looking westward into the living room

10   area.

11        Q.   And what's some of the damage you noted in

12   State's Exhibit 34?

13        A.   If you can make it out, my angle is bad here, but

14   there is an overturned cocktail table.  There is, again,

15   that demarcation line.  It's very evident here that the

16   heat was incredibly extreme on the top half.  This is a

17   fireplace.  The mantel of the fireplace is almost

18   completely destroyed.  Everything that was atop it was

19   almost melted beyond recognition.  The patio doors,

20   which are located here, have that same demarcation line

21   and the glass is almost completely blackened.  There is

22   standing water and other debris littering the entire

23   floor of the living room.

24        Q.   State's Exhibit 35 looks a little brighter?

25        A.   This, again, we are looking in the living room.

1   This is an overturned cocktail table.  If we're in

2   State's Exhibit 4, this is our cocktail table here in

3   the central portion of the living room.  As you can see,

4   there is extensive damage to the sofa and love seat.

5   The seams burst, stuffing exploded from it.  There was

6   stuffing slightly melt -- partially melted into the

7   floor.  The ceiling had begun to fall, leaving parts of

8   the ceiling on top of a lot of items in the area.

9        The plastic blinds, sliding curtain

10  arrangement that was hanging in front of the patio door,

11  has since melted and become almost unrecognizable on the

12  floor in front.

13  Q.   State's Exhibit 36?

14  A.   This is a photograph that's still in the same

15  perspective point of the love seat.  The back of the

16  love seat, again, you can see the damage all the way

17  down to the frame from the fire.  We are now standing in

18  this location.  We are looking southward from the

19  northeast corner of the living south towards the hall.

20  The hallway is to the left of the photograph.

21  Q.   State's Exhibit 37?

22  A.   We're now fully facing the hallway which ran

23  north to south in the living room area.  Again, our love

24  seat is to the right on the photograph and the kitchen

25  would then be to the left in our photograph.  So we are

1    standing here and we're taking the photograph down this

2    way.

3        Q.   So on State's Exhibit 4, you're -- if you could,

4    point again to where you --

5        A.   Yes.  We're standing in the northeast corner of

6    the living room photographing south down the hallway.

7        Q.   State's Exhibit 38?

8        A.   This is a photograph of the bar which separated

9    the kitchen area to the left from the living room area,

10   which is to the right in our photograph.  You can see

11   miscellaneous personal effects and items atop the bar,

12   which most of which, as I said before, unrecognizable.

13       Q.   Earlier you made some remarks about the line of

14   demarcation.  Is State's Exhibit 38 also a pretty good

15   example of how the difference in the damage from -- I

16   guess from counter height on up versus counter height on

17   down?

18       A.   It is.  You can see the demarcation here very

19   clearly.  It's bubbled on the southern end of the bar,

20   the wall on the southern end of the bar.  However, this

21   also is a good photograph to demonstrate how surfaces

22   can be protected from heat by other surfaces.  So the

23   retaining wall of the fire, underneath the countertop,

24   was in some ways protected from some of that heat by the

25   countertop itself.

1   Q.   Prior to this scene, had you worked any other

2  arson scene?

3   A.   I had worked one or, I believe, possibly two in

4  Gwinnett County, one of which was a vehicle.  So it is

5  actually quite different.  But in working with the fire

6  department so closely on these scenes, you do pick up

7  and learn quite a bit.

8   Q.   And what did you learn about -- just about the

9  way heat and fire works in terms of whether it rises or

10 falls?

11  A.   Well, I think we're all pretty familiar with the

12 concept of heat rising.  I mean, that's not a new

13 concept.  One thing that is interesting to be told is

14 how it actually almost behaves like water in a lot of

15 ways.  And I don't want to overspeak because, again, I'm

16 absolutely no expert in arson, but I have heard it

17 described that way, the way that it actually covers

18 surfaces.

19  Q.   It kind of moves towards the path of least

20 resistance.

21       State's Exhibit 39 we've come full circle in

22 the living room.

23  A.   Yes.  So, again, we are now looking at -- to the

24 left at the front door and then the -- it would be

25 considered the northeast -- nope, my apologies,

1  northwest corner of the bar.  There was a cell phone

2  charger in this area that had actually fused into the

3  bar top from the heat, but very evident demarcation

4  here.

5      Q.  Now on State's Exhibit 40, what are we looking

6  at?

7      A.  We are now standing in the living room at the

8  northwest corner.  Fireplace is here to our left.

9  That's our mantel.  So the front door is directly in

10  front of us and the hallway we were just looking to --

11  at would be to our right.

12     Q.  And State's Exhibit 41?

13     A.  We've now moved slightly south and taking a

14  photograph east towards the bar area from the western

15  side of the living room.  And, again, you can see the

16  amount of debris, overturned furniture, sort of a

17  child's stroller here and then the saturated nature of

18  the flooring and just the destructibility of the fire in

19  this location.

20     Q.  State's Exhibit 42?

21     A.  This is a photograph of an entertainment center

22  located in the southwestern corner of the living room

23  and a television which is behind the entertainment

24  center, which assumably was on top of the entertainment

25  center at one point.  Again, interestingly enough in

1  this photo you can see the child's toy almost appears
2  completely untouched.
3      Q.  Right south -- or I guess if we're looking at
4  the -- on State's Exhibit No. 42 right below that, it
5  looks like it's Asher's drum.  What is that object?
6      A.  It's very hard to make out in this photograph,
7  but it is a laptop computer directly on the floor in
8  front of the entertainment center.  It has a USB, like a
9  thumb drive in the USB slot.  Again, just almost
10 completely destroyed and standing in a puddle of water.
11     Q.  Did you eventually collect that?
12     A.  I did.
13     Q.  Now, State's Exhibit 43, what are we looking at?
14     A.  We are now standing in the southwest corner of
15 the living room looking out towards the northern --
16 northwest corner of the fireplace.  The mantel is full
17 of melted things.  I'm not sure exactly what most of the
18 those things used to be.
19     Q.  To say "things" is pretty much the closest we can
20 get with some of these objects?
21     A.  I apologize.  I was unable to determine what a
22 lot of things in that apartment were, actually, or had
23 been.
24     Q.  And State's Exhibit 44?
25     A.  This is a photograph of the sliding doors to the

1    patio.  Again, you see that demarcation line very

2    evident on the glass, as it was still visibly able to

3    view through on the bottom half but almost completely

4    opaque at the top from the soot and the damage.  This

5    area at the foot of the patio doors, those are the

6    plastic strips, the sliding strips, blinds, that you see

7    in apartment complexes routinely.

8        Q.  What are we looking at in State's Exhibit 45?

9        A.  State's Exhibit 45 is a photograph of the handle

10   to the patio doors.  I did note some -- what appeared to

11   be pry marks on this door.  Due to the nature of the

12   call, the damage from the fire, I wasn't able to

13   ascertain whether or not they were new or older pry

14   marks, but they were documented as possibly being

15   relevant.

16       Q.  State's Exhibit 46, what are we looking at?

17       A.  This is a closer view of that door handle.  In

18   the subsequent photographs we'll see evidence of the pry

19   marks I'm speaking of.

20       Q.  Okay.  State's Exhibit 47?

21       A.  Scratches are evident.  Otherwise, no damage to

22   the actual locking mechanism of the door, other than the

23   pry marks.

24       Q.  And State's Exhibit 48?

25       A.  We're able to see them a little bit better here

1    and they are angular in shape and they are probably

2    about two -- possibly two inches, encompassing a space

3    of two inches just above the actual handle.

4        Q.   State's Exhibit No. 49?

5        A.   This is the photograph I was waiting to get to.

6        Q.   Okay.

7        A.   As you can see, they are rectangular, angular in

8    shape and there are at least three, if not possibly

9    additional, scratches and scuffs to the metal.

10       Q.   And you said based on the -- I guess, the damage

11   that the fire did, you couldn't tell whether or not

12   these were recent or older pry marks?

13       A.   That's correct.  What you look for, things you

14   look for to determine that, would be flaking paint,

15   small residual pieces of metal that are still attached,

16   anything that would weather away over a short amount of

17   time.  And in this case the efforts of the fire

18   department to blow water all through there and the fire

19   itself, any of that would have been destroyed simply by

20   those efforts.  So it's impossible to say when those

21   were actually applied.

22       Q.   Would it be fair to say this apartment complex

23   was not the best apartment complex?

24       A.   Apartment complexes in general are habitually

25   known for burglaries and break-ins.  It just comes with

1    the nature of it.  So it's not uncommon to see any type

2    of damage, old damage to doors, apartment doors,

3    especially screen doors or sliding back doors.  It's

4    actually fairly common.

5        Q.   And State's Exhibit 50?

6        A.   These are what I believe to be some sort of a pry

7    mark or some type of agitation mark to the plastic frame

8    of the screen door, which was just outside of that glass

9    door we were just looking at.

10       Q.   Okay.  State's Exhibit 51, what are we looking

11   at?

12       A.   We've moved back inside the apartment now.

13   These, again, the plastic strips that form the blinds

14   that hang down in front of the patio door have melted,

15   fallen to the floor.  We also see some children's toys

16   and a dishtowel which, again, I know it doesn't look

17   like a dishtowel, but it is, right here atop the blinds.

18   That is going to be evidence marker number 17 and kind

19   of glary area for me here, but right here, to clarify,

20   northwest corner of the living room.

21       Q.   And the dishtowel, was there anything of note

22   about the dishtowel?

23       A.   Yes.  The dishtowel appeared to have singe marks,

24   as well as apparent blood on it, making it interesting

25   in an evidentiary way in multiple different ways.  So

1    here we can see the apparent blood on the dishtowel in

2    State's Exhibit 52.  We can also see that it is atop

3    blinds, however, below the rod.  Normally in a crime

4    scene you are looking for things that would indicate

5    timeframes, like this fell on the floor before the

6    person started to bleed or bled on it.

7              In this case with the high pressure water

8    hoses that were used, I have a hard time stating where

9    anything was before FD intervention on this scene.

10   Q.  But you can note that the vertical blinds have

11   melted and fallen to the ground and then somehow this

12   lands on top of it?

13   A.  Or is blown on top of it by a water hose or

14   kicked on top of it by a fireman's boot.  I really

15   couldn't say.

16   Q.  Would it be fair to say when firefighters are

17   going through an apartment, they're not really looking

18   at crime scene preservation?

19   A.  No.  And that's fair, very fair.  We don't get

20   mad about that because they're there to save people and

21   property, and I'm there to clean up after.

22   Q.  State's Exhibit 53, what are we looking at?

23   A.  We're now back looking at the western side of the

24   bar.  We are at evidence markers -- well, it's going to

25   be ten, cigarette pack, ten here, and then 41, which is

1     just above it.  Again, the northwest corner of the bar

2     is going to be an area of blood that's on the baseboard

3     and the wall.  We're also looking at some -- I don't

4     know if you can make it out from this photograph, but

5     there is a protected piece of floor again, this

6     rectangular object, which is on the central living room

7     floor, in my opinion had been covering this area of

8     blood before it was kicked or moved by a hose or a boot.

9     And it did -- once it was moved, it exposed a slightly

10    protected area of red oxygenated blood on the floor.

11        Q.  And State's Exhibit 54 is a closer view of what

12    you were just talking about?

13        A.  Yes, it is.  So we can see this rectangular item.

14    Again, it's burned beyond recognition.  I don't know

15    what it actually was, but it has left what I believe to

16    be a demarcation area on the carpet here where I believe

17    it to have been atop this area here before it was moved.

18        Q.  State's Exhibit 55 is a -- looks like you are

19    doing a measurement of the blood depicted in State's

20    Exhibits 53 and 54?

21        A.  Correct.  It's a poorly exposed photograph of the

22    area of blood that we just looked at.

23        Q.  You seem very sensitive about the exposure in

24    this apartment?

25        A.  Yes, as the camera is mirroring on the white

1    measuring device and everything in that apartment was

2    gray or black and so it was challenging to get these

3    photographs done.

4       Q.   State's Exhibit 56, what are we looking at?

5       A.   During the course of my investigation, I did

6    coordinate with Investigator Lea to get photographs that

7    might benefit him in his fire investigation.  This is

8    one I took of the ceiling area above the bar.  So we are

9    looking at a ceiling, which is above this area, facing

10   down southbound into the hallway of the apartment.  As

11   you can see, it has burned away most of the ceiling.

12   The paint is in very poor, very charred condition.  And

13   the items that were part of the ceiling, whether they

14   were lights or ventilation, may have started to melt and

15   then fall.

16      Q.   State's Exhibit 57?

17      A.   Okay.  We're now standing at the precipice of the

18   living room and the hallway.  So we are standing here,

19   photographing southward into the hall.  In this

20   photograph, again, you can see we no longer have a very

21   specific demarcation line here.  There's no white or

22   light gray wall.  It -- you can tell, in my opinion, not

23   as an expert, but that the fire did burn much hotter in

24   this location as we're moving south into this portion of

25   the apartment, the southwest corner of the apartment.

1    Q.   State's Exhibit 58, which direction have we

2    turned and what are we looking at?

3    A.   We have now turned to face this direction, east,

4    from that same vantage point, looking at a hall closet.

5    That's depicted on the left side of the photograph and

6    the entryway to the master bedroom on the right side of

7    the photograph.   So it would be this doorway right here.

8    Q.   State's Exhibit 59?

9    A.   Okay.   We are looking -- sorry.   We are now

10   standing with our back to the southern portion of the

11   hallway looking out into the living room area.   This is

12   the desk near the front door along the northern wall.

13   So we are now here, looking this way.

14   Q.   Now, could you tell the -- on State's Exhibit 59,

15   what was this material down here, the light green

16   material towards the -- I guess, the bottom left corner

17   of State's Exhibit 59?

18   A.   That to me appears to be stuffing from either the

19   sofa or love seat, which during rescue efforts was blown

20   from that area down the hall, south down the hallway.

21   Q.   State's Exhibit 60?

22   A.   We are now standing in that same location.   I'm

23   basically doing a 360-degree view from most of these

24   vantage points, so you'll see a lot of redundant vantage

25   points.   But we are now looking in a southwestern

Case 4:22-cv-00385-O   Document 163   Filed 08/18/22   Page 97 of 176   PageID 973

1    direction towards what you can see used to be a laundry

2    area in the central portion of this photograph.

3              At the top left of State's Exhibit 60 we see

4    some sort of ceiling-mounted ventilation or air

5    conditioning, some metal contraption.  I did hit my head

6    on that more than one time.  So it was very low-hanging,

7    as I'm only 5'5.  So that just demonstrates, again, that

8    this area had burned far more significantly in this

9    location than any of the living room areas.

10   Q.   State's Exhibit 61?

11             THE COURT:  Tamla?

12             MS. RAY:  Yes.

13             THE COURT:  Five minutes and we'll send them

14   to lunch because you're -- we're going to be a while, I

15   assume; is that correct?

16             MS. RAY:  Yes, Your Honor.  I have 113.

17             THE COURT:  There's no problem.  No, I

18   understand.  And having looked at it and see the pace

19   you're going -- I have no problem with how either side

20   does their job.  I'm just going to give the jury a break

21   before we get through all these pictures just because

22   it's about 12:35.

23             Are y'all good for about another five

24   minutes before we eat?

25             SEVERAL JURY MEMBERS:  Yes.

STATE OF THOMAS OLIVAS

```
 1              THE COURT:  Does that sound about right for
 2   y'all?
 3              SEVERAL JURY MEMBERS:  Yes.
 4              THE COURT:  All right.  Then why don't
 5   you -- I tell you what, when you get to 70, stop at 70.
 6              MS. RAY:  Okay.  I might even stop before
 7   then --
 8              THE COURT:  That's fine.
 9              MS. RAY:  -- just narratively.
10              THE COURT:  Depending on how much detail.
11              MS. RAY:  Okay.
12              THE COURT:  That's fine.
13   Q.  (BY MS. RAY)  State's Exhibit 61?
14   A.   State's Exhibit No. 61 is a photograph of the
15   interior of the laundry area.  In our diagram here it's
16   going to be on the northern side of the west-running
17   hallway.  You can see -- kind of see, a lot of plastic
18   and metal shelving that has melted and collapsed down on
19   top of what used to be a washer and a dryer.
20   Q.   And would it be fair to say just that the fire
21   damage is getting more and more extreme the further back
22   we go?
23   A.   Yes, that's a fair statement.
24   Q.   State's Exhibit 62?
25   A.   State's Exhibit 62 is standing with the washer
```

1  and dryer to our left, facing into the master bedroom.
2  To the east we can see -- I don't know if you can make
3  it out -- but through the window of what is an Arlington
4  Police Department patrol car and more personnel, so this
5  would have been the window on the eastern wall of the
6  master bedroom, the one that we photographed from the
7  exterior and looked at several slides ago.
8      Q.  And 63?
9      A.  We're now in the master bedroom.  We are in the
10  master bedroom.  An interesting note about this
11  photograph is the ceiling fan is almost completely
12  melted away.  The paint on the walls is, again,
13  incredibly damaged.  But we do, again, have a
14  demarcation line on what is going to be the southern
15  wall of the bedroom.  The mattress, you can see exposed
16  springs as a result of the fire.
17      Q.  And, again, this window is the window that we see
18  in those much earlier photos as you're arriving on the
19  scene.  This is the window that faces to the parking
20  lot?
21      A.  Correct.  It is the window on the eastern side of
22  the master.
23      Q.  State's Exhibit 64, what are we looking at?
24      A.  This is another wall inside of the master
25  bedroom.  It's going to be the wall in this area, off of

1    the master bathroom, kind of separating.  So it's on the

2    western wall of the bedroom in State's Exhibit 4.

3         Denoting that this photograph is just --

4    again, depicts a very, very evident demarcation line,

5    almost blackened paint where it still is visible.  Yet

6    you have just a lighter, a much lighter gray color as

7    you move down.

8    Q.   Sixty-five, what are we looking at?

9    A.   Sixty-five is a photograph of the master bathroom

10   in the master bedroom.  So this room here.  We are

11   obviously standing in the master facing westward into

12   the bathroom.  You can see in this photograph the damage

13   caused to the mirror.  Again, I don't know the logistics

14   or chemistry behind it, but it was very evident that the

15   blackened and opaque quality of the glass surrounded

16   this central portion, which was much brighter.  I'm sure

17   there's a reason.  I don't know it, but...

18   Q.   State's Exhibit 66, what are we looking at?

19   A.   We now moved from our master bathroom into the

20   spare bathroom.  So this is a photograph standing in

21   this hallway.  In State's Exhibit 4 it is the hallway

22   which runs east to west.  And we are now facing south

23   into the spare bathroom.  You can see much, much hotter.

24   The actual countertop is beginning to melt and deform.

25   The porcelain of the sink is -- or ceramic of the sink

1  is blackened.  Whereas, it was white in the master

2  bathroom.  So that indicates to me an incredible

3  increase in heat just between the master and spare

4  bathroom.

5      Q.  State's Exhibit 67?

6      A.  Another photograph standing now inside the spare

7  bathroom.  So we are now standing in a vantage point

8  here photographing out the doorway, north, or into the

9  hall.  This would be the -- sorry -- the washer and

10  dryer.

11      Q.  State's Exhibit 68?

12      A.  I mentioned earlier that there was a hole in the

13  wall between the spare bedroom and the spare bathroom.

14  It is on the western wall, the spare bathroom.  And it

15  is what we are looking at through here.  I'm not sure

16  how it was created, but it was large enough to

17  photograph through.

18      Q.  Sixty-nine?

19      A.  We are looking at the door to the spare bathroom.

20  It was off its hinges and falling down.  It is going to

21  be at what we would say -- it's evidence marker four.

22  It's being held up by an assistant.

23      Q.  And State's Exhibit 70.

24      A.  This might be a good -- this is going to be the

25  spare bedroom.  We are standing just inside the doorway

1   here, photographing in from the east to west hallway.

2      Q.  Now, would it be fair to say that the -- the

3   spare bedroom had the bulk of -- the brunt of the fire

4   damage?

5      A.  Yes.  Even without being an expert in any type of

6   arson investigation, it was very evident.  There were no

7   articles of furniture, no discernable items left, except

8   for a water heater that was located in the northeast

9   corner, which we'll see a picture of.  Everything else

10   was completely decimated.

11      Q.  Now, at the point when you were taking these

12   photographs, has Asher been found?

13      A.  Not at this time.

14      Q.  When you first started taking photographs, you're

15   still out there with -- Investigator Stephen Lea is

16   still there with you?

17      A.  Yes.

18      Q.  So what was he doing while you're taking

19   photographs?

20      A.  The arson investigation was suspended pending my

21   initial documentation of the residence photographically,

22   for the reason that I need photographs of it untouched

23   before he began sifting through the debris and looking

24   for evidence of arson.  So at this time he was pending

25   and waiting for me to finish taking my photographs, my

1    initial photographs.

2       Q.  And once you finished taking your initial

3    photographs, what did he start doing?

4       A.  He began in this room, because it was believed at

5    the time to be a room which the fire was actually

6    started, and he began sifting through the debris in the

7    room looking for any items of evidentiary value and

8    potentially looking for the infant child, Asher.

9       Q.  And did he eventually find something in this

10   bedroom?

11      A.  He did.  Indicated in State's Exhibit 4, the

12   second decedent, a small infant, was located in the

13   southeast corner of the bedroom on top of a metal set of

14   springs around the same size of an infant bed.  However,

15   all the mattress had burned away, and on the springs, he

16   was located, I believe, under eight to nine inches of

17   Sheetrock.

18      Q.  And looking at State's Exhibit 70, are we looking

19   at the corner where Asher was eventually found?

20      A.  Yes, ma'am, standing inside the doorway looking

21   at that direction.

22      Q.  And at the time when you took State's Exhibit 70,

23   did you know that you were taking a picture of Asher?

24      A.  No.

25            MS. RAY:  Your Honor, we can go ahead and

STATE v. THOMAS OLIVAS

1    take our break.

2              THE COURT:  All right.  Lights.

3              I'm going to give you an hour and 20 minutes

4    to eat so you don't get in a hurry.  I know you maybe

5    could be a little quicker, but I don't want anyone

6    tripping or slipping or having to dodge cars that

7    haven't adjusted to the wet weather after so long

8    without it.  So be at your pickup point -- just be at

9    your pickup point at 2:00 or by 2:00.  The sheriff will

10   bring you back up here.

11             Everyone else, we'll start 2:05, 2:10,

12   whenever the jury is squared away.  So be back in an

13   hour and 20 minutes.

14             Remember your instructions.  We'll pick up

15   from there.

16             Everyone remain in the courtroom until the

17   jury has left the floor.

18             (Lunch break taken, 12:40 - 2:00 p.m.)

19             (OPEN COURT, DEFENDANT AND JURY PRESENT)

20             (Witness on the stand)

21             THE COURT:  On the record.

22             Everybody eat that wanted to?

23             SEVERAL JURY MEMBERS:  Yes.

24             THE COURT:  Everyone follow your blue card

25   instructions at lunch?

```
1              SEVERAL JURY MEMBERS:  Yes, sir.
2              THE COURT:  Thank you.
3              Still the State's witness.  Still direct
4    examination.
5              State your name for the court reporter
6    again.
7              THE WITNESS:  Shannon Fallentine.
8              THE COURT:  All right.  And you may resume.
9              And outside voice, you're away from the
10   microphone.
11   Q.  (BY MS. RAY)  Okay.  Investigator Fallentine,
12   right before the break, we were discussing the division
13   of labor between you and Investigator Lea, correct?
14   A.  Yes.
15   Q.  So if you could, explain again how you guys were
16   working together at the scene.
17   A.  He was waiting until I finished my initial
18   documentation of the crime scene, after which he then
19   began his investigation of the arson aspect at the time
20   by starting in the spare bedroom.
21   Q.  So it was -- it was abundantly clear that the
22   spare bedroom was where the brunt of the fire or where
23   the fire probably started?
24   A.  Yes.
25   Q.  So what was it that he was doing while you were
```

 1   documenting?

 2      A.   He was sifting through the debris on the floor

 3   looking for any items of evidentiary value or note in

 4   his investigation.  I had made it clear that I was

 5   looking for also the same things he was looking for, as

 6   well as any sharp objects, instruments that could have

 7   been used to inflict the wounds that we saw on

 8   Ms. Gandy.

 9      Q.   And I know you've had lunch, but remember we've

10   got it slow it down.

11           THE COURT:  Yeah.  I was -- you saw me

12   looking for the sign, didn't you, Tamla?

13           You may continue.

14           MS. RAY:  Thank you, Judge.

15      Q.   (BY MS. RAY)  So we are -- in State's Exhibit 70

16   we are in Asher's bedroom?

17      A.   Correct.

18      Q.   And what part of the bedroom are we looking at in

19   State's Exhibit 70?

20      A.   We are looking from the doorway of the bedroom in

21   the direction of the southeast corner of the room.

22      Q.   And State's Exhibit 71, what are we looking at?

23      A.   We have now moved on to the southwest corner of

24   the room, to include this window here on the western

25   wall.

1    Q.   State's Exhibit 72?

2    A.   This is a photograph that was taken to assist

3    Investigator Lea.  This is of a light fixture and the

4    beams of the room.  This assists him in determining heat

5    and temperature the fire burned in this location.

6    Q.   State's Exhibit 73, what are we looking at?

7    A.   We have now moved on to the northwest corner of

8    the room.  In this vicinity we see a large pile of

9    debris.  I was able to make out a few items which

10   appeared to be melted diapers in this area.  However,

11   any of the furniture or other items that have been in

12   the room were almost completely destroyed.

13   Q.   Now when you were in this apartment, does the

14   apartment appear to be appropriately furnished?

15   A.   As best as I could determine, yes.

16   Q.   For example, in the master bedroom there was a

17   bed and a dresser and that sort of thing?

18   A.   Correct.

19   Q.   And in the living room there appeared to be toys

20   and highchair or stroller, appropriate items for a woman

21   who had a baby with her?

22   A.   Yes.

23   Q.   But in this bedroom did you see any such

24   appropriate -- those kinds of furnishings, like a

25   changing table or a crib?

1      A.   Not that I could readily identify at this point.

2      Q.   State's Exhibit 74, what are we looking at?

3      A.   We are looking at the northern wall of the

4    bedroom.  Again, this wall, as you can see, it's white,

5    almost no paint remaining.  Several areas of intense

6    burn and a demarcation line, which corresponds to the

7    pile of miscellaneous debris that is on the floor in

8    that northwest corner of the room.

9      Q.   And State's Exhibit 75?

10     A.   Here we are looking in the northeast quadrant of

11   the bedroom and we see that lone water heater, just

12   about the only remaining distinguishable item in that

13   location.

14     Q.   And, Investigator Fallentine, I probably should

15   have been given you a heads-up.  I'm going to ask you

16   some questions about times, so if you need to go get

17   your report...

18     A.   May I?

19     Q.   Yes.

20          THE COURT:  Do you have enough light to read

21   over there?

22          THE WITNESS:  Yes, sir.  Thank you.

23          THE COURT:  All right.  You may proceed.

24          MS. RAY:  Thank you, Your Honor.

25     Q.   (BY MS. RAY)  You stated at some point that the

1   medical investigator came -- arrived at the location.

2   And what time was that?

3       A.   2:17 in the morning.

4       Q.   And what part of the -- where did the medical

5   investigator go and what did he do?

6       A.   He began his investigation with the female

7   decedent, Ms. Gandy, on the outside of the apartment.  I

8   seized my documentation to proceed to assist him in his

9   efforts, as well as to get documentation of the back

10  side of Ms. Gandy and any injuries that she may have

11  sustained to her back.  After completing that

12  documentation, I then returned indoors to continue

13  documentation.

14      Q.   And while you were now outside -- now that you

15  were no longer in the back bedroom taking photos, does

16  that allow Investigator Lea to go in and continue his

17  investigation?

18      A.   Yes, I did complete my photographs of the spare

19  bedroom before proceeding to Ms. Gandy.  And

20  Investigator Lea then began his portion of the

21  investigation in that room as I was assisting MEI

22  Greenwell.

23      Q.   And MI Greenwell will would be the name of the

24  medical investigator, right?

25      A.   Medical Examiner Investigator Greenwell.

1    Q.   At some point did Investigator Lea indicate to

2    you that he had found something?

3    A.   Yes.  At 2:30 in the morning he approached me

4    outdoors and advised he had found the remains of a small

5    infant in the spare bedroom, in the southeast corner of

6    that room.

7    Q.   And what did you do?

8    A.   At that time we proceeded with MEI Greenwell into

9    that bedroom to document the infant child.

10   Q.   Before you had gone -- when we said that

11   Investigator Lea was doing his investigation in that

12   bedroom, literally what was he doing?

13   A.   Sifting through debris, trying to determine where

14   the actual point of origin for the fire was, to

15   determine whether accelerants had been used, things that

16   the fire department is charged of investigating.

17   Q.   State's Exhibit 76 is a photo of the water heater

18   still in the bedroom?

19   A.   Yes.  This is showing the relationship of the

20   water heater to doorway, just setting up basically a

21   point of view shot of that.

22   Q.   And 77, what are we looking at?

23   A.   This is a photograph taken directly after

24   Investigator Lea determined he had remains in this

25   corner of the bedroom.  You can see here some of his

STATE V. THOMAS OLIVAS

1    tools that he was using to sift through the debris.  I

2    did use my flashlight to light up the area in which he

3    was indicating for clarity in this photograph.  So this

4    area is going to be where the infant child is located.

5        Q.  What observations did you make about the

6    condition of the infant child?

7        A.  From the perspective of looking down upon the

8    remains, when they were first located, it did not look

9    like a human person.

10       Q.  Did -- at what point were you able to identify

11   some distinguishing characteristics?

12       A.  Medical transport personnel arrived at

13   approximately 3:17.  The deceased child was picked up

14   from metal framework on which he was lying.  At that

15   time, as he was lying on his left side in the debris,

16   his left side was protected to a certain degree from the

17   fire and you could make out distinguishing

18   characteristics, human characteristics and clothing on

19   his left side.

20       Q.  Before you -- before he was carried out, were you

21   able to identify anything, like clothing or anything,

22   diaper, or anything on the child?

23       A.  The only thing that I could make out was a small

24   plastic tab around what appeared to be midway between

25   the top and bottom of the remains, which was similar in

1   appearance to a diaper tab, but that is all.

2      Q.  And once the investigator, or the medical

3   investigator picked him up, you were able to see his

4   other side?

5      A.  Yes.  You could make out facial features and

6   clothing?

7      Q.  Could you tell what sort of -- could you describe

8   the clothing?

9      A.  It appeared to be light blue in color.  I

10  remember a portion of a sleeve, but it was certainly

11  burned and destroyed on his right side, making it

12  difficult to determine if it was a simple T-shirt or an

13  actual onesie.

14     Q.  State's Exhibit 78, what are we looking at?

15     A.  These are the remains as they were located by

16  Investigator Lea.  This is the area in which we are

17  looking -- the charred black area and it's the gray

18  rubble.  As you can see, it doesn't actually look like a

19  person.

20     Q.  And State's Exhibit 79?

21     A.  This is a photograph as he was removed from the

22  metal framework.  As you can see, the light blue or

23  turquoise-colored top.  Just to orient you, we're

24  looking at the head being on this side, the bottom and

25  then the legs and feet.

1    Q.   And --

2    A.   And a small hand here.

3    Q.   And this is Investigator Greenwell?

4    A.   No.  This is medical transport personnel,

5    Mitchell and Davis, from transport services arrived.

6    I'm not sure if this is Mitchell or Davis.

7    Q.   State's Exhibit 80, what are we looking at?

8    A.   We are going to start to seeing the evidence

9    markers that I talked about before, which I've used for

10   purposes of clarity.  This evidence marker number one

11   was used to depict the metal framework, which was

12   located underneath the decedent in the southeast

13   quadrant of the spare bedroom.

14   Q.   Now, in this photo, this is after Asher has been

15   removed?

16   A.   Yes.  Asher has been tentatively identified as

17   Asher Olivas and he has been removed at this point,

18   leaving just what was beneath him and metal framework

19   and debris.

20   Q.   And State's Exhibit 81, what are we looking at?

21   A.   After his removal, Investigator Lea continued to

22   remove debris on top of the metal framework, leaving it,

23   and only it, exposed so I could document it and take

24   decent measurements of its location.

25   Q.   Did you have an indication of how much debris was

1    on top of Asher?

2        A.   Investigator Lea had stated it was eight to

3    nine inches.  However, I was not there to measure that

4    amount, so I cannot really state it for a fact.

5        Q.   Earlier when -- before Asher had been discovered

6    and you were in that room taking photographs, how long

7    would you say you were in that room?

8        A.   Approximately 15 minutes.

9        Q.   And while you were in that room, did you have any

10   idea or reason to believe that Asher was still in there?

11       A.   No.

12       Q.   State's Exhibit 82, what are we looking at?

13       A.   We are looking at the doorknob from the spare

14   bedroom door, located on the floor in front of the

15   window on the western wall of the spare bedroom.  It's

16   indicated by evidence marker number two on State's

17   Exhibit No. 4.

18       Q.   And when we talk about a doorknob, did you ever

19   see an actual door?

20       A.   I did not see a door to this room.

21       Q.   State's Exhibit 83, where have we gone?  Are we

22   back in the living room?

23       A.   We are in the living room.  We are on the western

24   side of the bar, at evidence marker number ten, which is

25   right here.  A pack of very damp, crushed Marlboro brand

1    cigarettes.

2        Q.   State's Exhibit 84, what are we looking at?

3        A.   We are looking at evidence markers 13 and 14,

4    marker 13 being paperwork which appeared to be

5    court-related paperwork, which Detective Stewart had

6    requested we look for and collect, should we find any.

7    Evidence marker 14 is depicting a small area of apparent

8    blood on the face of a box underneath the desk.  Again,

9    where we are looking here is going to be 13 and then 14.

10       Q.   And all the item markers indicate items that you

11   collected?

12       A.   Yes.

13       Q.   So State's Exhibit 85 is a close-up view of the

14   apparent blood that you swabbed?

15       A.   Correct.

16       Q.   State's Exhibit 86?

17       A.   We are looking at evidence marker 15 and depicted

18   here to the west of the desk of the living room area,

19   that is a disposable lighter.  Due to the nature of the

20   scene, it being an arson, all lighters were also

21   collected on scene.

22       Q.   State's Exhibit 87?

23       A.   This is evidence marker 17 depicting the towel,

24   that we discussed earlier, as being just inside the

25   patio door.  Again, State's Exhibit No. 4, we see it

1    indicated just east of the patio sliding door.

2         Q.   State's Exhibit 88?

3         A.   Evidence marker 18.  Another disposable lighter

4    located on the patio table itself, on the corner of it,

5    patio table.

6         Q.   State's Exhibit 89?

7         A.   This is evidence marker 19.  This is the laptop

8    that we discussed and could barely see in the other

9    photograph.  You can see the debris.  It was standing in

10   water, it is in very poor condition, but located in

11   front of entertainment center in the southwest corner of

12   the living room.

13        Q.   And what are we looking at in State's Exhibit 90?

14        A.   This is a close-up photograph of the thumb drive,

15   which was plugged in to the USB port of the laptop, to

16   demonstrate its poor condition.  It was melted and

17   broken, as well, but still plugged in.

18        Q.   State's Exhibit 91?

19        A.   This is depicting evidence markers 20 and 21.

20   Twenty-one is somewhat hard to see due to the cover of

21   the sofa here.  These were located underneath an end

22   table, which was here at the southeast corner of the

23   living room, just at the hallway.  Evidence marker 20 is

24   indicating a cellular phone, again, waterlogged and

25   fairly damaged.  Twenty-one is indicating a Bud Light

1   beer can which is located underneath the table.

2       Q.   State's Exhibit 92.

3       A.   This is a better photograph to depict the same

4   beer can.

5       Q.   State's Exhibit 93?

6       A.   Evidence marker 22 is a female's button-up

7   blouse.  It was located on the corner of the love seat,

8   which was in the southeast corner of the living room

9   area, just off the north/south hallway portion.

10      Q.   State's Exhibit 94?

11      A.   Evidence marker 23, depicting two sets of keys.

12  They were located just inside the front doorway to the

13  west, on the floor.  They appear to have fallen off of a

14  key hook apparatus which had melted off the wall.

15      Q.   Did you make any sort of attempt to see if you

16  could figure out where these keys belonged?

17      A.   I did utilize the keys to test the dead-bolt lock

18  to the front door and they did disengage and reengage

19  that lock successfully.

20      Q.   Which set of keys did that?

21      A.   Unfortunately, I did not note that in my report

22  specifically.

23      Q.   So --

24      A.   But they were both collected.

25      Q.   And on State's Exhibit 94, the set of keys right

1   here, are you familiar with what an old-style Honda key

2   looks like?

3       A.   I drove a very old-style Honda for many years and

4   I can tell you my key looked very much like this.

5       Q.   And so would that be perhaps consistent with the

6   '94 Civic -- or -- '94, '95 Civic that Mechelle drove?

7       A.   In my opinion, yes.

8       Q.   State's Exhibit 95, what are we looking at?

9       A.   This is a photograph taken of the front door and

10  the closet door behind that.  Again, we are now getting

11  into the location in the residence where y'all see a

12  fair number of evidence markers specially placed for

13  clarity in this area.  Thirty-eight is placed to

14  indicate the sock that was located just outside the

15  front door, 26 to indicate the damage to the dead-bolt

16  assembly and doorknob of the front door, 27 to indicate

17  an area of blood on the floor in this area, 28 to

18  indicate the doorknob to the closet, and 29 to indicate

19  the blood pattern here on the wall of the closet door.

20      Q.   State's Exhibit 96 looks like a close-up of 29?

21      A.   It is.  It's -- a standing ruler was placed to

22  give an approximate height of that particular

23  bloodstain.

24      Q.   And what is that approximate height?

25      A.   Well, center mass appears to be approximately two

1  feet, if I was to see that properly.  Two feet.

2      Q.  And State's Exhibit 97, what are we looking at?

3      A.  This is the directional blood spatter which was

4  noted on that same closet door.  So, again, we are here

5  behind the front door on this closet door.  Again, we

6  were talking about the basic types of blood patterns

7  that you see routinely.  This pattern does indicate a

8  directionality from -- if we were to look at the

9  photograph, top right to bottom left, as if blood was

10 cast off either an object or possibly a person.

11     Q.  State's Exhibit 98?

12     A.  Here we're looking at the range hood for the

13 stove.  So we are in this area now.  This was a very

14 dark stain.  It did have a lot of similar appearances to

15 apparent blood just based on the way the runoff has

16 pooled here at the bottom.  Due to the fact I could not

17 determine exactly what substance it was, it was

18 collected to be tested at a later date.

19     Q.  State's Exhibit 99?

20     A.  Here we see markers 31 and 32.  Thirty-one placed

21 to demonstrate areas of blood on the fronts of the

22 cabinetry below the microwave.  So we are now

23 currently -- let me double-check that first -- we're now

24 currently in this location here.  Thirty-two was placed

25 on the area of large apparent blood, a pool of which was

STATE v. THOMAS OLIVAS

1  covered by the plastic from the lighting assembly.

2      Q.  State's Exhibit 100?

3      A.  This is -- our photographs are usually taken with

4  measuring devices in them as well to depict size.  It's

5  a good practice, and you'll see several of these.

6      Q.  State's Exhibit 101?

7      A.  This is the blood patterns from evidence marker

8  31 that are on the front of cabinetry under the

9  microwave.

10     Q.  If you could, could you -- because it's kind of

11 getting mixed up with the grain.  Where was the apparent

12 blood spatter?

13     A.  Here.  We have some here.  Here.  And some in

14 this area.

15     Q.  So on State's Exhibit 1, the blood -- the

16 apparent blood spatter appears to be, I guess, dead

17 center of State's Exhibit 101?

18     A.  Yes.  It's going to be framed by the measuring

19 device here.

20     Q.  And I guess you note -- you noted four or five.

21 How many blood splatters did you note just now?

22     A.  There were several.  I was indicating the larger

23 ones that I felt the jury would be able to see from

24 their vantage point.  There are several smaller apparent

25 stains, possible spatter, but the primary areas are

 1    going to be right in here.

 2        Q.   State's Exhibit 102, what are we looking at?

 3        A.   This is a photograph of the bloodstain, a large

 4    bloodstain on the kitchen floor at 32.  We are now in

 5    this area here.  This was the stain which was covered by

 6    the plastic sheeting.  You can see in the coagulation of

 7    the blood itself.  The actual pattern of the grated

 8    plastic has embedded itself into that coagulation.

 9        Q.   State's Exhibit 103?

10        A.   This is another photograph of that same portion

11    of plastic which had fallen from the ceiling and it was

12    lifted up and documented to show the warpage and the

13    apparent blood transfer from the floor onto that side of

14    plastic.

15        Q.   State's Exhibit 104?

16        A.   Evidence marker 34 is being used to indicate a

17    lighter, another disposable lighter, tucked underneath

18    some mail on the kitchen counter in this area here.

19    Again, for clarity, southeast corner of the kitchen.

20        Q.   State's Exhibit 105, what are we looking at?

21        A.   We're now looking at the western side of the

22    kitchen.  We are in the southwestern quadrant of the

23    countertop here.  We are looking at the knife block,

24    that we discussed earlier, as evidence marker 35.  The

25    marker you can see here is not facing us due to space

1  constraint.  Thirty-six is used to indicate the two

2  brown-handled paring knives that we noticed in an

3  earlier photograph.  Thirty-seven is being used to

4  demonstrate the knives that were located inside of the

5  dishwasher itself.

6      Q.   State's Exhibit 106?

7      A.   This is a better photograph to demonstrate the

8  two brown-handled paring knives at evidence marker 36.

9      Q.   So the two knives are directly above the marker?

10     A.   There's one here and one here, slightly to the

11 right in the photograph.

12     Q.   State's Exhibit 107, what are we looking at?

13     A.   We are now on the living room side of the bar at

14 evidence markers 10 and 41.  Forty-one is being used to

15 indicate areas of apparent blood near the baseboard and

16 on the wall in this area.  Evidence marker 10, again,

17 the package of Marlboro cigarettes that were located on

18 the floor in that area.

19     Q.   State's Exhibit 108?

20     A.   These are close-up photographs of the apparent

21 blood that was on that western side of the bar, near the

22 baseboards.

23     Q.   State's Exhibit 109?

24     A.   Additional photograph of the actual blood on the

25 baseboard itself directly underneath what we just looked

1   at.

2      Q.   And 110, is that the same apparent blood drop?

3      A.   It's a -- yes, it's an additional photograph

4   taken without the evidence marker in place.

5      Q.   Now, what are we looking at in State's Exhibit

6   No. 111?

7      A.   This is the exterior at the southwest corner of

8   the unit.  The patio area, running along the west of the

9   apartment where there was a fence that ran along here, a

10  wooded area behind this fence.  At the corner and along

11  the southwest corner there was a build-out which housed

12  the meters to this building.  And this is a photograph

13  to document that property.

14     Q.   Can you tell in State's Exhibit 111, what -- was

15  there some sort of damage done to the fence that seemed

16  to be somehow darkened or blackened?

17     A.   The fence line that ran along the western edge of

18  the patio behind this unit did sustain some fire and/or

19  smoke damage as a result.

20     Q.   And could you tell, did this fence, this portion

21  that we see that's opened, did it appear to be

22  functional?  Was it supposed to be open or did it appear

23  to be broken to you?

24     A.   It did not appear to be broken.  I do not recall

25  whether or not it had a locking mechanism.

1     Q.   And a closer view of that area of the backyard?

2     A.   Correct.  This is just to depict the actual

3   condition of the fence door itself, to show that none of

4   the boards are broken and/or missing in this area.

5     Q.   And, I guess, we can see some of this -- some

6   debris back there in the backyard?

7     A.   Yes.  There was debris both from the upstairs

8   unit above the decedent's apartment, as well as some

9   debris from the spare bedroom of that apartment, which

10  was cast out by Investigator Lea during his

11  investigation.

12    Q.   State's Exhibit 113, what are we looking at?

13    A.   The build-out that we just looked at that housed

14  the electrical meters that run through these conduits

15  here.  Along the bottom of this build-out approximately,

16  probably four feet down on to the ground, there were

17  several items, miscellaneous garbage and trash.  But

18  there was also a screwdriver in this location, flathead

19  screwdriver, which I decided I would note for many

20  different reasons; one, we had the pry marks on the back

21  door, and two, she did have incise, cutting, and/or

22  possibly stab wound injuries.  So...

23    Q.   So when did you collect that screwdriver?

24    A.   That screwdriver was collected during my next

25  shift.  I returned to the property to collect that

1    screwdriver.  When I initially noted it, it was covered

2    in debris.  It looked like it had been there for some

3    time.  I did clear the scene, had gone home.  It was

4    bothering me and so the next shift I returned,

5    redocumented it, noted it was in the same condition and

6    collected it just to be cautious.

7        Q.   Okay.  Investigator Fallentine, I'll give you a

8    break to sit down and ask you some questions before we

9    get to some more photos.

10            Now, after you photographed the various

11   areas of the scene, what did you do after that?

12       A.   After the initial documentation photographically

13   the next step is place the evidence markers and take

14   additional photographs.  That's done for purposes of

15   clarity, especially important in this scene where it's

16   hard to even see what you're really looking at in a lot

17   of the instances.  After placing the markers and

18   redocumenting photographically, we then began taking

19   measurements of these areas and items of evidence on

20   scene.

21       Q.   And when you say "we," are you talking about

22   Investigator Tricksey and yourself?

23       A.   Yes.  She assisted me in collecting those

24   measurements.

25       Q.   Generally speaking, on a scene of this size, is

1    that usually how y'all work, some of you guys will help

2    each other out, someone will be primary and then there'd

3    be secondary?

4        A.   Yes.  On almost all homicides we require two

5    people to respond to a scene.

6        Q.   After taking your measurements, what did y'all

7    do, or what did you do?

8        A.   I then proceeded to collect the items of evidence

9    that we had already determined would be of importance.

10   This was done to preserve the integrity of these items,

11   as we were still operating within the apartment and it

12   was difficult to see.  After collecting those items, I

13   then continued to search for areas that would be

14   conducive to latent print processing, of which there

15   were -- there was only one.

16       Q.   And where was that area?

17       A.   The exterior of the patio door.  It was protected

18   from a bit of soot and though dirty, it was protected

19   from a lot of the water that was sprayed on the interior

20   of the apartment.  And I did process that area.

21       Q.   And, I guess, that goes along with the question

22   of what made the other surfaces unsuitable for latent

23   print search?

24       A.   Fingerprints definitely don't like heat.  They

25   also don't care for water.  Both of which we had an

1   abundance of in this case, not to mention most surfaces

2   were covered with soot, ash and debris which renders

3   them impossible to be printed at the time of our

4   response, and possibly ever.

5       Q.   And if you could, please, tell the jury, what

6   items did you collect from this apartment?

7       A.   Would you like a list of them?

8       Q.   Yes.  Let's walk through what you collected.

9       A.   Would you like item numbers, as well, or just a

10  general description?

11      Q.   A general description.

12      A.   I collected the metal framework that was

13  underneath the infant decedent, Asher.  I collected all

14  doorknobs in the apartment.  I collected any flammable

15  liquids that I located.  There was a small can in the

16  spare bathroom which I was unable to determine exactly

17  what liquid it was.  But it did have writing on the can

18  itself that described it as toxic and as flammable.

19          The two bottles of charcoal lighter fluid

20  from outside the apartment were also collected.  I

21  collected a purse from the master bedroom.  The pack of

22  Marlboro cigarettes that we saw on the floor in the

23  living room, as well as a package of Virginia Slims

24  cigarettes which were on the bar itself.  I collected

25  several knives.  We talked about the butcher-style block

1   with the three knives in it, that was collected, as well

2   as a butcher-style knife that was in factory-sealed

3   packaging that was on top of the bar, and a long square

4   Tonto-type bladed knife, which was also sitting side by

5   side with the packaged butcher knife on the bar itself.

6              I selected the miscellaneous paperwork from

7   the desk, the court paperwork.  The electronic devises,

8   I collected two cellular phones from inside the

9   apartment, the laptop computer that we saw, that was

10  melted.  And an unknown electronic device from the

11  fireplace mantel.  To this day I still don't exactly

12  know what it is, but Detective Stewart had requested all

13  electronic devices from the apartment that might have

14  some evidentiary value.

15  Q.  Investigator Fallentine, the cell phones that you

16  collected, did they have any sort of identification in

17  terms of what carrier those phones belonged to?

18  A.  Yes.  There was a Verizon LG brand cellular

19  phone.  That was the one that we saw at evidence marker

20  20, which was underneath the end table in the living

21  room area.  And then there was another Verizon LG brand

22  cellular phone which was inside of a dresser drawer

23  inside the master bedroom, the top dresser drawer.

24  Q.  And I interrupted you.  What else did you

25  collect?

1    A.   I collected the Bud Light beer can that we saw

2    underneath the end table; the woman's shirt on the side

3    of the love seat; the two sets of keys that we saw near

4    the front door; the dishtowel that we saw in front of

5    the patio door; a dollar bill that was partially singed

6    and burnt, which was located on the kitchen floor; a

7    library card, which I located on the ground along the

8    south side of the building.  It was quite a bit farther

9    past the area of debris that we saw outside the patio.

10   And there wasn't a real good explanation for why it

11   would have made it that far, in my opinion.

12        The sock, which was outside the front door;

13   eight knives from a plastic utensil tray that were in a

14   top drawer north of the refrigerator; a roll of duct

15   tape with an unknown red stain on it, which was on the

16   floor in front of the end table, near the Bud Light beer

17   can and a cellular phone; two cameras; control swabs

18   because of the apparent blood that was also collected;

19   and some miscellaneous papers that are located in the

20   bedroom closet, as well.

21   Q.   Now, when you -- how do you collect samples of

22   apparent blood?

23   A.   Apparent blood is collected using distilled water

24   and sterile cotton-tip applicators, Q-Tips, if you will.

25   They are then placed into breathable boxes and paper

1    bags to promote drying and prevent mold.

2       Q.   Now did you -- since you were also helping to

3    collect evidence for an arson investigation, did you

4    have to package certain items in different ways than you

5    normally would?

6       A.   Yes.  There are a lot of considerations in a case

7    like this.  We had evidence that was both wet, possibly

8    covered in accelerant and bloody.  Generally speaking,

9    when you collect bloody evidence, you want to dry that

10   evidence to prevent any mold formation, which will

11   degrade the DNA.  However, drying items that have

12   possible accelerant on them will dissipate those fumes

13   and make it difficult for fire investigators to

14   determine whether or not accelerant was used.  There was

15   a lot of discussion between Investigator Lea, Detective

16   Stewart and myself, as well as Tarrant County Medical

17   Examiner's Office, which is the lab that we use, to

18   determine what the best course of action with that

19   packaging was.

20      Q.   And it sounds like you used sort of a hybrid of

21   the traditional crime scene method versus the method

22   that's best for preserving evidence in an arson

23   investigation?

24      A.   Correct.  Generally speaking, arson evidence will

25   be packaged in paint cans, clean paint cans.  They are

1   great at sealing in fumes.  If anybody's ever painted,

2   you know they're great at sealing in fumes once you

3   close them up.  But sealing something that is bloody or

4   wet in a paint can is a very dangerous thing to do

5   because it's dark and it's airtight and you will degrade

6   your DNA very quickly.  That's why we don't package

7   things in plastic, normally.

8        Q.   After you collected these various items from the

9   scene, what did you do next?

10       A.   The next step was to do an additional search and

11   to collect the doorknobs from the actual doors.  I did

12   require assistance with this, especially with the front

13   door, which is a metal frame door.  The fire department

14   did come out with their sawzall and assisted me in

15   removing the doorknobs, but they were then collected, as

16   well as searching the ground around the apartment for

17   any additional evidence which might be of note.  That

18   included Dumpsters in the area and the wooded area

19   behind the apartment.

20       Q.   What did you do after that?

21       A.   After that -- during the time that I was doing

22   these things, Detective Stewart had had the Honda

23   belonging to Mechelle Gandy towed from the scene to be

24   secured in the seizure lot.  So as I was intending to go

25   process that at the scene, I did not have any need to do

1    that at the end.  And so we then cleared the scene at

2    approximately 1:45 in the afternoon.

3        Q.   And I believe you testified earlier that you got

4    there at 11:42?

5        A.   The evening before, yes.

6        Q.   So right at 14 hours?

7        A.   Yes.

8        Q.   Is that usual for you?

9        A.   In a scene like this, yes.

10       Q.   Did you do anything else involving the

11   investigation of the scene?

12       A.   The scene, no.  The vehicle, I was involved with

13   processing that at a later time.

14       Q.   Once you physically leave the scene, for example

15   when you physically left this scene, did that

16   necessarily stop your role and your job in terms of

17   preservation and documenting evidence?

18       A.   No.  Once we get back to the lab, our job is

19   really only just halfway done, at best.  The second

20   portion of my job is to document every item I collect in

21   the lab under strict conditions, lighting conditions.

22   It's much easier to document any nuances, as opposed to

23   being in a scene especially one like this where it's

24   dark and lighting conditions are very challenging.

25              So all of the evidence that was collected

1   was, again, redocumented in the lab and items that were

2   conducive to latent print processing were then

3   processed.

4       Q.  And were there any items that met that criteria,

5   that were conducive?

6       A.  There were.  Would you like a list of them?

7       Q.  Yes, ma'am.

8       A.  I should state that before processing for latent

9   prints, I did take some swabs, using the same method as

10   discussed before, for potential serological or DNA

11   evidence from the flint wheels of the lighters, the

12   ridged grip caps of charcoal lighter fluid and an

13   unknown red stain which I noted on the wooden knife

14   block from the bar area.

15          After taking those samples, I then proceeded

16   with the processing.  I processed the charcoal lighter

17   fluid bottles, all of the disposable lighters that I

18   collected, the beer can.  I was able to collect ten

19   latent print cards from both of the charcoal lighter

20   bottles.

21       Q.  And at the time -- once you collect latent

22   fingerprints -- and back then, were you a certified

23   fingerprint examiner?

24       A.  I was not doing any independent latent print

25   casework.  I was in training at that time.

1    Q.   So any latent print examination in this case

2   would have fallen to a different agency?

3    A.   We do it in-house.  I was in training with three

4   of our latent print examiners in our unit.  They -- it

5   would have been handled by my unit, just not by me

6   personally.

7    Q.   You stated earlier that at some point you were --

8   at some later day you were called out to process

9   Mechelle's Honda?

10   A.   Correct.

11   Q.   When was that?

12   A.   That was on April 6th of 2011, at half past

13  midnight.  Detective Stewart had requested that I

14  respond to the seizure lot, which is located at our main

15  police station, at 620 West Division Street, to document

16  and process her Honda.

17   Q.   And if you could, walk us through what you did in

18  the processing of the Honda.

19   A.   Photographs are first taken to depict the

20  condition of the vehicle in the seizure lot.  The goal

21  of this is to notate any difference between its current

22  condition and the condition of it on scene on the date

23  that we responded, on the 20th of March.  The vehicle is

24  then documented, the interior is documented and searched

25  for any items that seem to have potential evidentiary

```
 1   value in the case.
 2       Q.  And is that what you did?
 3       A.  Yes.
 4       Q.  Did you -- what specifically did you collect from
 5   the Honda?
 6       A.  I collected a box cutter from the passenger door,
 7   some partially smoked cigarettes and empty box of
 8   Marlboro cigarettes, another purse, a female's purse
 9   with miscellaneous contents, paperwork and receipts,
10   some currency from inside that purse, $5.46, and some
11   additional clothing, a gray colored zip-up jacket, black
12   colored short-sleeved shirt and gray colored knit cap.
13       Q.  Did you any -- do any other sort of processing of
14   the vehicle?
15       A.  Did I process the vehicle for presence of latent
16   print evidence, as it wasn't known whether the vehicle
17   was involved in the incident at all.  I did collect one
18   latent print from the interior of the driver's window.
19       Q.  Anything else that you did involving the
20   processing of that -- the vehicle or items taken from
21   the vehicle?
22       A.  No.
23               MS. RAY:  May I approach the witness, Your
24   Honor.
25               THE COURT:  Yes, you may.
```

Case 4:22-cv-00385-O   Document 16-8   Filed 08/16/22   Page 136 of 176   PageID 1012

1       Q.   (BY MS. RAY)   Investigator Fallentine, I am

2    showing you what has been marked as State's Exhibit 114,

3    115, 116, and 117.   Could you take a look at those?

4              Are you familiar with what's depicted in

5    State's Exhibits 114 through 117, inclusive?

6       A.   Yes.

7       Q.   And the -- State's Exhibit 114 through 117,

8    inclusive, does it appear to be photographs that you

9    took during your processing of the Honda Civic?

10      A.   Yes.

11      Q.   And do they fairly and accurately depict the

12   condition or observations that you made of the Honda?

13      A.   Yes, they do.

14             MS. RAY:   Your Honor, I offer State's

15   Exhibit 114 through 117, inclusive, after tendering to

16   Defense Counsel for objection.

17             THE COURT:   Fourteen through what?

18             MS. RAY:   Seventeen.

19             THE COURT:   Seventeen.

20             MS. KEENE:   I have no objection, Judge.

21             THE COURT:   All right.   State's 114 and 115,

22   116 and 117, each admitted.

23             (State's Exhibit No. 114 - 117 admitted)

24             MS. RAY:   And, Your Honor, permission to

25   publish State's Exhibit No. 114, 115, 116, and 117 via

1    the PowerPoint presentation?

2             THE COURT:  That will be fine.

3    Q.  (BY MS. RAY)  State's Exhibit 114, what are we

4    looking at?

5    A.  This is the white Honda belonging to Mechelle

6    Gandy and its location in the seizure lot at the main

7    police station.

8    Q.  Now are there -- what precautions, if any, are

9    taken to, I guess, maintain the integrity of the

10   evidence?

11   A.  Seals are supposed to be placed on the doors, the

12   hood and the trunk of all vehicles before they are

13   towed.  But as I was not notified it was being towed,

14   those seals were not placed.

15   Q.  So they towed it, towed the vehicle without

16   talking to you first?

17   A.  Correct.

18   Q.  Not the way you like things done?

19   A.  No, ma'am.

20   Q.  State's Exhibit 115, what are we looking at?

21   A.  This is a photograph that was tucked into the

22   dashboard of the vehicle of the infant child, Asher.

23   Q.  State's Exhibit 116, what are we looking at?

24   A.  These are some of the items noted in the vehicle.

25   This is going to be in the rear of the car on the driver

1    and passenger side floorboard areas.  This is the center

2    console here.

3        Q.   And State's Exhibit 117, what are we looking at?

4        A.   This is a Best Buy receipt from the interior of

5    the vehicle.  Appears to be dated March 15th, 2011.

6        Q.   And can you see where that Best Buy is located?

7        A.   It says Number 148, Grapevine, Texas 76051,

8    possibly.

9        Q.   Now, were there any items in the Honda that you

10   noted or observed that you did not collect?

11       A.   There was some green leafy material similar in

12   consistency to marijuana, which I did locate in the

13   glove box of the car.

14       Q.   And did you collect it?

15       A.   No.  As a matter of Arlington Police Department

16   policy, only uniformed sworn officers are to collect any

17   type of drugs, and I am a civilian.

18              MS. RAY:  Your Honor, may I approach?

19              THE COURT:  Yes.

20              (Discussion at the bench, off the record)

21              THE COURT:  Members of the jury, you get a

22   stretch break while we reset the stage for the next act,

23   if you will.  I'm trying not to use sports analogies all

24   the time.

25              All right.  Everyone else, we'll have at

1    least a five- to eight-minute recess, minimum.

2                (Break taken, 3:10 - 4:15 p.m.)

3                (OPEN COURT, DEFENDANT AND JURY PRESENT)

4                (Witness on the stand)

5                THE COURT:  On the record.

6                State, still your witness.

7                MS. RAY:  Thank you, Your Honor.

8        Q.   (BY MS. RAY)  Okay.  Investigator Fallentine, I'm

9    showing you what has been marked as State's Exhibit

10   166-B, 166-A and 166.  Are you familiar with what

11   State's Exhibit No. 166, 166-A and 166-B are?

12       A.   Yes.

13       Q.   And what are they?

14       A.   May I see the packaging?

15       Q.   Absolutely.

16       A.   Okay.  It is a swab sample from the lip of the

17   beer can collected from the living room floor, so the

18   Bud Light beer can collected from the floor in the

19   living room.

20       Q.   And you recognize that because of your markings

21   on 166-B?

22       A.   Correct.  It's my label, my initial and my seal

23   on the back.

24       Q.   And on 166-B do there appear to be markings from

25   other individuals?

1    A.   Yes.   There is a Tarrant County Medical

2    Examiner's seal at the bottom of the bag.

3    Q.   And on State's Exhibit No. 166-A, if you can also

4    look at that, does it also have your markings and

5    markings of any other individuals?

6    A.   Yes.   It has my initial, seals and the seals of

7    TCME.

8    Q.   Other than the markings from other people

9    indicating subsequent testing, does State's Exhibit

10   No. 166, 166-A and 166-B appear to be in substantially

11   the same condition they were when you collected them on

12   March 20th, 2011?

13   A.   Yes, except this was collected the 27th of March.

14   It's the swab from the beer can.   The beer can itself

15   was collected on the 20th.

16        MS. RAY:   Your Honor, I offer State's

17   Exhibit No. 166 for all the purposes, 166-A and 166-B

18   for the record only, after tendering to Defense Counsel.

19        MS. KEENE:   All right.   Can I take the

20   witness on voir dire real quick, Judge?

21        THE COURT:   Yes.

22            VOIR DIRE EXAMINATION

23   BY MS. KEENE:

24   Q.   All right.   On 166 there's a number of different

25   initials in the back.   Are one of those your initials?

1    A.   Yes, ma'am, at the top, my "SFR-2562".

2    Q.   So any time we're going to see in the

3    next whatever number, "SFR", that's you?

4    A.   That is me.

5    Q.   So it's -- because it's the "Reeves"?

6    A.   Correct.

7    Q.   Okay.  And then any other initials would be the

8    lab's, I presume?

9    A.   Correct.

10             MS. KEENE:  Okay.  Judge, I don't have any

11   objection to any of the evidence that's tendered, 166-B

12   and A for purposes of the record and 166 for all

13   purposes.

14             THE COURT:  All right.  The item marked 166

15   is admitted for all purposes and 166-A and 166-B are

16   admitted for the record only.

17             (State's Exhibit No. 166, 166-A, 166-B

18              admitted)

19             <u>DIRECT EXAMINATION CONTINUES</u>

20   BY MS. RAY:

21   Q.   Investigator, I'm now showing you what has been

22   marked as State's Exhibit 167, 167-A and 167-B?

23   A.   Okay.

24   Q.   Have you seen these items before?

25   A.   Yes, I have.

1      Q.   And where did you see these items?

2      A.   This is a swab sample from the flint wheel of the

3  lighter collected from the patio table outside.  This

4  was also collected on the 27th in the lab.

5      Q.   And how do you recognize that these are the same

6  items that you collected and then swabbed?

7      A.   The outer packaging has my label, my initials, my

8  original seal.  The box labeled 167-A has my seal and

9  initials.  And the item itself has my initials, the case

10  number, date, and time collected.

11      Q.   Do you also see on State's Exhibit No. 167-B,

12  167-A and 167 other people's initials or markings?

13      A.   I do.

14      Q.   Other than those additional markings, are State's

15  Exhibit No. 167, 167-A and 167-B in the same condition

16  they were when you collected them on March 26th?

17      A.   27th.

18      Q.   27th.

19      A.   Yes, they are.

20           MS. RAY:  Your Honor, I offer State's

21  Exhibit No. 166 -- I'm sorry -- 167, 167-A and 167-B;

22  167 for all purposes, 167-A and 167-B for record

23  purposes only.

24           MS. KEENE:  Judge, do you want me to look at

25  them and give them to you, as I have no objections?

1          THE COURT:  No, I'll -- no, as long as I can

2     see what you're talking about.  If I can't, I'll walk

3     over and look.

4               (Pause in proceedings)

5               MS. KEENE:  I have no objection to A and B

6     for purposes of the record and for 167 for all purposes.

7               THE COURT:  So it's 167-A, 167-B and 167.

8     167-A and B are admitted for the record and 167 admitted

9     for all purposes.

10              (State's Exhibit No. 167, 167-A, 167-B

11               admitted)

12              THE COURT:  Off the record.

13              (Discussion off the record)

14     Q.   (BY MS. RAY)  Investigator, I'm now showing you

15     what's been marked as State's Exhibit 168, 168-A and

16     168-B.  If you can, take a look at those.

17     A.   Okay.

18     Q.   And what are State's Exhibit 168-A, 168-B and

19     168?

20     A.   These are packaging and the items swab sample

21     collected from the ridged top of the charcoal fluid

22     bottle, item SFR-40.  This was the one inside the

23     charcoal bag outside Presidents Corner.  Collected again

24     in the lab on the 27th of March.

25     Q.   And do you recognize your markings on those?

 1     A.  I do.

 2     Q.  And in addition to your markings, do you see

 3  markings from other individuals?

 4     A.  I do.

 5     Q.  Other than those markings, are State's Exhibit

 6  No. 168, 168-A and 168-B in the same condition they were

 7  when you collected them on March 27th, 2011?

 8     A.  Yes, they are.

 9          MS. RAY:  Your Honor, I offer State's

10  Exhibit No. 168, 168-A and 168-B, after tendering to

11  Defense Counsel.

12          MS. KEENE:  May I take the witness on voir

13  dire, Judge?

14          THE COURT:  Yes.

15               VOIR DIRE EXAMINATION

16  BY MS. KEENE:

17     Q.  On 168 it has actually a rip in it.  Do you know

18  that -- how that rip or when that rip would have been

19  made?

20     A.  That rip was made when we moved the sterile tip

21  applicators from the packaging.  I then swab whatever

22  sample it is I'm swabbing and stick them back into the

23  paper for protection, for cotton tips.

24     Q.  And then you put it into the box so that it's

25  secured?

1    A.  Correct.  I don't want any breakage or anything.
2    If it didn't have the supported box inside the bag, it
3    could snap.
4    Q.  So all the other ones had that, I just didn't
5    notice it?
6    A.  Correct.
7    Q.  Okay.
8         MS. KEENE:  Judge, I have no objection to
9    168 for all purposes and A and B for purposes of the
10   record.
11        THE COURT:  All right.  State's 168-A, 168-B
12   admitted for the record and State's 168 admitted for all
13   purposes.
14        (State's Exhibit No. 168, 168-A, 168-B
15         admitted)
16        THE WITNESS:  If I may, as an aside, when
17   the lab does the testing, they also may break through
18   the paper to remove those applicators from that
19   packaging.  If you'll notice the edge on that had a red
20   piece of tape and a seal with my initials.  That would
21   have been my initial tearing into that packaging and
22   resealing.  That rip that we looked at there was made by
23   whoever tested that item.
24        MS. KEENE:  Okay.  Then, Judge, I do -- I
25   would object to that until someone explains the rip

1    and what it is.  So it can be contingent on tying it up

2    to whoever would have caused that hole or that rip in

3    that swab.

4              MS. RAY:  Your Honor --

5              MS. KEENE:  If that makes sense.

6              THE COURT:  I hear what you're saying.

7              So, for the record, you're talking about

8    where the tear -- where it looks like the stem has poked

9    a hole in the outside of the paper on 168; is that

10   the --

11             MS. KEENE:  Yes, sir.

12             THE COURT:  -- is what we're talking about?

13             MS. KEENE:  Yes.

14             THE COURT:  Is that what you were talking

15   about?

16             MS. KEENE:  Yes.

17             THE WITNESS:  Correct, Judge.  This is where

18   I opened it and I resealed it after I had inserted it

19   back into the paper.  This is most likely going to be

20   how they removed it at the lab for testing purposes, but

21   until you have someone to testify to that, I do not

22   recognize the rip.

23             THE COURT:  When put your seal on it, there

24   was no hole in it?

25             THE WITNESS:  Correct.

```
1              THE COURT:  All right.  I see what you're
2    saying.
3              All right.  What's your legal objection?
4              MS. KEENE:  Chain of custody, Judge, that at
5    this point the proper chain of custody -- this evidence
6    is not in the same condition as she submitted it.
7              THE COURT:  Do you have a witness you expect
8    to testify about that exhibit?
9              MS. RAY:  Yes, Your Honor.
10             THE COURT:  All right.  Then I will admit it
11   under 104.  I'll conditionally admit it, subject to an
12   explanation of the tear or if it does or does not affect
13   the chain of custody --
14             MS. KEENE:  Thank you, Judge.
15             THE COURT:  -- based upon what the
16   subsequent witness says.
17             (State's Exhibit No. 168, 168-A, 168-B
18              admitted)
19                  DIRECT EXAMINATION CONTINUES
20   BY MS. RAY:
21     Q.  And, Investigator Fallentine, I'm showing you
22   what's been marked as State's Exhibit No. 169, 169-A and
23   169-B.  If you'd take a look at those items.
24             And are you familiar with those items?
25     A.  Yes, I am.
```

Case 4:22-cv-00385-O   Document 16-8   Filed 08/16/22   Page 148 of 176   PageID 1024

1   Q.   How are you familiar with those items?

2   A.   This is an apparent blood swab sample taken from

3   the wall and baseboard near the western corner of the

4   front door, evidence marker 24, taken on the 21st at the

5   scene.

6   Q.   And do you recognize your markings on State's

7   Exhibit No. 169, 169-A and 169-B?

8   A.   Yes.

9   Q.   Other -- do you notice markings from other

10  individuals?

11  A.   Yes.

12  Q.   Other than those markings from other individuals,

13  do State's Exhibits 169, 169-A and 169-B appear to be in

14  the same condition they were when you collected them on

15  March 27th, 2011?

16  A.   March 21st.  And, yes, they do.

17  Q.   I'm not going to get this right.

18       They do seem to be in the same condition?

19  A.   Yes, ma'am.

20       MS. RAY:  Your Honor, I offer State's

21  Exhibit No. 169, 169-A -- I'm sorry -- 169 for all

22  purposes, 169-A for the record and 169-B for the record.

23       MS. KEENE:  No objection to 169-B and A for

24  purposes of the record and 169 for purposes, Judge.

25       THE COURT:  All right.  State's 169-A,

1    169-B, admitted for the record only; 169, admitted for

2    all purposes.

3              (State's Exhibit No. 169, 169-A, 169-B

4               admitted)

5    Q.  (BY MS. RAY)  I'm now showing you what has been

6    marked as State's Exhibit 170, and State's Exhibit 170-A

7    and State's Exhibit 170-B.  Would you take a look at

8    these items?

9    A.  Okay.

10   Q.  And are you familiar with those items?

11   A.  Yes, I am.

12   Q.  And how is it you're familiar with them?

13   A.  These are swab samples from the flint wheel of

14   the lighter collected from the living room floor.  Item

15   SFR-16.  These swabs were collected in the lab on the

16   27th of March.

17   Q.  And do you recognize your markings?

18   A.  I do.

19   Q.  And do you see markings of other individuals?

20   A.  Yes, I do.

21   Q.  Other than the markings of other individuals,

22   does State's Exhibit No. 170, 170-A and 170-B appear to

23   be in the same condition they were when you collected

24   them on March 27, 2011?

25   A.  Yes, they do.

 1              MS. RAY:  Your Honor, I offer State's
 2   Exhibit No. 170 for all purposes, 170-A and 170-B for
 3   purposes of the record.
 4              MS. KEENE:  I have no objection to State's
 5   Exhibit 170 for all purposes and I have no objection to
 6   170-A and B for purposes of the record.
 7              THE COURT:  All right.  State's 170-A,
 8   170-B, admitted for the record; State's 170, admitted
 9   for all purposes.
10              (State's Exhibit No. 170, 170-A, 170-B
11                admitted)
12   Q.  (BY MS. RAY)  Now showing you what has been
13   marked as State's Exhibit No. 171, 171-A, and 171-B.  If
14   you could, take a look at those items.
15              And what are items 171, 171-A and 171-B?
16   A.  Packaging and the two sets of control swabs that
17   I collected on scene, March 21st, 2011.
18   Q.  And what are control swabs?
19   A.  Control swabs are used to -- by the lab to
20   determine whether or not there's any contamination on
21   the items I'm using to collect the evidence.  So what I
22   will do is leave one set unopened in its factory seal
23   and go ahead and add distilled water to the other set,
24   but not swab any evidence with it, just leave it in its
25   pristine condition for the lab to make sure there's no

Case 4:22-cv-00385-O   Document 16-8   Filed 08/16/22   Page 151 of 176   PageID 1027

1   contamination.

2       Q.   And do you recognize your markings on State's

3   Exhibit 171, 171-A and 171-B?

4       A.   Yes.

5       Q.   And does State's Exhibit 171, 171-A and 171-B

6   appear to be in the same condition they were when you

7   packaged them?

8       A.   Yes.

9            MS. RAY:  Your Honor, I offer 171, 170 --

10  I'm sorry -- 171 for all purposes and 171-A and 171-B

11  for purposes of the record only.

12           MS. KEENE:  I have no objection to 171-A for

13  purposes of the record, 171-B for purposes of the record

14  and 171 for all purposes.

15           THE COURT:  All right.  State's 171-A and

16  171-B are admitted for the record.  State's 171 is

17  admitted for all purposes.

18           (State's Exhibit No. 171, 171-A, 171-B

19            admitted)

20      Q.   (BY MS. RAY)  I'm now showing you what has been

21  marked as State's Exhibit 172, 172-A and 172-B.  If you

22  can take a look at these items?

23           And what is State's Exhibit No. 172, 172-A

24  and 172-B?

25      A.   Packaging and swabs of the unknown red stain from

1    the bottom front edge of the knife block, which was

2    SFR-36.  This item was collected March 26th, 2011, in

3    the lab.

4        Q.  And do you recognize your markings?

5        A.  I do.

6        Q.  And do you see markings of other people?

7        A.  I do.

8        Q.  Other than the markings of other people, are

9    State's Exhibit No. 172, 172-A and 172-B in the same

10   condition they were when you packaged them?

11       A.  Yes, they are.

12            MS. RAY:  Your Honor, I offer State's

13   Exhibit 172 for all purposes and State's Exhibit

14   No. 172-A and 172-B for the record only.

15            MS. KEENE:  I have no objection to 172-A or

16   B for purposes of the record and no objection to 172 for

17   all purposes.

18            THE COURT:  State's 172-A, 172-B, admitted

19   for the record; State's 172, admitted for all purposes.

20            (State's Exhibit No. 172, 172-A, 172-B

21             admitted)

22       Q.  (BY MS. RAY)  I'm now showing you what's been

23   marked as State's Exhibit No. 173, 173-A and 173-B.  If

24   you would take a look at these items?

25       A.  Okay.

Case 4:22-cv-00385-O   Document 16-8   Filed 08/16/22   Page 153 of 176   PageID 1029

1    Q.   And what are State's Exhibits 173, 173-A and

2    173-B?

3    A.   Packaging, as well as apparent blood swabs from

4    evidence marker 27, which would be the floor just inside

5    the entryway to the apartment, south of the front door,

6    collected March 21st, 2011, on scene.

7    Q.   And do you recognize your markings on those

8    exhibits?

9    A.   I do.

10   Q.   Do you recognize -- or see markings from other

11   people?

12   A.   I do.

13   Q.   Other than the markings from other people, do

14   you -- are State's Exhibits 173, 173-A and 173-B in the

15   same condition they were when you packaged them?

16   A.   Other than the box being torn, exterior box,

17   otherwise, yes.

18            MS. RAY:  Your Honor, I would offer State's

19   Exhibits 173 for all purposes and 173-A and 173-B for

20   the purposes of the record.

21            MS. KEENE:  Judge, may I take the witness on

22   voir dire briefly?

23            THE COURT:  Yes.

24                  <u>VOIR DIRE EXAMINATION</u>

25   BY MS. KEENE:

1    Q.   You said other than the box being torn.  And we

2    can see in 173-A that the corner of the box is

3    compromised.

4    A.   Yes.  That does sometime happen when people are

5    opening it after it's been initially sealed.

6    Q.   Would you have placed 173 in a box that was

7    compromised such as this?

8    A.   No.  If I had used that box, I would have taped

9    that broken corner and initialed it.

10    Q.   Okay.  So as far as whenever you put 173 into

11    173-A, it was a box that was not broken?

12    A.   Correct.

13    Q.   And it was broken after you basically sealed this

14    box?

15    A.   Correct.

16         MS. KEENE:  And, Judge, really, I have --

17    let me look at -- hang on.  I have no objection to this

18    as long as they tie up any idea of who or when the boxes

19    could have been compromised, as far as for chain of

20    custody purposes, without a seal.

21         (Discussion off the record)

22         THE COURT:  I will -- so you'd like it

23    conditionally admitted until the witness who opened it

24    testifies; is that what you're asking?

25         MS. KEENE:  I wonder if someone from the lab

 1   could give us an idea how that could have been broken.

 2                   THE COURT:  I mean, if you have an objection

 3   pending that explanation, I will only conditionally

 4   admit it under Rule 104, pending an explanation of the

 5   box.

 6                   MS. KEENE:  Okay.  We'll see.  And after --

 7                   THE COURT:  And that's one, that's a

 8   conditionally admit, 173 and 173-A and B are admitted

 9   for the record only.  You have no objection to that?

10                   MS. KEENE:  No objection at all.

11                   MS. RAY:  Wait, just so I understand,

12   State's 173 does not have a rip, so that is being --

13                   THE COURT:  I'm conditionally admitting 173

14   pending it being connected, what happens next under Rule

15   104, but I'm admitting the packaging containers for the

16   record only.

17                   MS. KEENE:  Thank you, Judge.

18                   (State's Exhibit No. 173, 173-A, 173-B

19                    admitted)

20                   <u>DIRECT EXAMINATION CONTINUES</u>

21   BY MS. RAY:

22     Q.  I'm now showing you what has been marked as

23   State's Exhibit 174, 174-A and 174-B.  If you could,

24   take a look at those items.

25                   And what are State's Exhibits 174, 174-A and

1  174-B?

2     A.  Packaging and apparent blood swabs taken from the

3  wall opposite the front door at evidence marker 25, on

4  March 21st, 2011.

5     Q.  And do you recognize your markings on these

6  exhibits?

7     A.  I do.

8     Q.  And then do you notice markings from other

9  individuals?

10    A.  Yes, I do.

11    Q.  Other than the markings from other individuals,

12 are State's Exhibit 174, 174-A and 174-B in the same

13 condition they were when you packaged them?

14    A.  Yes, they are.

15          MS. RAY:  Your Honor, I offer State's

16 Exhibit 174 for all purposes, 174-A and 174-B for

17 purposes of the record only.

18          MS. KEENE:  Can I take the witness on voir

19 dire, Judge?

20          THE COURT:  Yes, you may.

21                VOIR DIRE EXAMINATION

22 BY MS. KEENE:

23    Q.  All right.  In 174 itself it appears to be open

24 on the side, the packaging on the side?

25    A.  Yes.

1    Q.   Is that the condition that would you have put it

2    in?

3    A.   Yes.  Because when I open these, they are

4    slightly open on one edge.  So you peel the paper back,

5    remove the swabs, use them, stick them back in, seal

6    that flap.

7    Q.   Okay.  What about that -- it doesn't matter about

8    the side being open like that?

9    A.   It does not because the box is also sealed, the

10   tape and my initials.  The bag is also sealed and taped

11   and my initials and that means --

12   Q.   So you have no concern about this being

13   compromised at all?

14   A.   I do not, no.

15   Q.   State's Exhibit 174.

16          MS. KEENE:   Then I have no objection, Judge.

17          THE COURT:   All right.  To any of them --

18          MS. KEENE:   As offered.

19          THE COURT:   -- as offered?

20          MS. KEENE:   Exactly, as offered.

21          THE COURT:   All right.  State's 174-A,

22   174-B, admitted for the record; 174, admitted for all

23   purposes.

24          (State's Exhibit No. 174, 174-A, 174-B

25           admitted)

1    <u>DIRECT EXAMINATION CONTINUES</u>

2  BY MS. RAY:

3    Q.  I am now showing you what has been marked as

4  State's Exhibit 175, 175-A and 175-B.  Take a look at

5  these items?

6             And what are State's Exhibits 175, 175-A and

7  175-B?

8    A.  Packaging and apparent blood swabs from evidence

9  marker number 30, which was the top of the cabinet door

10  and range hood part of the oven in the kitchen area,

11  collected March 21st, 2011.

12   Q.  And do you recognize your markings?

13   A.  I do.

14   Q.  Do you see markings from other people?

15   A.  I do.

16   Q.  Other than the markings from other people, do

17  State's Exhibit 175, 175-A and 175-B appear to be in the

18  same condition they were when you packaged them?

19   A.  Yes, they do.

20             MS. RAY:  Your Honor, I offer State's

21  Exhibit 175 for all purposes and 175-A and 175-B for

22  purposes of the record only.

23             MS. KEENE:  I have no objection, Judge,

24  to -- as offered.

25             THE COURT:  All right.  Exhibits 175-A,

```
 1   175-B, admitted for record; 175, State's exhibits,

 2   admitted for all purposes.

 3              (State's Exhibit No. 175, 175-A, 175-B

 4               admitted)

 5   Q.  (BY MS. RAY)  I'm now showing you what's been

 6   marked as State's Exhibit 176, 176-A and 176-B.  Can you

 7   take a look at those items?

 8              What are State's Exhibits 176, 176-A and

 9   176-B?

10   A.  Packaging and swab sample, flint wheel of the

11   lighter, collected from the kitchen counter, item

12   SFR-35.  These were collected in the lab on March 27th.

13   Q.  And do you recognize your markings?

14   A.  I do.

15   Q.  And do you see markings from other individuals?

16   A.  I do.

17   Q.  Other than the markings from other individuals,

18   are State's Exhibits 176, 176-A and 176-B in the same

19   condition they were when you packaged them?

20   A.  Again, we have an issue with the box, but yes.

21   Q.  The box, 176-A?

22   A.  Yes.

23   Q.  But other than that, same condition?

24   A.  Yes.

25              MS. RAY:  Your Honor, I offer State's
```

 1  Exhibit No. 176 for all purposes, 176-A and 176-B for

 2  purposes of the record.

 3               <u>VOIR DIRE EXAMINATION</u>

 4  BY MS. KEENE:

 5     Q.   And as far as for the same box, we're just

 6  talking about the -- where the box compromise is?

 7     A.   Yes.

 8     Q.   And would you not have -- you would have solved

 9  the compromise if you had done this, if you would have

10  made it?

11     A.   Correct.  It has happened to me before.  I can

12  show you how it happened, if you would like.  We can...

13     Q.   Right.  So it's not uncommon for these boxes to

14  do that when you open them up and shut them?

15     A.   Mostly when you shut them.  If you place the one

16  on top flat, it prohibits that from happening.  If you

17  come in at an angle, you're forcing that one side out.

18  And when you force it out, it will split on the seam.

19     Q.   But -- okay.  But as far as whenever you sealed

20  this, it was not that way?

21     A.   Correct.

22               MS. KEENE:  Judge, then I have the same --

23  I don't have an objection as long as it is tied up.  So

24  it will be a conditional admission of 176, no objection

25  to 176-A and B.

1            THE COURT:  All right.  Exhibits 176 is

2   conditionally admitted under Rule 104 and 176-A and B

3   are admitted for all purposes, all State's exhibits -- I

4   mean -- for the record only.

5            (State's Exhibit No. 176, 176-A, 176-B

6             admitted)

7            THE COURT:  "All purposes" and "for the

8   record only," members of the jury, this sounds like

9   lawyer talk.  For the record means it's for storage.

10  For all purposes means for the jury to consider as they

11  see fit in connection with all the other evidence.  So

12  that's not some magic language.  The law requires some

13  things to be stored and some things for the jury's use,

14  so don't get hung up with all that, especially having

15  heard it so many times.

16           Does everyone understand?

17           SEVERAL JURY MEMBERS:  Yes.

18           THE COURT:  All right.  You may continue.

19           <u>DIRECT EXAMINATION CONTINUES</u>

20  BY MS. RAY:

21     Q.  Investigator Fallentine, I'm now showing you

22  what's been marked as State's Exhibit 177, 177-A and

23  177-B.  What are State's Exhibits 177, 177-A and 177-B?

24     A.  Packaging and apparent blood swabs taken from

25  evidence marker 32, which was the large pool of the

1   blood on the kitchen floor, taken March 21st, 2011.

2       Q.   And do you recognize your markings?

3       A.   Yes, I do.

4       Q.   Do you see markings belonging to other

5   individuals?

6       A.   Yes, I do.

7       Q.   Other than the markings made by other people, are

8   State's Exhibits 177, 177-A and 177-B in the same

9   condition they were when you packaged them?

10      A.   Yes, they are.

11           MS. RAY:   Your Honor, I offer State's

12  Exhibit 177 for all purposes and 177-A and 177-B for the

13  record only.

14           MS. KEENE:   No objection as offered, Judge.

15           THE COURT:   Exhibits 177-A, 177-B, State's

16  exhibits, admitted for the record; State's 177, admitted

17  for all purposes.

18           (State's Exhibit No. 177, 177-A, 177-B

19            admitted)

20      Q.   (BY MS. RAY)   I'm now showing you what's been

21  marked as State's Exhibit 178, 178-A and 178-B.   What

22  are State's Exhibits 178, 178-A and 178-B?

23      A.   Packaging and apparent blood swabs from the

24  northeast side of the bar, the wall and the baseboard,

25  evidence marker 41, collected March 21st, 2011.

1    Q.  Do you recognize your markings?

2    A.  Yes, I do.

3    Q.  And do you see markings belonging to other

4  people?

5    A.  Yes, I do.

6    Q.  Other than the other markings belonging to other

7  people, are State's Exhibits 178, 178-A and 178-B in the

8  same condition they were when you packaged them?

9    A.  Yes, they are.

10         MS. RAY:  Your Honor, I offer State's

11  Exhibit 178 for all purposes and 178-A and 178-B for

12  purposes of the record only.

13         MS. KEENE:  No objection to 178-B or A for

14  purposes of the record and no objection to 178 for all

15  purposes.

16         THE COURT:  All right.  State's 178-A and

17  State's 178-B admitted for the record.  State's 178

18  admitted for all purposes.

19         (State's Exhibit No. 178, 178-A, 178-B

20          admitted)

21         THE COURT:  Members of the jury, do me a

22  favor.  Everyone just kind of stand up and stretch.

23         (Pause in proceedings)

24         THE COURT:  Back on the record.

25         Ms. Ray, you may continue.

1      MS. RAY:  Thank you, Judge.

2      Q.  (BY MS. RAY)  Investigator Fallentine, I'm now

3  showing you what has been marked as State's Exhibit 179,

4  179-A and 179-B.  What are State's Exhibits 179, 179-A

5  and 179-B?

6      A.  Packaging and apparent blood spots from evidence

7  marker 31, which is the lower tier cabinet drawer and

8  drawer face, which was north of the oven, collected

9  March, 21st, 2011.

10     Q.  And do you recognize your markings?

11     A.  Yes, I do.

12     Q.  And do you see markings belonging to other

13  people?

14     A.  Yes, I do.

15     Q.  Other than the markings belonging to other

16  people, are State's Exhibits 179, 179-A and 179-B in the

17  same condition they were when you packaged them?

18     A.  Yes, they are.

19          MS. RAY:  Your Honor, I offer State's

20  Exhibit No. 179 for all purposes, 179-A and 179-B for

21  the purposes of the record only.

22          MS. KEENE:  No objection as offered, Judge.

23          THE COURT:  State's 179-A, 179-B, admitted

24  for the record; State's 179, admitted for all purposes.

25          (State's Exhibit No. 179, 179-A, 179-B

```
 1                    admitted)

 2     Q.   (BY MS. RAY)  And I'm now showing you what's been

 3  marked as State's Exhibit 180, 180-A and 180-B.

 4                    What are these items?

 5     A.   Packaging and apparent blood swabs taken from

 6  marker 29, closet door and the door frame that was east

 7  of the front door, collected March 21st 2011.

 8     Q.   And do you recognize your markings?

 9     A.   Yes, I do.

10     Q.   And do you see markings belonging to other

11  people?

12     A.   Yes, I do.

13     Q.   Other than the markings from other people, are

14  State's Exhibits 180, 180-A and 180-B in the same

15  condition they were when you packaged them?

16     A.   Yes, they are.

17               MS. RAY:  Your Honor, I offer State's

18  Exhibit 180 for all purposes, 180-A and 180-B for

19  purposes of the record only.

20               MS. KEENE:  No objection to 180-B or A for

21  purpose of the record and 180 for all purposes.

22               THE COURT:  State's 180-A and B, admitted

23  for the record; State's 180, admitted for all purposes.

24               (State's Exhibit No. 180, 180-A, 180-B

25                 admitted)
```

 1    Q.   (BY MS. RAY)   I'm now showing you what has been

 2    marked as State's Exhibits 181, 181-A and 181-B.

 3              And what are State's Exhibits 181, 181-A and

 4    181-B?

 5    A.   These are another set of control swabs.   These

 6    were collected in the CSU lab on March 27th, 2011.

 7    Q.   And do you recognize your markings?

 8    A.   Yes, I do.

 9    Q.   And do -- are State's Exhibit 181, 181-A and

10    181-B in the same condition they were when you packaged

11    them?

12    A.   Yes, with the exception of the small tear in the

13    outer bag.

14              MS. RAY:   Your Honor, I offer State's

15    Exhibit 181, 181-A and 181-B, after tendering to

16    Defense -- sorry -- 181 for all purposes, 181-A and

17    181-B for purposes of the record.

18              MS. KEENE:   Can I take this witness on voir

19    dire, Judge?

20              THE COURT:   Yes.

21                  <u>VOIR DIRE EXAMINATION</u>

22    BY MS. KEENE:

23    Q.   You talked about the tear in 181-B.   Does that

24    cause you any concern about 181-A and B being

25    compromised?

1    A.   No, because the box appears to have the original

2   seal and to not be compromised.

3    Q.   Okay.  So because of 181-A being sealed and no

4   problems with it, it doesn't cause you concern?

5    A.   Correct.  I used the bags so that the property

6   room can keep track of things easier.  The boxes are

7   small.

8          MS. KEENE:  All right.  I have no objection

9   then, Judge.

10          THE COURT:  All right.  Exhibits 181-A,

11   181-B, admitted for the record; 181 -- all State's

12   Exhibits -- admitted for all purposes.

13          (State's Exhibit No. 181, 181-A, 181-B

14           admitted)

15          <u>DIRECT EXAMINATION CONTINUES</u>

16   BY MS. RAY:

17    Q.   Okay.  I'm now showing you what's been marked as

18   State's Exhibit 182, 182-A and 182-B?

19          What are 182, 182-A and 182-B?

20    A.   Packaging for a swab sample taken from the ridged

21   grip area of the top cap of charcoal lighter fluid

22   bottle, SFR-41.  This is the one we saw on the ground

23   outside of the grill and charcoal bag.  These swabs were

24   collected in the lab March 27th, 2011.

25    Q.   And do you recognize your markings on them?

1      A.  Yes, I do.

2      Q.  And do you see markings belonging to other

3   people?

4      A.  Yes, I do.

5      Q.  Other than the markings belonging to other

6   people, are State's Exhibits 182, 182-A and 182-B in the

7   same condition they were when you packaged them?

8      A.  Again, we have a slight rip in the exterior bag,

9   but yes, otherwise they are.

10          MS. RAY:  Your Honor, I offer State's

11   Exhibit 182 for all purposes and 182-A and 182-B for

12   purposes of the record only.

13          MS. KEENE:  Judge, may I take her on voir

14   dire real quick?

15          THE COURT:  Go ahead.

16          VOIR DIRE EXAMINATION

17   BY MS. KEENE:

18      Q.  All of these exhibits you and the prosecutor and

19   the court reporter opened prior to coming in today?

20      A.  Correct.

21      Q.  And that was actually today during the lunch

22   break, or during the break?

23      A.  I was not present for all of that.  I did eat

24   lunch.

25      Q.  Okay.  So would -- do you feel like they --

1   there's no compromise on any of these, though?

2      A.   Not in my opinion, no.

3      Q.   And that's the same question as in 182?

4      A.   I'm sorry?

5      Q.   I mean -- I'm sorry.  Yeah, 182 had the --

6           THE COURT:  182 what?

7           MS. KEENE:  182-B.  Correct, Judge.

8      Q.   (BY MS. KEENE)  State's 182-B had the hole in the

9   bag.  You don't have any concern about the integrity of

10  182 because of the hole in the bag?

11     A.   Correct, no.

12          MS. KEENE:  I don't have any objection,

13  Judge, to them as offered.

14          THE COURT:  All right.  State's 182-A and B,

15  each admitted for the record; State's 182, admitted for

16  all purposes.

17          (State's Exhibit No. 182, 182-A, 182-B

18           admitted)

19          <u>DIRECT EXAMINATION CONTINUES</u>

20  BY MS. RAY:

21     Q.   I'm now showing you what's been marked as State's

22  Exhibit 183, 183-A and 183-B.

23          And what are State's Exhibit 183, 183-A and

24  183-B?

25     A.   It is packaging and apparent blood swabs from the

1   side of the cardboard box that was beneath the desk in

2   the living room, collected March 21st, 2011.

3       Q.   And do you recognize your markings?

4       A.   Yes, I do.

5       Q.   And do you see markings of other people?

6       A.   Yes, I do.

7       Q.   Other than the markings of other people, are

8   State's Exhibits 183, 183-A and 183-B in the same

9   condition they were when you packaged them?

10      A.   Yes, they are.

11           MS. RAY:   Your Honor, I offer State's

12  Exhibit 183 for all purposes, 183-A and 183-B for

13  purposes of the record only.

14           MS. KEENE:   I have no objection to 183-A or

15  B for purposes of the record and 183-A for all purposes.

16           THE COURT:   You mean plain 183 for all

17  purposes?

18           MS. KEENE:   Yes, sir.   No objection.

19           THE COURT:   All right.   State's 183,

20  admitted for all purposes; State's 183-A and 183-B,

21  admitted for the record.

22           (State's Exhibit No. 183, 183-A, 183-B

23            admitted)

24           MR. MOORE:   Judge, for the record, does that

25  have an evidence marking number or an SFR number?

```
 1              THE WITNESS:  The item itself SFR --
 2              THE COURT:  Time out.  Do you want to ask
 3   that question, Ms. Keene?
 4              MS. KEENE:  I can ask that question.
 5              THE COURT:  You can, since it's your
 6   witness.
 7              MS. KEENE:  We do sit next to each other.
 8                  VOIR DIRE EXAMINATION
 9   BY MS. KEENE:
10      Q.  Does that -- can you tell us if that has an SFR
11   number, along with the evidence number?
12      A.  Yes.  It's item SFR-15 and it was taken at
13   evidence marker 14.
14      Q.  And could you do that each time we talk about the
15   exhibits --
16      A.  Yes.
17      Q.  -- so we don't have to interrupt?
18              Thank you.
19              THE COURT:  Off the record.
20              (Discussion off the record)
21              THE COURT:  Back on the record.
22              Then still your witness.
23                DIRECT EXAMINATION CONTINUES
24   BY MS. RAY:
25      Q.  Okay.  I'm showing you what has been marked as
```

```
1    State's Exhibit 184 and 184-A.  If you can take a look

2    at these items?

3               And what are State's Exhibits 184 and 184-A?

4       A.   It is item SFR-22, the Bud Light beer can, that

5    was located at evidence marker 21, on the living room

6    floor beneath the end table, and packaging.  It was

7    collected March 21st, 2011.

8       Q.   And do you recognize your markings on State's

9    Exhibit 184 and 184-A?

10      A.   Yes, I do.

11      Q.   And do you see markings belonging to other

12   people?

13      A.   Yes, I do.

14      Q.   Other than the markings belonging to other

15   people, are State's Exhibit 184 and 184-A in the same

16   condition they were when you packaged them?

17      A.   Yes, they are.

18               MS. RAY:  Your Honor, I offer State's

19   Exhibit 184 for all purposes and 184-A, after tendering

20   to Defense Counsel, 184-A for the record only.

21               MS. KEENE:  Can I take the witness on voir

22   dire?

23               THE COURT:  Yes, you may.

24                    VOIR DIRE EXAMINATION

25   BY MS. KEENE:
```

1     Q.   Did you find -- there's a white package that's

2   contained inside the 184 marker.

3     A.   Yes.

4     Q.   Was that found at the scene?

5     A.   No.   That's laboratory paper that I used to

6   package the can in case the exterior bag was to rip, as

7   we saw in some of the other cases.   I like to try to put

8   a barrier.

9     Q.   Okay.   So you double-packaged it?

10    A.   I do, yes.

11    Q.   Is there any writing on the white packaging?

12    A.   Yes, I can see it through the corner.

13    Q.   Okay.   But is there any writing other than your

14  initials?

15    A.   Should be tape and my initials on it.

16    Q.   None of other things like what's on 184-A?

17    A.   No.

18    Q.   And is this SFR-57?

19    A.   It's SFR-22.

20    Q.   Okay.   SFR-22.

21         MS. KEENE:   I have no objection to 184 for

22  all purposes and 184-A for purposes of the record.

23         THE COURT:   State's 184 is actually a Ziploc

24  bag.   It is -- the contents are what's being offered?

25         MS. RAY:   Yes, Your Honor.

STATE vs THOMAS OLIVAS

```
 1                    THE COURT:  All right.  And the bag it came
 2      in is what's offered as 184-A for the record only?
 3                    MS. RAY:  Yes, Your Honor.
 4                    THE COURT:  All right.  All right.  Then
 5      184, the Ziploc bag and specifically the contents, are
 6      admitted.  State's 184-A is admitted, the storage bag,
 7      for the record only.
 8                    (State's Exhibit No. 184, 184-A admitted)
 9                    THE COURT:  What the record -- lawyers refer
10      to as the storage bag.  Jury, you decide what anything
11      is, not what I say.  This is for her.
12                    Everyone remember that?
13                    SEVERAL JURY MEMBERS:  Yes.
14                    THE COURT:  All right.  Let's take a short
15      recess.
16                    (Discussion off the record)
17                    THE COURT:  On the record.
18                    We will take our recess for the evening.
19      And tomorrow morning same time, same channel, be at your
20      pickup point.
21                    If you'll be back here about ten till 9:00,
22      unless either side needs you here earlier, as long as
23      you're here by ten till 9:00, you'll be good.
24                    On and off the record, I hope we do get a
25      lot of rain, but if we do, y'all be careful coming in,
```

1    because the roads are used to it.  If it rains long

2    enough tonight, it will be fine.  If it starts raining

3    right when we get ready to come here, it will be slick.

4    So y'all be careful.  Thank you for a long day.  Get a

5    good night's sleep.  Don't forget your blue card.  See

6    you in the morning.

7              Sheriff, escort the jury to the jury room.

8              Everyone remain in the courtroom until the

9    jury's cleared the elevator.

10             (Recessed for the day at 5:20 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                  COURT REPORTER'S CERTIFICATE
2    THE STATE OF TEXAS          )
3    COUNTY OF TARRANT           )
4        I, Karen B. Martinez, Official Court Reporter in and
5    for the 372nd District Court of Tarrant County, State of
6    Texas, do hereby certify that the above and foregoing
7    contains a true and correct transcription of all
8    portions of evidence and other proceedings requested in
9    writing by counsel for the parties to be included in
10   this volume of the Reporter's Record, in the
11   above-styled and numbered cause, all of which occurred
12   in open court or in chambers and were reported by me.
13       I further certify that this Reporter's Record of the
14   proceedings truly and correctly reflects the exhibits,
15   if any, admitted by the respective parties.
16       I further certify that the total cost for the
17   preparation of this Reporter's Record is **located at the
18   end of Volume 21**.
19       WITNESS MY OFFICIAL HAND this the 30th day of March,
20   2015.
21                            /s/ Karen B. Martinez

22                            Karen B. Martinez, Texas CSR 6735
                              Expiration Date:  12/31/2015
23                            Official Court Reporter
                              372nd District Court
24                            Tarrant County, Texas
                              (817)884-2996
25                            kbmartinez@tarrantcounty.com
```