REPORTER'S RECORD

VOLUME 9 OF 21 VOLUME(S)

FILED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS
3/27/2015 12:36:05 PM
DEBRA SPISAK
Clerk

TRIAL COURT CAUSE NO. 1376685

COURT OF APPEALS CASE NO. 02-14-00412-CR

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE 372ND JUDICIAL |
| | ) | |
| VS. | ) | DISTRICT COURT |
| | ) | |
| THOMAS OLIVAS | ) | TARRANT COUNTY, TEXAS |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

TRIAL ON MERITS CONTINUES

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

On the 12th day of September, 2014, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Scott Wisch, Presiding Judge, held in Fort Worth, Tarrant County, Texas;

Proceedings reported by computerized machine shorthand with assisted realtime transcription.

KAREN B. MARTINEZ, CERTIFIED SHORTHAND REPORTER
Official Court Reporter
372nd Judicial District Court
Tarrant County, Texas

```
 1   APPEARANCES:

 2   ATTORNEYS FOR THE STATE:

 3       HONORABLE R. KEVIN ROUSSEAU
         SBOT NO: 17324950
 4       HONORABLE TAMLA S. RAY
         SBOT NO: 24046687
 5       Assistant Criminal District Attorneys
         Tim Curry Criminal Justice Center
 6       Fort Worth Texas  76196
         Phone: 817-884-1400
 7       Fax:   817-884-3333

 8   ATTORNEYS FOR THE DEFENDANT:

 9       HONORABLE TIM MOORE
         SBOT NO: 14378300
10       Attorney at Law
         115 West 2nd Street, Suite 202
11       Fort Worth, Texas  76102
         Phone: 817-332-3822
12       Fax:   817-332-2768

13            - AND -

14       HONORABLE JOETTA L. KEENE
         SBOT NO: 11165800
15       Attorney at Law
         204 South Mesquite Street
16       Arlington, Texas  76010
         Phone: 817-275-6611
17       Fax:   817-275-6621

18

19

20

21

22

23

24

25
```

```
 1                    CHRONOLOGICAL INDEX

 2                     Volume 9 of 21

 3                TRIAL ON MERITS CONTINUES

 4   September 12, 2014                    Page Vol.

 5   Witness Testimony Resumes...................  10    9

 6   STATE'S WITNESSES                        Voir
                        Direct     Cross   Dire    Vol.
 7
     Fallentine, Shannon    11,14,17,  77    12,15,18,  9
 8                          20,23,25,         22,24,26,
                            30,33,37,         31,34,38,
 9                          38,40,45,         39,44,46,
                            47,51,53,         48,52,54,
10                          55,57,60,         56,58,60,
                            62,63,65,         62,64,66,
11                          68,72             69,73

12   One Witness Sworn...........................  121   9

13   Recessed for the Day........................  202   9

14   Court Reporter's Certificate................  203   9

15
                 ALPHABETICAL LISTING OF WITNESSES
16
                                          Voir
17                      Direct     Cross   Dire    Vol.

18   Fallentine, Shannon    11,14,17,  77    12,15,18,  9
                            20,23,25,         22,24,26,
19                          30,33,37,         31,34,38,
                            38,40,45,         39,44,46,
20                          47,51,53,         48,52,54,
                            55,57,60,         56,58,60,
21                          62,63,65,         62,64,66,
                            68,72             69,73

22

23

24

25
```

1                              EXHIBITS

2      STATE'S
       NO.     DESCRIPTION              OFFERED ADMITTED VOL.
3
        185    Lighter in Ziploc          37      38      9
4
       *185A   Evidence Box               37      38      9
5
       *185B   Evidence Sack with Ruler   37      38      9
6
        186    Lighter in Ziploc          31      33      9
7
       *186A   Evidence Box               31      33      9
8
       *186B   Evidence Sack with Ruler   31      33      9
9
        187    Lighter in Ziploc          46      47      9
10
       *187A   Evidence Box               46      47      9
11
       *187B   Evidence Sack with Ruler   46      47      9
12
        188    Nikon Camera in Ziploc     48      50      9
13
       *188A   Evidence Box               48      50      9
14
        188B   Camera Bag in Ziploc       48      50      9
15
       *188C   Evidence Sacks             48      50      9
16
        189    Nikon Coolpix Camera in
17             Ziploc                     34      37      9

18     *189A   Evidence Box               34      37      9

19     *189B   Camera Charger and Bag in
               Ziploc                     34      37      9
20
       *189C   Evidence Sacks with Clear
21             Bag                        34      37      9

22     *190    Sealed Bag Containing Cell
               Phone with Evidence Box    43      45      9
23
       *190A   Evidence Sacks             43      45      9
24
        191    Keys on Rings              41      42      9
25

| 1 | *191A | Evidence Box | 41 | 42 | 9 |
| 2 | *191B | Evidence Sacks | 41 | 42 | 9 |
| 3 | 192 | Keys on Rings | 39 | 42 | 9 |
| 4 | *192A | Evidence Box | 39 | 42 | 9 |
| 5 | *192B | Evidence Sack | 39 | 42 | 9 |
| 6, 7 | 193 | Knife Block with Three Knives in White Packaging | 18 | 20 | 9 |
| | *193A | Evidence Sacks | 18 | 20 | 9 |
| 8, 9 | 194 | Black-Handled Knife in Ziploc | 21 | 22 | 9 |
| 10, 11 | *194A | Evidence Box, Packaging, Ruler | 21 | 22 | 9 |
| | *194B | Evidence Packaging | 21 | 22 | 9 |
| 12, 13 | 195 | Two Paring Knives in White Packaging in Ziploc | 24 | 25 | 9 |
| 14, 15 | *195A | Evidence Box, Packaging, Ruler | 24 | 25 | 9 |
| | *195B | Evidence Packaging | 24 | 25 | 9 |
| 16, 17 | 196 | Three Knives in White Packaging in Ziploc | 26 | 30 | 9 |
| 18, 19 | *196A | Evidence Box, Packaging, Ruler | 26 | 30 | 9 |
| | *196B | Evidence Packaging | 26 | 30 | 9 |
| 20 | 197 | Duct Tape in Packaging | 51 | 53 | 9 |
| 21, 22 | *197A | Evidence Paint Can with Packaging | 51 | 53 | 9 |
| 23 | *197B | Evidence Sack with Ruler | 51 | 53 | 9 |
| 24 | 198 | Sock in Ziploc | 54 | 55 | 9 |
| 25 | *198A | Evidence Paint Can with Packaging | 54 | 55 | 9 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | *198B | Evidence Sack with Ruler | 54 | 55 | 9 |
| 2 | 199 | Blouse in Ziploc | 15 | 17 | 9 |
| 3 | *199A | Evidence Paint Can with Packaging | 15 | 17 | 9 |
| 4 | *199B | Evidence Sack with Ruler | 15 | 17 | 9 |
| 5 | 200 | White Towel | 12 | 14 | 9 |
| 6 | *200A | Evidence Sack, Packaging, Ruler | 12 | 14 | 9 |
| 7 | | | | | |
| 8 | 202 | Laptop in White Packaging | 69 | 72 | 9 |
| 9 | *202A | Evidence Packaging | 69 | 72 | 9 |
| 10 | *202B | Evidence Box | 69 | 72 | 9 |
| 11 | 203 | Thumb Drive in Ziploc | 73 | 77 | 9 |
| 12 | *203A | Evidence Box | 73 | 77 | 9 |
| 13 | *203B | Evidence Sack | 73 | 77 | 9 |
| 14 | 204 | Doorknob with Packaging | 58 | 60 | 9 |
| 15 | *204A | Large Evidence Box | 58 | 60 | 9 |
| 16 | 205 | Doorknob with Packaging | 56 | 57 | 9 |
| 17 | *205A | Large Evidence Box | 56 | 57 | 9 |
| 18 | 206 | Doorknob with Packaging | 62 | 63 | 9 |
| 19 | *206A | Large Evidence Box | 62 | 63 | 9 |
| 20 | 207 | Doorknob with Packaging | 64 | 65 | 9 |
| 21 | *207A | Large Evidence Box | 64 | 65 | 9 |
| 22 | 208 | Dead Bolt and Knob Assembly with Packaging | 66 | 68 | 9 |
| 23 | *208A | Large Evidence Box | 66 | 68 | 9 |
| 24 | 209 | Dead Bolt and Knob Assembly with Packaging | 60 | 61 | 9 |
| 25 | | | | | |

| 1 | *209A | Large Evidence Box | 60 | 61 | 9 |
|---|---|---|---|---|---|

| 2 | DEFENDANT'S | | | | |
| 3 | NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
| 4 | 6 | Diagram | 115 | 115 | 9 |
| 5 | 7 | Crime Scene Document with Measurements | 116 | 116 | 9 |
| 6 | 12 | Photograph | 127 | 127 | 9 |
| 7 | 13 | Photograph | 127 | 127 | 9 |
| 8 | 14 | Photograph | 127 | 127 | 9 |
| 9 | 15 | Photograph | 127 | 127 | 9 |
| 10 | 16 | Photograph | 127 | 127 | 9 |
| 11 | 17 | Photograph | 127 | 127 | 9 |
| 12 | 18 | Photograph | 137 | 137 | 9 |
| 13 | 19 | Photograph | 137 | 137 | 9 |
| 14 | 20 | Photograph | 137 | 137 | 9 |
| 15 | 21 | Photograph | 137 | 137 | 9 |
| 16 | 22 | Photograph | 137 | 137 | 9 |
| 17 | 23 | Photograph | 137 | 137 | 9 |
| 18 | 24 | Photograph | 137 | 137 | 9 |
| 19 | 25 | Photograph | 137 | 137 | 9 |
| 20 | 26 | Photograph | 137 | 137 | 9 |
| 21 | 27 | Photograph | 137 | 137 | 9 |
| 22 | 28 | Photograph | 137 | 137 | 9 |
| 23 | 29 | Photograph | 152 | 154 | 9 |
| 24 | 30 | Diagram with Red Marks | 168 | 168 | 9 |
| 25 | 31 | Photograph | 180 | 180 | 9 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | 32 | Photograph | 180 | 180 | 9 |
| 2 | 33 | Photograph | 180 | 180 | 9 |
| 3 | 34 | Photograph | 180 | 180 | 9 |
| 4 | 35 | Photograph | 180 | 180 | 9 |
| 5 | 36 | Photograph | 180 | 180 | 9 |
| 6 | 37 | Photograph | 190 | 190 | 9 |
| 7 | 38 | Photograph | 190 | 190 | 9 |
| 8 | 39 | Photograph | 190 | 190 | 9 |
| 9 | 40 | Photograph | 190 | 190 | 9 |
| 10 | 41 | Photograph | 190 | 190 | 9 |
| 11 | 42 | Photograph | 190 | 190 | 9 |
| 12 | 43 | Photograph | 190 | 190 | 9 |
| 13 | 44 | Photograph | 198 | 198 | 9 |
| 14 | 45 | Photograph | 198 | 198 | 9 |
| 15 | 46 | Photograph | 198 | 198 | 9 |
| 16 | 47 | Photograph | 198 | 198 | 9 |
| 17 | 48 | Photograph | 198 | 198 | 9 |
| 18 | 49 | Photograph | 198 | 198 | 9 |
| 19 | 50 | Photograph | 198 | 198 | 9 |
| 20 | 51 | Photograph | 198 | 198 | 9 |
| 21 | 52 | Photograph | 198 | 198 | 9 |
| 22 | 53 | Photograph | 198 | 198 | 9 |
| 23 | 54 | Photograph | 198 | 198 | 9 |
| 24 | 55 | Photograph | 198 | 198 | 9 |
| 25 | 56 | Photograph | 198 | 198 | 9 |

STATE of THOMAS OLIVAS

| | | | | | |
|---|---|---|---|---|---|
| 1 | 57 | Photograph | 198 | 198 | 9 |
| 2 | 58 | Photograph | 198 | 198 | 9 |
| 3 | 59 | Photograph | 198 | 198 | 9 |
| 4 | 60 | Photograph | 198 | 198 | 9 |
| 5 | 61 | Photograph | 198 | 198 | 9 |
| 6 | 62 | Photograph | 198 | 198 | 9 |
| 7 | 63 | Photograph | 198 | 198 | 9 |

8

(*) Denotes an exhibit designated for the record only.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                P R O C E E D I N G S
 2           Friday, September 12, 2014   9:25 a.m.
 3               (OPEN COURT, DEFENDANT AND JURY PRESENT)
 4               (Witness on the stand)
 5               THE COURT:  Good morning, ladies and
 6      gentlemen.
 7               SEVERAL JURY MEMBERS:  Good morning.
 8               THE COURT:  Everyone see I'm holding up the
 9      blue card; is that right?
10               SEVERAL JURY MEMBERS:  Yes.
11               THE COURT:  You're all smiling.  A lot of
12      you are reaching for your blue cards and you don't have
13      to do that.  You just have to assure me, if you can,
14      that you have continued to follow those instructions
15      over the evening until you returned to us.
16               Did you do that?
17               SEVERAL JURY MEMBERS:  Yes.
18               THE COURT:  We thank you.
19               We're starting a little later, sorry.  Got
20      here, more boxes.  And it was my decision that -- get
21      everything marked, organized, everything, where everyone
22      can look at it and do whatever to speed up what is
23      sometimes a cumbersome and monotonous process.  And so I
24      left you back there with the smorgasbord you brought in
25      and your coffee.  I figured you're more comfortable
```

 1   there than coming in and out of the courtroom.  That was

 2   largely my decision approving the lawyers getting it all

 3   marked so it flows more smoothly when you're in the

 4   courtroom.

 5                Is everyone good to go?

 6                SEVERAL JURY MEMBERS:  Yes.

 7                THE COURT:  All right.

 8                State, ready to proceed?

 9                MS. RAY:  Yes, Your Honor.

10                THE COURT:  Defense ready to proceed?

11                MS. KEENE:  We are, Judge.

12                THE COURT:  All right.  Still your witness,

13   Ms. Ray.

14                MS. RAY:  Thank you, Your Honor.

15                May I approach the witness?

16                THE COURT:  Yes.

17                INVESTIGATOR SHANNON FALLENTINE,

18   having been previously duly sworn, testified as follows:

19                DIRECT EXAMINATION CONTINUES

20   BY MS. RAY:

21      Q.   Investigator Fallentine, I'm showing you what has

22   previously been marked as State's Exhibit 200 and 200-A.

23   Have you seen State's 200 and 200-A before?

24      A.   Yes, I have.

25      Q.   Okay.  And what are State's 200 and 200-A?

STATE v. THOMAS OLIVAS

```
 1        A.   SFR-18, white colored dishtowel with areas of
 2   apparent blood, from evidence marker 17, collected March
 3   21st, 2011.
 4        Q.   And have you had a chance to look at State's
 5   Exhibit 200 and 200-A to find your markings?
 6        A.   Yes, I have.
 7        Q.   And you did that prior to the jury coming in,
 8   just about five minutes ago?
 9        A.   Yes, I did.
10        Q.   And are -- 200 and 200-A, do they have markings
11   of other individuals?
12        A.   Yes, they do.
13        Q.   Other than the markings of the other individuals,
14   are 200 and 200-A in the same condition they were when
15   you packaged them?
16        A.   Yes, they are.
17             MS. RAY:  Your Honor, I offer 200 and 200-A,
18   after tendering to Defense Counsel.
19             MS. KEENE:  Can I take the witness on voir
20   dire?
21             THE COURT:  Yes, you may.
22                   VOIR DIRE EXAMINATION
23   BY MS. KEENE:
24        Q.   Inside 200-A is a white paper and brown paper; is
25   that correct?
```

```
 1        A.  Yes, ma'am.
 2        Q.  And is that -- does that have any writings on it
 3   at all?
 4        A.  Yes, it does.  The brown paper bag is what I used
 5   to collect it initially on scene and the white paper is
 6   what I covered it with in the lab, both of which have my
 7   initials on them.
 8        Q.  Other than your initials verifying that it's what
 9   you collected, does it have any other writing on it, and
10   the date?
11        A.  No, it does not.
12        Q.  And then as far as in 300 -- or 200 itself, did
13   you actually mark the rag?
14        A.  Yes, I did.
15        Q.  Can you show me where on the rag you marked it?
16             Okay.  So you marked the tag?
17        A.  Yes, ma'am.
18        Q.  And it's blurred out, but it was also wet when
19   you probably marked it?
20        A.  Yes, ma'am.  It's also a weave, so it will blur.
21        Q.  But you feel confident that's your markings, even
22   though it's blurred out?
23        A.  Yes, ma'am.
24        Q.  There's also some holes with markings on it.  So
25   there's more than just markings on the towel.  There's
```

1    also holes in it?

2       A.  Correct.  That's intervention from a separate

3    party.  Otherwise, it is the condition that I collected

4    it in.

5       Q.  Okay.  Where there's a hole -- where there's

6    holes and not a marking, was it in that condition when

7    you picked it up, that way?

8       A.  Yes, the burn holes.

9       Q.  Okay.  So if there's a hole and marking, that's

10   something else, lab or somebody else did that?

11      A.  Correct.

12           MS. KEENE:  Okay.  Judge, then I have no

13   objection to 200-A and 200 for all purposes.

14           THE COURT:  All right.  State's 200, bag and

15   contents, admitted all purposes; 200-A, admitted -- you

16   offered it for the record only?

17           MS. RAY:  Yes, Your Honor.

18           THE COURT:  -- for the record only.

19           (State's Exhibit No. 200, 200-A admitted)

20              <u>DIRECT EXAMINATION CONTINUES</u>

21   BY MS. RAY:

22      Q.  Ms. Fallentine, I'm now showing you what has been

23   marked as State's Exhibit 199, State's 199-A and 199-B.

24   Are you familiar with these items?

25      A.  Yes, I am.

1    Q.   And what is State's Exhibit 199, 199-A and 199-B?

2    A.   Original packaging, as well as laboratory

3    packaging and item SFR-23, black and white colored

4    button-up shirt, from evidence marker 22.  It was on top

5    of the love seat, collected March 21st, 2011.

6    Q.   And have you had an opportunity to look for your

7    markings on State's Exhibit 199, 199-A and 199-B?

8    A.   Yes, I have.

9    Q.   And do you see markings from other people?

10   A.   Yes, I do.

11   Q.   And other than the markings on -- from other

12   people, are State's Exhibit 199, 199-A and 199-B in the

13   same condition they were when you packaged them?

14   A.   Yes, they are.

15          MS. RAY:  I offer 199 for all purposes,

16   199-A and 199-B for purposes of the record.

17          MS. KEENE:  And may I take the witness on

18   voir dire?

19          THE COURT:  Yes, you may.

20          <u>VOIR DIRE EXAMINATION</u>

21   BY MS. KEENE:

22   Q.   You are already opening up and showing me your

23   initials "SR"?

24   A.   Yes, ma'am.

25   Q.   And that's -- is that what you use to verify that

1   this is, indeed, the same shirt?

2      A.   Yes, ma'am.

3      Q.   And it appears to you there's other markings on

4   here, that the lab also did some work on this?

5      A.   Yes, ma'am.

6      Q.   And that's what the other markings are?

7      A.   Yes, ma'am.

8      Q.   That was not -- there wasn't a marking of CP or

9   something when you collected it?

10     A.   No, ma'am.

11     Q.   Okay.  Did you put -- here we go.  Is that your

12   marking right here?  Am I seeing it -- did you put it in

13   the can?

14     A.   Yes, ma'am.

15     Q.   Okay.

16          MS. KEENE:  Judge, I have no objection to

17   199-A and B for purposes of the record and 199 for all

18   purposes.

19          THE COURT:  All right.  For purposes of the

20   record I'm going to ask the attorneys -- they advised me

21   of this in private.  There are many items that appear to

22   be in what looks like new Ziploc bags and it's my

23   understanding items removed from the evidence packaging

24   is described in the record, offered for the record, has

25   been put into new Ziploc bags by the court reporter at

 1   the direction of the parties in the presence of

 2   everyone.

 3            For purposes of trial publication, it's the

 4   contents of the bag that's being offered; is that an

 5   accurate understanding on my part?

 6            MS. RAY:  Yes, Your Honor.  The items were

 7   placed in Ziploc bags.

 8            THE COURT:  That were previously in the

 9   paper containers or cans or whatever might be in

10   evidence that were used for storage, that was done for

11   trial publication?

12            MS. RAY:  Yes, Your Honor.

13            THE COURT:  All right.  And, Ms. Keene, you

14   agree with that?

15            MS. KEENE:  Yes.

16            THE COURT:  All right.  Then 199, the baggie

17   and contents, is admitted, State's exhibit.  State's

18   199-A and B are each admitted for the record only.

19            (State's Exhibit No. 199, 199-A, 199-B

20             admitted)

21            DIRECT EXAMINATION CONTINUES

22   BY MS. RAY:

23     Q.  Investigator Fallentine, I'm showing you what has

24   been marked as 193 and 193-A.  Can you take a look at

25   those?  Have you seen State's Exhibit -- what are

1    State's Exhibits 193 and 193-A?

2        A.   It's the packaging and item SFR-36, a wooden

3    knife block containing three black-handled knives,

4    evidence marker 35, in the kitchen of the unit,

5    collected March 21st, 2011.

6        Q.   And did you recently have an opportunity to look

7    at State's Exhibit 193 and 193-A to find your markings?

8        A.   Yes, I did.

9        Q.   And are there markings from other individuals?

10       A.   Yes, there are.

11       Q.   Other than the markings from other individuals,

12   are State's Exhibit 193 and 193-A in the same condition

13   they were when you packaged them?

14       A.   Yes, they are.

15            MS. RAY:  Your Honor, I offer State's

16   Exhibit 193 and 193-A, after tendering to Defense

17   Counsel.

18            MS. KEENE:  Judge, may I take the witness on

19   voir dire?  She already knows the question.

20                  <u>VOIR DIRE EXAMINATION</u>

21   BY MS. KEENE:

22       Q.   Show me your markings.

23            And I believe I see an "SR".  I believe so,

24   yes.  And is that how you identify it as from being the

25   same block that you took from the Presidents Corner

1    apartment?

2        A.   Yes, ma'am.

3        Q.   As far as -- and there's also paper contained

4    inside of 193-A.  Does that have any markings on it,

5    other than your initials?

6        A.   My initials and my ID number.

7        Q.   Okay.  Is there any other writing at all on it?

8        A.   Yes.  There is writing from a separate party.

9        Q.   So from like lab work or whatever?

10       A.   Correct.

11       Q.   Okay.

12            MS. KEENE:  I have no objection to 193 for

13   all purposes and 193-A for purposes of the record.

14            THE COURT:  All right.  Just so I'm clear

15   what I'm looking at -- off the record.

16            (Discussion off the record)

17            THE COURT:  Okay.  Let's go back on the

18   record.

19            Since Karen can't write this down, the

20   parties have agreed, there is a grocery-colored evidence

21   storage sack that's marked for the record as 193-A.

22   Removed from it and marked is a white wrapping

23   surrounding and including what's been described in a

24   record as a knife block and three knives.  So the

25   sticker is on the white outer wrapping, but the

STATE v. THOMAS OLIVAS

```
 1   wrapping, the block and the three knives, are all
 2   offered as one package.  And the wrapping is to help
 3   keep stuff, smoke and all that that's on the block, it's
 4   able to handle it and protect it for purposes of storage
 5   and publication.
 6              So you're offering the white material and
 7   the block contained therein and the three knives?
 8              MS. RAY:  As 193, yes, Your Honor.
 9              THE COURT:  Yes.  And the Defense
10   understands that.
11              MS. KEENE:  We do, Judge.  We have no
12   objection to that.
13              THE COURT:  All right.  So in case those
14   things were to be separated, it's all one package and
15   one exhibit.  But the individual items of the block and
16   what's described in the record as three kitchen knives
17   are not individually marked.  It's all one unit.
18              And 193 is admitted as offered, the whole
19   package of materials.  And 193-A is admitted for the
20   record only.
21              (State's Exhibit No. 193, 193-A admitted)
22              DIRECT EXAMINATION CONTINUES
23   BY MS. RAY:
24   Q.  Investigator Fallentine, I'm showing you what's
25   previously been marked as 194, 194-A and 194-B.  Take a
```

1   look at those items?

2            What are they?

3        A.   Packaging and a box containing item 13B, as in

4   boy.  A black-handled, long-blade knife, with unknown

5   red stain.  This is going to be from the bar top at

6   evidence marker 12, collected March 21st, 2011.

7        Q.   And did you have an opportunity to look to see if

8   you recognize your markings on State's Exhibit

9   194, 194-A and 194-B?

10       A.   Yes, I did.

11       Q.   And did you do that?

12       A.   Yes.

13       Q.   And did you see markings belonging to other

14   people?

15       A.   Yes, I did.

16       Q.   Other than the markings from other people, are

17   State's Exhibit 194, 194-A and 194-B in the same

18   condition they were when you packaged them?

19       A.   Yes, they are.

20            MS. RAY:  And, Your Honor, I offer State's

21   Exhibit 194, 194-A and 194 -- sorry -- 194 for all

22   purposes, 194-A and 194-B for purposes of the record

23   only.

24            MS. KEENE:  And I'm taking the witness on

25   voir dire.  May I?

```
 1                THE COURT:  Yes, you may.
 2                VOIR DIRE EXAMINATION
 3  BY MS. KEENE:
 4     Q.  You just pointed to me a super tiny "SR"; is that
 5  correct?
 6     A.  Yes, ma'am.
 7     Q.  And is that how you recognize this knife,
 8  basically?
 9     A.  Yes, it is.
10     Q.  What is 194.
11                MS. KEENE:  And, Judge, this may be a good
12  item to put in the two-gallon sack.
13                THE COURT:  Off the record.
14                (Discussion off the record)
15                MS. RAY:  I have no objection, Your Honor.
16                THE COURT:  All right.
17                MS. KEENE:  And I have no objection as
18  offered.
19                THE COURT:  All right.  Then 194-A and
20  194-B, State's exhibits, admitted for the record.
21  State's 194, described in the record as a knife, is
22  admitted, and it and the protective paper have all been
23  placed in the two-gallon Ziploc bag for purpose of the
24  exhibition and publication, but the exhibit's marked on
25  the face of the exhibit.
```

```
 1                (State's Exhibit No. 194, 194-A, 194-B
 2                 admitted)
 3                DIRECT EXAMINATION CONTINUES
 4     BY MS. RAY:
 5        Q.   Investigator Fallentine.  I'm now handing you
 6     what's been marked as 195, 195-A and 195-B.  And what
 7     are those?
 8        A.   This is the packaging and a box containing
 9     SFR-37, two brown-handled kitchen knives from the
10     kitchen countertop, at evidence marker 36, collected
11     March 21st, 2011.
12        Q.   And have you had an opportunity to examine it and
13     see if you can find your markings?
14        A.   Yes, I have.
15        Q.   And did you find your markings?
16        A.   Yes, I did.
17        Q.   Other -- were -- did you also notice markings of
18     other individuals?
19        A.   Yes, I did.
20        Q.   Other than the markings by other people, are
21     State's Exhibit No. 195, 195-A and 195-B in the same
22     condition they were when you packaged them?
23        A.   Yes, they are.
24        Q.   And 195-A has been placed in a Ziploc bag,
25     correct?
```

*STATE v. THOMAS OLIVAS*

 1    A.   Yes.

 2    Q.   Okay.  And did you do that, did you put it in the

 3   Ziploc bag?

 4    A.   No.

 5         MS. RAY:  Your Honor, at this time I offer

 6   State's Exhibit 195, 195-A -- I'm sorry -- 195 for all

 7   purposes, 195-A and B for purposes of the record only.

 8         MS. KEENE:  And, Judge, may I take the

 9   witness on voir dire?

10         THE COURT:  Yes.

11              <u>VOIR DIRE EXAMINATION</u>

12   BY MS. KEENE:

13    Q.   You've just shown me your initials on the butt of

14   the blade.  Is that what you described that?

15    A.   The base of the blade near the handle.

16    Q.   The base of the blade near the handle.

17         And is that how -- is that the -- what you

18   used to identify and know that's the same knives that

19   you recovered from the scene?

20    A.   Yes, ma'am.

21    Q.   The white paper, is that -- that's what you --

22   there's no other markings on it other than your evidence

23   markers and your initials?

24    A.   That's correct.

25         MS. KEENE:  Judge, I have no objection to

```
 1   State's Exhibit No. 195, although I need to look at
 2   these.
 3            I have no objection to 195-B for purposes of
 4   the record.
 5            THE COURT:  Or A?  Or A?
 6            MS. KEENE:  Or A.
 7            THE COURT:  All right.  State's 195-A,
 8   195-B, admitted for the record only.  For the record,
 9   195 looks to me, again, like a court reporter Ziploc
10   bag.  It's the contents.  What's been described as white
11   paper and two kitchen knives that's offered into
12   evidence as placed in 195, the bag, for publication
13   purposes.
14            Am I correct in that?
15            MS. RAY:  Yes, Your Honor.
16            THE COURT:  Joetta, do you agree?
17            MS. KEENE:  Yes.
18            THE COURT:  All right.  Then 195 and
19   contents are all admitted for all purposes.
20            (State's Exhibit No. 195, 195-A, 195-B
21             admitted)
22            DIRECT EXAMINATION CONTINUES
23   BY MS. RAY:
24     Q.  I'm now handing you what have been marked as
25   State's Exhibit 196, 196-A and 196-B.  What are those
```

```
 1   items?
 2       A.   This is the packaging and a box containing item
 3   SFR-38.   These are three knives from the inside of the
 4   dishwasher, evidence marker number 37, collected
 5   3/21/2011.
 6       Q.   And did you look for it and find your markings on
 7   State's Exhibit 196, 196-A and 196-B?
 8       A.   Yes, I did.
 9       Q.   And do you see markings belonging to other
10   people?
11       A.   Yes, I do.
12       Q.   Other than the markings belonging to other
13   people, are State's Exhibit 196, 196-A and 196-B in the
14   same condition they were when you packaged them?
15       A.   The box has a little bit damage, exterior box.
16   Other items appear undamaged and unchanged.
17               MS. RAY:   Your Honor, I offer State's
18   Exhibit 196 for all purposes, 196-A and 196-B for
19   purposes of the record only.
20               MS. KEENE:   May I take the witness on voir
21   dire?
22               THE COURT:   Yes, you may.
23                    VOIR DIRE EXAMINATION
24   BY MS. KEENE:
25       Q.   So 196 is basically three knives, correct?
```

```
 1        A.   Yes, ma'am.
 2        Q.   And you see your initials at the base of the --
 3   right above the grip?
 4        A.   Yes, ma'am.
 5        Q.   There's also white paper contained in the
 6   sandwich bag, or whatever it's called, the bag?
 7        A.   Yes, ma'am.
 8        Q.   Does that white paper have your markings on it?
 9        A.   Yes, it does.
10        Q.   And only your markings?
11        A.   There are markings from another individual from
12   the lab on the back.
13        Q.   Okay.  Other than that, is there any other
14   markings on the bag?
15        A.   No, ma'am.
16        Q.   You talked about now in 196-A as having the --
17   the box being compromised.  Do you know how that
18   happened?
19        A.   I do not.  The initial tape I placed on the edge
20   of the box is still there.  It's just been torn or
21   ripped.
22        Q.   If you're staring at the box, it would be to the
23   right corner?
24        A.   Yes, ma'am.
25        Q.   And that's on 196-A?
```

1      A.  Yes, ma'am.

2      Q.  Does that give you any concern about the

3   integrity of what was inside 196-A?

4      A.  No, ma'am, because it was sealed by me in the

5   proper fashion when I submitted it to the lab.

6      Q.  But as far as after that?  Does that make sense?

7      A.  No, ma'am.

8      Q.  Okay.  Did -- on 196, the white packing, did that

9   seal the knives?

10      A.  Yes, it did.

11      Q.  So the -- these were sealed inside the white

12   packaging, which are then sealed inside the box?

13      A.  Yes, ma'am.

14      Q.  So if the box was compromised, the white

15   packaging was not?

16      A.  Correct.  Well, as would be the brown packaging,

17   which I don't see evidence of compromised seals on this.

18   It's not damaged other than being opened.

19      Q.  Okay.  So other than 196-A having been

20   compromised, the outside packaging of 196-A, being

21   196-B, was not compromised and then the inside packaging

22   of 196 was not compromised?

23      A.  Correct.

24      Q.  So you feel comfortable that these are in same

25   condition and weren't compromised as a piece of

1   evidence?

2       A.   Yes, ma'am.

3       Q.   All right.  And is it -- and you said it was your

4   item number 37, but you have SFR-38 on there.

5       A.   I believe I said evidence marker 37 and the item

6   number is SFR-38.  The evidence markers are what I place

7   on scene for demonstrative purposes.  The actual item

8   number, SFR-38, is for our property room.

9       Q.   Okay.  So if we're looking at pictures, that's

10  the numbers I would love for you to be giving us.

11      A.   Okay.

12      Q.   Is that the SFR-38?

13      A.   No.  That's going to be evidence marker number

14  37.  The yellow placard that we see in the photographs,

15  that will be the evidence marker number.

16      Q.   Okay.  Is that number that you've been giving us,

17  is the evidence number?

18      A.   I've been giving you both of them.

19      Q.   Oh, okay.  And that was just -- just the one that

20  was different, so it seemed.  Okay.  I understand.

21           MS. KEENE:  I have no objection to State's

22  Exhibit 196 for all purposes and State's Exhibit 196-A

23  and B for purposes of the record.

24           THE COURT:  All right.  State's 196, Ziploc

25  freezer bag, and what's described for the record as

1    three knives and white evidence paper, the package

2    exhibit is admitted as offered.  State's 196-A and B are

3    each admitted for the record for the only, all State's

4    exhibits.

5                    (State's Exhibit No. 196, 196-A, 196-B

6                    admitted)

7                    DIRECT EXAMINATION CONTINUES

8    BY MS. RAY:

9      Q.   I'm now showing you -- I'm handing you what have

10   been marked as State's Exhibit 186, 186-A and 186-B.

11   What are these items?

12     A.   This is item SFR-19.  It is made up of packaging,

13   including a box, containing a white-colored disposable

14   lighter that was located at evidence marker number 18.

15   It's going to be the back patio table.  And collected

16   March 21st, 2011.

17     Q.   And have you looked for and found your markings

18   on these items?

19     A.   All but the actual lighter itself.  I was unable

20   to locate my initials on the bottom of the lighter where

21   I normally place them.  There is a good deal of soot and

22   someone else's markings on the bottom of the lighter.

23     Q.   And do you have photos of this item?

24     A.   Yes, I do.

25     Q.   And did you compare them and see if they were

1    similar to the item that you're holding in State's

2    Exhibit No. 186?

3        A.   They are similar.  However, it is a generic item.

4    It's a white lighter.  The box was sealed with my

5    markings, my initials.  The bag was also sealed with my

6    marking and initials.  But, unfortunately, it was an

7    error that I did not put my initials on the base of the

8    lighter.

9        Q.   The -- other than the markings from other people,

10   do State's Exhibits 186, 186-A and 186-B appear to be in

11   the same condition as they were when you packaged them?

12       A.   They do.

13               MS. RAY:  Your Honor, I offer State's

14   Exhibit 186 for all purposes and 186-A and 186-B for

15   purposes of the record.

16                 <u>VOIR DIRE EXAMINATION</u>

17   BY MS. KEENE:

18       Q.   Okay.  On 186-B you see your initials; is that

19   correct?

20       A.   Yes, ma'am.  They're on the back seal, as well as

21   on the label.

22       Q.   And you would have placed a white lighter in a

23   box that would have been placed in 186-B?

24       A.   Correct.

25       Q.   And then in 186-A, you see your initials on this

1   box, as well?

2      A.   I do.

3      Q.   And does the tag number of 19 match which -- the

4   contents that this is?

5      A.   The writings do match, yes.

6      Q.   In other words, 19 is supposed to be a white

7   lighter?

8      A.   Yes, ma'am.

9      Q.   And so, although, you don't see your initials on

10  the bottom of 186, you could deduce that this is,

11  indeed, the same white lighter you put in there?

12     A.   I feel confident, yes.

13     Q.   And you deduce it because it looks just like the

14  white lighter -- it is a white lighter, but it does look

15  like the one you collected?

16     A.   Yes, it does.

17     Q.   And it was also put in a box labeled -- that was

18  labeled basically to be a white lighter?

19     A.   Yes, ma'am.

20     Q.   And it was sealed and put your initials on it?

21     A.   Yes, ma'am.

22     Q.   And then it was put into another bag with your

23  initials on it, labeled a white lighter, sealed?

24     A.   Yes, ma'am.

25     Q.   And you feel confident even without the initials

1   that this is, indeed, the same white lighter?

2       A.   Yes, I do.

3       Q.   Unless something just crazy happened, somebody

4   stole the white lighter and put a new white lighter in

5   there, this would be it?

6       A.   I suppose, yes.

7       Q.   Right.

8            MS. KEENE:   So, Judge, we have no objection

9   to 186 for all purposes, based on her testimony, and the

10  rest for purposes of the record.

11           THE COURT:   All right.   State's 186 is

12  admitted as offered, State's 186.   State's 186-A and B

13  are admitted for the record only.

14           (State's Exhibit No. 186, 186-A, 186-B

15            admitted)

16           <u>DIRECT EXAMINATION CONTINUES</u>

17  BY MS. RAY:

18      Q.   I'm now handing you State's Exhibit 189, 189-A,

19  189-B, and 189-C.   What are these items?

20      A.   Packaging containing SFR-47, a small camera case,

21  a Nikon Coolpix S560 camera and a plastic bag containing

22  cables.   These were located at -- in an end table at the

23  edge of the hallway and living room areas.   Collected

24  March 21st, 2011.

25      Q.   And did you look and find your markings on each

1  of these items?

2      A.  Yes, I did.

3      Q.  And did you see markings belonging to other

4  people?

5      A.  Yes, I did.

6      Q.  Other than the markings belonging to other

7  people, are State's Exhibits 189, 189-A, B and C in the

8  same condition they were when you collected them?

9      A.  Yes, they are.

10             MS. RAY:  Your Honor, I offer State's

11  Exhibit 189 for all purposes and then 189-A, B and C for

12  purposes of the record only.

13             MS. KEENE:  And can I take the witness on

14  voir dire, Judge?

15             THE COURT:  Yep.

16                  VOIR DIRE EXAMINATION

17  BY MS. KEENE:

18      Q.  I assume you are showing me what is going to be

19  marked as -- on 189 as your initials?

20      A.  Yes, ma'am.

21      Q.  And as evidenced in the last, with the white

22  lighter, why do you put your initials on the item, even

23  though you put it all the bags?

24      A.  We initial the evidence items just as an

25  additional step to help in court to identify these as

```
 1   items that we collected on scene.
 2       Q.   And know that it's not just some other person's
 3   camera put in there?
 4       A.   Correct.
 5       Q.   Okay.  So show me where your initials are.  And
 6   you learn to write really tiny.
 7       A.   I actually don't like writing on evidence as a
 8   personal rule, but it's policy.
 9       Q.   I got you.  All right.  So I see it.  And then --
10       A.   This bag was what the cables were contained in;
11   therefore, the bag was initialed, and I did not take
12   cable out of that bag.
13       Q.   So the bag attached, is it -- the clear plastic
14   bag attached to 189-C was actually found at the scene
15   and contained the cables?
16       A.   Correct.
17       Q.   They were part of the evidence, and that's why
18   you have your initials on it?
19       A.   Correct.
20       Q.   Now, you're showing me the bag that the case that
21   the camera was -- was the camera actually in that bag?
22       A.   Yes, it was.
23       Q.   And that's your initials to let you know it's the
24   same bag that the camera was in?
25       A.   Yes, ma'am.
```

1    Q.   That was found at the scene?

2    A.   Yes, ma'am.

3    Q.   Okay.  And what about the -- yes, I see that.

4         What about the cables, did you do anything

5    with them?

6    A.   I did not initial the cables because they were

7    inside of that bag.  I did not remove them.  So I

8    initialed the camera because I took it out of the bag,

9    but as I didn't take anything out of this bag, I only

10   initialed the bag and not the cables.

11   Q.   Okay.  And then they were placed in C and -- in B

12   and C in their relative -- was the camera placed in B

13   and the rest -- the other was placed in C?

14   A.   Yes, ma'am.  The camera was placed inside of a

15   box to protect it from any damage.  The cables and the

16   little bag were placed inside of the larger packaging

17   bag with the box containing the camera.

18   Q.   Okay.  Let me see that box.

19        MS. KEENE:  All right.  I have no objection,

20   Judge, to any of these as offered.

21        THE COURT:  All right.  State's 189 is in a

22   bag.  Is the bag marked or is the item marked?  I think

23   the bag is marked, but I'm not sure.

24        MS. RAY:  The bag is marked for 189.

25        THE COURT:  All right.  The baggie and

1   contents, 189, is admitted.  State's 189-A, 189-B, 189-C

2   are all admitted for the record only, all

3   State's exhibits.

4               (State's Exhibit No. 189, 189-A, 189-B,

5               189-C admitted)

6                    <u>DIRECT EXAMINATION CONTINUES</u>

7   BY MS. RAY:

8       Q.  Now handing you what have been marked as State's

9   Exhibit 185, 185-A and 185-B.  What are those items?

10      A.  The packaging and a box containing SFR-35, a blue

11  disposable lighter, located on a countertop within the

12  kitchen, at evidence marker number 34, collected March

13  21st, 2011.

14      Q.  And have you had an opportunity to look at

15  State's Exhibit 185, 185-A and 185-B to find -- locate

16  your markings?

17      A.  Yes, I have.

18      Q.  And are there markings belonging to other

19  subsequent lab people?

20      A.  Yes, there are.

21      Q.  Other than the markings made by other people, are

22  State's Exhibit 185, 185-A and 185-B in the same

23  condition they were when you packaged them?

24      A.  Yes, they are.

25               MS. RAY:  Your Honor, I offer State's

```
 1   Exhibit 185, 185-A and 185-B, after tendering to Defense
 2   Counsel.
 3              MS. KEENE:  May I take this witness on voir
 4   dire?
 5              THE COURT:  Yes.
 6                   VOIR DIRE EXAMINATION
 7   BY MS. KEENE:
 8      Q.  So on 185, the blue Cowboys lighter, your
 9   initials are on the bottom of that; is that correct?
10      A.  Yes, ma'am.
11              MS. KEENE:  Judge, I have no objection to
12   185-A and B for purposes of the record and 185 for all
13   purposes.
14              THE COURT:  All right.  They are each
15   admitted as offered.
16              (State's Exhibit No. 185, 185-A, 185-B
17               admitted)
18                   DIRECT EXAMINATION CONTINUES
19   BY MS. RAY:
20      Q.  I'm handing you what have been marked as 191,
21   191-A and 191-B.  What are these items?
22      A.  Packaging and two boxes, each of which contained
23   a set of keys on rings.  This is item SFR-24, collected
24   at evidence marker number 23, which was the floor along
25   the east side of the desk in the living room, collected
```

```
 1    March 21st, 2011.
 2        Q.  And have you had an opportunity to look at these
 3    items and locate your markings?
 4        A.  Yes, I have.
 5        Q.  And are there markings belonging to other people?
 6        A.  Yes, there are.
 7        Q.  Other than the markings belonging to other
 8    people, are these items packaged -- I'm sorry -- are
 9    these items -- do they appear to be the same as they
10    were when you packaged them?
11        A.  Yes, they do.
12            MS. RAY:  Your Honor, I offer State's
13    Exhibit No. 192, 192-A and 192-B -- I'm sorry -- 192 for
14    all purposes, 192-A and 192-B for the record.
15            MS. KEENE:  May I take the witness on voir
16    dire, Judge?
17            THE COURT:  Yes.
18                    VOIR DIRE EXAMINATION
19    BY MS. KEENE:
20        Q.  Okay.  Is the little "SR" at the bottom of the --
21    which I think you described earlier as a Honda key, or
22    what appears to be a Honda key?
23        A.  Yes, ma'am.
24        Q.  And that's the only marking on the whole
25    grouping?
```

```
 1        A.  Yes, ma'am.
 2        Q.  And that's how you use to identify this would be
 3   the same?
 4        A.  Yes, ma'am.
 5        Q.  And then there's an "SR".  Okay.  This could also
 6   be the Honda key, or whatever, a black key?
 7        A.  They're both Honda keys.
 8        Q.  They're both Honda keys?
 9        A.  Yes, ma'am.
10        Q.  Okay.  So another Honda key with an "SR" at the
11   base of that key?
12        A.  Yes, ma'am.
13        Q.  And that's what you just showed me on 192?
14        A.  Yes, ma'am.
15             (Pause in proceedings)
16             THE COURT:  All right.  While that tender
17   offer is pending, do you want to ask additional
18   questions?
19             MS. RAY:  Yes.  Sorry, we're getting these
20   numbers mixed up.
21                  DIRECT EXAMINATION CONTINUES
22   BY MS. RAY:
23        Q.  Okay.  State's Exhibit 191, what was State's
24   Exhibit 191?
25        A.  It is one of the set of keys collected as a
```

 1    two-part set of keys.  The same item number on my end,
 2    separate exhibit number for you, had an SFR-24.
 3        Q.  And State's 191-A, is that -- what is that?
 4        A.  It is a white box I used to contain those keys.
 5        Q.  And State's Exhibit 191 and 191-A, did you see
 6    your markings?
 7        A.  Yes, I did.
 8        Q.  And did you see markings belonging to other
 9    people?
10        A.  Other than your tag, that -- that's the only
11    other markings on there.
12        Q.  So are State's Exhibit 191 and 191-A in the same
13    condition they were when you packaged them?
14        A.  Yes, they are.
15            MS. RAY:  Your Honor, I offer State's
16    Exhibit 191 for all purposes, 191-A for purposes of the
17    record.
18            MS. KEENE:  Judge, I've looked at both of
19    them.  No objection as offered.
20            MS. RAY:  And State's Exhibit 191-B for
21    purposes of the record only.
22            MS. KEENE:  No objection.
23            THE COURT:  So I'm clear, 191 and 192 both
24    come out of 192-B?  Is that the confusion?
25            MS. RAY:  Yes, Your Honor.

```
 1                    THE COURT:  Do you agree with that, Joetta?

 2                    MS. KEENE:  Yes.

 3                    THE COURT:  All right.

 4                    Then 192-B, the evidence sack is admitted

 5       for the record only and 192-A and 191-A, the evidence

 6       boxes, are admitted for the record only.  State's

 7       Exhibit No. 191 and 192, the plastic bags containing

 8       contents describing each as keys are admitted for all

 9       purposes.

10                    (State's Exhibit No. 191, 191-A, 192,

11                     192-A, 192-B admitted)

12                    MS. RAY:  And just so I'm clear, Your Honor,

13       191-B is the packaging.  191-B.

14                    THE COURT:  Oh, 191-B.  I'm sorry.  Thank

15       you.

16                    State's 192-A and 191-A are both boxes.

17                    MS. RAY:  Yes, Your Honor.

18                    THE COURT:  Gotcha.

19                    (State's Exhibit 191-B admitted)

20       Q.   (BY MS. RAY)  I'm now handing you State's Exhibit

21       No. 190 and 190-A.  What are these items?

22       A.   It's my packaging, as well as Investigator

23       Weaver's packaging, for item SFR-21, which is a Verizon

24       LG brand cellular phone, evidence marker 20, which would

25       have been the living room floor, collected March 21st,
```

1    2011.

2        Q.   Who's Investigator Weaver?

3        A.   He is one of our electronic crime detectives.  I

4    believe he investigated the contents of the phone, or at

5    leas attempted to.

6        Q.   And have you had an opportunity to find your

7    markings on State's Exhibit No. 190 and 190-A?

8        A.   Yes, I have.

9        Q.   And other than the markings that you made and the

10   markings that Investigator Weaver made, are State's

11   Exhibit 190 and 190-A in the same condition they were

12   when you packaged them?

13       A.   Yes, they are.  They are, except that they're

14   not -- that -- when I packaged them, they were all in

15   one piece.  This was one cellular phone and now it's

16   multiple pieces of a cellular phone.  I assume that's

17   part of his investigation, but I don't know that,

18   though.

19       Q.   And it's your understanding that Detective Weaver

20   is in charge of analyzing cell phones?  He's in the

21   forensic digital unit where they investigate computers

22   and cell phones and that sort of thing?

23       A.   That's correct.

24            MS. RAY:  Your Honor, I offer State's

25   Exhibit No. 190 and 190-A after tendering -- I'm

```
 1   sorry -- 190 for all purposes and 190-A for purposes of
 2   the record.
 3               MS. KEENE:  Can I take the witness on voir
 4   dire, Judge?
 5               THE COURT:  Yes.
 6                    VOIR DIRE EXAMINATION
 7   BY MS. KEENE:
 8     Q.  There's a box contained in 190; is that correct?
 9     A.  Yes, ma'am.
10     Q.  And is that your initials on the box?
11     A.  Yes, ma'am.  That was how I initially packaged
12   it, was in that box.
13     Q.  Okay.  And 190 is in a different kind of a sack;
14   is that correct?
15     A.  Yes.
16     Q.  Would you have actually marked the cell phone?
17     A.  Yes, I did.
18     Q.  Okay.  Can you show us that?
19     A.  Yes.  May I have something to cut this open with?
20     Q.  Okay.  So was that -- the piece that you
21   initialed was actually on the inside of the phone?
22     A.  Yes.  The way that I do cell phones is to remove
23   the back cover and initial on the sticker.  Just in case
24   someone gets their property back at some point, they
25   don't want my initials on the screen of their phone.  In
```

1    this case, irrelevant, but...

2       Q.  Right.  I understand.  So basically it's on the

3    inside of the phone?

4       A.  Yes, ma'am.

5       Q.  And when you submitted the phone, it was not in

6    three pieces like that?

7       A.  No, ma'am.

8       Q.  Or however many pieces it is.

9       A.  I replace the cover when I'm done.

10      Q.  And I just need to see the bag.

11              MS. KEENE:  Judge, I have no objection to

12   State's Exhibit 190 provided Weaver -- I assume Weaver

13   is going to come and say he took that phone apart.  So

14   other than that being tied up, I don't have any

15   objection to it.  And then I have no objection to 190-A

16   for purposes of the record.

17              MS. RAY:  And, Your Honor, yes, Detective

18   Weaver will be testifying.

19              THE COURT:  All right.  Then I'll

20   conditionally admit 190 under Rule 104.  And I will

21   admit 190-A for the record.

22              (State's Exhibit No. 190, 190-A admitted)

23              <u>DIRECT EXAMINATION CONTINUES</u>

24   BY MS. RAY:

25      Q.  I'm now handing you State's Exhibit No. 190 --

1    sorry -- 187, 187-A and 187-B.  What are these items?

2        A.  Packaging, including the white box used to

3    contain item SFR-16, a disposable lighter, white with

4    red lettering, from evidence marker 15, the floor to the

5    west of the desk in the living room, collected March

6    21st 2011.

7        Q.  And have you had an opportunity to look at those

8    items and see if you can find your markings?

9        A.  Yes, I have.

10       Q.  And were they present?

11       A.  Yes, they are.

12       Q.  Do you see markings belonging to other people?

13       A.  Yes, I do.

14       Q.  Other than those markings from other people, are

15   State's Exhibits 187, 187-A and 187-B in the same

16   condition they were when you packaged them?

17       A.  Yes, they are.

18            MS. RAY:  Your Honor, I offer 187 for all

19   purposes, 187-A and 187-B for purpose of the record

20   only.

21            MS. KEENE:  Judge, may I take the witness on

22   voir dire?

23            THE COURT:  Yes.

24                 <u>VOIR DIRE EXAMINATION</u>

25   BY MS. KEENE:

```
 1     Q.  You've just shown me your initials on the bottom
 2   of 187; is that correct?
 3     A.  Yes, ma'am.
 4             MS. KEENE:  Judge, I have no objection to
 5   187-A and B for purposes of the record and 187 for all
 6   purposes.
 7             THE COURT:  All right.  State's 187 is
 8   admitted for all purposes.  State's 187-A, the box; B,
 9   the evidence bag, are admitted solely for the record,
10   all State's exhibits.
11             (State's Exhibit No. 187, 187-A, 187-B
12              admitted)
13             DIRECT EXAMINATION CONTINUES
14   BY MS. RAY:
15     Q.  I am now handing you items -- or State's
16   Exhibits 188, 188-A, 188-B and 188-C.  If you could take
17   a look at these items.  What are they?
18     A.  It's packaging, including a box containing a
19   Nikon Coolpix 5600 camera, camera case and two
20   batteries.  This is item SFR-50, 5-0, was located within
21   the closet in the master bedroom, collected March 21st,
22   2011.
23     Q.  And do you see your markings on these items?
24     A.  Yes, I do.
25     Q.  And are there items -- markings of other people?
```

1    A.  Yes, there are.

2    Q.  And other than the markings by -- made by other

3  people, are State's Exhibit 188, 188-A, B and C in the

4  same condition they were when you packaged them?

5    A.  Yes, they are.

6         MS. RAY:  Your Honor, I offer States's

7  Exhibit 188, for all purposes, 188-B for all purposes,

8  188-A and C for purposes of the record only.

9         MS. KEENE:  Judge, may I take the witness on

10  voir dire?

11         THE COURT:  Yes, you may.

12              VOIR DIRE EXAMINATION

13  BY MS. KEENE:

14    Q.  Did you just show me -- opened up the SD card

15  slot and showed me on your flap your initials?

16    A.  Yes, ma'am.

17    Q.  And that's how you identified as being the same

18  camera that you recovered at the scene?

19    A.  Yes, ma'am.

20    Q.  And then -- and that's in 188; is that correct?

21    A.  Yes, ma'am.

22    Q.  Was there an SD card in it?

23    A.  Yes, ma'am.

24    Q.  And it still is in the camera?

25    A.  Yes, ma'am.

```
 1      Q.  Okay.  So you're showing me a Samsonite case, and
 2   I will take you at your word that your initials in
 3   there.  You've gotten so tiny.
 4      A.  I'm going to start writing larger.
 5      Q.  Okay.  But you feel confident this is the same
 6   case that you recovered from the scene?
 7      A.  Yes, ma'am.
 8      Q.  And by those initials that you actually found
 9   again?
10      A.  Yes, ma'am.
11          MS. KEENE:  I don't have any -- wait a
12   minute.  Let me see that bag.
13      Q.  (BY MS. KEENE)  Were -- did you put the camera --
14   the camera was in the bag?
15      A.  Correct.  When I collected it at the scene, it
16   went -- it was in the bag, which went into the original
17   packaging, and then that was repackaged at the lab with
18   a box.
19      Q.  And that's not your handwriting, though, on the
20   original packaging?
21      A.  No.  That's an assistant who was actually writing
22   as I was collecting the items because my hands were
23   covered with soot and filth.
24      Q.  Okay.  It appears to be a guy's handwriting?
25      A.  It is.  It's SCI Fernandes.
```

```
 1      Q.   Okay.  SCI who?

 2      A.   Fernandes.

 3      Q.   Okay.  And he was helping you collect the

 4   evidence and mark it?

 5      A.   Yes, ma'am.

 6      Q.   And so you feel confident that that's also yours?

 7      A.   Yes, ma'am.  I verified the information on the

 8   bag at the lab when I returned with the evidence in each

 9   case.

10      Q.   And then your markings are also on the outside of

11   188-C?

12      A.   Yes, ma'am.

13               MS. KEENE:  We have no objection to 188 for

14   all purposes, B for all purposes, C for purposes of the

15   record and A for purposes of the record.

16               THE COURT:  All right.  And 188 is the bag

17   containing the camera, which contains the SD card which

18   is marked.

19               MS. RAY:  Yes, Your Honor.

20               THE COURT:  All right.  Then 188, baggie and

21   all contents, is admitted.  State's Exhibit 188-B is

22   admitted for all purposes and 188-A and C are admitted

23   for the record only, All State's exhibits.

24               (State's Exhibit No. 188, 188-A, 188-B,

25                188-C admitted)
```

```
1              DIRECT EXAMINATION CONTINUES
2    BY MS. RAY:
3       Q.  I'm now handing you what have been marked as
4    State's Exhibit 197, 197-A and 197-B.  What are these
5    items?
6       A.  It's packaging containing a paint can, containing
7    original packaging for SFR-48, a roll of duct tape with
8    an unknown red stain.  This was from the floor in the
9    living room, collected March 21st, 2011.
10      Q.  And did you look to see if you saw your markings
11   on these items?
12      A.  Yes, I did.
13      Q.  And do you see markings belonging to other
14   people?
15      A.  Yes, I do.
16      Q.  Other than the markings from other people, are
17   State's Exhibit 197, 197-A and B in the same condition
18   they were when you packaged them?
19      A.  Yes, they are.
20           MS. RAY:  Your Honor, I offer State's
21   Exhibit No. 197 for all purposes, 197-A and 197-B for
22   purposes of the record only.
23           MS. KEENE:  May I take the witness on voir
24   dire?
25           THE COURT:  For future reference, if you
```

1    don't want to take the witness on voir dire, say it's

2    not necessary and I have no objections.  If you do, just

3    ask your questions.  That will save us a few seconds.

4                   MS. KEENE:  Okay.  Thank you, Judge.

5                   THE COURT:  Not a problem.

6                   Ms. Ray, are you okay with that?

7                   MS. RAY:  Yes, Your Honor.

8                   THE COURT:  All right.  Then you may

9    continue.

10                   <u>VOIR DIRE EXAMINATION</u>

11   BY MS. KEENE:

12      Q.  You just handed me a gray duct tape?

13      A.  Yes, ma'am.

14      Q.  Actually called Duck, correct?

15      A.  Yes.

16      Q.  And it's State's Exhibit No. 197 and you showed

17   me a small "SR" that was on the inside?

18      A.  Yes, ma'am.

19      Q.  And this is duct tape you collected at the scene?

20      A.  Yes, ma'am.

21      Q.  And you put it inside of 197?

22      A.  Yes, I did.

23      Q.  Whatever that is, A?

24      A.  197-A.

25      Q.  Okay.  Which then went inside 197-B?

1    A.  Yes, ma'am.

2              MS. KEENE:  Judge, I have no objection to

3    197-A and B for the record and 197 for all purposes.

4              THE COURT:  All right.  Exhibits 197 is

5    admitted and 197-A and B are admitted for the record

6    only, all State's exhibits.

7              (State's Exhibit No. 197, 197-A, 197-B

8               admitted)

9              <u>DIRECT EXAMINATION CONTINUES</u>

10   BY MS. RAY:

11   Q.  Now handing you State's Exhibit 198, 198-A and

12   198-B.  What are these items?

13   A.  It's a small paint can enclosed in a paper bag

14   packaging, containing SFR-39, one black and white

15   colored sock.  This was at evidence marker 38, right

16   outside of the front door, collected March 21st, 2011.

17   Q.  And have you looked for and found your markings

18   on these items?

19   A.  Yes, I have.

20   Q.  Are there markings from other people?

21   A.  Yes, there are.

22   Q.  Other than the markings from other people, are

23   State's Exhibit 198, 198-A and B in the same condition

24   they were when you packaged them?

25   A.  Yes, they are.

 1              MS. RAY:  Your Honor, I offer State's

 2    Exhibit 198 for all purposes and 198-A and B for the

 3    record.

 4                 <u>VOIR DIRE EXAMINATION</u>

 5    BY MS. KEENE:

 6       Q.  All right.  So what's in a paper bag appears to

 7    black and white sock with your initials "SR" on top?

 8       A.  Yes.

 9       Q.  And then there's some other initials which are

10    potentially lab folks or someone?

11       A.  Correct.

12       Q.  And this is the same black and white sock that

13    you recovered from the scene?

14       A.  Yes, ma'am.

15       Q.  In 198.

16              And you put 198 in 198-A?

17       A.  Yes, I did.

18       Q.  And you put 198-A in 198-B?

19       A.  Yes, I did.

20       Q.  And your initials are in each of those places?

21       A.  Yes, ma'am.

22              MS. KEENE:  Judge, we have no objection to

23    198 for all purposes and 198-A and B for purposes of the

24    record.

25              THE COURT:  If I heard you correctly when

1    you first showed her the exhibit, you said in a paper

2    bag.  Did you mean a plastic bag?

3                MS. KEENE:  I did.

4                THE COURT:  All right.  So it's a clear

5    Ziploc bag --

6                MS. KEENE:  It is, Judge.

7                THE COURT:  -- you can see the sock.  All

8    right.

9                With that understanding, 198, the bag

10   containing sock and the sock are admitted as offered.

11   Exhibits 198-A and B are admitted for the record, all

12   State's exhibits.

13               (State's Exhibit No. 198, 198-A, 198-B

14                admitted)

15               <u>DIRECT EXAMINATION CONTINUES</u>

16   BY MS. RAY:

17      Q.  I'm now handing you State's Exhibits 205 and

18   205-A.  What are those items?

19      A.  It is a square box wrapped in brown paper

20   containing SFR-9, which is a doorknob assembly located

21   at evidence marker number eight, which would be master

22   bathroom door of the apartment.  I collected it March

23   21st, 2011.

24      Q.  And did you have an opportunity to look for your

25   markings on State's Exhibit 205 and 205-A?

```
 1        A.   Yes, I did.
 2        Q.   And for the record, 205 is -- the doorknob is
 3   contained inside of -- or 205 is the doorknob and the
 4   brown wrapping over it?
 5        A.   Okay.
 6        Q.   Is that --
 7        A.   Yes --
 8        Q.   -- right?
 9        A.   -- it appears to be, yes.
10        Q.   And do you see -- you saw your markings?
11        A.   Yes.
12        Q.   And did you see markings of other people?
13        A.   Yes, I did.
14        Q.   Other than the markings of other people, are
15   State's Exhibit No. 205 and 205-A in the same condition
16   they were when you packaged them?
17        A.   Yes.
18             MS. RAY:   Your Honor, I offer State's
19   Exhibit No. 205 for all purposes and 205-A for purposes
20   of the record only.
21                  VOIR DIRE EXAMINATION
22   BY MS. KEENE:
23        Q.   You've just shown me your SR markings on the
24   actual doorknob piece?
25        A.   The portion of the door, yes.
```

STATE v. THOMAS OLIVAS

1    Q.   Portion of the door attached to the doorknob?

2    A.   Yes.

3    Q.   And that's part of the exhibit which is No. 205?

4    A.   Yes, ma'am.

5    Q.   And that's -- you put that inside of that bag,

6    which is labeled 205, as well?

7    A.   Yes, I did.

8    Q.   Okay.  So 205 is both the bag and the doorknob?

9    A.   Yes.

10   Q.   All right.  And now -- and then you put that in

11   205-A?

12   A.   Yes, I did.

13   Q.   You just showed me at least two different places

14   where you have put your signature?

15   A.   Yes, ma'am.

16        MS. KEENE:  Judge, we have no objection to

17   205, which is the doorknob, as well as the bag, coming

18   in for all purposes, and for 205-A for purposes of the

19   record.

20        THE COURT:  All right.  State's 205,

21   described as a bag containing part of a door with

22   doorknob, the composite exhibit, is admitted as offered

23   and 205-A is admitted for the record only.

24        (State's Exhibit No. 205, 205-A admitted)

25        DIRECT EXAMINATION CONTINUES

```
 1   BY MS. RAY:
 2       Q.   Now handing you State's Exhibits No. 204 and
 3   204-A.  What are these items?
 4       A.   It is a square cardboard box with brown paper
 5   covering, containing SFR-6, which is a doorknob assembly
 6   from evidence marker number five.  That's going to be
 7   the portion of broken door that was outside of the
 8   master bedroom of the apartment.  Date collected,
 9   3/21/2011.
10       Q.   And have you had -- have you found your markings
11   on State's Exhibit No. 204 and 204-A?
12       A.   Yes, I have.
13       Q.   Do you see markings belonging to other people?
14       A.   Yes, I do.
15       Q.   Other than the markings of other people, are
16   State's Exhibit 204 and 204-A in the same condition they
17   were when you packaged them?
18       A.   Yes, they are.
19            MS. RAY:  Your Honor, I offer State's
20   Exhibit No. 204, which is the doorknob and the wrapping
21   around it and State's Exhibit No. 204-A for the record
22   only.
23                  VOIR DIRE EXAMINATION
24   BY MS. KEENE:
25       Q.   And you just showed me the part of the door where
```

```
 1   you put your initials "SR"?
 2       A.  Yes, ma'am.
 3       Q.  And that door is put inside the bag that is
 4   labeled 204?
 5       A.  Yes.
 6       Q.  And in the bag you've got your initials on it,
 7   too; is that correct?
 8       A.  Yes, ma'am.
 9       Q.  Okay.  Let me see that.
10           You also marked the outside of the box with
11   your initials?
12       A.  Yes, ma'am.
13       Q.  And that is in 204-A?
14       A.  Yes, ma'am.
15       Q.  So basically you put 204, the doorknob, inside
16   204, the bag?
17       A.  Yes.
18       Q.  And then you put those inside 204-A?
19       A.  Yes, ma'am.
20       Q.  And you marked all of them?
21       A.  Yes, I did.
22           MS. KEENE:  I have no objection, Judge, to
23   204 for all purposes and 204-A for purposes of the
24   record.
25           THE COURT:  All right.  State's 204, the
```

1   composite exhibit, is admitted as offered.  State's

2   Exhibit No. 204-A is admitted for the record.

3            (State's Exhibit No. 204, 204-A admitted)

4                  <u>DIRECT EXAMINATION CONTINUES</u>

5   BY MS. RAY:

6      Q.   Now handing you what have been marked as State's

7   Exhibits 209 and 209-A.  What are these items?

8      A.   This is a paper bag surrounding a cardboard box,

9   containing item SFR-10, a doorknob assembly from

10  evidence marker number 89, that is the master bedroom

11  closet door, collected March 21st of 2011.

12     Q.   And have you looked for and found your markings

13  on State's Exhibits 209 and 209-A?

14     A.   Yes, I have.

15     Q.   And are there markings from other people?

16     A.   Yes, there are.

17     Q.   Other than the markings from other people, are

18  State's Exhibits 209 and 209-A in the same condition as

19  when you packaged them?

20     A.   Yes, they are.

21            MS. RAY:  Your Honor, I offer State's

22  Exhibit No. 209 for all purposes, 209-A for purposes of

23  the record only.

24                  <u>VOIR DIRE EXAMINATION</u>

25  BY MS. KEENE:

1      Q.   You've just shown me your initials on 205 -- or

2  209, the actual doorknob part of the door?

3      A.   Yes, ma'am.

4      Q.   You've put that inside of 209, the paper bag?

5      A.   Yes, I did.

6      Q.   And then you put your initials, that you're just

7  now showing me, on the paper bag, as well?

8      A.   Yes, ma'am.

9      Q.   And then you placed those into 209, box?

10     A.   The box is 209-A, but yes, it went in the bag of

11  209 and box of 209-A.

12     Q.   And then you wrapped the box?

13     A.   Yes.  I tried to wrap all the boxes in plain

14  brown paper so not to confuse the matter since they had

15  writing on them.

16     Q.   Okay.  And then you also have your initials, and

17  I can see actually see it, as I stand here, your

18  initials on 209-A; is that correct?

19     A.   Yes, ma'am.

20     Q.   Okay.

21          MS. KEENE:  I have no objection, Judge, to

22  209 for all purposes and A for purposes of the record.

23          THE COURT:  State's 209, composite exhibit

24  as described, is admitted for all purposes and 209-A is

25  admitted for the record only.

```
 1                (State's Exhibit No. 209, 209-A admitted)
 2               DIRECT EXAMINATION CONTINUES
 3   BY MS. RAY:
 4      Q.   Now handing you -- I'm now handing you State's
 5   Exhibits 206 and 206-A.  What are these items?
 6      A.   It is a cardboard box wrapped in brown paper,
 7   containing SFR-7, the doorknob assembly from evidence
 8   marker number six, that's going to be the master bedroom
 9   door, collected March 21st, 2011.
10      Q.   And have you had an opportunity to look for and
11   find your markings on State's Exhibit 206 and 206-A?
12      A.   Yes, I have.
13      Q.   And are there markings from other people?
14      A.   Yes, there are.
15      Q.   Other than the markings from other people, are
16   State's Exhibit 206 and 206-A in the same condition they
17   were when you packaged them?
18      A.   Yes, they are.
19               MS. RAY:  Your Honor, I offer State's
20   Exhibit 206 for all purposes and 206-A for the record.
21               VOIR DIRE EXAMINATION
22   BY MS. KEENE:
23      Q.   And I can see your initials from here on 206,
24   which is the door?
25      A.   Yes, ma'am.
```

1     Q.   And it's -- doorknob?

2     A.   Yes, ma'am.

3     Q.   And those are put inside of the 206, which is the

4   package, which I also see your initials on?

5     A.   Yes, ma'am.

6     Q.   And so you put 206 in 206-A; is that correct?

7     A.   Yes, ma'am.

8     Q.   Which I also see your initials on it.  Thank you,

9   ma'am.

10          MS. KEENE:  Judge, we have no objection to

11   206 for all purposes and 206-A for purposes of the

12   record.

13          THE COURT:  All right.  State's 206,

14   packaging and contents, admitted for all purposes and

15   206-A for the record only.

16          (State's Exhibit No. 206 and 206-A admitted)

17          <u>DIRECT EXAMINATION CONTINUES</u>

18   BY MS. RAY:

19     Q.   Now handing you State's Exhibit 207 and 207-A.

20   What are these items?

21     A.   It is another cardboard box wrapped in brown

22   paper, containing items SFR-29, doorknob assembly,

23   evidence marker number 28, closet door east of the front

24   door.  It's going to be in our kitchen area.  March

25   21st, 2011, date collected.

```
 1       Q.   And have you had an opportunity to look for and
 2   find your markings on these exhibits?
 3       A.   Yes, I have.
 4       Q.   And do you see markings belonging to other
 5   people?
 6       A.   Yes, I do.
 7       Q.   Other than those other -- those additional
 8   markings, are State's Exhibits 207 and 207-A in the same
 9   condition they were when you packaged them?
10       A.   Yes, they are.
11            MS. RAY:   Your Honor, I offer State's
12   Exhibit 207 for all purposes and 207-A for purposes of
13   the record only.
14                VOIR DIRE EXAMINATION
15   BY MS. KEENE:
16       Q.   So you've just shown me basically on the --
17   basically the butt of where it was cut out of door your
18   initials "SR"?
19       A.   Yes, ma'am.
20       Q.   And what is the doorknob assembly that you put
21   inside of a bag which has now been labeled 207?
22       A.   Yes, ma'am.
23       Q.   And so your initials, I see them right there.
24   You're showing those to me.  And then you placed 207,
25   which is the bag and the doorknob, in 207-A.  And you've
```

```
 1   shown me your initials on that?
 2       A.  Yes.
 3            MS. KEENE:  Judge, I have no objection to
 4   207 for all purposes and 207-A for purposes of the
 5   record.
 6            THE COURT:  All right.  State's 207, as
 7   described in the record, packaging, contents, admitted;
 8   207-A, admitted for the record only.
 9            (State's Exhibit No. 207 and 207-A admitted)
10            MS. RAY:  Your Honor, may the witness stand
11   to see this next -- this next exhibit?
12            THE COURT:  Sure.
13            DIRECT EXAMINATION CONTINUES
14   BY MS. RAY:
15       Q.  I'm showing you what has been marked as State's
16   Exhibit 208 and 208-A.  What are these items?
17       A.  Large cardboard box with a good deal of brown
18   wrapping paper around it, containing SFR-27.  It's a
19   dead bolt and doorknob assembly front door of the
20   apartment.  It was evidence marker 26 on scene.  And
21   that was collected March 21st of 2011.
22       Q.  And did you find your markings on these exhibits?
23       A.  Yes, I did.
24       Q.  And do you see markings belonging to other
25   people?
```

1    A.  Yes, I do.

2    Q.  Other than those additional markings, are these

3    exhibits in the same condition they were when you

4    packaged them?

5    A.  Yes, they are.

6         MS. RAY:  Your Honor, I offer State's

7    Exhibit No. 208 for all purposes and 208-A for purposes

8    of the record only.

9              <u>VOIR DIRE EXAMINATION</u>

10   BY MS. KEENE:

11   Q.  And you have shown in 208 where your markings are

12   actually on the door?

13   A.  Yes, ma'am.

14   Q.  And where your markings are actually on the

15   packaging surrounding the door?

16   A.  Yes, ma'am.

17   Q.  This is the front door, correct?

18   A.  Yes, ma'am.

19   Q.  And then your markings on 208-A?

20   A.  That's the original packaging.

21   Q.  So 208 was originally packaged with a lot of

22   different bags?

23   A.  It was packaged in the same format as you see

24   here.  It's just these bags got very dirty and very

25   compromised.  So when I got into the lab, I went ahead

1    and repackaged it.  And by "compromised" I just mean

2    crumpled and...

3       Q.   I got it.  So basically you packaged it twice?

4       A.   Yes, I did.

5       Q.   And you kept the packaging that you did the first

6    time?

7       A.   Correct, for trace evidence, if there was any

8    need for that.

9       Q.   Okay.  And then -- so when you repackaged it,

10   that's what we're looking at in 208?

11      A.   Yes, ma'am.

12      Q.   Okay.  And then I think the only thing is the

13   box.  And you've just shown me your -- I can't see

14   that -- okay.  Here it is -- your initials on the box on

15   both sides.

16           MS. KEENE:  Judge, I have no objection to

17   208 for all purposes and 208 for purposes -- 208-A and

18   the multiple bags containing it for purposes of the

19   record.

20           THE COURT:  State's 208 --

21           MS. KEENE:  That's okay.  She did not hear

22   me.  I don't have objections to 208-A for purposes of

23   the record, which also contains the box as well as

24   numerous bags.

25           THE COURT:  All right.  State's 208-A,

1    described in the record as a box containing various

2    bags, admitted for the record only; 208, which is a

3    packaging containing what's described in the record as a

4    front door dead bolt assembly and et cetera, the

5    composite exhibit, admitted as offered.

6              (State's Exhibit No. 208 and 208-A admitted)

7              THE COURT:  Let's take a moment and see if

8    Tamla has one more thing she wants to do before our

9    stretch break.

10             MS. RAY:  It's the last one.

11             THE COURT:  Oh, okay.  Then are y'all all

12   right?

13             SEVERAL JURY MEMBERS:  Yes.

14             THE COURT:  I did notice that you -- I can't

15   see in the back of the UPS truck and I didn't realize

16   you had another box down there.

17             You may carry on.

18             MS. RAY:  Thank you.

19             <u>DIRECT EXAMINATION CONTINUES</u>

20   BY MS. RAY:

21      Q.  Okay.  I'm now showing you what has been marked

22   as State's Exhibit 202, 202-A and 202-B.

23             (Pause in proceedings)

24             THE COURT:  Do you need a short recess?

25      Q.  (BY MS. RAY)  Okay.  State's 202, 202-A, 202-B,

```
 1   203, and 203-B, so...
 2          Let's take a look -- we'll start with
 3   State's 202, 202-A and 202-B.  What are these items --
 4   what's -- what are these items?
 5      A.  It's a large cardboard box containing -- wrapped
 6   in brown paper containing item SFR-20.  It's going to be
 7   a laptop, cables, and a thumb drive attached.  These
 8   were at evidence marker 19, on the living room floor,
 9   collected March 21st, 2011.
10      Q.  And have you had an opportunity to find and
11   confirm your initials on State's Exhibits 202, 202-A and
12   202-B?
13      A.  Yes, I have.
14      Q.  Okay.  And do you see markings belonging to other
15   people?
16      A.  Yes, I do.
17      Q.  And other than those additional markers, are
18   State's Exhibits 202, 202-A and 202-B in the same
19   condition they were when you packaged them?
20      A.  Yes, they are.
21          MS. RAY:  Your Honor, I offer State's
22   Exhibits 202 for all purposes, 202-A and B for purposes
23   of the record only.
24                  VOIR DIRE EXAMINATION
25   BY MS. KEENE:
```

```
 1      Q.   And you just showed me the laptop itself,
 2  correct?
 3      A.   Yes, ma'am.
 4      Q.   And you had put your initials on the tag that's
 5  in the back of the laptop?
 6      A.   Yes, ma'am.
 7      Q.   It's on the -- actually, on the outside of the
 8  laptop?
 9      A.   Yes.
10      Q.   And then that's -- you wrapped it with the white
11  paper that you're holding?
12      A.   Yes, ma'am.
13      Q.   And then you put your initials on the white
14  paper?
15      A.   Yes, ma'am.
16      Q.   And there's nothing else you wrote on there,
17  other than your initials?
18      A.   No, ma'am.
19              THE COURT:  Just for the record, what is the
20  sticker actually on?  The evidence sticker, is it on the
21  paper or is it on the laptop itself?
22              It's on the laptop itself.  All right.  You
23  may continue.
24      Q.   (BY MS. KEENE)  State's 202 contains white paper,
25  as well as another brown bag.  Are those --
```

1      A.   This is original packaging from the scene and

2   this is the lab paper I photographed it on.  I saved it

3   because a lot of debris and dirt and soot were coming

4   off of the laptop onto the paper and I like to preserve

5   that if there's any trace need for determining what

6   accelerant was used, if any.

7      Q.   Okay.  And I see your initials on 202-A?

8      A.   Yes.

9      Q.   And did 202-A come out of 202-B?

10     A.   Yes, ma'am.

11     Q.   And is there nothing else in 202-B?

12     A.   There is.

13     Q.   So 202-B, then there's a sack with a bunch of

14  dirt and stuff inside it?

15     A.   It's a white piece of paper with additional dirt,

16  lined in the box in an attempt to keep the dirt from

17  coming out of the seam of the box into the property

18  room.

19     Q.   Okay.

20     A.   They get mad about that.

21     Q.   And then I see your initials on 202-B.

22          MS. KEENE:  So, Judge, I don't have any

23  objection to 202-B for purposes of the record and 202-A

24  for purposes of the record, and I don't have any

25  objection to 202 for all purposes.

```
 1              THE COURT:  All right.  State's 202-A and B,
 2   admitted for the record only; State's 202, admitted for
 3   all purposes.
 4              (State's Exhibit No. 202, 202-A, 202-B
 5               admitted)
 6              DIRECT EXAMINATION CONTINUES
 7   BY MS. RAY:
 8      Q.  And, finally, I'm handing you State's
 9   Exhibits 203, 203-A and 203-B.  What are those items?
10      A.  This is a smaller bag that was packaged along
11   with the laptop containing the thumb drive, the damaged
12   thumb drive that was attached to that laptop.
13      Q.  And do you see your markings on those items?
14      A.  Yes, I do.
15      Q.  And do you see markings belonging to other
16   individuals?
17      A.  Yes, I do.
18      Q.  Other than those additional markings, are State's
19   Exhibits 203, 203-A and 203-B in the same condition they
20   were when you packaged them?
21      A.  State's 203 was in one piece.  It was broken, but
22   it wasn't in four pieces.  Again, that's probably part
23   of Detective Weaver's investigation.  State's 203-A
24   someone didn't use very much care in opening it, but it
25   has my seals on it, and there's no problem with 203-B.
```

1    Q.   And do you see Detective Weaver's markings on

2    these items?

3    A.   I don't really know what they look like.  I don't

4    readily see, but he may put them somewhere I'm not --

5    no, I don't.

6    Q.   So you see no other markings on them other than

7    your own?

8    A.   Correct.

9    Q.   And so...

10          MS. RAY:  Your Honor, I offer State's

11   Exhibits 203, 203-A -- sorry -- 203 for all purposes,

12   203-A for the purposes of the record and 203-B for the

13   purposes of the record.

14                    VOIR DIRE EXAMINATION

15   BY MS. KEENE:

16   Q.   And I'm seeing your initials on 203-B, 203-A and

17   I saw your initials on 203.

18   A.   Yes, ma'am.

19   Q.   The only issue is 203-B contained 203-A?

20   A.   Yes.

21   Q.   And 203-A contained 203?

22   A.   Yes.

23   Q.   And that's how you submitted it to the lab?

24   A.   Well, it --

25   Q.   I mean submitted it to the property room or

```
 1   wherever you submitted it to?
 2        A.   It was packaged in with the laptop.
 3        Q.   Okay.  Then it was packaged in with 202-B?
 4        A.   Correct.
 5        Q.   The big box?
 6        A.   Correct.
 7        Q.   But whenever you put 203 in 203-A, 203 was not in
 8   four pieces?
 9        A.   Correct.
10        Q.   It was in one piece?
11        A.   Correct.
12        Q.   And 203-A, the box, was sealed?
13        A.   Correct.
14        Q.   And now it's not, clearly, because you had --
15   somebody had to get this out, correct?
16        A.   Correct.
17        Q.   But you don't know who caused it to go from one
18   piece to four pieces at this time?
19        A.   Not at this time.
20             MS. KEENE:  Judge, I'm assuming it will be
21   tied up.  I really am.  So I'm going to object -- I'm
22   only going to object -- I'm going to offer -- I'm going
23   to -- I'm not going to object provided it is tied up of
24   being in four pieces and the box being --
25             THE WITNESS:  I'm sorry.  May I make a
```

```
 1    correction?
 2              MS. KEENE:  Yes.
 3              THE WITNESS:  Looking at my lab photographs,
 4    image 195 does show that in four pieces in the lab
 5    before I submitted it to anyone.  So this image taken...
 6              THE COURT:  While she's looking, the
 7    contents of 203 were removed.  Were they in this bag at
 8    the time?
 9              MS. RAY:  No, Your Honor.  They were removed
10    from the --
11              THE COURT:  Number 203.
12              MS. RAY:  -- white box and placed into the
13    smaller baggie.
14              THE COURT:  For purposes of courtroom use.
15    All right.
16              MS. RAY:  Yes, Your Honor.
17              THE COURT:  I see.
18              Do you agree with that?
19              MS. KEENE:  I do agree with that, Judge.
20              THE COURT:  All right.  So 203 is a baggie
21    containing what the record has described as four pieces.
22              MS. KEENE:  And, Judge, it's been my
23    understanding that every baggie, other than, really, the
24    one that the officer described, was here for purposes of
25    this trial, not anything the officer did.
```

```
 1              THE COURT:  All right.

 2              MS. KEENE:  If we missed a baggie along the

 3    way.

 4              THE COURT:  All right.  And, again, Ziploc

 5    freezer bag that I know the court reporter provides,

 6    it's easy to tell the smaller bags, not always clear

 7    where they come from.

 8              THE WITNESS:  All right.  May I explain?

 9    Q.   (BY MS. KEENE)  Yes.

10    A.   On March 23rd, 2011, the laptop and cables and

11    the thumb drive were released to Detective Weaver.

12    Photographs were taken after I received them back from

13    Detective Weaver.  So I believe that that came back to

14    me from him in that condition, in the multiple pieces.

15    Because when I collected it on scene, it was collected

16    still attached to the computer and I have photographs to

17    document the condition it was found on scene.

18              MS. KEENE:  I think that answers my

19    question.  I don't have any objection to it.  I think

20    she's tied up why it's in four pieces.

21              THE COURT:  All right.

22              MS. KEENE:  I don't have any objection as

23    offered.

24              THE COURT:  So just to the pieces, as to

25    contents, if any, then you'll save those for Detective
```

```
 1   Weaver?
 2              MS. KEENE:  Oh, absolutely.
 3              THE COURT:  Okay.  Then 203 is admitted,
 4   baggie and contents, and 203-B and A are admitted for
 5   the record only, all State's exhibits.
 6              (State's Exhibit No. 203, 203-A, 203-B
 7               admitted)
 8              THE COURT:  All right.  Let's take a break.
 9   Hit the buzzer when you're ready to start back.
10              (Break taken, 11:15 - 11:30 a.m.)
11              (OPEN COURT, DEFENDANT AND JURY PRESENT)
12              (Witness on the stand)
13              THE COURT:  Still your witness.
14              MS. RAY:  Your Honor, I pass this witness.
15              THE COURT:  Now your witness.
16              MS. KEENE:  Thank you, Judge.
17                       CROSS-EXAMINATION
18   BY MS. KEENE:
19      Q.  It's only day two.
20      A.  Oh, my.  I don't know how you do it.
21      Q.  I don't know how we do it, either.
22              Okay.  I have a bunch of questions for you.
23   Let's start with some -- I think they're all easy, but
24   let's start with some real easy ones.  Okay?
25              You and I have met before; is that correct?
```

1     A.  Yes, ma'am.

2     Q.  And you met with myself and Mr. Moore in regard

3  to this case?

4     A.  Yes, I did.

5     Q.  We don't have to know the date, but about what

6  time period did we all meet?

7     A.  I want to say maybe four months, three, four

8  months ago.

9     Q.  And we -- where did we meet?

10     A.  We met in the laboratory at the main police

11  station, 620 West Division.

12     Q.  And you went over a lot of the different evidence

13  with us then?

14     A.  Yes, I did.

15     Q.  With the detective, as well as some of the

16  other crime -- I think it was actually all the other

17  crime scene officers?

18     A.  Yes.

19     Q.  And other than that, you and I have not had an

20  opportunity to talk?

21     A.  No, ma'am.

22     Q.  But you were kind enough to talk to us and let us

23  ask questions about the evidence and the things that you

24  did on that day?

25     A.  Yes, ma'am.

 1      Q.  And we were able, at that point, to realize that

 2   there we had -- there was a lot of things we were

 3   missing as far as in crime -- the diagrams that y'all

 4   did and so you gave us all those things.

 5      A.  Yes.

 6      Q.  In fact, we all --

 7              THE COURT:  Well, y'all are feeding off of

 8   each other and so slow it down.

 9              Thank you.

10      Q.  (BY MS. KEENE)  We actually had a discussion,

11   didn't we?

12      A.  Yes.  Yes, we did.

13      Q.  I said that is my problem, too.  All right.  Let

14   me calm down.

15              THE COURT:  You don't have to calm down,

16   Counsel, you just have to slow down.

17              MS. KEENE:  I'm trying.  It requires both.

18      Q.  (BY MS. KEENE)  We -- you gave us a number of

19   different diagrams?

20      A.  Yes.

21      Q.  And -- because y'all did a lot of work out there?

22      A.  I would like to think so, yes.

23      Q.  I would say a significant amount of work?

24      A.  I would also say that.

25      Q.  It was a difficult crime scene?

1      A.   Yes.

2      Q.   It was a crime scene that was on a horrific

3   crime?

4      A.   Yes.

5      Q.   And it deserved all the work that you gave it?

6      A.   Yes.

7      Q.   How do you continue to do your job after you see

8   that little baby?

9      A.   Someone has to do this job.

10     Q.   Okay.  Do you just -- do you compartmentalize it?

11     A.   I wouldn't say that.  I feel like there's some

12  importance to what I do and I feel like pretending these

13  things don't happen isn't really an option.

14     Q.   Okay.  So you just -- you can -- can you see it,

15  though, and emotionally recognize it for what it is but

16  then go about your work?

17     A.   Yes.  You can't be emotional on a scene.  It's

18  counterintuitive to what you're trying to accomplish.

19     Q.   But it would be very difficult when -- just

20  seeing the picture, and you can't make it out, it's

21  difficult for any human being?

22     A.   Yes.

23     Q.   Well, we appreciate you doing the work you've

24  done.  Okay?

25     A.   Okay.

1    Q.   I don't have a whole lot of criticism about what

2    you did.  All right.  So I just want to go through what

3    you did.

4    A.   Okay.

5    Q.   What is the big picture of a crime scene?  What

6    is the big -- if there was one theory, what would the

7    theory be?

8    A.   I'm assuming maybe we're getting at just like the

9    basic fundamental building blocks or forensics, or are

10   you talking about crime scene investigation

11   specifically?

12   Q.   Investigation specifically.

13   A.   To document and be able to recognize items of

14   evidence that could be important even if it -- they

15   don't seem important, focusing on details, consistency.

16   Q.   Why?

17   A.   Being consistent is important.  Because if we

18   just haphazardly approach crime scenes, several items

19   could be missed, several steps could be missed.  It's

20   important to evaluate each scene independently, but yet

21   follow a set of guidelines to ensure that everything

22   gets done that needs to be done.

23   Q.   And you're looking for -- you're looking at

24   physical evidence and you're looking for physical

25   things?

STATE v. THOMAS OLIVAS

1    A.   Yes, I am.

2    Q.   You are not talking to witnesses?

3    A.   No.

4    Q.   And physical items don't have motives, do they?

5    A.   No.

6    Q.   And they don't lie?

7    A.   No.

8    Q.   But, also, crime scenes can change?

9    A.   Yes.

10   Q.   Crime scene on March the 22nd, this crime scene

11   could have been very different than on March the 20th

12   when you went?

13   A.   Yes.

14   Q.   And certainly today if you were to go, it's a

15   different scene than it was on March the 20th?

16   A.   I would assume, yes.

17   Q.   So is it important for you to be -- to get

18   everything and to look at everything?

19   A.   Yes.  You don't get a second chance to go back

20   and do it again.

21   Q.   You get one chance?

22   A.   Yes.

23   Q.   And is there a theory, a pervasive theory -- and

24   I'll give you a hint of where I'm looking -- what I'm --

25   where I'm going, is based in science about crime scenes,

1   such as Locard's theory?

2       A.   Locard's principles of transference.

3       Q.   Yes.  What is -- is that kind of what crime scene

4   investigation is based on?

5       A.   I would say that's a good building block for

6   forensics and the crime scene investigations in general.

7   It is a standard and a well-accepted theory, yes.

8       Q.   And what is that theory?

9       A.   The theory is that when two objects make contact

10  with each other, evidence is left on each object to

11  depict that contact in some fashion.

12      Q.   So basically what the theory is, is that when any

13  two items connect, something will be left on each one?

14      A.   That's the theory, yes.

15      Q.   So let's just take the microphone you've been

16  talking on.  As a crime scene officer would the handle

17  of that microphone be a place that you might be

18  interested in, if that particular is the setting and the

19  scene, for you to maybe want to get DNA evidence?

20      A.   Yes.  It looks conducive to that.

21      Q.   And like what about it would look conducive?

22      A.   Actually, I would focus more on the mesh of the

23  microphone itself, because that's what someone is going

24  to be talking into, breathing into, possibly spitting

25  on, and it's hit me in the face a couple times as I've

1   been sitting here.  I would focus mainly on latent print

2   evidence on the actual grip of the microphone itself.

3   If I swab that for DNA, I will remove -- effectively

4   remove latent print evidence, as opposed to protecting

5   it.

6      Q.  Okay.  So -- and you've actually given a lot of

7   different theories, or principles, that happen with

8   crime scene just in your talking.  Whenever you talked

9   into the microphone, you could transfer DNA even though

10   your mouth never touched the microphone?

11      A.  Yes.  Your breath is wet, contains saliva.

12   Again, just the fact that it is in such close proximity,

13   for this particular microphone especially, I would think

14   that the better option would be possibly to swab maybe

15   any of the textured areas, like the switch.  For DNA,

16   since the surface area is too small for latent print

17   evidence to be effective there.  But I would preserve

18   the barrel for actually latent print and latent palm

19   print evidence and swab this portion for DNA.

20      Q.  And so when you're talking about the switch, you

21   know that a finger would touch the switch.  Or at least

22   in theory, we all would think a finger is what is being

23   used to touch a switch and turn it on?

24      A.  Correct.

25      Q.  And so if that finger was used and touched the

1  switch to turn on, it is certainly quite possible that
2  under Locard's theory you could swab it and find that
3  transfer?
4      A.  Yes.
5      Q.  On the -- I don't know what you would call it,
6  the stem or the handle of the microphone, you would look
7  for fingerprints and certainly fingerprints first?
8      A.  Correct.
9      Q.  So you've got DNA and you've also got
10 fingerprints?
11     A.  Yes.
12     Q.  And fingerprints are not likely to be left on the
13 end of that microphone, are they?
14     A.  They may be left, they would not be a comparable
15 quality because of the surface area, or what we call
16 substrate.  The same goes for this metallic rimming of
17 the cord.  It's very segmented.  It's very broken.
18 Leaving a latent print on this and collecting it would
19 cause the print to be so broken as to probably render it
20 unindividualizeable.
21     Q.  So what you want is a solid surface?
22     A.  Preferably.  I love them, yes.
23     Q.  Right.  A glass is like perfect?
24     A.  Oh, yes.
25     Q.  Because -- and we all know because we've had cars

 1  and see fingerprints all over the outside of a window of

 2  a car?

 3      A.  It's nice, yes.

 4      Q.  And so that's where you're leaving your full

 5  fingerprint or good partials where you can connect them

 6  to another person?

 7      A.  It's one of the areas, yes.

 8      Q.  How -- as a crime scene officer, how do you take

 9  a fingerprint off of a surface, let's say, like the

10  microphone?

11      A.  We would begin with processing it using one of

12  many different methods.  Super Glue or cyanoacrylate is

13  applied in order to fix the print.  This allows us to do

14  multiple lifts to try different techniques, possibly

15  florescent powders, other than your standard black

16  powder, to get the best print that you possibly can.

17  But generally speaking, I would use fingerprint powder

18  on something like that.

19      Q.  So there's a difference between fingerprint

20  powder and Super Glue?

21      A.  Yes.

22      Q.  What would you do with fingerprint powder?

23      A.  You apply the powder with a fiberglass brush.

24  You're applying it after you've Super Glued the item.

25  The powder adheres to the Super Glue, the Super Glue

```
1    adheres to the oils deposited by your finger.
2        Q.   So if I touch this microphone and take my hands
3    off, is it quite possible that I have left oils on the
4    microphone?
5        A.   It's possible.
6        Q.   It is possible that I've left enough oil for you
7    to be able to put Super Glue on that?
8        A.   It's possible.
9        Q.   Now, is this the Super Glue that's in the little
10   tubes that we go buy?
11       A.   Yes, it is.
12       Q.   And so how do you apply that Super Glue to that?
13       A.   The Super Glue is placed in a metal tray, which
14   is heated.  We have a chamber that we use for it.  You
15   place the item in the chamber, you heat the glue, you
16   add humidity, or moisture, to the chamber and it is
17   actually fumed in and adheres very evenly to the surface
18   and to the latent print evidence.
19       Q.   And so is that something that you would do out at
20   Presidents Corner, or out at the scene?
21       A.   There are methodologies for doing it in the
22   field.  We do sometimes use them.  If it's something
23   that I can collect, I prefer to bring it back to the lab
24   where I have controlled conditions and I have a chamber
25   to do it in.
```

1    Q.   And we'll go over that.  But that's really why

2    you cut all these doorknobs out?

3    A.   The doorknobs were cut out because I do not

4    possess the appropriate training or resources to process

5    a charred and burnt piece of metal for latent print

6    evidence.

7    Q.   So it was even another step, and we'll get to

8    that then.  Okay.  Once you've looked at a

9    fingerprint -- so you've got the oil -- let's just

10   assume the fingerprint was left and there's oil.  The

11   Super Glue would then attach to the oil of a person's

12   hand?

13   A.   The oil deposited on the item.

14   Q.   And then -- now, what would you do next?

15   A.   You would then, using a number of different

16   processing methods, the one we were just talking about,

17   fiberglass brush and black fingerprint powder or, in

18   this case, dual purpose fingerprint powder which has a

19   gray dichromatic scheme to it.  That gives me a little

20   bit more contrast between the black base of the

21   microphone and the actual latent print as it develops.

22   Q.   And so every person has different fingerprints,

23   that's another theory of crime scene?

24   A.   Yes.

25   Q.   And so what you're looking for is enough ridges.

1  Each of our hands have hundreds of little ridges on each

2  finger, correct?

3      A.   Yes.

4      Q.   And each of those ridges form a different

5  pattern?

6      A.   Yes.

7      Q.   And each of us -- all of us have different

8  patterns on our fingers?

9      A.   Yes.

10     Q.   And so you are looking for enough of that pattern

11  to be there such that could you compare it to a known

12  person and know whether or not that's their fingerprint?

13     A.   Correct.

14     Q.   And how -- do you have to have the full perfect

15  fingerprint in order to make a "gotcha" or that -- a

16  match?

17     A.   No.   In fact, finding a full fingerprint is

18  almost impossible.   Even rolled fingerprints are still

19  partial.   They don't go from the edge of the friction

20  ridge skin to the opposite edge of the friction ridge

21  skin, in most cases.

22     Q.   So how many points -- do you know how many points

23  it takes to say a person's fingerprint matches?

24     A.   There is no standard for the number of points

25  that are used to make a fingerprint match.   It differs.

1    Some agencies do put standards in place so that they

2    know that every identification that they do make meets

3    at least a minimum standard.  The Arlington Police

4    Department uses eight points, as --

5         Q.  So eight --

6         A.  -- you call them points.

7         Q.  I'm sorry.

8         A.  As you called them, point.

9         Q.  What do you call them?

10        A.  Galton details.

11        Q.  Details.

12        A.  Or minutiae.

13        Q.  Or minutiae.  Okay.  So that would be basically

14   here's a little point on this fingerprint and here's a

15   little point, or minutiae, on this known sample and we

16   can say that looks identical?

17        A.  Not only that it looks identical, but that it's

18   in the same location as it -- in both prints and same

19   formation in both prints.  You can even go to what's

20   called third-level detail.  What you're discussing now

21   is second-level detail.

22        Q.  And so basically that's how you take -- that's

23   why you're looking for fingerprints, is so you can -- if

24   you have a known suspect or somebody you want to compare

25   to, you can use their fingerprints and look at a

1    fingerprint that was left at a crime scene?

2        A.   Yes.

3        Q.   And can you also get DNA from fingerprints?

4        A.   Yes.

5        Q.   How do you do that?

6        A.   The oils that actually make up the fingerprint do

7    contain DNA.  You are leaving a DNA deposit when you

8    leave a fingerprint.

9        Q.   Are there times when you would leave your oils

10   and not leave a fingerprint?

11       A.   Yes.  There can be times that you will deposit

12   oil from nonfriction ridge skin and not leave a print.

13   And I should clarify, when I say a fingerprint, I'm

14   talking about latent fingerprint evidence, not patent

15   fingerprint evidence.

16       Q.   What's the difference?

17       A.   A latent fingerprint is one that you leave by

18   depositing oils from your finger onto a surface.  A

19   patent print is one that you leave by having something

20   on your finger and then depositing it.  So you're not

21   actually leaving your oil.  If you had paint on your

22   hand, for example.

23            And then the third type is a plastic print,

24   which, the best description I can give you is like Silly

25   Putty.  If you've ever played with that and you've seen

1  your print left in the Silly Putty, it's actually a

2  mirror image of what your actual fingerprint is because

3  you are depositing it into a substance that is pliable.

4      Q.  So that's -- that may or may not leave DNA, but

5  certainly the oils have a whole lot better chance of

6  leaving DNA than the other two?

7      A.  Correct.

8      Q.  And so when you arrive at -- and let's do

9  Presidents Corner.  When you arrive at Presidents

10  Corner, in your head what are you thinking, I'm going to

11  be collecting and looking for what?

12      A.  It's tricky.  You try to walk through your scene

13  without any preconceived notions.  What you don't want

14  is someone telling you exactly what to look for, because

15  then you may miss something that they didn't list out.

16  So that's part of the difference between being a crime

17  scene investigator and being a crime scene technician.

18  Technicians are told by their detectives what to pick up

19  and they basically document it and put it in a bag.

20          Crime scene investigator tries to use their

21  training and experience, their knowledge of forensic

22  techniques available and collect things that they might

23  think that could be useful or -- at some point.  So I

24  was looking for any type of evidence regarding the type

25  of wounds I saw on Ms. Gandy, any conducive surfaces for

1   fingerprinting, any paperwork and electronics.  A lot of

2   those are useful in the investigation process.

3       Q.   And you're looking for things you might collect

4   that you could get DNA off of?

5       A.   In theory, yes.  With arson scenes, fire is not a

6   friend of DNA.  It's not a friend of Locard, either.

7       Q.   Right.  Exactly.  In fact, fire can -- well, this

8   scene, you don't have to be a CSI person to know fire

9   can destroy a lot more than DNA?

10      A.   Yes.

11      Q.   I mean, it destroys paint and carpet and all

12  sorts of things, correct?

13      A.   Yes.

14      Q.   And when the firemen come in and they're coming

15  in to put out the fire, they're also destroying a crime

16  scene?

17      A.   Yes.

18      Q.   They got to do what they got to do.  Everybody

19  gets that.  But the reality is, when you looked

20  at Presidents Corner, you can't say with certainty that

21  there was a fight in there, can you?

22      A.   I can tell that there was someone bleeding in

23  there, yes.

24      Q.   But there's over -- okay.  Actually, that was

25  probably a bad question.

1           There's overturned furniture in the living
2  room?
3       A.  Yes.
4       Q.  You don't know if that was caused during this
5  crime or if that was caused by the firemen?
6       A.  Correct.
7       Q.  And we're going to go over some additional
8  pictures and some of the additional things that you
9  collected beyond the things in the courtroom, but things
10 such as Mechelle's bed was cockeyed or was off -- it
11 wasn't off the springs, but it was turned?
12      A.  Yes.
13      Q.  That could -- if there weren't firemen in that
14 house, that would be a pretty big clue of something as a
15 crime scene officer?
16      A.  Yes, it can be.
17      Q.  It would certainly be something that you would
18 document, her bed is significantly tilted on it's box
19 springs?
20      A.  Yes.
21      Q.  Not in a way that a normal person would sleep on
22 their bed?
23      A.  Correct.
24      Q.  And that would make you think, well, something
25 must have happened in the bedroom, possibly?

```
 1        A.   It's a possibility, yes.

 2        Q.   It's certainly something, as a good crime scene

 3   officer, that you would document and take pictures of?

 4        A.   Yes.  I would search under the mattress.

 5        Q.   And in this case you documented it and took

 6   pictures of it, even knowing that there were firemen in

 7   there?

 8        A.   Yes.

 9        Q.   Because firemen could have been the folks who

10   were breaking out windows and doing what they need to do

11   to cause that whole mattress to tilt?

12        A.   Yes.

13        Q.   And so what could have a real appearance of being

14   very significant evidence turns out not to be?

15        A.   Yes.

16        Q.   Because we just don't know --

17        A.   Correct.

18        Q.   -- correct?

19             And so when you arrive at Presidents Corner

20   and you know you're entering into a fire scene, I would

21   assume you know from right at that point this is a tough

22   one?

23        A.   Yes.

24        Q.   Because it's going to be nasty, dirty, stinky,

25   full of water, and probably still has some heat coming
```

```
 1    off of it, doesn't it?
 2        A.   It was warm in there, yes.
 3        Q.   Okay.  And so there's also just certain things
 4    that you may want to collect that are still dealing with
 5    what just happened to them, items?
 6        A.   Many of them were wet, yes.
 7        Q.   That's why you had to contact the different
 8    people to find out how to preserve that best?
 9        A.   Correct.
10        Q.   Whenever you first arrived at Presidents Corner,
11    at this apartment complex, what time was that?
12        A.   It was -- may I refer to my report?
13        Q.   Absolutely.
14        A.   I believe 2342.
15        Q.   2342.  So that's basically 11:42, is that
16    correct, before midnight?
17        A.   Yes, ma'am.
18        Q.   And if I show you a large diagram, can you give
19    us an idea -- well, let me back up.
20             Had there been a perimeter set around this
21    crime scene by the time you got there?
22        A.   Yes.  There were several patrol vehicles and
23    crime scene barrier tape in place.
24        Q.   Explain to the jurors what that is.
25        A.   Crime scene barrier tape is that yellow police
```

1   tape, I think everyone's seen, you know, photographs or

2   pictures or TV.  We actually do use yellow barrier tape.

3   And it is set up to keep individuals who are not

4   relevant to the investigation out of the crime scene.

5   If you cross the barrier tape, you are required to sign

6   in on what is called a crime scene access log so that we

7   have a record of who entered and who left and the times

8   in which they did that.

9        Q.  And so someone would basically -- a police

10   officer would actually be in charge of a crime scene

11   log?

12        A.  Yes.

13        Q.  Where they would check anybody that came in, they

14   would check their name and their time that they came in

15   and check them when they left?

16        A.  Yes.

17        Q.  And so that if the other people, let's say they

18   live two doors down, they're not on fire, but if that

19   perimeter's been set, they can't go home?

20        A.  In most cases.  A lot of times if the

21   investigation has been moved indoors, they may be

22   escorted into their residence by an officer, but they

23   are not allowed to just come and go, no.

24        Q.  Whenever you arrived at Presidents Corner, the

25   apartments, how big was this perimeter when you arrived?

1    A.   It encompassed most of the paved parking area

2    outside of the corner of that building.

3    Q.   If I -- if we go on the big -- you know what the

4    big diagram is, that you've been looking at?

5    A.   Yes.

6    Q.   Would that help you to show the jurors kind of

7    the idea where the big perimeter was?

8    A.   Yes, it might.

9         MS. KEENE:   May I approach her with the

10   aerial?

11        THE COURT:   Yep.

12   Q.   (BY MS. KEENE)   Let me show you what has been

13   marked as State's Exhibit No. 2 and ask you if this is

14   the -- in this aerial can you -- if we put it on a

15   board, can you use this to help us understand where the

16   perimeter was set up?  We can put it over here so they

17   can all see it.  But would this --

18   A.   Can I get my bearings as we're talking --

19   Q.   Yes.

20   A.   -- about this apartment building here in this

21   corner?

22   Q.   Yes.

23   A.   Okay.

24   Q.   There's been testimony that the white truck is

25   basically the marker, which is why we're about to go put

```
 1   it on a big --
 2       A.  Yeah.  Let's do that.
 3               (Pause in proceedings)
 4               MS. KEENE:  Judge, may she step down to show
 5   them --
 6               THE COURT:  Yes.
 7               MS. KEENE:  -- this on the board?
 8               THE COURT:  Just don't block her off from
 9   the court reporter, which means you might want to scoot
10   that back just a hair --
11               MS. KEENE:  Okay.
12               THE COURT:  -- to leave a window for Karen
13   to be able to see her face.
14               MS. KEENE:  Thank you.
15               (Pause in proceedings)
16               MS. KEENE:  Okay.  We're both going to face
17   her.  So I'm going to be talking I guess to your back.
18               THE COURT:  Or why don't you put her beside
19   you.
20               (Pause in proceedings)
21       Q.  (BY MS. KEENE)  All right.  Do you have your
22   bearings?
23       A.  I do.  The apartment in question is going to be
24   here.
25       Q.  And here is the -- basically the corner of that
```

1    building?

2        A.   Yes, I'm sorry.   The -- I'm assuming this is

3    north, so we're talking about the western corner of the

4    apartment complex, southern end of Building 2216.

5        Q.   And where was the perimeter, where was base --

6    well, when you arrived, where were people not allowed to

7    go?

8        A.   A perimeter was set up that spanned this area,

9    cutting off functionality to all these parking spaces.

10   It came down -- and a lot of the fire trucks and police

11   vehicles were in this area here, as it was a wider kind

12   of area for them to maneuver their large trucks and

13   such.   So this -- roughly this quadrant.

14       Q.   And did they actually mark it off with the yellow

15   tape?

16       A.   Yes, as best that they could.   They did use

17   vehicles in some cases.   Because as you can see, there's

18   not a lot to tie it to, and it is flexible tape.

19       Q.   And then, since we've got this up there, give the

20   jurors an idea just in a big picture, and we'll go over

21   it specifically, where you focused in on your crime

22   scene investigation.   Because I know it went beyond the

23   apartment, correct?

24       A.   It did.   Obviously the apartment.   Ms. Gandy, who

25   was in the parking lot outside of the apartment.   This

1   Dumpster area here, I did search that for any potential
2   evidence, and we searched the wooded area back behind
3   Building 2216.
4      Q.  And back behind in that wooded area, that is not
5   flat?
6      A.  No.
7      Q.  In fact, that is, if you recall, if you were to
8   walk out of -- and we'll going through it more in
9   details.  But basically, the big picture, if you were to
10  walk out of Ms. Gandy's apartment in the back, you're
11  going to face a fence; is that correct?
12     A.  Yes.
13     Q.  And then immediately behind that fence it becomes
14  a ravine?
15     A.  Yes.  It's hilly and I fell down it once and
16  there is a -- it's very dense.  It's not easily
17  traversed.
18     Q.  About how -- like what are we talking about, you
19  fell down it?
20     A.  Dramatic.  It was maybe two and a half to three
21  feet.
22     Q.  That you fell?
23     A.  Yeah.
24     Q.  Okay.  But it's a much deeper ravine than two and
25  a half to three feet?

1    A.   Is it?

2    Q.   Yes.

3    A.   Well, I was kind of sliding haphazardly and

4  grasping for branches.

5    Q.   All right.  This is -- and, basically, the point

6  is, this is not an easy area -- if I wanted to sneak up

7  and jump over a fence, this is not an easy area to do

8  that with?

9    A.   I don't recall it being easy, no.

10   Q.   Okay.

11   A.   The search, no.

12   Q.   If you're at -- being out there and having walked

13 around, that would not be the point of entry that you

14 would choose?

15   A.   This is three years ago, but I remembered

16 specifically thinking it was difficult to traverse that

17 area.

18   Q.   Okay.  And so you -- when did you search that

19 area?

20   A.   That was the final thing we did before we cleared

21 the scene, because we were using the advantage of

22 daylight at that time.

23   Q.   So that was the 22nd?

24   A.   That was the 21st.

25   Q.   I mean 21st.  I'm sorry.  During the day?

STATE vs/THOMAS OLIVAS

1    A.   It was approximately, if I had to guess, around

2    noon.

3    Q.   And had that area been secured?

4    A.   There was no barrier tape used back in that area,

5    no.

6    Q.   Because it would just be barrier tape on a ravine

7    really?

8    A.   I can't even think how you might even accomplish

9    it.

10   Q.   Right.  Exactly.  It does, in theory, make sense,

11   but in reality would be silly to put tape on a 20-foot

12   drop-off?

13   A.   Yes.  Twenty feet?

14   Q.   Uh-huh.  Pretty deep, ten, maybe I'm wrong with

15   the numbers, but deep.  But anyway...

16            About how long did y'all look back in that

17   area?

18   A.   This is going from memory, I don't have specific

19   times, but I would estimate about 45 minutes to an hour.

20   Q.   And did y'all find anything of evidentiary value

21   back in that area?

22   A.   I did find a library card belonging to Ms. Gandy

23   outside of the fenced area where all of the debris and

24   things from the apartment had been left.  The library

25   card was a significant distance away from that, which

1  lent it a little bit more evidentiary weight because it

2  wasn't part of the -- otherwise, I wouldn't have really

3  found it odd to see a library card in a pile of debris.

4      Q.  Okay.  And we'll go over that as we go through it

5  step by step.

6              So you found in addition -- you found her

7  library card away from her apartment?

8      A.  Yes.

9      Q.  And you collected that?

10     A.  Yes.

11     Q.  And made a notation that you found that?

12     A.  Yes.

13     Q.  And that's something you discovered during the

14  daylight hours?

15     A.  Yes, as well as set of keys on a lanyard that

16  were in the Dumpster.

17     Q.  Okay.  Well, since we're here, do -- can you use

18  this to show us the general area where the library card

19  was found?

20     A.  Can I look at my report?

21     Q.  Absolutely.

22     A.  I have it listed as the south corner of the

23  building east of the -- okay.  The south corner of the

24  building, east of the fence line, along the drainage

25  ditch and culvert.

1   Q.   So what does "east" mean, on the inside of the

2   fence or outside of the fence?

3   A.   That's a good point.

4   Q.   I'm sorry.

5   A.   That would be west of the fence line.  Wouldn't

6   it?  Let's see...

7   Q.   That's all right.

8   A.   Let me look at my photographs instead, just to

9   double-check.  I do have it listed as east.  So --

10  Q.   The --

11  A.   -- I have to say east of the fence line.

12  Q.   Well, and what we'll do is over the lunch break,

13  you can look at some other pictures and see if that

14  will -- knowing some of the things, see if you can

15  identify it further.

16  A.   Okay.

17  Q.   You've got a lot of evidence you have to keep in

18  your head so I'm not going to bug you about that.  Okay?

19  A.   Okay.

20  Q.   Basically you found her library card outside in

21  the backyard ara.

22  A.   And it was along the culvert and drainage path.

23  The culvert was on the west side of the fence line.

24  Q.   Okay.

25  A.   Which, it does --

```
 1      Q.  Well, we'll get it perfect, okay, when you look
 2   at your pictures.  All right?
 3      A.  All right.
 4      Q.  You also stated outside, what else?  You just
 5   talked about keys on a landing?
 6      A.  Lanyard.
 7      Q.  Lanyard.
 8      A.  Right.  It was one of those long -- it was -- the
 9   keys were located in the Dumpster, which is in decently
10   close proximity to the apartment.  Dumpsters are
11   somewhere that you search normally as part of any crime
12   scene investigation, because people throw evidence away
13   more often than you think.  The keys, obviously, no one
14   goes about throwing their keys away intentionally, and I
15   collected it because it was something I didn't expect to
16   see in the Dumpster.  And I did take photographs and
17   notate where that was in there.
18          I used the keys to attempt to disengage the
19   dead bolt of Ms. Gandy's apartment.  It did not work.
20   It was -- it fit and it was similar, but it did not
21   disengage her lock.
22      Q.  So you found -- and basically a -- I don't see
23   anybody in the courtroom that has one.  But basically
24   it's a -- what is a lanyard?
25      A.  A lanyard is the thing that goes around your
```

1    neck.  It's like one of those -- I need to look at my

2    pictures of the keys.  I haven't actually seen them

3    in --

4       Q.  All right.  Well, we'll --

5       A.  -- three years.

6       Q.  We'll go over that.

7            THE COURT:  One at a time, please.

8       Q.  (BY MS. KEENE)  But it's what you call a lanyard.

9    That's where you found those keys?

10      A.  I believe they were on a lanyard.  But yes, they

11   were in the Dumpster.

12      Q.  And, as you said, obviously, people do not throw

13   away their keys?

14      A.  Not on purpose.

15      Q.  Did it have -- a lot of times people, when they

16   have their keys basically on a big necklace, they'll

17   have their badge where they work or anything.  Did it

18   have anything like that on it?

19      A.  I don't recall it having any identifiable

20   markings that would tie it to a person.

21      Q.  Okay.  Why would you take those keys and go try

22   to use them in Mechelle's house?

23      A.  Just to ensure that they didn't actually go to

24   her house.

25      Q.  Was there -- did you take any significance about

1    the fact that they fit into the lock?

2        A.   It tended to possibly indicate that it was

3    someone who lived in that apartment complex.  The

4    apartment complexes generally buy mass quantities of

5    these dead-bolt locks and the keys are similar in

6    appearance.  I have keys at my house that fit in both my

7    front door and my back door, but only one opens one and

8    one opens the other.  So I believe it's possibly

9    belonging to a resident who lives in that apartment

10   complex, possibly.

11       Q.   But who knows?

12       A.   Who knows.

13       Q.   You collected them because people don't throw

14   away their keys?

15       A.   Correct.

16       Q.   And you found it in a Dumpster?

17       A.   Yes.

18       Q.   Right outside a murder scene?

19       A.   Yes.

20       Q.   And was there anything else in the Dumpster or

21   outside area that you saw that was out of place to you?

22       A.   No.

23       Q.   That you collected?

24       A.   No.

25       Q.   Okay.  That's the things you did the next day

```
 1    when it was daylight?

 2       A.  At the end of the -- it was during my initial

 3    response.  So you have to keep in mind when I say we

 4    responded on the 20th, we did, but we were only there

 5    for an hour on the 20th.  The prime -- primarily we were

 6    there the 21st.  So this would be right before we

 7    cleared the scene the first time.

 8       Q.  And so by the time you're searching through the

 9    Dumpster, this area of the Dumpster was never under a

10    secure scene, so to speak?

11       A.  No.

12       Q.  In other words, there wasn't yellow tape that

13    included the Dumpster?

14       A.  No.

15       Q.  And the reality is, anybody could have put in the

16    keys after the homicide?

17       A.  Oh, yes.

18       Q.  But you're still -- you go even beyond the tape

19    here and then looking in Dumpsters.  Was there any other

20    Dumpster, other than this one, that you recall looking

21    in?

22       A.  No, not personally.  I did have assistance during

23    the search from Investigator Fernandes and I do not

24    recall -- I don't want to speak out of school for what

25    he actually searched.  He wasn't always right there next
```

```
 1   to me.  My instruction to him was we need to search the

 2   grounds within a reasonable distance to see if we see --

 3   we're looking for a knife.

 4       Q.  Absolutely.  You're looking for something sharp,

 5   knife, that could have been used to killed Ms. Gandy?

 6       A.  Yes.

 7       Q.  That's the bottom line.

 8       A.  And woods are a good place to throw things like

 9   that.

10       Q.  And that's why you're willing to get on your

11   hands and knees looking for the knife back there?

12       A.  Falling down in a hole.

13       Q.  Exactly.  Okay.  I think that's all I've got

14   on this one.  You can have a seat.

15               What do you got?  Tell me.

16       A.  The screwdriver that was hanging in the

17   build-out --

18       Q.  Oh, yeah.  Yeah.

19       A.  -- where you said did I collect anything else

20   from outdoors, that would fall under that.

21       Q.  Show them on this.

22       A.  The build-out is along the southern wall of the

23   building, in the southwestern corner.  And that's

24   where -- it was down -- it was taller than our division

25   here by probably about a foot.  It was far too deep for
```

Case 4:22-cv-00385-O   Document 16-9   Filed 08/16/22   Page 111 of 203   PageID 1163

```
 1    me to reach in to get it.  I had to get one of those
 2    plastic grippy arms to get it out.
 3        Q.  Okay.  And that was outside?
 4        A.  Yes, ma'am.
 5        Q.  And you took pictures of the area, as well as I
 6    think they saw -- at least looking down one picture of
 7    that?
 8        A.  Yes, ma'am.
 9        Q.  Did you -- when you were out there looking or
10    doing any of the crime scene, did you have any
11    information about a suspect or a figure or a person
12    coming from that area right before the fire started?
13        A.  I was not given that information on the scene,
14    no.
15        Q.  Was that any information you had at any point
16    prior to doing any of that, of your crime scene work?
17        A.  Several years later.
18        Q.  Okay.
19        A.  Two years later.
20        Q.  Okay.  That's -- do you usually get that kind of
21    information?
22        A.  With a scene like this where detective look --
23    what's the -- Detective Stewart was looking for Asher
24    and doing an Amber Alert during the beginning, where we
25    normally have this type of conversation, it's
```

1   not uncommon for that information to stay with the

2   detective, depending on the detective.  Some of them are

3   very interactive, others are more independent and will

4   come to you if they think that they have information you

5   might need.

6       Q.   Okay.  So it just depends?

7       A.   Yes, ma'am.

8       Q.   You can take nothing from it, not having known

9   that?

10      A.   I like to think I processed the scene thoroughly

11  enough where it encompassed the potential for someone to

12  have handled the back door and front door.  So either

13  way, if they had gone in or out the back door, I would

14  like to think that I did the best that I could to

15  process these areas.  So...

16      Q.   Okay.  Thank you.  You can have a seat.

17           As part of your work doing the crime scene,

18  did you take measurements?

19      A.   Yes, I did.

20      Q.   Was that something that y'all did basically as a

21  group, so to speak, or as a team?

22      A.   I was assisted by CSI Tricksey.

23      Q.   And so the crime scene officer, Tricksey, helped

24  you take measurements.  Why do you want to take

25  measurements?

 1    A.   Measurements, doing your diagram and your sketch,

 2   taking measurements is part of standard protocol.  It is

 3   so that if at any time someone needs to come back and

 4   place evidence back on scene, they can do that

 5   sufficiently.

 6    Q.   Was your diagram to scale?

 7    A.   No.  They're not to scale.

 8    Q.   So you can't look at the diagram and know, well,

 9   that's where it was, it was only -- well, even if it's

10   small, it was only in relation to what it was?  Does

11   that make sense?

12    A.   No.

13    Q.   Well, okay.  If you have a 34 and 35, you can't

14   decide if they're an inch distance apart and then 36 is

15   two inches and that's the difference?  That's just --

16   that would be to scale.

17    A.   Right.  That's why we take the measurements and

18   we put them with our diagram, but the diagram itself is

19   not a good indication if you're trying to actually

20   determine the specific size.

21    Q.   The diagram is used to kind of give us an

22   overview and an idea of what the apartment looked like?

23    A.   It's demonstrative, yes.

24    Q.   And it's an overview and a look of where the

25   various items were?

Case 4:22-cv-00385-O   Document 16-9   Filed 08/16/22   Page 114 of 203   PageID 1166

1    A.  Yes.

2    Q.  It's not a GPS location of those items?

3    A.  No.

4    Q.  But y'all -- because it's important to know the

5  distances, y'all did do all those measurements?

6    A.  Yes.

7    Q.  And you created a diagram that had all those

8  measurements?

9    A.  CSI Tricksey did our diagram in this case.

10    Q.  And is it one -- did she also do the other

11  diagram that we've looked at?

12    A.  She's done all the diagrams.

13         MS. KEENE:  Judge, may I approach the

14  witness?

15         THE COURT:  You may.

16    Q.  (BY MS. KEENE)  Investigator, let me show you

17  what has been marked as Defendant's Exhibit No. 6.  Do

18  you recognize that?

19    A.  Yes, I do.

20    Q.  What is that?

21    A.  This is a diagram of the evidence markers removed

22  and the measurements in place.

23    Q.  And would this help you to explain to the jurors

24  kind of the layout of this place in terms of the real

25  dimensions?

```
 1       A.  Yes.

 2       Q.  And --

 3            MS. KEENE:  All right.  Judge, at this time

 4    we would offer in Defense Exhibit No. 6.

 5            MS. RAY:  No objection, Your Honor.

 6            THE COURT:  Defense 6 is admitted.

 7            (Defendant's Exhibit No. 6 admitted)

 8       Q.  (BY MS. KEENE)  Investigator, let me show you

 9    what has been marked as Defense Exhibit No. 7 and ask

10    you if you recognize this?  Seven is a two-page

11    document.

12       A.  Yes, I do.

13       Q.  And what is Defense Exhibit No. 7?

14       A.  This is a -- it's basically a key that Anna

15    Tricksey, CSI Tricksey, created that lists the actual

16    measurements out for each of the items of evidence.

17       Q.  And is this something that you know to be

18    accurate?

19       A.  Yes, I believe it to be accurate.

20       Q.  And this is something that you think it would be

21    helpful for the jurors to understand really the exact

22    location of each item?

23       A.  Depending on how they like to view things.  I

24    would prefer -- I prefer the demonstrative aid.  This is

25    very specific.  So if they see things in numbers, this
```

```
 1   is good for them.
 2      Q.  Okay.  This could be other folks that see things
 3   in more GPS-kind-of number things?
 4      A.  I don't know if I'd say GPS, but in feet and
 5   inches, yeah.
 6      Q.  Okay.  South and east, all those directions?
 7      A.  Yes.  I am not a fan of those.
 8      Q.  Okay.
 9           MS. KEENE:  Judge, we would offer in
10   Defendant's Exhibit No. 7.
11           MS. RAY:  No objection, Your Honor.
12           THE COURT:  All right.  Defense Exhibit 7 is
13   admitted.
14           (Defendant's Exhibit No. 7 admitted)
15      Q.  (BY MS. KEENE)  Investigator, let me show you
16   what's been marked as Defense Exhibit No. 8, 9, 10, and
17   11 and ask you if you recognize what those depict?
18      A.  They appear to be an apartment complex and a
19   Dumpster outside of an apartment complex.
20      Q.  Do they appear to be -- is that the -- does that
21   appear to be the Dumpster that you recall looking in and
22   finding the keys?
23      A.  It's hard to tell from this prospective view
24   because I cannot see any of the numbers on the
25   buildings, the numbers on the apartments.
```

STATE vs/THOMAS OLIVAS

```
1      Q.   Okay.  So you can't say?

2      A.   I really can't.  I apologize.

3      Q.   It's okay.  That's okay.  About how far was the

4  Dumpster that you got the keys out of from the homicide

5  scene?

6      A.   See, this is why I use measuring devices.  I'm

7  not great at estimating.  We looked at the aerial view.

8  We can -- I can show them again where it was.

9      Q.   That's okay.  We'll cover -- we'll figure that

10  out over a break.

11      A.   Okay.

12           MS. KEENE:  This is really a good time,

13  Judge, actually, because I'm going to go into some

14  things with the ELMO, if you want to.

15           THE COURT:  Okay.  Let's go eat.  Be back at

16  your pickup point in an hour and 15 to 20 minutes,

17  depending on what time you get on the elevator and get

18  out, powder your nose and stuff.  If you're back there

19  for five minutes, then an hour and 15 minutes ought to

20  be good.  If you go straight out now, I'll give you an

21  hour and 20 minutes.  Be at your pickup point.

22           Lawyers be back here in an hour and 15

23  minutes from the moment the jury leaves the floor and

24  we'll pick up at that point.

25           Remember your instructions.  As of now, I
```

1    think it's okay outside and everything on the radar -- I

2    just checked again when she walked up and I asked about

3    when to lunch break and I think it's all north so I

4    think you'll be okay.

5           All right.  We'll be in recess for an hour

6    and 20 minutes.

7           (Jury excused from courtroom)

8           MR. ROUSSEAU:  Judge?

9           THE COURT:  Yes.

10          MR. ROUSSEAU:  I want to put something on

11   the record real quick before --

12          THE COURT:  Okay.

13          MR. ROUSSEAU:  It will just take a second.

14          THE COURT:  Not a problem.  We're stuck in

15   here for a minute anyway.

16          All right.

17          MR. ROUSSEAU:  Your Honor, this morning I

18   handed to the Counsel for Defense a document that is a

19   printout.  It was -- it's a printout from a -- of what

20   appears to be a screenshot that was sent to me by the --

21   Detective Stewart yesterday, of the Arlington Police

22   Department, indicating a series of the telephone -- the

23   police calls that were made at the apartment that we've

24   been talking about, the scene of this crime.  It appears

25   to be a printout of all calls made by the police to that

1   address from January of 2000 up until the date of this

2   offense.  There -- I believe there are ten entries on

3   there.  I do not have it -- a full explanation of

4   every one of the incidents.

5              It is my understanding that it is

6   comprehensive, that this does indicate all of the police

7   calls at that address.  And I have explained to the

8   Defense my understanding of one call in particular,

9   which was supposed to have been a burglary

10  investigation, and that was from July of 2009, and I

11  just got that yesterday.  I just wanted to make it clear

12  that I have turned it over this morning.

13             THE COURT:  Can I see what you're kind of

14  describing in the record --

15             MR. ROUSSEAU:  I have it, Your Honor.  I'd

16  just like to -- if you don't mind me mark -- writing in

17  pen, I can mark it as a Court's exhibit.

18             THE COURT:  Oh, well, it doesn't really

19  matter.  I want to look at it.  It may or may not be

20  necessary to do that.

21             I just want to be clear, "screenshot" means

22  there's a computer entry and it's a print screen of

23  what's an electronic record and you have a hard copy

24  that you gave to Defense Counsel.  Is that what you mean

25  by "screenshot", Kevin?

```
 1              MR. ROUSSEAU:  That's my understanding.
 2    That's what it looks like to me, Your Honor.
 3              THE COURT:  Okay.
 4              MR. ROUSSEAU:  And that's how it was sent to
 5    me.
 6              THE COURT:  Yeah.  It says -- it has http
 7    bar at the top.  That's what it looks like to me, as
 8    well.  It's labeled "calls for service".  So any call
 9    for service to 2216 Presidents Corner is listed here
10    beginning 1/15 of 2000, ending 3/20 of 2011.  One --
11    yeah.  You can see "death" is the final one on the last
12    day.  Investigation, 9-1-1 calls, unexplained
13    disturbance, unexplained R theft, unexplained -- those
14    are back prior to 2005 -- or 2005 and prior.  MIS
15    warrant in 2007.  Investigation 2009.
16              But you don't have specific reports or
17    details.  These are the just the calls of service which
18    appears in a list of call numbers that may or may not
19    still be available.
20              MR. ROUSSEAU:  That's all I have right now,
21    Your Honor.
22              THE COURT:  Gotcha.
23              Mr. Moore, you got all this?
24              MS. KEENE:  We do.
25              THE COURT:  All right.
```

1         MR. ROUSSEAU:  I'll attach it to the

2    electronic file to get it open, but my computer system

3    was messed up this morning and I'm not all that quick

4    about that sort of thing anyway, so I wanted to give

5    them a hard copy this morning.

6         THE COURT:  That's fine.  And I don't see

7    any need of putting that in the record if you have a

8    copy.

9         Do you see any need, other than what's in

10   the record, of putting anything else in the record at

11   this time?

12        MR. MOORE:  No, Judge, I don't.

13        THE COURT:  All right.  Then the

14   disclosure's on record.  You have the original copy.

15   We're good.

16        We're in recess again.

17        (Lunch break taken, 12:25 - 1:45 p.m.)

18        (OPEN COURT, DEFENDANT PRESENT, NO JURY)

19        THE COURT:  State your full, legal name for

20   the court reporter, please, sir.

21        THE WITNESS:  Gabriel Salinas, Jr.

22        THE COURT:  I need you to face me and raise

23   your right hand, please, sir.

24        (One witness sworn)

25        THE COURT:  Certain rules that apply to any

STATE vs. THOMAS PLIVAS

1    witness in a criminal trial.  The first rule is you may

2    not be present in the courtroom to listen to what other

3    witnesses say when they testify.  For the same reason,

4    you're not allowed to discuss anything you know about

5    the facts and circumstances or people involved in this

6    trial with any other person who may be called as a

7    witness.  You're not allowed to, quote, discuss your

8    testimony with other witnesses.  You can talk about the

9    weather, the Rangers, whatever, but you cannot talk

10   about anything that might be asked about in the

11   courtroom.

12            You still with me?

13            THE WITNESS:  Yes.

14            THE COURT:  You may speak in the private

15   with the attorneys for either side or their

16   investigators at any time as long as other witnesses

17   can't overhear your conversations in order to prepare

18   for your own testimony.  You must make sure you hear and

19   understand the question asked.  If you can't hear

20   or don't understand, then say so.  And if you do hear

21   and understand, answer that question, stop, and then

22   wait for the next question.  If you keep talking, her

23   hands will wear out before the trial is over.

24            You understand?

25            THE WITNESS:  Yes, sir.

```
 1              THE COURT:  If someone asks you, Do you have
 2    a watch, if you do, say, Yes.  Don't say what time it
 3    is, don't say where you got it unless they ask you.  If
 4    they ask to explain, go for it.  But don't explain
 5    unless it's part of the question.  All clear?
 6              THE WITNESS:  Yes.
 7              THE COURT:  Let's take a short recess.
 8              (Pause in proceedings)
 9              (Witness Fallentine takes the stand)
10              THE COURT:  Bring in the jury.
11              (Jury seated in courtroom)
12              THE COURT:  Joetta, still your witness.
13              MS. KEENE:  Thank you, Judge.
14    Q.  (BY MS. KEENE)  Did you have a chance,
15    Investigator, to look up where the library card was
16    found?
17    A.  Yes, I did.
18    Q.  And do you feel comfortable now having looked at
19    whatever you looked at to be able to testify whether it
20    was inside or outside of the fence line?
21    A.  Yes, I do.
22    Q.  And where was it?
23    A.  It is outside of the fence line running towards
24    the parking area in a cement culvert.
25    Q.  So basically it's not back towards the ravine,
```

1   it's towards the parking lot?

2      A.   Towards the parking lot in front of the apartment

3   building, yes.

4              MS. KEENE:   Judge, may I approach the

5   witness?

6              THE COURT:   Yes.

7      Q.   (BY MS. KEENE)   I'm going to show you what has

8   been marked as Defense Exhibit No. 12.   Do you recognize

9   Defense Exhibit No. 12?

10     A.   Yes, I do.

11     Q.   And how do you recognize Defense Exhibit No. 12?

12     A.   It is a photograph that I took.   I see the

13   evidence marker and the evidence item in question.

14     Q.   And what is it a picture of?

15     A.   It is a picture of a North Richland Hills library

16   card.

17     Q.   And is it a picture of the card that we've been

18   talking about?

19     A.   Yes.

20     Q.   Let me show you what has been marked as Defense

21   Exhibit No. 13 and ask you if you recognize that?

22     A.   Yes, I do.

23     Q.   And how do you recognize that?

24     A.   It is a picture of the back of the same library

25   card in discussion, at evidence marker number 42.

1    Q.   And so what you did is whenever you saw the

2    library card, you put the marker on, as the jurors have

3    seen, in the other -- as like the ones in the house?

4    A.   Correct.

5    Q.   And for this one, it was 42?

6    A.   Yes, ma'am.

7    Q.   And let me show you what's been marked as Defense

8    Exhibit No. 14.  What is that?

9    A.   This is a medium-range photograph of the same

10   library card.

11   Q.   And what is -- what is it showing the jurors, in

12   a broad sense?

13   A.   Generally speaking, crime scene photography is

14   done in three steps.  You have a step to show the

15   overall location of an item of evidence.  You have a

16   midrange photograph, so that if it's a small item you

17   can then make out somewhat what it is.  And then you

18   have a close-up photograph which only deals with that

19   item of evidence in question.

20          This assists you in being able to see where

21   it was in the grand scheme of your crime scene.

22   Q.   So in -- so 14, Defense Exhibit No. 14, would be

23   a midrange?

24   A.   Yes.

25   Q.   Okay.  And let me show you Defense Exhibit No. 15

1    and ask you if you recognize that?

2        A.   I do.

3        Q.   And what is Defense Exhibit No. 15?

4        A.   This would be an example of a long-range

5    photograph for this same item, the library card, at

6    evidence marker number 42.

7        Q.   And 16 and 17, let me show you Defense Exhibit

8    No. 16 and 17 and see if you recognize those?

9        A.   Yes, I do.

10       Q.   How do you recognize those?

11       A.   These are photographs of the same library card

12   without the evidence markers in place.  That is also

13   part of the photography process, is to make sure that

14   you get photographs without adding or subtracting

15   anything.  And so these would have been the first

16   photographs I took before the marker was in place.

17       Q.   So you can write in a report that something like

18   a card is found east of a fence, but two years,

19   three years later that can be confusing even to a smart

20   young lady or person like yourself?

21       A.   Yes.

22       Q.   And so you have to go back and look at pictures

23   sometimes?

24       A.   I'm glad I have them, yes.

25       Q.   Right.  So you're glad you have the pictures?

 1      A.  Yes.

 2      Q.  So you were able to look at the pictures so you

 3  don't have to just guess where was this library card

 4  found.  You actually took pictures and we can show the

 5  jurors?

 6      A.  Yes, we can't guess.

 7      Q.  We cannot guess.

 8          But these pictures will certainly explain to

 9  the jurors where you found this library card?

10      A.  Yes.

11          MS. KEENE:  Your Honor, we would offer in

12  Defense Exhibit No. 12 through 17.

13          THE COURT:  Defense 12, 13, 14, 15, 16, 17?

14          MS. KEENE:  Yes, sir.

15          THE COURT:  Got it.

16          MS. RAY:  No objection, Your Honor.

17          THE COURT:  All right.  Exhibits 12, 13, 14,

18  15, 16, 17 each admitted.

19          (Defendant's Exhibit No. 12 - 17 admitted)

20          MS. KEENE:  Thank you, Judge.

21          Permission to publish by the projector,

22  ELMO?

23          THE COURT:  You may do that.

24          While you're setting it up, we talk about

25  "ELMO" through this trial.  For purposes of the trial

1    record, it's not little pink Sesame Street character.

2    It's a high-tech operated overhead projector that can

3    magnify and zoom.  And it is for use by lawyers in

4    court.  So any time the word "ELMO" appears, it means

5    whatever is being displayed is being put on a

6    larger-than-the-American-flag-size screen and it's

7    viewed by all participants in the trial and the jury.

8              And that's the only time I intend to state

9    that.

10             State, agree with that?

11             MR. ROUSSEAU:  Yes, Your Honor.

12             MS. RAY:  Yes, Your Honor.

13             THE COURT:  Defense agree with that?

14             MS. KEENE:  We do, Judge.

15             THE COURT:  All right.  You may proceed.

16   Q.   (BY MS. KEENE)  We're now looking at Defense

17   Exhibit No. 12 and you recognize what this is?

18   A.   Yes.

19   Q.   And is this the library card we've been talking

20   about?

21   A.   Yes.

22   Q.   And would this be called the close-up?

23   A.   Yes.

24   Q.   And that would be one side?

25   A.   Correct.

1    Q.  All right.  And then Defense Exhibit No. 13 would

2    be the other side?

3    A.  Yes.

4    Q.  And then whose name is on there?

5    A.  It appears to be Mechelle Gandy.

6    Q.  At the time -- this is during the day, correct?

7    A.  Correct.

8    Q.  By this time you know the name of the person that

9    had been killed?

10   A.  Certainly.

11   Q.  Okay.  So you know that this is significant?

12   A.  I believe it -- it could be, yes.

13   Q.  All right.  And we'll get to that.  Fourteen,

14   this is a midrange?

15   A.  Yes.

16   Q.  Now, we'll get that in the bigger one.  All

17   right.  Here's 15.  Defense Exhibit 15.

18            And what is Defense Exhibit No. 15 showing

19   the jurors?

20   A.  This is a farther distance away from evidence

21   marker 42.  It is beginning to show you what the item's

22   location is and bearing to the crime scene by showing

23   you other items around the evidence item.

24   Q.  And so -- do you have a pointer up there?

25   A.  Yes.

1    Q.   Where is the -- actually, let's start here.

2         Where is the -- what is this?  Is that

3    anything you did, these markings?

4    A.   No, they're not.

5    Q.   So the red marks were already there?

6    A.   Yes.

7    Q.   Where is the fence line?

8    A.   The fence line is running up at the top left-hand

9    corner of this photograph.

10   Q.   And we've got another picture that will show it a

11   little bit better.

12        Here is 16.  And is that basically 15

13   without the marker on it?

14   A.   Yes.  Yes, it is.

15   Q.   And that's not part of the picture, is it?

16   A.   No.  That's your pointer.

17   Q.   I don't know what's up with that.  All right.  I

18   guess we could -- whatever -- right there is where the

19   library card is?

20   A.   Yes.

21   Q.   And then in the grand scheme of things, where it

22   is, 17, does that help kind of put a perspective on

23   where it was found in relation to Mechelle's house?

24   A.   Yes, it does.

25   Q.   And explain to the jurors where that is, or how

1     that shows that.

2         A.   This is the outside corner of the building.  The

3     spare bedroom would be in this -- centrally located in

4     the photograph here.  The fence line running behind her

5     apartment, indicated here.  The culvert is then running

6     toward the parking area in front of the apartment, which

7     is out of the range of the photograph, in the lower

8     right-hand quadrant.

9         Q.   And this yellow tape right here, is that the type

10    of tape that we were talking about that y'all put around

11    the perimeter of the house --

12        A.   Yes.

13        Q.   -- so to secure it?

14        A.   Yes, it is.

15        Q.   Would that type of tape have been all out and

16    around in the parking lot at some point?

17        A.   Yes, it would have.

18        Q.   And then does it keep getting narrower and

19    narrower coming in?

20        A.   As the scope of the investigation focuses in,

21    they will sometimes bring the barrier in closer, because

22    it's easier to control with less patrol vehicles.

23        Q.   Okay.  Now, this card being outside of her house

24    was significant enough for you to collect, correct?

25        A.   It is not in the same location as the rest of the

1    debris from inside the apartment; therefore, it has to

2    be considered potentially significant.

3        Q.   Because there was a lot of debris from her

4    apartment outside, and we're going to show pictures of

5    that.

6        A.   Right.

7        Q.   So this also could be like the bed, nothing?

8        A.   Yes.

9        Q.   This could also be firefighters throwing hoses

10   inside a house where there's debris?

11       A.   Yes.

12       Q.   But because this is different than a big mass of

13   debris, this was significant for you to take pictures,

14   document and actually take that card?

15       A.   Yes.

16       Q.   Just in case?

17       A.   Yes.

18       Q.   Because we can't -- we could never go back and

19   find that card again?

20       A.   Correct.

21       Q.   Where was the major amount of debris?

22       A.   The majority of the debris was outside of the

23   spare bedroom window.

24       Q.   Front yard?  Backyard?

25       A.   Backyard near the patio.

1     Q.  Let me show you what's been marked as Defense

2  Exhibit No. 18 and ask you if you recognize that?

3     A.  Yes, I do.

4     Q.  Would that help explain to the jurors kind of how

5  the layout is heading into the backyard?

6     A.  Yes, it would.

7     Q.  How -- who took that picture?

8     A.  I took that picture.

9     Q.  Let me show you Defense Exhibit No. 19.  Do you

10  recognize 19?

11     A.  Yes, I do.

12     Q.  How do you recognize 19?

13     A.  It is basically the same area, just photographed

14  a little closer up.

15     Q.  So it's doing the same thing you've talked about

16  where you would go back and then you'd, what, take a

17  couple of feet, walk a couple feet and take another

18  pictures?

19     A.  Actually, it's the opposite.  We start from far

20  away and focus in on our object of interest.

21     Q.  Okay.  I think we said the same thing.  We just

22  said it a different way.

23          Defense Exhibit No. 20.  Do you recognize

24  Defense Exhibit No. 20?

25     A.  Yes.

```
 1      Q.   And does Defense Exhibit 20 show where one of the

 2   lighters was found?

 3      A.   Yes, it does.

 4      Q.   And did you take that picture?

 5      A.   Yes, I did.

 6      Q.   All right.  Now, Defense Exhibit No. 21.  Do you

 7   recognize 21?

 8      A.   Yes, I do.

 9      Q.   And what is that going to help you explain to the

10   jurors, in 21?

11      A.   It demonstrates the amount of debris that was

12   removed from both the upstairs apartment and Ms. Gandy's

13   apartment by Investigator Lea.

14      Q.   And so these pictures that we're looking at right

15   now, we started out at dark, the 21 I just showed you is

16   daytime, correct?

17      A.   Yes.

18      Q.   And so this was the next day when you went -- or

19   this was that morning.  Once the light turns, you're now

20   outside again?

21      A.   Yes.

22      Q.   So you took pictures when it was dark and then

23   you went back outside when it was light and took more

24   pictures?

25      A.   Yes.  It's definitely a good idea to do that.
```

```
1        Q.   Plus your scene was actually changing, wasn't it?
2        A.   I'm not sure I understand.
3        Q.   Well, if Lea was throwing debris out, then that
4   didn't look like that when you arrived?
5        A.   Correct.
6        Q.   Okay.  Number 22, is that -- what is that a
7   picture of?
8        A.   It is another angle depicting that same debris.
9        Q.   And would these help you to explain to the jurors
10  how this was set up out there in the back?
11       A.   Yes.
12       Q.   Was that back gate open or shut when you saw it?
13       A.   I believe it was open.  Otherwise, I would have a
14  photograph depicting it being shut.
15       Q.   And all the pictures you have are of this gate
16  being open?
17       A.   Correct.
18       Q.   You have pictures of it at night being open; is
19  that correct?
20       A.   I would have to check.  I believe so.  Yes.
21       Q.   And you have pictures of it during the day being
22  open?
23       A.   Yes.
24       Q.   I'm going to hand you what has been marked as 23
25  through 26 and ask you if those would -- if you took
```

Case 4:22-cv-00385-O    Document 16-9    Filed 08/16/22    Page 136 of 203    PageID 1188

1    those pictures?

2        A.  Yes, I did.

3        Q.  And did you take those pictures during the day or

4    at night?

5        A.  During the daytime, it appears.

6        Q.  And what are those pictures of?

7        A.  These are pictures showing the gate.  I guess you

8    could call it a locking mechanism.  It's just some wire.

9        Q.  Okay.  So this is an up-close -- close pictures

10   of what that gate looked like, what the condition of

11   that gate was in her backyard?

12       A.  Yes.

13       Q.  And you took those during the daytime?

14       A.  Yes.

15       Q.  But you also have a picture of the gate at

16   nighttime?

17       A.  Yes, I do.

18       Q.  And do these -- and these fairly and accurately

19   depict what you saw out there?

20       A.  Yes.

21       Q.  And then let me show you what has been marked as

22   27 -- and 28 has been admitted on the State's side, but

23   just keep -- just for me not having to dig through that

24   stack, if you'll look at those two again and see if you

25   recognize what those pictures were attempting to show

1    that you took?

2        A.  Yes.

3        Q.  Would those fairly and accurately help you

4    explain to the jurors where the screwdriver was that you

5    found out there?

6        A.  Yes.

7                 MS. KEENE:  We would offer in 27 and 28.

8                 MS. RAY:  No objection, Your Honor.

9                 MS. KEENE:  Twenty-three through 26.

10                THE COURT:  Through 26?

11                MS. KEENE:  Yes.

12                THE COURT:  Twenty-three through 26.  Okay.

13   Continue.

14                MS. KEENE:  And 18 through 22.

15                MS. RAY:  No objection, Your Honor.

16                THE COURT:  All right.  Defense 22, 21, 20,

17   19, 18, 23, 24, 25, 26, 27, 28 are each admitted.

18                (Defendant's Exhibit No. 18 - 28 admitted)

19                MS. KEENE:  May I publish them using the

20   ELMO?

21                THE COURT.  Yes, you may.

22        Q.  (BY MS. KEENE)  All right.  What is Defense

23   Exhibit No. 22 showing the jurors?

24        A.  This is a photograph of the debris that was

25   outside of the spare bedroom of the apartment.

1    Q.   Where is the back door to Mechelle's house?

2    A.   It is just above center in the photograph, off of

3    the patio area.

4    Q.   And so in your diagram where it's marked "patio",

5    is that this little area right here?

6    A.   Yes.

7    Q.   And in your diagram y'all did not account for

8    the grass area or the fence?

9    A.   Does not appear that CSI Tricksey included those.

10   Q.   Okay.  So basically it includes this right there.

11   Where is that lighter found?

12   A.   It is on the corner of a patio table, which is

13   right in this location here.  The lighter is on the

14   corner here.

15   Q.   And then all this is what you've classified as

16   "debris"?

17   A.   Correct.

18   Q.   And right here is the window to what -- which

19   bedroom?

20   A.   The spare bedroom.

21   Q.   And so all this is what Lea -- or at least some

22   of it -- this is certainly what Lea has been kicking out

23   as he's been sifting through the room?

24   A.   Correct.

25   Q.   So this is the evolving crime scene, so to speak,

```
 1   in the backyard?
 2       A.  Yes.
 3       Q.  Because when you first got there -- this is a
 4   daytime picture, isn't it?
 5       A.  Yes.
 6       Q.  And when you first got there, this level of
 7   debris was not in the backyard?
 8       A.  There was debris, but not that level.
 9       Q.  There was debris that the fire left and the
10   firemen left -- not the fire -- the investigator left?
11       A.  Correct.  It was from the second-floor apartment,
12   I believe.
13       Q.  So up here also had fire damage and some of these
14   things possibly, probably not that, but some of these
15   other things possibly could have come from upstairs?
16       A.  Yes.
17       Q.  Twenty-one is basically just tilted and turning
18   it so that you can see the fence, is that correct, right
19   in here?
20       A.  Correct.
21       Q.  And so there was no measurements as far as how
22   wide this is, was there?
23       A.  I don't believe she took measurements of that.
24       Q.  Okay.  But it's not a tiny backyard, but it's not
25   big?
```

1    A.   No, it's not big, no.

2    Q.   Does it go very far back this way, or is that

3    fence right there related to her apartment?

4    A.   I don't recall.

5    Q.   When you stood at this fence -- I know you

6    didn't -- and I've looked through your notes and I've

7    talked to you.  I know you did not take dimensions on

8    how tall this fence was.  But when you stood at it, was

9    it significantly taller than you?

10   A.   Yes.  It was at least a couple feet taller than

11   me.

12   Q.   How tall are you?

13   A.   Five-foot-five.

14   Q.   So it's a good seven- to eight-foot fence?

15   A.   I would say so.

16   Q.   It's not your six-foot-tall, small fence that are

17   sometimes found in residential areas?

18   A.   No.

19   Q.   And her -- did any of the -- did any of that

20   fence appear to be tampered with?

21   A.   Not tampered with.  It was blackened in this area

22   from the fire.

23   Q.   Did anything appear to be like it had rotted out

24   where somebody could have squeezed through or gotten

25   through?

1      A.   Not to my recollection, no.  It would have been

2   documented.

3      Q.   Exactly.  If you saw an area where you thought,

4   ooh, someone could easily come right through that hole,

5   you would have documented, taken pictures, again,

6   up-close, medium and back pictures, correct?

7      A.   Yes.  Yes.

8      Q.   What is Defense Exhibit No. 20 showing the

9   jurors?

10      A.   This is a photograph of the lighter that was

11   located on the patio table.

12      Q.   Okay.  That's the same patio table we just

13   described?

14      A.   Yes.

15      Q.   Okay.  Now, going back to that fence, this is a

16   nighttime picture, isn't it, Number 19?

17      A.   Yes.

18      Q.   Is this outside of her yard looking in, so to

19   speak?

20      A.   Yes.  The parking area would have been to my back

21   as I took this photograph.

22      Q.   So the parking area is towards the audience here,

23   in theory?

24      A.   Behind me, as I'm seated, if I'm looking at the

25   fence from where I'm seated, that's confusing.

1    Q.   It is.  We'll keep going.  Don't worry about it.

2    A.   It's out of frame in this area over here.

3    Q.   We'll resolve it.  Don't worry about it.

4              I think you took a backup picture.  But

5    neither here nor there, this is at nighttime.  Would you

6    have gone and taken these pictures before you took the

7    ones on the inside, or how did that take place?

8    A.   Yes.  This would have been part of the

9    documentation of the exterior scene, which -- before I

10   ever made entrance into the apartment.

11   Q.   So whenever you arrive, you -- camera is first

12   thing you're going to do?

13   A.   Notes about my initial observations will be

14   first, but the camera is a close second, yes.

15   Q.   And you start outside in?

16   A.   Yes.

17   Q.   And so basically you will have walked around the

18   perimeter as much as you can of her apartment and taken

19   pictures of what it looks like at almost midnight?

20   A.   Yes.

21   Q.   So this is almost midnight in the condition that

22   you saw it in?

23   A.   This would have been past midnight.  I arrived at

24   2347.  I would have had to meet with the officer, take

25   notes.  It would have been past midnight, but close to

1  it.

2      Q.  So nighttime?

3      A.  Yes.

4      Q.  And one of the first things you did?

5      A.  Yes.

6      Q.  And this also -- you're taking pictures just to

7  preserve it, but, also, if that gate is open, I mean,

8  that potentially could be significant?

9      A.  Yes.

10      Q.  Or it could, again, be a fireman opening that

11  gate?

12      A.  Yes.

13      Q.  Because he ran through the inside and he needed

14  to get out and took off out...

15      A.  Yes.

16      Q.  So that's either significant or it's not,

17  correct?

18      A.  Correct.

19      Q.  Can you tell what that is?  Let me show you a

20  close-up.

21      A.  No.  A vine or a stick perhaps, a branch.

22      Q.  It appears to be something that has got some

23  sticker things on it, doesn't it?

24      A.  A bramble.  It does look like it has sharp

25  protrusions.

1    Q.   It looks like barbed wire to me, but it's hard to

2    believe it would be barbed wire right there?

3    A.   No.  It -- it appears to have a tan end on one

4    side.  In -- in this photographic I see it more clearly

5    than your ELMO, which indicates it might be a -- a -- a

6    branch or something that's stripped of bark at the end.

7    Q.   Like briars?

8    A.   Possibly.

9    Q.   Are you from Texas?

10   A.   No, ma'am.

11   Q.   Well, they grow here.  They love us.

12        All right.  Let's see.  This is during the day,

13   okay.  And you can tell that, can't you, from this

14   picture?

15   A.   Yes.

16   Q.   Because of the sky?

17   A.   Yes.

18   Q.   So how come you would have come back again and

19   taken another really almost the same picture you took

20   from before?

21   A.   A lot of times things are better visualized in

22   the day.  Sometimes it's easier to portray what it is

23   that you're looking at.  If I'm ever on a scene that

24   extends from nighttime in to daytime, I do try to take

25   daytime photographs just to assist in court at some

 1 point.

 2     Q.  Now, do you see whatever was there is no longer

 3 there?

 4     A.  Yes.

 5     Q.  But now there's this big long thing?

 6     A.  Yes.

 7     Q.  And looking at State's -- or Defense Exhibit

 8 No. 18, can you tell what that -- if that big long thing

 9 was in the prior exhibit or does it appear -- what does

10 it look like to you, if you can tell?

11     A.  I don't know, a vine maybe.  I hate to speculate.

12     Q.  Okay.  But it wasn't there at nighttime and now

13 it's there during the day?

14     A.  Yes.

15     Q.  It's long, where before, it seemed to be kind

16 shriveled around, or who knows?

17     A.  I really don't know.

18     Q.  But that's why you take pictures, isn't it?

19     A.  Yes.

20     Q.  All right.  So this is now an up-close picture of

21 the back gate during the day; is that correct?

22     A.  Yes.

23     Q.  And now it's got this evidence during the day...

24     A.  Crime scene barrier tape.

25     Q.  Yes.  Crime scene barrier tape.  There you go.

1       A.   Yes.

2       Q.   But what is this picture showing the jurors?

3       A.   Again, it's a daytime photograph used to depict

4   the gate, the condition of the gate, the debris in the

5   backyard of the premises.

6       Q.   Right in here is just debris?

7       A.   Yes.

8       Q.   Where is this locking mechanism?

9       A.   I really hate to call it that.  It's just a wire,

10  but it's here.

11      Q.   Okay.  Let's get a better view of that wire.  Is

12  State's -- is Defense Exhibit No. 25 a better view of

13  the wire?

14      A.   Yes.  It's a midrange photograph of the wire, as

15  you can see, attached here and free-hanging.

16      Q.   And because I think you got to look at it close,

17  does it look like it loops around, or is that that same

18  thing, just probably a briar or something behind it, in

19  this picture, 25?

20      A.   We're discussing, to be clear, this?

21      Q.   Yes.

22      A.   Yes.  It's almost easily apparent as a sticker

23  bush, is what we call them back home.  But a briar

24  branch.

25      Q.   Sticker bush?

1    A.   Sticker bush.

2    Q.   Good name.  Okay.  So that's not part of this?

3    A.   No, ma'am.

4    Q.   But it kind of -- you can see it kind of looks

5    like that in this picture.  Maybe not.

6    A.   Well, it goes through the fence, I guess.

7    Q.   All right.  So what it is, is -- this locking

8    mechanism is a wire that comes down and keeps coming,

9    doesn't it?

10    A.   Yes.  It terminates in some sort of a loop.

11    Q.   And then is there also a wire down in here, I

12    guess, that's supposed to do something?

13    A.   Uh-huh.  Yeah.  I'm not really sure what, though.

14    Q.   Okay.  This is a close-up of this thing that you

15    said you're afraid to call a locking mechanism, and I

16    understand why.  What is that showing, the end?

17    A.   That's the termination, the end of it.  It ends

18    in a loop.  It was similar to a wire coat hanger.

19    Q.   And then in Defense Exhibit No. 26?

20    A.   This is the point along the wire where they -- it

21    appears they tried to make it longer by twisting them

22    around each other, two segments possibly.  But it was

23    midway in between the gate and the end of it.

24    Q.   Not a professional locking job here at all?

25    A.   No.

```
 1      Q.   This would not make you feel safe at your house,
 2   would it?
 3      A.   No.
 4      Q.   Okay.  When you were out there, you also passed
 5   by on the side -- so basically if you're at her gate and
 6   now I'm walking towards the parking lot to my left,
 7   there was this, correct?
 8      A.   Yes.  If you're going from the gate to the
 9   parking lot, that would be on your left.
10      Q.   Did it look like that?
11      A.   Yes.
12      Q.   And did you -- were you able to determine if it
13   looked like that, like it's been looking like that?
14      A.   I have no idea.
15      Q.   So you don't know if the firemen did this or not?
16      A.   I don't know.
17      Q.   But you looked inside that?
18      A.   Yes.
19      Q.   Why?
20      A.   Seemed like a good place to dispose of something,
21   possibly somewhere someone wouldn't look.
22      Q.   And particularly if you're coming out of that
23   gate, that does make sense, doesn't it?
24      A.   Very close to it, yes.
25      Q.   And so you look down and you see something in
```

1    there, right, in 28?

2        A.   There are several things down in the bottom

3    amongst leaves and debris, one of which is a

4    screwdriver.

5        Q.   And you said you first saw the screwdriver.  Did

6    you take that picture whenever you saw the screwdriver?

7        A.   I believe, if this is from the series of scene

8    photographs, this is a photograph on the day that I

9    located it.

10       Q.   And can you show the jurors where that is?  It's

11   hard to see in theirs.

12       A.   It is right here.

13       Q.   And it's laying on top of a bunch of leaves?

14              (Pause in proceedings)

15              MS. KEENE:  Let me go old school.

16              THE COURT:  It's allowed.

17       Q.   (BY MS. KEENE)  Is my finger on the screwdriver?

18       A.   Yeah.  You can see a portion of the screwdriver

19   is covered by debris and a portion of it is not.

20       Q.   So when you look down, you could see the

21   screwdriver with your bare eyes?

22       A.   Yes.

23       Q.   So it's not like you had to dig through the

24   debris?

25       A.   No.

 1     Q.   And so when you looked down and you saw this

 2  screwdriver that first time, you took a picture of it,

 3  correct?

 4     A.   I did.

 5     Q.   But did you not collect it?

 6     A.   I did not.

 7     Q.   And then you finish your business and you go

 8  home, right?

 9     A.   Eventually, yes.

10     Q.   Eventually.  And then as any good crime scene

11  officer, this bothered you?

12     A.   Yes.

13     Q.   Because you didn't collect it?

14     A.   Yes.

15     Q.   And so you were able to solve that, right?

16     A.   Yes.

17     Q.   And you went and collected it?

18     A.   On my next shift, yes.

19     Q.   And so how many days after did you go collect

20  this?

21     A.   Ten hours.

22     Q.   So it wasn't even a day?

23     A.   No.

24     Q.   But had you not done that and we were in this

25  courtroom, you would be very upset, wouldn't you?

```
 1        A.  Yes.
 2        Q.  It would have been bothering you for years,
 3   really?
 4        A.  It would have been.
 5        Q.  So you knew that you need to go get it because of
 6   why?
 7        A.  Conscientiousness.  I don't know.
 8        Q.  Oh, yeah, that's true.  But you couldn't go back
 9   and get it today, potentially, right?
10        A.  Correct.
11        Q.  It certainly wouldn't be in the same condition it
12   was on the day that this young lady was murdered?
13        A.  No.
14        Q.  And you're only the person -- and you really are
15   the only person that gets to choose or not what evidence
16   is coming into this courtroom.  Never thought of it that
17   way, did you?
18             THE COURT:  Is that a question?
19             MS. KEENE:  Yes, it is.
20             THE COURT:  So you can give an opinion if
21   you have one.
22             THE WITNESS:  I think that the attorneys
23   decide what comes into the courtroom.
24        Q.  (BY MS. KEENE)  That's a good answer, I guess.
25             But they can't put anything into evidence
```

1    that you didn't collect, correct?

2         A.   Correct.

3         Q.   Let me show you what has been marked as Defense

4    Exhibit 29 and ask you if you recognize that?

5         A.   Yes.

6         Q.   What is 29?

7         A.   It is item SFR-54, which is the screwdriver in

8    question.

9         Q.   And where did you take this picture?

10        A.   That was taken in my lab at 620 West Division,

11   the main police station.

12        Q.   And how come you took a picture of this, as well

13   as other items of evidence, in your lab?

14        A.   I always try to take lab photographs of evidence

15   that I collect because it's under controlled lighting,

16   controlled situation and I have time to examine them and

17   get photographs of the pertinent information.

18        Q.   And so do you think this would help the jurors in

19   knowing exactly what the screwdriver looked like, as

20   opposed to that little tiny picture?

21        A.   Yes.

22             MS. KEENE:  Judge, we would offer in Defense

23   Exhibit No. 29.

24             MS. RAY:  No objection, Your Honor.

25             THE COURT:  All right.  Defense 29 is

```
1     admitted.  Defense 29.
2               (Defendant's Exhibit No. 29 admitted)
3               MS. KEENE:  Permission to publish by ELMO?
4               THE COURT:  Yes.
5     Q.  (BY MS. KEENE)  And so is this -- tell us what
6     this is.
7     A.  This is a picture of the screwdriver that was
8     collected from the build-out.
9     Q.  And so this, just like any piece of evidence,
10    could be very significant or it could not be significant
11    at all?
12    A.  Yes.
13    Q.  But because it could be significant, you
14    collected it?
15    A.  Right.
16    Q.  It was certainly at the right place?
17    A.  It was around a place that might need a
18    screwdriver to do work on.  However, it also could have
19    been disposed of by someone who used it to pry open a
20    back door.
21    Q.  Exactly.
22    A.  I don't know.
23    Q.  And you had pry marks on a back door?
24    A.  Yes.
25    Q.  So when you have pry marks on a back door and
```

1    you're a good crime scene officer and you see a

2    screwdriver that could easily have caused those pry

3    marks, you need to go collect it, and you did?

4        A.  I -- yes, I feel like you do.

5        Q.  Okay.  Before we go into some of the pictures of

6    the crime scene, I want to go over these, the dimensions

7    in the diagram that we put in before.  Okay?

8        A.  Yes.

9        Q.  Let's start with No. 7.  We're not going to go

10   through these individually, but to give them an idea

11   of the work y'all did out there and why did you this.

12   So this is your report; is that correct?

13       A.  No.  This is CSI Tricksey's sketch and her

14   attached documentation which lists out the actual

15   physical measurements.

16       Q.  And you helped her do some of these measurements,

17   correct?

18       A.  Yes.  It's a two-person job.

19       Q.  Because you've got to have one person on one side

20   holding the tape measure and the other person at the

21   other side, or how do you do know that?

22       A.  At the time we were using a standard tape

23   measure.  Now we have a laser measuring device, which

24   enables one person to be able to obtain the same

25   measurements.  But we were, as you said, old school

1    doing things at this time.

2        Q.   Defense Exhibit No. 7 has got 19 items on the

3    first page, 1 through 19; is that correct?

4        A.   Yes.

5        Q.   Just to make it more confusing, it's SFR-2

6    through 20?

7        A.   I can explain if it makes it --

8        Q.   Yeah.

9        A.   -- for clarity purposes.

10       Q.   Go for it.

11               THE COURT:  Whoa.  One at a time.  Go ahead.

12               THE WITNESS:  The first SFR item in any case

13   that I work will be a photo, CD or DVD.  The first

14   evidence marker number that I use will always be number

15   one.  So I will always be one number behind, just to

16   keep it confusing.

17       Q.   (BY MS. KEENE)  Okay.  I like that.  That's fun.

18   And now -- and of course all these numbers, what -- if

19   they've been introduced, they're going to have different

20   numbers on their evidence stickers here?

21       A.   The numbers 1 through 19 will correspond with the

22   evidence marker placards that you see in the

23   photographs.  The SFR numbers are for my property room

24   only and can be disregarded for our purposes here.

25       Q.   All right.  So what -- and the reason I'm

1    bringing this up is we don't need to think that, okay,

2    let's look at 12 and go to the plaque pictures and find

3    12 and think you're going to find the Marlboro

4    cigarettes?

5        A.   Right.

6        Q.   So --

7        A.   Eleven is the Virginia Slims cigarettes and 12 is

8    a knife, but, yes, you're right.

9        Q.   These numbers are not going to help us, just the

10   concept of what the evidence is that you recovered?

11       A.   The numbers 1 through 19 will assist you.  The

12   SFR numbers will not assist you.

13       Q.   I understand then.  So 11 on the placard is a

14   Virginia Slim?

15       A.   Yes.  Evidence marker number 11 in the photograph

16   will be a Virginia Slims cigarette package.

17       Q.   Okay.  Not the number here.  All right.  Now,

18   whenever y'all would do this, what is -- what's it

19   take -- use the -- let's do the pack of Virginia Slims,

20   number 11, SFR-12.  What does "6'10, south of C, east of

21   E" mean?

22       A.   If you look at the legend above the list that

23   you're looking at now, each wall, CSI Tricksey assigned

24   each wall a letter to keep it a little simpler.  Instead

25   of saying ten feet from the east wall, she'll say ten

1    feet from wall G or D, however it coordinates.  She has

2    her diagram with the evidence marker numbers.  I believe

3    it is in evidence.  I don't know what number.

4              MS. KEENE:  Judge, may I approach her with

5    the large board?

6              THE COURT:  Yes, you may.

7              THE WITNESS:  Number 4.

8    Q.  (BY MS. KEENE)  State's Exhibit No. 4, does it

9    have A, B, Cs, all those numbers -- or letters?

10   A.  Yes.  As you can see A, B, C, D.  Each wall that

11   is relevant to our measurements has been designated a

12   letter for clarity.  So when CSI Tricksey states

13   six-foot, ten inches, south of C, she is coming to C,

14   coming down ten feet, six inches, and that is how far

15   away our number 11 would be from wall C.

16   Q.  And you're -- are you showing them how 11 is the

17   same 11 up there, Virginia Slims?

18   A.  I'm trying to.

19   Q.  Right.

20   A.  So C and 11, that's the distance, six foot, ten

21   inches, south.  And we have our cardinal directions

22   here.

23   Q.  And so that's what is the absolute accurate --

24   this is not to scale.  This is just to give you an idea

25   of where things are?

```
 1        A.   Correct.

 2        Q.   That is the actual hundred percent accurate of

 3   exactly where this particular item was?

 4        A.   Correct.

 5        Q.   Now, y'all also took measurements of the rooms,

 6   correct?

 7        A.   Yes.

 8        Q.   And Tricksey put together a diagram; is that

 9   correct?

10        A.   Yes.

11        Q.   And is that contained in Defense Exhibit No. 6?

12        A.   Yes, it is.

13        Q.   I just can't read those numbers from here.  But

14   can you -- why don't you tell the jurors how big --

15   where is the front door?

16        A.   Front door is here.  Basically it's central in

17   the diagram.

18        Q.   And is this the same diagram that we just held

19   up?

20        A.   I believe it -- I believe she worked off the same

21   template, but I can't attest to that a hundred percent.

22        Q.   But it certainly looks a lot the same?

23        A.   Yes.

24        Q.   Only this one has got numbers in it, correct?

25        A.   Correct.  We've removed the evidence markers so
```

1   that we could put the dimensions in without causing it

2   to be so cluttered that you couldn't understand what

3   was going on.

4       Q.   All right.  So if I live in the apartment

5   adjoining Ms. Gandy, where -- how far am I from her

6   front door, if I am standing at my front door?

7       A.   Well, you've got 21 feet and 9 inches from the

8   front door area of this apartment to the terminate wall

9   here.  The front door to Apartment 603 -- excuse me --

10              THE REPORTER:  Could you slow down, please.

11      Q.   (BY MS. KEENE)  So basically you have under

12  20 feet, close to it?

13      A.   Yes.

14      Q.   If you're standing at the neighbor's door,

15  correct?

16      A.   It appears to.

17      Q.   When you were there, the whole time you were

18  there, Mechelle was here, correct, the deceased here,

19  correct?

20      A.   Correct.

21      Q.   There was not another car here?

22      A.   No, there was not.

23      Q.   There was not a car here and a barbecue pit with

24  some fajitas on it?

25      A.   Not in the parking lot area.

 1      Q.   Right.  However, there was Mechelle?

 2      A.   Yes.

 3      Q.   But if a person was sitting right here, had their

 4   car here and had their fajitas, grill rolling, about how

 5   far is that from the front door?

 6      A.   I would only be approximating it.  Approximately

 7   ten feet, half the distance between the retaining wall

 8   here and her front door.

 9      Q.   And the best you can do is approximate, but at

10   least y'all have done your measurements so you can do a

11   pretty good approximation about how far a person would

12   be if they're right in this area from her front door?

13      A.   Roughly.

14      Q.   And how much distance is from, let's say, the end

15   here all the way down to here?  And that's going to

16   require some math.

17      A.   Allow me to tabulate?

18      Q.   Absolutely.  Do you want me to bring you this one

19   up here or you have one?

20      A.   I have one.

21           I would say we could estimate it at between

22   28 and 30 feet.

23      Q.   So it's about 30 feet from here to here?

24      A.   Approximately.

25      Q.   So if you're going to approximate from -- what

STATE v. THOMAS OLIVAS

1   about that same -- about right in here to the end of

2   this, about how many feet is that?

3       A.  I'm sorry.  Could you show again where you...

4       Q.  Basically about right in here in the front, about

5   where says "decedent" to about there.

6       A.  Well, if we approximated that between eight and

7   ten feet just a moment ago and you add it to the 28 to

8   30, then you're looking at 36 to 40, I assume.

9       Q.  Or you actually have to subtract this amount,

10  wouldn't you?

11      A.  Again, subtract, what, ten feet.

12      Q.  So you're probably looking at 25 feet-ish?

13      A.  From?

14      Q.  And we can get a calculator and do it pretty

15  exact, because she's done the measurements, correct?

16      A.  Yes.  I'm confused about what you're asking.

17  Sorry.

18      Q.  Okay.  If you -- let's just say where it says

19  "decedent one" to this corner, we're down here, about

20  how far would that be?

21      A.  Well, if we had approximated looking -- we know

22  that is 22, right?

23      Q.  Correct.

24      A.  If we are thinking the door is at least a couple

25  of feet from the retaining wall, so we went to 20, and

```
 1    assuming the decedent is halfway, at ten feet, and that

 2    this, from the front door to the southern wall, is

 3    approximately 28 to 30 feet, then you're looking at 38

 4    to 40 feet.

 5         Q.   You just convinced me.  I gotcha.

 6         A.   Got me, okay.

 7         Q.   All right.  So from here to there is basically

 8    40 feet-ish?

 9         A.   Yes.

10         Q.   And here's the patio we talked about, correct?

11         A.   Yes.

12         Q.   And here's the back door, correct?

13         A.   Yes.

14         Q.   And was this back door open or closed whenever

15    you were there?

16         A.   It was open during my time on the scene.

17         Q.   And so the whole time you're there, this back

18    door was open?

19         A.   Yes.

20         Q.   Was -- is there a two-door process; in other

21    words, is this a screen door and a glass door?

22         A.   Yes.

23         Q.   Were they both open?

24         A.   Yes.

25         Q.   That is a very significant point for a crime
```

1    scene officer to make and you did make it in this case,

2    correct?

3        A.   In most scenes it is very significant.   In an

4    arson scene where the fire department has been through,

5    I think it loses some of its potential significance.

6        Q.   Because who knows, could that have been firemen

7    or could that have been the murderer, who knows, that

8    left that open?

9        A.   Correct, I don't know.

10       Q.   All right.   So back here, is it right about back

11   in here where is the fence line is?

12       A.   Correct.

13       Q.   And where is the gate?

14       A.   The gate is going to be at the southwest corner

15   of the building, somewhat at an angle.

16       Q.   And so the gate that was open, that we don't know

17   if it's significant that it's open, but it was open and

18   the little hinky-locking mechanism was right about in

19   here?

20       A.   Yes.

21       Q.   And then right about in here is that box where

22   you found the -- the screwdriver?

23       A.   Yes.

24       Q.   And then somewhere right about in here is where

25   you found the library card?

STATE vs. THOMAS OLIVAS

1    A.   Probably right around in here.  It appeared to be

2    a significant angle from the build-out and the

3    screwdriver.  And I could see clearly the parking lot

4    area up here.

5    Q.   Where did it appear that runoff -- could you tell

6    where the runoff came from?

7    A.   I don't recall, with it being so long ago.

8    Q.   Could you tell if it was going this way runoff or

9    this way runoff?  You're --

10   A.   Are you talking about topography?

11   Q.   Yeah.

12   A.   Elevation?

13   Q.   Yes.

14   A.   I believe it was running off towards the parking

15   area, but I could be wrong.

16   Q.   So running from basically this to that direction,

17   taking whatever water's back here back that way?

18   A.   Correct.

19   Q.   Okay.  All right.  Now, in this area right here,

20   what is that?

21   A.   That's the kitchen.

22   Q.   And you described it as a small, gallery-type

23   kitchen?

24   A.   It is -- galley is the way I describe it.

25   Q.   I like to mispronounce words.  I think you're

1    right, it is galley.

2          Where was the majority of the significant

3    amount of blood that you found?

4    A.   The floor of the kitchen had the largest blood

5    pool, as we saw in our photographs yesterday.  There was

6    also blood in the entryway and on this wall just inside

7    the front door, additional smaller amount of blood on

8    the doorjamb just west of the front door, a small amount

9    of blood on the western side of the bar, and a small

10   amount of blood on a box beneath the desk, along the

11   northern living room wall.

12   Q.   And then we'll talk about this in a minute.  And

13   then there's also a dishtowel back here that had

14   something on it, that you don't know if it was blood on

15   it, either?

16   A.   It had the look of blood.

17   Q.   So other than the dishtowel that had apparent

18   blood, under here that had apparent blood, was all the

19   apparent blood within the kitchen area?

20   A.   Yes.

21   Q.   Did Tricksey make a diagram of the kitchen area?

22   A.   Yes.

23   Q.   And if -- can you take that diagram and just

24   highlight the areas where there was apparent blood in

25   that -- in that kitchen area?

```
 1        A.  Yes.
 2        Q.  And I asked you to -- prepared you that that
 3   might -- I might ask you that question?
 4        A.  Yes.
 5        Q.  Did I give you that diagram already?
 6        A.  Yes.
 7        Q.  Did I?  Okay.  Can you do that?
 8        A.  Yes.
 9        Q.  Do you need a highlighter?
10        A.  Yes.
11        Q.  I'm going to hand you two different red pens.
12   You can choose.  And I'm going to mark -- show you
13   what's been marked as Defense Exhibit No. 30 and ask you
14   if you recognize that diagram?
15        A.  Yes, I do.
16        Q.  Is that a diagram of the kitchen area?
17        A.  Yes, it is.
18        Q.  And this is the diagram that we were just talking
19   about that you think would assist, in a conceptual way,
20   to show the jurors where the different apparent
21   bloodstains were?
22        A.  Yes, I do.
23        Q.  Okay.  If you could mark it up for us.
24            (Pause in proceedings)
25            THE WITNESS:  I'm finished.
```

1    Q.   (BY MS. KEENE)   Okay.   And so on Defense Exhibit

2   No. 30, does that contain all of the areas where there

3   was blood, except for the apparent blood under the table

4   or desk and the apparent blood on the dishtowel by the

5   door?

6    A.   Yes.

7    Q.   So we're only missing two areas that you believe

8   you collected evidence swabs or something that appeared

9   to have blood on it?

10    A.   Yes.   But that's not actually accurate.

11    Q.   All right.   Here we go.   And also write that

12   down.

13    A.   I also believe there was an unknown red stain on

14   the knife block.

15    Q.   Here we go.

16    A.   So write what down?

17    Q.   Write the areas -- is the knife block in the

18   kitchen?

19    A.   Yes.

20    Q.   Go ahead and put a mark -- or put "knife block"

21   where you think there is a...

22             Defendant's Exhibit No. 30, there are two

23   other areas that you believed had apparent -- and you

24   can write "apparent blood" where you -- and if you would

25   just write it down so it's clear.

1     A.   So we're speaking about the box under the dresser

2   and the towel near the porch door?

3     Q.   Yes, ma'am.  You can just write those words so

4   the exhibit is complete.

5          And so do you now feel like Defense Exhibit

6   No. 30 is a complete showing of where you collected

7   samples or items that appeared to you to have blood on

8   it?

9     A.   Yes.

10         MS. KEENE:  We would offer Defense Exhibit

11  No. 30 into evidence.

12         MS. RAY:  No objection, Your Honor.

13         THE COURT:  All right.  And for the record,

14  what you had her hand-write is also in the same red ink

15  you had her mark the other things; is that correct?

16         MS. KEENE:  Yes, sir.

17         THE COURT:  All right.  Defense 30 is

18  admitted.

19         (Defendant's Exhibit No. 30 admitted)

20         MS. KEENE:  Permission to publish via ELMO?

21         THE COURT:  Hand it to her and let her log

22  it and let her date it.

23         (Pause in proceedings)

24         MS. KEENE:  Do you care if I put the sticker

25  on, or do you want me to let her do all of it?

```
 1              THE COURT:  I would just let her write a
 2   sticker.  She writes what it is, she logs it --
 3              MS. KEENE:  Right.
 4              THE COURT:  -- and that keeps -- it makes
 5   her job easier and keeps the record clearer.
 6              MS. KEENE:  I will do that.
 7      Q.  (BY MS. KEENE)  All right.  Let me show the
 8   jurors what Defense No. 30 is showing them.
 9      A.  This is a diagram of the kitchen area.
10      Q.  Where is the front door to orient them?
11      A.  Front door is here.
12      Q.  And that front door opens -- and I know this is
13   not to scale, we can -- we'll ultimately look at
14   pictures.  But when that front door opens, does it open
15   and cover up this wall?
16      A.  Yes.  It opens in towards the closet door here.
17      Q.  And it's big enough to -- basically if that door
18   is open, it's going to cover up almost that whole area?
19      A.  It was wedged open during my time on scene and I
20   did not attempt to fully open it to see.  But it is a
21   large door.  It's larger than the closet door.
22      Q.  Okay.  And right when you open up that door -- or
23   let's go backwards.  Behind the door then, the front
24   door, at 27, what was that that you found that you
25   thought was blood?
```

1    A.   Apparent blood on the floor.

2    Q.   And so that's blood on the floor --

3    A.   Yes --

4    Q.   -- right in here?

5         Twenty-nine is also behind the door; is that

6    correct?

7    A.   Yes.  That's blood on the closet door and door

8    frame.

9    Q.   And like I said, we'll go back over there with

10   the pictures, but is this -- this is actually a

11   significant amount of blood on the door?

12   A.   Yes.

13   Q.   This is the amount of blood that's really at the

14   door frame?

15   A.   Yes.

16   Q.   This is the one that's on the wall, or the door

17   of the closet?

18   A.   Correct.  Any time you see an arrow, it's going

19   to be indicating that something is raised or elevated,

20   as opposed to being on the floor.

21   Q.   Okay.  Thank you.  I did not know that.  So 24

22   then is what?

23   A.   That is the area of apparent blood that's right

24   at the baseboard on the northwest corner of the door

25   frame here.

1    Q.   Okay.  And then 25 is what?

2    A.   The apparent blood on the wall as you enter the

3    apartment.

4    Q.   All right.  And that's where also there was a

5    number of droppings or what appeared to be blood coming

6    down the wall?

7    A.   Yes.

8    Q.   Was here and that is at 25?

9    A.   Yes.

10    Q.   What about 31, what is that?

11    A.   The apparent blood on the face of the cabinets

12    that we saw yesterday.

13    Q.   And that was where -- it was actually on wood so

14    it was harder to see?

15    A.   Yes, it was.

16    Q.   But it was more dotted than dropping, than

17    gravity pulling?

18    A.   Correct.  It didn't have specific directionality

19    that was really evident.

20    Q.   And y'all documented the height of where these

21    began, or ended in a lot of them, didn't you?

22    A.   In many of them, yes.

23    Q.   And then what about 41?  What was 41?  What was

24    the blood there?

25    A.   It was an apparent bloodstain on both the wall

```
 1   and at the baseboard.

 2       Q.   And was this also a significant amount in here?

 3       A.   Not as significant, no.

 4       Q.   Not like what was really in 27 -- and -- or 25

 5   and 29?

 6       A.   Correct.

 7       Q.   Were those the two bigger areas?

 8       A.   Yes.

 9       Q.   As far as when you just like liked a wall and

10   went, oh, like, you know, I know what I'm seeing?

11       A.   Yes.

12       Q.   Okay.  Where was the dark area where you said you

13   couldn't really see the red on the wall but it did look

14   like it was something coming down?

15       A.   That is the northern wall of the -- beginning in

16   the living room, leading into the front door.  It's to

17   the west of the front door.  So it would be this area

18   here.

19       Q.   So this area is what looked like blood, but it

20   was -- it had a lot of soot on it or something on it

21   that made it dark and it looked like blood, though?

22       A.   The pattern formation looked similar to the blood

23   that was at 25.  However, the coloring was completely

24   different.

25       Q.   And the wall was completely different, the
```

*STATE vs. THOMAS OLIVAS*

1    coloring from the fire?

2        A.   Correct.

3        Q.   Okay.  Forty-one.  What about 32?  What was 32?

4        A.   Thirty-two was the large blood pool that was

5    protected by the plastic from the lighting arrangement.

6        Q.   Okay.  And then what about 30?

7        A.   Thirty was the blackened stain which was on the

8    range hood above the stove.

9        Q.   And what about 35?

10       A.   Thirty-five was the wooden knife block that did

11   have an unidentified red stain on it.

12       Q.   And if you're dealing with -- at this point you

13   know you've seen enough or you know enough that Mechelle

14   has probably been stabbed as opposed to shot or

15   something?

16       A.   Yes.

17       Q.   In other words, you know a knife is a potential

18   thing that would be of use to kill her?

19       A.   Yes.

20       Q.   So if you see a red stain on even a kitchen block

21   knife, that's significant to anyone and certainly

22   significant to a crime scene investigator, correct?

23       A.   Yes.

24       Q.   And so you made note of it and you also collected

25   the whole block?

1    A.   Yes.

2    Q.   And that's the block the folks saw today,

3  correct?

4    A.   Yes.

5    Q.   And looking at her whole apartment and I know the

6  fire caused so much damage, the water, did it appear,

7  from what you could see, that there was any other areas

8  where a fight, or however you wanted to describe this,

9  happened?

10   A.   I would not have been able to tell you that in

11  the condition the apartment was in when I arrived.

12   Q.   So you can't look at that crime scene and say

13  this is where she was killed?

14   A.   I cannot, no.

15   Q.   And I know you're not a crime scene

16  reconstruction person.

17   A.   Correct.

18   Q.   There are people that do that?

19   A.   Yes.

20   Q.   But certainly, based on what you could see in

21  that house, if she had been stabbed in her own bedroom,

22  you weren't going to be able to determine that or not,

23  were you?

24   A.   If there had been blood in the bedroom, I

25  certainly would have done my best to locate and document

```
 1   it.  That's as -- that's about as far as I can go with
 2   that statement.
 3       Q.  And you didn't find any blood on her mattress
 4   because that may have not gone away?
 5       A.  Correct.  I did not see any, no.
 6       Q.  Or anything else in her bedroom, as -- like you
 7   said as best you can say?
 8       A.  As best as I can say.
 9       Q.  So as best you can say, this is the area that
10   certainly had what appeared the most significant blood
11   from -- based on the state of the crime scene?
12       A.  Yes.
13       Q.  Okay.  I also talked to you about explaining to
14   the jurors in a real life way, because all we know is
15   this, the blood, the apparent blood is in this room, is
16   giving them an idea about how big visually that room is.
17       A.  Yes.
18       Q.  Do you feel comfortable doing that?
19       A.  Yes.
20       Q.  And I promised you a measuring tape, correct?
21       A.  Yes.
22       Q.  Okay.  So we could accurately show them the real
23   size of this entryway, right?
24       A.  Yes.  Yes.
25               MS. KEENE:  Judge, may she step down so we
```

1  can do that?

2            THE COURT:  Yes.

3    Q.  (BY MS. KEENE)  Looking at the courtroom and I

4  know you love the jury box, but let's not do it in the

5  jury box, so we can walk around.  What area, here or

6  over here, do you think would easily show it?

7            Right where you're standing.  Okay.  I'll

8  let you have the tape measure.

9    A.  The kitchen itself, the galley kitchen, measured

10  at three foot, three inches at its widest point.  So not

11  even as wide as the distance between...

12    Q.  So that's how wide the kitchen was?

13    A.  Yes.

14    Q.  All right.

15    A.  Or was not.

16    Q.  That's true.  That's how wide the kitchen was

17  not.  And so when you said short, compressed, it was

18  very compressed in there?

19    A.  Yes.

20    Q.  Now, let's give them an idea of -- so that's

21  about at -- it's about at -- can you look back there?

22  Is that about the edge of that ELMO table?

23    A.  You can let it go.

24    Q.  All right.

25    A.  Yeah.  You're about two inches shy.

 1    Q.   Okay.  And now, let's see, from that, if you can

 2  bring out the kitchen, how long it was from the door.

 3  Do you have that measurement?

 4    A.   Yeah.  We got math.  Twelve feet, 10 inches.  All

 5  the way to the front door?

 6    Q.   Yes.

 7    A.   Because the kitchen itself was only nine foot,

 8  eight.

 9    Q.   Well, let's go to the kitchen first so they can

10  see it and then we'll go to the front door.

11    A.   The bar, which separated the southern wall of the

12  living room from that wall inside the entryway, so this

13  is -- this would be the length of the bar itself.

14    Q.   Okay.

15    A.   To about here.

16    Q.   So the bar kind of defines the end of the

17  kitchen?

18    A.   It does, pantry included.

19    Q.   Okay.  I'm like standing in front of all them.

20  Let me get out of it.  Okay.  It's about right there?

21  There we go.

22    A.   So you're looking just about the distance from

23  that side to this table.

24    Q.   Skinny?

25    A.   And thin.

```
 1      Q.   And that's where most -- and that compressed area
 2    is where most of the apparent blood was found by you?
 3      A.   Yes.
 4      Q.   And certainly the big amount is on the walls?
 5      A.   The walls and on the floor.  The large pool on
 6    the floor.
 7      Q.   And so we're talking about the floor was right in
 8    this area?
 9      A.   And if someone were, say, laying on the floor of
10    the kitchen, there would not be -- on either side of --
11              THE REPORTER:  There wouldn't be what?
12              THE WITNESS:  A lot of room on either side
13    of that.  Sorry.
14      Q.   (BY MS. KEENE)  Now, if you're in the kitchen
15    and -- I mean if you're at the front door and you walk
16    into the kitchen, how many feet do you -- if you walk
17    into the house, how many feet do you take before you're
18    right in the kitchen?  How many feet do you...
19      A.   How many feet is it?
20      Q.   Yeah.
21      A.   How steps would you take?
22      Q.   That's actually what I asked you.
23      A.   Well, your steps are different than mine, are
24    different than theirs, so it's tricky.  So three foot,
25    two inches.
```

 1     Q.  So it's three -- show them again what three foot,

 2   two inches is.

 3     A.  So this would have been the general foyer, I

 4   guess if you'd like to call it, or entryway.

 5   Approximately this far from...

 6     Q.  And so if you walk in, the door swung to the

 7   left?

 8     A.  Correct.

 9     Q.  And behind that door area was the closet door?

10     A.  Yes.

11     Q.  But it's all compressed?

12     A.  It is.  It is very tight.  It's a tight squeeze.

13     Q.  And that's where a large amount of the blood was,

14   on that door?

15     A.  Yes.

16     Q.  Okay.  Thank you.

17     A.  It wasn't as bad as you said.

18     Q.  Okay.  All right.  Have a seat back up here.

19          THE COURT:  All right.  Let the record

20   reflect that during the last series of testimony, the

21   witness was holding a traditional carpenter-type tape

22   measure, displaying measurements and distances in open

23   court, in the presence of the parties and the jury.

24          You may continue.

25     Q.  (BY MS. KEENE)  Let me show you what has been

```
1    marked as Defense Exhibit No. 32, 33 -- 31, 32, 33, 34,
2    35, and 36 and ask you if you recognize those pictures?
3       A.  Yes, I do.
4       Q.  Did you take those pictures?
5       A.  Yes, I did.
6       Q.  And do they fairly and accurately show the scene
7    as it looked at nighttime when you were there on 3/20?
8       A.  Yes, it does.
9            MS. KEENE:  I'd offer Defense Exhibit No. 31
10   through 36.
11           MS. RAY:  No objection, Your Honor.
12           THE COURT:  All right.  Defense 31, 32, 33,
13   34, 35, and 36 each admitted.
14           (Defendant's Exhibit No. 31 - 36 admitted)
15           MS. KEENE:  Permission to publish via ELMO?
16           THE COURT:  You may do so.
17      Q.  (BY MS. KEENE)  When you arrived at the scene,
18   Ms. Gandy was out and they had already declared her
19   deceased, right?
20      A.  Yes.
21      Q.  And she was in the front area, correct?
22      A.  Yes.
23      Q.  And we saw from the diagram, if you're facing her
24   car, she was to the left of her car?
25      A.  Yes.
```

STATE vs. THOMAS OLIVAS

```
 1      Q.   And right in front of this area there was a lot
 2   of chalk, drawings and chalk; is that correct?
 3      A.   Yes.
 4      Q.   Was there also a little scooter out there?
 5      A.   A little blue scooter, yes.
 6      Q.   Like a little kid scooter?
 7      A.   Yes.
 8      Q.   And there was, you know, the little Tupperware
 9   that -- did it appear to be what the chalk went in?
10      A.   I don't know.  Possibly.
11      Q.   You did not collect this stuff, did you?
12      A.   No.
13      Q.   It appeared to be -- did -- a kid playing with
14   chalk didn't appear to be something that you needed to
15   collect?
16      A.   No.
17      Q.   So whatever it was, when you were out there at
18   the scene, this did not appear to be a part of what
19   happened in there?
20      A.   No.
21      Q.   So if that was significant, it didn't seem
22   significant to you because there's a bunch of chalk
23   around it?
24      A.   Correct.
25      Q.   All right.  And as stated, there's not a car
```

1    right here next to Ms. Gandy's car?

2        A.   No.

3        Q.   And this is from the other side, you took -- as

4    you do -- as you start walking and taking your outside

5    pictures, tell the jurors where Defense Exhibit No. 32

6    is, what it's showing now?

7        A.   This is a little further along, going towards the

8    gate, which we've looked at, which would be off to the

9    left side of the photograph.  The door to the apartment

10   in question is just inside this recessed area.  This is

11   the Honda.  Ms. Gandy would be off the right edge of the

12   photograph on the other passenger side of the Honda.

13       Q.   And so if somebody was in it -- was sitting on

14   their car or had a car over there that's by Ms. Gandy,

15   they would be off the picture in Defense Exhibit No. 32?

16   Does that make sense?

17       A.   I'm sorry, could you repeat that?

18       Q.   Well, I'll just show this picture.  Defense

19   Exhibit No. 33, what does that show?

20       A.   This is standing behind the white Honda.

21   Ms. Gandy is here, front door, in this area.

22       Q.   And so if Ms. Gandy wasn't here and there was a

23   car here, they would basically be right in front of her

24   door?

25       A.   Yes.

1    Q.   So we looked at the measurements and we kind of

2    talked about how far that was, but visually this picture

3    shows you, if there's a car in this space, how -- really

4    how close ten feet is?

5    A.   The angle is a little bit deceptive.  But yes, it

6    gives you an idea.

7    Q.   And that's why you do measurements because

8    pictures can be a little deceptive sometimes?

9    A.   Absolutely.

10   Q.   All right.  You talked about there being a -- the

11   door propped open.  Do you remember what it was propped

12   open with?

13   A.   With a plastic ladle.

14   Q.   What is that?  This is Defense Exhibit No. 34.

15   Tell the jurors what that's showing.

16   A.   A front door, exterior of the front door to the

17   apartment, plastic ladle.

18   Q.   Well, what's a ladle?

19   A.   A ladle is like a soup ladle.

20   Q.   Oh, a ladle?

21   A.   Ladle.

22   Q.   Do you have any idea how that got there?

23   A.   I do not know who placed that there.

24   Q.   But that's the condition of the scene as you

25   arrived?

1    A.   Yes.

2    Q.   And also, that could be significant, but it could

3    also make sense the firemen would grab something out of

4    the kitchen and prop it open?

5    A.   Yes.  For ventilation purposes, to ventilate and

6    get smoke out so that I could do my job.

7    Q.   Probably not their own ladle?

8    A.   I don't think so.

9    Q.   Okay.  That's one of their tools, you never know.

10         Okay.  And that's a -- this is more

11   close-up, although this ELMO makes things dark, a ladle

12   stuffed in the door, correct?

13   A.   Yes.  The handle is here.

14   Q.   Okay.  And then right when you walk in, we kept

15   talking about as the door opens how there was what

16   appeared to be blood behind it.  What does Defense

17   Exhibit No. 36 show the jurors?

18   A.   It's the front door to the apartment, the closet

19   door just behind the front door and the apparent

20   bloodstain on that wall and door.

21   Q.   And did you take measurements of high how high up

22   this was?

23   A.   There -- we saw photographs yesterday with a

24   ruler in place, a long, standing yardstick.

25   Q.   And that's not -- it was up, what, about two

```
 1   feet?
 2       A.  I don't want to guess.  I'd rather see the
 3   photograph.
 4       Q.  I'll give you yesterday's pictures.
 5               (Pause in proceedings)
 6               THE COURT:  Joetta --
 7               THE WITNESS:  I found it.
 8               THE COURT:  -- she found it.
 9       Q.  (BY MS. KEENE)  How many feet up or inches up
10   where -- where did you measure in and looking at Defense
11   Exhibit 36?
12       A.  The middle portion, the main center mass of the
13   largest stain is at approximately 24 inches from the
14   floor.  The top -- the highest point here just below the
15   doorknob appears to be approximately 35 inches, with the
16   doorknob being an even three feet.
17       Q.  The doorknob being even three feet?
18       A.  From the floor.
19       Q.  So the doorknob of the closet door is three feet
20   down?
21       A.  Three feet up from the floor.
22       Q.  Up from the floor or three feet down from the
23   doorknob?  Three feet -- up from the floor to the
24   doorknob is three feet?
25       A.  Yes, ma'am.
```

1    Q.   There.   This -- you called this a transfer-type

2    pattern?

3    A.   Yes.

4    Q.   How can -- how do you know that, or how can you

5    tell that when you look at it?

6    A.   The way that the blood is, for lack of a better

7    term, flattened up against, as opposed to being in

8    droplet form, rivulet form almost, usually indicates

9    something bloody coming in contact with a surface and

10   then either sliding along the surface or -- like a

11   sponge that's damp or with paint.   When you're pressing

12   it up against a wall, that's similar to the appearance

13   of a transfer pattern stain.

14   Q.   And so this is like a real visual where it's a

15   principle of transfer in that because it's red and

16   blood?

17   A.   It's easy to see that a bleeding person and a

18   wall came in contact there and left evidence.

19   Q.   Can you tell when you look at that, or do you

20   have the ability to tell, the velocity of the transfer?

21   A.   I do not.

22   Q.   To know whether or not it's a hard hit or soft

23   hit or...

24   A.   I don't have the training for that, no.

25   Q.   And you don't have the training to reconstruct

1    what happened in this corner?

2        A.   No.

3        Q.   And there are people that are smarter than us to

4    be able to do that?

5        A.   Better trained.

6        Q.   Better trained, there you go.  People that are

7    better trained to do that.  For us to decide we know

8    exactly what happened in that corner is speculation,

9    correct?

10       A.   Yes.

11       Q.   Okay.  And what we could tell from this and

12   what your training tells us is this is a transfer, these

13   right here.  You have a different word for them and

14   that is called?

15       A.   This is my term.  It's looks like a "rivulet" or

16   a runoff wherein the initial transfer of blood was

17   significant enough that gravity pulls it from the stain

18   downward.

19       Q.   And then this area in here had a different type

20   that you described?

21       A.   It's a little farther in than what you were

22   pointing to here.  They are hard to see because of your

23   arrow.

24            MS. KEENE:  I don't know how you can

25   change...

Case 4:22-cv-00385-O   Document 16-9   Filed 08/16/22   Page 188 of 203   PageID 1240

```
 1               THE COURT:  There's a -- off the record.
 2               (Discussion off the record)
 3               THE WITNESS:  They are here.  These are
 4     directional blood spatter patterns.
 5          Q.  (BY MS. KEENE)  Directional as in?
 6          A.  As in when blood makes contact with a surface and
 7     it is in motion, a tail forms on the blood droplet
 8     itself which indicates the direction in which it was
 9     traveling.
10          Q.  What direction was this blood traveling?
11          A.  From -- if we are staring at the door, we'll say
12     right to left, upwards to downwards, so in a motion such
13     as this.
14          Q.  Right to left, upwards to downwards?
15          A.  If you're standing, facing the door, yes.
16          Q.  I understand.  At the angle of -- can you tell
17     the angle when you're looking at a better picture, or
18     not really?
19          A.  Again, I don't have the training.  That requires
20     measuring with calibers the actual -- it's -- it's akin
21     to shooting reconstruction, but I am not a blood spatter
22     pattern person.
23          Q.  And I appreciate you not speculating.
24               This door, though -- and then we're going to
25     take a break, I believe, or at least I think.
```

```
 1              THE COURT:  Uh-huh.
 2      Q.  (BY MS. KEENE)  This door, if it shuts, it
 3   basically covers up that door right there, that closet
 4   door; is that correct?
 5      A.  From the angle that the photograph is taken, it
 6   certainly does appear that way.  Again, I didn't test
 7   that theory on scene.
 8      Q.  Okay.  But you do know that the front door was
 9   bigger than the closet door?
10      A.  It was definitely wider, yes.
11      Q.  So that angle may not be as deceiving, it may not
12   be deceiving, it may be accurate?
13      A.  Possibly.
14      Q.  Okay.  Thank you, ma'am.
15              THE COURT:  All right.  Let's take a stretch
16   break.
17              Did anyone drink any iced tea for lunch?
18              Yes.  All right.  Let's take a short stretch
19   break.  Hit the buzzer when you're ready to come back.
20   Maybe about ten minutes.
21              (Break taken, 3:35 - 4:05 p.m.)
22              (OPEN COURT, DEFENDANT AND JURY PRESENT)
23              (Witness on the stand)
24              THE COURT:  Still cross-examination.
25      Q.  (BY MS. KEENE)  Let me show you what has been
```

1    marked as State's Exhibit -- or -- Defense Exhibit

2    No. 37, 38, 39, 40, 41, 42, 43 and ask you if you

3    recognize those exhibits.

4        A.   Yes, I do.

5        Q.   And did you take all these pictures?

6        A.   Yes, I did.

7        Q.   And would they aid you in explaining to the

8    jurors the pattern that you found on the floor in the

9    kitchen?

10       A.   Yes.

11       Q.   As well as in the foyer area?

12       A.   Yes.

13               MS. KEENE:  I would offer 37 through 43.

14               MS. RAY:  No objection, Your Honor.

15               THE COURT:  All right.  Defense Exhibit

16   No. 37, 38, 39, 40, 41, 42, and 43 are each admitted.

17               (Defendant's Exhibit No. 37 - 43 admitted)

18               MS. KEENE:  Thank you, Judge.  Permission to

19   display them on the ELMO?

20               THE COURT:  Yes.

21       Q.   (BY MS. KEENE)  First, looking back at your

22   Exhibit No. 30, the kitchen area, most of these pictures

23   are of blood in that area; is that correct?

24       A.   Yes.

25       Q.   Where is that in the kitchen?

Case 4:22-cv-00385-O   Document 16-9   Filed 08/16/22   Page 191 of 203   PageID 1243

1    A.   Most of the blood we're going to be looking in

2   those photographs is at evidence marker 32, in front of

3   the oven and range top.

4    Q.   So --

5    A.   On the floor.

6    Q.   And so whenever they see -- and an "appliance",

7   we're talking about the oven?

8    A.   Yes.

9    Q.   And so these pictures relate to 32?

10    A.   Yes, ma'am.

11    Q.   And Defendant's Exhibit No. 39, what is that

12   showing the jurors?

13    A.   This is showing part of that large substantial

14   blood pool on the kitchen floor.  The oven is going to

15   be down off of the frame to the lower left.

16    Q.   And were you able to see any sort of like

17   footprints or anything within the blood?

18    A.   No.  The blood itself is covered by the plastic

19   sheeting from the light.

20    Q.   And is Defendant's Exhibit No. 39 showing the

21   blood with the sheet on top of it?

22    A.   No.  The sheet has been removed for this

23   photograph.

24    Q.   Okay.  So in -- right up in this area of the

25   photograph, okay?

```
 1        A.  Yes.
 2        Q.  In Defendant's Exhibit No. 39 did it appear to
 3   have footprints up in that area?
 4        A.  There is tread pattern, what appeared to be tread
 5   pattern in this area, yes.
 6        Q.  What is tread pattern?
 7        A.  Shoe tread, possibly equipment that will leave
 8   its mark in soot or water-stained areas, even in blood,
 9   which we do see a little bit of here.  But the primary
10   blood pool that was covered by the plastic should be in
11   this area.
12        Q.  Whenever you lifted, though, the plastic up was
13   there any sort of impressions, whether they be tread
14   marks or anything in the blood or in that area under the
15   plastic?
16        A.  There was an impression in the blood from the
17   plastic itself.  The plastic was like a grated pattern,
18   grate, G-R-A-T-E.  And it was apparent in the
19   coagulation of the blood in some areas.
20        Q.  And so -- and then just this -- maybe I'm not
21   understanding.  This has the glass, or the plastic, on
22   top of it already, or the plastic's gone?
23        A.  The plastic is removed.  You see the straight
24   line where we have a very soot-covered floor, as opposed
25   to a mildly white creamish-colored floor.  That is going
```

1    to be an area that was uncovered by the plastic, versus

2    an area that was protected in some fashion from the

3    plastic.

4        Q.   But then -- and doesn't it appear that within

5    that whiter area, with the area that was already

6    covered, that there is some tread marks, there's

7    something other than blood or the floor?

8        A.   Yes.

9        Q.   And what do you do -- as a crime scene officer,

10   what can you do other than take a picture?

11       A.   I would imagine that this photograph was taken

12   during the processing phase, but with firemen going in

13   and out of the kitchen and that location, there isn't

14   much I can do about that.

15       Q.   You can say that's either -- as with some of

16   these things, that's either extremely significant or not

17   at all?

18       A.   I can say it's not my shoe tread pattern.  That's

19   about all I can tell you.

20       Q.   That -- that's not you causing that?

21       A.   Correct.

22       Q.   But it could be a fireman's causing that?

23       A.   It could be.

24       Q.   Certainly the shoe patterns on top of the -- is

25   this a picture of the -- what does 42 show us?

1    A.   This is a picture of the plastic sheeting over

2    the primary blood pool area.   Again, you can see some

3    shoe tread markings in the soot on the plastic, as well

4    as soot on the floor.

5    Q.   So based on this, you don't have to be much of a

6    Sherlock Holmes to figure out, firemen, somebody,

7    outside of being the killer, walked in this area because

8    that piece of the ply -- or that plastic is there?

9    A.   Yes.   That would have come down during the fire.

10   Q.   But under it there's also some markings, and

11   whether or not that's caused by the killer or firemen,

12   we just don't know?

13   A.   No.

14   Q.   Do you know whether or not this piece of plastic

15   was there when they pulled Mechelle out?   In other

16   words, was she on top of this or do you know whether or

17   not she was -- this came down after she had been pulled

18   out of the house?

19   A.   I do not know the answer.   That's how it was upon

20   my arrival.

21   Q.   Defendant's Exhibit No. 40, what is that showing

22   the jurors?

23   A.   This is underneath the oven.   There was a drawer

24   for keeping pots and pans that slid out from the bottom

25   of the oven, and this is the area underneath it.

1    Q.  Was it already slid out when you arrived?

2    A.  No.  I slid it out to look under there to see

3    if -- I wasn't missing anything.

4    Q.  Okay.  So you pulled out -- is that what's

5    depicted in 41?

6    A.  Yes, it is.

7    Q.  So you've now pulled out the -- or explain to us

8    what you've done in this.

9    A.  This is the drawer in question.  And she did have

10   several baking pans in that drawer.  But this is showing

11   it removed from the oven, documenting my steps.

12   Q.  And so this was not the way you found it; this is

13   the way you made it, so to speak?

14   A.  Correct.

15   Q.  Okay.  Defense Exhibit No. 43 is a dollar bill.

16   What is that showing us, other than a dollar bill?

17   A.  The dollar bill was on the kitchen floor at

18   evidence marker 33.

19   Q.  So going back in our -- in the diagram of the

20   kitchen, it's at 33?

21   A.  Yes, ma'am.

22   Q.  And you collected that?

23   A.  Yes, I did.

24   Q.  Why?  Why does that stand out to you as

25   something?

Case 4:22-cv-00385-O   Document 16-9   Filed 08/16/22   Page 196 of 203   PageID 1248

1    A.   It's out of place.  I find it odd to have a

2  dollar bill on our kitchen floor.

3    Q.   Even with the firemen in there, it's a one-dollar

4  bill?

5    A.   Yes.  But it's also burned.  It's singed.  So I'm

6  not sure where it would have been located.  It could

7  have been on the counter.  It could have fallen out of

8  someone's pocket.  I don't know.

9    Q.   And then you also -- this shows a little bit

10 above -- of this, that you also began to document the

11 cabinets and what was inside the cabinets; is that

12 correct?

13   A.   That's correct.

14   Q.   And this also shows -- what does it -- or what

15 does it show down in here in this area?

16   A.   This is another melted piece of plastic, much

17 more melted than the large sheet that we saw before.

18 And this is going to be that same bloody area at

19 evidence marker number 32.

20   Q.   And so this cabinet is actually the cabinet that

21 would correspond with the -- next to the closet?

22   A.   This area here.  It is going to be on the same

23 cabinet that the bloodstains from evidence marker 31

24 were taken from, the face of the cabinet.

25   Q.   So the majority of the blood at 32 is that in --

 1   it's where you put the number, basically?

 2       A.   She got fairly close.  I think it actually is

 3   probably a little bit more centrally located in front of

 4   the oven itself, but she also had to fit "30" in here.

 5   I didn't make the diagram.

 6       Q.   Okay.  But she had a lot of numbers to put in

 7   there?

 8       A.   Yeah.

 9       Q.   Because in the kitchen, it was the least damaged?

10       A.   If you're taking into consideration countertops

11   and the bar top, I don't know if I'd say it's the least

12   damaged.  The kitchen floor was still in fairly good

13   shape.

14       Q.   It also wasn't carpet, right?

15       A.   Right.

16       Q.   All right.  How come you began to take pictures

17   of the inside of the cabinets?

18       A.   That is standard protocol for me.  I've found

19   things hidden basically in plain sight in cabinets, on

20   top of the refrigerators, in the back of toilet tanks.

21   I document areas that I feel may have something of

22   evidentiary value inside of them just as a course of

23   action.

24       Q.   If you'll look at Defense Exhibits 44 through 63

25   and tell me if you recognize those pictures.

1    A.   Yes, I do.

2    Q.   And did you take all those pictures?

3    A.   Yes, I did.

4    Q.   And would these aid you in explaining to the

5    jurors the different things you found in her kitchen and

6    why you took the pictures?

7    A.   Yes.

8         MS. KEENE:  Judge, we'd offer at this time

9    Defense Exhibits 44 through 63.

10        THE COURT:  Inclusively, no gaps?

11        MS. KEENE:  Inclusively, no gaps.

12        MS. RAY:  No objection, Your Honor.

13        THE COURT:  All right.  Defense 44, 45, 46,

14   47, 48, 49, 50, each admitted.  Defense 51, 52, 53, 54,

15   55, 56, 57, 58, 59, 60, 61, 62, and 63 are also

16   admitted.

17        (Defendant's Exhibit No. 44 - 63 admitted)

18        MS. KEENE:  Permission to publish with the

19   ELMO?

20        THE COURT:  Yes.

21   Q.   (BY MS. KEENE)  What is this showing the jurors?

22   A.   This is a photograph of the kitchen standing from

23   the vantage point of the front door looking towards the

24   pantry.  The pantry door is open at this point to show

25   contents.

Case 4:22-cv-00385-O   Document 16-9   Filed 08/16/22   Page 199 of 203   PageID 1251

1    Q.   And did you go through -- and we went -- all

2    these pictures here, you took pictures of all items in

3    the pantry?

4    A.   I tried to document all of the cupboards, the

5    pantry, the refrigerator contents.

6    Q.   You documented every drawer that you looked at;

7    is that correct?

8    A.   Yes, ma'am.

9    Q.   You documented every cabinet that you looked at?

10   A.   Yes, ma'am.

11   Q.   You opened up the microwave?

12   A.   Yes.

13   Q.   Is that correct?

14   A.   Yes, ma'am.

15   Q.   You opened up every drawer.  You opened up the

16   kitchen refrigerator, correct?

17   A.   Yes, ma'am.

18   Q.   And other than the bottle of Bud Light, did you

19   find in any of these different places that you looked

20   cans of Bud Light or cans that were similar to the one

21   you'd found out in the living room area?

22   A.   Not to my knowledge.  Though I do not recall

23   taking everything out of the refrigerator.

24   Q.   So unless it was somewhere back behind there, you

25   just did not see that?

1    A.   Correct.   I did not remove contents.   And it is a

2  very full refrigerator.

3    Q.   And it's full, all the drawers, but you pulled

4  the drawers open and took a picture, correct?

5    A.   Yes.   Yes.

6    Q.   And you looked in the refrigerator -- in the

7  freezer, correct?

8    A.   Yes.

9    Q.   And what was significant about the Bud Light can

10 that you found to -- for you to collect and bring here

11 to court or give to the lab?

12   A.   Cans, bottles, drinking cups, glasses, all of

13 those are things you put your mouth on.   Cigarette butts

14 are also sometimes relevant.   So these are good sources

15 for DNA, in most cases.

16   Q.   And if there's no Bud Light cans in the house and

17 there's just one and it's empty and it's in the living

18 room area, is that also something that would be

19 significant as a crime scene officer that you would want

20 to collect in a scene like this?

21   A.   It being empty is irrelevant, as long as it's

22 open.   But yes, it is significant.

23        MS. KEENE:   I will finish at this time.   I'm

24 not passing the witness.

25        THE COURT:   All right.   Ms. Keene, can the

STATE vs. THOMAS OLIVAS

```
 1   record reflect, as you discussed with the witness having
 2   taken a picture of everything in the refrigerator and
 3   the cabinets, you were flashing -- putting each of those
 4   exhibits that just got in one at a time for couple of
 5   seconds as she looked at them and as you talked?
 6              MS. KEENE:  Yes, sir.
 7              THE COURT:  All right.  So that would have
 8   been 44 through 54, you showed at least 90 percent of
 9   them, if not all of them?
10              MS. KEENE:  I did, Judge.
11              THE COURT:  All right.
12              MS. KEENE:  Not all of them, but most of
13   them.
14              THE COURT:  All right.
15              State okay with that?
16              MS. RAY:  Yes, Your Honor.
17              THE COURT:  All right.  Then it's 4:33 and
18   it's time to call it a weekend.
19              Blue card instructions now become more
20   important than they ever have because the exposure to
21   others when you're not too tired to talk, gives you
22   three days to rest up.  Those of you who have been
23   dealing with the weather changes and the allergies and
24   what's affected us, I hope you feel better next week.
25   And thanks for sticking with us through this marathon,
```

```
1    if you will, at the courthouse.  I'll see you Tuesday
2    morning.  Y'all be at your regular pickup point.
3               And if the attorneys need the Court or the
4    court reporter for anything over the break, Monday we're
5    here.  Otherwise, I'll expect to see y'all back her
6    about ten till 9:00 on Tuesday.
7               And with that, we'll be in recess.
8               Enjoy your weekend.
9               (Jury excused from courtroom)
10              THE COURT:  Everyone else remain in the
11   courtroom until the jury has cleared the elevator.
12              (Recessed for the day at 4:35 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1              COURT REPORTER'S CERTIFICATE

2   THE STATE OF TEXAS          )

3   COUNTY OF TARRANT           )

4      I, Karen B. Martinez, Official Court Reporter in and

5   for the 372nd District Court of Tarrant County, State of

6   Texas, do hereby certify that the above and foregoing

7   contains a true and correct transcription of all

8   portions of evidence and other proceedings requested in

9   writing by counsel for the parties to be included in

10  this volume of the Reporter's Record, in the

11  above-styled and numbered cause, all of which occurred

12  in open court or in chambers and were reported by me.

13     I further certify that this Reporter's Record of the

14  proceedings truly and correctly reflects the exhibits,

15  if any, admitted by the respective parties.

16     I further certify that the total cost for the

17  preparation of this Reporter's Record is **located at the

18  end of Volume 21**.

19     WITNESS MY OFFICIAL HAND this the 30th day of March,

20  2015.

21                    /s/ Karen B. Martinez

22                    Karen B. Martinez, Texas CSR 6735
                      Expiration Date:  12/31/2015
23                    Official Court Reporter
                      372nd District Court
24                    Tarrant County, Texas
                      (817)884-2996
25                    kbmartinez@tarrantcounty.com
```