1          REPORTER'S RECORD

2       VOLUME 10 OF 21 VOLUME(S)

FILED IN
2nd COURT OF APPEALS
3       TRIAL COURT CAUSE NO. 1376658R    FORT WORTH, TEXAS

3/27/2015 12:36:05 PM
4       COURT OF APPEALS CASE NO. 02-14-00412-CR    DEBRA SPISAK
Clerk

5

6   THE STATE OF TEXAS        )  IN THE 372ND JUDICIAL
                              )
7                             )
                              )
8                             )
    VS.                       )  DISTRICT COURT
9                             )
                              )
10                            )
                              )
11                            )
    THOMAS OLIVAS             )  TARRANT COUNTY, TEXAS
12

13

14        * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

15            TRIAL ON MERITS CONTINUES

16        * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

17

18     On the 16th day of September, 2014, the following
    proceedings came on to be heard in the above-entitled
19  and numbered cause before the Honorable Scott Wisch,
    Presiding Judge, held in Fort Worth, Tarrant County,
20  Texas;
       Proceedings reported by computerized machine
21  shorthand with assisted realtime transcription.

22

23

       KAREN B. MARTINEZ, CERTIFIED SHORTHAND REPORTER
24            Official Court Reporter
           372nd Judicial District Court
25            Tarrant County, Texas

2

```
 1   APPEARANCES:

 2   ATTORNEYS FOR THE STATE:

 3      HONORABLE R. KEVIN ROUSSEAU
        SBOT NO: 17324950
 4      HONORABLE TAMLA S. RAY
        SBOT NO: 24046687
 5      Assistant Criminal District Attorneys
        Tim Curry Criminal Justice Center
 6      Fort Worth Texas  76196
        Phone: 817-884-1400
 7      Fax:   817-884-3333

 8   ATTORNEYS FOR THE DEFENDANT:

 9      HONORABLE TIM MOORE
        SBOT NO: 14378300
10      Attorney at Law
        115 West 2nd Street, Suite 202
11      Fort Worth, Texas  76102
        Phone: 817-332-3822
12      Fax:   817-332-2768

13           - AND -

14      HONORABLE JOETTA L. KEENE
        SBOT NO: 11165800
15      Attorney at Law
        204 South Mesquite Street
16      Arlington, Texas  76010
        Phone: 817-275-6611
17      Fax:   817-275-6621

18

19

20

21

22

23

24

25
```

*STATE v. THOMAS OLIVAS*

```
 1                  CHRONOLOGICAL INDEX

 2                   Volume 10 of 21

 3              TRIAL ON MERITS CONTINUES

 4    September 16, 2014                    Page Vol.

 5    Witness Resumes Testimony.................... 13 10

 6    STATE'S WITNESSES                        Voir
                          Direct    Cross    Dire    Vol.
 7
      Fallentine, Shannon     169      14,108   --      10
 8
      Rowe, Amanda         59,103      88      --      10
 9
      Shinpaugh, Det. Layne   173      199     --      10
10
      Smith, Detective Adam   213      226     --      10
11
      Recessed for the Day........................ 232 10
12
      Court Reporter's Certificate.................. 233 10
13

14           ALPHABETICAL LISTING OF WITNESSES

15                                       Voir
                          Direct    Cross    Dire    Vol.
16
      Fallentine, Shannon     169      14,108   --      10
17
      Rowe, Amanda         59,103      88      --      10
18
      Shinpaugh, Det. Layne   173      199     --      10
19
      Smith, Detective Adam   213      226     --      10
20

21

22

23

24

25
```

STATE v. THOMAS OLIVAS

```
1                              EXHIBITS

2    STATE'S
     NO.     DESCRIPTION           OFFERED  ADMITTED  VOL.
3
       128   Photograph               80       81      10
4
       129   Photograph               80       81      10
5
       130   Photograph               80       81      10
6
       132   Photograph               80       81      10
7
       133   Photograph               80       81      10
8
       134   Photograph               80       81      10
9
       135   Photograph               80       81      10
10
       210   Chart on Easel Paper    198      198      10
11
     DEFENDANT'S
12   NO.     DESCRIPTION           OFFERED  ADMITTED  VOL.

13      64   Photograph               14       14      10

14      65   Photograph               14       14      10

15      66   Photograph               14       14      10

16      67   Photograph               14       14      10

17      68   Photograph               14       14      10

18      69   Photograph               14       14      10

19      70   Photograph               14       14      10

20      71   Photograph               14       14      10

21      72   Photograph               24       24      10

22      73   Photograph               24       24      10

23      74   Photograph               24       24      10

24      75   Photograph               25       25      10

25      76   Photograph               25       25      10
```

| 1 | 77 | Photograph | 25 | 25 | 10 |
| 2 | 78 | Photograph | 25 | 25 | 10 |
| 3 | 79 | Photograph | 25 | 25 | 10 |
| 4 | 80 | Photograph | 40 | 41 | 10 |
| 5 | 81 | Photograph | 40 | 41 | 10 |
| 6 | 82 | Photograph | 40 | 41 | 10 |
| 7 | 83 | Photograph | 40 | 41 | 10 |
| 8 | 84 | Photograph | 40 | 41 | 10 |
| 9 | 85 | Photograph | 40 | 41 | 10 |
| 10 | 86 | Photograph | 40 | 41 | 10 |
| 11 | 87 | Photograph | 40 | 41 | 10 |
| 12 | 88 | Photograph | 40 | 41 | 10 |
| 13 | 89 | Photograph | 40 | 41 | 10 |
| 14 | 90 | Photograph | 40 | 41 | 10 |
| 15 | 91 | Photograph | 40 | 41 | 10 |
| 16 | 92 | Photograph | 40 | 41 | 10 |
| 17 | 93 | Photograph | 40 | 41 | 10 |
| 18 | 94 | Photograph | 45 | 45 | 10 |
| 19 | 95 | Photograph | 45 | 45 | 10 |
| 20 | 96 | Photograph | 45 | 45 | 10 |
| 21 | 97 | Photograph | 45 | 45 | 10 |
| 22 | 98 | Photograph | 45 | 45 | 10 |
| 23 | 99 | Photograph | 45 | 45 | 10 |
| 24 | 100 | Photograph | 45 | 45 | 10 |
| 25 | 101 | Photograph | 108 | 109 | 10 |

*STATE v. THOMAS OLIVAS*

| | | | | | |
|---|---|---|---|---|---|
| 1 | 102 | Photograph | 108 | 109 | 10 |
| 2 | 103 | Photograph | 108 | 109 | 10 |
| 3 | 104 | Photograph | 108 | 109 | 10 |
| 4 | 105 | Photograph | 108 | 109 | 10 |
| 5 | 106 | Photograph | 108 | 109 | 10 |
| 6 | 107 | Photograph | 108 | 109 | 10 |
| 7 | 108 | Photograph | 108 | 109 | 10 |
| 8 | 109 | Photograph | 108 | 109 | 10 |
| 9 | 110 | Photograph | 108 | 109 | 10 |
| 10 | 111 | Photograph | 108 | 109 | 10 |
| 11 | 112 | Photograph | 108 | 109 | 10 |
| 12 | 113 | Photograph | 108 | 109 | 10 |
| 13 | 114 | Photograph | 108 | 109 | 10 |
| 14 | 115 | Photograph | 108 | 109 | 10 |
| 15 | 116 | Photograph | 108 | 109 | 10 |
| 16 | 117 | Photograph | 108 | 109 | 10 |
| 17 | 118 | Photograph | 123 | 123 | 10 |
| 18 | 119 | Photograph | 123 | 123 | 10 |
| 19 | 120 | Photograph | 123 | 123 | 10 |
| 20 | 121 | Photograph | 123 | 123 | 10 |
| 21 | 122 | Photograph | 123 | 123 | 10 |
| 22 | 123 | Photograph | 123 | 123 | 10 |
| 23 | *124 | Photograph | 127 | 127 | 10 |
| 24 | *125 | Photograph | 127 | 127 | 10 |
| 25 | *126 | Photograph | 127 | 127 | 10 |

STATE v. THOMAS OLIVAS

| | | | | | |
|---|---|---|---|---|---|
| 1 | *127 | Photograph | 127 | 127 | 10 |
| 2 | *128 | Photograph | 127 | 127 | 10 |
| 3 | *129 | Photograph | 127 | 127 | 10 |
| 4 | *130 | Photograph | 127 | 127 | 10 |
| 5 | *131 | Photograph | 127 | 127 | 10 |
| 6 | *132 | Photograph | 127 | 127 | 10 |
| 7 | *133 | Photograph | 127 | 127 | 10 |
| 8 | *134 | Photograph | 127 | 127 | 10 |
| 9 | *135 | Photograph | 127 | 127 | 10 |
| 10 | *136 | Photograph | 127 | 127 | 10 |
| 11 | *137 | Photograph | 127 | 127 | 10 |
| 12 | *138 | Photograph | 127 | 127 | 10 |
| 13 | *139 | Photograph | 127 | 127 | 10 |
| 14 | *140 | Photograph | 127 | 127 | 10 |
| 15 | *141 | Photograph | 127 | 127 | 10 |
| 16 | *142 | Photograph | 127 | 127 | 10 |
| 17 | *143 | Photograph | 127 | 127 | 10 |
| 18 | *144 | Photograph | 127 | 127 | 10 |
| 19 | *145 | Photograph | 127 | 127 | 10 |
| 20 | *146 | Photograph | 127 | 127 | 10 |
| 21 | *147 | Photograph | 127 | 127 | 10 |
| 22 | *148 | Photograph | 127 | 127 | 10 |
| 23 | *149 | Photograph | 127 | 127 | 10 |
| 24 | *150 | Photograph | 127 | 127 | 10 |
| 25 | *151 | Photograph | 127 | 127 | 10 |

STATE v. THOMAS OLIVAS

| | | | | | |
|---|---|---|---|---|---|
| 1 | *152 | Photograph | 127 | 127 | 10 |
| 2 | *153 | Photograph | 127 | 127 | 10 |
| 3 | *154 | Photograph | 127 | 127 | 10 |
| 4 | *155 | Photograph | 127 | 127 | 10 |
| 5 | 156 | Photograph | 123 | 123 | 10 |
| 6 | 157 | Photograph | 123 | 123 | 10 |
| 7 | 158 | Photograph | 129 | 130 | 10 |
| 8 | 159 | Photograph | 129 | 130 | 10 |
| 9 | 160 | Photograph | 129 | 130 | 10 |
| 10 | 161 | Photograph | 129 | 130 | 10 |
| 11 | 162 | Photograph | 129 | 130 | 10 |
| 12 | 163 | Photograph | 129 | 130 | 10 |
| 13 | 164 | Photograph | 129 | 130 | 10 |
| 14 | 165 | Photograph | 129 | 130 | 10 |
| 15 | 166 | Photograph | 129 | 130 | 10 |
| 16 | 167 | Photograph | 129 | 130 | 10 |
| 17 | 168 | Photograph | 129 | 130 | 10 |
| 18 | 169 | Photograph | 129 | 130 | 10 |
| 19 | 170 | Photograph | 129 | 130 | 10 |
| 20 | 171 | Photograph | 129 | 130 | 10 |
| 21 | 172 | Photograph | 129 | 130 | 10 |
| 22 | 173 | Photograph | 129 | 130 | 10 |
| 23 | 174 | Photograph | 129 | 130 | 10 |
| 24 | 175 | Photograph | 129 | 130 | 10 |
| 25 | 176 | Photograph | 129 | 130 | 10 |

| 1 | 177 | Photograph | 134 | 134 | 10 |
| 2 | 178 | Photograph | 134 | 134 | 10 |
| 3 | 179 | Photograph | 134 | 134 | 10 |
| 4 | 180 | Photograph | 134 | 134 | 10 |
| 5 | 181 | Photograph | 134 | 134 | 10 |
| 6 | 182 | Photograph | 134 | 134 | 10 |
| 7 | 183 | Photograph | 134 | 134 | 10 |
| 8 | 184 | Photograph | 134 | 134 | 10 |
| 9 | 185 | Photograph | 134 | 134 | 10 |
| 10 | 186 | Photograph | 134 | 134 | 10 |
| 11 | 187 | Photograph | 134 | 134 | 10 |
| 12 | 188 | Photograph | 134 | 134 | 10 |
| 13 | 189 | Photograph | 134 | 134 | 10 |
| 14 | 190 | Photograph | 134 | 134 | 10 |
| 15 | 191 | Photograph | 134 | 134 | 10 |
| 16 | 192 | Photograph | 134 | 134 | 10 |
| 17 | 193 | Photograph | 142 | 142 | 10 |
| 18 | 194 | Photograph | 124 | 142 | 10 |
| 19 | 195 | Photograph | 144 | 144 | 10 |
| 20 | 196 | Photograph | 144 | 144 | 10 |
| 21 | 197 | Photograph | 144 | 144 | 10 |
| 22 | 198 | Photograph | 144 | 144 | 10 |
| 23 | 199 | Photograph | 144 | 144 | 10 |
| 24 | 200 | Photograph | 144 | 144 | 10 |
| 25 | 201 | Photograph | 151 | 151 | 10 |

| 1 | 202 | Photograph | 161 | 161 | 10 |
| 2 | 203 | Photograph | 161 | 161 | 10 |
| 3 | 205 | Photograph | 161 | 161 | 10 |
| 4 | 211 | Photograph | 161 | 161 | 10 |
| 5 | 212 | Photograph | 161 | 161 | 10 |
| 6 | 215 | Photograph | 161 | 161 | 10 |
| 7 | 216 | Photograph | 161 | 161 | 10 |
| 8 | 217 | Photograph | 161 | 161 | 10 |
| 9 | 218 | Photograph | 161 | 161 | 10 |
| 10 | 219 | Photograph | 161 | 161 | 10 |
| 11 | 220 | Photograph | 161 | 161 | 10 |
| 12 | 221 | Photograph | 161 | 161 | 10 |
| 13 | 223 | Photograph | 161 | 161 | 10 |
| 14 | 224 | Photograph | 161 | 161 | 10 |
| 15 | 225 | Photograph | 161 | 161 | 10 |
| 16 | 226 | Photograph | 161 | 161 | 10 |
| 17 | 227 | Photograph | 161 | 161 | 10 |
| 18 | 228 | Photograph | 161 | 161 | 10 |
| 19 | 229 | Photograph | 161 | 161 | 10 |
| 20 | 230 | Photograph | 161 | 161 | 10 |
| 21 | 231 | Photograph | 161 | 161 | 10 |
| 22 | 232 | Photograph | 161 | 161 | 10 |
| 23 | 233 | Photograph | 161 | 161 | 10 |
| 24 | 234 | Photograph | 161 | 161 | 10 |
| 25 | 235 | Photograph | 161 | 161 | 10 |

| 1  | 236 | Photograph       | 161 | 161 | 10 |
|----|-----|------------------|-----|-----|----|
| 2  | 237 | Photograph       | 161 | 161 | 10 |
| 3  | 238 | Photograph       | 161 | 161 | 10 |
| 4  | 239 | Photograph       | 161 | 161 | 10 |
| 5  | 240 | Xerox Photograph | 151 | 151 | 10 |
| 6  | 241 | Xerox Photograph | 151 | 151 | 10 |
| 7  | 242 | Xerox Photograph | 151 | 151 | 10 |
| 8  | 243 | Xerox Photograph | 151 | 151 | 10 |
| 9  | 244 | Xerox Photograph | 151 | 151 | 10 |
| 10 | 245 | Xerox Photograph | 151 | 151 | 10 |
| 11 | 246 | Xerox Photograph | 151 | 151 | 10 |
| 12 | 247 | Xerox Photograph | 151 | 151 | 10 |
| 13 | 248 | Xerox Photograph | 151 | 151 | 10 |
| 14 | 249 | Xerox Photograph | 151 | 151 | 10 |
| 15 | 250 | Xerox Photograph | 151 | 151 | 10 |
| 16 | 251 | Xerox Photograph | 151 | 151 | 10 |
| 17 | 252 | Xerox Photograph | 151 | 151 | 10 |
| 18 | 253 | Xerox Photograph | 151 | 151 | 10 |
| 19 | 254 | Xerox Photograph | 151 | 151 | 10 |
| 20 | 255 | Xerox Photograph | 151 | 151 | 10 |
| 21 | 256 | Xerox Photograph | 151 | 151 | 10 |
| 22 | 257 | Xerox Photograph | 151 | 151 | 10 |
| 23 | 258 | Xerox Photograph | 151 | 151 | 10 |
| 24 | 259 | Xerox Photograph | 151 | 151 | 10 |
| 25 | 260 | Xerox Photograph | 151 | 151 | 10 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | 261 | Xerox Photograph | 151 | 151 | 10 |
| 2 | 262 | Photograph | 14 | 14 | 10 |
| 3 | 263 | Photograph | 14 | 14 | 10 |
| 4 | 264 | Photograph | 14 | 14 | 10 |
| 5 | 265 | Photograph | 93 | 93 | 10 |
| 6 | 266 | Photograph | 93 | 93 | 10 |
| 7 | 267 | Photograph | 93 | 93 | 10 |
| 8 | 269 | Photograph | 93 | 93 | 10 |
| 9 | 270 | Photograph | 93 | 93 | 10 |

10

(*) Denotes an exhibit designated for the record only.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S
 2          Tuesday, September 16, 2014   9:25 a.m.
 3              (OPEN COURT, DEFENDANT AND JURY PRESENT)
 4              (Witness on the stand)
 5              THE COURT:  Good morning, members of the
 6    jury.
 7              SEVERAL JURY MEMBERS:  Good morning.
 8              THE COURT:  Does everyone recognize the blue
 9    card?
10              SEVERAL JURY MEMBERS:  Yes.
11              THE COURT:  Did everyone follow the blue
12    card instructions since you left us Friday until you
13    returned this morning?
14              SEVERAL JURY MEMBERS:  Yes.
15              THE COURT:  We so do thank you.
16              I think when we recessed last week it was
17    still the Defense witness.
18              Is the Defense ready to continue?
19              MS. KEENE:  We are, Judge.
20              THE COURT:  Is the State ready to continue?
21              MS. RAY:  Yes, Your Honor.
22              THE COURT:  All right.  Joetta.
23              MS. KEENE:  Thank you, Judge.  May I
24    approach the witness?
25              THE COURT:  Yes.
```

1          INVESTIGATOR SHANNON FALLENTINE,

2   having been previously duly sworn, testified as follows:

3          CROSS-EXAMINATION CONTINUES

4   BY MS. KEENE:

5      Q.  Let me show you what has been marked previously

6   as Defense Exhibit No. 64 through 71 and Defense Exhibit

7   262 through 264, and ask if you recognize those

8   pictures?

9      A.  Yes, I do.

10     Q.  And did you take those pictures?

11     A.  Yes, I did.

12     Q.  And do they fairly and accurately show the scene

13  as it looked when you were there taking pictures?

14     A.  Yes, it does.

15          MS. KEENE:  Your Honor, at this time we

16  would offer in Defense Exhibit No. 64 through 71 and 262

17  through 264.

18          MS. RAY:  No objection, Your Honor.

19          THE COURT:  Defendant's Exhibit No. 64, 65,

20  66, 67, 68, 69, 70, 71 are admitted.  Defendant's

21  Exhibit No. 262, 263, 264, also admitted.

22          (Defendant's Exhibit No. 64-71, 262-264

23           admitted)

24          MS. KEENE:  Permission to publish via the

25  ELMO, Judge?

1          THE COURT:  You may do so.

2     Q.   (BY MS. KEENE)  What is Defendant's 64 showing

3 the jurors?

4     A.   This is a photograph depicting evidence markers

5 26, 27, 28, 29, and 38 as they related to each other on

6 the scene.

7     Q.   And the 27 and 29, really, this is an area that

8 appeared to be blood, as well, in that area?

9     A.   Yes.

10    Q.   And then 38 was where a sock, as well as this

11 area here, that appeared to have blood?

12    A.   Yes.

13    Q.   And 26, did -- how would you describe this front

14 door, the condition of the front door?

15    A.   The door frame itself, along with the locking

16 mechanisms, was damaged prior to my arrival on scene.

17 That is the condition it was in when I arrived.

18    Q.   And the jurors heard testimony that someone

19 kicked this door open.  Does it appear to be a door that

20 was kicked open?

21    A.   It does appear that way.

22    Q.   Could you tell whether or not a dead bolt had

23 been engaged on this door?

24    A.   I believe there are photographs that show a top

25 interior dead bolt, one that can't be opened from the

1    outside of the residence, to be engaged.  The locking

2    mechanism, which is partially blocked by the evidence

3    marker in this photograph, did not appear to be engaged.

4        Q.   So we've got -- right up in there area is what?

5        A.   That is the main locking mechanism that you can

6    open from outside.

7        Q.   And what about this one right here?

8        A.   I'm not sure what you're...

9        Q.   This right here.  Was there two different locking

10   mechanisms, one at the top and one below it?

11       A.   Yes, there are.  You have your main handle here.

12   You have a dead-bolt assembly.  It's hard to see in that

13   photograph, I apologize.

14       Q.   Okay.  You were there, what --

15       A.   Yes.

16       Q.   Tell us about the locking mechanisms of the

17   doors.  Tell the jurors, actually.

18       A.   There were two dead-bolt mechanisms and one door

19   handle.  The dead-bolt mechanism in the middle was one

20   that you can open from either inside or outside using a

21   key.  The top dead-bolt mechanism was an interior safety

22   lock which you could only lock and unlock from inside

23   the apartment.

24       Q.   And then which one appeared to be locked or which

25   one appeared to be engaged when you arrived?

1     A.   The top interior safety mechanism, which you can

2     only lock and unlock from the inside.

3     Q.   And so, basically, you can see it in this

4     picture, as well as in other pictures -- it's a little

5     dark on the ELMO.  That's probably darker -- but you can

6     see that it's actually protruding, is that correct, in

7     your pictures, this lock?

8     A.   There are photographs that demonstrate that it is

9     engaged, the top locking mechanism.

10    Q.   What about this lock, lock number two?

11    A.   It did not appeared to be engaged.

12    Q.   And then what about the handheld, were you able

13    to tell whether or not it was locked or not?

14    A.   Was unable to tell.

15    Q.   As in -- did the -- do you remember making any

16    notes of trying the handle?

17    A.   I did.  It was compromised by the damage to the

18    door.  The assembly was loose but -- due to the damage

19    I'm assuming from kicking the door.

20    Q.   So basically what you can say is you know that

21    one locked, was engaged?

22    A.   Yes.

23    Q.   And you know that one was not?

24    A.   It did not appear at the time I arrived to be

25    locked, no.

STATE v. THOMAS OLIVAS

1    Q.   In State's -- or -- Defense Exhibit No. 65, what

2    is this showing the jurors?

3    A.   This is one of the photographs taken with a

4    measuring device in place to show general size.  This is

5    of an area of blood just inside the front door at

6    evidence marker number 27.

7    Q.   And if I show you Defense Exhibit 65, can you

8    kind of tell the jurors -- because it's hard to tell on

9    the ELMO -- what you're trying to show with the tape

10   measure in this picture?  And you can use your pointer.

11   A.   We're just attempting to show general size.  So

12   if we're talking about the blood area starting roughly

13   in this area continuing through, you can get a general

14   idea of the size of bloodstain.

15   Q.   So about what size was the bloodstain on the

16   floor around marker 27?  Is that about -- a little bit

17   over two feet?

18   A.   It's approximately two feet.

19   Q.   And the distance going into that area was

20   approximately three feet?

21   A.   Approximately, yes.

22   Q.   What is State's 60 -- or Defense 66 showing the

23   jurors?

24   A.   This is a photograph with a measuring device in

25   place to demonstrate the size of the bloodstain just

1    inside the front door to the apartment.

2        Q.   And what was the measurement of it?  We've talked

3    about how high one of the them was on the closet door to

4    the -- in the entryway, correct?

5        A.   Yes.

6        Q.   And in Defense Exhibit No. 66 this is now showing

7    them -- let me show you what's been marked as State's

8    Exhibit No. 44 and just remind them, since we're

9    starting again, what area this is that this is showing

10   them.

11       A.   We are looking at this small wall just inside the

12   front door at evidence marker 25.

13       Q.   So this is a different area than the one on the

14   closet?

15       A.   Yes.

16       Q.   And what is the distance that you measured that

17   it was in width?

18       A.   The stain appears to be approximately, from one

19   corner -- if we are considering the farthest corner to

20   the other farthest corner, it's also approximately two

21   feet in width.

22       Q.   And did this one also contain what you believed

23   in your training to have a transfer-type pattern on it?

24       A.   It does appear to have a transfer pattern at the

25   top, where something that was bleeding came in contact

```
1    with the wall at this location.

2       Q.  And does Defense No. 68 attempt to show that

3    better?

4       A.  Yes, it does.

5       Q.  Show the jurors what you, in your experience,

6    believe is a transfer-type pattern?

7       A.  I'm outlining it with the pointer now.  But it is

8    at the top of the stain.  This area, the droplets down,

9    the rivulets down tend to be runoff from the initial

10   transfer stain when a significant amount of blood is

11   applied to a surface.

12      Q.  So by the time whatever object or person or

13   whatever part of the body has hit -- or hits even not --

14   can you tell the velocity of this?

15      A.  No, I cannot.

16      Q.  Had that made contact with this wall, there would

17   be -- how would you quantify the amount of blood on that

18   object that transfers?

19      A.  Significant, but I wouldn't be able to give you

20   an actual quantity.

21      Q.  But enough to create that much of a stream coming

22   down?

23      A.  Yes.

24      Q.  Other than being able to tell there is a

25   transfer, can you determine if that was actually a body
```

1   that has a body that is transferring that amount of

2   blood on that wall?

3       A.   That's out of the scope of my expertise.

4       Q.   So, I mean, as far as you know, it could be

5   a bloody rag?

6       A.   It could be.

7       Q.   But whatever it is, it's something that has this

8   red liquid on it that has touched that wall?

9       A.   Yes.

10      Q.   So when it touched that wall, it transferred the

11  red substance and that -- there was enough for that

12  substance to fall back?

13      A.   Yes.

14      Q.   But you cannot say whether or not that's a body

15  part?

16      A.   No.

17      Q.   And then let me show you now what has been marked

18  as Defense Exhibit No. 67.  What is that showing the

19  jurors?

20      A.   This is a photograph of that same wall, at

21  evidence marker 25, with a measuring device attempting

22  to show an approximate height of the blood on this wall.

23      Q.   And I'm pointing on Defense Exhibit 67 to a red-

24  or maroon-colored door.  What door is that?

25      A.   That is the exterior of the front door.

1    Q.   Okay.  So this -- the front door is I -- well,
2    opened, I assume?
3    A.   Yes.
4    Q.   And are you outside taking this picture looking
5    in or at least at the doorway?
6    A.   I'm inside -- I'm at the doorway, yes.
7    Q.   And so how tall, again, did this go up?  Do you
8    need to see the picture?
9    A.   Yes, ma'am, please.
10             May I ask the judge if he has that
11   magnifying glass that he mentioned the last time we were
12   in court?
13             MS. KEENE:  You may.
14             THE COURT:  I think you just did.
15             MS. KEENE:  And, Judge, may I also present
16   her with Defense Exhibit 69 and 70, which also may be
17   helpful.
18             THE WITNESS:  It appears that the top
19   portion of the stain is just below four feet.  This
20   arrow -- I know you probably cannot see it on the jury
21   from your angle or your distance -- is four feet.  This
22   is three feet.
23   Q.   (BY MS. KEENE)  And so -- and I just handed you
24   some other exhibits, which, the close-ups don't really
25   matter for us, but if you can look at them, how wide,

```
 1   or whatever word you would use, was the area of
 2   transfer?
 3       A.   Approximately 21 inches, it appears.
 4       Q.   Now, let me show you what has been marked as
 5   Defense Exhibit No. 71 and ask you if you can look at
 6   that and explain to the jurors what you were attempting
 7   to show when you took that picture?
 8       A.   This is a photograph which appears a bit washed
 9   out due to the lighting in here of the transfer pattern
10   on that same wall that we're discussing.
11       Q.   And where is that transfer pattern?
12       A.   We are taking this measure to depict its distance
13   from the edge of the wall.  That would be the eastern
14   edge of that wall.
15       Q.   Is that right in here?  Are you talking about
16   from this wall going right?
17       A.   Yes, ma'am.  The -- this is the eastern edge of
18   the wall headed westward.
19       Q.   And this is the same wall we've been talking
20   about?
21       A.   Yes, it is.
22       Q.   And the jurors can see this clearly, or as clear
23   as it can be, on the picture itself, as opposed to the
24   ELMO just washes it out in this one?
25       A.   Yes.
```

 1    Q.   And that's because these -- this transfer pattern

 2   is actually pretty dark?

 3    A.   It is, yes.

 4    Q.   Okay.  Let me show you what has been previously

 5   marked as Defense Exhibit 72 through 74 and ask if you

 6   recognize those?

 7    A.   Yes, I do.

 8    Q.   How do you recognize those?

 9    A.   They are photographs of the cabinet and areas of

10   the blood in the kitchen at evidence marker 31.

11    Q.   And do they -- did you take those on that

12   evening?

13    A.   Yes, I did.

14    Q.   And does Defense Exhibits 72 through 74

15   accurately show what you saw in the kitchen area, the

16   areas that you believed to be apparent blood?

17    A.   Yes.

18         MS. KEENE:  At this time, Judge, we would

19   offer in Defense Exhibits 72 through 74.

20         MS. RAY:  No objection, Your Honor.

21         THE COURT:  Defendant's Exhibit No. 72, 73,

22   74 are each admitted.

23         (Defendant's Exhibit No. 72 - 74 admitted)

24    Q.   (BY MS. KEENE)  I should have done this earlier,

25   but 75 through 79, Defense Exhibit No. 75 through 79,

1    and ask you if you recognize those?

2        A.   Yes, I do.

3        Q.   And how do you recognize those?

4        A.   They are photographs I took of the interior of

5    the apartment in the kitchen and bar areas.

6        Q.   And do you think that these were -- these

7    pictures, you took them that night?

8        A.   Yes.

9        Q.   And would they help you explain to the jurors the

10   different areas that you also saw what appeared to be

11   blood, or at least where you took samples?

12       A.   Yes.

13             MS. KEENE:   Judge, I would offer in Defense

14   Exhibit No. 75 through 79.

15             MS. RAY:   No objection, Your Honor.

16             THE COURT:   All right.   Defendant's Exhibit

17   No. 75, 76, 77, 78, 79 are all admitted.

18             (Defendant's Exhibit No. 75 - 79 admitted)

19       Q.   (BY MS. KEENE)   What does Exhibit 72 -- what

20   does -- why did you take that pictures?

21       A.   This is a photograph taken in the kitchen to

22   depict areas of what I believed to be apparent blood in

23   these locations, at markers 31 and 32.

24       Q.   And so these are pictures that you took.   First

25   you took the -- a scene picture without these markers

```
 1    and then you came back and took the picture with the
 2    markers?
 3         A.   Yes.
 4         Q.   And you actually took samples from these areas?
 5         A.   Yes.
 6         Q.   And that was the day where we're putting -- where
 7    the State was putting a lot of evidence in for the
 8    swabs?
 9         A.   Yes.
10         Q.   Swabs were taken in these areas, as well as other
11    areas we talked about --
12         A.   Yes.
13         Q.   -- with the apparent red blood?
14         A.   Yes.
15         Q.   But you also took some measurements of these; is
16    that correct?
17         A.   I believe I did, yes.
18         Q.   Okay.  Let me show you what is Defense Exhibit
19    No. 73 and ask you to tell the jurors what this is --
20    what -- why you took this picture and what you're
21    attempting to show.
22         A.   This is yet another photograph using a different
23    type of measuring device, in this case an ABFO scale, to
24    demonstrate the size of what I believe to be apparent
25    blood at marker 31 on the counter face.
```

1    Q.   And did you have any expert -- or any opinion

2   about whether this was a transfer type of whatever it

3   is, red stain there?

4    A.   I did not.  I wasn't wholly convinced it wasn't

5   food, but I was unable to tell, so I collected it.

6    Q.   Okay.  Whether it's food or blood or whatever it

7   is, you didn't have an opinion about whether or not it's

8   a drop, whether or not it's a spray or whether or not

9   it's a transfer type?

10    A.   No.

11    Q.   And sometimes you just don't have that opinion,

12   correct?

13    A.   Correct.  I don't have as much training as others

14   who are experts in that field.

15    Q.   But, I mean, also, some evidence just doesn't

16   lend itself to let you have opinions?

17    A.   Sometimes not.

18    Q.   Where the other two were actually -- were very

19   clear?

20    A.   Yes.

21    Q.   Okay.  And Defense Exhibit No. 74, what is that

22   showing the jurors?  Why did you take this picture?

23    A.   We are still on that same cabinet and counter

24   face.  There is what I believed to be apparent blood on

25   the face of the cabinetry.  This is just attempting to

1    demonstrate height.

2       Q.   And just as an idea, because you did the tape

3    measurements, about where was the blood, as far as in

4    what you were able to -- or not blood, but the red

5    stain, the apparent blood that you were able to see and

6    take measurements of?

7       A.   Are you asking in this photograph specifically?

8       Q.   Yes.   Yes.

9       A.   There are very small droplets almost covering a

10   large portion of the cabinet.   They're very small.   I

11   don't believe you can probably make them out too well in

12   this photograph from your distance in the jury box.

13      Q.   About what height were they?

14      A.   May I see that photograph?

15      Q.   Yeah.

16      A.   They appear to span almost the entire door.   So

17   from the ground all the way up to about 26 inches.

18      Q.   And then did you see anything up here in this

19   area, really, post-26 inches?

20      A.   There is additional transfer on the drawer

21   itself.   So that's going to be below the countertop face

22   that we were just looking at in the other photograph.

23      Q.   And you used the word "transfer", do you mean

24   just because there was just blood there or do you think

25   that was actually transfer type of red substance?

1     A.   I apologize.  I don't mean to assume the way that

2   it was applied.  But there is apparent blood on both the

3   drawer face and the cabinet face.

4     Q.   And did you have an opinion about what type of --

5   how it got there?

6     A.   I do not.

7     Q.   So whether or not it was transfer or not, you

8   don't know?

9     A.   I don't know.

10    Q.   And then what is Defense Exhibit No. 75 showing

11  the jurors?

12    A.   This is a photograph of the kitchen countertop.

13  It's on that same side of the kitchen.  It's the east

14  side of the kitchen.  This is on the other side of the

15  stove.  Here is the lighter that was collected from the

16  scene at marker 34 and a singed dollar bill collected

17  from the scene at marker 33.

18    Q.   Let me -- give us an idea of where this is on the

19  map, the diagram.

20    A.   It's this countertop here and the floor just

21  below it.

22    Q.   Okay.  And what was it that you found down there?

23    A.   I'm sorry?

24    Q.   What is at 33?

25    A.   A singed dollar bill.

 1     Q.  Okay.  And that's the one we saw the close-up of

 2  earlier?

 3     A.  Yes.

 4     Q.  And so it was significant to you because it's a

 5  dollar bill on the floor that's burnt in an area that

 6  doesn't have burns?

 7     A.  That, and it's a dollar bill on a kitchen floor.

 8  It's the only currency in that area and it's out of

 9  place.

10     Q.  And there's what appears to be apparent blood, or

11  there's certainly a lot of red smears around it?

12     A.  Yes.

13     Q.  And so that seemed significant enough for you

14  to collect -- I mean -- or to take pictures of and

15  collect?

16     A.  Yes.

17     Q.  Okay.  Defense Exhibit No. 76, what is this

18  showing the jurors?

19     A.  This is the northwest corner of the bar.  To get

20  your bearings, this is the front --

21     Q.  How about here?

22     A.  It is this area right here.

23     Q.  So where is the front door?

24     A.  This -- here at the northeastern corner of the

25  apartment.

1    Q.   Okay.  And then from there, what is this -- what

2    are you attempting to show?

3    A.   This is a photograph demonstrating height of

4    apparent blood on the wall at evidence marker 41.  There

5    is additional blood on the slightly recessed wall at the

6    bar in this area, as well.

7    Q.   And does Defense Exhibit 77 show that?

8    A.   Yes.  If you are trying to --

9    Q.   Here we go.  I'm going to do a closer-up, 78?

10   A.   Yes.

11   Q.   And so these are also ones in which you got

12   samples for; is that correct?

13   A.   That's correct.

14   Q.   And then in 77, did there appear to be anything

15   down here on the baseboard?

16   A.   Yes.  There is apparent blood in this area.

17   Q.   And does Defense Exhibit No. 79 show that?

18   A.   Yes.

19   Q.   And then how -- what is this yellow plaque card,

20   41, what are you attempting to show in that picture?

21   A.   I am using a measuring scale that is part of

22   every evidence marker that we use to demonstrate size.

23   Q.   And about what is the size of the larger of the

24   two?

25   A.   It's a metric scale so we're looking at about,

1   what is that, one and a half to two centimeters.

2       Q.  And this is just too much for me.  I didn't even

3   realize that's metric.  Okay.

4           So this is smaller than -- what would this

5   be in inches?  Can you convert?

6       A.  Not today.

7       Q.  Okay.  That's all right.  That's metric?

8       A.  Yes, ma'am.

9       Q.  I'm glad we talked about that, because you use

10  this metric marker on several of them.

11      A.  I prefer metric.  Unfortunately, we're not

12  standardized in my unit.

13      Q.  Okay.  Did this also appear -- this other little

14  dot to the left of the larger dot in Defense Exhibit

15  No. 79, did that also appear to be blood?

16      A.  I do not recall.  I can look at the photograph

17  for you and attempt to tell you.

18      Q.  Because the photograph is a lot better than the

19  way it washes out up there.

20      A.  Yes, it does appear to be.

21      Q.  And is this something that you got a sample for?

22      A.  Yes, it is.

23      Q.  And why are you getting samples of areas that

24  just look like blood?

25      A.  Blood is impossible to tell just from looking at

1   it who it came from.  In violent crime scenes there is

2   always potential for both the aggressor and the victim

3   to bleed.  You, therefore, attempt to take samples in

4   each location that you note blood in the attempts that

5   you'll catch more than one DNA profile.

6       Q.  You know, actually let's -- because I asked that

7   question.

8           Did you make a notation of the amount of

9   wounds on Ms. Gandy?

10      A.  I did notate in my notes where it appeared she

11  had injury, but the actual list of injuries should come

12  from the medical examiner.

13      Q.  Did you actually, as you were taking pictures,

14  though, list out the number of wounds that you saw --

15      A.  Yes.

16      Q.  -- as you were taking pictures?

17      A.  Yes, I did.

18      Q.  Can you give the jurors an idea -- and did you

19  see both the front and back of her?  And you're correct,

20  the medical examiner did a full autopsy.  But just give

21  them an idea of how many wounds she had on her front and

22  her back?

23      A.  May --

24      Q.  Yes.

25      A.  -- I refer to my report?

 1      Q.   Yes.

 2      A.   When I first documented the front of Ms. Gandy,

 3   this was prior to the medical examiner investigator

 4   arriving on scene, I did note two apparent stab wounds

 5   to the right breast; one incise wound to her right side,

 6   below her right arm; an incise wound to the top of her

 7   right shoulder; abrasions, layers of missing skin on the

 8   right side of her chin, neck, right shoulder, and left

 9   thigh; and four potentially sequential abrasions and a

10   scratch on her chest, the top of her left breast; as

11   well as a bluish-purple discoloration and laceration of

12   the left shoulder; and a small scratch on her left

13   forearm.

14      Q.   Did you note anything on her back?

15      A.   At 2:17 when the Medical Examiner's Office

16   Investigator Greenwell arrived, I was able to view the

17   back of Ms. Gandy and did note one apparent stab or

18   incise wound just above her lower back, left of center,

19   and what appeared to be two apparent stab or incise

20   wounds near the middle of her back, just below the right

21   shoulder blade.

22      Q.   And so that's what you noticed on the scene,

23   correct?

24      A.   To the best of my ability.  It should be noted

25   that the condition that victims are generally found in

1    can make it very difficult to actually see the wounds

2    when they're bloody or clothed.

3       Q.   Absolutely.  But as a crime scene officer, you

4    wanted to see what kind of -- just to get a visual, an

5    idea of what kind of wounds this young lady had that

6    potentially killed her, so you could do as thorough of a

7    job as you could in her house?

8       A.   Yes.

9       Q.   And so when you're seeing that amount of wounds

10   on her -- and somebody can describe what they're

11   actually called -- but those wounds on her, blood was

12   something that was relevant to you to find and locate?

13      A.   Yes.

14      Q.   Why?

15      A.   Well, obviously to demonstrate where the victim

16   could possibly have bled in the apartment.  Also, in --

17   if it is a stabbing wound, use of a knife does sometimes

18   cause injury to, like I said, the aggressor and the

19   victim, additional signs of a struggle, anything that

20   might indicate that that aggressor had bled on scene.

21           But it is to document as much of the blood

22   as you can locate and -- just to give a full and

23   accurate representation of the scene as a whole.

24      Q.   All right.  Now, let's say that a person -- if a

25   person is wielding a knife, let's say they're doing it

1   over their head or even under, however they're using it,

2   it has certainly happened that whenever they're using

3   the knife, that they're -- they go off the grip and that

4   their own hand will go onto the blade, correct?

5       A.   I can't -- I'm not sure I'm qualified as to --

6       Q.   Okay.

7       A.   -- how that would happen.  I've cut myself

8   cutting open fruit.

9       Q.   Okay.  And so basically using a knife, the person

10  who is the bad person could also have been cut by their

11  own knife?

12      A.   Possibly.

13      Q.   And so what you're doing is you're looking for,

14  if they were, if they left any of their own DNA and

15  blood at the scene?

16      A.   I would like to find it if it's there.

17      Q.   Okay.  Now, you've got a large two-foot -- let's

18  just stick with the bottom one.  You got a large

19  two-foot area of blood on the floor in the entryway,

20  correct?

21      A.   Yes.

22      Q.   And you took a sample from this area?

23      A.   Yes.

24      Q.   But you do not get every little drop of blood in

25  that area?

1    A.  No, I don't.

2    Q.  And so your sample was at 27, correct?

3    A.  The sample is generally taken from as many points

4  as is possible in the location.  So it's not necessarily

5  just from where you see the evidence marker.

6    Q.  Okay.  And that's really my question.  So let's

7  just say -- is there any -- did you document where -- or

8  how do you get the samples out of 27?  Tell them that.

9  That's really what I'm looking for.

10    A.  It's an average.  I try to select the -- what

11  appear to be the cleanest areas of blood, the wettest

12  areas of the blood.  Those are going to generally give

13  you the best, cleanest samples.

14    Q.  All right.  Let's say -- just using this area as

15  an example, this would be true in all of the different

16  areas that you collected samples of blood, correct?

17    A.  Correct.

18    Q.  Particularly where there was a large area where

19  there was blood?

20    A.  Correct.

21    Q.  If a person cuts themselves, a bad person, and

22  blood drops down, it actually drops and hits the floor,

23  if they drop once right here at that spot and that's the

24  only place that they -- that their blood dropped, is it

25  possible that you could have gotten a sample right

1    there, right there, right there, and missed a droplet of

2    their blood within that large space?

3        A.  Yes, it's possible.

4        Q.  And it's possible because you don't take all of

5    the -- you don't go mop and clean up the entire area

6    that had blood?

7        A.  Correct.

8        Q.  You do your best to get samples from different

9    areas?

10       A.  Correct.  That's why we take so many from so many

11   difference areas.

12       Q.  But what -- and reality is, is you don't get

13   every single piece of blood to analyze it to determine

14   if someone left a droplet of blood?

15       A.  Unfortunately, no.

16       Q.  So if someone was cut, a bad person at this

17   scene, and that -- let's just say hypothetically that's

18   the pot where the blood was and you got the spots all

19   around here, then you wouldn't have gotten those samples

20   without the spot?

21       A.  Correct.

22       Q.  Where a spot like this or a transfer pattern like

23   this, where are you getting your samples on this?  Are

24   you getting it from below or within the transfer

25   pattern?

1    A.  I would attempt to get it where the blood looked,

2    again, the cleanest, the most oxygenated, which in this

3    case is going to be on the runoff pattern here, as

4    opposed to the transfer pattern, which was easily

5    determined to be washed down from the water and/or

6    burnt.  It definitely looks different than the nicer,

7    cleaner blood down here.

8    Q.  Okay.  So on each of these -- at least two areas

9    like this, you got your samples down here?

10   A.  It would have been from the best-looking blood --

11   to use a better term, I'm sure there's a better term --

12   but the cleanest-looking blood.

13   Q.  We understand what you're saying.  This is

14   black-looking up here?

15   A.  Yes.  Yes.

16   Q.  This was -- looked more like the red dried blood

17   that you would think it would look like?

18   A.  Yes.

19   Q.  And so you got your sample down here because it

20   just looked better?

21   A.  It would have a better chance of withstanding

22   what it had been through, hopefully give you a better

23   sample.

24   Q.  Let me show you what has been marked as Defense

25   Exhibit No. 80 through Defense Exhibit No. 93 and ask

```
1    you if you recognize those.

2        A.   Yes, I do.

3        Q.   How do you recognize those?

4        A.   They are both lab and scene photographs that I

5    took regarding evidence in this case.

6        Q.   And would those pictures -- you took those that

7    night or that morning?

8        A.   Most of them.  There are some lab photographs.

9        Q.   And the lab pictures you took the next day or

10   within a week, probably?

11       A.   Within a few days, yes.

12       Q.   Would those help explain to the jurors those

13   particular items, where you found them and what you

14   found?

15       A.   Yes.

16       Q.   And those are not items that were introduced

17   herein, I don't think -- all right.  Forget it.  That's

18   too much to ask.

19            MS. KEENE:  Judge, we would offer in Defense

20   Exhibit No. 80 through 93.

21            THE COURT:  No gaps?

22            MS. KEENE:  No gaps.

23            MS. RAY:  No objection, Your Honor.

24            THE COURT:  All right.  Defense 80, 81, 82,

25   83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93 each
```

```
 1    admitted.
 2                  (Defendant's Exhibit No. 80 - 93 admitted)
 3        Q.  (BY MS. KEENE)  I put Defendant's Exhibit No. 6
 4    up on the ELMO.  And you know what pictures we have
 5    here, correct?
 6        A.  Yes.
 7        Q.  Tell the jurors what they're about to see
 8    pictures of and where these items were found.
 9        A.  We are going to be discussing from the -- what I
10    see in the pictures, evidence marker ten, which was on
11    the floor just to the west of the bar; and evidence
12    marker 11, which was on top of the bar, in this area,
13    near evidence marker ten; and you can also make out
14    evidence marker 12 in one of your photographs next to
15    evidence marker 11 on the bar top.
16        Q.  All right.  And is this the actual picture,
17    Defense Exhibit 80, of the two markers?
18        A.  Three markers.
19        Q.  Three markers?
20        A.  Yes, ma'am.
21        Q.  The two items are 10 and 11, though, correct?
22        A.  The rest of the photographs refer to 10 and 11,
23    11 here, ten here on the floor.
24        Q.  All right.  What is ten showing the jurors?
25        A.  That is a photograph of a burned and wet package
```

1   of Marlboro cigarettes.

2        Q.  And Defense Exhibit No. 82?

3        A.  It's another photograph depicting the cigarettes.

4        Q.  Were you able to tell what type of cigarettes,

5   other than Marlboro, if there was a specific type of

6   Marlboro, that those were?

7        A.  The package is charred and I don't smoke

8   Marlboro, so I'm not familiar.  I can see that it says

9   "Marlboro", though.

10       Q.  Were you able to tell -- you then took pictures

11   in the lab; is that correct?

12       A.  Yes.

13       Q.  And that -- is that in Defense Exhibit 88 -- oh,

14   hang on.

15            Defense Exhibit 88 is a picture you took in

16   the lab?

17       A.  No.  This is another photograph taken on scene.

18   This has got a paper bag background, the packaging for

19   the cigarettes.  It was an attempt to get a better view

20   of the label.

21       Q.  And 89, Defense Exhibit 89, as well?

22       A.  Yes.

23       Q.  And on -- in 89 were you able to read what type

24   of Marlboros they were, as in right in this area of

25   Defense Exhibit 89?

1    A.   It says "Blend No."  -- it's unclear from this

2    angle -- "27".

3    Q.   Blend No. 27 as the specific type of Marlboro.

4         Were you able to determine whether or not

5    they were empty or full?

6    A.   There did appear to be cigarettes in the package.

7    Q.   Were you able to determine how many cigarettes

8    were in the package or how many cigarettes were missing

9    from the package?

10   A.   I do not believe I removed them due to their

11   condition.  Being saturated, I worried that they would

12   fall apart.

13   Q.   But they appeared to be pretty full?

14   A.   It does appear, yes.

15   Q.   It doesn't appear that that many cigarettes had

16   been smoked out of that packet; is that correct?

17   A.   To the best of my knowledge, no.  It is crushed

18   slightly which makes it appear to be full, but I believe

19   that the majority of cigarettes are still in there.

20   Q.   But this package was in the opened condition, it

21   wasn't like with this -- the wrapper around it?

22   A.   No.

23   Q.   And this was found under the bar area?

24   A.   Yes, on the floor.

25   Q.   And in a -- if a scene where the firemen had not

1    been in the house, potentially knocking things off of

2    wherever, that would be very significant to see a full

3    pack of cigarettes laying on the floor?

4        A.   It's significant regardless, I feel.

5        Q.   Okay.  And why is that?

6        A.   I -- cigarettes are generally a good piece of

7    evidence, in a lot of cases.  If I find them on scenes,

8    I do collect them.

9        Q.   Did you -- you said you looked in Mechelle's car?

10       A.   Yes.

11       Q.   And did you do a search of her car?

12       A.   Yes.

13                  MS. KEENE:  Judge, may I approach the

14   witness?

15                  THE COURT:  Yes.

16       Q.   (BY MS. KEENE)  Let me show you what has been

17   marked as Defense Exhibit No. 94 through 100 and ask if

18   you recognize those.

19       A.   Yes, I do.

20       Q.   And did you take those pictures?

21       A.   Yes, I did.

22       Q.   And do those pictures fairly and accurately show

23   what you found in her car?

24       A.   Yes.

25       Q.   And what you found in her car that could possibly

```
 1    be related to the subject we're talking about, the
 2    cigarettes here?
 3        A.   Yes.
 4        Q.   Okay.
 5             MS. KEENE:  Judge, I would offer into
 6    evidence Defense Exhibit No. 94 through 100.
 7             MS. RAY:  No objection, Your Honor.
 8             THE COURT:  All right.  Defense Exhibit
 9    No. 94, 95, 96, 97, 98, 99, and 100 are each admitted.
10             (Defendant's Exhibit No. 94 - 100 admitted)
11             MS. KEENE:  May I publish via the ELMO?
12             THE COURT:  Yes.
13        Q.   (BY MS. KEENE)  All right.  What is Defense
14    Exhibit 94?  Where is that picture taken?
15        A.   That is inside of the white Honda belonging to
16    Ms. Gandy.  And this is the rear passenger side
17    floorboard.
18        Q.   And did you find any cigarettes in her car?
19        A.   I did find partially smoked cigarettes, as well
20    as an empty cigarette pack, which is right here in this
21    photograph, behind the driver seat.
22        Q.   And that's 95.  Defense Exhibit 95 is showing a
23    better picture of that?
24        A.   Yes, it is.  Right here.
25        Q.   And this is -- is this kind of -- basically I've
```

1   got some pictures where you're doing low range, short

2   range, medium range?

3       A.   Yes, ma'am.

4       Q.   Long range, medium range, short range.

5            Okay.  And so now in Defense Exhibit No. 96,

6   what type of cigarettes did you find in her car?

7       A.   That was an empty box of Marlboro, Blend No. 27.

8       Q.   And that appeared to be the same type of

9   cigarette box that you found inside her house?

10      A.   Yes.

11      Q.   And if it were Mechelle that smoked that type of

12  cigarette, that would make sense that you would find

13  that kind of cigarette in the house?

14      A.   Yes.  But I didn't know that at the time I was

15  processing her house.

16      Q.   Absolutely.  And, also, you don't know if

17  somebody smokes -- bums cigarettes off each other?

18      A.   No.

19      Q.   All right.  So in her car you also looked into

20  her ashtray?

21      A.   Yes.

22      Q.   And why did you look in her ashtray?

23      A.   I tend to always look and attempt to collect any

24  partially smoked cigarettes for possible DNA testing.

25      Q.   And did you that in this case?

```
 1      A.  Yes.

 2      Q.  And in Defense Exhibit No. 98 you're able to tell

 3  that the one full cigarette is a number -- at least a

 4  two.  You can't see what the other number is?

 5      A.  Yes.  I don't know that it's a full cigarette

 6  but, yes, it's -- you can see the brand here.

 7      Q.  And these other burnt things on the bottom, would

 8  they be, for lack of a better term, roach-type stuff?

 9      A.  It's cigar paper.

10      Q.  Okay.  It's different than this right here,

11  this in Defense Exhibit No. 98?

12      A.  Yes.

13      Q.  This is a different type of smoking thing than a

14  cigarette?

15      A.  Yes.  Yes.

16      Q.  And then you stated that in the car it was -- or

17  wait a minute.  I hit something.  I don't know.  I may

18  need help.

19              THE COURT:  All right.  Help.

20              (Pause in proceedings)

21      Q.  (BY MS. KEENE)  You determined that that box was

22  empty?

23      A.  Yes, I did.

24      Q.  And just as you took a picture of the box that

25  was full, you took a box -- picture of this when it was
```

1    empty in her car?

2        A.   Yes.

3        Q.   Now, is that the only type of cigarettes that you

4    found in Mechelle's house?

5        A.   No.

6        Q.   Where else did you find the cigarettes?  What

7    other -- where was the other pack of cigarettes?

8        A.   There was a pack of the Virginia Slims brand

9    cigarettes on the bar at evidence marker 11.

10       Q.   And could you show the jurors?

11            And so where -- in relation to the Marlboro,

12   where was the Virginia Slims?

13       A.   These are the Marlboro cigarettes.  Virginia

14   Slims are here.

15       Q.   And what was significant to you or why did you

16   collect the Virginia Slims?

17       A.   Same principle applies, you can't tell what type

18   of cigarette brand someone's going to prefer just based

19   on gender or -- I know Virginia Slims seems like a

20   female cigarette, but I collect it because I can't go

21   back and get it later.

22       Q.   Well, the reality is, a female could have been

23   the killer in this case?

24       A.   Yes.

25       Q.   Or the female, Mechelle Gandy, could have smoked

1   these cigarettes?

2      A.   Yes.

3      Q.   So you collect them because you collect

4   cigarettes at scenes because sometimes they have turned

5   up very significant evidence?

6      A.   Yes.

7      Q.   Defense Exhibit No. 85, what is that showing the

8   jurors?

9      A.   This is a close-up photograph on scene of the

10  Virginia Slims cigarettes.

11     Q.   And that's where they're turned.  And Defendant's

12  Exhibit No. 86, what is that showing the jurors?

13     A.   This is the resting location initially of that

14  package of cigarettes.  The photograph we just saw, I

15  had turned them on their end so you could tell what

16  brand type they were.

17     Q.   All right.  I'm actually showing you these

18  pictures backwards.  Is Defense 87 exactly how the scene

19  of the cigarettes and this round thing looked whenever

20  you first located it?

21     A.   Yes.

22     Q.   And then in Defendant's Exhibit No. 86 you took

23  the round thing up?

24     A.   This is actually just taking the photograph from

25  the side, as opposed to 90 degrees, top down.

1    Q.   And then did you later, back in the lab, take

2    clearer pictures of the cigarettes, 91?

3    A.   Yes.

4    Q.   And Defense Exhibit 92?

5    A.   Yes, ma'am.

6    Q.   And Defense Exhibit 93?

7    A.   Yes.

8    Q.   And were you able to determine how many

9    cigarettes -- because you can see in Defense Exhibit 93

10   that there are cigarettes in Virginia Slims packet?

11   A.   There are.  I do not know the quantity.  Again, I

12   didn't remove them due to their fragile state.

13   Q.   Did this packet appear to be as full as the

14   Marlboro 27 Blend in the house?

15   A.   It doesn't appear to be, no.

16   Q.   With either the Marlboro cigarettes or the

17   Virginia Slims cigarettes, can you potentially obtain

18   evidence outside of the cigarette butt itself and on the

19   external of a cigarette package?

20   A.   You can in theory, yes.

21   Q.   And in theory what could you potentially obtain?

22   A.   Either fingerprints or possible DNA evidence.

23   Q.   And where would -- and that's because people

24   handle their packs of cigarettes, correct?

25   A.   Yes.

 1      Q.   And so it could be a real good place to find DNA?

 2      A.   Could be, yes.

 3      Q.   And the surface -- certainly if we're just

 4  looking at the Virginia Slims ones, the surface, this

 5  one has a cellophane wrapper on it, correct?

 6      A.   Yes.

 7      Q.   Is that a good surface to get fingerprints, or

 8  has it been?

 9      A.   It can be.

10      Q.   How come?

11      A.   It's a nice smooth surface and it works in a lot

12  of similar ways to like, say, a glass surface.

13      Q.   So where glass you stick your finger on it,

14  it's -- you can visually look and see that you've left

15  fingerprints on your own car's glass, correct?

16      A.   Yes.

17      Q.   And on cellophane sometimes you can actually

18  visually just see the cigarette because it's the same

19  concept?

20      A.   See the latent print, yes.

21      Q.   I mean, yes.  Not the cigarette, the print.

22           How would you take a print off of something

23  like that cellophane?

24      A.   Generally speaking, this one has been damaged by

25  fire and water, but a nice clean pack of cigarettes, I

 1  would try Super Gluing the cellophane wrapper and

 2  processing it with magnet powder.  I would also do the

 3  same for the box itself.

 4      Q.  And then -- so that's the outside.

 5          Would you do anything in regards to unsmoked

 6  cigarettes on the inside?

 7      A.  I would not.  Those would be probably better

 8  retained for DNA testing where someone's finger came in

 9  contact with the filter portion while they're removing

10  other cigarettes.

11      Q.  So if you open up cigarettes and you're trying to

12  get one cigarette out, whether -- there are times that

13  you touch more than one cigarette getting your cigarette

14  out?

15      A.  Yes.

16      Q.  And so that may be an area that is ripe with DNA,

17  it may or may not, at least to test and look for DNA on

18  those; is that correct?

19      A.  Yes.

20      Q.  And then in something like Defense Exhibit

21  No. 98, you said you collected these for a number of

22  reasons, but the big one is what?

23      A.  The potential for DNA evidence on filters of the

24  cigarette.

25      Q.  And that's because people put it -- a cigarette

```
 1   is, in theory, smoked in someone's mouth, correct?
 2        A.   Yes.
 3        Q.   And they inhale and exhale, correct?
 4        A.   Yes.
 5        Q.   And that same cigarette is one that they've
 6   probably been holding with their fingers?
 7        A.   Correct.
 8        Q.   So you can get a large quantity, potentially, of
 9   DNA at the end of a cigarette in their filter?
10        A.   Potentially.
11        Q.   And you could also get their DNA along the
12   outside, if you test it, and you -- there's potential to
13   find it from where they've touched it?
14        A.   In theory you may also get latent print evidence
15   from the paper, if there is enough of it left.
16        Q.   Because that's such a thin type of paper?
17        A.   It has nothing really to do with the thickness of
18   the paper, just the fact that it is paper.  There are
19   chemical processes for paper that generally yield decent
20   results.  The issue with it is the way that you hold a
21   cigarette.  Generally you're holding it with nonfriction
22   ridge skin.
23        Q.   So basically -- and you've showed with your
24   hands.
25                  Basically you hold a cigarette by doing the
```

```
 1    peace signal and you put in between your hands like a
 2    clamp, correct?
 3         A.   Generally, yes.
 4         Q.   Generally you see people doing that.
 5              As opposed to holding it with your thumb
 6    and index finger and other finger holding it?
 7         A.   Correct.
 8              THE COURT:  Joetta, slow down a little.
 9              MS. KEENE:  I'm sorry, Judge.
10         Q.   (BY MS. KEENE)  All right.  And so for those
11    reasons you collect ashtrays?
12         A.   Contents of them, yes.
13         Q.   And inside Mechelle's house were you able to find
14    any ashtrays?
15         A.   Not that were evident.  I'm sure they were
16    probably there, but everything was fairly destroyed and
17    burned.
18         Q.   So you did not see any?
19         A.   No.
20         Q.   And because of the condition of the house, you
21    can't say she didn't smoke or allow other people to
22    smoke in the house because you don't know?
23         A.   I don't know.
24         Q.   You know that on the back porch, though, there
25    was a lighter, correct?
```

```
1      A.   Yes.

2      Q.   Did you find in that area, of the back area, any

3  evidence that that was an area that if a smoker lived at

4  that house that they would go on the back porch and

5  light a cigarette and smoke back there?

6      A.   I don't recall seeing any cigarette butts in that

7  area, but, otherwise, I'm not sure.

8      Q.   Other than the lighter being out there?

9      A.   Right.

10     Q.   Which could have been out there for a number of

11 different reasons?

12     A.   Correct.

13     Q.   Did you find any cigarettes in that backyard,

14 having smoked cigarettes in that back area?

15     A.   Not that I recall, no, ma'am.

16          MS. KEENE:  Judge, may we approach?

17          THE COURT:  Yes.

18          (Discussion at the bench, off the record)

19          THE COURT:  All right.  Let's take a stretch

20 break.

21          Also -- hold on.  Hold on.  Time out -- the

22 parties have advised me, as a professional agreement,

23 there's a witness from out of state who may have some

24 medical issues that have nothing to do with their

25 testimony, per se, but to accommodate that person, we
```

1   might interrupt this witness' testimony if they've

2   arrived, put them on and then resume, not to confuse you

3   but to be courteous to the witness.

4          Is everybody going to be able to separate

5   all that out like you do all the other testimony on a

6   trial that last multiple weeks?  Y'all think y'all can

7   handle that?

8          SEVERAL JURY MEMBERS:  Yes.

9          THE COURT:  I do, too.  And I appreciate

10  your courtesy and the professionalism of the attorneys.

11         Take your break.  And if there's a different

12  witness on the stand, we're not playing mind games with

13  you.  Okay.  You may retire.

14         (Break taken, 10:30 - 10:42 a.m.)

15         (OPEN COURT, DEFENDANT PRESENT, NO JURY)

16         THE COURT:  I need you to officially state

17  your full name for her.

18         THE WITNESS:  Amanda W. Rowe.

19         THE COURT:  All right.  Then look up at me

20  and raise your right hand.

21         (One witness sworn)

22         THE COURT:  There are certain rules that

23  apply to anyone who's a witness in a criminal trial.

24  The first rule is you cannot be in the courtroom unless

25  you're actually answering questions.  You can't sit in

 1    the courtroom and listen to what other people say.

 2              Do you understand rule one?

 3              THE WITNESS:  Yes.

 4              THE COURT:  Rule two, you can't talk to

 5    anyone else about what you know or they know about

 6    anything that is asked about in court.  The rule

 7    technically is you cannot discuss your testimony with

 8    other witnesses while the trial is in progress.

 9              Still with me?

10              THE WITNESS:  Yes.

11              THE COURT:  Rule three, you can talk to the

12    lawyers for either side or people who work for them

13    about what you know so they know what questions to ask

14    you.  You just have to make sure other witnesses can't

15    listen in on your private conversations.

16              THE WITNESS:  Yes, sir.

17              THE COURT:  Make sure you hear and

18    understand the question asked.  And if you can't hear or

19    do not understand, then say so, but never guess.  Don't

20    wing it.

21              Still with me?

22              THE WITNESS:  Yes.

23              THE COURT:  If you do understand the

24    question, answer that question, stop and wait for the

25    next question.  Never explain anything unless that's

```
 1   part of the question.
 2               THE WITNESS:  Okay.
 3               THE COURT:  For example, do you have a
 4   watch, either the answer is yes or no, not "I used to
 5   but not anymore," or "Yes, I do.  My grandmother gave it
 6   to me."  "It used to belong to my great-grandfather," et
 7   cetera.
 8               Do you follow what I'm saying?
 9               THE WITNESS:  Yes.
10               THE COURT:  If they want to --
11               THE WITNESS:  I'm bad about that.
12               THE COURT:  Well, everybody is.  But in the
13   courtroom her hands have to write everything down for a
14   trial that's going to last a couple of weeks and there
15   has to be question, answer, pause, so her hands can
16   rest.
17               Are you still with me?
18               THE WITNESS:  Yes.
19               THE COURT:  All right.  These rules will
20   apply, even if you're excused after your testimony,
21   until you find out from a reliable source, like one of
22   the lawyers or investigators, that the trial is over,
23   the jury has made a decision.  Then you can talk or not
24   talk to whoever you want.
25               Okay?
```

```
 1                    THE WITNESS:  Okay.

 2                    THE COURT:  Thanks for coming in.

 3                    (Pause in proceedings)

 4                    (Witness takes the stand)

 5                    THE COURT:  Here they come.

 6                    (Jury seated in courtroom)

 7                    THE COURT:  All right.  Pursuant to the

 8       agreement of the parties, we're interrupting one

 9       witness' testimony.  We're going to interject full

10       direct and cross of another witness and then upon

11       conclusion of this witness' testimony, we'll resume with

12       the prior witness.

13                    Will you state your full, legal name again

14       for Miss Karen and also for the members of the jury.

15                    THE WITNESS:  Amanda W. Rowe.

16                    THE COURT:  And I swore you in, placed you

17       under oath and rules while the jury was on break; is

18       that correct?

19                    THE WITNESS:  Correct.

20                    THE COURT:  All right.  Mr. Rousseau.

21                    MR. ROUSSEAU:  Thank you, Judge.

22                          AMANDA ROWE,

23       having been first duly sworn, testified as follows:

24                       DIRECT EXAMINATION

25       BY MR. ROUSSEAU:
```

```
 1        Q.   Good morning.

 2        A.   Good morning.

 3        Q.   You've already told the jury that your name is

 4   Amanda W. Rowe; is that correct?

 5        A.   Yes.

 6        Q.   Ms. Rowe, where are you from?

 7        A.   Richmond, Virginia.

 8        Q.   Is that where you live right now?

 9        A.   Yes.

10        Q.   Is that -- generally speaking, is that where

11   you're from?

12        A.   I was born there and raised there and have since

13   lived in Texas and Chicago and D.C. and now back in

14   Virginia.

15        Q.   What do you do for a living, ma'am?

16        A.   I run a nonprofit medical society, the

17   International Society for Heart & Lung Transplantation.

18        Q.   So you're president and you do a lot of traveling

19   in connection with that?

20        A.   Yes.

21        Q.   Do you have any children?

22        A.   I do.

23        Q.   How old are they?

24        A.   Two -- or they're 12 and -- no, they're not.

25   Fourteen and 15 now.  They're getting old.
```

1    Q.   Okay.  A lot of that going around, trust me.

2         And you live back in Richmond, Virginia,

3    now, correct?

4    A.   Yes.

5    Q.   Back in 2010, 2011, where were you living then?

6    A.   Southlake, Texas.

7    Q.   And during that period of time -- well, I didn't

8    ask this.

9         Are you married now, ma'am?

10   A.   No, I'm not.

11   Q.   Back during that period of time, 2010, 2011, were

12   you married at the time?

13   A.   Yes, I was separated.

14   Q.   Were you going through a divorce?

15   A.   Yes.

16   Q.   And did that divorce take a -- was it a lengthy

17   one?

18   A.   Very.

19   Q.   During that period of time, though, specifically

20   in 2011, did you happen to meet a person named Thomas

21   Olivas?

22   A.   Yes.

23   Q.   And how did you meet him?

24   A.   My friend, who lives in McKinney, took me to a

25   bar called Truluck's, a restaurant in Southlake, and

1    Thomas was the bartender.

2       Q.   Tell the jury -- give the jury a little bit of an

3    idea about what kind of place Truluck's is.

4       A.   It's a very nice high-end seafood restaurant.

5    And then the -- on the bar side they have a pretty large

6    crowd in there all the time.  Appetizers.  And it's kind

7    of the place to go, especially if you're single, which I

8    suddenly was, in Southlake.

9       Q.   And -- excuse me.

10           On that particular night you said that

11   Thomas was tending bar; is that right?

12      A.   Yes.

13      Q.   And did you strike up a conversation with him?

14      A.   Yes.  He was our bartender.

15      Q.   Did y'all end up -- did you and your friend sit

16   at the bar for a pretty good while that night?

17      A.   Oh, boy.  Probably about three hours.

18      Q.   Well, over the -- had you ever been to that bar

19   before or to that restaurant before?

20      A.   I'd been to the restaurant before, never to the

21   bar.

22      Q.   Would you consider yourself to have been a

23   regular at that establishment?

24      A.   No.  That was probably the third time I've been

25   there in three years.

1    Q.   After that time -- well, do you remember when

2    that was?

3    A.   I believe it was February of 2011.

4    Q.   After that time, did you and Mr. Olivas get to

5    know each other?

6    A.   Yes.

7    Q.   And before we go any farther, do you see -- the

8    person we're -- we've been referring to as Thomas

9    Olivas, do you see him here in the courtroom here?

10   A.   Yes.  He's sitting there.

11   Q.   Could you point at him and just describe

12   something that he's wearing?

13   A.   A dark jacket and dark tie.

14   Q.   Okay.  There's two men at this table.  Which one

15   would he be?

16   A.   Oh, I'm sorry.  The farthest one from you.

17            MR. ROUSSEAU:  May the record --

18            THE WITNESS:  Farthest to your right.

19            MR. ROUSSEAU:  May the record reflect the

20   witness has identified the Defendant?

21            THE COURT:  It may.

22   Q.   (BY MR. ROUSSEAU)  And just so we're real clear,

23   have you recently had some type of concern or some type

24   of health problem involving your eyesight?

25   A.   Yes.  I have a condition called multifocal

1    choroiditis, both eyes.  It has left me with a lot of

2    blind spots and areas that I just can't see very well.

3        Q.   But you're able to see Mr. Olivas well enough?

4        A.   Yes.

5        Q.   Thank you.  I would ask you to spell that

6    condition, but we'll -- if you say it slowly, maybe

7    we'll just look it up later.

8        A.    Multifocal choroiditis.

9        Q.   Choroiditis?

10       A.   Uh-huh.

11            THE COURT:  Would that be

12   C-H-O-R-O-I-D-I-T-I-S?

13            THE WITNESS:  Yes.

14            THE COURT:  For the court reporter only.

15            Members of the jury, you use your own

16   judgment how to spell it.

17            You may proceed.

18            MR. ROUSSEAU:  Thank you, Judge.

19       Q.   (BY MR. ROUSSEAU)  So you saw Mr. Olivas -- in

20   the days following that February 2011 meeting, you saw

21   him some outside of the Truluck's environment?

22       A.   Yes.

23       Q.   Was there ever a time when you would have

24   considered yourself to have been in a dating

25   relationship with him?

1      A.  No.  We were just kind of friends and --

2   commiserating friends.  We were both -- needed somewhere

3   to talk to about what we were going through personally.

4      Q.  And -- well, you've already told us you were

5   going through a divorce, right?

6      A.  Yes.

7      Q.  And I take it you confided some of those issues

8   in him?

9      A.  Yes.

10      Q.  What did he tell you about his domestic

11   relationship at that time?

12      A.  He said that he had been living with a woman

13   named Rebeca.  They had a daughter, I think she was two

14   or three, and that they -- their relationship had ended

15   and that he was in disputes or arguments with her over

16   being able to see his daughter or have custody, partial

17   custody of her.

18      Q.  Did he ever -- and I understand now you know that

19   we're talking -- that the incident that we're talking

20   about is -- involves the date of March the 20th,

21   correct?

22      A.  Yes.

23      Q.  Okay.  I'm talking about before that time.

24      A.  Yes.

25      Q.  Okay.  That's what we're talking about right now.

 1      A.   Yes.

 2      Q.   Before that time, did Thomas Olivas ever tell you

 3   anything about a woman who was attempting to force him

 4   to pay child support for a child?

 5      A.   No.

 6      Q.   That's -- this was news to you?  You didn't know

 7   anything that?

 8      A.   I did not.

 9      Q.   All right.

10      A.   Not before March 20th.

11      Q.   I understand.

12           Did he tell you where he was actually living

13   at the time before --

14      A.   He --

15      Q.   Again, before March the 20th, did he tell you

16   what his living situation was?

17      A.   He told me he was living in a house in Grapevine

18   with someone named Ben.

19      Q.   Would that have been a male?

20      A.   Yes.

21      Q.   Someone named Ben?

22      A.   Yes.

23      Q.   Okay.  A house?

24      A.   Yes.

25      Q.   Okay.  Do you recall what type of vehicle

1    Mr. Olivas was driving at that time?

2        A.   A silver Toyota Camry.

3        Q.   Now, you've said that you -- y'all were not in a

4    dating relationship.  Were there times, though, when you

5    were intimate with Mr. Olivas?

6        A.   Yes.

7        Q.   And prior to -- leading up to March the 20th of

8    2011, prior to that time, how many times would you say

9    that y'all had been intimate with one another?

10       A.   I'd probably seen him a total of five, so maybe

11   two or three.  And we text and talked a lot -- texted

12   and talked a lot.

13       Q.   Okay.  I want to move ahead a little bit to March

14   20th of 2011.  That would have been a Sunday.  I

15   wouldn't expect you to know that, but that would have

16   been a Sunday.

17            Where were you at that time --

18       A.   I was --

19       Q.   -- on that day?

20       A.   I was in Richmond, Virginia.

21       Q.   And why were you in Richmond, Virginia?

22       A.   I had taken my daughters to Nags Head, North

23   Carolina, for spring break and we flew in and out of

24   Richmond.  And I was staying at my parents' house on

25   each end of the trip.  So I was at my parents' house

 1   that night.

 2       Q.   Okay.  So I want to back up maybe -- that's a

 3   Sunday.  I want to back up maybe a couple of days, maybe

 4   three.  You can set me straight.

 5            Did you receive a telephone call from Thomas

 6   a few days before that Sunday?

 7       A.   Yes.  I think it was Thursday or Friday.

 8       Q.   Okay.  And what time of -- do you recall what

 9   time of day he called you?

10       A.   No.  I think it was evening, but I'm not

11   positive.

12       Q.   What did he have to say?

13       A.   He called -- he just called to talk and was

14   telling me that -- during the conversation, he was

15   telling me that he didn't have a car anymore, was

16   worried how to get to work, and he explained that he had

17   lent his car to a friend who had totalled it getting --

18   he'd gotten into an accident trying to avoid some kid on

19   a skateboard.  And he didn't have transportation to his

20   job and he was worried he was going to lose his job.

21       Q.   All right.

22       A.   And that's what we talked about.

23       Q.   That's good for right now.

24            So the information provided to you was he

25   had loaned his car to a friend, correct?

1     A.   Yes.

2     Q.   The friend had wrecked it while trying to avoid a

3   kid on a skateboard?

4     A.   Yes.

5     Q.   He had no way to get the car fixed and he was

6   without a way to get to work?

7     A.   Yes.  He said his insurance didn't cover another

8   driver wrecking his car.

9     Q.   Okay.  So what happened after that?

10     A.   Well, you know, I guess we talked about some

11   other things, probably, and then hung up.  And then

12   probably a couple hours later I'd been thinking about

13   his situation and I realized my car was sitting in my

14   garage at home, not being used.  So -- but I wasn't sure

15   if I had a key at home that he could use.  So I either

16   called or texted him and said I was going to check with

17   the pet sitter and if she find a key, that I'd get her

18   to leave my car in the driveway and put the key on the

19   tire and he could borrow my car until I came home.  And

20   told him I needed it on Monday afternoon when I got back

21   because I had to take my kids somewhere or pick them up

22   from school or something -- or I guess they were with

23   me, but I needed my car Monday afternoon.

24     Q.   Okay.  So did the two of you get all that squared

25   away where he was, in fact, going to come over and pick

1   up your vehicle?

2       A.  Well, I had to check with my pet sitter and I

3   called him back and said she'd done that and left the

4   key and it was ready for him to pick up if he wanted it.

5       Q.  Okay.  Well, what is the next -- would that have

6   also been on that, say, Thursday?

7       A.  That probably would have been the next day.  I

8   think we talked that evening and the next day I made all

9   the arrangements.

10      Q.  Well, let's move ahead then.

11              When is the next time that you heard from

12  Thomas Olivas?

13      A.  It was probably -- it was after the 20th.  It was

14  after the 22nd.  It was probably the 24th or 25th,

15  maybe, I would guess.

16      Q.  Let me back up a just a moment.

17              Did you receive a telephone call from Thomas

18  Olivas on Sunday night?

19      A.  Oh, yes.  Sorry.  Yes, I did.

20      Q.  Okay.  And I'm sorry to cut you off.  It's been

21  how many years since this happened now?

22      A.  Well, that was March of 2011.  So it's been...

23      Q.  Three and a half years?

24      A.  Three and a half, yeah.

25      Q.  And you've had a chance to talk to the -- you

1    eventually talked to the detectives after -- to a

2    Detective Stewart, correct?

3        A.   Yes.

4        Q.   Okay.  And I -- and you gave a statement to

5    Detective Stewart, correct?

6        A.   Yes.

7        Q.   And did I provide you with a copy of that

8    statement?

9                 And it's a recorded statement, right, on a

10   disc?

11       A.   Yes.

12       Q.   And did you have a chance to review that recorded

13   statement before coming in here today?

14       A.   Yes.

15       Q.   When did you review that?  When did you look at

16   it?

17       A.   Day before yesterday.

18       Q.   Back home in Virginia?

19       A.   Uh-huh.

20       Q.   Okay.  Did that help you remember some of the

21   details?

22       A.   Some of them.  Most of them I remembered.  But,

23   yeah.  Ben was a name I didn't remember off the top of

24   my head.

25       Q.   Sure.  Okay.  Well, on -- do you recall then what

1   time it was when you got a telephone call from Thomas

2   Olivas on March the 20th of 2011?

3       A.   It was 12:36 in Virginia and I had been sound

4   asleep, so I looked at my phone and noted the time,

5   because I wasn't used to getting called at that hour.

6       Q.   So 12:36 Virginia time --

7       A.   In the morning --

8       Q.   -- correct?

9       A.   -- uh-huh.

10      Q.   You were in Virginia, but at that time your

11  residence was Fort Worth -- well, Southlake, Texas,

12  correct?

13      A.   Correct.

14      Q.   What was the time in Southlake, Texas?

15      A.   It would have been 11:36.

16      Q.   11:36 p.m.?

17      A.   Yes.

18      Q.   You received a telephone call.

19           And what did Thomas Olivas tell you in that

20  telephone call?

21      A.   Well, he called to -- the purpose of call was to

22  arrange -- to finalize when he was going to drop the car

23  off for me.  And I think we agreed on a time.  It was

24  somewhere between -- I needed it by 6:00, so he -- we

25  agreed that he would drop it off and I would take him to

 1   work.  He would get there by 5:00, somewhere between

 2   3:00 and 5:00.

 3              And then he told me that I was going to be

 4   very mad at him because my car smelled like gasoline.

 5   And I must have asked him why or he volunteered.  He

 6   said that he had been helping a friend move a lawnmower

 7   in my car and that some of the gas had spilled and that

 8   he'd tried to get it out, but -- and I said leave the

 9   windows down and air it out and maybe it will go away.

10   And he said he tried that and couldn't get rid of the

11   smell, and apologized that, you know, he spilled gas in

12   my car.

13              THE COURT:  Pause.

14      Q.  (BY MR. ROUSSEAU)  So --

15              THE WITNESS:  I talk fast.  Sorry.

16              THE COURT:  Not in here you don't.  Okay.

17      Q.  (BY MR. ROUSSEAU)  What kind of a car are we

18   talking about here?

19      A.  It's a 2002 Ford Explorer.

20      Q.  An '02 Ford Explorer?

21      A.  Yes.

22      Q.  And you had it for -- since it was new?

23      A.  Since 2004.

24      Q.  2004.  Prior to that date -- did you drive it

25   every day?

 1    A.  Every day.

 2    Q.  It was your daily drive?

 3    A.  Yep.

 4    Q.  Did it normally smell like gasoline?

 5    A.  No.

 6    Q.  Had you ever -- as far as you can remember, had

 7  you ever spilled gasoline in the interior of that car?

 8    A.  No.

 9    Q.  You didn't have to roll the windows down to keep

10  from being overcome by the fumes of gasoline?

11    A.  No.

12        MR. ROUSSEAU:  Just one moment, please.

13    Q.  (BY MR. ROUSSEAU)  All right.  What did you -- do

14  you have any hobbies, by the way, involving the use of

15  hay?

16    A.  Well, it's -- we used to decorate in front of our

17  house with hay bales at Thanksgiving and Halloween --

18  one Halloween.

19    Q.  Would there have been any reason for hay to have

20  been in your car, straw, that sort of thing?

21    A.  This was March, so we -- well, in '11, I mean,

22  we'd been plant -- trying to get grass seed to grow in

23  the back.  I have hauled hay when I was in Texas in my

24  car.  I don't remember whether it was at that point in

25  time.  I can't -- my ex-husband had been living in

1    Austin for a year and a half.  He'd been the hay hauler.

2    So I guess, you know, there could be leftover hay.  I

3    hadn't done anything recently that I can recall.

4        Q.  Are your -- are you and your children involved in

5    equestrian sports?

6        A.  Yes.  Oh, yes.  My daughter does -- did ride when

7    she was in Texas.

8        Q.  Okay.  And, in fact, did she keep -- were there a

9    pair of boots and a riding helmet in the car at that

10   time?

11       A.  There may well have been.  Probably, yep.

12       Q.  That would have been common?

13       A.  Yes.

14       Q.  Let's get back to the conversation again.  He

15   told you that he had accidentally spilled some gas in

16   your vehicle while helping a friend move a lawnmower,

17   correct?

18       A.  Yes.

19       Q.  And you told him to air it out as best you can,

20   correct?

21       A.  Correct.

22       Q.  All right.  Now, that was -- you've already told

23   us 11:36 local time on Sunday night, March the 20th,

24   2011.

25              When is the next time that you actually

1   heard from Thomas Olivas?

2      A.  And that's -- I know it's after the 22nd because

3   that's the day I talked to the detective.  But it was

4   probably within two or three days after that that I

5   talked to him.

6      Q.  Okay.  So -- and I won't -- I'm not going to try

7   to hold you to anything specific so...

8              But if you talked to the detective on the

9   22nd, the 23rd, 24th, 25th, somewhere in that range --

10     A.  Yes.

11     Q.  -- 25th or so?

12             Had you done anything -- had you attempted

13  to contact him during that period of time?

14     A.  Yes.

15     Q.  And did -- were you able -- were you successful?

16     A.  No.  He did not return my texts or phone calls.

17     Q.  Okay.  When you finally talked to him, did you

18  ask him about why he hadn't returned your phone calls?

19     A.  Yes.

20     Q.  What did he tell you?

21     A.  He told me he had been in jail.

22     Q.  That he'd been in jail during that time?

23     A.  For part of it.

24     Q.  Okay.  Did he say why he'd been in jail?

25     A.  He told me about -- well, I already knew.  I

1  talked to the detective so I already knew that they

2  had -- about the incident with -- I don't remember her

3  name -- the woman who was killed.

4      Q.  That's okay.

5      A.  And --

6      Q.  You were under -- you were aware that there --

7  that he was at least someone that the police were

8  interested in, in connection with --

9      A.  Yes.  Yes.

10     Q.  -- a very serious crime?

11          THE COURT:  Don't talk at the same time.

12 Wait for his question before you answer.

13          THE WITNESS:  Yes, I was aware.

14     Q.  (BY MR. ROUSSEAU)  Okay.  Now, do you recall --

15 and let me finish my question all the way through.

16 Okay.

17          Did he -- do you recall whether he told you

18 he was in jail because of that crime or did you just put

19 two and two together had -- knowing about the crime and

20 come up with the fact that that's why he had been in

21 jail?

22     A.  Well, he had not called me when my -- he was

23 supposed to return my car and I asked him why and he

24 told me he'd been in jail.

25     Q.  Okay.  All right.  That's fine.

1                When you came -- well, how did you finally

2    get your vehicle back?

3         A.   The police called me and told me that they had my

4    car and wanted me to come down for questioning.  And

5    they told me what was going on and I went -- came down

6    here to Arlington and met with Detective Stewart.

7         Q.   Did you get your car back that day?

8         A.   Yes.

9         Q.   And was it in pretty good condition?

10        A.   Yes.

11        Q.   Did you ever see -- well, I'll ask you that in

12   just a moment.

13               When you got your car, did you notice

14   anything unusual about the way it smelled?

15        A.   It still smelled like gasoline -- or it did smell

16   like gasoline, quite strongly.

17        Q.   Does it still smell like gasoline today?

18        A.   No.

19        Q.   What did you have to do to get rid of that

20   gasoline smell?

21        A.   Oh, gosh.  I mean, I aired it out a lot.  I

22   actually took -- had it cleaned.  I had it cleaned

23   twice.  And eventually it just dissipated.

24        Q.   Have you ever -- I take it you put gas in your

25   own car from time to time?

1     A.  Yes.

2     Q.  I take it you -- at some point in time you

3  managed to get a little gas on your hands or a little

4  bit on the -- maybe on the seat or something like that?

5     A.  Yes.

6     Q.  And you can smell it when you first get back in

7  your car, correct?

8     A.  Yes.

9     Q.  Was it stronger than that?

10    A.  Yes.  You had to ride with the windows down.

11    Q.  Okay.

12         MR. ROUSSEAU:  May I approach, Your Honor?

13         THE COURT:  Yes.

14    Q.  (BY MR. ROUSSEAU)  Ms. Rowe, I want to show you

15  some photographs here and let me know if you have any

16  difficulty seeing them or anything.  And I apologize, I

17  couldn't show those to you before because we were out in

18  the hall and jury was in the room.

19         Why don't you take a look -- flip through

20  these pictures.  There are Exhibits 128, 129, 130, 132,

21  133, 134, and 135.  Just flip through there and in a

22  moment I'll ask you a couple of questions about them.

23    A.  Okay.

24    Q.  Have you had a chance to look at those?

25    A.  Yes.

1    Q.   You recognize what's in those photos?

2    A.   That's my car.

3    Q.   Do they fairly and accurately depict your vehicle

4    as it was at the time we've been talking about?

5    A.   Yes.

6    Q.   And notice in couple of them there are some

7    pieces of tape attached to your vehicle.  Did you put

8    that piece of tape there?

9    A.   Well, I'm assuming the police did.  When I went

10   to collect it in that garage, they had white markings

11   and tape.

12   Q.   And that's State's Exhibit No. 133, correct?

13   A.   Yes.

14   Q.   Okay.  But other than that, fairly and

15   accurate --

16   A.   It's my car.  It's my car.

17          THE COURT:  Don't talk at the same time.

18   Let him finish his question.

19          THE WITNESS:  I'm sorry.

20          THE COURT:  Don't apologize to me.  Do it to

21   the lady whose hands are getting sore.

22          THE WITNESS:  Sorry.

23          MR. ROUSSEAU:  Your Honor, I'll offer

24   State's 128, 129, 130, 132, 133, 134, and 135, subject

25   to any objection by the Defense.

```
 1                   MR. MOORE:  No objection.
 2                   THE COURT:  All right.  State's 128, 129,
 3   130, 132, 133, 134, 135 each admitted.
 4                   (State's Exhibit No. 128-130, 132-135
 5                    admitted)
 6                   MR. ROUSSEAU:  May I publish a few of these,
 7   Your Honor --
 8                   THE COURT:  Yes.
 9                   MR. ROUSSEAU:  -- through PowerPoint?
10                   THE COURT:  Yes, you may.
11        Q.  (BY MR. ROUSSEAU)  First one will be State's
12   Exhibit No. 128.
13                   (Pause in proceedings)
14        Q.  (BY MR. ROUSSEAU)  Ms. Rowe, do you make
15   presentations sometimes for your job?
16        A.  Yes.
17        Q.  Are you better than I am?
18        A.  No.
19        Q.  All right.  I put up, first, State's Exhibit 128.
20                   All right.  Can you tell us what we're
21   looking at in State's Exhibit No. 128?
22        A.  That's my 2002 Ford Explorer.
23        Q.  Okay.  Is that your house?
24        A.  No.
25        Q.  Okay.  Let's look now at State's Exhibit No. 130.
```

1   Again, your vehicle?

2        A.   Yes.

3        Q.   Let's look now at State's Exhibit No. 135.  I

4   don't know how well you can see that.  Let me zoom in

5   just a little bit.

6             Would those be your -- can you see that?

7        A.   I can see boots and a helmet.

8        Q.   Okay.  So that would be your daughter's boots and

9   helmet?

10       A.   Yes.

11       Q.   Did you ever see -- or was it ever shown to you

12   where the police had cut out a section of carpet or

13   padding from your vehicle?

14       A.   They told me it was in that little well area, but

15   I don't remember ever looking for it.

16       Q.   There's a -- I see the helmet.  You can see my

17   shadow right there.

18       A.   Uh-huh.

19       Q.   There's the boots.  Where in this vehicle --

20   where in this part of the car would you be talking

21   about?

22       A.   Well, they said if you lift up some part of my

23   car, which I'm assuming was the cover of the well --

24       Q.   Uh-huh.

25       A.   -- there's a little piece of carpet they cut out.

1    Q.  But you never checked?

2    A.  But I don't remember checking, no.

3    Q.  I want to ask you a little bit about your

4    relationship with Mr. Olivas.  Before March the 20th of

5    2011, did you receive -- did he ever at any time tell

6    you -- did he express feelings for you that were

7    stronger than you had for him?

8    A.  Yes.

9    Q.  What did he tell you?

10    A.  Well, I believe it was the night that he called

11    when I was at Nags Head, so the Thursday or Friday in

12    March, he called and was telling me about his car being

13    in an accident and he had told me that he loved me and

14    wanted to move with me to Virginia.

15    Q.  Did that surprise you?

16    A.  Yes.

17    Q.  And just so we're clear for the court reporter,

18    did you say Nags Head?

19    A.  Yes.  Nags Head, North Carolina.

20    Q.  It kind of sounded like NASA.

21    A.  Oh, Nags Head.

22    Q.  Did you discourage him?

23    A.  Well, I mean, I just changed the topic of the

24    conversation.

25              MR. MOORE:  I'm sorry, I didn't hear that.

1           THE WITNESS:  I just changed the topic of

2    the conversation.  We didn't really discuss it.

3        Q.  (BY MR. ROUSSEAU)  I want to move ahead just a

4    little bit and ask you about some communications between

5    yourself and Mr. Olivas after March 20th, 2011, after

6    your vehicle was returned to you by the police.  Okay?

7           Was there ever a time when you actually saw

8    the Defendant in Richmond, Virginia?

9        A.  Yes.

10       Q.  Tell us about that.

11       A.  I believe it was August, might have been

12   September.  But I think --

13       Q.  Of the same year?

14       A.  Of '11, uh-huh.

15       Q.  Okay.

16       A.  And he came to Richmond and wanted to -- he

17   was -- he wanted to go to a bar called the Baja Bean

18   Company, which is one of the places where you can play

19   in Golden Tee tournaments and he knew the owner or

20   wanted to meet the owner.  And so I met him at the bar

21   and we spent time there and played Golden Tee and I

22   think he -- we chatted with the owner and some friends

23   that he had met.

24       Q.  How -- what prompted -- what caused him to come

25   out to Richmond, Virginia, in the first place?  Had you

1   invited him out there?

2       A.   No.   I think he wanted to come out for this

3   gold -- there was some sort of a Golden Tee thing going

4   on and he'd always wanted to go to this bar.

5       Q.   Tell the jury what Golden Tee is.

6       A.   Well, I'm not -- I've never played Golden Tee.

7   But I think it's some -- it's like a video game golf

8   tournament where you can compete for money.

9       Q.   Was there --

10              THE COURT:   Is that tee like T-E-E?   It's

11  spelled like golf tee?

12              THE WITNESS:   Or it might just be the letter

13  T.

14              THE COURT:   Letter T.

15              THE WITNESS:   I'm not really sure.

16              THE COURT:   For the court reporter, you

17  don't know.   That's fine.

18              Carry on.

19      Q.   (BY MR. ROUSSEAU)   Was it your impression that

20  that was something that he did on a regular basis, was

21  play Golden Tee?

22      A.   Oh, definitely.   He talked about it a lot.

23      Q.   Well, on this -- did he ever tell you -- well, on

24  that particular occasion, do you recall whether he asked

25  you anything about your contact with the police?

1     A.   I don't recall.  I don't remember.

2     Q.   Do you recall him ever in -- on any date

3 subsequent to March 20th of 2011 ever telling you where

4 he had been at the time of the killings?

5     A.   Yes.

6     Q.   What did he tell you?

7     A.   Well, I remember he told me that he had been at a

8 bar in Arlington, a sports bar, playing Golden Tee --

9 because we were talking about my car being involved,

10 which the police had said my car was -- he was using my

11 car, and he had said he'd been in Arlington, had been

12 driving around and then had gone to this sports bar to

13 play Golden Tee.

14     Q.   Did he ever tell you anything -- did he ever

15 indicate in any way a connection between himself and the

16 two victims in this case?

17     A.   Well, subsequent to my interview with the police

18 when I had talked to him about where -- what he'd been

19 doing with my car and, et cetera, he had told me that

20 the -- a woman who lived in Arlington, the woman who had

21 been killed, had claimed probably about a year prior

22 that her son was -- that he was the father of her son,

23 and that during that year there had been multiple

24 attempts to have a paternity test done and they for

25 various reasons had fallen through.

1    Q.   Did he ever tell you anything about a plan to

2    meet that person that night, the night they were killed?

3    A.   No.

4    Q.   Did he ever tell you whether or not he believed

5    that the child that was killed, Asher Olivas, did he

6    ever tell you whether or not he believed that child was

7    his?

8    A.   He said he did not think it was his child.

9    Q.   And this would have been -- can you tell us

10   approximately when he might have said that?

11   A.   Sometime in late March, would be my best guess.

12   Q.   March of 2011?

13   A.   Correct.

14   Q.   Ms. Rowe, do you still have the telephone number

15   today that you had at that time, the same cell phone

16   number?

17   A.   Yes.

18   Q.   What is that cell phone number?

19   A.   804-873-2541.

20   Q.   Do you have -- do you by any chance have Thomas

21   Olivas' phone number from that period of time available

22   to you?

23   A.   No.  I don't think so.

24   Q.   It would no longer be in your telephone?

25   A.   It might be.  I doubt it.  It might be.

1      Q.   Would you like to check?

2      A.   Sure.

3      Q.   Would you?  You have a pink purse and a great big

4    suitcase, which one would you --

5      A.   It's in the purse, the pink purse.

6      Q.   Just look in there and see whether or not you

7    have a contact for him, and -- but don't tell me what it

8    says.

9      A.   Okay.  No, he is not in here.  Well, let me look

10   in the T's just in case.  No.

11     Q.   Okay.  That's fine.

12          MR. ROUSSEAU:  I'll pass the witness, Your

13   Honor.

14          Thank you very much, ma'am.

15                    <u>CROSS-EXAMINATION</u>

16   BY MR. MOORE:

17     Q.   Good morning, Ms. Rowe.

18     A.   Good morning.

19     Q.   My name is Tim Moore.  I don't think I've ever

20   met you, have we?

21     A.   No.

22     Q.   Okay.  I only have a few questions for you and

23   we'll try not to talk over each other so THE court

24   reporter can get it all down.  Okay?

25     A.   Okay.

1    Q.   You flew over here when?

2    A.   This morning.

3    Q.   This morning?

4    A.   Yes.

5    Q.   Okay.  And prior to that, you had been mailed, I

6    guess, a copy of the CD of your interview with Detective

7    Stewart?

8    A.   Yes.

9    Q.   And you listened to that in its entirety before

10   you testified here?

11   A.   Yes.

12   Q.   Okay.  And that was an interview that you did at

13   the Arlington Police Department on March 22nd of 2011,

14   correct?

15   A.   Yes.

16   Q.   Just so we're clear, you were in Richmond,

17   Virginia, that weekend of the 19th and 20th of March of

18   2011, correct?

19   A.   Well, I was actually in Nags Head, North

20   Carolina, and Virginia.

21   Q.   Okay.  When did you go to Virginia?

22   A.   I went probably the Friday or Saturday prior to

23   the 20th.

24   Q.   Okay.

25   A.   That was my daughters' spring break week.

1    Q.   So when you were having this conversation with

2  Thomas over here about borrowing your car, you were out

3  of town?

4    A.   Correct.

5    Q.   And you had left that vehicle at your home in

6  Southlake, correct?

7    A.   Yes.

8    Q.   And the pet sitter, I assume, was coming over and

9  checking on the house, feeding the pet, that kind of

10  thing?

11    A.   Yes.

12    Q.   And you told her to leave the key to the car on

13  the wheel?

14    A.   Yes, and leave the car in the driveway.

15    Q.   Okay.  And who was the pet sitter, do you

16  remember?

17    A.   Her name is Mariah, but I don't remember her last

18  name.

19    Q.   All right.  I assume the car was in the garage

20  or...

21    A.   Yes.

22    Q.   Tucked away safe?

23    A.   Yes.

24    Q.   All right.  And when we look at -- well, we can

25  see State's Exhibit No. 128, that's your vehicle,

```
 1   correct?
 2       A.   Yes.
 3       Q.   And is that in about the shape you remember it
 4   when you left to go over -- on your trip to Virginia?
 5       A.   Yes.
 6       Q.   And nothing against you, but it's kind of dirty,
 7   isn't it?
 8       A.   Yes.
 9       Q.   It has not been washed, correct?
10       A.   No, it has not.
11       Q.   And so you left your vehicle in your garage, went
12   to Virginia and, actually, it was you who offered Thomas
13   to borrow the car, correct?
14       A.   Correct.
15       Q.   He didn't ask you to borrow it, you said, well --
16   I assume you said, "Well, if you need a ride, my car is
17   just sitting there, go ahead and take it," correct?
18       A.   Yes.
19       Q.   Because you liked him you, trusted him, correct?
20       A.   Yes.
21       Q.   And so when you get back -- you got back on that
22   Monday; is that correct?
23       A.   I believe so.  Yes, I got back on Monday.
24       Q.   Which, if this incident happened on the -- March
25   20th, that was a Sunday and you got back on the 21st,
```

1  which was a Monday?

2      A.  Yes.

3      Q.  And then the 22nd went and talked to Detective

4  Stewart?

5      A.  Yes.

6      Q.  Did you see your vehicle during that period of

7  time?

8      A.  No, I did not.  I saw it at the end of the day on

9  the 22nd after the interview with Detective Stewart.

10     Q.  Okay.  Did they allow you to take it home on the

11 22nd?

12     A.  Yes.

13     Q.  And was it in basically the same condition as

14 when you had left it for your trip to Virginia?

15     A.  Except it smelled like gasoline and there was

16 tape with magic marker writing on it and white writing

17 on my car.

18     Q.  Right.  Other than that, though, it hadn't been

19 washed or cleaned up or anything?

20     A.  No.  Well, I don't know.  Maybe they had washed

21 it.  I can't remember.  I thought they told me they were

22 going to wash it, but...

23              (Pause in proceedings)

24     Q.  (BY MR. MOORE)  Ms. Rowe, let me show you what

25 has been marked for identification as Defendant's

1    Exhibit No. 265 through 270 and ask if you recognize
2    those?
3        A.   I've never seen that view.  I don't recognize
4    that picture.  Everything else I recognize.
5        Q.   Okay.  And you're referring to Defendant's
6    Exhibit No. 268 as the one you don't recognize?
7        A.   Yes.
8        Q.   Okay.  The others you recognize?
9        A.   Yes.
10       Q.   And those truly and accurately depict the inside
11   of your vehicle, correct?
12       A.   Yes.
13               MR. MOORE:  We would offer all but 268,
14   Judge.
15               That would be 265, 266, 267, 269, and 270.
16               MR. ROUSSEAU:  No objection.
17               THE COURT:  All right.  Defense 265, 266,
18   267, 269, 270 each admitted.
19               (Defendant's Exhibit No. 265 - 267, 269, 270
20                admitted)
21               MR. MOORE:  Can I publish them on the ELMO?
22               THE COURT:  Yeah.
23               MR. MOORE:  Okay.  I still don't get this.
24               MS. KEENE:  Can I help him, Judge?
25               THE COURT:  Yes.

```
 1                  (Pause in proceedings)
 2        Q.   (BY MR. MOORE)   Looking at Defendant's Exhibit
 3   270, that's a picture of the interior of your Explorer,
 4   correct?
 5        A.   Yes.
 6        Q.   And the seats are leather, correct?
 7        A.   Yes.
 8        Q.   Everything -- you see some items here in the
 9   tray, correct?
10        A.   Yes.
11        Q.   Those were how you left them, correct, as far as
12   you remember?
13        A.   I guess.   I mean, I don't know what they are, but
14   I have stuff in my tray all the time.
15        Q.   Okay.   But you notice the inside hasn't been
16   cleaned out, as far as you know, has it?
17        A.   No.   That looks like how I would have left it.
18        Q.   Okay.   And I'm going to show you Defendant's
19   Exhibit No. 265.   Do you recognize that?
20        A.   Yes.
21        Q.   You recognize this thing sitting right there on
22   the floorboard?
23        A.   Yes.
24        Q.   That's a smoke detector, isn't it?
25        A.   Yes.
```

1      Q.   And the police were real interested in that smoke

2   detector, weren't they?

3      A.   Yes.

4      Q.   They wanted to know if that was, indeed, your

5   smoke detector, didn't they?

6      A.   Yes.

7      Q.   And, indeed, it was your smoke detector, wasn't

8   it?

9      A.   Yes.

10     Q.   Why is it in your car?

11     A.   Well, my smoke detector had started going off.

12  It's wired -- it was wired into my house and it would go

13  off at 2:00 and 3:00 in the morning repeatedly and I had

14  to have the fire department come out.  And they told me

15  to take one of them to Home Depot and get the whole

16  series of replacements to match.  That would be the only

17  way to fix that problem.  So it was in my car to remind

18  me to go to Home Depot.

19     Q.   Okay.  And you cleared that up for the police,

20  correct?

21     A.   Correct.

22     Q.   And Defendant's Exhibit No. 266, that's another

23  picture of the inside of your vehicle, correct?

24     A.   Yes.

25     Q.   And looks like some -- maybe some cleaning --

1    shirt from the cleaners sitting there; is that correct?

2        A.  That's Thomas' uniform from Truluck's, I believe.

3        Q.  Okay.  And was that still in the car when you got

4    it from the police department?

5        A.  I don't believe so.

6        Q.  Okay.  How do you know that's Thomas' uniform

7    from Truluck's?

8        A.  Because I remember that's what it looks like.

9        Q.  Okay.

10       A.  It doesn't look -- well, I work from home.  I

11   never took anything to the dry cleaners.  But I know he

12   had his shirt dry cleaned and that looks like his shirt.

13   And I remember it being in my car at one point.

14       Q.  Okay.  Now, you testified previously that you and

15   Thomas met at Truluck's at the bar, correct?

16       A.  Correct.

17       Q.  He was bartending and you and your friend were

18   having drinks for about three hours, I believe you

19   testified?

20       A.  Yes.

21       Q.  And as well as your memory can remember, that was

22   sometime in February of 2011 and the first time you ever

23   met him, correct?

24       A.  Yes.

25       Q.  So from February to March 18th, or around in

```
 1   there, when you went to Virginia, how many times did you
 2   see him?
 3       A.   Four or five.
 4       Q.   Okay.  And where would these places be?  Where
 5   would you see him?
 6       A.   We'd been to the Cheesecake Factory.  He'd come
 7   to my house.  I don't really remember any -- I don't
 8   remember if we'd been anywhere else.
 9       Q.   Okay.  Y'all would go out and eat together?
10       A.   Well, no.  I think we met for drinks at the
11   Cheesecake Factory.  I don't remember if we'd been out
12   to eat.
13       Q.   Okay.  But you -- in that month or so period of
14   time you got to know each other very well, correct?
15       A.   Yes.  And we'd spoke a lot on the phone.
16       Q.   Did you ever go to where he said he lived?
17       A.   No.
18       Q.   Okay.  Always either where you lived or some
19   restaurant or bar?
20       A.   Yes.
21       Q.   And you would communicate regularly with him,
22   correct?
23       A.   Maybe once a week or so.
24       Q.   Okay.  But you had his phone number in your phone
25   at one time?
```

1      A.  Yes.

2      Q.  And you would call and text and maybe e-mail each

3  other?

4      A.  Yeah.  I don't know if we e-mailed, but we called

5  and texted.

6      Q.  Okay.  And I believe you testified that sometime

7  after the car was returned to you -- I believe you said

8  it may have been in August or September of 2011 -- that

9  Thomas actually came to Richmond, Virginia, where you

10  were living; is that correct?

11      A.  Yes.

12      Q.  And you'd already known by then that Thomas was a

13  suspect in the killing of Mechelle and her baby, didn't

14  you?

15      A.  Yes.

16      Q.  The police had made that abundantly clear to you,

17  hadn't they?

18      A.  Yes.

19      Q.  On the 22nd when you talked to Detective Stewart,

20  Thomas Olivas was the prime suspect in your mind after

21  talking to Detective Stewart, wasn't he?

22      A.  Yes.

23      Q.  When he came to Richmond, Virginia, after this,

24  did he stay with you?

25      A.  Yes.

1    Q.   You actually paid for him to fly out there,
2    didn't you?
3    A.   I don't remember.
4    Q.   Well, did you ask him to come out there and see
5    you?
6    A.   No.
7    Q.   He asked to come see you?  Or you don't remember?
8    A.   I don't remember.  He wanted to come out to meet
9    this Golden Tee guy.
10   Q.   Okay.
11   A.   But I don't remember the -- I don't even remember
12   when it was arranged.
13   Q.   And you knew he played -- well, he came out there
14   and stayed with you.  How long did he stay with you out
15   there?
16   A.   Just a night.
17   Q.   Okay.  Were your children there?
18   A.   Yes.
19   Q.   And are you -- is your divorce over with now?
20   A.   Yes.
21   Q.   Okay.  So you knew that his hobby was playing
22   this video golf called Golden Tee?
23   A.   Yes.
24   Q.   How did you know that?
25   A.   Oh, because he talked about it a lot.

```
 1      Q.   Okay.  And during the time that you knew him and
 2   were seeing him, did you ever go with him to a place
 3   called Volcanos out in Bedford?
 4      A.   No.
 5      Q.   You didn't act certain, do you --
 6      A.   I know he mentioned Volcanos, but I don't
 7   remember ever going there.
 8      Q.   Okay.
 9      A.   I don't remember going any -- no, definitely
10   don't remember that.
11      Q.   Did you know that he frequented a place called
12   Volcanos?
13      A.   Yes.
14      Q.   Okay.  How did you know that?
15      A.   He told me.
16      Q.   And did he tell you about the game of Golden Tee
17   and how it was played and tournaments that they played
18   in?
19      A.   Yes.
20      Q.   Okay.  Because I believe you testified that
21   on March 20th of 2011, you had some contact with Thomas,
22   correct?
23      A.   Yes.
24      Q.   Do you recall how many times that you
25   communicated with him or he communicated with you on
```

```
 1   March 20th of 2011?
 2       A.   I remember just that one phone call, which,
 3   technically, it was on the 21st because it was 12:30 in
 4   the morning, 12:36 in the morning, 11:36 in Texas.  I
 5   don't remember talking to him earlier that day.
 6       Q.   Okay.  Do you remember texting him -- I guess in
 7   Virginia it would have been at approximately 9:35 -- I
 8   mean -- in Virginia it would have been 10:34 and 10:35,
 9   meaning here it would have been 9:34 and 9:35.  Do you
10   remember texting him that night?
11       A.   No, but I may have.
12       Q.   Okay.  Do you remember, if you did, why you were
13   texting him?
14       A.   No.
15       Q.   Do you remember if y'all were communicating about
16   how you were going to get your car back the next day?
17       A.   I do remember communicating with him that Sunday,
18   the 20th, about that, but I thought we had done it on
19   the telephone.
20       Q.   Okay.  Would it surprise you if the records
21   reflected that you text him at 9:34 and 9:35 our time?
22       A.   No, that wouldn't surprise me.
23       Q.   Okay.  Okay.  Now, when you got your car back --
24   or let me back up a little bit.
25               Before you got your car back, you had given
```

1   the police your permission to not only search that

2   vehicle but take samples all they wanted, hadn't you?

3       A.   Yes.

4       Q.   So it was up to the police -- in fact, you had

5   not ridden or been in your car until after they searched

6   the vehicle, correct?

7       A.   Correct.

8       Q.   Now, you testified that you also remember talking

9   to Thomas Olivas about where he had been on March 20th

10  and you recall he told you that he had been at a sports

11  bar in Arlington playing Golden Tee and in Arlington

12  driving around.   That's your recollection?

13      A.   Yes.

14      Q.   Did you tell -- when you listened to your

15  recorded statement you gave Detective Stewart, was that

16  on there?

17      A.   No.

18      Q.   When did you remember that?

19      A.   I remembered that -- well, just recently.   I

20  remembered it today.

21      Q.   Okay.   So today is the first time you've ever

22  told anybody that that's what he told you he was doing?

23      A.   Possibly.   I can't imagine anybody else would

24  have asked me, yes.

25      Q.   Because you certainly didn't tell that to

```
1    Detective Stewart back on March 22nd of 2011 when you
2    were telling him about your relationship with him?
3        A.  Correct.
4        Q.  Okay.  So if he had been at a sports bar playing
5    Golden Tee on the whole afternoon of March 20th of 2011,
6    you wouldn't know that, would you?
7        A.  No.
8        Q.  Okay.  Well, Ms. Rowe, thank you.
9            MR. MOORE:  I'll pass the witness.
10                    REDIRECT EXAMINATION
11   BY MR. ROUSSEAU:
12       Q.  I just want to clear up a couple little things.
13           One, the smoke detector, the police actually
14   came out to your house later and took pictures of your
15   ceiling to show where the smoke detector was missing
16   from, correct.
17       A.  Yes.
18       Q.  And you were there then, right?
19       A.  Yes.
20       Q.  Okay.  And now, the other thing is about this --
21   about the Defendant telling you that he had been playing
22   Golden Tee in Arlington at the time of the fire, at the
23   time of the murders, you didn't tell Detective Stewart
24   that, right?
25       A.  Correct.
```

1    Q.  But you talked to Detective Stewart on the 22nd

2   of March, the day after you got back to town, correct?

3    A.  Yes.

4    Q.  Had this conversation between you and Thomas,

5   where he told you that he was out playing Golden Tee,

6   had that conversation happened yet --

7    A.  No.

8    Q.  -- when you talked to Detective Stewart?

9    A.  Sorry.  No.

10    Q.  It happened sometime down the road in a later

11   communication?

12    A.  Yes.

13    Q.  Okay.

14         MR. ROUSSEAU:  That's all I have, Your

15   Honor.

16         MR. MOORE:  Judge, I don't have any other

17   questions.

18         THE COURT:  All right.  May this witness be

19   released?

20         MR. MOORE:  Judge, I understand she's out of

21   state, but I would like her subject to recall.

22         (Discussion off the record)

23         MR. MOORE:  We've just discussed it and

24   we'll give them plenty of notice if we need her back.

25         THE COURT:  All right.  That will work.  So

```
 1   she can return to wherever home is now as long as the
 2   State will have her back if you need her.
 3                MR. MOORE:  That's correct.  That's my
 4   understanding.
 5                MR. ROUSSEAU:  Yes.
 6                THE COURT:  All right.  With that
 7   understanding then, I won't require you to remain
 8   here --
 9                THE WITNESS:  Okay.
10                THE COURT:  -- on the possibility that you
11   might not be needed.  But if you are, you need to, for
12   at least the next two weeks, the rest of this week and
13   next week, be alert in case you get that phone call.
14                THE WITNESS:  Okay.
15                THE COURT:  All right.  And thanks for
16   coming in.  And you're excused temporarily, at least
17   this time, permanently when you hear back from the
18   lawyers.
19                THE WITNESS:  Okay.  Thanks.
20                THE COURT:  Thank you.
21                (Witness excused from courtroom)
22                MR. ROUSSEAU:  May I approach?
23                (Discussion at the bench, off the record)
24                THE COURT:  We need to take a short recess
25   while we rotate witnesses in.
```

```
 1                    (Jury excused from courtroom)

 2                    (Discussion off the record)

 3                    (Lunch break taken, 11:50 a.m. - 1:30 p.m.)

 4                    (OPEN COURT, DEFENDANT PRESENT, NO JURY)

 5              THE COURT:  All right.  Anything we need to

 6    do before the jury comes in, since we're sitting here?

 7              MR. ROUSSEAU:  There's a witness named Miles

 8    Thayer, T-H-E -- is that correct -- T-H-E-Y-E-R --

 9              MS. RAY:  No, it's A.

10              MR. ROUSSEAU:  I'm sorry.  A-Y-E-R.  I

11    thought he was on my witness list.  He is not on my

12    second amended witness list.  There is a recorded

13    interview that the Defense has and has had, but he was

14    not on my witness list.  I would like at some point in

15    time to call him as a witness, but -- and I understand

16    the Defense may have objection to it.  He's not today or

17    tomorrow, it's pretty good ways down the road.  But I

18    want to go ahead and put them on notice that I will --

19    shall be attempting to call him.

20              THE COURT:  And you said there's a recorded

21    statement, like a police interview?

22              MR. ROUSSEAU:  Yes, sir.

23              THE COURT:  And that's been provided as part

24    of the discovery and they have had that for at least a

25    while?
```

1          MR. ROUSSEAU:  Yes, sir.  I see Tim and
2    Tamla sharing the list right now.  It's my understanding
3    that --
4          MR. MOORE:  I don't see here -- his name is
5    on the list.
6          MS. RAY:  He's on your --
7          MR. ROUSSEAU:  Should we go off the record
8    for just a minute?
9          THE COURT:  Yeah, let's take a recess.
10          (Discussion off the record)
11          THE COURT:  All right.  On the record.
12          Defense acknowledges having received the
13    interview, made notes therefrom.  They're going to talk,
14    review it and see if they have an objection or not.
15    They'll let me know before the witness is called.
16          We'll be in recess.
17          (Witness Fallentine retakes the stand)
18          THE COURT:  Go get them.
19          (Jury seated in courtroom)
20          THE COURT:  All right.  Jury, blue card
21    question, answer is?
22          SEVERAL JURY MEMBERS:  Yes.
23          THE COURT:  Excellent.  You may continue.
24          MS. KEENE:  Thank you, Judge.  May I
25    approach the witness?

```
1              THE COURT:  Yes.
2              INVESTIGATOR SHANNON FALLENTINE,
3   having been previously duly sworn, testified as follows:
4              CROSS-EXAMINATION CONTINUES
5   BY MS. KEENE:
6      Q.  Let me show you some more pictures.  Let me show
7   you what's been marked as Defense Exhibit No. 101
8   through 117.  Do you recognize those pictures?
9      A.  Yes, I do.
10     Q.  And if you want to check one of them, that's
11  fine.  Go ahead.
12     A.  Yes, I do.  Yes, I do.
13     Q.  And did you take each of these pictures?
14     A.  Yes, I did.
15     Q.  And will they help explain to the jurors the
16  different items that you found that are depicted in here
17  and where you found them?
18     A.  Yes, they will.
19             MS. KEENE:  Judge, at this time we would
20  offer in Defense Exhibit 101 through 117.
21             THE COURT:  Inclusive?
22             MS. KEENE:  Inclusive.
23             MS. RAY:  Okay.  Your Honor, no objection to
24  101, 102, 103, 104, and 105, 106, 107, 108, 110, 111,
25  112, 113, 114, 115, 116, and 117.  And if you could give
```

```
 1    us second on State's 101.  We're just going to take a
 2    closer look at it.
 3                  THE COURT:  On?
 4                  MS. KEENE:  It's not 101.
 5                  MS. RAY:  I'm sorry.  109.
 6                  THE COURT:  And it's Defense 109.
 7                  MS. RAY:  Yes, Your Honor.
 8                  THE COURT:  I know what you're holding and
 9    that's fine.
10                  All right.  While you're looking, State's
11    101 -- Defense 101, Defense 102, and 103 and 104 and
12    105, 106, 107, 108 are all admitted.  Defense 110, 111,
13    112, 113, 114, 115, 116, 117, all admitted.
14                  (Sotto voce discussion between attorneys)
15                  MS. RAY:  No objection to Defendant's
16    Exhibit No. 109, Your Honor.
17                  THE COURT:  Then Defense 109 is also
18    admitted.
19                  (Defendant's Exhibit No. 101-117 admitted)
20                  MS. KEENE:  Judge, may I publish via the
21    ELMO?
22                  THE COURT:  Yes.
23       Q.  (BY MS. KEENE)  Okay.  You found a total of three
24    different lighters, as depicted in Defense Exhibit 101;
25    is that correct?
```

1    A.  Yes.

2    Q.  And you found two of them inside and one outside

3    on the porch?

4    A.  Yes.

5    Q.  Where did you find the two inside?  Hang on one

6    second.  Let me -- do you have your pointer?

7    A.  I do.

8    Q.  There we go.

9        Could you show us where the two inside were?

10   A.  Yes.  There was one on the countertop next to the

11   refrigerator in the kitchen, the second was on the floor

12   of the living room next to the desk.

13   Q.  And then the third one was, we saw -- we've seen

14   a picture of it out here?

15   A.  Correct.

16   Q.  You recover lighters from all crime scenes, or

17   was this one in particular different?

18   A.  It all depends on the nature of the scene.

19   Q.  This is not like cigarettes?

20   A.  It can be.  They're generally a good -- they're a

21   good method for getting DNA and latent print evidence,

22   generally.

23   Q.  And you testified to that earlier about the flint

24   being a place where you can gather DNA because someone's

25   finger is there?

```
 1      A.   Yes.  And it's rough, potentially, to cause the
 2   friction needed.
 3      Q.   And so that's -- did you swab that or did you let
 4   the lab do that?
 5      A.   I swabbed it myself.
 6      Q.   And then as far as fingerprints or DNA on the
 7   outsides of these three lighters?
 8      A.   You can test for both.  I tested for latent print
 9   evidence myself, but DNA would be done at the lab.
10      Q.   And so once you test for latent prints, does that
11   stop your ability to then test for DNA?
12      A.   No.
13      Q.   So you can test for both?
14      A.   Yes.
15      Q.   But you can't test for DNA and then test for
16   latent prints?
17      A.   It's not advantageous to do it that way.  The
18   methodology used to swab for DNA is just that, a swab.
19   So what that can do is destroy friction ridge evidence
20   that's on the exterior of any item.
21      Q.   So if you were to take a big swab and go all the
22   way down the side of this in Defendant's Exhibit 101 to
23   get DNA, you may destroy a fingerprint?
24      A.   Yes.
25      Q.   But if you were to fume this and lift a print so
```

1    that you could pull it off there for a fingerprint,

2    would you not destroy DNA?

3        A.   In theory.

4        Q.   In theory at least.  You have a better shot at

5    potentially getting both if you do it in the order that

6    you did it in?

7        A.   That's the correct methodology, yes.

8        Q.   Okay.  And so you did the fingerprinting and left

9    anything else for the lab to do, as far as DNA?

10       A.   Other than the swabs I took from the flint of

11   each.

12       Q.   Now, let me show you what has been marked as

13   Defendant's Exhibit No. 103 and ask you if you can tell

14   the jurors what you took a picture of here in 103?

15       A.   This is a photograph depicting a teal-colored

16   woman's purse that is hanging on the interior doorknob

17   of the master bedroom door.

18       Q.   And in 102 is that a picture that shows where it

19   is in the master bedroom?

20       A.   Yes.  It's a bit hard to see here, but it is in

21   the lower right-hand quadrant of the photograph in this

22   area.

23       Q.   And if a person were to walk out this door right

24   here, what is that out there?

25       A.   This is the short hallway which leads to the

```
1   spare bedroom.  You can see here living room, dining
2   room, and kitchen would be off frame to your right.
3       Q.  So the purse on the diagram is found where?
4       A.  It is on the back of this door right here.
5       Q.  And did you take -- you collected that purse?
6       A.  Yes, I did.
7       Q.  Why are purses something important -- that you
8   felt it was important to collect?
9       A.  Women's purses generally have a lot of items in
10  them, some of which can be used to demonstrate many
11  different things; receipts, identification, cell phones
12  in some cases, cameras, other personal items.  It's a
13  place where women keep a lot of information.
14      Q.  And is it a place where a lot of women keep their
15  wallets?
16      A.  Yes.
17      Q.  And so did you recover the purse on the back of
18  the master closet?
19      A.  Yes.
20      Q.  And is this -- what is this?  What is 104 showing
21  the jurors?
22      A.  This is a photograph I took in our lab to show
23  that same purse.
24      Q.  And did you find a purse that looked just I mean
25  identical to this purse somewhere else?
```

```
 1      A.   There was a teal-colored purse that appeared to
 2   be the same brand, same make, in the trunk of
 3   Ms. Gandy's white Honda.
 4      Q.   And let me show you what has been marked as 106.
 5   Can you show the jurors where that purse was found?
 6      A.   The purse is right here.
 7      Q.   And is this one of the more up-close ones?
 8      A.   Yes.   This is a better one to be able to see it.
 9   It's right here.
10      Q.   And then was this a close-up of that?
11      A.   Yes.
12      Q.   And so when you looked as these two purses, you
13   got one basically burned up looking and one pristine
14   because it was in the car, but they're the same purse?
15      A.   They appear to be the same type of purse, yes.
16      Q.   Okay.   Both of them were full of different
17   contents?
18      A.   They both had things inside of them, yes.
19      Q.   Okay.   In either of them did you find a wallet?
20      A.   I photographed the contents of both, but we would
21   need to look at those photographs.
22      Q.   And 109 -- I can only find contents of one.   So I
23   can -- you can look at your notes and see the other.   In
24   109 -- I mean, I'll bring you this because you're
25   probably going to need to see it to answer my question.
```

1      What contents did 109 come out of, which of
2   these purses?
3      A.  Has it listed as SFR-62.  Give me just a moment
4   and I will tell you which purse that is.
5           That is the purse from the trunk of the
6   white Honda.
7      Q.  Okay.  And then you said you also looked into the
8   purse that was inside the house?
9      A.  Yes.
10     Q.  And in either of those purses were you able to
11  find the wallet?
12     A.  I do not believe so.  I don't recall a wallet.
13     Q.  Do you recall something that had the credit
14  cards, driver license, money, insurance cards, things
15  that most people keep in a wallet?
16     A.  May I refer to my --
17     Q.  Yes.
18     A.  -- notes real quick?
19     Q.  Yes.
20     A.  No, it does not appear so.  However, it does not
21  look like I took many items out of the one from the
22  bedroom.  It appears only a black umbrella was noted
23  inside of that purse.
24     Q.  And had there been -- there we go -- in Defense
25  Exhibit 105 there's the black umbrella; is that correct?

1      A.   Yes.

2      Q.   And had there been a wallet and identification,

3  you would have made note of those things?

4      A.   Yes.

5      Q.   And laid them out on a table to take pictures,

6  such as you did with the other purse?

7      A.   Yes.

8      Q.   So in all of your looking, you never found credit

9  cards.  The only thing you found was a library card, but

10  that was outside.  Any sort of things that are normally

11  kept in a wallet you did not find?

12      A.   There was a checkbook, receipts and currency in

13  the actual purse from the trunk of the vehicle, but no

14  specific identification.

15      Q.   Okay.  Let me show -- I'm going to turn the

16  subject matter now to that shirt that you found.  Where

17  did you find this shirt?

18      A.   The shirt was set atop the corner of --

19      Q.   Here we go.  Let me put Defense Exhibit No. 6

20  back up there.

21      A.   The shirt was set atop the corner of the love

22  seat, in this area.

23      Q.   Okay.  And the shirt was setting in the manner as

24  it is depicted in Defense Exhibit 110?

25      A.   Yes.

1    Q.   In other words, it's setting where the -- kind of
2    inside out sitting-ish?
3    A.   Yes.
4    Q.   In fact, here's a better picture of -- in 22; is
5    that correct?
6    A.   Yes.
7    Q.   Whenever you lifted that up, do you recall if
8    under the shirt, if that was -- does that still look
9    like this, the couch, because the couch looks like it
10   exploded or something from the heat or whatever,
11   exploded?
12   A.   It does.  The stuffing is coming out of the
13   couch.
14   Q.   Did it appear to be that way under the shirt, as
15   well, if you recall?
16   A.   I don't recall, unless we have a specific
17   photograph.
18   Q.   Okay.  I mean, you don't recall lift -- picking
19   it up like basically saying this shirt was here all the
20   time or not?  Do you have any feelings one way or
21   another?  Or did you make any notations about whether or
22   not this shirt was placed there by firemen, I guess, or
23   someone other than that being a piece of evidence at a
24   scene?
25   A.   I can say that if I lifted it up and found that

1    the sofa was in perfect condition underneath it, I would

2    have noted that as being unusual.

3        Q.   Okay.  And you did not do that?

4        A.   Correct.

5        Q.   All we know is this is where you found the shirt?

6        A.   Correct.

7        Q.   And then when you took the shirt -- you took the

8    shirt, correct?

9        A.   Yes, I did.

10       Q.   And did you make any notations about whether or

11   not there was any tears or anything on this shirt, any

12   rips?

13       A.   I didn't notate any.

14       Q.   And had there been any rips or tears, would you

15   have made notations?

16       A.   Yes.

17       Q.   Why?

18       A.   I document any damage to clothing.  As part of

19   our protocol, it's routine practice.

20       Q.   Why?

21       A.   It helps to sometime substantiate whether or not

22   someone was wearing a piece of clothing at the time that

23   they received the injuries.

24       Q.   Okay.  If somebody rips clothes off of someone,

25   it could be shown on the piece of clothing.  If somebody

 1    says I'm wearing that coat and someone ripped it off of

 2    me, then if you looked at the coat and it was ripped, it

 3    might corroborate what they said?

 4        A.   If they were shot or...

 5        Q.   Holes in it from the bullet or the stabs?

 6        A.   Commonly.

 7        Q.   And blood, as well?

 8        A.   Yes.

 9        Q.   And you didn't see any of that on this shirt?

10        A.   I believe the only damage was some soot and

11    possibly a little charring.

12        Q.   Okay.  Let me show you what has been marked as

13    Defense Exhibit No. 112.  And what is that showing the

14    jurors?

15        A.   This is a laboratory photograph of that same

16    shirt.

17        Q.   And is that the front?

18        A.   Yes.

19        Q.   And in Defense Exhibit 113, what is that showing

20    them?

21        A.   This is demonstrating an area of possible soot

22    and charring at the bottom of the shirt, near the

23    center.

24        Q.   Okay.  And then in 114, is that one of your more

25    close-ups?

1    A.  Yes.  That is that same sooted area.

2    Q.  You know, where it was laying, do you have a

theory as to how it ended up -- the way it's laying like

this, how the inside -- how the outside or inside, as

depicted in Defense Exhibit 111, the part that was not

exposed, how does that end up, if you have a theory, if

you don't, you don't, with that, from 114?

8    A.  It could have been made in many different ways,

one of which is making contact with an item that's

covered in soot.

11   Q.  Did you see it contact an item that was covered

in soot when you recovered it?

13   A.  The love seat was covered in soot and charring.

14   Q.  So maybe it could have picked it up from the love

seat, it just happened underneath it?

16   A.  It's all speculation.  It's possible.

17   Q.  Don't know.

18       MS. KEENE:  Sorry, Judge.

19       THE COURT:  Thank you.

20   Q.  (BY MS. KEENE)  Tell the jurors what 115 is

showing now.

22   A.  This is the back of that same shirt.

23   Q.  And then 116 is a close-up?

24   A.  Yes.

25   Q.  And you, also, when you were -- you dug through

1   her drawers, so to speak, her desk?

2       A.   Yes.

3       Q.   And the items inside her desk were not injured?

4       A.   I would need to see photographs of that, if you

5   have them available.

6       Q.   We will.  I'm going to show you one right now.

7       A.   Okay.

8       Q.   Did you find a picture of her with her little

9   baby and another young lady or older lady with her that

10  appeared she was wearing that same shirt?

11      A.   I found a photograph of two females and one small

12  infant, male.  I was unsure, but I had a guess as to who

13  they were.

14      Q.   But did the shirt that she has on in the picture

15  appear to you to be the same shirt that you recovered

16  from the scene?

17      A.   Certainly a very similar shirt, if not the same

18  shirt.

19      Q.   It looks the same, doesn't it?

20      A.   Yes.

21      Q.   But you can't tell from the picture whether or

22  not it is the same shirt?

23      A.   No.

24      Q.   But you still took a picture of the picture?

25      A.   Yes.

STATE v. THOMAS OLIVAS

1    Q.  Now, inside her desk did you find a binder with

2    writings in it?

3    A.  Yes.

4              MS. KEENE:  May I approach the witness,

5    Judge?

6              THE COURT:  Yes.

7    Q.  (BY MS. KEENE)  Let me show you first what's been

8    marked as Defense Exhibit 118 through 121 and ask you if

9    you recognize those?  Let me -- excuse me.  Through 123.

10   A.  Yes.

11   Q.  And did you take each of those pictures?

12   A.  Yes, I did.

13   Q.  And let me show you, while we're on the desk,

14   Defense Exhibit 156 and 157 and ask if you recognize

15   those?

16   A.  Yes, I do.

17   Q.  And did you take those pictures?

18   A.  Yes, I did.

19   Q.  And would those help explain to the jurors, just

20   in general, the different things you found in that desk

21   and around that desk?

22   A.  With the exception of 157, which I believe is in

23   a closet.

24   Q.  Okay.  Let me see 157.  Let's put 157 -- here you

25   go.

1    A.   Yes.  That is in the closet.

2    Q.   Defense 157 is in the closet?

3    A.   The master bedroom closet.

4    Q.   Okay.  Would 157 help you explain to the jurors

5    what you found in the closet?

6    A.   Yes.

7         MS. KEENE:  All right.  We would offer in

8    156 and 157 for all purposes and 118 through 123 for all

9    purposes.

10        MS. RAY:  Your Honor, may we approach?

11        THE COURT:  Yes.

12        (Discussion at the bench, off the record)

13        THE COURT:  All right.  For purposes of this

14   these exhibits, the four corners of the exhibits as

15   displayed, you have no objection; is that correct?

16        MS. RAY:  No, Your Honor.

17        THE COURT:  All right.

18        MS. RAY:  Or that is correct.

19        THE COURT:  All right.  Then 118, 119, and

20   120 are admitted; 121, 122, 123 are admitted; 156 and

21   157 are admitted, all Defense exhibits.

22        (Defendant's Exhibit No. 118-123, 156, 157

23         admitted)

24   Q.   (BY MS. KEENE)  All right.  Ms. Reeves, can you

25   tell the jurors what they're seeing in Defense Exhibit

```
 1   No. 156?
 2       A.   It's Fallentine.
 3       Q.   I'm mean -- what did I call you?  Oh, I'm
 4   right -- you're right.
 5       A.   My married name.
 6       Q.   Fallentine.  I called you your old name.
 7       A.   Right.
 8       Q.   I'll back up anyway.
 9            Ms. Fallentine, in Defense Exhibit No. 6,
10   which is the diagram, can you remind the jurors where
11   the desk is that we've talked about?
12       A.   Yes.  The desk was along the northern wall of the
13   living room, just west of the front door.
14       Q.   And it was under this desk, that there was a
15   cardboard box that had a -- what appeared to be blood on
16   it?
17       A.   Yes.
18       Q.   But on top of it -- in fact, 14, does that show
19   the cardboard box?
20       A.   Yes.  The box with the bloodstain is here.
21       Q.   And then what else does -- what else is it
22   showing in this Defense Exhibit No. 156?
23       A.   It is showing miscellaneous paperwork atop the
24   desk at evidence marker 13.
25       Q.   And did you collect and look at all the different
```

1     paperwork on top of the desk?

2         A.   I collected the paperwork that was still able to

3     be read or was discernable and not damaged by fire, as

4     Detective Stewart had requested.

5         Q.   Okay.  So you didn't collect every piece of paper

6     in her house?

7         A.   No.

8         Q.   You collected the types of paper that Detective

9     Stewart had asked you to collect, correct?

10        A.   Yes.

11        Q.   But you also found different items inside the

12    drawers of her desk; is that correct?

13        A.   Yes.

14        Q.   And here's a good picture of just opening up a

15    drawer, 123.  Is that inside the -- is Defense Exhibit

16    No. 123 inside the desk drawers?

17        A.   Yes, it is the bottom desk drawer.

18        Q.   And they're just not damaged the way the rest of

19    the items are?

20        A.   Correct.

21        Q.   And you also found in 122, in that desk,

22    something like a diary?

23        A.   A spiral notebook with personal writings, I

24    believe, is how I describe it.

25        Q.   And that's depicted in Defense Exhibit No. 118?

1    A.  Yes.

2    Q.  And again in 119, the front?

3    A.  Yes.

4    Q.  And then again in 120, right?

5    A.  Yes.

6    Q.  We cannot go into the contents.  It's just called

7  hearsay.

8    A.  Okay.

9    Q.  But why would you, as a crime scene officer,

10  actually seize something that has a personal nature to

11  the person who is deceased?

12    A.  It can sometimes be a helpful investigative tool

13  for the lead detective in the case.

14    Q.  So whether or not it's admissible later in court

15  or not, it could be something that the investigator

16  could use or not use, if it's helpful, in finding leads

17  to find out a little bit more about this person's life?

18    A.  Yes.

19    Q.  And so it's something, certainly, if you arrive

20  at a crime scene and someone is deceased and you see

21  their diary or journal or a binder full of what appears

22  to be very personal writings, you would take that?

23    A.  I collect that, yes.

24    Q.  And in front of you are a number of pictures, 124

25  through 155, and I'm going to ask you if you recognize

```
 1    those?
 2       A.  Yes.
 3       Q.  And are those pictures that you took of each page
 4    of this binder?
 5       A.  Yes.
 6               MS. KEENE:  Judge, I'm going to offer these
 7    in for purposes of the record only.  It would be Defense
 8    Exhibit No. 124 through 155, record only.
 9               THE COURT:  Defense 124 through what,
10    Joetta?
11               MS. KEENE:  155.
12               THE COURT:  Okay.
13               MS. RAY:  No objection for record purposes
14    only, Your Honor.
15       Q.  (BY MS. KEENE)  Why would you take pictures --
16               THE COURT:  Hold on.  Time out.  Time out.
17               MS. KEENE:  I'm sorry.  I'm sorry.  Can't
18    even believe I did that.  Sorry.
19               THE COURT:  All right.  For record purposes
20    only, Defense 124 through 155, inclusive, with no gaps,
21    does everyone agree with that?
22               MS. KEENE:  Yes.
23               MS. RAY:  Yes, Your Honor.
24               THE COURT:  All right.  They're admitted for
25    the record only.
```

1              (Defendant's Exhibit No. 124-155 admitted)

2      Q.   (BY MS. KEENE)  Why would you take pictures of

3   each page of the -- this binder?

4      A.   I take it for documentation purposes.  Some

5   people will take photocopies as opposed to photographs.

6   I do photographs because I feel it's less intrusive to

7   the evidence.

8      Q.   In other words, by taking pictures, if somebody

9   wants to fingerprint the journal or whatever this is,

10   they could do that because you didn't contaminate it by

11   putting whatever...

12      A.   Yes.

13      Q.   You just took a picture?

14      A.   Yes.

15      Q.   It also means you don't have to go down to the

16   property room and check it out to read it?

17      A.   Yes.

18      Q.   It means you can start clicking through the

19   pictures of the crime scene and you can read whatever is

20   contained in this binder full of writings?

21      A.   It's not fully documented unless it's

22   photographed.

23      Q.   And the contents, too?

24      A.   Yes.

25      Q.   And so then this is -- again, in 121 this is --

```
1    is this a picture of the area that we're talking about
2    that you found both the picture of Mechelle in that
3    shirt as well as this binder full of writings?
4        A.  Yes.  They were in this desk here.
5        Q.  And then you also recovered the documents in
6    manila envelope on top?
7        A.  Yes.
8        Q.  I'm going to move on to the guest bathroom -- or
9    what I call the guest bathroom, the bathroom that is not
10   attached to the master.  All right.
11            Let me show you what has been marked as
12   Defense Exhibit No. 158 through 176 and ask you if each
13   of these pictures reflects that bathroom?
14       A.  Yes.
15       Q.  And do they also contain pictures of the
16   accelerant you found in the bathroom, or the --
17   whatever, the flammable liquid?
18       A.  Flammable liquid, yes.
19       Q.  And would these pictures, 158 through 176, help
20   you explain to the jurors where that liquid was and what
21   the bathroom looked like?
22       A.  Yes.
23            MS. KEENE:  We would offer in Defense
24   Exhibit No. 158 through 176.
25            MS. RAY:  No objection, Your Honor.
```

```
1              THE COURT:  Defendant's Exhibit No. 158,
2   159, 160, 161, 162, 163, 164, 165 are all admitted.
3   Defense 166, 167, 168, 169, 170, 171, 172, 173, 174,
4   175, 176 are also admitted.
5              (Defendant's Exhibit No. 158 - 176 admitted)
6      Q.  (BY MS. KEENE)  Can you tell the jurors what
7   158 -- when you took the picture, what you were
8   attempting to show?
9      A.  This is a photograph of the spare bathroom as
10  viewed from out in the hallway.  What you see on either
11  side photographed here is the door and subsequent damage
12  to that door.  This is a bathtub, if that helps.
13     Q.  Okay.  So this bathroom, which one was depicted
14  in Defense Exhibit No. 6?
15     A.  It is this bathroom here.  We are standing here
16  looking inward toward in that photograph.
17     Q.  And both of these bathrooms were heavily damaged?
18     A.  Yes.
19     Q.  Could you tell in this bathroom the -- what did
20  you call it the -- what kind of bathroom?
21     A.  The spare.
22     Q.  Spare bathroom.  Could you tell in the spare
23  bathroom whether or not there was anything that looked
24  like blood?
25     A.  I could not tell, no.
```

1    Q.  I mean, had Mechelle been first assaulted in the

2   spare bathroom, you can't figure that out because of its

3   condition, or could you?

4    A.  I could not, no.

5    Q.  Looking at Defense Exhibit No. 159, what is that

6   showing the jurors?

7    A.  This is a photograph of the sink in that

8   bathroom.

9    Q.  And what was at least noteworthy to you that you

10  could find in there?

11   A.  The only thing of evidentiary note within this

12  room was a small can of what appeared to be a flammable

13  liquid on the side of the sink.  It was heavily burned,

14  damaged.  The cap was melted.

15   Q.  And that's in 160.  Is that a more close-up view

16  of that can?

17   A.  Yes.  Just to get our bearings, this is a faucet

18  handle, soap dispenser, and this is our can in question

19  here.

20   Q.  I mean, the reality is, if this sink is covered

21  in blood, we don't know it?

22   A.  No.

23   Q.  I mean, that's just the reality?

24   A.  Yes.

25   Q.  You didn't find blood in this area maybe because

1  there is no blood.  You didn't find blood in this area

2  because -- you can't find blood in this area even if it

3  was covered?

4      A.  It may have been destroyed, yes.

5      Q.  And as far as -- you also -- when you went back

6  to the lab, you took cleaned up or sort of cleaned up

7  pictures of this bottle; is that correct, 169?

8      A.  Yes.

9      Q.  Exhibit 170, the other side?

10     A.  I believe that's a close-up of the same side, but

11 yes.

12     Q.  Exhibit 171?

13     A.  Yes.

14     Q.  And then, of course, the part in 172 where it

15 says "flammable"?

16     A.  Yes.

17     Q.  And that's the same bottle that you found in the

18 spare bathroom; is that correct?

19     A.  Yes.

20     Q.  The one that is right there.  Could you show the

21 jurors where that is?

22     A.  Right in this area here.

23     Q.  And this is what it looks like at the lab; is

24 that correct?

25     A.  Yes.  Here's the red cap in the scene photograph,

1    the melted red cap in the lab photograph, if that helps.

2        Q.   And then why would you collect that?

3        A.   Any flammable liquids located at the scene of an

4    arson are relevant.

5        Q.   Period?

6        A.   Yes.

7        Q.   Did you find a gas can in this place?

8        A.   No.

9        Q.   And if you'd found one, you obviously would have

10   made a note of that?

11       A.   I would have collected that, yes.

12       Q.   Here's just another, this picture of 161, so the

13   jurors can get an idea of what that bathroom looked

14   like?

15       A.   Yes.

16       Q.   Could you tell whether or not anybody had taken a

17   bath in that bathroom?

18       A.   I would not have been able to tell.

19       Q.   And 164, can you tell if that's a picture of the

20   bathtub?

21       A.   Yes.

22       Q.   Can you tell that there's water in it?

23       A.   Yes.

24       Q.   Would there be several reasons for there to be

25   water in the tub?

```
1    A.  I can think of at least two.

2    Q.  I can think of two.

3         What is one?

4    A.  That someone was taking a bath.  Second reason

5    could be from the fire extinguishing efforts and the

6    fact that they use water.

7    Q.  I want to turn to the master bath now and ask you

8    if you recognize Defense Exhibit 177 through 192?

9    A.  Yes.

10   Q.  And do they fairly and accurately depict what the

11   master bathroom looked like whenever you were there and

12   taking pictures of it?

13   A.  Yes.

14        MS. KEENE:  Judge, we would offer in Defense

15   Exhibits 177 through 192.

16        MS. RAY:  No objection, Your Honor.

17        THE COURT:  All right.  Defense 177, 178,

18   179, 180 are admitted.  Defense 181, 182, 183, 184, 185,

19   186, 187, 188, 189, 190 admitted.  Defense 191, 192

20   admitted.

21        (Defendant's Exhibit No. 177 - 192 admitted)

22   Q.  (BY MS. KEENE)  All right.  In the master

23   bathroom, it was also heavily damaged, wasn't it?

24   A.  Yes.

25   Q.  And if there had been -- the same questions I
```

```
 1   asked you about the spare bedroom, if there had been an
 2   assault in the master bathroom, do you believe that you
 3   would have found blood?
 4       A.  Not necessarily, no.
 5       Q.  Okay.  All right.  In Defense Exhibit 178 there
 6   is very weird -- it's kind of artsy, but it's not artsy,
 7   but all the weird lines in this bathroom.  Did you
 8   notice that?
 9       A.  Yes, I did.
10       Q.  And you took a lot of different pictures of
11   those, correct?
12       A.  Yes.
13       Q.  These lines did not exist all over the house,
14   correct?
15       A.  No, not all over the house.
16       Q.  Exhibit 180, the same thing where you've got
17   these lines?
18       A.  Yes.
19       Q.  Did that indicate anything to you?
20       A.  My hope was that it indicated something to the
21   arson investigator.  It didn't indicate anything offhand
22   to me.
23       Q.  Okay.  Indicating anything to you and me is mere
24   speculation?
25       A.  Yes.
```

```
 1      Q.  But it was something -- here's another picture,

 2   in 185, to note almost like a -- like seaweed or

 3   something.  I don't know of another -- what's a better

 4   description of that?

 5      A.  I think that's a good description.

 6      Q.  It looked like seaweed.  All right.

 7           And then the other thing to note that was

 8   different about the master bedroom -- I mean, the master

 9   bathroom, as opposed to the spare bathroom, was the

10   spare bathroom's mirror was broken, correct?

11      A.  It was definitely destroyed, yes.

12      Q.  It wasn't there anymore?

13      A.  Correct.

14      Q.  But the mirror in the master bath was there?

15      A.  Yes.

16      Q.  And it had a weird -- it had smoke around it.

17   Basically, it had a big circle around it, but not as

18   much in the middle?

19      A.  It was no longer reflective.

20      Q.  The whole thing was no longer reflective?

21      A.  Correct.

22      Q.  But you see how -- and you took pictures of it --

23   where it's -- basically it's black at the top and almost

24   in a circle around -- in the bottom, as well?

25      A.  Yes.  That -- some of this is potentially from
```

 1   the flash of the camera making that a little more

 2   apparent.

 3       Q.   Profound?

 4       A.   Yes.

 5       Q.   Here's another picture of it that kind of shows

 6   it, same idea, is that -- or you describe it.  How did

 7   the mirror look?

 8       A.   This is more accurate.  It did have heavy soot

 9   and charring on the top and bottom, yet in the center

10   nearly white, but, again, not reflective at any point in

11   the mirror any longer.

12       Q.   And then the same seaweed stuff on the front

13   here?

14       A.   Yes.

15       Q.   However, that was doing -- all right.

16            The other thing, did -- this has a -- had a

17   bathtub, as well, didn't it?

18       A.   Yes.

19       Q.   And it had a shower.  And tell the jurors -- here

20   we go.  This -- here's -- is this the bathtub in 191?

21       A.   Yes.

22       Q.   And what is that showing them?

23       A.   This is showing the general layout of the master

24   bathroom, including the toilet, shower stall/tub

25   assembly.

```
1        Q.   And then, again, in a normal scene, if you walk

2   into a bathroom and you've got a shower curtain that's

3   down, you've got -- you know there's probably been an

4   struggle of some sort in that bathroom, correct?

5        A.   Or a broken rod or something, yes.

6        Q.   Something's happened.

7             In this case who knows because it could be

8   heat, it could be firemen, it could be all sorts of

9   things?

10       A.   Yes.

11       Q.   Or it could be a struggle happened in here and

12  that's how it was caused?

13       A.   It's all speculation.  We don't know.

14       Q.   We just don't know because of all the different

15  factors we've been talking about for a couple of days --

16       A.   Yes.

17       Q.   -- correct?

18            Was there water in this bathtub like there

19  was in the spare bathroom's bathtub?

20       A.   I don't believe it was as significant.

21       Q.   And had it been, don't you -- you would have

22  taken a picture of it, correct?

23       A.   There would be a photograph showing it, yes.

24       Q.   In 190 you took a picture of the tile, though,

25  again, displaying almost like drops going down it; isn't
```

```
 1   that correct?
 2       A.  Yes.
 3       Q.  In a lot of ways it has a lot of the same type of
 4   patterns that we saw with what was apparent blood in
 5   the beginning of the house, in the foyer area?
 6       A.  It's got a similar appearance to liquid having
 7   run down a surface, yes.
 8       Q.  So you took that picture because that's just for
 9   people smarter than you and I, correct?
10       A.  Yes.
11       Q.  Okay.  For us to speculate -- that would be
12   speculation for us to determine what on earth caused
13   that?
14       A.  Yes.
15       Q.  And then in the corner of this bathroom you
16   found -- tell the jurors what's shown in 198.
17       A.  It's a photograph of the corner -- this is the
18   roof here of the bathroom above the shower stall.
19   There's additional staining here.  It has an interesting
20   pattern, but it did not appear to have the same look as
21   apparent blood to me.
22       Q.  And that's -- and 184 was a more close-up of it?
23       A.  Yes.
24       Q.  It had enough of a "that looks weird" for you to
25   take pictures?
```

1    A.   Yes.

2    Q.   And did you take a sample?

3    A.   No.

4    Q.   Okay.  How come?

5    A.   It does not demonstrate, in my opinion, the same

6  appearance as the blood in the rest of the apartment,

7  which had been subject to fire and not subject to fire.

8  It actually does not appear to be blood to me.

9    Q.   It just didn't -- it didn't struck you -- it

10 struck you as weird but not that this was a place where

11 someone was stabbed and that happens to be blood?

12   A.   This photograph was taken in an attempt to assist

13 the arson investigation.

14   Q.   Okay.  And that's in 183, too, it also shows it,

15 where it is in the corner of that room?

16   A.   Yes.  It's here high above the tiling.

17   Q.   And then I'm showing the condition of the sink

18 area in 187.  Same thing, it's covered in a heavy layer

19 of soot?

20   A.   Yes.

21   Q.   And if there was any blood all in this area, who

22 knows?

23   A.   Yes.

24   Q.   Fire destroys crime scenes?

25   A.   Very well.

 1    Q.   And we've seen it in this case, correct?

 2    A.   Yes, ma'am.

 3    Q.   Before I forget, 157, you talked about finding

 4   this binder -- not a binder.  What would you describe

 5   this as?

 6    A.   An expanding file.

 7    Q.   And where did you find that?

 8    A.   It was in the master bedroom closet.

 9    Q.   And why would that be important for you to note

10   this spiral binder or spiral -- what did you call it?

11    A.   An expanding file.

12    Q.   Expanding file.

13    A.   I noted it as Detective Stewart had requested any

14   court paperwork or documentation, and it was labeled as

15   such.

16    Q.   Okay.  Let me show you what has been marked as

17   193 and 194 and ask you if you recognize those?

18    A.   Yes.

19    Q.   And do they -- would they fairly and accurately

20   show the master bedroom, in particular the bed and the

21   dresser drawer?

22    A.   Yes.

23    Q.   And would they help you explain to the jurors

24   about the conditions they were in when you saw them?

25    A.   Yes.

```
 1     Q.   And you took these pictures?

 2     A.   Yes, ma'am.

 3               MS. KEENE:  I would offer in Defense Exhibit

 4    No. 193 and 194.

 5               MS. RAY:  No objection, Your Honor.

 6               THE COURT:  All right.  193, 194 are

 7    admitted.

 8               (Defendant's Exhibit No. 193, 194 admitted)

 9     Q.   (BY MS. KEENE)  What is shown -- what is 193

10    showing the jurors?

11     A.   This is a photograph of the master bedroom, the

12    bed here, which we can see the mattress as being offset

13    on the box spring assembly.  This would be located in

14    the southeast corner of the master bedroom.

15     Q.   And did you look through the dresser drawer?

16     A.   Yes, I did.

17     Q.   And did you recover anything of significance?

18     A.   There was a cellular phone in one of the drawers

19    of the dresser.

20     Q.   And you recovered that?

21     A.   Yes.

22     Q.   In then in 194, what is that showing the jurors?

23     A.   This is a photograph specifically of the mattress

24    as it was found.

25     Q.   And we talked earlier about your ability to find
```

1   if she had been assaulted on this bed or near this bed.

2   What did you notice about the bed, anything, any blood

3   or anything?

4       A.  I did note any blood.  Just the heavy -- heavier

5   damage in the central portion of the mattress which

6   seemed odd.

7       Q.  And what do you mean by the "heavier damage"

8   in -- right where we're looking at it?

9       A.  Yes.  It seems to be burned down to the springs

10  in the center the mattress.

11      Q.  And so had there been blood in this area, you're

12  not going to be able to find that?

13      A.  No.

14      Q.  And had there been blood -- actually, really a

15  lot of places in this room, you would not be able to

16  find it?

17      A.  No.

18      Q.  You cannot say where this assault began, period?

19      A.  No.

20      Q.  When you look at a crime scene, usually that

21  crime scene will tell you a story, doesn't it?

22      A.  Yes.

23      Q.  And when you look at this crime scene, you can't

24  get a story out of it?

25      A.  It tells a story, but a not -- not a sequential

1    story like you are talking about, no.

2       Q.  It doesn't tell you -- it does tell a story,

3    you're correct.

4       A.  Yes.

5       Q.  It does not tell a story about where this began?

6       A.  Yes.

7       Q.  Or certainly that would just be speculation?

8       A.  Yes.

9       Q.  Let me show you what has been marked as Defense

10   Exhibit 195 through 200 and ask if you recognize those.

11      A.  Yes, I do.

12      Q.  And do these pictures fairly and accurately show,

13   really, the outside area and the front door area that

14   evening?

15      A.  Yes.

16      Q.  And would they aid you in explaining to the

17   jurors the condition of the grill, et cetera?

18      A.  Yes.

19            MS. KEENE:  We would offer in Defense

20   Exhibit No. 195 through 200.

21            MS. RAY:  No objection, Your Honor.

22            THE COURT:  All right.  Defense Exhibits

23   193, 194 -- I'm sorry -- 195, 196, 197, 198, 199, 200

24   are each admitted.

25            (Defendant's Exhibit No. 195 - 200 admitted)

1    Q.   (BY MS. KEENE)   Let me show you what's been

2    marked as Defense Exhibit No. 195 and tell the jurors

3    what that's showing them?

4    A.   This is a photograph of a small personal barbecue

5    that was outside the front door to the neighboring

6    apartment.

7    Q.   And that was the barbecue that was next to the

8    charcoal in the front; is that correct?

9    A.   Yes.   If you'll slide that down.   That's...

10           Yes.   In the other diagram we can see it.

11   I have it noted, but it's in this area here.

12   Q.   And this -- and 195, this barbecue grill is full

13   of sand, isn't it?

14   A.   Yes, and cigarettes butts.

15   Q.   And this -- does this appear to be an ashtray?

16   A.   It did to me at the time, yes.

17   Q.   It appears to be a very large ashtray, correct?

18   A.   Yes.

19   Q.   And it is setting next to the charcoal, which is

20   right here, correct?

21   A.   Yes.

22   Q.   And inside the charcoal was basically an empty

23   bottle of charcoal lighter?

24   A.   Lighter fluid, yes.

25   Q.   And then next to that charcoal was a full bottle

1   of lighter fluid?

2       A.  Not totally full.  It had been opened.  But, yes,

3   it was somewhat full.

4       Q.  And there's also cigarettes found inside 195,

5   correct?

6       A.  Yes.

7       Q.  Did you collect those cigarettes?

8       A.  No, I did not.

9       Q.  How come?

10      A.  They are not actually physically inside of my

11  crime scene.

12      Q.  Okay.  We're going to go through that.

13              So because it's not taped off -- this was

14  not your crime scene, what is there on that porch?

15      A.  The flammable liquid was pertinent.  I didn't

16  feel that the cigarette butts in the neighbor's barbecue

17  grill was relevant at the time.

18      Q.  Okay.  That's fine.  Were you able to determine

19  whether or not these were Marlboro 27s or not, or did

20  you make any notation about what type of cigarettes were

21  in there?

22      A.  I did not.

23      Q.  Okay.  But did not collect these?

24      A.  No.

25      Q.  And these -- this does appear to you to be the

```
 1   neighbor's, basically, ashtray?
 2       A.  Yes.
 3       Q.  I want to show you what has been marked as
 4   Defense Exhibit No. 197.  And what is that showing the
 5   jurors?
 6       A.  This is a photograph of the outside door to the
 7   victim's apartment.
 8       Q.  And so this is Mechelle's door?
 9       A.  Correct.
10       Q.  And what about this bag right here?
11       A.  It's a bag that appeared to be full of garbage.
12       Q.  And was that there whenever you arrived?
13       A.  I believe that it was.
14       Q.  That's nothing that the firemen left, correct?
15       A.  That is not my understanding, no.
16       Q.  In fact, there's a little bit -- you can kind of
17   see the trash bag right here, correct?
18       A.  Yes.
19       Q.  And then you took a close-up picture of the trash
20   bag, correct?
21       A.  Yes.
22       Q.  Did you look to see what was inside the trash
23   bag?
24       A.  Yes.  Contents are searched.
25       Q.  And what, in general, was inside the trash bag?
```

```
1        A.   Miscellaneous standard household garbage.

2        Q.   Was there anything in there that you seized or

3   you thought was of evidentiary value?

4        A.   No.

5        Q.   Could you tell how long -- by looking at the

6   contents, could you tell how long that bag had been

7   setting out there?

8        A.   No.

9        Q.   Could you tell whether or not it had been setting

10  out there a day?

11       A.   I really couldn't say.

12       Q.   Okay.  Did it have a foul odor or anything?  Do

13  you have any recollection of that?

14       A.   I don't recall.  The smell that was predominant

15  was from the fire.

16       Q.   Okay.  That makes sense.

17            And then in 196, again, there's the trash,

18  correct?

19       A.   Yes, ma'am.

20       Q.   Looking back further, there's Mechelle's car?

21       A.   Yes.

22       Q.   Did you ever receive any information about when

23  the trash is picked up or know anything about the timing

24  of that?

25       A.   I did not know, no.
```

1    Q.   And then there was one other item you noted in

2    the front, and what was that, in Defense Exhibit

3    No. 200?

4    A.   It's a candy wrapper that was just outside of the

5    doormat to the apartment.

6    Q.   And why was that significant to you?

7    A.   It's out of place.  It could have blown in or it

8    could have been relevant.  I document almost everything

9    that I see on scene, whether I collect it or not is a

10   decision I formulate later.  But photographs are taken

11   to document a scene as I find it, even if it includes

12   items that shouldn't necessarily be there.

13   Q.   And this one you would -- let's say this is an

14   item -- did you collect this item?

15   A.   No, I did not.

16   Q.   This could be an item, if it became relevant,

17   where someone's DNA, though, would be on the end,

18   because they would have to open it up for the candy,

19   correct?

20   A.   Yeah.  Yes.

21   Q.   So how do you make choices about what to collect

22   and what not to collect?

23   A.   Generally speaking, that is not indicative of a

24   crime to me, that someone opened a candy wrapper outside

25   her apartment.

1    Q.   Okay.  But it was relevant enough to take a

2    picture of?

3    A.   Yes.  But it is also next to a bag of garbage and

4    it is in a scene that multiple people have traversed.

5    The interior of the apartment should have been far more

6    localized and guarded against people coming in and out.

7    Many firemen traversed that door frame to gain entry

8    into the apartment.

9    Q.   Right.  And for lack of better a term, a "normal"

10   crime scene, is not going to have the in-and-outs that

11   this one did?

12   A.   Correct.

13   Q.   And so if you had found the same brand of candy

14   inside her house, in a normal crime scene that hasn't

15   been covered in soot, this may become extremely

16   relevant?

17   A.   Or had there been ash or blood or some other type

18   of evidence on the wrapper itself, yes.

19   Q.   Okay.  Let me show you what has been marked as

20   Defense Exhibit 201 and then 240 through 261 and ask if

21   you recognize those.

22   A.   Yes, I do.

23   Q.   And did you take each of those pictures?

24   A.   Yes, I did.

25   Q.   And do they fairly and accurately show the scene

1    as it looked on that evening and the next day --

2    actually, it's the next day?

3        A.   Yes.

4        Q.   And then the pictures of the keys that you found

5    in the Dumpster, is that what is depicted in 201?

6        A.   Yes.

7             MS. KEENE:  Your Honor, we would offer in

8    Defense Exhibit No. 201 and Defense Exhibit No. 240

9    through 261.

10            MS. RAY:  No objection, Your Honor.

11            THE COURT:  All right.  Defendant's Exhibit

12   No. 201 is admitted.  Defendant's Exhibit No. 240, 241,

13   242, 243, 244, 245, 246, 247, 248, 249, 250, 251, 252,

14   253, 254, 255, 256, 257, 258, 259, 260, 261, all Defense

15   exhibits, all admitted.

16            (Defendant's Exhibit No. 201, 240-261

17             admitted)

18       Q.   (BY MS. KEENE)  And 201, what is this showing the

19   jurors?

20       A.   This is a lab photograph taken of a set of keys

21   that was recovered from a Dumpster north of Mechelle

22   Gandy's apartment.

23       Q.   And you did not take a picture of them actually

24   in the Dumpster, you took a picture of them in the lab

25   later?

1      A.   I took a picture of them in the Dumpster.

2      Q.   Okay.  I couldn't find it.  But I want you to

3  show which Dumpster it was.  Let me show you what has

4  been marked as 246.  Do you see a Dumpster in Defense

5  Exhibit 246?

6      A.   Yes, ma'am.  It's near the center of the

7  photograph in a little build-out.

8      Q.   And is that the Dumpster that you found keys in?

9      A.   Yes.

10     Q.   And where is that in relation to Mechelle's

11  house?

12     A.   It is north of her apartment building.  From her

13  front door almost directly north, visually.

14     Q.   Show them up here where her -- where her house

15  would be?

16     A.   It's going to be off frame in the lower left-hand

17  corner.

18     Q.   And then there was another Dumpster out there?

19     A.   Yes.

20     Q.   And is that depicted in Defense Exhibit 249?

21     A.   Yes.

22     Q.   And where is that?

23     A.   It's here in the top right-hand quadrant of the

24  photograph.

25     Q.   Okay.  I'm going to show you what has been

1    introduced -- I'm just going to hold it up.  If you'll

2    just show the jurors -- I think we looked at this on one

3    of the breaks -- on this, if you'll just show them where

4    those two Dumpsters are?

5                    THE COURT:  "This" being?

6                    MS. KEENE:  This being the aerial picture.

7                    THE COURT:  It's got a number.

8                    MS. KEENE:  Yeah.  It does have a number.

9    State's 2.

10                   THE COURT:  All right.

11                   THE WITNESS:  To give us a reference point,

12   the apartment in question is here.  The northern

13   Dumpster is here.  The eastern Dumpster is here, outside

14   of this building.

15   Q.   (BY MS. KEENE)  And which one is the one you

16   found the keys in?

17   A.   The northern Dumpster here.

18   Q.   And you did not personally search the other

19   Dumpster, but one of the crime scene officers did?

20   A.   Correct.

21   Q.   And nothing of evidentiary value was found in the

22   other Dumpster?

23   A.   No.  He would have had to have notified me as the

24   lead crime scene investigator on the case.

25   Q.   If you were to walk out of that -- walk out the

1   back door of Mechelle's house, if you were to walk

2   through this little area -- this just washes it out.  If

3   you were to walk through this little area -- if this is

4   Mechelle's apartment right in here and you were to walk

5   out the back door, walk this area and head this

6   direction, which Dumpster would you go by?

7        A.   Depending on which direction you took.  If you

8   headed east, you would head to the eastern Dumpster.  If

9   you headed north along this roadway, you would hit the

10  other one.

11       Q.   If you came out and headed that way -- which I'm

12  not sure what that is now.  Is that east?

13       A.   That is south.

14       Q.   And headed south.  If you came out and headed

15  south or even headed straight across the parking lot,

16  the closest Dumpster would be one the other CSI officer

17  searched?

18       A.   Yes.

19       Q.   The one you didn't find the keys in?

20       A.   Correct.

21       Q.   That one, actually right there, in Defense

22  Exhibit No. 249?

23       A.   Yes.

24       Q.   And you took these pictures, though, correct?

25       A.   These I did.  The one we were just looking at I

```
 1    did not take.
 2        Q.  Exhibit 250, is that just a close-up of the same
 3    Dumpster that is depicted actually in 251, which is the
 4    parking lot which is really right in front of Mechelle's
 5    house, there's a large parking lot?
 6        A.  She's at a corner.  There are two parking lots,
 7    one to the north and one to the east.
 8        Q.  And then in 252, you took this picture.  You
 9    had -- is that the crime scene unit, is that y'all's
10    truck right here?
11        A.  Yes, it is.
12        Q.  And is that your police department there?
13        A.  Yes.
14        Q.  And then what is that yellow stuff?
15        A.  That is crime scene barrier tape.
16        Q.  And so this picture actually depicts what you
17    were telling us about the other day of where the crime
18    scene barrier tape had been put up?
19        A.  And this reflects the crime scene barrier tape as
20    it was in the morning, as we were getting towards the
21    end of our investigation.  It -- so it does sometimes
22    move in closer to your crime scene area as your call
23    progresses.
24        Q.  And that's in 252?
25        A.  Yes.
```

STATE V. THOMAS OLIVAS

1   Q.  And so in 252 -- and in 253 it also has even a

2   better showing of the crime scene tape, even back here

3   in that area we were just discussing, correct?

4   A.  Well, this is along the northern side of the

5   building.  You were discussing along the southern side

6   of the building.  But yes, it encompasses both the north

7   and the south.

8   Q.  All right.  Then in 254 does it also show tape

9   here and here and then also back in that area we were

10  discussing?

11  A.  Yes.

12  Q.  And so this would have been the way -- if this

13  had been -- the crime scene had not been restricted but

14  brought in by the morning to be this area in here?

15  A.  Yes.

16  Q.  So could this Cadillac, or whatever this is this,

17  that could be somebody's car or it could be a police

18  officer's car, and it doesn't matter?

19  A.  That's not a police officer's car.

20  Q.  So this is somebody-who-lives-there's car?

21  A.  Yes.

22  Q.  Because the tape is on the other side?

23  A.  The tape is irrelevant if that's where the tape

24  is.  We sometimes -- we will include people's private

25  vehicles inside of a crime scene if they fall within the

```
 1   boundary.
 2      Q.  So if you were to leave -- if your car was left
 3   and the fires happen right in front of you, you may not
 4   get to that car for a while?
 5      A.  You won't.
 6      Q.  You just won't get to your car for a while?
 7      A.  You won't.
 8      Q.  There was testimony that some folks I guess knew
 9   that and they moved their car.  That would make sense?
10      A.  They would be smart if they were allowed to do to
11   so.
12      Q.  Well, if they did it before the firemen got
13   there?
14      A.  Yeah.
15      Q.  That that would make sense to you?
16      A.  Yes.
17      Q.  If somebody said, Hey, I know when firemen come,
18   you don't get to get your car for a while, that makes
19   sense, doesn't it?
20      A.  Yes.
21      Q.  Because you guys are not going to let them -- not
22   going to let it happen?
23      A.  Once I get there, no.
24      Q.  Okay.  If you are to be inside Mechelle's house
25   and you're out -- the back door being right here, what
```

1   is the furthest room on foot to the back door?

2       A.   The southeast corner of the master bedroom.

3       Q.   Right over here?

4       A.   Yes.

5       Q.   On foot.  What about walking here or even this

6   corner?  Because you have to walk all the way around,

7   what about on foot?

8       A.   We would have to do measurements on that.  I

9   would just be speculating.

10      Q.   It certainly would be in one of these two

11  bedrooms to be away from this door; is that correct?

12      A.   Yes.  However, if this window was broken out,

13  then you could easily --

14      Q.   Run out there --

15      A.   -- walk -- it's all speculation.

16      Q.   I'm just saying if you're standing -- forget

17  there's a fire.  If I'm standing at the back door right

18  here and then I'm going to walk on foot, my perception

19  is -- which room is the furthest from me?  Because you

20  were in there and I wasn't.

21      A.   I would say this still strikes me, the southeast

22  corner of the master to a little bit farther.  However,

23  it wouldn't be by much to the southwestern corner of the

24  spare bedroom.

25      Q.   Okay.  Now, that back door had the pry marks on

```
 1    it, correct?  It's in State's Exhibit No. 46.
 2        A.  Yes.
 3        Q.  And you said that the pry marks were on the door,
 4    as well as on the screen door?
 5        A.  There were some scratches and superficial gouges
 6    on the plastic of the screen door, yes.
 7        Q.  Could you tell whether or not it had compromised
 8    the lock?
 9        A.  It -- I could not tell at that time.
10        Q.  And you understand what I'm saying?
11        A.  Yes.  But the type of lock that's on those type
12    of doors you can pop open without actually compromising
13    the lock.
14        Q.  Okay.  Actually --
15        A.  Do you see what I mean?
16        Q.  Uh-huh.  So basically somebody could have pried
17    open this door and it's nothing -- and you could still
18    lock it the next day?
19        A.  Yes.
20        Q.  And in State's Exhibit 47 it showed like a --
21    kind of a hole inside the -- anyway, it looks weird, the
22    hole thing in there.
23        A.  Yes.  For better -- for lack of a better term,
24    it's a hook-and-hole-type of lock.
25        Q.  And so it can be compromised and yet tomorrow you
```

 1  can lock it?

 2     A.  Yes.  You, in theory, could force it down where

 3  the hook portion comes out of the hole, without damaging

 4  either the hook or the hole.

 5     Q.  Can you tell -- and you couldn't tell anything

 6  from this one way or another if this had been more

 7  recent or not, even by judging from whether or not the

 8  lock worked?

 9     A.  No.

10     Q.  And you don't recall whether or not the lock

11  actually worked or didn't work?

12     A.  No.

13     Q.  All right.  Let me show you what has been marked

14  as Defense Exhibit No. 202 through 239 and ask you if

15  you recognize that car and its contents?

16              THE COURT:  We're going to take a recess

17  while she reviews these exhibits, based on an anonymous

18  request to my right.  Let's take our stretch break.

19              For the record, my right would be the jury

20  box.

21              (Break taken, 3:10 - 3:30 p.m.)

22              (OPEN COURT, DEFENDANT AND JURY PRESENT)

23              (Witness on the stand)

24              THE COURT:  At the time of the recess the

25  witness was looking through a stack of photographs.

```
 1              Have you had the opportunity to review the
 2   photos?
 3              THE WITNESS:  Yes, I have.
 4              THE COURT:  Then you may pick up where you
 5   left off.
 6      Q.  (BY MS. KEENE)  Were you able to recognize the
 7   pictures that you had taken?
 8      A.  Yes.
 9      Q.  And can you hand those to me.
10              So all the pictures you handed to me you
11   recognize as the pictures you took of the Honda?
12      A.  Yes.
13              MS. KEENE:  Judge, we would offer in Defense
14   Exhibit 202 and 203, 205 to 212, 215 through 221, 223,
15   and 224, 211, and 225 through 239.
16              MS. RAY:  No objection, Your Honor.
17              THE COURT:  All right.  Defense 203, 202,
18   205, 212, 215, admitted; 216, 217, 218, 219, 220, 221,
19   admitted; 223, 224, admitted; 211, admitted; 225, 226,
20   227, 228, 229, 230, 231, 232, 233, 234, 235, 236, 237,
21   238, 239, admitted, all Defense exhibits.
22              (Defendant's Exhibit No. 202, 203, 205-212,
23               215-221, 223-239 admitted)
24      Q.  (BY MS. KEENE)  Okay.  You looked inside
25   Mechelle's white Honda; is that correct?
```

1      A.   Yes.

2      Q.   In fact, you did a crime scene on it?

3      A.   An investigation, yes.

4      Q.   Crime scene search?

5      A.   Yes.

6      Q.   And you found a large number of "stuff" in her

7   car, for lack of a better word?

8      A.   Yes.

9      Q.   And would 203 kind of give us an idea of just

10  general contents of her car?

11     A.   Yes.

12     Q.   What did you find in the glove compartment, in

13  212?

14     A.   There were several miscellaneous papers, personal

15  effects within the glove box, as well a plastic baggie

16  containing a green leafy material.

17     Q.   So in 219 it looks like a different front seat

18  than in 212; is that correct?

19     A.   Yes.   The contents of the glove box are laid out

20  on the seat.

21     Q.   In 219?

22     A.   Yes.

23     Q.   And then in 220 is what appears to be basically

24  marijuana?

25     A.   I can't speculate.  I -- it's a green leafy

```
 1   material.
 2       Q.  And then in 221, a 7-Eleven badge?
 3       A.  Yes.
 4       Q.  Did you also find actually another -- in 218
 5   another 7-Eleven badge?
 6       A.  Yes.
 7       Q.  You also found some money?
 8       A.  Yes, I did.
 9       Q.  Where did you find the money?
10       A.  The currency was tucked into the backseat pocket
11   of the passenger -- front passenger seat.
12       Q.  Was it hidden?
13       A.  It was tucked away, yes.  It was not in plain
14   view.
15       Q.  And how much money was it?
16       A.  One hundred and twenty dollars.
17       Q.  And did you also find some clothes in her car?
18       A.  Yes, I did.
19       Q.  In 205, does that just show the general location
20   of those clothes?
21       A.  Yes.  They were on the rear driver side seat.
22       Q.  And what clothing did you find?
23       A.  There was a black T-shirt, a hooded sweatshirt
24   and a gray knit cap.
25       Q.  And if I show you what has been marked as 225, is
```

```
1    that a lab picture of the hooded -- the hoodie, so to
2    speak?
3        A.  Yes.
4        Q.  And you seized that, obviously, because you took
5    pictures of it at the lab?
6        A.  Yes.
7        Q.  And you took pictures of it, the front and the
8    back, just as you do all the other clothing, correct?
9        A.  Yes.
10       Q.  You said you also found, in 230, a black T-shirt?
11       A.  Yes.
12       Q.  And you took pictures of the front and back of
13   it?
14       A.  Yes, I did.
15       Q.  And there was no -- nothing you noticed on there
16   that struck you as having blood or anything on her
17   clothing inside her car, was there?
18       A.  No, there was not.
19       Q.  And then you also found a knit cap in 239; is
20   that correct?
21       A.  Yes.
22       Q.  And you took that to the lab, as well?
23       A.  Yes, I did.
24       Q.  And also nothing visually that you could see that
25   looked out of place from any other knit cap?
```

1    A.   Correct.

2    Q.   Her gas cap in 211 appeared to be a locking-type

3    that was kind of messed with a little bit?

4    A.   Yes.

5    Q.   And that's -- so you took a picture of that in

6    211?

7    A.   Yes.

8    Q.   But other than that, it just looked like the

9    generic contents of really, probably any of our cars?

10    A.   Yes.

11    Q.   Absent marijuana, we would hope?

12    A.   We would hope.

13    Q.   Okay.  You spent how many hours at this crime

14    scene?

15    A.   At the Presidents Corner address, I spent

16    approximately 14 hours.

17    Q.   And you've probably spent more time testifying

18    now, haven't you?

19    A.   I actually have, yes.

20    Q.   Okay.  So about this amount of time you spent at

21    the crime scene?

22    A.   Yes.

23    Q.   There's not a lot of things you can say for sure

24    based on this crime scene?

25    A.   Correct.

1    Q.   You can say it for sure looked like there was a

2    fire?

3    A.   Yes.

4    Q.   You can say that there was significant amounts of

5    what appeared to be blood in the kitchen area?

6    A.   Yes.

7    Q.   You can say you don't know if there was blood

8    anywhere else, just because of the condition of the

9    fire?

10   A.   Yes.

11   Q.   You can say that Mechelle did not have a top on?

12   A.   Yes.

13   Q.   That she had on shorts and one sock?

14   A.   Correct.

15   Q.   Those are things you know for sure?

16   A.   Yes.

17   Q.   You can say that there were two packs of the

18   cigarettes in the bar area?

19   A.   Yes.

20   Q.   They were both basically full or had lots of

21   cigarettes in them?

22   A.   Yes.

23   Q.   One was a Marlboro 27 brand and one was a

24   Virginia Slims brand, correct?

25   A.   Yes.

1    Q.   You can say there was a Bud Light can in the

2    living room?

3    A.   Yes.

4    Q.   And you can say that you didn't find any Bud

5    Light canned beer in the house?

6    A.   I did not look specifically for that in the

7    refrigerator, though I would have noted it had I seen

8    it.

9    Q.   You can say that Asher was -- body was found in

10   his -- what appeared to be his bed?

11   A.   It appeared that way.

12   Q.   And you could say that it appeared that the most

13   fire damage was in his room and in that back hallway

14   area?

15   A.   Yes.

16   Q.   But that the whole house had fire damage?

17   A.   Yes.

18   Q.   Am I missing anything else that you can say for

19   sure?

20   A.   Other than that she was murdered and so was he,

21   yes.

22   Q.   That there were definitely wounds on her?

23   A.   Yes.

24   Q.   And we talked about how in the big picture you

25   can't say that she was stabbed and killed in the

```
 1  kitchen?
 2      A.  No.
 3      Q.  And to say that would be speculation because we
 4  don't know what the rest of the house looked like?
 5      A.  Correct.
 6      Q.  You can't say whether or not she had been taking
 7  a bath and was, you know, finishing her bath when she
 8  was stabbed in her bathroom?
 9      A.  She was clothed.
10      Q.  You can't say whether or not she finished taking
11  a shower?
12      A.  Correct.
13      Q.  Put on your pants but not your top and you could
14  get killed in the bathroom?
15      A.  Correct.
16      Q.  Because we just can't, because of the fire, tell
17  what happened, if it happened in that bathroom?
18      A.  Correct.
19      Q.  We can only tell what we can tell, period.  It
20  just is what it is?
21      A.  Yes.
22      Q.  And I think what I can say is that you are one
23  very good crime scene officer.
24      A.  Thank you.
25      Q.  And you've done a very good job of testifying and
```

1   letting us grill you about all of your work.  And I told

2   you I thought I found one huge mistake and I didn't.  I

3   thought you didn't go through the trash and you did.

4            MS. KEENE:  So I will pass the witness with

5   that, Judge.

6            THE COURT:  Any redirect?

7            MS. RAY:  I swear it will be really brief.

8                    <u>REDIRECT EXAMINATION</u>

9   BY MS. RAY:

10   Q.   Investigator Fallentine, I'm not sure if we

11   discussed it, but do you -- did you do some sort of

12   processing on those pry marks?

13   A.   I attempted to process them using a tool called

14   microseal.

15   Q.   And what is that tool?

16   A.   It's basically almost like a soft putty that you

17   apply that hardens to do a cast of an impression of

18   toolmark evidence.

19   Q.   And you said attempted to?

20   A.   I did.

21   Q.   So go ahead and explain what you did.

22   A.   It met with unsuccessful results due to not only

23   equipment failure but the condition of the charred

24   remains of the door.

25   Q.   And we talked a little about that screwdriver

1    that you found over in that work area.  Could you,

2    please, describe the condition that that screwdriver was

3    in when you located it.

4        A.  It was lying partially on top of debris inside of

5    the workout building.  It additionally had some debris

6    over the actual screwdriver tip.  And it was the

7    textured handle and just your standard flathead

8    screwdriver.

9        Q.  Did it appear to you, based on the way it was

10   covered in the debris that you mentioned, did it appear

11   to have been just recently placed there?

12       A.  It's hard to really be able to ascertain.  It was

13   not buried underneath debris or leaves, but there were

14   some leaves over part of it.

15       Q.  You testified earlier a little bit about whether

16   or not surfaces are conducive for certain types of

17   processing, be it DNA or latent.  In your opinion was

18   that screwdriver conducive for latent print testing?

19       A.  I believe due to the amount of dirt and the fact

20   that the grip, the rubberized grip was textured, that

21   DNA would be better than latent fingerprints on the

22   handle of that item.  The actual blade of the

23   screwdriver does not have enough surface area to

24   generally be a conducive surface for that type of

25   processing.

1    Q.   And if you could, going through your report, how

2   many swabs of apparent blood did you take?

3    A.   There were nine swab samples taken, as well as

4   items collected which appeared to have blood on them.

5    Q.   And how many of those items?

6    A.   Five.

7                MS. RAY:  I pass this witness, Your Honor.

8                MS. KEENE:  No further questions.

9                MS. RAY:  I also have no further questions

10   for this witness, Your Honor.

11               THE COURT:  So what's the likelihood of this

12   witness being permanently released?

13               MS. RAY:  I don't know, Your Honor.  I have

14   to think about it.

15               MS. KEENE:  Subject to recall.

16               THE COURT:  Just on call but --

17               MS. KEENE:  I doubt we would need her,

18   but...

19               THE COURT:  Just in case.

20               Ditto?

21               MS. RAY:  No objection, Your Honor.

22               THE COURT:  All right.  Then here's the

23   deal.  You don't have to hang around here.  You have to

24   hang around town Tuesdays through Fridays for the next

25   several weeks just in case we need you, unless they call

```
 1   you and say we're not going to need you back.  But if
 2   there is any reason you had to leave town,
 3   professionally or otherwise, for more than 24 hours, let
 4   somebody know so they can let me know to find you if
 5   necessary.
 6                  THE WITNESS:  Thank you.
 7                  (Witness excused from courtroom)
 8                  THE COURT:  Off the record.
 9                  (Discussion off the record)
10                  THE COURT:  Next witness?
11                  MR. ROUSSEAU:  We'll call Officer Layne
12   Shinpaugh.
13                  (Witness takes the stand)
14                  THE COURT:  State your full, legal name to
15   the court reporter and also to the members of the jury.
16                  THE WITNESS:  Layne Shinpaugh.
17                  THE COURT:  Spell your last name for her.
18                  THE WITNESS:  It's S-H-I-N-P-A-U-G-H.
19                  THE COURT:  Just for fun, spell your first
20   name for her.
21                  THE WITNESS:  Layne, L-A-Y-N-E.
22                  THE COURT:  All right.  There you go.
23                  All right.  Face me and raise your right
24   hand.
25                  (One witness sworn)
```

```
 1              THE COURT:  Off the record.
 2              (Discussion off the record)
 3              THE COURT:  Back on the record.
 4              Have you testified before in district court?
 5              THE WITNESS:  Yes, sir.
 6              THE COURT:  Are you familiar with the rules
 7    that apply to all witnesses during a criminal trial,
 8    where you may and may not be, who you may and may not
 9    talk to, and about what, while the trial is in progress?
10              THE WITNESS:  Yes, Your Honor.
11              THE COURT:  They apply in this case as they
12    do in most.  Just make sure that you follow them.
13              THE WITNESS:  Yes, Your Honor.
14              THE COURT:  Kevin.
15              MR. ROUSSEAU:  May I, Judge?
16              THE COURT:  Yes.
17              DETECTIVE LAYNE SHINPAUGH,
18    having been first duly sworn, testified as follows:
19              DIRECT EXAMINATION
20    BY MR. ROUSSEAU:
21       Q.  Good afternoon.
22       A.  Good afternoon.
23       Q.  You are -- I've already called your name, Layne
24    Shinpaugh; is that correct?
25       A.  That's correct.
```

 1    Q.  And explain to the jury what you do for a living,

 2  sir.

 3    A.  I'm a fugitive detective for Arlington Police

 4  Department.

 5    Q.  And I think I referred -- called your name as

 6  Officer Layne Shinpaugh.  Is that actually accurate?  Is

 7  that the way I should refer to you, or is it detective?

 8    A.  Well, it's just -- the job title is just

 9  detective.

10    Q.  Okay.  Thank you.

11        You're a fugitive officer?

12    A.  Yes, sir.

13    Q.  Tell the jury what that means exactly.

14    A.  We -- my unit is just assigned to serve fugitive

15  warrants of arrest for individuals for violent offenses.

16    Q.  And when you serve a warrant, does that mean you

17  walk up casually and hand it to somebody?

18    A.  No.  It means we serve the warrant in terms of an

19  arrest.

20    Q.  And sometimes it's peaceful and sometimes it's

21  not?

22    A.  That's correct.

23    Q.  In essence, you find people that need to be

24  arrested?

25    A.  Yes, sir.

```
1     Q.   How long have you been working in that capacity?
2     A.   Approximately -- I've had previous experience
3  from another department, so, total, probably about
4  18 years.
5     Q.   Kind of a specialty of yours?
6     A.   I've done a few of them, yes, sir.
7     Q.   How long have you been a police officer
8  altogether?
9     A.   Twenty -- approximately 26 years.
10    Q.   How long in Arlington?
11    A.   Eighteen.
12    Q.   Well, I'm not going to go through everything else
13 you've ever done in your life as a police officer,
14 instead we'll get to this case.  I think you've
15 explained it fairly well.
16         Were you on duty on March the 21st of 2011?
17    A.   Yes, sir.
18    Q.   Working in the same capacity as you are now?
19    A.   Yes, sir.  Also as a deputy U.S. Marshal assigned
20 to the U.S. Marshal Task Force.
21    Q.   Okay.  As a deputy U.S. Marshal, do your
22 responsibilities differ somewhat?
23    A.   They're basically the same, the same protocol
24 exists where we serve violent felony warrants.
25    Q.   Okay.  And so -- but it's not limited strictly to
```

```
 1   Arlington cases?
 2       A.   No.  It's federal jurisdiction, also.
 3       Q.   Okay.  And is it customary for police agencies,
 4   such as Arlington, to lend or assign officers from their
 5   department to a task force that may consist of officers
 6   from various departments?
 7       A.   Yes, it is.
 8       Q.   And is that what you did -- are you still on that
 9   task force?
10       A.   I have -- I'm actually in the process of starting
11   that again.  I was off for one year due to the fact my
12   sergeant went to Afghanistan.  And so I got pulled off
13   because we were short of manpower.  Now I'm going back.
14       Q.   I take it your sergeant came back safe and sound?
15       A.   He did.
16       Q.   Good for him then.
17            Well, on March the 21st, were you working
18   that day?
19       A.   Yes, sir.
20       Q.   Were you working alone or with a partner?
21       A.   I -- we're assigned to work alone, unless we need
22   to call for assistance.
23       Q.   If you're going to go out and arrest a bad guy
24   that might be violent, are you going to take somebody
25   with you?
```

```
1        A.  Yes, sir.

2        Q.  And on this particular day what were you asked to

3   do?

4        A.  I was contacted by my direct supervisor,

5   Detective Sergeant Hummel at the time, to assist

6   Detective Stewart in locating a person of interest on a

7   homicide.

8        Q.  Was there an arrest warrant in place?

9        A.  Not at that time.

10       Q.  So you were not out trying to find this person

11  for the purpose of placing him under arrest?

12       A.  No.

13       Q.  Did you -- I'll go ahead and cut to the chase a

14  little bit.

15            Did you ultimately make contact with that

16  person?

17       A.  Yes, I did.

18       Q.  Do you see him present here in the courtroom

19  today?

20       A.  Yes, I do.

21       Q.  Could you point him out and describe something

22  that he's wearing, please?

23       A.  In the dark jacket, sitting on the end of the

24  counsel table.

25            MR. ROUSSEAU:  May the record reflect the
```

```
 1   witness has identified the Defendant?
 2                THE COURT:  It may.
 3       Q.  (BY MR. ROUSSEAU)  Now, did you have a name?
 4       A.  Yes, I did.
 5       Q.  What was that name?
 6       A.  Thomas Olivas.
 7       Q.  And did you have a location that you were -- that
 8   he might be?
 9       A.  Yes.
10       Q.  Where was that?
11       A.  It was -- may I refer to my report?  I don't have
12   it memorized.
13       Q.  Refer to your report any time you need to if it
14   will help you remember.
15       A.  Yeah.  The exact address was going to be 1515
16   West State Highway 114 at Best Buy.
17       Q.  Best Buy.  And is that in Grapevine, Texas?
18       A.  Yes, it is.
19       Q.  And did you go to that location?
20       A.  Yes, I did.
21       Q.  Did you go alone or with another officer?
22       A.  I had requested assistance from another officer
23   in my unit.
24       Q.  Who was that?
25       A.  Detective Smith.  Adam Smith.
```

1    Q.   Adam Smith.  And were you in the same vehicle or

2    in separate cars?

3    A.   We were in separate vehicles.

4    Q.   Do you recall what you were driving that day?

5    A.   Yes.  I believe it was 2011 GMC Acadia, silver in

6    color.

7    Q.   And is that marked like a police car?

8    A.   No, it's a covert unit.  It's -- it doesn't look

9    like a police car.

10   Q.   And your -- I'm going to call him your partner,

11   but the other officer, Adam Smith, was he also driving a

12   covert unit?

13   A.   Yes.

14   Q.   Do you recall what type of vehicle it was?

15   A.   I honestly do not at this time.

16   Q.   Do you guys switch cars pretty often?

17   A.   Quite often.

18   Q.   Probably a good thing to do in your line of work?

19   A.   Yes.

20   Q.   So did you go to the Best Buy?

21   A.   Yes, we did.

22   Q.   About -- approximately what time did you get

23   there?

24   A.   I believe it was approximately 12:30 to 12:40.

25   Q.   Did you go inside the store?

1    A.  We did.

2    Q.  Well, how did y'all go about deciding or

3  determining whether or not the person you were looking

4  for was actually there?

5    A.  Well, I had had in my possession previous to

6  arriving there a photograph of Mr. Olivas and was asked

7  by Detective Stewart to locate the person.  And so

8  myself and Detective Smith went into the store,

9  basically posing as customers, and I made contact with

10  Mr. Olivas in the -- I believe it was the television

11  sales portion of the store.

12    Q.  Did you two enter separately?

13    A.  Yes, we did.

14    Q.  So when you said "made contact" with him,

15  describe what you did.

16    A.  Well, I -- after knowing pretty well what he

17  looked like from a photograph, I saw a person that

18  matched his description in the television section and I

19  went over to him and acquired about a television set.

20  And at that time I recognized the person to be the

21  person that I had the photograph of, and he also had a

22  name tag on with "Thomas", the first name, on it.

23    Q.  So what did you do at that point?

24    A.  At that point I just asked several obscure

25  questions about television sets, small conversation, and

1   then we parted ways.

2       Q.  I take it you did not buy a television?

3       A.  No, I did not.

4       Q.  So when you parted ways, where did you go?

5       A.  At that point I made contact with Detective Smith

6   at another portion of the store and at that time we

7   exited the store and went out to the parking lot.

8       Q.  And how long did you remain in the parking lot?

9       A.  We -- I -- I'm trying to remember the exact time.

10  If I may refer --

11      Q.  Any time you need to.

12      A.  Okay.

13      Q.  I would prefer that you be right.

14      A.  It was several hours, I believe, that we stayed

15  outside and just maintained a visual on the department

16  store.

17      Q.  I believe you'll find what you're looking for on

18  the first line of the second page of your supplement.

19      A.  We -- about three -- stayed out there until about

20  3:10, 1510 hours.

21            MR. ROUSSEAU:  May I approach just a moment,

22  Your Honor?

23            THE COURT:  Yes.

24      Q.  (BY MR. ROUSSEAU)  Take a look at what you

25  brought with you today.  Okay.  I believe mine is still

1   labeled "draft".  That's why I wanted to check yours.

2   Consists of three pages, correct?

3       A.   Yes.

4       Q.   So did you see Mr. Olivas during that time?

5       A.   Eventually, yes, he did leave the store.

6       Q.   Walking?

7       A.   Yes.

8       Q.   And, I believe, you said that was around 3:10,

9   1510 hours?

10      A.   Approximately, yes.

11      Q.   So at -- when he walked out of the store, where

12  did he go?

13      A.   He walked out and went to a vehicle in the

14  parking lot.

15      Q.   Okay.  And did he get into it?

16      A.   Yes, he did.

17      Q.   Did he drive away?

18      A.   Yes, he did.

19      Q.   What did the two of you do when he did that?

20      A.   Myself and Detective Smith, after recognizing him

21  leaving the store, we followed him in his vehicle to his

22  apartment.

23      Q.   Did you call ahead of you to let the other -- let

24  anybody else know that you were headed in that

25  direction?

```
 1        A.  I did not.
 2        Q.  Okay.  Did you -- at any time did you lose sight
 3   of him?
 4        A.  For a brief period, probably just several
 5   minutes.
 6        Q.  Okay.  Were you able to catch back up to him?
 7        A.  Yes.
 8        Q.  When you caught back up to him, where was it?
 9        A.  Actually turning into the parking lot of his
10   apartment complex.
11        Q.  When he -- were you able to see where he parked?
12        A.  Yes, I did.
13        Q.  Now, you ultimately found out where his apartment
14   was, right?
15        A.  Yes.
16        Q.  Was this the first time you had been to that
17   complex?
18        A.  Yes, it was.
19        Q.  Were there other police officers already on the
20   scene waiting for him to arrive?
21        A.  Yes, there were.
22        Q.  All right.  But you had not been there yet?
23        A.  No, I had not.
24        Q.  So he parked.  And where did he park in relation
25   to the location of his actual apartment?
```

1    A.   Well, from where he entered the parking lot, it

2  was pretty much immediately after he entered, he parked.

3  If my directions are correct here, he parked

4  approximately 80 to a hundred yards away from his actual

5  apartment in a parking space.

6    Q.   What type of vehicle was he driving?

7    A.   It was a green Ford Explorer.

8    Q.   So when -- once he parked his vehicle, what did

9  he do?

10    A.   He exited the vehicle and walked towards his

11  apartment.

12    Q.   What did you do?

13    A.   At that time, after observing him exit the

14  vehicle and walk towards his apartment, myself and

15  Detective Smith and then at that time another detective

16  from Grapevine, we walked towards Mr. Olivas and made

17  contact with him.

18    Q.   Do you recall whether you were the first to reach

19  him or whether someone else was?

20    A.   I believe Detective Easley actually spoke to him

21  first, probably just a matter of seconds before I walked

22  up.

23    Q.   Would Detective Easley be the detective from

24  Grapevine?

25    A.   Yes, sir.

1    Q.  And so you believed he made contact with him just

2    a few seconds before you arrived?

3    A.  I believe.  Just a matter of a couple of seconds.

4    Q.  Okay.  Well, when you -- describe the encounter.

5    A.  Well, at that time I just made contact,

6    identified myself.  I showed my badge and my ID and

7    identified myself as an Arlington detective and asked if

8    we could speak with him for a few minutes, and he

9    agreed.

10   Q.  Was he rude, belligerent, angry, or anything of

11   that nature?

12   A.  Not at all.

13   Q.  Did he appear to be cooperative?

14   A.  Yes.

15   Q.  This was -- you said that he left the Best Buy

16   and you -- the two of you followed him to his apartment.

17   What we didn't talk about is how far that was.  How long

18   did it take you to get there?

19   A.  It was pretty short distance, probably around

20   five, six minutes.  I really am having a hard time

21   remembering that exact amount of time.

22   Q.  That's fine.

23   A.  But I would estimate five, six minutes.

24   Q.  Just a mile or so down the road?

25   A.  Yes, not very far.

STATE V. THOMAS OLIVAS

1    Q.   Okay.  So if he left around 3:10, we're talking

2    about before 3:30?

3    A.   Yes.

4    Q.   So when you told him that you would like to speak

5    to him, he agreed to do that?

6    A.   Yes.

7    Q.   Did you just stand there in the road chatting or

8    did you go and -- did you go somewhere else?

9    A.   No.  Due to the fact that we didn't want to stand

10   in the middle of the parking lot, we -- I asked if he

11   wouldn't mind just having a seat in my car, be more

12   comfortable, and he could sit down and we could speak

13   there.

14   Q.   This would be in the Acadia that you described

15   earlier?

16   A.   That's correct.

17   Q.   And did he sit in the front seat or the backseat?

18   A.   The front seat.

19   Q.   Was he handcuffed?

20   A.   No, not at all.

21   Q.   Was he free to get up and walk away had he chosen

22   to do so?

23   A.   Yes.

24   Q.   Did you tell him that?

25   A.   Yes.  I told him that he was not under arrest,

```
 1   that we just wanted to talk to him.
 2       Q.  Okay.
 3       A.  And I did leave his door wide open, also.
 4       Q.  So it was not just unlocked, it was actually
 5   open?
 6       A.  It was open.
 7       Q.  And while you were sitting there, did you tell
 8   him anything about the case that you were helping to
 9   investigate?
10       A.  No, I did not.  I just told him that detective --
11   another detective with Arlington Police Department
12   wished to speak with him and if he would be willing to
13   do that, and he agreed.
14       Q.  Specifically did you tell him it was about
15   someone named Mechelle?
16       A.  No, I did not.
17       Q.  Is that anything you would do under any
18   circumstances?
19       A.  No, it's not.
20       Q.  Why not?
21       A.  It -- my job description was to locate Mr. Olivas
22   and not to interview him about the offense.  I was just
23   to locate him, contact Detective Stewart and Detective
24   Stewart would be en route to contact Mr. Olivas.
25       Q.  Did you tell him it was in reference to a
```

```
 1    homicide?
 2        A.  No, did not.
 3        Q.  At any point in time did he ask you what the --
 4    what Arlington Police Department wanted to talk to him
 5    about?
 6        A.  I don't recall any specific question of that
 7    kind.
 8        Q.  Were you present when the Defendant signed a
 9    consent to search his apartment?
10        A.  No, I was not present for that.
11        Q.  Okay.  But are you -- were you under the
12    impression that at some point in time he had signed a
13    search to consent his apartment?
14        A.  Yes, I was contacted, I believe, by Detective
15    Stewart who was actually present with Mr. Olivas when
16    that happened.
17        Q.  Okay.
18        A.  And relayed the information to me.
19        Q.  I guess we kind of skipped over a little bit of
20    the story.
21              He was sitting in the front seat of your car
22    waiting for Detective Stewart to arrive, correct?
23        A.  Yes.
24        Q.  At some point in time did he go somewhere else?
25        A.  Yes.  He -- I believe the decision was made by
```

```
1    Detective Easley to transport Mr. Olivas to the
2    Grapevine Police Department for the interview there.
3        Q.  Did you ever go to the Grapevine Police
4    Department?
5        A.  No, I did not.
6        Q.  Did you remain on scene?
7        A.  Yes, I did.
8        Q.  And before that decision -- or let me put it this
9    way.
10            Before he actually left to go to the
11   Grapevine Police Department, about how much time had
12   passed?  How long did he sit there in your car?
13       A.  About maybe 10 to 15 minutes or so.  Not very
14   long.
15       Q.  And how did he -- as far as you know, how did he
16   get to the Grapevine Police Department?
17       A.  I believe he was given a ride by Detective
18   Easley.
19       Q.  Once he had been taken down to the Grapevine
20   Police Department, what did you do?
21       A.  At that point I stayed on the scene just to
22   maintain the apartment and the vehicle until Detective
23   Stewart contacted me.
24       Q.  Do you have any -- did you at that point have any
25   knowledge of whether or not Detective Stewart was
```

1    attempting to obtain a search warrant to search

2    Mr. Olivas' apartment?

3        A.  Did I have knowledge that he was attempting to do

4    that?

5        Q.  One way or the another, was it your understanding

6    that he was or did you even -- was this a subject matter

7    that you had any knowledge of at all?

8        A.  It was my understanding that Detective Stewart

9    was going to attempt to get consent for search or a

10   search warrant.

11       Q.  Do you have -- did you get that information

12   directly from Detective Stewart or was it just a general

13   understanding among the people at the scene?

14       A.  No, I got that from Detective Stewart.

15       Q.  So this was at least being discussed, a warrant

16   for -- to search the apartment?

17       A.  It was.

18       Q.  Okay.  Did you ultimately take part in a search

19   of that apartment?

20       A.  Yes, I did.

21       Q.  And who -- were you the only one searching the

22   apartment?

23       A.  No, I was not.

24       Q.  Who was in charge of that search?

25       A.  In terms of in charge of the search, there was a

```
 1   supervisor at the location, my direct supervisor at the
 2   location, Detective Sergeant Hummel.  And at that point
 3   a crime scene investigator was called to the location.
 4       Q.  Okay.  I guess that's what I meant.
 5             Who was the crime scene investigator who was
 6   conducting the search?
 7       A.  That would be Rosenauer.
 8       Q.  That's a name that I know.
 9       A.  Uh-huh.
10       Q.  Rosenauer.  Elizabeth Rosenauer.
11       A.  Right.  I hope I said that right.
12       Q.  Well, if you didn't, then we're both wrong.
13             So -- but you assisted in the search; is
14   that correct?
15       A.  Yes.
16       Q.  Was there anything in particular that you were
17   asked to look for?
18       A.  Well, not anything in particular.  In general,
19   just any evidence of a crime, any type of weapon or
20   anything with maybe blood on it, any clothing of that
21   sort.
22       Q.  And were you able to find anything like that?
23       A.  I did not.
24       Q.  As far as you know, was anything like that found,
25   period?
```

```
 1        A.   Not to my knowledge.

 2        Q.   Well, we will have those other people here, so

 3   that's okay.

 4              Once the search of the apartment was

 5   completed -- first of all, was it still daytime?

 6        A.   When the search was completed?

 7        Q.   Yes, sir.

 8        A.   I don't believe so.  I believe it was dark.

 9        Q.   Was -- where was his vehicle while this was going

10   on?

11        A.   It was parked in its original location, where

12   Mr. Olivas parked, approximately 80 to a hundred yards

13   away from the apartment door.

14        Q.   Did you -- once the search of the apartment was

15   completed, did you ever go down to where that vehicle

16   was and get a -- more of a firsthand look at it?

17        A.   Yes, I did.

18        Q.   Describe it.  Was there anything unusual about

19   that vehicle?

20        A.   Well, besides the fact of where it was parked,

21   the windows were rolled down approximately three,

22   four inches.

23        Q.   All of them?

24        A.   To my knowledge, they were, all of them.

25        Q.   Okay.  And was there anything else about it that
```

```
 1   you noticed?
 2      A.  When we approached the vehicle -- "we" being
 3   Detective Smith, myself and Detective Sergeant Hummel,
 4   along with Crime Scene Rosenauer -- I could notice a
 5   smell of gasoline that was emitting from the open
 6   windows.
 7      Q.  And this is before you actually opened the
 8   vehicle, correct?
 9      A.  This was before I opened the vehicle.
10      Q.  Was there -- was the search of that Ford Explorer
11   done there at the scene?
12      A.  Yes, it was.
13      Q.  Was there -- was the vehicle left there or was it
14   seized and taken somewhere else?
15      A.  Eventually it was seized and towed to a secure
16   lot in Arlington.
17      Q.  When it was -- before it was seized -- sorry.
18   Scratch that.  I'll start over.
19          Did you hang around while the -- waiting for
20   the wrecker to show up?
21      A.  Yes, I did.
22      Q.  Did anyone tamper with that vehicle in any way
23   during that time?
24      A.  No, they did not.
25      Q.  Do you recall whether or not the windows were
```

1  rolled up prior to being -- prior to the vehicle being

2  towed?

3      A.   The vehicle was secured, the windows rolled up,

4  and I believe crime scene tape was affixed to the

5  vehicle, also.

6      Q.   What does that mean exactly, "crime scene tape"?

7      A.   Just an adhesive tape that would seal the doors,

8  just so that it wouldn't -- it could not be tampered

9  with or opened.

10     Q.   Basically you can't open the door without

11  breaking the tape?

12     A.   Correct.

13     Q.   It's a way to know whether -- if anyone has been

14  inside the vehicle, correct?

15     A.   Correct.

16     Q.   Did you have any further responsibilities in

17  connection with the case on that day?

18     A.   Other than following the vehicle to the final

19  designation after that, no.

20     Q.   Did you notice anything unusual -- once the

21  vehicle was opened and the contents were examined, did

22  you notice anything unusual that caught your eye?

23     A.   There was a smoke detector, which was lying on

24  the front passenger floorboard of the vehicle.

25     Q.   And I take it, by this time you were aware that

```
1    this murder investigation involved a fire?
2        A.  Yes, I was.
3        Q.  And is that why you paid particular attention to
4    that?
5        A.  Yes, it was.
6        Q.  Did you have -- later on in the days following,
7    did you have some involvement in actually tracking down
8    the source of that smoke detector?
9        A.  Yes, I did.
10       Q.  What did you do?
11       A.  Detective Smith had given me information that --
12   of the owner of the vehicle and asked me to verify if
13   the smoke detector belonged to that person.  And that's
14   what I did.  I contacted that person and verified that
15   the smoke detector did come from her residence.
16       Q.  Okay.
17            MR. ROUSSEAU:  Your Honor, may I approach?
18   I need to use the easel a moment.
19            THE COURT:  You may.
20            MR. ROUSSEAU:  Your Honor, may I inquire
21   whether the jury can read them -- read my writing from
22   there?
23            SEVERAL JURY MEMBERS:  Yes.
24       Q.  (BY MR. ROUSSEAU)  All right.  Detective
25   Shinpaugh, I just wanted to get a couple times down.  I
```

```
 1  believe you've already testified, but I want to make
 2  sure we're straight.
 3           Approximately -- was it approximately 12:45
 4  that you entered the Best Buy?
 5      A.  Correct.
 6      Q.  And approximately 3:10, that's when the Defendant
 7  was seen exiting the Best Buy?
 8      A.  That's correct.
 9      Q.  1510 hours, correct?
10      A.  Correct.
11      Q.  You made contact with him at his apartment.  How
12  long did you say it probably took you to drive there?
13      A.  It was less than ten minutes.
14      Q.  I will say about 15, 20?
15      A.  Correct.
16      Q.  Okay.  Do you recall -- and did you make note in
17  your report of the actual address of his apartment?
18      A.  Yes, I did.
19      Q.  Would you, please, check that and see if you can
20  remember that for me, please.
21      A.  Address I have in my report is 601 North Park
22  Boulevard, No. 208, Grapevine, Texas.
23      Q.  And you said he sat in your vehicle for -- give
24  me another approximation, the best you can, please.
25      A.  As --
```

```
 1       Q.   Before leaving to go to Grapevine PD.

 2       A.   Before leaving?

 3       Q.   Yes.

 4       A.   Probably 10, 12 minutes, 15 minutes, something

 5  like that, approximation.

 6       Q.   Okay.  So I will say 1530 to 1545?

 7       A.   That would be correct.

 8       Q.   Then you stayed on the scene until late that --

 9  well, much later that evening, correct?

10       A.   That's correct.

11       Q.   Waiting for the wrecker and then tailing that

12  wrecker back to Arlington?

13       A.   That's correct.

14       Q.   Do you have in your -- I want you to refer to the

15  bottom of -- last full paragraph on page two of your

16  report.  You indicate that CSI -- that would be crime

17  scene investigator -- is that correct, Rosenauer?

18       A.   Yes.

19       Q.   Sealed the vehicle was vehicle tape and you --

20  and then contacted Kelly McKnight Wrecker Services; is

21  that correct?

22       A.   Correct.

23       Q.   All right.  Now, you ended up staying on scene

24  until the wrecker showed up.  And what time was that?

25       A.   I believe the wrecker appeared on scene at
```

```
 1    2152 hours.
 2        Q.   Okay.  And approximately what time did you and
 3    that wrecker leave the scene?
 4        A.   At approximately 2210 hours.
 5        Q.   Long day for you, huh?
 6        A.   Little bit.
 7        Q.   Detective Shinpaugh, you've been watching me
 8    write some entries on this easel -- on the paper on this
 9    easel as we've been talking; is that correct?
10        A.   Yes, sir.
11        Q.   Have I accurately recorded the time frames that
12    we've been talking about?
13        A.   Yes, sir.
14             MR. ROUSSEAU:  Your Honor --
15        Q.   (BY MR. ROUSSEAU)  And does it accurately reflect
16    some of the time -- some of the events of that day,
17    for -- the times that you conducted some of the events
18    of that day?
19        A.   That's correct.
20             MR. ROUSSEAU:  Your Honor, I will offer
21    State's Exhibit No. 210, subject to any objections from
22    Defense.
23             MR. MOORE:  No objection.
24             THE COURT:  All right.  State's 210 is
25    admitted.
```

```
 1                    (State's Exhibit No. 210 admitted)
 2                    MR. ROUSSEAU:  I'll pass the witness, Your
 3     Honor.
 4                    Thank you, Detective.
 5                    THE COURT:  Defense may cross.
 6                    MR. MOORE:  Thank you.
 7                         CROSS-EXAMINATION
 8     BY MR. MOORE:
 9        Q.  Detective Shinpaugh, on March 21st of 2011 what
10     time did you start work on your shift?
11        A.  Approximately, to the best of my knowledge,
12     0800 hours.
13        Q.  I'm sorry?
14        A.  0800 hours.
15        Q.  Eight o'clock in the morning?
16        A.  Yes.
17        Q.  Okay.  Had you gone to the Presidents Corner
18     apartment complex?
19        A.  No.
20        Q.  Were you aware of the tragedy that happened at
21     the Presidents Corner apartment complex?
22        A.  Not at 0800 hours.
23        Q.  Okay.  When did you become aware of what had
24     happened out there?
25        A.  Sometime that morning when I was contacted by
```

1    Detective Stewart.

2        Q.  Okay.  You were well aware of the fact that two

3    people were in that apartment and there was a bad fire,

4    you were aware of that?

5        A.  Yes.

6        Q.  Were you aware that the female victim, Mechelle

7    Gandy, was stabbed multiple times?

8        A.  I believe that was the information I was given,

9    yes, sir.

10        Q.  And that there was a 13-month-old child that was

11    burned badly in the fire?

12        A.  That's correct.

13        Q.  Okay.  And so you were contacted by Detective

14    Stewart, given that kind of information and told to

15    check the Best Buy out in Grapevine to see if Thomas

16    Olivas was there, correct?

17        A.  Correct.

18        Q.  Because by that time somebody obviously knew,

19    whether it was Detective Stewart knew or whoever, that

20    Thomas Olivas worked at that Grapevine Best Buy,

21    correct?

22        A.  I'm sorry.  Could you repeat the question?

23        Q.  Well, by the time that you were asked at around

24    12:45 or so or 12:00 in the afternoon to go to the Best

25    Buy, the Arlington Police Department, probably Detective

```
 1    Stewart, knew that Thomas Olivas worked at that Best Buy
 2    out in Grapevine, didn't he?
 3        A.   I would assume so, since that's where he asked me
 4    to go, sir.
 5        Q.   Exactly.  Did you talk to the manager of Best Buy
 6    out there when you went in there?
 7        A.   No.
 8        Q.   Did you check any records of Best Buy when Thomas
 9    Olivas may have arrived at work that morning?
10        A.   No, I did not.
11        Q.   Okay.  But you knew that -- you had a picture of
12    him from a driver license, correct?
13        A.   Correct.
14        Q.   And you went in there and I believe you testified
15    that it was around 12:30 to 12:45 that you were posing
16    as a customer in there?
17        A.   Correct.
18        Q.   And Thomas walked up to you and y'all chatted
19    about a plasma TV and you were just confirming that this
20    was indeed Thomas Olivas?
21        A.   Correct.
22        Q.   Okay.  And you confirmed that, correct?
23        A.   Yes, sir.
24        Q.   Okay.
25        A.   To my satisfaction, yes, sir.
```

1    Q.   And when you went and sat in your covert vehicle

2    out in the parking lot for a couple of hours, you saw

3    Thomas go to that Ford Explorer and get in it and drive

4    off, correct?

5    A.   Correct.

6    Q.   Where was the Ford Explorer parked in the Best

7    Buy parking lot, do you remember?

8    A.   To the best of my knowledge, I remember it was on

9    the side of the building, but I couldn't tell you a

10   direction.  I mean, I couldn't tell you north, south,

11   east, or west.  I don't recall.

12   Q.   Okay.  Now skip ahead and you testified he

13   parked -- once he got to the apartment complex where he

14   lived, he parked 80 to a hundred yards away; is that

15   correct?

16   A.   That was an estimation, yes, sir.

17   Q.   And you -- what significance do you put into

18   that?

19   A.   Are you asking my opinion?

20   Q.   Yes, sir.

21   A.   I just thought it was strange that a person would

22   park that far away from his apartment when there were

23   empty parking spaces directly in front of his apartment.

24   Q.   Okay.  As a detective, do you find that to be

25   somewhat evasive?

1    A.  I don't understand your question.

2    Q.  Well, do you find that he was trying to, in your

3  mind as a detective, trying to hide something?

4    A.  No.  I just thought it was not normal.

5    Q.  Okay.  Because up until then, he was at work at

6  Best Buy just like he was supposed to be, correct?

7    A.  He was at work at Best Buy, yes, sir.

8    Q.  Okay.  He had a name tag on that said "Thomas",

9  didn't he?

10    A.  Yes.

11    Q.  Okay.  He wasn't trying to hide from anybody in

12  there, was he?

13    A.  Not to my knowledge, sir.

14    Q.  Okay.  And this was about -- well, there's been

15  testimony that the fire was observed about 10:10 the

16  night before.  Were you aware of that?

17    A.  I can't speak to that, sir.  I wasn't aware of

18  it.

19    Q.  Okay.  Well, if it was, then you were at the Best

20  Buy speaking to Thomas Olivas about 14 hours after that

21  fire.  Would that be fair?

22    A.  That would be fair, yes, sir.

23    Q.  Did you notice anything unusual about him?  Did

24  he have any odor about him?  Did he have any -- anything

25  unusual?

1    A.   Not to my knowledge, sir.

2    Q.   Did he just act like a regular TV salesman at

3  Best Buy?

4    A.   Yes.

5    Q.   Okay.  So when you followed him home, did -- do

6  you remember following him by a cleaners and him picking

7  up some of his cleaning?

8    A.   No, I don't recall that.

9    Q.   You don't recall that?

10   A.   No, sir.

11   Q.   Okay.  But it was a short distance from the Best

12  Buy to his apartment; is that correct?

13   A.   That's correct.

14   Q.   Okay.  When you approached him, were you aware --

15  when you approached him, I believe you testified

16  sometime after 3:00 o'clock in the afternoon, in the

17  parking lot at his apartment complex, you were aware

18  that his apartment had been watched since early that

19  morning, hadn't you?

20   A.   I don't believe I was given that information at

21  that time.

22   Q.   Okay.  You didn't know that there were several

23  Grapevine officers who had already been in that

24  apartment to make a sweep of it and were sitting

25  outside?

1      A.   I don't -- I do not recall that.

2      Q.   Okay.  You learned that later, though, didn't

3   you?

4      A.   At some point I may have.  I do not recall.

5      Q.   Well, because when you got there, you were with

6   Detective Smith, correct?

7      A.   Right.

8      Q.   In two different vehicles?

9      A.   Correct.

10      Q.   And when you got there, there were how many other

11   officers?

12      A.   To my recollection, I believe it was Detective

13   Easley and one other officer.

14      Q.   Okay.  And so that makes four officers.

15           Were y'all in plain clothes?

16      A.   Yes, sir.

17      Q.   And were all of you standing around Thomas in the

18   parking lot?

19      A.   No, not all, I don't believe.  I believe it was

20   myself, Detective Easley and Detective Smith.

21      Q.   Okay.

22      A.   In the immediate vicinity.

23      Q.   And you identified yourself to him as police

24   officers, correct?

25      A.   Yes.

```
 1      Q.  Showed him your badge?

 2      A.  Yes.

 3      Q.  Had your guns on, correct?

 4      A.  Well, I had it on, but I don't believe it was

 5  visible.

 6      Q.  Okay.  You had a coat on?

 7      A.  Yes.  A coat or jacket of some type.

 8      Q.  Okay.  And so here's at least three police

 9  officers identifying themselves and saying, "We'd like

10  to talk to you," correct?

11      A.  Well, not three.  I did, myself.  I'm the one

12  that made contact and asked him.

13      Q.  Right.  You weren't all three --

14      A.  All three of us weren't talking at the same time.

15      Q.  I got you.  But three of you standing there?

16      A.  In the vicinity, yes.

17      Q.  All right.  And he was cooperative with you,

18  correct?

19      A.  Yes.

20      Q.  Didn't take off running?

21      A.  Nope.

22      Q.  And eventually I believe you took part in the

23  search with Ms. Rosenauer of his apartment, correct?

24      A.  Yes, sir, I did take part in that.

25      Q.  Okay.  How long did y'all search his apartment?
```

```
1        A.  I don't recall exact -- the exact time.
2        Q.  Okay.  Well, he left at around 1345, correct, if
3   that's -- referring to Mr. Rousseau's --
4        A.  Yes.
5        Q.  -- chart?
6        A.  Uh-huh.
7        Q.  And you stayed there, correct, at the apartment?
8        A.  Yes.
9        Q.  And you didn't leave that apartment until 2210,
10  which is 10:10 in the evening, civilian time, correct?
11       A.  No, I left the apartment before that.  I didn't
12  leave the scene before that.
13       Q.  Well, what time did you leave the scene?
14       A.  The scene, was when the wrecker came.
15       Q.  Okay.  When was -- and that was 2210?
16       A.  Yes.
17       Q.  All right.  So you were how long inside of his
18  apartment doing the search?
19       A.  I don't recall the exact amount of time I was
20  actually in the apartment.  I can try to piece that
21  together through my report, if you would like me to.
22       Q.  Well, tell me about that apartment.  How many
23  bedrooms did it have?
24       A.  I don't recall exactly.
25       Q.  Well, who all was in there searching?
```

1      A.   Myself, Detective Sergeant Hummel and Crime Scene

2   Officer Rosenauer.

3      Q.   That's it?

4      A.   I believe Detective Smith was in there for a

5   short time.

6      Q.   Okay.  And was Rosenauer, she is a crime scene

7   investigator for Arlington Police Department, correct?

8      A.   Yes.

9      Q.   That's her job, just like Ms. Fallentine who

10  testified here for a short period, correct?

11     A.   Yes.

12     Q.   Okay.  And was she telling y'all what to look

13  for?  How did that work?

14     A.   No, she wasn't telling us what to look for.  We

15  were actually looking for any type of evidence that we

16  thought pertinent and then she would collect that

17  evidence.

18     Q.   Okay.  And what did you collect?

19     A.   I did not collect anything inside the apartment.

20     Q.   Did you look?

21     A.   Yes.

22     Q.   And where all did you look?

23     A.   Just throughout the various areas of the

24  apartment, in the -- his bedroom and closet.  And

25  just -- we did not exactly have specific areas cordoned

```
 1    off.  We -- basically it was a search that we did
 2    together.
 3        Q.  Okay.  So y'all all went in the bedroom together
 4    and searched and then went in another room and searched?
 5        A.  We tried to maintain the integrity of one room at
 6    a time, yes.
 7        Q.  Okay.  A thorough search, though?
 8        A.  Yes.
 9        Q.  I mean, you don't do semi-searches, do you?
10        A.  No.
11        Q.  I mean, this was, from what you understood, a bad
12    crime scene, correct, over at the Presidents Corner?
13        A.  I understood it was a homicide scene.
14        Q.  Right.
15        A.  I didn't have any knowledge of the scene or had
16    seen the crime scene.
17        Q.  And you knew that the search of his apartment had
18    to be a very thorough search, didn't you?
19        A.  Yes.
20        Q.  I mean, you knew one day you may end up right
21    here testifying as to what you did.  You've done that
22    before, haven't you?
23        A.  Yes.
24        Q.  And you know how important it is to search every
25    nook and cranny of a person's apartment who's a
```

1    suspect in a homicide, don't you?

2        A.   Yes.

3        Q.   And so I would assume y'all did an extremely

4    thorough search, if you were out there that long,

5    correct?

6        A.   Well, we searched the apartment to the best of

7    our ability, as we always do.

8        Q.   Now, you testified earlier that when you searched

9    that -- the vehicle there -- and by the way, the

10   vehicle, the Ford Explorer, I believe you testified, was

11   searched there while it was sitting in the apartment

12   complex?

13       A.   Yes, sir.

14       Q.   Okay.  And you had seen the smoke detector that

15   was in the front floorboard, correct?

16       A.   Yes.

17       Q.   And knowing that there had been a fire at that

18   point in time, that looked awfully important to you,

19   didn't it?

20       A.   Well, it looked like something we needed to

21   collect, yes, sir.

22       Q.   Right.  That could potentially have been a

23   available piece of evidence, couldn't it?

24       A.   Yes, sir.

25       Q.   As it turns out, things don't always look like

```
1    they appear, do they?  That -- you understood later that
2    that was -- the lady who owned the car, that was her
3    smoke detector; you understood that?
4        A.  Yes.
5        Q.  Okay.  By the way, did you happen to talk to any
6    of the neighbors of Thomas Olivas out there?
7        A.  No.
8        Q.  Do you know if anybody did?
9        A.  At the crime scene?
10       Q.  No, at -- where you were searching at Thomas
11   Olivas' apartment.
12       A.  Oh, I wasn't aware of that.
13       Q.  Okay.  You didn't talk to any?
14       A.  No, I did not.
15       Q.  Okay.  Thank you, Detective.
16              MR. MOORE:  I'll pass the witness.
17              MR. ROUSSEAU:  No further questions.
18              THE COURT:  May this witness be excused?
19              MR. ROUSSEAU:  We know how to contact him,
20   Your Honor.  That's fine with us.
21              THE COURT:  All right.  Is that agreeable,
22   Mr. Moore?  Tim?
23              MR. MOORE:  I'm sorry?
24              THE COURT:  Can I let him go?
25              MR. MOORE:  Yes.
```

*STATE v. THOMAS OLIVAS*

```
 1                    THE COURT:  All right.
 2                    MR. MOORE:  Subject to recall.
 3                    THE COURT:  All right.
 4                    Then you are excused subject to recall, if
 5      needed.  Be available during working hours and days
 6      Monday through Friday for the next couple of weeks.
 7                    THE WITNESS:  Yes, Your Honor.
 8                    THE COURT:  All right.  Thank you.
 9                    (Witness excused from courtroom)
10                    THE COURT:  You may call your next witness.
11                    MR. ROUSSEAU:  We call Detective Smith.
12                    (Witness takes the stand)
13                    THE COURT:  All right.  State your full,
14      legal name for the court reporter and jury, please.
15                    THE WITNESS:  Adam Smith.
16                    THE COURT:  And you haven't been sworn yet,
17      have you?
18                    THE WITNESS:  No, sir.
19                    THE COURT:  I didn't think so.
20                    Face me and raise your right hand.
21                    (One witness sworn)
22                    THE COURT:  Have you testified before in
23      district court?
24                    THE WITNESS:  Yes, sir.
25                    THE COURT:  Are you familiar with the rules
```

```
 1   that usually apply to witnesses during a felony trial?
 2              THE WITNESS:  Yes, sir.
 3              THE COURT:  Where to be, where not to be,
 4   who you can and cannot talk to, et cetera?
 5              THE WITNESS:  Correct.
 6              THE COURT:  Those rules apply in this case,
 7   as they do most.  Make sure that you follow them.
 8              THE WITNESS:  Yes, sir.
 9              THE COURT:  Until you find out there is a
10   final verdict, even if you're excused after your
11   testimony.
12              THE WITNESS:  Yes, sir.
13              THE COURT:  All right.
14              Kevin.
15              MR. ROUSSEAU:  Thank you, Judge.
16                    DETECTIVE ADAM SMITH,
17   having been first duly sworn, testified as follows:
18                    DIRECT EXAMINATION
19   BY MR. ROUSSEAU:
20       Q.  You are Detective Adam Smith; is that correct?
21       A.  Yes, sir.
22       Q.  And who are you employed by, sir?
23       A.  Arlington Police Department.
24       Q.  And how long have you been an Arlington police
25   officer?
```

```
 1        A.  Approximately 18 years.

 2        Q.  And what are you -- what is your current

 3    assignment?

 4        A.  I am a detective with the fugitive unit.

 5        Q.  How long have you had that position?

 6        A.  Approximately five years now.

 7        Q.  Do you work with Detective Shinpaugh?

 8        A.  Yes, sir, I do.

 9        Q.  In fact, have you two been killing time in the

10    back for at least a couple hours today?

11        A.  Yes, sir.

12        Q.  And maybe a few more hours on another day?

13        A.  Yes.

14        Q.  I'm -- we've had the benefit of Detective

15    Shinpaugh explain to us y'all's responsibilities as

16    fugitive officers.  Do you do anything differently than

17    he does?

18        A.  No, sir.  We have mainly the same roles.

19        Q.  Do you work together frequently?

20        A.  We do.

21        Q.  Are you both assigned -- or have you both been

22    assigned one time or another to the federal task force,

23    fugitive task force?

24        A.  I have not.

25        Q.  And I may be using the wrong term.  What is --
```

```
 1    how --
 2        A.   The U.S. Marshal Task Force?
 3        Q.   That's it, sir.
 4        A.   Yes, sir.  I have not been assigned to that.
 5        Q.   You tend to work other off-duty jobs; is that
 6    correct?
 7        A.   Yes.
 8        Q.   You work at The Ballpark in Arlington sometimes?
 9        A.   Correct.
10        Q.   And that's why we -- that's why you look
11    familiar.  You're in the dugout sometimes; is that
12    right?
13        A.   Yes, sir.
14        Q.   Thank you.
15             We've been talking about yours and Detective
16    Shinpaugh's involvement in contacting a person named
17    Thomas Olivas on the 21st of March of 2011.  Do you
18    recall that day?
19        A.   Yes, sir, I do.
20        Q.   How is it that you came to be involved in that
21    situation?
22        A.   On that day, Detective Shinpaugh asked me if I
23    could assist him in attempting to locate Mr. Olivas,
24    referencing an investigation that Detective Stewart was
25    conducting.
```

```
 1        Q.   Did you ever have any direct communication with
 2   Detective Stewart during that day?
 3        A.   If I did, it was very brief.  I do recall him
 4   saying that -- or, well, he may have not said that, but
 5   we did obtain that he possibly worked -- Mr. Olivas
 6   possibly worked for the Best Buy.
 7        Q.   And did you go with -- and did you, along with
 8   Detective Shinpaugh, go to that location?
 9        A.   Yes, sir, I did.
10        Q.   When Detective Shinpaugh went inside to make
11   contact with Mr. Olivas, were you there, also?
12        A.   I was.
13        Q.   When he was talking to Mr. Olivas, where were
14   you?
15        A.   I was standing over in another department area.
16   We had both walked in together and separated.  And when
17   I observed Detective Shinpaugh talking with an
18   individual that looked like Mr. Olivas, I just kind of
19   stood back and watched them until they got through with
20   their conversation.
21        Q.   Did you wait a long -- after that, did you exit
22   the store with Detective Shinpaugh?
23        A.   Yes, sir, I did.
24        Q.   Did you -- did the two of you both sit outside in
25   your cars for the remainder of the afternoon until
```

1      Mr. Olivas exited that Best Buy store?

2          A.   Yes, sir, we did.

3          Q.   When Mr. -- when he left, when Mr. Olivas left

4      the store, do you recall where he went, on foot where he

5      went?

6          A.   He walked to a vehicle.

7          Q.   Do you recall what type of vehicle?

8          A.   It was -- at the time I didn't know the year, but

9      I did find out it was a 2002, a dark green-colored Ford

10     Explorer.

11         Q.   Do you remember where it was parked?

12              (Pause in proceedings)

13         Q.   (BY MR. ROUSSEAU)  Do you remember where it was

14     parked?

15         A.   Let me get my directions correct here.  It would

16     have been closer toward the east side of the parking

17     lot.  I can't remember exactly how far it was from the

18     building, though.

19         Q.   Did -- and you were in separate vehicles,

20     correct?

21         A.   Yes.

22         Q.   Did you and Detective Shinpaugh both leave the

23     parking lot following Mr. Olivas?

24         A.   Yes, sir, we did.

25         Q.   And at any point in time on the -- as he -- after

```
 1    he exited the parking lot, did the two of you ever lose
 2    sight of him?
 3        A.  Yes, we did.
 4        Q.  For approximately -- how did that happen and
 5    about how long were you out of his -- was he out of your
 6    line of sight?
 7        A.  Since we were in unmarked vehicles, we -- I
 8    believe we got stuck at a red light and that's when we
 9    actually lost view of him momentarily.
10        Q.  Did you have an idea of where it was he was
11    headed?
12        A.  Yes, sir.
13        Q.  And were you -- did you go ahead and head to that
14    location?
15        A.  I did.
16        Q.  Did you catch up to him before he actually
17    arrived at that location?
18        A.  We did.
19        Q.  Did you -- and the location was an apartment
20    complex; is that correct?
21        A.  Yes, sir.
22        Q.  Did you see him pull into that complex?
23        A.  Yes.  That's the first point when I saw him
24    again, was when he was pulling into the main drive off
25    of North Park Boulevard there.
```

1    Q.   During the time that you lost sight of him, would

2    he have had time to stop at a dry cleaners, go inside

3    and pick up clothing, come -- pay for it and come back

4    outside and then drive?

5    A.   No, sir.

6    Q.   Okay.  He wasn't out of your sight that long?

7    A.   No, sir.

8    Q.   So did you notice -- did anything catch your

9    eye -- or later when you found out where his apartment

10   actually was, his physical apartment, is there -- did

11   you notice -- did anything strike you as unusual about

12   the location where he parked?

13   A.   Yes, sir.

14   Q.   What was that?

15   A.   It was parked approximately 80 yards away from

16   where his actual apartment was located at, which I

17   thought was odd because there were several other parking

18   spaces in between that.

19   Q.   So he parked here and walked over there?

20   A.   Yes, sir.

21   Q.   And when he began to walk towards his apartment,

22   what did you do?

23   A.   As he initially had stopped in the parking place,

24   I was rounding another building.  I didn't pull right up

25   behind him.  So when I rounded the corner and saw the

1    vehicle parked, I observed him walking southbound toward

2    his apartment.  That was when Detective Shinpaugh and I

3    were in communication with each other via radio.  And he

4    had rounded the other side of the building.

5           That's when we made the determination to go

6    ahead and make contact with him while he was on foot,

7    before he made it to his apartment.

8    Q.  Now, so the two of you were still in your

9    vehicles as he was walking?

10   A.  Yes, sir.

11   Q.  Now, was it one of those screeching Starsky &

12   Hutch style -- and I'm dating myself badly by saying

13   Starsky & Hutch, but it's in reruns.

14          Was it one of those kinds of stops or did

15   y'all just -- did you have time to park normally, get

16   out of your car and walk up to him?

17   A.  Yes, sir.

18   Q.  When you got up to him, did you have anything to

19   say to him?

20   A.  No, sir.  I didn't any conversations with him.

21   Q.  Who did the talking for the two -- for you -- for

22   the three of you?

23   A.  Detective Shinpaugh.

24   Q.  And I said the three of you.  Was there a third

25   detective there from Grapevine Police Department?

1      A.   Yes, sir, there was.

2      Q.   So if I am the Defendant and my partner here,

3   Ms. Ray, is Detective Shinpaugh, where would you have

4   been?

5      A.   I would have been toward the back of the

6   Detective Shinpaugh's vehicle.

7      Q.   Okay.  A little farther away?

8      A.   Yes, sir.

9      Q.   And was Detective Easley more up even or in the

10   group with Detective Shinpaugh and the Defendant, or was

11   he hanging back, also, if you recall?

12      A.   That, I can't recall.

13      Q.   Did you have any -- the whole time you were there

14   dealing -- when the -- you and Detective Shinpaugh were

15   in the presence of the Defendant, and we already know

16   that was some 15 or 20 minutes, did you have any

17   conversation with the Defendant at all?

18      A.   No, sir, I did not.

19      Q.   And I've been referring to him as the Defendant.

20   And it's Thomas Olivas.  Could you look around the

21   courtroom, please, and tell me if you spot the person in

22   the room that you were dealing with that day?

23      A.   Yes, sir, I do.

24      Q.   Could you point him out and describe something

25   that he's wearing?

1    A.  He's sitting right over here at the end of the

2   table wearing, looks like, either a dark blue or black

3   jacket with a white shirt and multi-colored tie.

4    Q.  Thank you.

5         MR. ROUSSEAU:  Your Honor, may the record

6   reflect the witness has identified the Defendant?

7         THE COURT:  It may.

8    Q.  (BY MR. ROUSSEAU)  So you never had any direct

9   conversation with him?

10    A.  No, sir.

11    Q.  Were you present when he was taken away from the

12   scene by a Grapevine detective?

13    A.  Yes, sir, I was.

14    Q.  By the same Grapevine detective that had been in

15   the little group talking to the Defendant?

16    A.  Correct.

17    Q.  Did you later that afternoon take part, or maybe

18   early evening, take part in searching the apartment of

19   Mr. Olivas?

20    A.  Yes, sir, I did.

21    Q.  Were you in there the entire time or were you

22   there for only a part of it?

23    A.  Only part of it.

24    Q.  Was there something in particular that made you

25   leave the apartment while the search was going on?

1    A.  Yes, sir.

2    Q.  What was that?

3    A.  Made the determination, since we had other

4  officers in there, as well as crime scene, that I would

5  step outside and as -- what we call security scene

6  security, just to keep an eye on what's going on so that

7  someone doesn't walk up to us on the apartment and then

8  also to keep an eye on the vehicle that was parked down

9  the way.

10   Q.  Could you see it from his apartment, from where

11 you were?

12   A.  Yes, sir.

13   Q.  Did you see anyone tamper with his vehicle at any

14 time?

15   A.  No, sir.

16   Q.  At some point later in the day, did you end up

17 going down to where that vehicle was?

18   A.  Yes.

19   Q.  And did you go up close to the vehicle?

20   A.  Yes.

21   Q.  Did you notice anything unusual about it?

22   A.  When I initially approached it, I did notice

23 that -- it was normally parked in a parking space.  I

24 did notice that the windows were partially rolled down

25 I'm going to guesstimate probably an inch or so, maybe

 1   two inches.

 2       Q.   Anything else?

 3       A.   As I continued to walk around the vehicle, just

 4   to see inside, I walked up closer to the windows and

 5   that was when I could smell an odor of gasoline coming

 6   from the crack in the window.

 7       Q.   Did you notice any -- did you notice a puddle of

 8   gasoline under the vehicle, leaking out, running down

 9   the street, anything like that?

10       A.   No, sir.

11       Q.   So did the odor appear to be coming from inside

12   the car?

13       A.   Yes, sir.

14       Q.   Were you advised at any point in time that

15   Mr. Olivas had actually given consent to search his

16   apartment, as well as that vehicle?

17       A.   Yes, sir.

18       Q.   Did you take part in searching the vehicle?

19       A.   Yes.

20       Q.   Now, did you stay on scene the entire time until

21   the vehicle was hauled away or did you leave earlier?

22       A.   No, sir.  I left before it was towed.

23       Q.   Did you take possession of any items that were

24   found inside the vehicle?

25       A.   Momentarily, yes.

1      Q.   And what was that?

2      A.   When I initially approached the vehicle, I did

3    observe in the front passenger floorboard a smoke

4    detector that was laying on the floor.  After we had the

5    consent signed and we had opened the vehicle up, the

6    crime scene investigator asked if I could place that

7    into a brown paper bag that she gave me and basically

8    hold on to it, since she was taking her photographs,

9    until she got done taking her photographs.  And then I

10   handed it over to her to be secured into her van.

11     Q.   Did you have any further involvement in the --

12   investigating this case?

13     A.   No, sir.

14     Q.   Just so -- to be on the safe side, you and I have

15   had a chance to meet and discuss the contents of your

16   report on at least one occasion; is that correct?

17     A.   Yes, sir.

18     Q.   Did we identify a couple places where you

19   accidentally wrote the term "Grand Prairie" instead of

20   Grapevine?

21     A.   Yes, sir.

22     Q.   Okay.  I do it myself all the time, so...

23          I appreciate it, sir.

24          MR. ROUSSEAU:  I'll pass the witness, Your

25   Honor.

*STATE v. THOMAS OLIVAS*

```
 1              THE COURT:  Defense may cross.
 2                    CROSS-EXAMINATION
 3  BY MR. MOORE:
 4     Q.  Detective Smith, I have very few questions for
 5  you here.
 6              When you and Detective Shinpaugh went to the
 7  Best Buy, did you talk to the manager or anybody else
 8  that was employed by Best Buy?
 9     A.  No, sir.
10     Q.  Did you check any employment records, time
11  records, anything like that while you were there?
12     A.  No, sir.
13     Q.  Did you determine what time that Mr. Olivas got
14  to work at Best Buy that morning?
15     A.  No, sir.
16     Q.  But you know at approximately a quarter of 1:00
17  in the afternoon he was there at Best Buy, at work?
18     A.  Yes, sir.
19     Q.  You didn't talk to him, Detective Shinpaugh did
20  all the talking?
21     A.  Yes, sir.
22     Q.  You didn't walk up to be around him.  I assume
23  you didn't want him to know that y'all were working
24  together?
25     A.  Yes, sir.
```

```
 1        Q.   Is that correct?

 2        A.   Correct.

 3        Q.   And so after hanging around in the parking lot

 4   wait -- I guess you were waiting for him to get off

 5   work, correct?

 6        A.   Yes, sir.

 7        Q.   Did y'all know what time he was getting off work?

 8        A.   No, sir, we did not.

 9        Q.   Did -- were y'all parked close together, I'm --

10   you and Detective Shinpaugh?

11        A.   Yes, sir.  Not too far away.

12        Q.   You could see each other?

13        A.   I don't know that we actually had a visual on

14   each other, depending on how we were parked.  We were

15   communicating by radio.

16        Q.   Okay.  Where were you parked?

17        A.   I was parked more -- if you're facing toward the

18   front of the business, it would have been somewhat off

19   to the east, but directly from where the main entry door

20   is at, out into the parking lot, basically.

21        Q.   Does the front of that Best Buy, does it face,

22   what, to the north?

23        A.   Faces north, yes, sir.

24        Q.   Okay.  So you're sitting over to the left-hand

25   side and -- as you're looking at Best Buy?
```

1    A.   It would have been more -- if you're looking --

2  yes, sir, if you're looking at it.

3    Q.   Okay.  And when Mr. Olivas walked out and got in

4  his car, I believe you said it was -- his car was parked

5  closer to the east side of the parking lot, correct?

6    A.   Yes, sir, because all of the -- that's what side

7  of the parking lot that business is on, so it was more

8  on that side.

9    Q.   Out in the Best Buy parking lot?

10   A.   Yes, sir.  That's right.

11   Q.   Okay.  It wasn't around on the side?

12   A.   I don't recall it being on the side.

13   Q.   Okay.  Now, when you get to his apartment, I

14  believe -- believe you testified that when following

15  him, you lost him at a certain spot, correct?

16   A.   Yes, sir.

17   Q.   But then saw him -- did you go then to the

18  apartment complex and wait for him or did you find him

19  before you got to the apartment?

20   A.   It was before we actually got to the apartment.

21   Q.   You kind of caught up with him?

22   A.   Right.  As he was turning onto -- into the

23  apartment complex, off of North Park Boulevard there.

24   Q.   Okay.  A person who has an apartment or a car

25  does not have to give consent for the police to search,

1    do they?  Does that make sense?  If you stopped me as a

2    police officer, I'm driving down the street and you say,

3    Tim, I want to search your car, I don't have to let you,

4    do I?

5         A.  You do not have to.

6         Q.  In fact, if you came to my house and knocked on

7    my door and said, "We'd like to come in and look around

8    and search your house," as a police officer, I can say,

9    "Go away, you're not coming here," correct?

10        A.  I would have to say that would depend on the

11   situation.  If we did not have any other offense then --

12   and nothing else, then, yes.  I'm just thinking of other

13   situations as far as what I normally do, felony

14   warrants --

15        Q.  Well --

16        A.  -- and stuff like that.

17        Q.  -- you don't have a warrant, you just walk up --

18        A.  Correct.

19        Q.  -- knock on my door, say, "I want to come search

20   your house," I can say, "Go take a hike"?

21        A.  Yes.

22        Q.  There's nothing you can do about that, correct?

23        A.  Yes.

24        Q.  Now, you can go to Judge Wisch with a warrant

25   that establishes probable cause and get a warrant to

```
 1   search my vehicle or my house, correct?
 2       A.  Yes.
 3       Q.  Thomas Olivas, on March 21st, said -- signed a
 4   consent to search, which is a form that all police
 5   agencies, or most police agencies, use that say,
 6   "Mr. Police Officer, you can search whatever you want to
 7   search," my house, my car, whatever, correct?
 8       A.  Yes, sir.
 9       Q.  And that's what he did on March 21st out in that
10   parking lot, right?
11       A.  Correct.
12       Q.  Okay.  Thank you, Detective.
13               MR. MOORE:  I'll pass the witness.
14               MR. ROUSSEAU:  No further questions, Your
15   Honor.
16               THE COURT:  Same rules?
17               MR. MOORE:  Yes.
18               THE COURT:  On call, don't come back unless
19   requested?
20               Ditto?
21               MR. ROUSSEAU:  Yes, sir.
22               THE COURT:  All right.  Then you're released
23   from the courtroom.  If they need you back before the
24   trial is over, they know how to get ahold of you.  It
25   will be during regular working hours, during the
```

```
1   Tuesday-Friday window.
2           THE WITNESS:  Yes, sir.
3           THE COURT:  Thanks for coming in.
4           THE WITNESS:  Thank you.
5           (Witness excused from courtroom)
6           MR. ROUSSEAU:  May we approach, Your Honor?
7           THE COURT:  Yes, you may.
8           (Discussion at the bench, off the record)
9           THE COURT:  I've been advised that this will
10  be a good place to stop at five after 5:00, rather than
11  try to get into something else and not go very long if I
12  cut off at 5:30, as I promised to do.  I have advised
13  the attorneys respectfully and with full understanding
14  of the positions and the responsibilities, having sat in
15  both seats, and I absolutely encourage them to do any
16  and everything they need to do to represent their
17  clients, but if I'm sensing that the three-week time
18  limit estimate was liberal, instead of conservative, I
19  might -- we might work a little bit later to try to meet
20  that schedule that I told you about.  So you be
21  thinking, if you want to work till 6:00, we'll work to
22  6:00 and we'll have them lined up to go, to try to meet
23  the schedule.  If you don't care if it's three weeks or
24  three and a half weeks, but for, I know one of you has a
25  wife with an issue that needs husband there and we have
```

```
 1   to stop half-day, I don't want to push you beyond what
 2   are normal human levels of proper attention and
 3   concentration.
 4             So be thinking about that.  I'll be asking
 5   you about it.  If we quit at 6:00 instead of 5:30, I'm
 6   willing to do that.  They're willing to do whatever
 7   y'all need.
 8             So with that understanding, I don't think
 9   there's going to be rain now, but I hope by the time you
10   come back tomorrow, there has been.  Be careful coming
11   if the roads are slick.  See you in the morning.  Same
12   time.  Same station.
13             And everyone remain in the courtroom until
14   the jury has left the floor.
15             (Recessed for the day at 5:10 p.m.)
16
17
18
19
20
21
22
23
24
25
```

```
1              COURT REPORTER'S CERTIFICATE
2    THE STATE OF TEXAS        )
3    COUNTY OF TARRANT         )
4        I, Karen B. Martinez, Official Court Reporter in and
5    for the 372nd District Court of Tarrant County, State of
6    Texas, do hereby certify that the above and foregoing
7    contains a true and correct transcription of all
8    portions of evidence and other proceedings requested in
9    writing by counsel for the parties to be included in
10   this volume of the Reporter's Record, in the
11   above-styled and numbered cause, all of which occurred
12   in open court or in chambers and were reported by me.
13       I further certify that this Reporter's Record of the
14   proceedings truly and correctly reflects the exhibits,
15   if any, admitted by the respective parties.
16       I further certify that the total cost for the
17   preparation of this Reporter's Record is **located at the**
18   **end of Volume 21**.
19       WITNESS MY OFFICIAL HAND this the 30th day of March,
20   2015.
21                      /s/ Karen B. Martinez
22                      Karen B. Martinez, Texas CSR 6735
                        Expiration Date:  12/31/2015
23                      Official Court Reporter
                        372nd District Court
24                      Tarrant County, Texas
                        (817)884-2996
25                      kbmartinez@tarrantcounty.com
```