STATE v. THOMAS OLIVAS

1                       REPORTER'S RECORD

2               VOLUME 11 OF 21 VOLUME(S)

FILED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS
3/27/2015 12:36:05 PM
DEBRA SPISAK
Clerk

3        TRIAL COURT CAUSE NO. 1376688R

4      COURT OF APPEALS CASE NO. 02-14-00412-CR

5

6   THE STATE OF TEXAS       ) IN THE 372ND JUDICIAL
                        )

7                        )
                        )

8   VS.                ) DISTRICT COURT
                        )

9                        )

10                      )

11                      )
   THOMAS OLIVAS          ) TARRANT COUNTY, TEXAS

12

13

14         * * * * * * * * * * * * * * * * * * * * * * * *

15             TRIAL ON MERITS CONTINUES

16         * * * * * * * * * * * * * * * * * * * * * * * *

17

18     On the 17th day of September, 2014, the following

19  proceedings came on to be heard in the above-entitled
  and numbered cause before the Honorable Scott Wisch,

20  Presiding Judge, held in Fort Worth, Tarrant County,
  Texas;

21     Proceedings reported by computerized machine
  shorthand with assisted realtime transcription.

22

23

24    KAREN B. MARTINEZ, CERTIFIED SHORTHAND REPORTER
            Official Court Reporter

25         372nd Judicial District Court
           Tarrant County, Texas

```
 1   APPEARANCES:

 2   ATTORNEYS FOR THE STATE:

 3       HONORABLE R. KEVIN ROUSSEAU
         SBOT NO: 17324950
 4       HONORABLE TAMLA S. RAY
         SBOT NO: 24046687
 5       Assistant Criminal District Attorneys
         Tim Curry Criminal Justice Center
 6       Fort Worth Texas  76196
         Phone: 817-884-1400
 7       Fax:   817-884-3333

 8   ATTORNEYS FOR THE DEFENDANT:

 9       HONORABLE TIM MOORE
         SBOT NO: 14378300
10       Attorney at Law
         115 West 2nd Street, Suite 202
11       Fort Worth, Texas  76102
         Phone: 817-332-3822
12       Fax:   817-332-2768

13            - AND -

14       HONORABLE JOETTA L. KEENE
         SBOT NO: 11165800
15       Attorney at Law
         204 South Mesquite Street
16       Arlington, Texas  76010
         Phone: 817-275-6611
17       Fax:   817-275-6621

18

19

20

21

22

23

24

25
```

```
 1                    CHRONOLOGICAL INDEX

 2                     Volume 11 of 21

 3                TRIAL ON MERITS CONTINUES

 4   September 17, 2014                      Page Vol.

 5   Witness on the Stand........................   5  11

 6   Motion in Limine...........................   6  11

 7   Court's Ruling.............................  14  11

 8   State's Motion in Limine/Court's Ruling.......  14  11
```

STATE'S WITNESSES

| | Direct | Cross | Voir Dire | Vol. |
|---|---|---|---|---|
| Raudry, Rebeca | 17,50, 151,160, 190,193, 197 | 71,183, 192,195, 197 | 48,157, 180 | 11 |
| Armistead, Richard | 201,219 | 212 | -- | 11 |
| Jopson, Timothy | 223,252, 276,278 | 255,277, 278 | 251 | 11 |

```
Recessed for the Day........................ 281  11

Court Reporter's Certificate.................. 282  11
```

ALPHABETICAL LISTING OF WITNESSES

| | Direct | Cross | Voir Dire | Vol. |
|---|---|---|---|---|
| Armistead, Richard | 201,219 | 212 | -- | 11 |
| Jopson, Timothy | 223,252, 276,278 | 255,277, 278 | 251 | 11 |
| Raudry, Rebeca | 17,50, 151,160, 190,193, 197 | 71,183, 192,195, 197 | 48,157, 180 | 11 |

```
 1                              EXHIBITS

 2      STATE'S
        NO.      DESCRIPTION              OFFERED  ADMITTED  VOL.
 3
        *211     Xerox Photograph            48       50      11
 4
         231     Birthday Invitation         34       34      11
 5
         231A    Envelope                    34       34      11
 6
         232     Audio Disc                 177      177      11
 7               (Tarrant-1376698R-RR-SX232.mp3)

 8       233     Court Documents            180      181      11

 9       234     Court Documents            190      190      11

10       235     Chart on Easel Paper       192      192      11

11       236     Court Documents            194      195      11

12       237     Xerox Photograph           251      252      11

13       238     Bank of America Document   251      252      11

14       239     Southwest Bowling Document 251      252      11

15       240     Bowling Calendar           251      252      11

16       241     "The Bowling News" Article 251      252      11

17       242     Hotel Receipt              251      252      11

18       243     Jopson's Phone Records     280       --      11

19
        DEFENDANT'S
20      NO.      DESCRIPTION              OFFERED  ADMITTED  VOL.

21       271     Chart on Easel Paper       188      189      11

22       272     Chart on Easel Paper       188      189      11

23
        _____
24
        (*) Denotes an exhibit designated for the record only.
25
```

```
 1                P R O C E E D I N G S
 2           Wednesday, September 17, 2014  9:27 a.m.
 3               (OPEN COURT, DEFENDANT PRESENT, NO JURY)
 4               (Witness on the stand)
 5               THE COURT:  State your full, legal name for
 6      Karen again, please.
 7               THE WITNESS:  Rebeca Ann Raudry.
 8               THE COURT:  And didn't I swear you in a
 9      while back.
10               THE WITNESS:  Yes, sir.
11               THE COURT:  And you remember all that still
12      carries over, the oath, the rules, not talking to other
13      people outside THE courtroom, wait for the question to
14      be over before you answer, relax, speak slowly and
15      clearly.
16               Do you remember all that?
17               THE WITNESS:  Yes, sir.
18               THE COURT:  All right.  That's still on.
19               Are you still good with that?
20               THE WITNESS:  Yes, sir.
21               THE COURT:  All right.
22               Anything either side needs to address before
23      we bring in the jury?
24               MS. KEENE:  Judge, we have an oral motion in
25      limine.
```

```
 1              THE COURT:  Okay.

 2              MS. KEENE:  On extraneous offenses and on

 3    hearsay statements of Mechelle Gandy.

 4              THE COURT:  That's kind of vague.  Anything

 5    in particular?  Do I need to send her out?

 6              MS. KEENE:  No.  Basic introduction

 7    of actual Facebook conversations, did Mechelle tell you

 8    this, Did Mechelle tell you that, or any of the

 9    conversations that they had, What did you and Mechelle

10    say on the telephone when you talked?  I know that she

11    can talk --

12              THE COURT:  Are you talking about this

13    witness?

14              MS. KEENE:  Yes, this witness.

15              THE COURT:  Why don't you take her out just

16    a second.

17              (Witness excused from courtroom)

18              THE COURT:  All right.  Specifically, what

19    are you concerned about?  What statements do you think

20    might be elicited?  And then if the State thinks there

21    is a hearsay exception, fine.  And if the State's

22    convinced there's not, then I just want the record clear

23    what she doesn't need to be saying in front of the jury.

24              MS. KEENE:  Okay.  Just any statements that

25    she's going to attribute to Mechelle, Mechelle told
```

```
 1   me... or any of those.
 2           THE COURT:  Okay.  Any verbal, in person or
 3   telephone or social media or text or something, that it
 4   is her belief it's -- she's conversing with Mechelle on
 5   the other end of the keypad.  Okay.
 6           Are there any statements that Mechelle Gandy
 7   made to this witness that the State believes are
 8   admissible under an exception to the hearsay rule?
 9           MR. ROUSSEAU:  Yes, Your Honor.  First of
10   all, a little background, so you understand, there was a
11   lot of communications between Mechelle Gandy and Rebeca
12   Raudry dating back to, gosh, probably a year before this
13   incident or --
14           THE COURT:  So approximately a year --
15           MR. ROUSSEAU:  Approximately.
16           THE COURT:  -- to the death date there was
17   some kind of communications going on?
18           MR. ROUSSEAU:  And possibly before that.
19           THE COURT:  Okay.
20           MR. ROUSSEAU:  Because it was during
21   Mechelle Gandy's pregnancy.
22           THE COURT:  Okay.
23           MR. ROUSSEAU:  And I don't intend to go into
24   the nuts and bolts of those communications in any real
25   detail beyond asking did they occur, did you receive a
```

8

1    communication from her, that sort of thing.  I

2    understand I can't get into the chapter and verse about

3    what was said.

4             But we're in a little bit of a gray area

5    because a lot of these communications from Mechelle this

6    witness this later confronted the Defendant with and he

7    acknowledges those communications.  He acknowledges the

8    subject matter.

9             THE COURT:  Hold that thought.

10            All right.  This witness giving hearsay

11   statement just "Mechelle told me this..." in a vacuum, I

12   understand the hearsay.  Or asking your client, Did you

13   tell Mechelle this, and him saying, I did, or I didn't,

14   the statement's not offered for the truth.  It's offered

15   to show his reaction and whether he adopts it or not,

16   and if he says, I said that, then the answer is

17   admissible for its truth, but not the question.

18            MS. KEENE:  I agree with that, Judge.

19            THE COURT:  So you're good as long as in the

20   context of the conversation between this witness and

21   your client, that your limine isn't covering things he's

22   confronted with, as opposed to she said in private

23   conversations or text with the witness.

24            MS. KEENE:  And -- correct.  And, I mean, I

25   guess what I could do is say, Objection.  He can say,

```
 1   Not offered for the truth, and then we just proceed.
 2   You know, because I agree with you.
 3                THE COURT:  That the --
 4                MS. KEENE:  It's not just rank hearsay being
 5   put in.  It's being offered for the purpose of what the
 6   Court just stated.
 7                THE COURT:  The question.  Yeah.  I think --
 8   do you have any different legal position on that?
 9                MR. ROUSSEAU:  It depends on what we're
10   talking about.
11                THE COURT:  Her statement out of court is
12   not hearsay.  It's simply offered to confront the
13   Defendant or any other witness.  His answer is not
14   hearsay.
15                MR. ROUSSEAU:  I think that --
16                THE COURT:  It's admissible.  So...
17                MR. ROUSSEAU:  I believe -- I guess, let me
18   see if this answers your question.
19                THE COURT:  Okay.
20                MR. ROUSSEAU:  If, for example --
21                THE COURT:  Or another exception where it
22   would be admissible for its truth, I'm open-minded to
23   that, too.
24                MR. ROUSSEAU:  If, for example, Rebeca were
25   to say she -- in describing conversations between
```

1    herself and the Defendant, if she were to say -- and

2    this is not from an -- this is just me making this up,

3    Mechelle said you went over to her house on Wednesday,

4    is that true?

5                    THE COURT:  Uh-huh.

6                    MR. ROUSSEAU:  His response is, No, I

7    didn't.

8                    THE COURT:  Uh-huh.  Then what Mechelle said

9    is not admissible, but his statement he did not go to

10   Mechelle's house is not hearsay and is admissible as

11   factual evidence.

12                   MR. ROUSSEAU:  I guess so.  Yes, that would

13   be fine.

14                   THE COURT:  Yeah, Mechelle said you went to

15   Six Flags, Did you go to Six Flags, that doesn't mean

16   they did.  But if he says yes, then that means the jury

17   can find they went to Six Flags.  If he said no, it

18   can't be argued that what Mechelle said is true, because

19   Mechelle's statements is not admissible as the fact that

20   they went to Six Flags, merely as he was confronted with

21   that.

22                   MR. ROUSSEAU:  That's fine, Your Honor.

23                   THE COURT:  Or for notice that,

24   hypothetically, Mechelle says, That's your baby, answer,

25   No, well, the fact someone told him that someone thinks

STATE OF THOMAS OLIVAS

1   that's his baby, his knowledge, it's admissible to

2   impute someone has made it clear to him that he was

3   aware of the accusation, whether true or not.  There are

4   things it can be used for, but Mechelle's words alone,

5   unless there's exception to the hearsay rule that is

6   established when they're offered.

7           MR. ROUSSEAU:  Sure.  There is one instance

8   that I can think of off the top of my head where -- that

9   I believe there will be -- we will go into it, attempt

10  to go into it.

11          THE COURT:  Uh-huh.

12          MR. ROUSSEAU:  And I believe there is valid

13  hearsay exception.  And that is when -- on the day of

14  March the 20th, 2011, earlier in the day, daytime,

15  daytime hours, Mechelle and Rebeca were in a telephone

16  conversation and during that telephone conversation

17  Mechelle said to Rebeca, "Guess who's texting me right

18  now," and Rebeca says, "Oh, you're kidding," and the

19  response essentially was "Yes, it's Thomas."

20          THE COURT:  Okay.  Hold that thought.  Any

21  reason that wouldn't be a present-sense impression like

22  this blue car just ran the red light or any other thing

23  that's related at the time it's being observed?

24          MR. ROUSSEAU:  And --

25          MS. KEENE:  Huh?

STATE OF THOMAS OLIVAS

```
1              MR. ROUSSEAU:  -- I raised this --

2              THE COURT:  Hold on.

3              MR. ROUSSEAU:  I realize it's the Defense --

4              THE COURT:  No.  I understand it is hearsay,

5    but is it an exception if that's the context?  If his --

6    if it's delivered in the context of what he represented,

7    as opposed to in some other form.

8              MS. KEENE:  I think that -- and I think the

9    Court actually brought up a good exception and it may

10   fit that exception.

11             THE COURT:  If --

12             MS. KEENE:  I'd have to look at the exact

13   language of it.  But I would object to that still based

14   on confrontation clause because it's being offered for

15   the truth of the matter asserted.

16             THE COURT:  Well, and I think the

17   confrontation clause, if she was making that statement

18   to a police officer while filing a report, you might

19   have a good point.

20             MS. KEENE:  Right.

21             THE COURT:  But being made to an individual

22   in casual conversation, I think I understand where

23   you're coming from of they're offering it, but that --

24   as far as to the statement "Guess who's texting me right

25   now," I'm not sure it's there.  But I would be happy to
```

1    look at any law to correct me.

2              MR. ROUSSEAU:  If I may interject just a

3    little bit, and it doesn't go directly to your question,

4    Your Honor, but it may have an effect on everybody.

5    These are matters that the Defendant himself

6    acknowledges when he talks to the police and they are

7    also reflected in his phone records.

8              THE COURT:  Okay.

9              MR. ROUSSEAU:  Which will be admitted --

10             THE COURT:  Some of this --

11             MR. ROUSSEAU:  -- or offered.

12             THE COURT:  -- having sat through pretrial

13   hearings and spent many hours in front of a computer

14   terminal with headphones, I think I understand where

15   you're coming from with that last statement.  A

16   statement describing or explaining of any condition made

17   while the declarant was perceiving the event or

18   condition or immediately there after, 803.1.

19             MS. KEENE:  Judge, I think the statement

20   that Mr. Rousseau wants to present does fit that

21   exception.  I do.  I think -- and so, I mean, I would

22   make that objection, but I recognize what the rule says

23   under 803.1 --

24             THE COURT:  And --

25             MS. KEENE:  -- and I think that that is an

1   exception.  I would just ask the Court to give me a

2   running objection on that --

3          THE COURT:  Well, you would just --

4          MS. KEENE:  -- as far as the confrontation

5   clause.

6          THE COURT:  -- make an objection hearsay,

7   and I'll overrule it and the record will reflect.  If

8   it's delivered in the form it's proffered, I understood

9   your objection, I understood your hearsay objection, I

10   understand there appears to be on its face based on the

11   limited question and answer --

12          Short recess.

13          (Discussion off the record)

14          THE COURT:  Let's go on the record.

15          I've talked to the attorneys.  The State's

16   counsel went and talked to the witness to find out

17   specific information or to clarify certain information.

18   So the Defense motion in limine to general statements of

19   Mechelle Gandy made to this witness is granted.  I'll

20   rule on their admissibility if asked to.

21          The motion in limine as to any statements

22   Mechelle Gandy made to the witness, which the Defendant

23   was confronted with by the witness, the motion in limine

24   is overruled as to specifically a reference to Mechelle

25   telling the current witness in the midst of a phone

1    conversation, Oh, my gosh, guess who's texting right

2    now.  Because it appears if it develops in testimony as

3    proffered, it would be a present-sense impression.  The

4    contents of what's being texted, the limine is in effect

5    unless and until the contents meet an independent

6    exception to the hearsay rule, or at least part and

7    parcel of the observation.  And I'll have to have a

8    record to determine if they're just reading it as it

9    types or going back later and discussing something after

10   the impression has ended.  What is immediately after, as

11   the rule requires, is a case-by-case decision and a

12   statement-by-statement decision.

13            Finally, I'm going to limine, at the request

14   of the State, any reference to any CPS inquiry that

15   occurred prior to the date of this offense involving

16   anybody.  That's a double-edge sword.  If it --

17            MS. KEENE:  Say that one more time.

18            THE COURT:  Involving anyone -- if there's

19   anything to do with CPS that anyone wants to go into,

20   something that's alleged to have happened before the

21   date of this offense, nobody needs to be talking about

22   anybody's CPS anything unless you come and express why

23   it has some bearing to this trial, not only with this

24   witness but for future reference any witness, unless you

25   can show some nexus that has to do with their bias or

```
 1    their testimony or some door opened or some direct
 2    connection to this case.  Keep that simple.
 3               MS. KEENE:  I agree with that.
 4               THE COURT:  All right.  So anything else for
 5    record either side needs?
 6               MR. ROUSSEAU:  No, sir.
 7               THE COURT:  All right.
 8               MR. ROUSSEAU:  I need to get a little thing
 9    marked here before the jury comes in.
10               THE COURT:  That's fine.
11               (Witness retakes the stand)
12               (Jury seated in courtroom)
13               THE COURT:  All right.  Good morning.  What
14    am I holding up?
15               SEVERAL JURY MEMBERS:  Good morning.
16               THE COURT:  What am I holding up?
17               SEVERAL JURY MEMBERS:  The blue card.
18               THE COURT:  The blue card.  Thank you for
19    those full responses.
20               Did everyone follow these rules?
21               SEVERAL JURY MEMBERS:  Yes.
22               THE COURT:  We know you're going to, but I
23    have to ask so Karen can write it down.  And, again, we
24    thank you.
25               And with that, the State may call and
```

```
 1    identify its next witness.
 2              MR. ROUSSEAU:  Thank you, Your Honor.  We
 3    call Rebeca Raudry.
 4              THE COURT:  If you'd state your name again
 5    for the jury and also for Karen one more time, please.
 6              THE WITNESS:  Yes, sir.  Rebeca Ann Raudry.
 7              THE COURT:  Ms. Raudry, I swore you in and
 8    placed you under oath and rules as a witness, and you
 9    understand all that still carries over until the trial
10    is over?
11              THE WITNESS:  Yes, sir.
12              THE COURT:  All right.  Mr. Rousseau.
13                      REBECA RAUDRY,
14    having been first duly sworn, testified as follows:
15                    DIRECT EXAMINATION
16    BY MR. ROUSSEAU:
17    Q.  Good morning.
18    A.  Good morning.
19    Q.  You all right today?
20    A.  Yes, as good as I can be.
21    Q.  Little nervous?
22    A.  A little bit, yes.
23    Q.  It's all right.  Well, we've already introduced
24    you.  You are Rebeca Raudry, correct?
25    A.  Yes.
```

1    Q.   And that's Rebeca with one C?

2    A.   Yes, sir.

3    Q.   And your last name is R-A-U-D-R-Y?

4    A.   Yes, sir.

5    Q.   Since I can tell you're way younger than me, I'm

6    going to ask you.  How old are you?

7    A.   I just turned 34.

8    Q.   And are you currently employed anywhere?

9    A.   No, sir.

10   Q.   Where do you live?  With whom do you live?

11   A.   With my father in Grapevine.

12   Q.   And are there other people living there with you,

13   also?

14   A.   Yes.

15   Q.   Who are they?

16   A.   My children.

17   Q.   And what are your children's names?

18   A.   Rya.

19   Q.   Rya.  That's a little girl, correct?

20   A.   Yes.  My seven-year-old.

21   Q.   And your -- do you have a son, also?

22   A.   Yes.

23   Q.   And what is his name?

24   A.   Mio.

25   Q.   Mio.  Because it's an unusual name, why don't you

1   spell both of -- both of those names are a little

2   unusual.  Why don't you spell them for the court

3   reporter.

4        A.  Yes.  Rya is R-Y-A and Mio is M-I-O.

5        Q.  And you told us about Rya, but how old is Mio?

6        A.  He's 11.

7        Q.  Both in school, obviously?

8        A.  Yes.

9        Q.  Are you in school, also?

10       A.  Yes.

11       Q.  And what is your -- what are you studying?

12       A.  Criminal justice.

13       Q.  Do you also do some volunteer work?

14       A.  Yes.

15       Q.  Where do you volunteer?

16       A.  At the Grapevine Police Department.

17       Q.  What do you do for the Grapevine PD?

18       A.  Well, it varies.  Sometimes I'll sit at the front

19  desk and show people where to go to pay their tickets.

20  Sometimes I help CID with computer projects, just

21  various paperwork, putting paperwork together.

22       Q.  Whatever they need doing?

23       A.  Yes.

24       Q.  Okay.  Well, do you know a person named Thomas

25  Olivas?

1    A.  Yes.

2    Q.  And frankly, we have -- I think we've probably

3 heard your name some mentioned in this trial already, so

4 I think the jury has some idea of who you are.

5         Do you see Mr. Olivas here in the courtroom

6 today?

7    A.  Yes.

8    Q.  And could you just point at him, please, and

9 describe something that he's wearing?

10    A.  Yes.  He's wearing a black suit.

11    Q.  The gentleman on the end of this table?

12    A.  At the end of the table, yes.

13    Q.  All right.  Thank you very much.

14         MR. ROUSSEAU:  May the record reflect that

15 the witness has identified the Defendant?

16         THE COURT:  It may.

17    Q.  (BY MR. ROUSSEAU)  Can you tell the jury how is

18 it that you came to know Mr. Olivas?

19    A.  We met through MySpace, online.

20    Q.  Did you eventually end up in a relationship with

21 him?

22    A.  Yes.

23    Q.  And is he the father of one of your children?

24    A.  Yes.

25    Q.  Which of your children is he the father of?

```
 1      A.  Rya.

 2      Q.  Rya.  That's your little girl?

 3      A.  Yes.

 4      Q.  Do you recall about when it was that you met the

 5   Defendant?

 6      A.  Around August 2006.

 7      Q.  August 2006?

 8      A.  Yes, sir.

 9      Q.  Did the two of you -- well, at some point in time

10   I know -- you just said you met in August.  At some

11   point in time, did the two of you move in together?

12      A.  Yes.

13      Q.  And when was that?

14      A.  Six months later, after we met online.

15      Q.  Were you pregnant at that time?

16      A.  I can't remember.  I was pregnant around

17   November, I believe.  I believe so.

18      Q.  In either event, would it be safe to say the two

19   of you moved in together right around the time that you

20   got pregnant?

21      A.  Yes.

22      Q.  Pretty close?

23      A.  Yes.

24      Q.  When you first moved in together, where did the

25   two of you live?
```

```
 1        A.   We lived at my dad's.
 2        Q.   Is that the same place that you live now?
 3        A.   Yes.
 4        Q.   And are the two of you still living together as a
 5   couple?
 6        A.   Can you repeat that, please?
 7        Q.   Are the two of you still a couple?
 8        A.   No.
 9        Q.   You no longer live together?
10        A.   No.
11        Q.   Are you married to the Defendant?
12        A.   No.
13        Q.   Have you ever been married to him?
14        A.   No.
15        Q.   Have you ever agreed with the Defendant that the
16   two of you are married?
17        A.   No.
18        Q.   Have you ever represented to other people that
19   you're married?
20        A.   No.
21        Q.   While the two of you were living together, did
22   you ever work outside the home?
23        A.   No, I did not.
24        Q.   So for the period of time that y'all lived
25   together, he was the only one who was working outside
```

```
1   the home?
2       A.   Yes.
3       Q.   Have you ever been treated for a mental health
4   condition?
5       A.   Yes.
6       Q.   When was that?
7       A.   I was diagnosed years ago, so -- and treated, can
8   you kind of further explain what "treated" means?
9       Q.   Oh, sure.  I probably asked it probably a little
10  bit too open-ended.
11           You said you were diagnosed years ago?
12      A.   Uh-huh.
13      Q.   What is the condition and what's the diagnosis
14  and what period of time is it we're talking about that
15  you were diagnosed?
16      A.   I've been diagnosed with bipolar and
17  posttraumatic stress.  And it's been so many years since
18  that, I really don't know.
19      Q.   Tell me, were you a teenager?
20      A.   Yes.
21      Q.   Have you taken medication for those conditions in
22  the past?
23      A.   Yes.
24      Q.   Are you taking medication now?
25      A.   No.
```

1      Q.   Can you tell -- give the jury an idea of how long

2   it's been since you've taken medication?

3      A.   It's been about two and a half, three years.

4      Q.   Have you ever been diagnosed as having any type

5   of schizophrenia?

6      A.   No.

7      Q.   During the time that you and the Defendant were

8   together, what type of work did the Defendant do?

9      A.   He worked retail.  He worked at Truluck's

10   restaurant and eventually got a job at Best Buy, and he

11   was in the Air Force Reserves.

12      Q.   Was he in the Air Force Reserves when the two of

13   you met?

14      A.   Yes.

15      Q.   To your knowledge, has the Defendant ever been

16   assigned to active duty?

17      A.   No.

18      Q.   Has he ever been sent overseas?

19      A.   No.

20      Q.   Has he ever been enrolled in any type of a school

21   that you're aware of?

22      A.   No.

23      Q.   Give the jury an idea of what his military

24   commitments required of him, time-wise.

25      A.   Well, he usually would just go maybe twice a

```
 1  week, once a month to Fort Worth.  And maybe once a year
 2  he would have a two-week -- I'm not sure what they call
 3  it -- military leave where they would send him out for
 4  two weeks, somewhere out of town for training.
 5      Q.  And that would be for, you'd say, approximately
 6  two weeks at a time?
 7      A.  Yes, sir, like once a year, but monthly he would
 8  just be gone once like two days.
 9      Q.  A weekend?
10      A.  Yes, a weekend.
11      Q.  And I'm sorry.  I'm talking over you a little
12  bit.  I apologize for that.
13      A.  Okay.
14      Q.  So I asked you if he's ever been in any type of
15  school and I'm including any type of technical school
16  training, any type of junior college or community
17  college, any type of vocational training that you're
18  aware of, anything of that nature at all?
19      A.  No.
20      Q.  Have you ever known the Defendant to suffer from
21  any chronic health problem?
22      A.  No.
23      Q.  Specifically, have you ever known him to complain
24  about having a skin condition known as eczema?
25      A.  No.
```

```
 1      Q.   Do either one of your children have eczema?

 2      A.   Yes.

 3      Q.   Which one?

 4      A.   Rya.

 5      Q.   And what does it look like?

 6      A.   Well, she'll get kind of dry -- dried patches on

 7   her elbows, usually, or her upper arms.  It's not

 8   severe.  But they're just dry patches.  Turns kind of

 9   pink.

10      Q.   Have you ever known him to suffer from that

11   condition?

12      A.   No.

13      Q.   Did he ever scratch himself while he was sleeping

14   to the point that he would make his skin bleed?

15      A.   No.

16      Q.   Did he ever scratch himself while he was sleeping

17   so much that he would wake you up?

18      A.   No.

19      Q.   Have you ever known him to begin itching

20   uncontrollably as soon as he takes off his shirt?

21      A.   No.

22      Q.   Did he ever take off his shirt when you -- the

23   two of you would go to a swimming pool?

24      A.   Yes.

25      Q.   During the summertime, did he swear shorts, short
```

 1  pants?

 2      A.  Yes.

 3      Q.  When he would wear short pants, would his legs

 4  break out in big red welts?

 5      A.  No.

 6      Q.  In the summertime, or in warmer weather, did he

 7  wear short-sleeved shirts?

 8      A.  Yes.

 9      Q.  T-shirts, that sort of thing?

10      A.  Yes.

11      Q.  Did he -- did his arms break out in big red welts

12  or -- where he would have to continuously scratch

13  himself when he was wearing short-sleeved shirts?

14      A.  No.

15      Q.  Does he wear hoodies -- you know what a hoodie

16  is?

17      A.  Yes, sir.

18      Q.  Well, does he wear hoodies and other jackets,

19  even in the summertime, to keep from scratching himself?

20      A.  No.

21      Q.  In your experience with the Defendant, do you

22  know him to be highly emotional?  And by that I mean, is

23  he the type of person who will cry easily?

24      A.  I've seen him cry, but it's really hard to say

25  with him.

```
 1      Q.   I understand.  It depends on the situation?
 2      A.   Yes.
 3      Q.   And I realize I'm jumping around a little bit.
 4   We'll settle down in a little bit, but I needed to ask
 5   you some of these questions upfront.
 6           I want to ask you about firearms.  Did -- to
 7   your knowledge, did the Defendant ever own a firearm?
 8      A.   No.
 9      Q.   And I mean a gun of any type; handgun, shotgun,
10   rifle, anything at all?
11      A.   No.
12      Q.   Were there any problems around your apartment
13   with animals, that is, squirrels, raccoons, that sort of
14   thing, where they were maybe tearing up your property?
15      A.   No.
16      Q.   Or raising all kinds of Cain, making lots of
17   noise where it was difficult to sleep?
18      A.   No.
19      Q.   And basically just becoming -- just varmints
20   becoming a nuisance, was that a problem that y'all had
21   at the apartment where you lived with the Defendant?
22      A.   No.
23      Q.   And I may have gotten a little -- I've gotten
24   ahead of myself just a little bit.
25           You told us earlier that he lived with you
```

```
 1   at your father's home, correct?
 2        A.   Yes, sir.
 3        Q.   At some point in time did the two of you and your
 4   children move to an apartment?
 5        A.   Yes.
 6        Q.   And do you recall the address of that apartment?
 7        A.   I know it was Park Boulevard in Grapevine.  It
 8   was right across the street, pretty much, from my dad's
 9   house.
10        Q.   How long would it take you to walk it?
11        A.   Less than five minutes.
12        Q.   So essentially across the street a little bit you
13   got an apartment with the Defendant?
14        A.   Yes.
15        Q.   Wow.  So I'm -- these questions I'm asking you
16   about, varmints and all that stuff, I'm asking about the
17   apartment.  Nothing, no problems of that nature you're
18   aware of?
19        A.   No.
20        Q.   How about back at your dad's house?
21        A.   No.
22        Q.   Did he ever tell you he needed, you know, a
23   handgun or any type of firearm so that he could address
24   this problem with squirrels and raccoons and other
25   woodland creatures?
```

```
 1        A.   No.
 2        Q.   All right.  I want to turn your attention now to
 3   Mechelle Gandy.  Okay?  And you understand that that's
 4   what we're here to talk about, correct?
 5        A.   Yes.
 6        Q.   Did you ever have any in person, face-to-face
 7   contact with a woman named Mechelle Gandy?
 8        A.   No.
 9        Q.   I'm going to ask you a question and I want you to
10   understand that I'm not asking for any -- to tell us
11   anything that anyone said.  Okay?
12        A.   Okay.
13        Q.   Do you recall how you first learned that Mechelle
14   Gandy even existed?
15        A.   Yes.
16        Q.   How is it that you found out that she even
17   existed?
18        A.   Text message.
19        Q.   A text message to you?
20        A.   No.
21        Q.   Where did you see this text message?
22        A.   On Thomas' phone, cell phone.
23        Q.   Okay.  And did you -- was it a text message that
24   caused you some concern?
25        A.   Yes.
```

1    Q.   Did you confront him with it?

2    A.   Yes.

3    Q.   What did you say to him?

4    A.   I asked him who Mechelle was and what the text

5    was about.

6    Q.   And when you were asking him what the text was

7    about, did you actually say the words that were in it?

8    A.   Yes.

9    Q.   Okay.  And what were those words?

10   A.   "Is that all you want?"

11   Q.   That's the text that you related to him, "Is that

12   all you want"?

13   A.   Yes.

14   Q.   And what was his response?

15   A.   He said it's just some girl, some crazy girl

16   that -- someone from Boston's, a waitress gave her the

17   number to find work, and she got ahold of his number

18   somehow and she's been stalking him.

19   Q.   Before you asked Thomas about that, confronted

20   Thomas with that, with that text message, did you

21   actually call that person?

22   A.   Yes.

23   Q.   Okay.  And did you have a conversation with her?

24   A.   Yes.

25   Q.   And was the Defendant's explanation consistent

1   with your -- with Mechelle's?

2       A.   No.

3       Q.   Was that the beginning of an ongoing, on again --

4   sometimes on/sometimes off, issue involving Mechelle

5   Gandy, between you and the Defendant?

6       A.   Yes.

7       Q.   Did it pop up from time to time?

8       A.   Yes.

9       Q.   Did you ever ask the Defendant anything about a

10  child that belonged to Mechelle Gandy?

11      A.   Yes.

12      Q.   What did you ask him?

13      A.   I asked him if he got Mechelle pregnant and if

14  the baby was his.

15      Q.   And what did he say?

16      A.   He said no.

17      Q.   Did he acknowledge ever spending any time with

18  Michelle at all -- and I'm sorry -- Mechelle.

19           Did he ever acknowledge ever -- prior to

20  March the 20th of 2011, did he ever acknowledge to you

21  spending any time with her?

22      A.   No.

23      Q.   Did you receive at your home, at your father's --

24  or did a birthday invitation arrive at your father's

25  home at some point?

STATE v. THOMAS OLIVAS

```
 1      A.  Yes.
 2              MR. ROUSSEAU:  May I approach, Your Honor?
 3              THE COURT:  Yes.
 4      Q.  (BY MR. ROUSSEAU)  Are you okay?
 5      A.  Yes.
 6      Q.  All right.  All right.  I want to show you what
 7   I've had marked as State's Exhibit No. 231-A, which is
 8   an envelope, and State's Exhibit No. 231, which is the
 9   contents.  Okay?
10      A.  Yes.
11      Q.  And take a look at both of those items and tell
12   me -- and then I'll ask you a question about them.
13   Okay?
14      A.  Yes, sir.
15      Q.  Have you had a chance to look at them?
16      A.  Yes.
17      Q.  Do you recognize those two items?
18      A.  Yes.
19      Q.  Is this the invitation that came to your --
20      A.  My --
21      Q.  -- father's home?
22      A.  Yes.
23      Q.  Okay.  Did you show this to the Defendant?
24      A.  Yes.
25      Q.  Did you question him concerning the contents of
```

1  this envelope?

2      A.  Yes.

3      Q.  And is this the original?

4      A.  Yes.

5      Q.  Now, is there something that was contained inside

6  the State's Exhibit No. 231 that is no longer inside of

7  it?

8      A.  Yes.

9      Q.  And except for that, does it appear to be in the

10  exact same condition that it was when you received it?

11      A.  Yes.

12          MR. ROUSSEAU:  I'll offer 231 and 231-A,

13  subject to any objection by the Defense.

14          MS. KEENE:  No objection, Judge, to 231 or

15  231-A.

16          THE COURT:  All right.  Each are admitted as

17  offered, 231, 231-A, State's exhibits.

18          (State's Exhibit No. 231 and 231-A admitted)

19          MR. ROUSSEAU:  Thank you, Judge.  May I

20  publish, Your Honor, using the ELMO?

21          THE COURT:  Yes, you may.

22      Q.  (BY MR. ROUSSEAU)  I'm going to show first 231-A.

23  Is this the envelope that you're talking about that

24  contained an invitation?

25      A.  Yes.

1      Q.   214 Brookside Drive, is that your address?

2      A.   Yes, sir.

3      Q.   Up at the top you can see a postage stamp.  Does

4  that say -- this is the stamp over here.  But does it

5  say "February 2011"?

6      A.   Yes.

7      Q.   Right there.  In fact, it's "08, February 2011".

8  Can you make that out or would it be helpful -- more

9  helpful if you saw the actual envelope?

10     A.   I can make it out.

11     Q.   Is that what at that says, 08?

12     A.   February, yes, 08.

13     Q.   And I see that the return address is "Olivas",

14  correct?

15     A.   Yes.

16     Q.   Is that your address, 2216 Presidents Corner,

17  No. 601, Arlington, Texas 76011?

18     A.   No.

19     Q.   Okay.  Now, I'm going to lay 231 on top of 231-A.

20  Is this the outer covering of the invitation?

21     A.   Yes.

22     Q.   Is this part of the interior, "first birthday"?

23     A.   Yes.

24     Q.   And is this the way the interior reads, Asher

25  for -- the party is for Asher Rion Olivas?

```
 1        A.   Yes.

 2        Q.   Gives the date of February 27th, correct?

 3        A.   Yes.

 4        Q.   Gives the same address as appears on the outside

 5   of that envelope that we just looked at?

 6        A.   Yes.

 7        Q.   "Given by the coolest mom ever"?

 8        A.   Yes.

 9        Q.   And it lists the things that are needed, correct?

10        A.   Yes.

11        Q.   What was inside of this -- what was inside of

12   that invitation that's no longer inside?

13        A.   A picture of Asher.

14        Q.   Where is that picture now?

15        A.   It's in my living room on the mantel.

16        Q.   At your house?

17        A.   Yes.

18        Q.   Why did you keep it?

19        A.   I kept it because it was really the only picture

20   I had of him and...

21        Q.   Why do you feel the need to keep a picture of

22   Mechelle Gandy's child?

23        A.   Because in all reality, he's my daughter's little

24   brother.

25        Q.   Okay.  You're pretty emotional right now.  I
```

1    don't -- and I understand.  Do you need a moment or are

2    you okay?

3         A.   I'm okay.

4         Q.   Okay.  Take a drink of water if you need to.

5    Obviously, that was received in February of 2011,

6    correct?

7         A.   Yes.

8         Q.   And it came to your father's house?

9         A.   Yes.

10        Q.   That you picked it up, correct?

11        A.   Yes.

12        Q.   And did you -- well, were you shocked by the

13   contents?

14        A.   Yes.

15        Q.   Did you talk to the Defendant about it?

16        A.   Yes.

17        Q.   And what was his response when you showed him the

18   birthday invitation which contained a picture of Asher?

19   What was his response?  And you can use the words that

20   he used.

21        A.   Okay.  I showed him the invitation and the

22   picture of Asher and he said, "I don't want to fucking

23   look at that.  I don't want to fucking look at that."

24        Q.   Did he say anything about -- did he refer to

25   Asher in any way that upset you?

1        A.   Yes.

2        Q.   What did he say?

3        A.   He said, "That fucking baby is the devil's

4    child."

5        Q.   Did he ask -- did he ever refer to -- well, by

6    that time had you had any communications with Mechelle

7    directly?

8        A.   Yes.

9        Q.   And was he aware of that fact?

10       A.   Yes.

11       Q.   Have you heard him use the term "bulldog"?

12       A.   Yes.

13       Q.   Tell us about that.

14       A.   Well, when I had started talking to Mechelle, he

15   knew about it and he said, "Why are you talking to that

16   fucking bulldog?"  He would always just call her ugly

17   names, and that was the main one he used.

18       Q.   Were you a hundred percent convinced by this time

19   that Mechelle -- that Mechelle was in fact -- let me

20   back up.

21            Were you convinced by this time that Asher

22   was the Defendant's child or did you have doubts?

23       A.   I had some doubts still.  I just wasn't sure.

24       Q.   Was his -- did he deny that Asher was his child?

25       A.   Yes.

```
 1        Q.   In fact -- and I'm going to jump ahead a little
 2   bit.
 3             In the time after March the 20th of 2011,
 4   when Asher was already dead, did you ever ask the
 5   Defendant then if he was the father of Asher?
 6        A.   Yes.
 7        Q.   And what was his response then?
 8        A.   No.
 9        Q.   Did the subject of paternity testing ever come
10   up?
11        A.   Yes.
12        Q.   Did you discuss that issue with the Defendant?
13        A.   Yes.
14        Q.   What was your viewpoint on the topic of paternity
15   testing?
16        A.   I basically said to man up and go get it done.
17   If he's not your child, it won't be so hard to go to
18   Court or wherever he needed to go to get it done.
19        Q.   At that point was he still denying that he had
20   ever had sexual relations with Mechelle Gandy?
21        A.   Yes.
22        Q.   Did you or Thomas receive any letters addressed
23   to him regarding the topic of paternity testing?
24        A.   Yes.
25        Q.   Now, were those from Mechelle?
```

```
1      A.   No.

2      Q.   Do you recall who they were from?

3      A.   They were from the Attorney General's Office.

4      Q.   Did you read them?

5      A.   Yes.

6      Q.   Did they contain any references to specific dates

7   that he was supposed to have shown up?

8      A.   Yes.

9      Q.   So when you asked him to go ahead and take a

10  paternity test, get this thing settled once and for all,

11  how did he respond?

12     A.   He said, "Okay.  I'll get it done."

13     Q.   To your knowledge, did he ever?

14     A.   No.

15     Q.   Okay.  I want to turn your attention to the

16  week -- do you understand and remember that March the

17  20th of 2011 was a Sunday?

18     A.   Yes.

19     Q.   I want to back up to a point earlier in the week,

20  Tuesday.  It's going to be Tuesday, March 15th.  Now,

21  you and I have had a chance to talk about these events

22  before; is that correct?

23     A.   Yes.

24     Q.   And we've actually looked at a calendar and

25  established what day of the week certain things happened
```

1  on; is that correct?

2      A.   Yes.

3      Q.   Are you comfortable when I say Tuesday, April --

4  Tuesday, March 15th, you received a telephone call?

5      A.   Yes.

6      Q.   From the Defendant?

7      A.   Yes.

8      Q.   Are you comfortable with that?

9      A.   Yes.

10     Q.   Okay.  Tuesday, March 15th, did you receive a

11  telephone call from the Defendant while he was at work?

12     A.   Yes.

13     Q.   Why was he calling?

14     A.   He said, "She's here."

15     Q.   What did you take that to mean?

16     A.   I assumed -- well, at first I was like, well,

17  who, and then I assumed it was Mechelle.

18     Q.   Had he called -- was that the first time he had

19  called you?

20     A.   No.

21     Q.   And I mean that day?

22     A.   Oh, that day.  He -- yes.

23     Q.   So when he called you, what did he want you to

24  do?

25     A.   To pick him up at work.

1       Q.   Describe his mood.

2       A.   Very agitated.

3       Q.   He wanted you to come pick him up.  So did you

4   go?

5       A.   Yes.

6       Q.   Why would you have had to go pick him up?  Did he

7   not have a car of his own?

8       A.   No, he didn't.

9       Q.   How many cars did y'all own between the two of

10  you?

11      A.   I have my own car.

12      Q.   You had a car?

13      A.   Yes.  He didn't have any car in his name at all.

14  We shared my car.

15      Q.   What type of vehicle was that?

16      A.   A Toyota Camry.

17      Q.   So that's the only car -- as far as you know, the

18  only car that he routinely had to get around in?

19      A.   Yes.

20      Q.   And sometimes he used it and sometimes you used

21  it?

22      A.   Yes.

23      Q.   All right.  So he asked you to come get him,

24  correct?

25      A.   Yes.

```
 1      Q.   Did you go?

 2      A.   Yes.

 3      Q.   Where were your kids?

 4      A.   They were with me.

 5      Q.   So they were in the car?

 6      A.   Yes.

 7      Q.   So this would be 2011, three and a half years

 8 ago?

 9      A.   Yes.

10      Q.   So they were about eight and four or so?

11      A.   About three and seven.

12      Q.   Okay.

13      A.   Three and eight.

14      Q.   Did he come outside the store and get in your

15 car?

16      A.   Yes.

17      Q.   When he got in your car, what was his mood like?

18      A.   Very angry.

19      Q.   Was he angry at you?

20      A.   Yes.

21      Q.   Why was he angry at you?

22      A.   Because I didn't answer the phone soon enough and

23 I didn't pick him up fast enough.

24      Q.   Well, what did he say when he got in the car?

25      A.   He said, "That bitch is here.  She won't leave us
```

```
1    alone.  I fucking hate her."
2        Q.   Do you recall anything else that he said?
3        A.   No.
4        Q.   Okay.  And this was -- this would have been on
5    Tuesday, March the 15th, five days before the fire,
6    correct?
7        A.   Yes.
8        Q.   Let's move ahead to the next day, Wednesday,
9    March the 16th.  Did -- well, before we do that, let me
10   ask you, at any point in time did you become aware of a
11   problem being able to receive calls or communications,
12   text communications on your phone from Mechelle?
13       A.   Yes.
14       Q.   When did you become aware of that?
15       A.   Probably sometime in March when I started talking
16   to Mechelle more.
17       Q.   And do you know why you were unable -- do you
18   know why you were unable to receive those
19   communications?
20       A.   No.  I wasn't sure why.
21       Q.   Did you ever ask the Defendant?
22       A.   Yes.
23       Q.   What did he say?
24       A.   He said he doesn't want her calling us anymore so
25   he blocked her.
```

1    Q.  He had blocked her from calling?

2    A.  Yes.

3    Q.  And you didn't find out about it for a while?

4    A.  Right.

5    Q.  I skipped something.  Back when he first was in

6    the car -- I'm sorry.

7            When you picked him up from Best Buy, and

8    I'm talking about Tuesday now.

9    A.  Yes.

10   Q.  And you told us what he had to say and his mood.

11   How do you respond to that?  When he tells you she's

12   here and he used some bad language, he's angry at her,

13   how do you respond?

14   A.  I was basically, "Well, what do you expect?  You

15   need to -- I told him, "I'm stuck in the middle.  I'm

16   fucking stuck in the middle and I'm tired of it and I'm

17   tired of feeling like you getting mad me for no reason,

18   tired of not knowing the truth, what's going on."

19   Q.  Was there ever a time, right around that time,

20   when you stopped believing Thomas about Asher and

21   Mechelle and you started to believe Mechelle?

22   A.  Yes.

23   Q.  When did that occur and -- when did that occur?

24   A.  In March 2011.

25   Q.  Did you ever receive any communications from

1  Mechelle that made you change your mind?

2      A.  Yes.

3      Q.  Was it -- and I'm not asking you about words that

4  she sent you or said to you, but did she ever send you

5  anything on your phone or to a computerized account that

6  made you convinced that she was, in fact, telling you

7  the truth?

8      A.  Yes.

9      Q.  Was it something that she did on her own or was

10  it at your urging?

11      A.  I urged her.

12      Q.  You asked her to do it, right?

13      A.  I asked her.

14      Q.  To essentially "show me what you've got"?

15      A.  Yes.

16      Q.  And did she?

17      A.  Yes.

18      Q.  Did she send you some photographs?

19      A.  Yes.

20          MR. ROUSSEAU:  May I approach, Your Honor?

21          THE COURT:  Yes.

22      Q.  (BY MR. ROUSSEAU)  I want to show you State's

23  Exhibit No. 211 and ask you if you recognize this

24  photograph?

25      A.  Yes.

1      Q.  Is this a photograph that was sent to you by --

2   well, I'll ask you that in a moment.

3           You recognize the content of the photograph?

4      A.  Yes.

5      Q.  Okay.  Had you ever -- this photograph, had you

6   ever seen this same photograph -- had you ever had this

7   photograph sent to you from another source?

8      A.  I'm not sure I understand.

9      Q.  Mechelle sent you this photograph, correct?

10     A.  Yes.

11     Q.  Had you ever received this same photograph from

12  another source, from someone else?

13     A.  Yes.

14     Q.  And from whom was that?

15     A.  Thomas.

16           MR. ROUSSEAU:  I'll offer --

17     Q.  (BY MR. ROUSSEAU)  And is this photograph a true

18  representation, a duplicate of the photograph that you

19  received from Michelle?

20     A.  Yes.

21     Q.  And does it -- Mechelle, I'm sorry -- and does it

22  appear to be changed in any way?

23     A.  No.

24           MR. ROUSSEAU:  I apologize, Your Honor.

25  I'll offer State's Exhibit --

```
 1                    What is the number, Joetta?
 2                    MS. KEENE:  Number 211.
 3                    MR. ROUSSEAU:  State's 211, subject to any
 4   objection by the Defense.
 5                    MS. KEENE:  Judge, may I take the witness on
 6   voir dire?
 7                    THE COURT:  Yes, you may.
 8                    VOIR DIRE EXAMINATION
 9   BY MS. KEENE:
10      Q.  Ms. Raudry, I'm going to show you what's been
11   marked as State's Exhibit No. 211.  There's a lot of
12   writing at the top of that.
13      A.  Yes.
14      Q.  Do you see that?
15      A.  Yes.
16      Q.  Was the picture sent to you with all that writing
17   on the top of it?
18      A.  I don't remember the writing.
19      Q.  You just remember getting a picture?
20      A.  Yes.
21      Q.  So this, with the writing on it, does not fairly
22   and accurately depict what you were sent?  Does that
23   make sense?
24      A.  No, it doesn't make sense.
25      Q.  You were just sent a picture.  Your picture
```

```
1    didn't have a bunch of writing on the top?
2       A.   I don't remember.
3              MS. KEENE:   Judge, I would object to 211 in
4    that it didn't fairly and accurately represent what she
5    was sent.
6              THE COURT:   Y'all come up here.
7              (Discussion at the bench, off the record)
8              THE COURT:   All right.  For the record, I've
9    reviewed the exhibit with counsel.  On the top 15 to
10   20 percent of the exhibit is a bunch of writing, typed
11   information, which is not being admitted.  The State
12   would like that part of the exhibit conditionally
13   admitted under Rule 104 but not for publication and
14   intends to address that with a subsequent witness.
15             So all that is admitted is the image, not
16   any writing on the face of the exhibit, other than the
17   exhibit sticker.
18             Is that acceptable, Defense, at this time,
19   pending connection of the writing later?
20             MS. KEENE:   It is, Judge.
21             THE COURT:   All right.  Then your objection
22   to the written part of the document is sustained.  The
23   document has been amended to make that not visible to
24   the jury.  It will be published, but the writing won't
25   be visible and will address that with a subsequent
```

 1  witness.  But the image contained on 211 is admitted.

 2  I'll allow the image portion only to be published.  And

 3  the Court, under the supervision of the lawyers, has

 4  occluded the written information on the face of the

 5  exhibit.

 6              (State's Exhibit No. 211 admitted)

 7              THE COURT:  Are you satisfied, having

 8  observed the occlusion, that it's adequate for your

 9  purposes?

10              MS. KEENE:  Yes.

11              THE COURT:  All right.  And is the State

12  satisfied with that?

13              MR. ROUSSEAU:  Yes.  Yes, Your Honor.

14              THE COURT:  All right.

15              <u>DIRECT EXAMINATION CONTINUES</u>

16  BY MR. ROUSSEAU:

17     Q.  Rebeca, just to recap, you received the

18  photograph that we've just had admitted conditionally as

19  State's Exhibit 211, you received -- you had this sent

20  to you by Mechelle Gandy, correct?

21     A.  Yes.

22     Q.  And it was at your urging, correct?

23     A.  Yes.

24              THE COURT:  For the record, the image is

25  admitted unconditionally.  The written part is admitted

 1  conditionally and not for publication unless fully

 2  admitted, so...

 3           MS. KEENE:  That's my understanding, Judge.

 4           THE COURT:  Yeah.  Okay.  I just wanted to

 5  be clear, to be fair to the State, he's using words with

 6  the witness but the record reflects otherwise.

 7           You may continue.

 8           MR. ROUSSEAU:  Thank you, Your Honor.

 9     Q.  (BY MR. ROUSSEAU)  Why did you want her to send

10  you photographs?

11     A.  Because I wanted -- I felt stuck in the middle

12  and I wanted to hear her side finally, like really give

13  her a chance.

14     Q.  Was this an attempt by you to let her show you

15  her proof?

16     A.  Yes.

17     Q.  Proof of the relationship with the Defendant?

18     A.  Yes.

19     Q.  Now, this is a photograph, did she ever send you

20  any text messages?  Were you able to get any of those?

21     A.  Yes.

22     Q.  Were they also text messages from the Defendant?

23     A.  Yes.

24     Q.  She forwarded them to you, correct?

25     A.  Yes.

1    Q.  This photograph -- and we're about to show this

2   to the jury -- was the only photograph that she sent

3   you?

4    A.  No.

5    Q.  Were the other ones of a very similar nature?

6    A.  Yes.

7              MR. ROUSSEAU:  May I publish, Your Honor?

8              THE COURT:  Yes.  And do you intend to do it

9   by walking it in front of the jury box or are you going

10  to pass it to them and have them pass to each other?

11             MR. ROUSSEAU:  I'll hold it.

12             THE COURT:  You'll walk it?

13             MR. ROUSSEAU:  Yes, sir.

14             (Pause in proceedings)

15             THE COURT:  All right.  The exhibit has been

16  published to the jury, the image part only.

17             You may continue.

18   Q.  (BY MR. ROUSSEAU)  Was there -- just so we're

19  clear, the image that we've been talking about in 211 is

20  an image of a penis, correct?

21   A.  Yes.

22   Q.  And other than the penis itself, was there

23  something in the background of the image that convinced

24  you that it was, in fact -- that helped you recognize

25  where this photograph was taken?

1    A.   Yes.

2    Q.   Where was it taken?

3    A.   In our bathroom.

4    Q.   So when you got this image, I guess other

5    photographs, as well, when you actually received them,

6    was the Defendant at home?

7    A.   No.

8    Q.   Were you at home?

9    A.   Yes.

10   Q.   In your apartment?

11   A.   Yes.

12   Q.   When the Defendant came home that day, did you

13   and he have a conversation about this?

14   A.   Yes.

15   Q.   How did that conversation go?

16   A.   Badly.  It turned into an argument.

17   Q.   Did he have an explanation for how Mechelle might

18   have gotten these images, these photographs?

19   A.   He said that she must have hacked into our

20   phones.

21   Q.   How did that hit you?

22   A.   I thought it was ridiculous.

23   Q.   Did you tell him that?

24   A.   Yes.

25   Q.   This would have been on Wednesday night, the day

```
 1   after your -- you picked him up at work?

 2       A.   Yes.

 3       Q.   What happened -- how did -- at the end of this

 4   conversation between yourself and Thomas, you -- you've

 5   already said it blew up into an argument, correct?

 6       A.   Yes.

 7       Q.   At the end of this argument, how did it -- how

 8   did the argument end?

 9       A.   He kicked me and the kids out of the apartment.

10       Q.   And what time of the day was this?

11       A.   It was about 11:45 at night, almost midnight.

12       Q.   Were the kids in bed?

13       A.   Yes.  They were in the room, bed.

14       Q.   What did he say about you leaving the apartment?

15   You said he kicked you out.  What did he actually tell

16   you?  What did he say?

17       A.   He said, "Get the fuck out of here.  You take the

18   kids and get the fuck out of here.  I don't even want to

19   look at you.  You're never going to believe me anyways.

20   You're worthless."

21       Q.   So what did you do?

22       A.   I quietly tried to get the kids.  I tried to rush

23   out of there and I grabbed the kids.  I called my dad.

24       Q.   Why did you call your dad?

25       A.   I felt a little scared and I wanted him to know
```

1   what was going on so he wouldn't wonder, well, who's

2   coming into the house late at night or...

3       Q.  Did your dad actually come over?

4       A.  He didn't go over.  I believe he was just --

5   since it's literally right down the street, he just -- I

6   believe he got in his car and just kind of sat on Park

7   Boulevard and waited until I took my car over there.

8       Q.  Okay.  Before you got out of the apartment, did

9   something happen?

10      A.  Yes.

11      Q.  What was that?

12      A.  Well --

13              MR. ROUSSEAU:  Just a moment, please.  Just

14  a moment.

15              (Sotto voce discussion between attorneys)

16      Q.  (BY MR. ROUSSEAU)  I'm sorry.  Go ahead.  What

17  happened before you got out of that apartment?

18      A.  Well, as I was leaving with the kids, I had Rya

19  in my arms and Mio was holding my hand.  And we were on

20  the balcony, we were on the second-level apartment.  And

21  I just pretty much wanted to get out of there.  I didn't

22  really -- I grabbed maybe a few little things, like a

23  little bit of clothes.  I didn't really grab much of

24  anything, just a couple of things.

25              And as I was walking down the stairs, I

 1    looked up and he just looked at me like -- just so mean

 2    and evil.

 3        Q.   Did you have your telephone with you?

 4        A.   I had my cell phone, too, and he grabbed -- he

 5    grabbed the cell phone out of my hand and threw it into

 6    the street.

 7        Q.   This is the same phone that you had shown the

 8    photographs to him on?

 9        A.   Yes.

10        Q.   So did you pick up your phone?  Did you find it?

11        A.   Well, when I was walking down the stairs, I tried

12    to look for it, but I just couldn't find it.  And I told

13    the kids, "Let's just go.  I don't need my phone."  So I

14    never got it.

15        Q.   So did you go to your dad's house that night?

16        A.   Yes.

17        Q.   Over the course of the next few days, did you

18    have some communications with Mechelle?

19        A.   Yes.

20        Q.   Did you receive, at some point in time, a

21    telephone call -- and I don't mean on -- obviously not

22    on your cell phone, but a voice message on another phone

23    from the Defendant about Mechelle?

24        A.   Yes.

25        Q.   What did he say?  Let me ask you another way.

1          Was there ever a concern about you being

2    allowed to recover some of your belongings from the

3    house, taking some of your stuff?

4    A.   Yes.

5    Q.   Did he ask you -- did he leave a voice message

6    about that?

7    A.   Yes.

8    Q.   What did he say?

9    A.   Well, he basically didn't want me to get my stuff

10   at first.

11   Q.   Okay.  When he talked to you, when he left this

12   voice message, did he reference any communication from

13   Mechelle?

14   A.   Yes.

15   Q.   What did he say?

16   A.   He just said, "That fucking bulldog, why are you

17   talking to her," that's basically what I can remember.

18   Q.   That's fine.  Well, I'm going to move ahead a

19   little bit.

20          Did you become aware -- well, was there ever

21   communication between yourself and the Defendant prior

22   to March the 20th of 2011?

23   A.   Yes.

24   Q.   About -- after he kicked you out, but before the

25   murders, did you receive any communications from him

```
 1   about an attempted suicide by him?
 2       A.  Yes.
 3       Q.  Did you talk to him about it or communicate with
 4   him about it prior to those murders?
 5       A.  Yes.
 6       Q.  Did you talk to him about it after those murders?
 7   And I'm talking now in a Facebook communication.
 8       A.  Yes.
 9       Q.  Did he tell you that he had, in fact, taken some
10   of your medication and tried to kill himself?
11       A.  Yes.
12       Q.  Did he tell you that he had -- that a friend had
13   talked him into --
14             MR. MOORE:  Your Honor, I'm going to have to
15   object to him leading the witness.
16             MR. ROUSSEAU:  I'll rephrase, Your Honor.
17       Q.  (BY MR. ROUSSEAU)  Had you received any
18   communications from a friend of his on this same topic?
19       A.  Yes.
20       Q.  Would that -- does he have a friend named Isaac?
21       A.  Yes.
22       Q.  Did the Defendant have anything to say regarding
23   Isaac's role in this attempted suicide?
24       A.  Yes.
25       Q.  What did he say?
```

1    A.   He said that Isaac made him throw up, to throw up

2   the pills, and that he was calling the ambulance or

3   about to call the ambulance.

4    Q.   And was he quite insistent that -- was he very

5   specific about having taken your medication?

6    A.   Yes.

7    Q.   Did you believe him?

8    A.   No.

9    Q.   Did he tell you -- did he say whether or not he

10   had actually gotten sick from having taken the pills?

11    A.   No.

12    Q.   Okay.  I want to move on a little bit to March

13   the 20th, 2011.  And you understand that's a Sunday,

14   correct?

15    A.   Yes.

16    Q.   That's the day of the murders?

17    A.   Yes.

18    Q.   Were there any communications between yourself

19   and Mechelle that day?

20    A.   Yes.

21    Q.   And how did those communications take place, like

22   were they computer, were they text messaging, was it

23   telephone?  That's what I --

24    A.   On my dad's house phone.

25    Q.   On your dad's house phone?

```
 1      A.   Yes.
 2      Q.   Did you -- had you replaced your cell phone yet?
 3      A.   No.
 4      Q.   So you were reduced to old-school communications
 5  on a regular telephone?
 6      A.   Yes.
 7      Q.   While you were talking to Mechelle on the phone,
 8  during the conversation with you, did she make reference
 9  to something that was happening right then?
10      A.   Yes.
11      Q.   And what was that something that she was
12  referencing?
13      A.   That Thomas was texting her while we were
14  talking.
15      Q.   And if you don't remember, that's fine, but do
16  you remember what time of day this would have been?
17      A.   About 5:30, 6:00, sometime early evening.
18      Q.   Do you know your dad's house phone number?
19      A.   Yes.
20      Q.   What is it?
21      A.   It's 817-481-1214.
22      Q.   How did you come to find out that Mechelle and
23  her son had been killed?
24      A.   The Arlington Police Department called me around
25  6:00 the next morning and -- well, actually, they called
```

```
 1   me two or three times and left voicemails on the house
 2   phone, but I didn't receive them until around 6:00 in
 3   morning when I woke up the kids for school and I saw the
 4   little red light on the phone indicating there were
 5   voicemails left.
 6        Q.   So did you call them back?
 7        A.   Yes.
 8        Q.   And how did that make you feel?
 9        A.   Scared, confused, angry, frustrated.
10        Q.   The night before, before you had gone to bed that
11   night, had you -- did you notice -- or I don't know if
12   it was before you went to bed or not, but were you aware
13   of the Defendant having posted something on Facebook
14   late at night that night?
15        A.   On which night?
16        Q.   The night of -- I guess it would be the very
17   early morning hours of the 21st.
18        A.   Yes.
19        Q.   What was it that he posted, do you recall?
20        A.   If I remember correctly, it was a song.
21        Q.   Is that normal for him?
22        A.   Not really.
23        Q.   What did he -- how did he normally use Facebook?
24        A.   To play -- I forgot the name of the game, but
25   he'd usually just go on there and play games.  And once
```

1    in a while he would post a post about work, or if he was
2    out of town, he would say stuff like "I miss my baby
3    mama."  And we would communicate on there.  But he
4    wasn't like a regular user, except play the game.
5         Q.   Did the police come to your house that morning?
6         A.   Yes.
7         Q.   And did you actually provide them with a key to
8    get into your apartment over there on Park?
9         A.   Yes.
10        Q.   Did you help them in any way that you could?
11        A.   Yes.
12        Q.   Did you ultimately end up meeting with Detective
13   Stewart, or with a detective anyway, from the Arlington
14   Police Department and giving an interview?
15        A.   Yes.
16        Q.   And did you on subsequent days provide them
17   access to your Facebook account so that they could
18   review Facebook conversations between you and the
19   Defendant?
20        A.   Yes.
21        Q.   In later days after March the 20th of 2011,
22   did -- well, right away let's talk about in that first
23   couple of weeks.
24             Did you have any face-to-face communications
25   with the Defendant right -- in the next couple of weeks

STATE OF THOMAS OLIVAS

1    after this all happened?

2        A.   No.

3        Q.   Did you have communications with him via

4    Facebook, though?

5        A.   Yes.

6        Q.   Did you ever ask him what he had done, where he

7    had been during the time that Mechelle and Asher were

8    killed?

9        A.   Yes.

10       Q.   What did he say?

11       A.   He said he wanted to meet up with her, they ended

12   up talking and wanting to meet up to look at the papers.

13       Q.   They ended up talking, you mean on the telephone?

14       A.   I'm not sure how they communicated.

15       Q.   Okay.

16       A.   And that they were going to meet up, but he drove

17   out to Arlington and drove up and down Lamar for a good

18   while.  And he said he kept trying to call her or

19   contact her and he didn't hear anything, so he said he

20   stopped at a couple of places while he was in Arlington

21   and then he said he drove home.

22       Q.   Did he tell you specifically that he tell -- did

23   he tell you specifically that she texted him telling him

24   to call her for directions?

25       A.   Can you repeat that, please?

1    Q.  Do you recall him telling you that she texted him

2    and told him to call her for directions?

3    A.  I believe so.

4    Q.  Okay.  Would it be helpful for you if you looked

5    at your -- at some of the Facebook conversation, would

6    that refresh your memory?

7    A.  Yes.

8            MR. ROUSSEAU:  May I approach, Your Honor?

9            THE COURT:  Yes.

10           MR. ROUSSEAU:  Joetta, I'm looking at March

11   30, 12:12 p.m.

12   Q.  (BY MR. ROUSSEAU)  Just read it to yourself.

13   A.  Okay.

14   Q.  Does that help you remember?

15   A.  Yes.

16   Q.  Do you recall him asking -- telling you

17   specifically that she texted him saying call me for

18   directions?

19   A.  Yes.

20   Q.  And that he called her but she never answered?

21   A.  Correct.

22   Q.  During those days when you were communicating

23   with him via Facebook, did he ever tell you that he

24   never met Asher?

25   A.  Yes.

1   Q.   Did you ask him whether he -- whether after he

2   found out that Mechelle was pregnant, did you ask him if

3   he ever had anything to do with her, ever slept with her

4   again?

5   A.   Yes.

6   Q.   And what did he say?

7   A.   He said absolutely not.

8   Q.   Did he say that he never even saw her again after

9   she found out she was pregnant?

10   A.   Correct.

11   Q.   Did you ever remind him about his comment

12   regarding his comment that he thought of Asher as the

13   devil's child?  Did you ever remind him of that in a

14   Facebook conversation?

15   A.   Yes.

16   Q.   And do you recall how he responded?

17   A.   Yes.

18   Q.   Did he acknowledge -- well, how did he respond?

19   A.   He acknowledges that he called him that.

20   Q.   Do you recall him saying whether or not he was

21   devastated by the death?

22   A.   No.

23   Q.   You don't recall him saying or...

24   A.   I do recall him saying that he wasn't devastated.

25   Q.   Do you recall a question from him inquiring about

 1   your involvement with the police?

 2      A.  Yes.

 3      Q.  Tell us about that.

 4      A.  He thought that the reason why I want to

 5   communicate with him on Facebook was possibly because

 6   the police were putting me up to it.

 7      Q.  Were they?

 8      A.  Not at all.

 9      Q.  Do you recall accusing him in there of having

10   told Mechelle that he loved her?

11      A.  Yes.

12      Q.  How did he respond to that?

13      A.  He said that he told her he loved her so that way

14   she would leave us alone.

15      Q.  Did that sound logical to you?

16      A.  Not at all.

17      Q.  I want to move ahead a little bit.  These

18   communications that we've been talking about involving

19   Facebook, those were in the first few weeks after

20   Mechelle and Asher were killed; is that correct?

21      A.  Yes.

22      Q.  As time passed, weeks turned into months, did you

23   eventually reestablish contact with him, actual

24   face-to-face communication?

25      A.  Yes.

1    Q.   Did there -- was there a time when you actually

2    ended up spending time with him again?

3    A.   Yes.

4    Q.   Explain to the jury about that.

5    A.   Well, since months had passed, I wasn't sure how

6    to really feel.  I still wanted to believe in my gut

7    that he had nothing to do with it, but at the same time

8    I was scared of him and I didn't want to take his

9    daughter completely away from him, so I was kind of

10   in -- stuck in the middle, not knowing what to do.  And

11   then, of course, I had spent almost five years of my

12   life with him and I was just used to being around him,

13   so I don't really know, I was just...

14   Q.   For a while did you see him again?

15   A.   Yes.

16   Q.   And did you have -- did you allow him to see the

17   children again?

18   A.   Not Mio, just Rya.

19   Q.   Just Rya.

20        Was there a time when the three of you went

21   to a swimming pool?

22   A.   Yes.

23   Q.   Where -- which pool was that?

24   A.   At the apartments.

25   Q.   And the three of you were there?

1      A.   Yes.

2      Q.   Was Rya swimming?

3      A.   Yes.

4      Q.   Were all of you swimming?

5      A.   Yes.

6      Q.   Did he have his shirt off?

7      A.   Yes.

8      Q.   Did something happen that day that made you

9   change your mind about spending any more time with him?

10     A.   Yes.

11     Q.   What was it?

12     A.   We were at the pool and Rya was throwing her

13   regular three-year-old -- one of her regular

14   three-year-old tantrums and kind of screaming and she

15   didn't want to leave or whatever, and for some reason --

16   and I never really had seen Thomas respond in any manner

17   like this with her tantrums before, but he's like "make

18   her stop screaming, make her stop."

19     Q.   And you're holding --

20     A.   Like -- he was like kind of -- like almost

21   panicking.

22     Q.   You were holding your hands to the side of your

23   head at the time, correct?

24     A.   Yes.  He -- and I thought that's really weird

25   because he was -- never acted like panicky when she had

```
 1    her tantrums.
 2        Q.  Why did that bother you?
 3        A.  Because I was thinking maybe -- I was just
 4    thinking of Asher, that maybe he heard sounds from Asher
 5    screaming or crying.
 6        Q.  Can you tell me whether or not you had any --
 7        A.  May I have a minute, please?
 8        Q.  Sure.
 9             THE COURT:  You know what, it's 11:00
10    o'clock.
11             Jurors, let's take a break.
12             (Break taken, 11:00 - 11:20 a.m.)
13             (OPEN COURT, DEFENDANT AND JURY PRESENT)
14             (Witness on the stand)
15             THE COURT:  All right.  Still your witness.
16             MR. ROUSSEAU:  Thank you, Judge.
17        Q.  (BY MR. ROUSSEAU)  Rebeca, I just have another
18    question or two.
19             Do you recall asking the Defendant, after
20    the murders, in the time you were communicating by
21    Facebook, do you recall asking him about a time when
22    he -- in February, the preceding February, when he did
23    not come home at night?
24        A.  Yes.
25        Q.  What did you ask him?  Well, I tell you what,
```

```
 1    tell us why you were asking him that and -- let me do it
 2    again.
 3              Stop.  I'll rephrase.
 4              THE COURT:  New question.
 5              MR. ROUSSEAU:  New question.
 6    Q.  (BY MR. ROUSSEAU)  Was there a time in February
 7    when he did not come home from work?
 8    A.  Yes.
 9    Q.  And did you ultimately in those Facebook
10    communications, did you ask him about that night?
11    A.  Yes.
12    Q.  And what did he say?
13    A.  He said he was at Truluck's where he worked just
14    helping out with setting up tables, cleaning up, and
15    that he -- it was one of those snow days where it was
16    really icy and snowy and he said he just pretty much
17    fell asleep in the car for a while and didn't really
18    want to drive quite yet.
19    Q.  Would this have been right around the time that
20    the Super Bowl was in town?
21    A.  Yes.
22              MR. ROUSSEAU:  That's all I have, Your
23    Honor.  I'll pass the witness.
24              THE COURT:  Defense may cross.
25                    CROSS-EXAMINATION
```

```
 1  BY MS. KEENE:
 2      Q.  Rebeca, my name is Joetta Keene and I represent
 3  Thomas.  Okay?
 4      A.  Yes.
 5      Q.  And I have a lot of questions I want to ask you.
 6  Okay?
 7      A.  Yes.
 8      Q.  I'm going to try to go slow, but sometimes I go
 9  fast.
10      A.  Okay.
11      Q.  Okay?
12      A.  Yes.
13      Q.  You and I have never met, have we?
14      A.  No.
15      Q.  If you do not understand a question I ask you,
16  will you please just don't answer something that's not
17  accurate.
18      A.  Yes.
19      Q.  Just stop, breathe, and answer the question the
20  best you can.
21      A.  Yes.
22      Q.  Is that an agreement?
23      A.  Yes, ma'am.
24      Q.  How many -- when is about the first time period
25  you had contact with Mechelle Gandy?
```

```
 1      A.  It was around August '09 when I found that text
 2   message in Thomas' phone.
 3      Q.  And you called her, correct?
 4      A.  Yes.
 5      Q.  You had a conversation with her --
 6              MS. KEENE:  Judge, may I approach the board?
 7              THE COURT:  Yes.
 8      Q.  (BY MS. KEENE)  In August of '09?
 9      A.  Yes.
10      Q.  And about how many conversations did you have in
11   '09, or during this time period?
12      A.  Not many.
13      Q.  Was it just one day?
14      A.  Excuse me?
15              MS. KEENE:  Judge, can I get this moved up
16   for me?
17              THE COURT:  Yes, you may.
18      Q.  (BY MS. KEENE)  Was it just one?
19      A.  Yes.  I believe it was one, maybe two, tops.
20      Q.  R-E-B-E-C-C-A?
21      A.  One C.
22      Q.  R-E-B-E-C-A, R-A-U-D-R-Y?
23      A.  Yes.
24      Q.  And Mechelle Gandy.  Okay.  Does that make sense,
25   what we're going to go through is different
```

 1    conversations and the time periods that you had with

 2    Mechelle?

 3        A.   Yes.

 4        Q.   Okay.  The very first one was in August of 2009,

 5    correct?

 6        A.   I believe so.

 7        Q.   And in August of 2009 you confronted her about a

 8    text that she had with Thomas?

 9        A.   Yes.

10        Q.   And wanted to know who she was?

11        A.   Yes.

12        Q.   And it's safe to say that at this point you are

13    thinking that she just might be another woman who's

14    having relations with your man, so to speak?

15        A.   Yes.

16        Q.   And so you're confronting her accordingly?

17        A.   Yes.

18        Q.   And how many conversations did you have with her

19    in August of 2009?

20        A.   One, maybe two, tops.

21        Q.   And how are these conversations?

22        A.   They were tame.  They were --

23        Q.   No, no, no, no.  Were they live?  On the

24    telephone?

25        A.   Oh.  Yes, they were on the telephone.

 1     Q.   They were both on the telephone?

 2     A.   Yes.

 3     Q.   Was there any texting back in '09?

 4     A.   I recall her texting me once or twice.

 5     Q.   So there were two live conversations and then she

 6   may have texted you several times?

 7     A.   Not several times.  Once or twice.

 8     Q.   Okay.  And then text one to two times; is that

 9   correct?

10     A.   Yes.

11     Q.   Was there any other conversations back in August

12   of 2009?

13     A.   Conversations between Mechelle and I?

14     Q.   Whether it be by text, telephone, Facebook,

15   e-mail, social media, on a game, any sort of

16   communications in any manner between you and Mechelle in

17   August of 2009?

18     A.   No.  We really just had one full conversation,

19   but she tried to text me like one or twice and I ignored

20   her the other times.  So...

21     Q.   And this was all August 2009?

22     A.   I don't fully remember.

23     Q.   Okay.  Was there ever a time period that you

24   actually kind of gave her the "what for" about leaving

25   you alone and stop texting you?

1       A.   Yes.

2       Q.   Is this at this time period or is this later?

3       A.   I don't remember the time period because this ran

4    for a long time.   She would leave and then come back and

5    then try to contact us and not -- I don't really

6    remember the exact timeframe.

7       Q.   But you know that in August of 2009 is the first

8    time that you had any knowledge of her?

9       A.   Yes.

10      Q.   And was there a time period that you got one of

11   your friends to contact her and give her the "what for"?

12      A.   Yes.

13      Q.   Was that back in August of 2009 or was that more

14   close to this March or February?

15      A.   I don't remember.

16      Q.   Do you remember if it was within a month or two

17   of Mechelle being murdered or if it was years before?

18      A.   I'm sorry.   Can you repeat that, please?

19      Q.   Do you remember -- I know you don't remember the

20   exact date.   But do you remember if it was within a

21   month or two months before she was murdered or within

22   years of her being murdered?

23      A.   Within years.

24      Q.   All right.   So back at least in the 2009 time

25   period?

```
1        A.  Yes.

2        Q.  What was your friend's name that you had call

3   Mechelle and give her the "what for"?

4        A.  Charla.

5        Q.  Sharla?

6        A.  Charla.

7             THE COURT:  Spell it.

8             THE WITNESS:  C-H-A-R-L-A.

9        Q.  (BY MS. KEENE)  And what is Charla's last name?

10       A.  At the time it was Storey.

11       Q.  Storey?

12       A.  Yes.

13            THE COURT:  Spell that, if you know.

14            THE WITNESS:  S-T-O-R-E-Y.

15       Q.  (BY MS. KEENE)  S-T-O-R-E-Y?

16       A.  Yes.

17       Q.  And how are you friends with Charla Storey?

18       A.  We went to high school together.

19       Q.  So this is someone you've known since you were a

20   child?

21       A.  Not since I was a child.

22       Q.  At least since you were in high school?

23       A.  Yes.

24       Q.  And this was a person that you solicited to call

25   and talk to Rebeca?
```

1     A.  No, to Mechelle.

2     Q.  I meant -- I'm sorry -- I'm looking at your name.

3  To Mechelle?

4     A.  To Mechelle.

5     Q.  And why did you want Charla to call and give

6  Mechelle the "what for" back in '09?

7     A.  I don't really -- I was kind of -- I don't really

8  know.  I felt like maybe Mechelle would tell her

9  something she wouldn't tell me or...

10    Q.  Well --

11    A.  I don't know.

12    Q.  I'm sorry.

13          THE COURT:  Joetta.  Slow down.  You're

14  talking over the witness.  Y'all are speeding each other

15  up.  Deep breath.  Carry on.

16    Q.  (BY MS. KEENE)  Charla, describe what Charla

17  looks like.

18    A.  She has long brown hair.

19    Q.  About how tall?

20    A.  Five -- she's taller than me.  I'm five-four.

21  Five-six.  I don't know.

22    Q.  Is she heavy?  Skinny?

23    A.  Skinny.

24    Q.  Okay.  And is there some reason that you would

25  have her call to talk what apparently, or it looks like

```
 1   to you, is a mistress of your man?
 2       A.  I just thought that Mechelle -- or that Mechelle
 3   would tell her -- I don't really know why, particularly
 4   why I had her call.  But I thought maybe if one of my
 5   friends calls, she'll feel like -- maybe she'll tell
 6   Charla more information or tell her something that she
 7   wouldn't tell me.
 8       Q.  Okay.  So basically you've been telling -- you
 9   tell Mechelle you don't want any contact -- "don't
10   contact me," correct?
11       A.  Right.
12       Q.  But then you have one of your friends contact
13   her?
14       A.  Yes.
15       Q.  Okay.  Is there any other person, whether it be a
16   male, female, any other way that you sent communication
17   to Mechelle back in '09?
18       A.  No.
19       Q.  When is the next time that you have communication
20   with Mechelle?
21       A.  Well, she tried to text me once and I ignored
22   her.  And then the real communication I had again with
23   her was in March 2011.
24       Q.  So she tries to text you.  How does somebody try
25   to text you?
```

1    A.   Well, she texted me.

2    Q.   Okay.  And about what time period is it that she

3  text you?

4    A.   I would say in the morning.  I was on my way to a

5  yoga class at 24-Hour Fitness in Southlake, Texas.

6    Q.   So we know it's in the morning.  Number two, is

7  that -- it's in the morning, but do you have any idea

8  what year it's in?

9    A.   I don't recall.  I don't remember.

10   Q.   Is it in the '09, is it in the --

11   A.   I don't remember.

12   Q.   Okay.  Morning, and don't remember...

13        But Mechelle Gandy texted you; is that

14  correct?

15   A.   She did text me, yes.

16   Q.   And you did not respond in any way to this text?

17   A.   No.

18   Q.   When you got this text, did you confront Thomas

19  again about being a cheater?

20   A.   Yes.

21   Q.   And this is sometime after 2009 and before 2011,

22  correct?

23   A.   Can you please repeat that?

24   Q.   This is sometime after 2009 --

25   A.   Uh-huh.

STATE OF THOMAS OLIVAS

1    Q.   -- and before 2011?

2    A.   Yes.

3    Q.   Okay.  When is the next conversation that you

4    had, in any manner, with Mechelle?

5    A.   In March 2011.

6    Q.   All right.  Do you recall having a conversation

7    with her on Facebook in February 17th of 2011?

8    A.   I don't recall.

9              MS. KEENE:  Judge --

10   Q.   (BY MS. KEENE)  If I showed you your Facebook

11   communications, would that help refresh your memory?

12   A.   Yes, it would.

13             MS. KEENE:  Judge, may I approach the

14   witness?

15             THE COURT:  Yes, you may.

16   Q.   (BY MS. KEENE)  If you'll just read though

17   silently to yourself so you can remember, if it

18   refreshes your memory, about any conversations in

19   February.

20   A.   Okay.  I've read through it.

21   Q.   And does that help refresh your memory about a

22   conversation with -- that you had with Mechelle in

23   February 2011?

24   A.   Yes.

25   Q.   And that's a conversation that y'all had

```
 1   privately on Facebook?
 2       A.  Yes.
 3       Q.  And on Facebook you can privately message someone
 4   else who's on Facebook?
 5       A.  Yes.
 6       Q.  That doesn't have to broadcast to the entire
 7   world?
 8       A.  Correct.
 9       Q.  And this is a conversation you had privately with
10   Mechelle on Facebook?
11       A.  Yes.
12       Q.  And you confronted Mechelle in 2011 about
13   paternity court papers?
14       A.  Yes.
15       Q.  Okay.  And what -- and that was February 17th?
16       A.  Correct.
17       Q.  Of 2011, correct?
18       A.  Yes.
19       Q.  "R.R. confronts M.G. about court paperwork,"
20   really.
21       A.  Yes.
22       Q.  And when you confronted her about the court
23   paperwork, you're confronting her about the fact that
24   Mechelle Gandy had missed appointments?
25       A.  Yes.
```

1    Q.   And you're confronting her about the fact that
2    the case had actually been dismissed?
3    A.   Yes.
4    Q.   And that if she's missing going to see the
5    attorney general and going to these appointments and
6    getting the case dismissed, how are you supposed to
7    believe that this kid is Thomas', kind of the gist?
8    A.   Yes.
9    Q.   And that's something that you had a confrontation
10   with her about in February of 2011?
11   A.   Yes.
12   Q.   And in this same string you also were very clear
13   about the fact that you wanted her to stop bothering you
14   and messing with your family, your children, and
15   basically "quit harassing us"?
16   A.   Yes.
17   Q.   Okay.  So, basically, "Stop bothering us"?
18   A.   Yes, "Please stop bothering my family and I."
19   Q.   Okay.  So then you tell her please stop
20   bothering...
21              And you actually accuse her of being
22   unstable, correct?
23   A.   Yes.
24   Q.   And -- because you believe that she is basically
25   being a nut, she's saying that Thomas is a cheater,

1    she's saying Thomas is the father of her baby, she

2    didn't follow through with her paperwork and basically

3    harassing y'all?

4        A.   Yes.

5        Q.   And so "you're unstable, I don't know what you're

6    on but --

7        A.   I didn't say, "I don't know what you're on."

8        Q.   But basically, "Get out of our lives"?

9        A.   Basically, yes.

10       Q.   Okay.  And that is in February of 2011; is that

11   correct?

12       A.   Yes.

13       Q.   And that is nothing that you testified to earlier

14   with the jurors, is it?

15       A.   I'm not sure I understand that.

16       Q.   All right.  When is the next time you had a

17   conversation in any manner with Mechelle Gandy after

18   February 17th of 2011?

19       A.   I believe it to be in March.

20       Q.   All right.

21       A.   But I don't...

22       Q.   Did you have -- how was the conversation?

23       A.   Ummm.

24       Q.   By what means?

25       A.   Through Facebook.

STATE v. THOMAS OLIVAS

```
 1        Q.   Okay.  And, actually, we need to --
 2        A.   And -- well, there is a couple ways we
      communicated, which was through Facebook and my dad's
 3    house phone.
 4
 5        Q.   Okay.  And February 17th of 2011, that was by
 6    Facebook only?
 7        A.   Yes.  But, actually, I also had my cell phone
 8    then, so I'm pretty sure I communicated with her with my
 9    cell phone, as well.  Not my dad's house phone until
10    March, 2011.
11        Q.   So in February there's conversations on Facebook?
12        A.   And my cell phone.
13        Q.   And then there's also conversations on
14    Facebook -- I mean -- on cell phone?
15        A.   Yes.
16        Q.   And what was your cell phone number?
17        A.   I don't remember my old cell phone number.
18        Q.   Okay.  I'll show you something in a minute.
19    We'll get back to that.  Okay?
20             What was the conversations you had with her
21    on -- in February 17th on the telephone?  About how long
22    was that conversation?
23        A.   If I'm thinking of the right day, I believe it --
24    I know we've had some really long phone conversations,
25    but I don't remember the exact date.
```

1    Q.   Do you think it was in February, the 17th?

2    A.   I don't think so.  I believe on the 17th was just

3    on Facebook.

4    Q.   Okay.  So you think you then have a conversation

5    on the cell phone in February, but after you told her --

6    A.   After --

7    Q.   -- to leave you alone?

8    A.   Yes.

9    Q.   So that would be the fourth contact, the fourth

10   different date where there's a contact; is that fair?

11   A.   Yes.

12   Q.   So basically you've got August, there was

13   different types of contact, a day we don't remember

14   where there's a contact; February, there's a Facebook

15   contact; and then after February the 17th, 2011, there's

16   conversations on the cell phone?

17   A.   Yes.

18   Q.   And that's cell phone to cell phone?

19   A.   Yes.

20   Q.   You're calling Mechelle's cell phone, too?

21   A.   Yes.

22   Q.   Was she calling you or were you calling her?

23   A.   Both.

24   Q.   So I did a little arrow going back and forth

25   between the two of you in some time period between

 1   February 17th; is that correct?

 2      A.  Yes.

 3      Q.  All right.  Now, when is the next conversation

 4   that you actually remember having with her, what date?

 5      A.  I don't remember the date.

 6      Q.  Was it through Facebook?

 7      A.  Yes.

 8      Q.  And on March the 15th, did you and Mechelle have

 9   another conversation on Facebook?

10      A.  Yes.

11      Q.  March 15th?

12            MR. ROUSSEAU:  Thank you.

13      Q.  (BY MS. KEENE)  Yes?

14      A.  Yes.

15      Q.  So this is the fifth conversation.  So this is

16   March 15th.

17            And did you have any contact with her on the

18   cell phone on March 15th?

19      A.  What was the exact day of the week on March 15th,

20   please?

21      Q.  Tuesday.

22      A.  Tuesday?  Yes.

23      Q.  Do you remember who called who?

24      A.  No, I don't remember.  We all -- we just

25   constantly called back and forth to each other.

1    Q.   So you're telling the jury by March 15th you guys

2    are constantly talking to each other on the telephone,

3    calling each other back and forth?

4    A.   Yes.

5    Q.   And you are Facebooking?

6    A.   Yes.

7    Q.   And any other conversations happened between the

8    two of y'all on March 15th?

9    A.   No.   Just through Facebook and phone.

10   Q.   And this was a Tuesday.   All right.

11           After the Tuesday conversations, is there

12   any more -- about how many conversations do you think

13   you had with her on the telephone?

14   A.   A lot.   I don't -- I can't recall the exact

15   amount --

16   Q.   And certainly on Face --

17   A.   -- of phone calls.

18   Q.   I'm sorry.   On Facebook probably had how many?

19   A.   I have no idea how many, but I know it was a lot.

20   Q.   You can refresh.   I left my stuff up there in

21   front of you.   Just count the number of conversations on

22   that date to yourself.

23   A.   It might take a while.

24   Q.   See if that helps refresh your memory.

25           THE COURT:   When you get through counting,

```
 1    look up and say, I'm ready.
 2              MR. ROUSSEAU:  Your Honor, I'm going to
 3    object.  And it's really more -- requesting more in the
 4    nature of clarification the term "conversation".  If are
 5    we talking about specific back-and-forth, is that one
 6    conversation or a series of like messages?  If we can
 7    narrow it down a little bit, it might be helpful.
 8              THE COURT:  Just in fairness to the witness,
 9    are you asking how many sent or received transmissions
10    on Facebook occurred on that day?
11              MS. KEENE:  Yes, sir.
12              THE COURT:  Regardless of who sent or who
13    answered?
14              MS. KEENE:  Yes.
15              THE COURT:  All right.
16              Then just count the total number of
17    communications in either direction and then when you get
18    the number, you can look up.
19              THE WITNESS:  As -- specifically for the
20    15th or this whole...
21              MS. KEENE:  The 15th.
22              THE WITNESS:  Okay.
23              THE COURT:  Just for one day.
24              THE WITNESS:  Okay.  It looks like on the
25    15th, approximately, if I counted correctly, 34 back and
```

1    forth between -- altogether between Mechelle and I.

2        Q.   (BY MS. KEENE)   Thirty-four messages; is that

3    fair to say?

4        A.   Yes.  Yes.

5        Q.   On Facebook.  And about how many telephone

6    conversations on March the 15th?

7        A.   I don't remember.

8        Q.   And did you have any conversations with Mechelle

9    on the 16th?

10       A.   Yes.

11       Q.   And was that on Facebook or was that on

12   telephone?

13       A.   Most likely both.  And definitely on Facebook.

14   But I'm pretty sure we talked on the phone, as well.

15       Q.   All right.  Give us an idea on March 16th about

16   how many Facebook conversations y'all had.

17       A.   About 16 on Facebook.

18       Q.   Mechelle Gandy, Rebeca, Facebook, about 16

19   messages on the 16th, which is Wednesday?

20       A.   Yes.

21       Q.   How many phone conversations between you?

22       A.   I don't remember.

23       Q.   And on the 15th or the 16th, on either of these

24   days, did you confront Thomas with what you now believe

25   to be true, that being that he is a cheater?

```
 1        A.   Yes.

 2        Q.   Is that on one of those dates?

 3        A.   The 15th was Tuesday.  Yes, 16th.

 4        Q.   Was that on the Wednesday, the 16th?

 5        A.   Yes.

 6        Q.   And so this -- on this day where you've been

 7   communicating with Mechelle Gandy, you now confront

 8   Thomas because you've got the picture of the penis?

 9        A.   Yes.

10        Q.   And when you confronted Thomas, rather than you

11   kicking Thomas out, he kicked you out of the house?

12        A.   Yes.

13        Q.   And so you were kicked out of the house on the

14   16th?

15        A.   Yes.

16        Q.   And you went to your father's house?

17        A.   Yes.

18        Q.   You took your kids, correct?

19        A.   Yes.

20        Q.   And you began to live at your father's house from

21   the 16th --

22        A.   Yes.

23        Q.   -- on?

24             THE COURT:  Pause.  Let her finish her

25   questions.  Let there be air in between her words and
```

 1    yours, because those are two different people talking.

 2    So you can't overlap.  Just like I tell her, she can't

 3    overlap your answers.  We've got to let Karen do her

 4    job.  Okay?

 5              THE WITNESS:  Okay.  Thanks.

 6              THE COURT:  Just, everyone, take a deep

 7    breath and slow down.

 8              THE WITNESS:  Okay.

 9              THE COURT:  Next question.

10    Q.  (BY MS. KEENE)  Then on -- other than through

11    Facebook, you said there was also cell phone

12    conversations with Mechelle on the 16th?

13    A.  Yes.

14    Q.  And was it cell phone to cell phone or was it

15    house phone to cell phone?

16    A.  By then it was from house phone to her cell

17    phone.

18    Q.  All right.  What is your father's house phone?

19    A.  It was 817-481-1214.

20    Q.  And so by now it's this phone number and

21    Mechelle's cell phone; is that correct?

22    A.  Yes.

23    Q.  And about how many conversations did you have

24    with her on the 16th?

25    A.  On Facebook or the phone?

1    Q.  Phone.

2    A.  I don't remember.

3    Q.  Many?

4    A.  Yes.

5    Q.  Was there ever a time that you confronted

6    Mechelle about showing up at Thomas' work, at Best Buy?

7    A.  Yes.

8    Q.  And was that prior to these dates when you got

9    kicked out?

10   A.  Yes.

11   Q.  Do you recall what date that was?

12   A.  I don't recall, but I know it's in our

13   conversation here, in these Facebook conversations.

14   Q.  But does that help refresh your memory about the

15   time period that it was?  Was it after February 17th?

16   A.  Yes.

17   Q.  Would that have been about this time period of

18   the conversations on the cell phone, between

19   February 17th and March 15th, that you confront her

20   about her showing up at Thomas's work?

21   A.  Yes.

22   Q.  And did that bother you that she showed up at his

23   work?

24   A.  Yes.

25   Q.  And you gave her, for lack of a better word, the

1    "what for" about that?

2        A.   Yes.

3        Q.   And that would have been -- my question is, do

4    you have any idea what time period between February 17th

5    and March 15th that that was?  And if you don't, you

6    don't.

7        A.   Yeah.

8        Q.   But it was between those dates?

9        A.   It was between those dates.

10       Q.   Okay.  So I'm going to do a 4(A) because I missed

11   it.  Okay?  Do you recall if you did it on Facebook or

12   if you called her?

13       A.   It was on Facebook.

14       Q.   Okay.  So you confront on Facebook.  You confront

15   Mechelle Gandy about Best Buy; is that correct?

16       A.   About -- can you please repeat that?

17       Q.   Somewhere in between February 17th and March the

18   15th you confronted, on Facebook, Mechelle Gandy about

19   going to Best Buy?

20       A.   Yes.

21       Q.   And the Best Buy was in Grapevine?

22       A.   Yes.

23       Q.   And that's where Thomas worked?

24       A.   Yes.

25       Q.   And it wasn't but a mile from y'all's house --

```
 1        A.   Hang on.
 2        Q.   -- is that correct?
 3             Fifteenth, you're talking to her multiple
 4   times on Facebook, 16th you're talking to her multiple
 5   times on Facebook.  On any of these dates do you-all
 6   actually meet face to face?
 7        A.   No.
 8        Q.   On any of these dates does she bring to you some
 9   new paperwork that has now been filed?
10        A.   Yes.
11        Q.   Is that on any of these dates?
12        A.   I don't remember the exact date.
13        Q.   Okay.  About -- would this have been after this
14   time period, if you know?
15        A.   Yes.
16        Q.   Would it have been prior to March 17th?
17        A.   I believe so, yes.
18        Q.   So about -- we can put "about" on the March 16th
19   date, is that right, about --
20        A.   Yes.
21        Q.   -- this date Mechelle Gandy brought to you some
22   paperwork?
23        A.   Yes.
24        Q.   Okay.  And did she leave that paperwork in your
25   father's mailbox?
```

1    A.  Yes.

2    Q.  And this was a time period that you now were not

3 living at Thomas' -- you and Thomas were not living

4 together because you'd just gotten kicked out?

5    A.  Correct.

6    Q.  And now she's come over to your dad's house and

7 left some new paperwork, correct?

8    A.  In the mailbox, yes.

9    Q.  And you looked at the paperwork?

10    A.  Yes.

11    Q.  And the paperwork that you looked at looked like

12 she was being sued for some sort of paternity?

13    A.  Yes.

14    Q.  It was very confusing?

15    A.  Yes.  It was confusing paperwork.

16    Q.  It said the case has been brought against

17 Mechelle Gandy?

18    A.  Yes.

19    Q.  And that's the paperwork she gave to you?

20    A.  Yes.

21    Q.  It didn't say the case has been brought against

22 Thomas, the paperwork she gave to you?

23    A.  I don't remember word for word what was on that

24 paper, but I do remember it stating something against

25 Mechelle, and Thomas' name was on there, but I don't

```
 1   remember in what manner.
 2       Q.  It seemed confusing to you that if someone wanted
 3   to get paternity established for a father and get child
 4   custody, that there would be paperwork that says it's
 5   against them?
 6       A.  Right.
 7       Q.  That caused you -- you understood that that was
 8   confusing?
 9       A.  Yes.
10       Q.  And -- okay.  So now by the 17th if you now have
11   this paperwork -- actually, there's a birthday that
12   happened before this.  When did you get a birthday
13   invitation?
14       A.  In February.
15       Q.  In February?
16       A.  Yes.
17       Q.  Okay.  Would that have been before the
18   February 17th --
19       A.  Yes.
20       Q.  -- "leave me alone"?
21           Okay.  So prior to February 17th.  Do you
22   have any idea what date that was?
23       A.  I believe it was February 8th.
24       Q.  Okay.  So we'll do a 2(A) here.
25           And the birthday card was sent to your dad's
```

```
 1   house, correct?
 2      A.  Yes.
 3      Q.  That's not where you and Thomas lived?
 4      A.  No.
 5      Q.  And this is the birthday card that's now been
 6   introduced as State's Exhibit No. 231, 231-A, correct?
 7      A.  Yes.
 8      Q.  And you maintained this in your possession,
 9   correct?
10      A.  Yes.
11      Q.  This is not something that was given to Thomas
12   for him to have, correct?
13      A.  I don't -- it was given to us.  I mean, I don't
14   really know how to answer that.
15      Q.  Well, it came to your dad's house, correct?
16      A.  Yes.
17      Q.  It did not come to the apartment that you lived
18   with Thomas?
19      A.  Correct.
20      Q.  Thomas was not living at your dad's house when
21   this came to your house -- to your dad's house?
22      A.  Correct.
23      Q.  And --
24              THE COURT:  Joetta, can I talk to you a
25   second?
```

```
 1              MS. KEENE:  Uh-huh.
 2              (Discussion at the bench, off the record)
 3     Q.  (BY MS. KEENE)  You received the card about on
 4  February the 8th?
 5     A.  Yes.
 6     Q.  And that's a card that you received at your
 7  father's house?
 8     A.  Yes.
 9     Q.  And that's a card that you ultimately turned in
10  to the police department?
11     A.  Yes.
12     Q.  And we'll get to that and when that happened.
13  Okay?
14     A.  Okay.
15     Q.  But that's a card that you kept and you had in
16  your possession?
17     A.  Yes.
18     Q.  Okay.  That's not a card -- I understand it was
19  sent to Olivas family, but that's not a card that you
20  gave to Thomas?
21     A.  No.
22     Q.  You confronted him about a birthday card with
23  somebody's name, Olivas, a little kid on it, correct?
24     A.  I don't know.  I mean, I didn't know it was the
25  little kid's invitation before it was opened.
```

1      Q.   Okay.   February 8th you get the birthday
2   invitation and you opened the invitation; is that
3   correct?
4      A.   Yes.
5      Q.   And at some point you realize it is a little
6   kid's birthday invitation?
7      A.   Yes.
8      Q.   And you realize it is a little kid's birthday
9   invitation about this woman named Mechelle?
10     A.   Yes.
11     Q.   And you realized this is the same woman named
12   Mechelle that you've already had a "what for" with in
13   August of 2009?
14     A.   Yes.
15     Q.   And you realize this is the same person that you
16   had your friend even contact?
17     A.   Yes.
18     Q.   And then it's now in -- February 17th, prior to
19   the actual birthday, that you've told her to stop
20   bothering y'all?
21     A.   Yes.
22     Q.   Okay.   Is there any other date within this that
23   we've missed?
24     A.   I'm not -- I'm really not sure.
25     Q.   Okay.   Now March 16th, jumping forward, you're

```
 1    having Facebook conversations with Mechelle; is that
 2    correct?
 3         A.   Yes.
 4         Q.   You're having telephone conversations with
 5    Mechelle?
 6         A.   Yes.
 7         Q.   And Mechelle has now brought you paperwork to
 8    your father's house?
 9         A.   Yes.
10         Q.   You did not go over to her house to pick up the
11    paperwork?
12         A.   No.
13         Q.   And the paperwork dealt with child custody?
14         A.   Yes.
15         Q.   Was there any other contact between you and
16    Mechelle, whether it be through people, telephones,
17    mail, Facebook, e-mail, on March 16th?
18         A.   No.
19         Q.   Okay.  March 17th, was there any contact?
20         A.   Yes.
21         Q.   All right.  How -- what was the contact?
22         A.   It was through Facebook and phone.
23         Q.   About how many Facebook conversations did you
24    have with Mechelle on the 17th?
25         A.   Approximately 61 conversations.
```

```
 1        Q.   Sixty-one messages, correct?

 2        A.   Messages, yes.

 3        Q.   And so that's a 6-1.  Does that look slightly

 4   like a 6-1?

 5        A.   Yes.

 6        Q.   All right.  So what 61 means is you sent her a

 7   message, that's one; she sent you back, that's two?

 8        A.   Correct.

 9        Q.   Each one of those is a message?

10        A.   Yes.

11        Q.   And 61 of those back-and-forths, one way or the

12   other, happened on the 17th of March?

13        A.   Yes.

14        Q.   And by now this is Thursday; is that correct?

15        A.   Yes.

16        Q.   And then on the telephone how many conversations

17   did you have with her?

18        A.   I don't remember.

19        Q.   More than one?

20        A.   Most likely, yes.

21        Q.   More than two?

22        A.   Probably.

23        Q.   More than three?

24        A.   I'm not sure.

25        Q.   So two-plus?
```

```
 1        A.   Yes.
 2        Q.   And was that your house phone to her cell phone?
 3        A.   Yes.
 4        Q.   Were you ever using your father's cell phone to
 5   talk to her?
 6        A.   No.
 7        Q.   But your father has a cell phone?
 8        A.   Yes.
 9        Q.   And you are now living at the house with your
10   father by the 17th?
11        A.   Yes.
12        Q.   Was anybody else at the house that you were
13   living with, other than your father?
14        A.   Yes.
15        Q.   Who else?
16        A.   My children.
17        Q.   Anyone other than your children and your father?
18        A.   No.
19        Q.   All right.  Any other conversations on the 17th
20   with Mechelle?
21        A.   No.
22        Q.   Did you send any friends to talk to her?
23        A.   No.
24        Q.   Anybody dropping anything off?
25        A.   No.
```

```
 1      Q.   Okay.  On the 18th was there any contact between
 2   Mechelle and you?
 3      A.   Yes.
 4      Q.   All right.  How was the contact?
 5      A.   Facebook and phone.
 6      Q.   And this is Friday; is that correct?
 7      A.   Yes.
 8      Q.   How many contacts on Facebook did you have with
 9   Mechelle?
10      A.   Five.
11      Q.   And during this time period you're still
12   basically broken up with Thomas?
13      A.   Yes.
14      Q.   And you're still living with your dad?
15      A.   Yes.
16      Q.   How many phone conversations do you have?
17      A.   More than two again.  Two-plus most likely.
18      Q.   Is there any texting happening?
19      A.   No.
20      Q.   Okay.  On March 18th is there any other
21   conversations that you've had with Mechelle?
22      A.   On which day?
23      Q.   On that Friday.
24      A.   Just through Facebook and the phone.
25      Q.   On Saturday, the 19th, was there any -- is there
```

```
 1   any contact between you and Mechelle?
 2       A.   Yes.
 3       Q.   How was the contact?
 4       A.   Through Facebook and phone conversations.
 5       Q.   How many Facebook conversations?
 6       A.   Fourteen.
 7       Q.   And how many telephone conversations?
 8       A.   I would say again two-plus.
 9       Q.   And any other conversations, whether it be
10   e-mail, dropping things off, on the 19th, between you
11   and Mechelle?
12       A.   No.
13       Q.   On now the 20th, the day this happened.  Okay.
14   That is a Sunday; is that correct?
15       A.   Yes.
16       Q.   You testified earlier with the jurors that you
17   had some telephone conversations with Mechelle on the
18   day she was murdered?
19       A.   Yes.
20       Q.   And about what time do you believe those
21   telephone conversations were?
22       A.   Approximately 5:30 to 6:30.
23       Q.   About how many phone conversations?
24       A.   A lot.  And I know there was phone calls even
25   prior to that earlier in the day, but I don't remember
```

```
 1    the timing because I know she had to work.
 2        Q.  And so it was your understanding that Mechelle
 3    was working on the 20th?
 4        A.  Yes.
 5        Q.  And you believe you talked to her in the morning?
 6        A.  I don't remember when exactly.
 7        Q.  When you're talking to her at 5:30 and 6:30 p.m.
 8    on the phone, you believe that she's finished working?
 9        A.  Yes.
10        Q.  And do you believe that she is now at her house?
11        A.  She was on her way.
12        Q.  To her house?
13        A.  To pick up Asher from her mother's house.
14        Q.  So you believe, what your knowledge is, at 5:30
15    and 6:30 she's about to have the baby and she's about to
16    be home?
17        A.  Yes.
18        Q.  And you know "home" to be the house or the
19    apartment on Presidents Corner because of the invitation
20    you got?
21        A.  Well, I never really paid attention to the
22    address, but I knew through our conversations she lived
23    in an apartment.
24        Q.  In Arlington?
25        A.  Yes.
```

1    Q.   You said you had about some -- about how many

2    phone conversations did you have with her in the morning

3    hours?

4    A.   I don't remember.

5    Q.   One or two?

6    A.   More than two, maybe.  I don't remember.

7    Q.   So two-plus in the morning; is that correct?

8    A.   I believe so.

9    Q.   Phone?

10   A.   And I'm not really sure if it was the morning or

11   early afternoon.  It was sometime that day.

12   Q.   And then how many phone conversations at 5:30 to

13   6:00?

14   A.   I think it was just one long one, long

15   conversation.

16   Q.   One long conversation.  What is "long" to you?

17   A.   I know some of our conversations would last maybe

18   like 45 minutes to an hour.  I don't know.

19   Q.   That would be long?

20   A.   Long.

21   Q.   So do you think this is a 45 minute to an hour

22   long conversation?

23   A.   No.

24   Q.   What do you think it is?

25   A.   Maybe less than 30 minutes.

STATE v. THOMAS OLIVAS

```
1    Q.   So a long conversation, less than 30 minutes; is
2    that correct?
3    A.   Yes.
4    Q.   And is this the last contact you had with
5    Mechelle on the day she was murdered?
6    A.   Yes.
7    Q.   Do you recall Facebooking with her at all on that
8    day?
9    A.   Yes.
10   Q.   Okay.  So that wouldn't be the last conversation
11   you had with Mechelle, or contact?
12   A.   Well, we have Facebook contact in the morning.
13   Q.   In the morning.
14   A.   Prior to about 5:30 to 6:30.
15   Q.   So all this is phone, correct?
16   A.   9:24 a.m.
17   Q.   What time is the first Facebook conversation with
18   Mechelle on Sunday?
19   A.   It shows 9:24 a.m.
20   Q.   Does that ring true to -- other than what it
21   shows, because it's really about your memory.  You're
22   not supposed to read off documents.  Okay.  Just look at
23   it and think does that help me remember?
24   A.   Okay.
25   Q.   Does that sound right to you?
```

1    A.   Yes.

2    Q.   That at about 9:24 a.m. there was a message.

3  What about -- was there just one message about Facebook

4  on the day she was killed?

5    A.   I can count like I've done before.  It looks like

6  one that I see here.  I don't know if there was more on

7  not, but I just see one here.

8    Q.   Do you recall Facebooking Mechelle at 9:10 in the

9  evening that she was killed?

10   A.   Yes.

11   Q.   Okay.  Now, that would be another contact then on

12 Facebook, correct?

13   A.   Yes.

14   Q.   And that's nothing that you told these jurors

15 about when you testified?

16   A.   Not yet.

17   Q.   Until right now?

18   A.   Until right now.

19   Q.   And that's nothing that you ever told the police

20 about whenever you talked to them?

21   A.   Yes, I did.

22   Q.   Okay.  Well, we'll go over that.

23        So what time was it that you Facebooked her

24 on the night that she was killed?

25   A.   Around 9:00 p.m.

```
 1      Q.   So you think that you had two messages, one at
 2   9:24 a.m. and one at 9:00, basically, p.m.?
 3      A.   Yes, I i-messaged her.
 4      Q.   You i-messaged her about 9:00 p.m. on the night
 5   that she's killed; is that correct?
 6      A.   Yes.
 7      Q.   Okay.  Is this, what we have just listed out, the
 8   sum total of your contacts and conversations between you
 9   and Mechelle Gandy?
10      A.   Yes.
11      Q.   Do you think that we have missed any of them?
12      A.   No.
13      Q.   Okay.  You did not like Mechelle Gandy; is that
14   fair to say?
15      A.   I don't think that's fair to say.
16      Q.   Mechelle Gandy had had an affair with the man you
17   loved; is that true?
18      A.   Yes.
19      Q.   And you did not like her because she had had an
20   affair with the man you loved?
21      A.   I didn't like her at the beginning when I didn't
22   know anything at all.
23      Q.   You believed that Mechelle Gandy had destroyed
24   your home; is that correct?
25      A.   Yes.
```

1    Q.   And you believed that she had destroyed what you

2  and Thomas had built as a family together?

3    A.   Yes.

4    Q.   And you actually believed that Mechelle Gandy in

5  all of these telephone -- or all these telephone and

6  Facebook conversations was playing you to get your man?

7    A.   At times I felt that way.

8    Q.   You felt like she was coming on strong to you,

9  being nice, to separate you from Thomas so she could

10  jump back in the seat and get him?

11    A.   Sometimes I felt that way.

12    Q.   And so it's safe to say you did not trust

13  Mechelle Gandy?

14    A.   No.

15    Q.   It's safe to say you did not like her?

16    A.   I didn't like her at first.

17    Q.   But you did -- you never trusted her?

18    A.   No, I didn't fully trust her.

19    Q.   And you certainly would never have trusted her to

20  be alone with your man?

21    A.   No.

22    Q.   Because you believed that she would have been

23  trying to basically get back with him?

24    A.   Yes.

25    Q.   After all of this happened -- what -- where were

```
1    you on the night that Mechelle was killed?

2        A.   I was at home.

3        Q.   And you were at home in Grapevine?

4        A.   Yes.

5        Q.   And you were at home in Grapevine with your

6    father?

7        A.   My father and children.

8        Q.   And your children.  You received some telephone

9    phone calls from the police?

10       A.   Yes.

11       Q.   And you did not answer those phone calls?

12       A.   No, not -- no.

13       Q.   They left voice -- they left messages on your

14   machine?

15       A.   Voicemails, yes.

16       Q.   And when you heard those messages, it wasn't

17   until 6:00 a.m. that you actually called the police

18   back?

19       A.   Correct.

20       Q.   Or did the police call you?

21       A.   I called them back.

22       Q.   And when you talked to the police, you were

23   hysterical?

24       A.   Yes.

25       Q.   And yet they had not told you what had happened
```

```
 1   or that anything had happened?
 2       A.   Correct.
 3       Q.   But yet you were hysterical, correct?
 4       A.   Well --
 5       Q.   Correct?
 6       A.   -- they didn't tell me at first.  Like they told
 7   me later in conversation that -- well, they had
 8   mentioned that Mechelle had been murdered, but they
 9   didn't tell me further than that.
10       Q.   So it's your testimony today that the police call
11   you on the telephone and told you that Mechelle Gandy
12   was murdered?
13       A.   Yes.
14       Q.   And that's what you remember and that's why you
15   were hysterical?
16       A.   Yes.
17       Q.   Is it your testimony that you were never
18   hysterical prior to them telling you anything about why
19   they were even calling?
20       A.   I was worried.  When I checked the voicemail, I
21   knew something obviously had gone wrong, otherwise the
22   police wouldn't have called me in the first place.
23       Q.   So when you -- basically when you pick up the
24   phone, you're hysterical because you figure the police
25   are calling and it's got to be bad, whatever it is?
```

*STATE v. THOMAS OLIVAS*

```
 1        A.   Yes.
 2        Q.   And is that part of -- during that time period --
 3   and I don't mean to be prying, okay, but during that
 4   time period you were on medication?
 5        A.   Yes.
 6        Q.   And you were under the care of a psychiatrist?
 7        A.   Yes.
 8        Q.   What sort of medications were you on?
 9        A.   I don't remember.  I believe one was an
10   antidepressant and antianxiety.
11        Q.   Nothing more than that?
12        A.   Not that I can recall.
13        Q.   Have you ever had a diagnosis of -- because
14   you're hearing voices or anything like that?
15        A.   No.
16        Q.   It's always just been the bipolar?
17        A.   And posttraumatic stress.
18        Q.   And posttraumatic stress?
19        A.   Yes.
20        Q.   And the posttraumatic stress, are you seeing
21   things or hearing things at all?
22        A.   Not really.  I think I would get side effects on
23   the medication and I would -- sometimes I would maybe
24   see something and I would tell my doctor, like I think
25   I'm kind of -- these medications are not doing well with
```

STATE V. THOMAS OLIVAS

```
 1   me.  Can we please switch them?  So I'd gets physical
 2   and mental side -- bad side effects from my medications
 3   and I would constantly ask my doctor to change them
 4   because I didn't like any of them.
 5       Q.  And you're not on any now?
 6       A.  No.
 7       Q.  Are you still seeing a psychiatrist now?
 8       A.  No, I'm going to counseling.
 9       Q.  A psychologist?
10       A.  No, a certified counselor.
11       Q.  And that's all I really am allowed to get into.
12   That's all I need to get into.  Okay?
13            Because back then you're hysterical when
14   you're talking to the police?
15       A.  Yes.
16       Q.  And you're so hysterical that you -- they
17   continue to talk to you before they arrived at your
18   house?
19       A.  Yes.
20       Q.  And so about how long do you think you talked to
21   the police before all of a sudden there's police
22   officers outside?
23       A.  I don't remember.
24       Q.  And whenever the police came and talked to you
25   when you were at home, where did you go then, did you
```

```
 1   stay at home?
 2       A.   I stayed at home until eventually I went and
 3   talked to the Arlington detective.
 4       Q.   And we'll go over that.  Okay.
 5            So you stayed at home, the police came out
 6   there, they talked to you, you stayed at home, correct?
 7       A.   Yes.
 8       Q.   Did the police ever confront you about where you
 9   were that night?
10       A.   Yes.
11       Q.   And when was that?
12       A.   When I went to go talk to the Arlington police
13   later that morning.
14       Q.   And was that with a female detective?
15       A.   Yes.
16       Q.   Did they ever ask you to give your DNA to them?
17       A.   No.
18       Q.   Ever take a swab from you?
19       A.   No.
20       Q.   Did they ever ask to take any pictures of you?
21       A.   No.
22       Q.   Did they ever ask you for your cell phone that
23   you say was broken?
24       A.   I don't remember.
25       Q.   Did they ask you for consent to search your
```

1  father's house?

2      A.  I don't remember.

3      Q.  Did they ever ask you to give the clothes that

4  you had on that night to them?

5      A.  No.

6      Q.  In fact, when you went and saw and talked to

7  them, do you recall having on a black sweatshirt?

8      A.  Yes.  I think I was wearing a black hoodie and

9  jeans.

10     Q.  And wearing a black hoodie does not a make a

11 person a killer, does it?

12     A.  No.

13     Q.  But the police saw you in a black hoodie the next

14 day and they never asked for you to produce or give them

15 that black hoodie, correct?

16     A.  No.

17     Q.  They talked to you, you were also hysterical when

18 you went down to talk to the police again; is that

19 correct?

20     A.  I don't understand that.

21     Q.  We're going to go over that.

22         But whenever you went down and talked to the

23 police --

24     A.  Uh-huh.

25     Q.  -- you were upset?

```
 1        A.   Yes.

 2        Q.   And crying?

 3        A.   Yes.

 4        Q.   To the point that you're hysterical or just

 5   crying?

 6        A.   Just crying.

 7        Q.   Was your father home all night?

 8        A.   Yes.

 9        Q.   And did you leave your children with your father

10   whenever you went down to talk to the police?

11        A.   No.  They were in school.

12        Q.   So in the morning you took your children to

13   school and then went and talked to the police?

14        A.   Yes -- well, I didn't take -- well, yes, I took

15   the children to school early that morning.

16        Q.   You did not believe that Thomas was ever

17   suicidal, did you?

18        A.   No.

19        Q.   You believed that he was playing you?

20        A.   Yes.

21        Q.   To basically get sympathy to -- for you to

22   forgive him for being a cheater?

23        A.   Yes.

24        Q.   I mean, summing it up, correct?

25        A.   Yes.
```

```
 1     Q.   He told you that he'd taken some of your
 2  medication?
 3     A.   Yes.
 4     Q.   But when you looked at your medication, you were
 5  not missing any?
 6     A.   No.
 7     Q.   You believe that Thomas -- looking back today,
 8  you believe that Thomas was cheating on you with a lot
 9  of different women?
10     A.   Yes.
11     Q.   Not with just Mechelle?
12     A.   Correct.
13     Q.   But during that time period, this was the only
14  woman that you knew about?
15     A.   I had suspicions of other women, so no.
16     Q.   So you thought maybe other women, correct?
17     A.   Yes.
18     Q.   But certainly no other person had built a wedge
19  in between you and Thomas like Mechelle had?
20     A.   Correct.
21     Q.   And certainly no other woman had built a wedge to
22  where you actually got kicked out of your house?
23     A.   Correct.
24     Q.   After this, you and -- you began to have a long
25  conversation with Thomas, correct?
```

```
 1        A.   After when?
 2        Q.   Mechelle's murder.
 3        A.   Yes.
 4        Q.   And within -- how long is it that you get a -- be
 5   back within his graces from being kicked out to being
 6   part of his life again?
 7        A.   I started seeing him in person again in July or
 8   August.
 9        Q.   And do you know that in August, did he ever go to
10   Virginia to your knowledge?
11        A.   No, I have no idea.
12        Q.   But when you began to start seeing him again in
13   July, it wasn't just him getting to see his daughter,
14   was it?
15        A.   No.
16        Q.   I mean, you getting to see Thomas, too?
17        A.   Yes.
18        Q.   No matter what you feel today, back then you
19   loved him very much?
20        A.   Yes, I did.
21        Q.   This was a person who had come into your life and
22   been in your life five years?
23        A.   Yes.
24        Q.   And it's safe to say, as far as men go, the most
25   stable that you had had up to that point?
```

```
 1        A.  Yes.
 2        Q.  And you had had a prior dude, or whatever, guy,
 3   who was not stable at all, in which you had your little
 4   boy with?
 5        A.  Can you rephrase that?
 6        Q.  Absolutely.  You're little boy is not Thomas'
 7   little boy?
 8        A.  No.
 9        Q.  But Thomas has always acted as if that was his
10   little boy?
11        A.  Yes.
12        Q.  The father of the little boy was not in the
13   little boy's life?
14        A.  That's incorrect.
15        Q.  Was the father of the little boy in his life?
16   Yes?
17        A.  He was in his life, yes.
18        Q.  Was he a person that was a stable person or not a
19   stable person?
20        A.  I'm really not quite sure what your definition of
21   stable or instable is.
22        Q.  I mean --
23             MR. ROUSSEAU:  Object, Your Honor.  Can we
24   approach just a moment?
25             MS. KEENE:  I can go forward, Judge.  I
```

```
 1   don't need to keep going there.
 2              THE COURT:  Are you leaving that subject
 3   matter and moving on?
 4              MS. KEENE:  I can leave the subject matter.
 5              THE COURT:  Then you may do so.
 6      Q.  (BY MS. KEENE)  Because the bottom line is,
 7   Thomas was a person who acted like a father to your
 8   little boy?
 9      A.  Yes.
10      Q.  And in your mind loved him?
11      A.  Yes.
12      Q.  And certainly the two of y'all now had a daughter
13   together?
14      A.  Yes.
15      Q.  And so this was a person that you loved?
16      A.  Yes.
17      Q.  And this was a person that you wanted to get
18   married and have a long-term life commitment with?
19      A.  Yes.
20      Q.  This was a person that you wanted to give you a
21   ring and say, Will you marry me, Rebeca --
22      A.  Yes.
23      Q.  -- correct?
24      A.  Yes.
25      Q.  And so what stopped all of that was a person by
```

```
 1    the name of Mechelle Gandy?
 2        A.  Not necessarily.
 3        Q.  Well, you'd never been kicked out of the house,
 4    had you?
 5        A.  No.
 6        Q.  And -- but yet when all this was done, by about
 7    July, you get him back, correct?
 8        A.  I wouldn't say that I got him back.
 9        Q.  Well, what -- how would you describe it?  He got
10    you back?
11        A.  I wouldn't describe it that anyone got anyone
12    back.  I was confused and didn't really know what to do
13    and I didn't want to upset him more, but I also wanted
14    to believe that he had nothing to do with Mechelle and
15    Asher's deaths.
16        Q.  And so you begin to have a sexual relationship
17    with him; is that correct?
18        A.  I did.
19        Q.  And he moved his apartment from a two-bedroom
20    apartment, when he lived with you, he went and got a
21    one-bedroom apartment when this was over because he was
22    free, correct, you guys weren't coming back?
23        A.  Yes.
24        Q.  Not in his mind, at least, correct?
25        A.  Correct.
```

1    Q.   But yet then once you, by about July, start

2    coming into his life, he gave you a key to that

3    apartment, didn't he?

4    A.   Yes.

5    Q.   And so you began to then see him on a regular

6    basis for things other than just "let's see my

7    daughter," is that correct?

8    A.   No.

9    Q.   You began to see him sexually?

10   A.   I saw him sexually, but not regularly.

11   Q.   He did not move you back into that apartment, did

12   he?

13   A.   No.

14   Q.   In fact, did you have any suspicion that during

15   this same time period that you were now going to see him

16   that he was still basically being a gigolo?

17   A.   Can you repeat that, please?

18   Q.   Did you have any belief or do you know or do --

19   at that time period do you have any belief that even

20   while seeing you he was being a gigolo out there?

21   A.   I wasn't sure.

22   Q.   You weren't sure if he was ever being faithful?

23   A.   Exactly.

24   Q.   And not having the confidence in someone being

25   faithful will ultimately destroy a relationship, won't

```
 1   it?
 2       A.  Yes.
 3       Q.  And so y'all's relationship ultimately got
 4   finished?
 5       A.  Yes.
 6       Q.  And that was probably by about October?
 7       A.  Yes, in October.
 8       Q.  And then there's no more relationship between the
 9   two of y'all?
10       A.  Correct.
11       Q.  Basically; is that correct?
12       A.  Correct.
13       Q.  You testified that Thomas, when you were talking
14   to him, that he said to you at some point -- I didn't
15   write down the date -- but he said, "That fucking baby
16   is a devil's child," is that correct?
17       A.  Yes.
18       Q.  Do you recall ever telling the police that he
19   said that?
20       A.  Yes.
21       Q.  Do you believe you told them that on the -- on
22   what occasion?
23               MS. KEENE:  Judge, may I approach the board?
24               THE COURT:  Yes.
25               THE WITNESS:  Probably the next -- that --
```

STATE v. THOMAS OLIVAS

```
 1   on March 20th, that morning when I went into the
 2   Arlington Police Department.
 3       Q.   (BY MS. KEENE)  Okay.  How many times have you
 4   talked to the police about this case?
 5       A.   I don't remember.
 6               MS. KEENE:  Does anyone have a black marker?
 7               THE COURT:  Are we out of ink?
 8               MS. KEENE:  Well, no, I left the top off.
 9               (Pause in proceedings)
10       Q.   (BY MS. KEENE)  All right.  Attempts to say,
11   "Rebeca.  Police conversations."  "Conversations" got
12   messed up.
13       A.   Okay.
14       Q.   Does that kind of look like that?
15       A.   Yes.
16       Q.   Okay.  I need to steal my book back for some
17   dates.
18       A.   Sure.
19       Q.   Okay?
20       A.   Uh-huh.
21       Q.   On March the 20th is the first contact you had
22   with the police; is that correct?
23       A.   Yes.
24       Q.   Actually it was March 21st, that morning?
25       A.   Yes.  Yes.
```

```
1        Q.   And about what time was that?
2        A.   I don't remember.
3        Q.   What time you called the police back?
4        A.   What time I called them back, was around 6:30,
5   6:00, 6:30.
6        Q.   And that was when --
7        A.   a.m.
8        Q.   And that was the time period that you were
9   hysterical and it was on the phone?
10       A.   Yes.
11       Q.   So we'll put "phone" and "hysterical".  Is that
12   okay to put that?
13       A.   Yes.
14       Q.   At 6:30 a.m.  And then later that day at about --
15   actually, did you ever talk to Detective Stewart that
16   day?
17       A.   No.
18       Q.   On the telephone, the 21st?
19       A.   I don't believe so.  I just remember, really,
20   talking to Detective Wade.
21       Q.   Detective Wade is the first time you talked to
22   any detective?
23       A.   Yes.
24       Q.   And is that about --
25       A.   I believe so.
```

```
1      Q.   About what time is that?

2      A.   I don't remember.

3      Q.   Is that about 8:49 a.m.?

4      A.   I don't remember.  I just remember it being in

5   the morning.

6      Q.   All right.  So in the morning you talked for

7   about an hour with Detective Wade?

8      A.   I don't remember how long I talked to her.

9      Q.   But was the conversation recorded?

10     A.   Yes.

11     Q.   On video?

12     A.   Yes.

13     Q.   Okay.  Video recording, Detective Wade, correct?

14     A.   Yes.

15     Q.   No conversation with Detective Stewart at all on

16   the 22nd -- on 21st?

17     A.   I don't remember for sure, but I don't think so.

18     Q.   And you know who I'm talking about when I say

19   Detective Stewart, correct?

20     A.   Yes.

21     Q.   Okay.  When is the next conversation you have

22   with the police?

23     A.   I don't remember.

24     Q.   Do you recall going down again on April the 13th

25   and meeting with a Detective Alley?
```

1    A.  Yes.

2    Q.  And did you give a statement whenever you met

3  with Detective Alley?

4    A.  I don't remember.

5    Q.  But certainly you provided her with -- by the

6  13th you provided her with all of your Facebook

7  conversations with Mechelle?

8    A.  Yes.

9    Q.  Did you provide her with all your Facebook

10  conversations with Thomas, as well?

11    A.  Yes.

12    Q.  Did you provide her with anything else on the

13  13th, other than basic Facebook?  Did you give her the

14  court papers that Mechelle had given you?

15    A.  Yes.  And I believe that's also the time I gave

16  the invitation to them.

17    Q.  So you gave the invitation, which is State's

18  Exhibit No. 231, and then the court papers you think,

19  too?

20    A.  I believe so.

21    Q.  Gave Facebook between yourself and Mechelle

22  Gandy, correct?

23    A.  Yes.

24    Q.  And also between yourself and Thomas Olivas; is

25  that correct?

```
 1        A.   Yes.
 2        Q.   And then, also, the court papers that Mechelle
 3   had delivered to your house and the baby -- invitation,
 4   birthday party invitation?
 5        A.   Yes.
 6        Q.   After the 13th -- you don't think you gave a
 7   statement on that day; is that correct?
 8        A.   That's correct.
 9        Q.   And then on November the 17th, 2011, you met with
10   the police again and gave another statement?
11        A.   I don't remember.
12        Q.   Do you remember meeting with them in --
13   November 17th, 2011?
14        A.   No, I don't remember.
15        Q.   Okay.  If you looked at something that purports
16   to be a statement, look at that, don't read it, just --
17             MR. ROUSSEAU:  Your Honor, may I see what
18   she's looking at?
19             THE COURT:  Sure.
20        Q.   (BY MS. KEENE)  And see if that helps reflects
21   your memory about meeting with the police or giving them
22   a statement.
23             THE COURT:  You want her to reflect her
24   memory or refresh it?
25             MS. KEENE:  Refresh.
```

1          THE COURT:  All right.

2          MS. KEENE:  Reflect it...

3          THE COURT:  Do you want her to read the

4    whole thing?

5          MS. KEENE:  Just to see if it refreshes your

6    memory.

7          THE COURT:  Do you want her to read the

8    whole thing to see if the whole thing refreshes her

9    memory or any particular part?

10          MS. KEENE:  Just her meeting with the

11   police, if that helps her remember doing that in --

12          THE COURT:  I just asked do you want her to

13   read whole thing through and see what it refreshes or is

14   there any particular part?

15          MS. KEENE:  Just if she remembers giving a

16   statement in November.

17          THE COURT:  To the question of looking at

18   that, does that help you remember giving a statement?

19          THE WITNESS:  Yes.

20          THE COURT:  All right.

21   Q.  (BY MS. KEENE)  Did you meet with the police

22   again after April 13th and give another statement?

23   A.  Yes.

24   Q.  And when was that?

25   A.  November 17th.

```
 1        Q.  Of 2011?

 2        A.  Yes.

 3        Q.  And that's another statement you gave?

 4        A.  Yes.

 5        Q.  And this time it was actually a written

 6   statement --

 7        A.  Yes.

 8        Q.  -- is that correct?

 9             Do you remember who you met with or gave

10   that written statement to?

11        A.  Detective Stewart.

12        Q.  And that's Detective Stewart?

13        A.  Yes.

14        Q.  Is that the first time that you had met with

15   Detective Stewart in November of 2011?

16        A.  I don't remember.

17        Q.  Is that the last time that you gave any

18   statements in regards to this case?

19             Do I have them all?

20        A.  I don't remember.

21        Q.  March, April and November; is that correct?

22        A.  Those are correct.

23        Q.  You don't remember if you've given more

24   statements than at least two, if not three?

25        A.  Correct.
```

```
 1       Q.   You don't remember?

 2       A.   I'm not really sure -- when you say statement,

 3   what, do you mean like -- can you really tell me what

 4   statement?

 5       Q.   Going down to the police department and

 6   talking --

 7       A.   Uh-huh.

 8       Q.   -- to them about the events of March the 20th of

 9   2011.

10       A.   I know I would e-mail Detective Stewart once in a

11   while to -- if something popped in my head that maybe

12   would have been of help.

13       Q.   Okay.  So you believe you had e-mails with

14   Detective Stewart?

15       A.   Excuse me?

16       Q.   You do believe you had had e-mails with Detective

17   Stewart?

18       A.   Yes.

19       Q.   How many e-mails do you think?

20       A.   I don't know.  I don't remember.

21       Q.   More than one?

22       A.   Yes.

23       Q.   More than two?

24       A.   I think so.

25       Q.   More than five?
```

```
 1        A.   Yes.
 2        Q.   More than ten?
 3        A.   I don't remember.
 4        Q.   Between five and ten e-mails?
 5        A.   I don't remember.
 6        Q.   Between five and eight?
 7        A.   I don't remember.
 8        Q.   Just more than five?
 9        A.   Just -- yes.
10        Q.   Okay.  And then a date unknown -- dates unknown,
11   or do you know the dates?
12        A.   I don't know the dates.
13        Q.   Five times, dates unknown; is that correct?
14        A.   Yes.
15        Q.   But it's -- you believe it's within this same
16   time period in 2011?
17        A.   I really not sure of the time period.
18        Q.   Are you e-mailing him like yesterday?
19        A.   No.
20        Q.   Are you e-mailing him in 2014?
21        A.   I don't remember.
22        Q.   But it's your testimony that in which one of
23   these statements now that you told the police that
24   Thomas said that fucking baby is a devil child?
25        A.   Yes.
```

```
 1        Q.   Which one?
 2        A.   That was like in March, like right at the
 3   beginning.
 4        Q.   So it's your testimony that to Detective Wade,
 5   you told Detective Wade that Thomas called the child a
 6   devil child?
 7        A.   I believe so.
 8        Q.   In which one of these statements did you tell the
 9   detective that Thomas said, "Why are you talking to that
10   bulldog," or did you ever tell the police that?
11        A.   Yes, I did.
12        Q.   When did you tell the police that?
13        A.   I don't remember.
14        Q.   When did you tell the police -- did you ever tell
15   Detective Wade that you had a conversation with Thomas
16   on the phone in which Mechelle had come out to Best Buy
17   and Thomas said, "That bitch is here, I fucking hate
18   her"?
19        A.   Yes.
20        Q.   Do you recall telling the jury that?
21        A.   Yes.
22        Q.   Okay.  Did you tell Detective Wade that in March?
23        A.   I know I told one of the detective -- the
24   detectives at some point, and I believe it to be in
25   March.
```

1    Q.  Do you recall telling any of the police officers

2   that you told Thomas "I will kill that bitch"?

3    A.  Can you repeat that?

4    Q.  All right.  Whenever you found out that this

5   woman who is having sex with your man shows up now at

6   his work, Best Buy, right?

7    A.  Uh-huh.

8    Q.  And is that a confirmation to you that she is

9   truly harassing him?

10    A.  Somewhat, yes.

11    Q.  In other words, you're hearing that he's cheating

12   on her, maybe she's unstable, you don't quite know, but

13   now Thomas is calling you and saying she's here at my

14   work --

15    A.  Yes.

16    Q.  -- correct?

17         And that upset you?

18    A.  Yes.

19    Q.  And you said that Thomas said, "That bitch is

20   here, I fucking hate her," is that correct?

21    A.  Yes.

22    Q.  And you're saying that you told some detective

23   along the way or a police officer those words?

24    A.  Yes.

25    Q.  I'm asking you did you tell Thomas at that time

1    period, "I will kill that bitch"?

2        A.   No.

3        Q.   Did you ever feel that way at that time period?

4        A.   No.  I wanted them to take care of it, what they

5    needed to take care of in court.

6        Q.   But yet you get on Facebook and then you begin to

7    do the "what for" at that same time period with

8    Mechelle?

9        A.   Yes.  But I never threatened Mechelle.

10       Q.   I didn't ask you that.  I'm saying did you tell

11   Thomas, "I will kill that bitch," when you just heard

12   that she's up there, not whether or not --

13       A.   No, I --

14       Q.   -- you would literally --

15       A.   -- did not tell Thomas that.

16       Q.   Did you ever tell the police -- well, strike

17   that.

18            Did you ever tell the police that Thomas

19   told you, "That fucking bulldog, why are you talking to

20   her," about those words?

21       A.   Did I tell the police that?

22       Q.   Yeah.

23       A.   Yes.

24       Q.   Do you recall which one of the police officers

25   you told that?

1     A.   No, I don't.

2     Q.   Did you ever tell the police that whenever --

3  about your cell phone being thrown, that he looked at

4  you mean and evil, whenever he threw the cell phone?

5     A.   Yes.

6     Q.   Which police did you tell that to?

7     A.   I don't remember.  I believe it to be Detective

8  Wade, but...

9     Q.   You stated that he posted -- that Thomas posted

10 something on Facebook on March the 20th?

11    A.   Yes.

12    Q.   Do you recall what time that he did that post?

13    A.   I don't recall the time.

14    Q.   Do you recall what time you saw the post?

15    A.   It's anywhere from possibly 10:00 at night to

16 3:00 in the morning.  I don't remember.

17    Q.   So somewhere between 10:00 p.m. and 3:00 a.m. you

18 were someplace where you could see a Facebook post of

19 Thomas' about a song?

20    A.   Yes.

21    Q.   And do you feel like you saw it right after he

22 posted it or significantly later?  What do you feel

23 like?

24    A.   More towards right after.

25    Q.   So were you able to check your Facebook on a

```
 1   phone?
 2       A.  No.
 3       Q.  So what you're telling the jurors is you were
 4   sitting at your computer screen between 10:00 p.m. and
 5   3:00 a.m.?
 6       A.  At a laptop, yes.
 7       Q.  So that you were on your laptop between 10:00
 8   a.m. -- 10:00 p.m. and 3:00 a.m.?
 9       A.  Yes.
10       Q.  And did the police ever get ahold of your laptop
11   to look at it?
12       A.  No.
13       Q.  Did the police ever ask to see your laptop so
14   they could look at it and determine different things
15   that they can determine from laptops?
16       A.  No.
17       Q.  Did you ever describe Mechelle Gandy as
18   aggressive?
19       A.  Sometimes, yes.
20       Q.  And a person who would not back down?
21       A.  No, she wouldn't.
22       Q.  You testified earlier about Thomas getting a
23   text -- about you asking him about a text he got from
24   Mechelle in which it said, "Call me for directions to
25   the house"?
```

1    A.   Yes.

2    Q.   On March the 20th, correct?

3    A.   Yes.

4    Q.   So on the day she's killed you ask him about,

5  Hey, you got a text from Mechelle that said call me for

6  directions to her house; is that right?

7    A.   I don't -- I think it was a different day when I

8  talked to him about that through Facebook.

9    Q.   But you were certainly talking about March 20th?

10   A.   We were talking about March 20th, yes.

11   Q.   And you were asking him about why he didn't stay

12 on her to get the direction to her house?

13   A.   Yeah.

14   Q.   Basically, correct?

15   A.   Yes.

16   Q.   You certainly never said, Dude, you know where

17 she lived, anything like that, correct?

18   A.   I believe that's correct.

19   Q.   This whole pool incident that you said happened

20 in August of 2011; is that correct?

21   A.   Yes.

22   Q.   "Make her stop screaming"?

23   A.   Yes.

24   Q.   Did you ever tell the police about that in -- I

25 guess it would be November or e-mail Detective Stewart

```
1    about that incident?
2         A.  I don't remember.  I may have.  I don't remember.
3         Q.  Well, it upset you a lot here on the -- when you
4    testified in front of the jury, correct?
5         A.  What upsets me?
6         Q.  This whole conversation about the pool and about
7    Thomas saying, "Make her stop screaming"?
8         A.  Yes.
9         Q.  And so if it upset you in 2014, you certainly
10   would have told the police in November of 2011 about
11   this conversation?
12        A.  Most likely.
13             MS. KEENE:  Okay.  Judge, may I approach the
14   witness?
15             THE WITNESS:  I just don't remember.
16             THE COURT:  Yes, you may approach the
17   witness.
18             MS. KEENE:  And, Judge, it may be a good
19   time for a lunch break and I can have her read this
20   while we're all gone to lunch and then ask her the
21   questions afterwards.
22             THE COURT:  That will be fine.  You're going
23   to have to do that anyway?
24             MS. KEENE:  Exactly.
25             THE COURT:  That will be perfect.
```

1          All right.  Then it's 12:45.  Be at your

2    pickup point at, say, 2:00, 2:05.  Sheriff will be down

3    there waiting for you at 2:00, and try to be there by

4    2:05 and we'll pick up as soon as you get refreshed when

5    you get back upstairs.  Remember your instructions.

6          Everybody, else we won't resume before 2:10.

7          (Lunch break 12:45 - 2:00 p.m.)

8          (OPEN COURT, DEFENDANT AND JURY PRESENT)

9          (Witness on the stand)

10          THE COURT:  On the record.

11          Everyone eat?

12          SEVERAL JURY MEMBERS:  Yes.

13          THE COURT:  Everyone ready to resume?

14          SEVERAL JURY MEMBERS:  Yes.

15          THE COURT:  All right.  Parties have already

16    told me the same.

17          Still your witness.

18          MS. KEENE:  Thank you, Judge.

19    Q.  (BY MS. KEENE)  Rebeca, did you have an

20    opportunity to look at your statement dated November of

21    2011?

22    A.  Yes.

23    Q.  Over the break?

24    A.  Yes.

25    Q.  And did you tell the police in your written

1    statement anything about this pool incident, which you

2    testified to in front of the jury?

3        A.   No.

4        Q.   And that would have been closer to the time

5    period of the pool incident certainly than when you

6    testified here today, correct?

7        A.   Yes.

8        Q.   Do you have any idea, or can you explain to the

9    jurors, why you would find that so significant and

10   emotional today but not significant enough to tell the

11   police about in November of 2011, if you have an answer

12   to that?

13       A.   Well, I'm really not sure if I did tell them or

14   not.  It wasn't in the written statement.  It may have

15   been through e-mail or not.

16       Q.   All right.  So is it your testimony that you may

17   have told them and it would have been through e-mail and

18   it certainly was not in a written statement?

19       A.   It certainly wasn't written in the written

20   statement.

21       Q.   And do you recall an incident at the Truluck's

22   with Mechelle?

23       A.   Yes.

24       Q.   And was that where Mechelle basically went up to

25   Truluck's where Thomas was working?

1      A.   Yes.

2      Q.   The same kind of idea that happened at the Best

3  Buy?

4      A.   Yes.

5      Q.   Did that happen prior to or after the Best Buy

6  incident?

7      A.   I believe prior to.

8      Q.   And did you also confront her or talk to her

9  about that incident?

10     A.   Yes.

11     Q.   Did you do that by e-mail, through Facebook, by

12 telephone conversation or how?

13     A.   I believe through the telephone.

14     Q.   And how much before the Best Buy incident was the

15 Truluck's incident?

16     A.   I don't remember.

17     Q.   Well, was it months before, years before?

18     A.   I don't remember.

19     Q.   You don't remember if it was within a month of

20 her death or within a year of her death?

21     A.   I don't remember.

22     Q.   Was it a time period that you did not like her?

23     A.   No.

24     Q.   So you think it -- does that help you at all to

25 narrow down the time period of when this was?

```
 1        A.   Some -- somewhat.
 2        Q.   And so what time period do you think the
 3   Truluck's incident was?
 4        A.   I really don't know.
 5        Q.   Okay.  You recall ever being at your house and
 6   having any constable or person that looked like they had
 7   authority come there with paperwork and say, "We're here
 8   to serve papers," or anything like that?
 9        A.   At my dad's house or...
10        Q.   At the house with Thomas.
11        A.   Well, we lived at my dad's house and we lived in
12   an apartment together, so I'm not sure which one
13   you're --
14        Q.   Well --
15        A.   -- asking about.
16        Q.   -- let's start with the apartment.  Okay.  For
17   the past six months, six months prior to Mechelle's
18   death, you and Thomas lived in a two-bedroom apartment,
19   correct?
20        A.   Yes.
21        Q.   And during that time period did a constable ever
22   show up and try to serve papers, that you recall?
23        A.   No.
24        Q.   Thomas worked at Best Buy, correct?
25        A.   Yes.
```

1        Q.   Thomas worked at Truluck's, correct?

2        A.   Yes.

3        Q.   And Thomas was in the Air Force as a reserve

4    officer -- or not officer, reserve person, correct?

5        A.   Yes.

6        Q.   And did you work?

7        A.   No.

8        Q.   You had two babies, you worked at home, correct?

9        A.   Yes.

10       Q.   But your babies went on to school during the day,

11   correct?

12       A.   Yes.

13       Q.   Either daycare or school?

14       A.   When Rya was an infant/infant, I had her with me,

15   but then she started preschool when she was about three.

16       Q.   And so that would have been in that six-month

17   time period I'm talking about.  Rya was going to school,

18   Thomas was going to work and you would have been at home

19   or yoga, or whatever you were, correct?

20       A.   Yes.

21       Q.   And during that time period no constable ever

22   came to your house at the apartment complex saying we're

23   looking for Thomas, here's papers?

24       A.   No.

25       Q.   And that was one of your big concerns about

1    dealing with Mechelle and your mistrust was if you're

2    acting like my man has had your baby or, you know, that

3    your baby is my man's, I'm not seeing no papers, no

4    constable's rolling around our house, correct?

5        A.   No constable came around, no.

6        Q.   Nobody coming around with these papers, correct?

7        A.   No.  But some papers came through the mail.

8        Q.   To where?

9        A.   To our apartment.

10       Q.   And when did the papers come in -- by mail to

11   your apartment?

12       A.   On and off, I mean -- well, not off, but they

13   came -- seems like once a month or once every -- I don't

14   really know the timeframe, but I remember seeing some

15   papers.

16       Q.   These were not the same type of papers that

17   Mechelle delivered to your father's mailbox, were they?

18       A.   I don't remember.

19       Q.   These were papers about actually Mechelle missing

20   the meeting, when you talked to her about that?

21       A.   Yes.  A couple of them were, both of them missing

22   their court dates.

23       Q.   So basically there was -- what you understood,

24   was there was some going back and forth, both of them

25   missing some dates to go talk to whoever it is they're

1   supposed to talk to about paternity?

2       A.  Yes.

3       Q.  And then there was this official paperwork that

4   Mechelle brought and put in your dad's mailbox, correct?

5       A.  Yes.

6       Q.  And that is different than the other paperwork

7   that was coming in the mail, if you recall?

8       A.  I don't remember.  All of it was very

9   similar-looking.

10      Q.  Well, did it all say it was against Mechelle

11  Gandy, like the paperwork that you saw in your father's

12  mailbox?

13      A.  I don't remember.  I mean it had both names on

14  there.

15      Q.  You testified that you were -- on the day that

16  Mechelle was killed, that you were up from 10:00 p.m.

17  until 3:00 a.m., correct, on your computer?

18      A.  I wasn't up the whole time.  I think I got up

19  just to see if he had posted anything.  But I slept on

20  and off.  I would wake up, go to sleep, my daughter

21  would come in and wake me up because she didn't like to

22  sleep alone anymore and I tried to -- I also tried to

23  take her back to bed.  So a lot of things kind of kept

24  me up that night.  And -- but I would see, check online

25  to see if he had posted anything, or...

1    Q.   And this is the night at 9:10, you -- since your

2    last Facebook contact to a woman who ultimately is

3    killed about that time; is that correct?

4    A.   Yes.

5    Q.   And then you're telling this jury that from

6    basically right after that until 3:00 a.m. you're waking

7    up to go look at your computer to see if Thomas has

8    posted something on Facebook?

9    A.   Yes.

10   Q.   Okay.  And that's when you saw a post about a

11   song?

12   A.   Yes.

13   Q.   Did you give that Facebook or any of that to the

14   police whenever you took the court papers, the baby

15   invitation, the birthday invitation?

16   A.   I don't remember exactly when I gave it to them,

17   but I did give it to them.

18   Q.   You believe you gave them all of those things?

19   A.   Yes.

20   Q.   What officer do you believe you gave them to?

21   A.   I don't know.  It was mainly -- my interaction

22   was mainly with Detective Wade, Investigator Alley and

23   Detective Stewart.  Those are the main three people I

24   talked to.

25   Q.   So Wade, Alley or Stewart should have Thomas

```
 1   Olivas' Facebook post from the night that Mechelle was
 2   killed?
 3       A.  I believe so.
 4       Q.  Why do you say "believe"?
 5       A.  Well, I can't answer for the -- them.  I'm just
 6   saying I know what I gave them.
 7       Q.  You know that you gave it to them as certain as
 8   you know that you gave them the birthday invitation?
 9       A.  Yes.
10       Q.  And as certain as you know that you sent e-mails
11   about all these other comments that you heard Thomas
12   say?
13       A.  Comments?
14       Q.  About the devil child.  That's not in any of your
15   statements, that you sent that, I guess, in an e-mail?
16            MR. ROUSSEAU:  Objection, Your Honor.  It's
17   argumentative.
18            THE COURT:  Well, she said -- she was
19   sort -- response -- she said comments, question mark, if
20   that meant "what comments?"
21            MR. ROUSSEAU:  Actually, Your Honor, my
22   objection is that she referred to a comment regarding
23   devil child, which is not in any of her statements.  She
24   was very specific.
25            THE COURT:  Read it back.
```

```
 1              MS. KEENE:  I can clarify, Judge.
 2              THE COURT:  Well, read -- hold on.
 3              Read back how Joetta phrased it.
 4     Q.  (BY MS. KEENE)  You never told --
 5              THE COURT:  Hold it.
 6              MS. KEENE:  I'm sorry.  I'm sorry.
 7              THE REPORTER:  "And as certain as you know
 8     that you sent e-mails about all these other comments
 9     that you heard Thomas say?"
10              "Comments?"
11              "About the devil child.  That's not in any
12     of your statements, that you sent that, I guess, in an
13     e-mail?"
14              THE COURT:  All right.  You can ask the
15     statement did you say anything about devil child in an
16     e-mail.  To that question, you can answer that.
17              THE WITNESS:  Can you -- I'm sorry, can you
18     repeat it?
19              THE COURT:  Did you ever send an e-mail
20     referring to "devil child" expression?
21              THE WITNESS:  An e-mail to the detectives?
22              THE COURT:  Yes.
23              I assume you meant to the detectives?
24              MS. KEENE:  Yes, sir.
25              THE COURT:  Yes.
```

```
 1                THE WITNESS:  I don't remember.

 2                THE COURT:  All right.  Next question.

 3                MS. KEENE:  I'll pass the witness, Judge.

 4                     REDIRECT EXAMINATION

 5   BY MR. ROUSSEAU:

 6        Q.   I need to ask you a few questions.  Okay?

 7        A.   Yes.

 8        Q.   All right.  First of all, I want to ask you about

 9   your and Thomas' financial situation at the time that

10   all this was going on.

11                Would Thomas have been able to afford to pay

12   child support -- or let me ask it another way.

13                What effect would it have had on your and

14   Thomas' living situation if Thomas had suddenly been

15   forced to pay child support for Asher?

16        A.   Well, it would have been financially very hard.

17        Q.   Why is that?

18        A.   Well, he was working two jobs and we were barely

19   making it ourselves.

20        Q.   Okay.  Did you ever -- did he ever say anything

21   to that effect?

22        A.   Did he say anything?

23        Q.   Yes, about that, about his ability to make child

24   support payments?

25        A.   Yes, he did.
```

```
1        Q.   What did he say?

2        A.   He said that he basically wouldn't be able to

3   help out and...

4        Q.   Did he say basically he would be?

5        A.   He wouldn't.

6        Q.   Okay.

7        A.   He wouldn't be able to afford it, that we were

8   barely making it, and he was working two jobs.  He would

9   get angry about it and say, "How the hell am I supposed

10  to pay for another child?"

11       Q.   And you weren't earning a living outside of the

12  home at that time; is that correct?

13       A.   That's correct.

14       Q.   Were you receiving child support from your -- the

15  father of your son?

16       A.   Yes.

17       Q.   When the Defense Counsel asked you, Ms. Keene,

18  was asking you about service of -- I don't know if you

19  know this, but when someone -- when a constable is

20  trying to serve you papers, that's what we refer to as

21  service or process.

22            You were not aware of any attempts to serve

23  Thomas; is that correct?

24       A.   That's correct.

25       Q.   You're not -- are you saying there were no
```

1    attempts made or you just don't know of any?

2       A.   I don't know of any.

3       Q.   There was a question asked about your use of

4    Facebook on the night that Mechelle was killed.  You

5    sent her a text, a Facebook message around ten after

6    9:00; is that correct?

7       A.   Yes.

8       Q.   Okay.  Do you recall what the Facebook message

9    was?

10      A.   Yes.

11      Q.   What was it?

12      A.   I asked her what happened, if she -- she's heard

13   anything.

14      Q.   Why would you be sending her that message?

15      A.   Because when we talked last around 5:30 --

16            MS. KEENE:  Objection to hearsay, Judge.

17            MR. ROUSSEAU:  Your Honor, I believe under

18   the rule of optional completeness we need to go into

19   this.

20            THE COURT:  What's the date?

21            MR. ROUSSEAU:  The date of -- it's the date

22   of the murders, Sunday, March 20th, 2011.

23            THE COURT:  I'll allow limited inquiry under

24   106, 107.

25      Q.   (BY MR. ROUSSEAU)  So why were you curious?  Why

STATE V. THOMAS OLIVAS

```
1    did you need to send her that message?
2       A.   Because around that time we actually spoke on the
3    phone, around 5:30, 6:30, you know, she was kind of in a
4    rush to go pick up Asher from her mom's and so she's
5    like, "Well, I'll let you know what happens," and I said
6    okay.  And I hadn't heard from her, I hadn't heard from
7    her, I hadn't heard from her, so around 9:00 to 9:10, I
8    e-mailed her on Facebook and asked her, well --
9    something along the lines of have you heard anything or
10   is -- what's going on?  Everything okay?  Some -- it was
11   in a sentence.  I don't really remember word for word
12   what I said, but I remember e-mailing her.
13      Q.   What was it that you were curious about?  Was
14   it -- was there a specific thing that you expected to
15   happen that night?
16      A.   Not really.  I -- because I was curious like,
17   wow, he's texting you, what's going on, what's happening
18   and why is he texting you --
19      Q.   Okay.
20      A.   -- type of thing.
21      Q.   You had already -- you were already aware from
22   your conversation with her that he had been text -- that
23   text message -- he had been text messaging her; is that
24   correct?
25      A.   Yes.
```

```
1     Q.  There was -- you were asked about a series of
2  Facebook messages between yourself and Mechelle where
3  you were talking to her about her failure to follow
4  through with paternity testing at some point in time.
5  Do you recall that series of questioning from the
6  Defense Counsel?
7     A.  Yes.
8     Q.  All right.  And did Mechelle provide you with an
9  explanation for why she had not followed through on at
10 least one occasion?
11    A.  Yes.
12    Q.  And what was that?
13    A.  She said it wasn't her, that it was him, but one
14 of the times she did cancel one of the court meetings
15 because she had to go out of town, or something along
16 those lines.  She had something going on.
17    Q.  Was there ever a point where -- was the subject
18 of the Defendant being deployed overseas ever raised
19 between yourself and Mechelle in connection to this
20 paternity testing?
21    A.  Yes.
22    Q.  What was that all about?
23            MS. KEENE:  Your Honor, I'm going to object
24 to hearsay.  This is back into the motion.
25            THE COURT:  Time/space continuum relative to
```

```
1    the conversations in evidence?

2              MR. ROUSSEAU:  It would be during the --

3    probably during February, Your Honor, when she was

4    communicating with Mechelle regarding paternity testing

5    and why it hadn't taken place yet.

6              THE COURT:  All right.  Ms. Keene, why would

7    it not be a 106, 107 based on the dates and

8    conversations in evidence?

9              MS. KEENE:  Because we didn't talk -- we

10   just didn't talk about any of what's he's going into

11   now.  We didn't have any of those --

12             THE COURT:  Well --

13             MS. KEENE:  -- discussions.

14             We might want to take this up outside the

15   presence.

16             THE COURT:  Well, you know, why don't y'all

17   come up here just real quick and then we'll decide if we

18   need to do that.

19             In fact, even quicker, jurors, why don't

20   y'all just run out a minute.  I can handle this much

21   more quickly when I don't have to stay behind the little

22   curtain, the legal curtain, that makes me an umpire and

23   not a factfinder.  So I'll get you back in here in just

24   a second.

25             (Jury excused from courtroom)
```

1       THE COURT:  Outside the presence of the

2   jury, Mr. Rousseau, why don't you ask the questions you

3   want to ask then I'll hear her objections of why they

4   would not be encompassed under Rule 106, 107, series of

5   related conversations or writings under the rule of

6   optional completeness, under the common law rule that is

7   now codified in the rules of criminal evidence.

8       MR. ROUSSEAU:  Yes, Your Honor.  If I may be

9   permitted to lead just a little bit to get there.

10       THE COURT:  I think that would probably be

11   appropriate based on nature of the objection.  And be

12   pointed so she knows what you're -- where you're going

13   and whether there's a rightful objection and I can make

14   a proper ruling.  So go ahead.

15                  VOIR DIRE EXAMINATION

16   BY MR. ROUSSEAU:

17   Q.   Mechelle, during your -- I apologize.

18   A.   That's okay.

19   Q.   And it's probably going to happen again so...

20   A.   That's okay.

21       THE COURT:  It isn't the first time.

22   Q.   (BY MR. ROUSSEAU)  Rebeca, during your

23   communications with Mechelle, regarding why or why not

24   any paternity testing had yet been done, did you at one

25   point accuse her of having cancelled certain

```
 1   appointments for paternity testing?
 2       A.   Yes.
 3       Q.   And did she respond that yes, she had to cancel
 4   one but others he had cancelled?
 5       A.   Yes.
 6       Q.   Did she, at some point in time during this back
 7   and forth series of communications between you, tell you
 8   that at one point in time she was under the impression
 9   that he had been deployed overseas?
10       A.   Yes.
11       Q.   And that that was one of the reasons she had not
12   pushed the issue during that period of time?
13       A.   Yes.
14            MR. ROUSSEAU:  That's it, Your Honor.
15            THE COURT:  Ms. Keene, if you want to
16   articulate any objections with that line of
17   questioning...
18            MS. KEENE:  I mean, I really don't honestly,
19   I mean, except that it's not optional completeness and
20   so I don't know how far we're going to go.  If he wants
21   to ask that, that doesn't really particularly offend me.
22   I didn't know where all he was going with this.  Because
23   there was about 500 Facebook things that I don't want to
24   go into.  If he wants to ask that question, that
25   doesn't -- there's nothing --
```

```
 1                THE COURT:  And in all fairness --
 2                MS. KEENE:  But if he keeps going, then I've
 3     got issues.  But if he stops there, I'm not...
 4                THE COURT:  Okay.  Well, the rule is such
 5     parts, in all fairness, be considered contemporaneously
 6     and some are -- some things are, some things aren't.
 7     But in light of the nature of the record before me, I
 8     think that is the, quite frankly, aboveboard legal
 9     position for you to take based on what's been offered.
10                And in that case, while they're out, is
11     there anything else that might raise an objection you
12     want to deal with, just to keep from sending them out,
13     that just your radar tells you might be an issue, if you
14     want to double-check.  If not, if it pops up, we can
15     send them out again.  I'm sure they like to stretch
16     their legs like we all do.
17                Let's take a short recess.
18                (Pause in proceedings)
19                (Witness on the stand)
20                THE COURT:  All right.  For the record, any
21     time when the Court says 106, 107, referring in code to
22     the attorneys, I'm referring to Rule 106, 107 of the
23     Texas Rules of Evidence.  And, quite frankly, in this
24     modern day and age, if I ask my wife, the teacher, is a
25     Facebook a conversation or a writing, she'd say it's a
```

```
 1   writing.  If I ask my 21-year-old son, he would say it's
 2   a conversation.
 3               And so I'm not sure which rule would control
 4   anymore in the modern age where people text instead of
 5   talk.  So I will always throw both rules out, based upon
 6   modern era of legal theory and communication we're in,
 7   to cover all bases.  So I'm not trying to be confusing
 8   and can't pick a rule.  It's like I'm not sure really
 9   which one would apply to that.
10               So with that, both sides ready to get the
11   jury back in?
12               MR. ROUSSEAU:  I'm ready, Judge.
13               MS. KEENE:  We're ready, Judge.
14               THE COURT:  All right.  Go get them.
15               (Jury seated in courtroom)
16               THE COURT:  All right.  You may re-ask your
17   question.
18               MR. ROUSSEAU:  Thank you, Judge.  I will
19   try.
20               THE COURT:  All right.
21                    REDIRECT EXAMINATION CONTINUES
22   BY MR. ROUSSEAU:
23       Q.  Rebeca, during the time that you were
24   communicating with Mechelle regarding the -- both by
25   Facebook and by telephone, regarding the fact that
```

 1   paternity testing had not proceeded, did you, in fact,

 2   confront her about the fact that it was your

 3   understanding that she had cancelled giving a DNA sample

 4   on at least one occasion?

 5       A.  Yes.

 6       Q.  And did she acknowledge that she had, in fact,

 7   done that?

 8       A.  Yes.

 9       Q.  But did she have an explanation for -- did she

10   also allege that she was not the only one who had

11   cancelled?

12       A.  Yes.

13       Q.  Who else had cancelled?

14       A.  Thomas.

15       Q.  During that period of time, did the subject of

16   the Defendant being deployed in the military come up?

17       A.  Yes.

18       Q.  And did this deployment have any connection to

19   Mechelle's failure to pursue paternity testing at that

20   time?

21       A.  Yes.

22       Q.  What did she tell you?

23           MS. KEENE:  Objection to -- I mean --

24   objection to hearsay, Judge.

25           THE COURT:  Overruled, 106, 107 to this

```
 1   specific issue.
 2       Q.  (BY MR. ROUSSEAU)  What did she tell you about
 3   his deployment?
 4       A.  She said that from her understanding he said that
 5   she -- he would be deployed overseas for about six
 6   months or longer.
 7       Q.  And had that ever actually happened?
 8       A.  No.
 9       Q.  And did you ever -- in the days following the
10   murders, did you in Facebook communication address that
11   issue with Thomas?  Did you actually mention that he had
12   represented that to Mechelle?
13       A.  Yes.
14       Q.  Do you recall how he reacted to that, how he
15   responded?
16       A.  I don't remember.
17               MR. ROUSSEAU:  May I approach, Your Honor?
18               THE COURT:  Yes.
19       Q.  (BY MR. ROUSSEAU)  I'm looking at March 30th.
20   Does that help you remember that particular portion of
21   the communication between yourself and the Defendant?
22       A.  Yes.
23       Q.  Did you ask him -- or did you accuse him of
24   having told her that he was overseas?
25       A.  Yes.
```

```
 1        Q.   And how did he respond to that?

 2        A.   He said it was crap.

 3        Q.   That -- crap that he had not told her or crap

 4   that -- the statement that, yes, he was deployed

 5   overseas was crap?

 6        A.   That he was deployed over -- can you -- I'm

 7   sorry, can you repeat that?

 8        Q.   What I can do is let you look at it again.

 9        A.   Okay.

10        Q.   Does that help you remember now?

11        A.   Yes.

12        Q.   Okay.  What did he say about that?

13        A.   Oh...

14        Q.   About telling her that he had been deployed?

15        A.   He said the deployment was for her to leave him

16   alone.

17        Q.   That him telling her that was for -- so she would

18   leave him alone?

19        A.   Yes.

20        Q.   Ms. Keene asked you -- I believe the question was

21   something to the effect of you did not like Mechelle.

22   Do you recall that --

23        A.   Yes.

24        Q.   -- question?

25             And what was your response, how did you
```

1    actually feel about Mechelle?

2        A.  Well, at first I didn't know how to feel about

3    her.  I didn't particularly like her at first.  But then

4    once I started talking to her and getting to know her

5    and listening to her side for once, I liked her.

6        Q.  You were getting two stories of -- you were

7    getting two versions or two sides of the same issue at

8    that point in time; is that correct?

9        A.  Yes.

10       Q.  Which one made the most sense to you toward the

11   end?

12       A.  Mechelle's.

13       Q.  And the -- her sending you photographs that she

14   received from the Defendant and texts that she received

15   from the Defendant, whose idea was that?

16       A.  I'm sorry, I kind of went blank for a minute.

17   Can you please repeat that?

18       Q.  You've only been up there for about six hours.

19           Her sending you photographs and text

20   messages that she had gotten from the Defendant, that

21   happened --

22       A.  Yes.

23       Q.  -- correct?

24       A.  Yes.

25       Q.  Whose idea was that?  Whose idea was it to send

1    you those texts, yours or hers?

2        A.   Mine.

3        Q.   And did you do that in an attempt to see if she

4    could back up what she was saying?

5        A.   Yes.

6        Q.   Was there something -- we talked -- you and I

7    talked for a few minutes during lunch; is that correct?

8        A.   Yes.

9        Q.   Was there something that you want to correct

10   about the testimony that you gave this morning?

11       A.   Yes.

12       Q.   What was that?

13       A.   It was just about the morning of March 21st.  I

14   thought I had taken my children to school but I -- and I

15   don't remember who it was, but I know either my uncle or

16   my dad or cousin took my kids to school.  It wasn't me

17   that took to them to school that morning.

18       Q.   And you ended up going to the police department

19   that day, correct?

20       A.   Yes.

21       Q.   Let's talk about how you were distraught.  I

22   believe the term used was "hysterical" during the

23   evening or very early morning hours when you talked to

24   the police, when -- the Arlington police.  Do you recall

25   that series of questions?

1    A.   I recall them.  It's --

2    Q.   That's okay.

3    A.   -- it's been three and a half years.  I recall

4    most of them.

5    Q.   Okay.  That's fine.  Really what I want to ask

6    you about is, I'm trying to ask you if you can explain

7    to the jury why it was at 6:00 o'clock in the morning or

8    so when you were talking to the police, on the morning

9    following the murders, why is it that you were so upset,

10   why -- before you knew the full story, why is it that

11   you were so upset?

12   A.   I was scared.  I didn't know where Thomas was.  I

13   didn't know if he had anything to do with something.  I

14   just -- I was scared for my children.  I didn't know

15   what was going on, so I was panicking.

16   Q.   At that point, that was some four days after

17   you'd been kicked out around midnight; is that correct?

18   A.   Yes.

19   Q.   Did you have a belief at that point in time about

20   whether or not Thomas hated Mechelle and Asher?

21        MR. MOORE:  Again, Judge, I'm going to

22   object to him leading his witness.

23        THE COURT:  Yeah.  Sustained to that one.

24   Q.   (BY MR. ROUSSEAU)  Did you have a belief at that

25   point in time about Thomas' feelings towards Mechelle

1    and Asher?

2        A.   Yes.

3        Q.   What was -- what did you believe that feeling to

4    be?

5        A.   Hatred.

6        Q.   Did you have a belief at that time about whether

7    or not Mechelle and Thomas had been communicating the

8    previous evening?

9        A.   Can you repeat that, please?

10       Q.   Did you have a belief that Thomas and Mechelle

11   had been communicating the previous evening?  This is

12   very early in the morning, 6:00 o'clock on the now

13   Monday morning?

14       A.   Yes.

15       Q.   And did you know Mechelle was dead?

16       A.   No.

17       Q.   Did the police tell that you Mechelle -- that

18   there -- that something had happened at Mechelle's

19   apartment?

20       A.   Not right away.  But they eventually -- they

21   didn't even tell me where.  They just say something had

22   happened to Mechelle.  And then eventually they said

23   there's been a double homicide.  It was very slowly into

24   them telling me what had happened.

25       Q.   While you were on the telephone that night, the

1   first phone call that you were able to actually

2   communicate, it was communicated to you that something

3   had happened to Mechelle?

4        A.   Yes.

5        Q.   How tall are you?

6        A.   I'm about five-four.

7        Q.   How much do you weigh?

8        A.   A hundred and ten.

9        Q.   About the same size back then?

10       A.   Yes.

11       Q.   The Defense lawyer also asked you whether after

12   all this happened in the -- I guess in the several

13   months later, whether you were, quote, back within his

14   graces, talking about Thomas' graces.  Is that the way

15   you would characterize it?

16       A.   No.

17       Q.   When you and Thomas started spending time

18   together again, whose idea was that?  Let me rephrase

19   that.  That wasn't very fair.

20            Up until you started spending some time with

21   Thomas again, had he made any request of you to spend

22   time together?

23       A.   Yes.

24       Q.   Had he communicated with you frequently?

25       A.   Yes.

```
 1      Q.  Had he at any point in time threatened suicide if
 2   you did not take him into your life again?
 3      A.  Yes.
 4      Q.  Was there a point in time on Facebook when he was
 5   quite insistent that he was going to kill himself that
 6   night?
 7      A.  Yes.
 8      Q.  Rebeca, have you actually lost people in your
 9   family, close to you, to suicide?
10      A.  Yes.
11      Q.  Did he know that?
12      A.  Yes.
13      Q.  And when the relationship finally ended, who
14   ended it?
15      A.  I did.
16      Q.  This moment -- this situation that took place at
17   the pool, did he strike Rya in any way?
18      A.  No.
19      Q.  Did he threaten her in any way?
20      A.  No.
21      Q.  Did he threaten you in any way?
22      A.  No.
23      Q.  Was there any reason for you to have reported
24   that to the police?
25      A.  No.
```

1    Q.   Was it something that made an impact on you

2  personally?

3    A.   Yes.

4    Q.   There were a series of questions regarding

5  Mechelle breaking up your happy home.  Do you recall the

6  Defense lawyer asking you those questions?

7    A.   Yes.

8    Q.   Is this the first time you'd suspected Thomas of

9  cheating on you?

10   A.   No.

11   Q.   Was the -- his infidelity a concern of yours

12  going back several years?

13   A.   Yes.

14   Q.   What was that based on?

15   A.   I'm not really sure what you mean by what was

16  that based on.

17   Q.   Did he spend a lot of time away from home?

18   A.   Yes.

19   Q.   And I don't mean when he's in the military.  I

20  mean at night?

21   A.   Yes.

22   Q.   And when he's not working, still -- when he's not

23  working, still away from home?

24   A.   Yes.

25   Q.   Are you familiar with Golden Tee?

1    A.   Yes.

2    Q.   What is Golden Tee?

3    A.   It's a video game, a golf video game.

4    Q.   Did he play Golden Tee?

5    A.   Yes.

6    Q.   Would you character -- how would you characterize

7  his Golden Tee playing?  I don't mean was he good or

8  bad.  I mean how frequently would he play?

9    A.   Oh, like every weekend at least, if not -- even

10 during the week, sometimes after work.

11   Q.   And where would he go to play Golden Tee?

12   A.   He would go to various bars, but mainly Boston's

13 and Volcanos.

14   Q.   And Volcanos, did you ever go to Volcanos with

15 him?

16   A.   I went once or twice.

17   Q.   How --

18   A.   I've never frequented him with his Golden Tee

19 playing.

20   Q.   How about Boston's, did you ever go to Boston's

21 with him?

22   A.   Yes.

23   Q.   How many times?

24   A.   Probably just one to three times.

25   Q.   And did he have a regular circle of Golden Tee

```
 1   friends?
 2       A.   Yes.
 3       Q.   You were asked about Mechelle going to Truluck's
 4   by the Defense lawyer.  Do you recall being asked that
 5   question or series of questions touching on that?
 6       A.   Yes.
 7       Q.   What was the source of your information that
 8   Mechelle had gone to Truluck's?
 9       A.   Mechelle.
10       Q.   You got that from Mechelle, she told you?
11       A.   Yes.
12       Q.   Did she tell you why she went to Truluck's?
13       A.   She did.  I just don't remember the full
14   conversation.
15       Q.   Well, as best you can.
16       A.   She said she was really angry and she mainly
17   wanted to confront him and embarrass him in front of
18   everybody.
19       Q.   Do you know if that happened?
20       A.   I don't know for sure because I wasn't present.
21       Q.   Do you recall whether that had any connection to
22   his claim of being deployed overseas?
23       A.   I'm sorry, can you...
24       Q.   Her going to Truluck's to confront him, do you
25   recall whether that had any connection to his having
```

1    told her that he was deployed overseas?

2         A.   I'm not sure.  I don't remember.

3         Q.   What did you mean when you said sometimes

4    Mechelle can be aggressive, or that she is aggressive?

5         A.   Well, some of our conversations we had, she would

6    be like, "Well, come to my work, we'll have a family

7    outing," and just kind of like confrontational with me.

8    But then I'd be like, "Mechelle, come on, calm down."

9         Q.   Was she joking?

10        A.   Like sometimes she would be kind of joking, but

11   then sometimes she wasn't.  She would kind of try to

12   push my nerve a little bit.  But then I would kind of

13   tell her, you know, "We don't have to be this way."

14        Q.   Would it be fair to say that your relationship

15   with Mechelle was sometimes cordial, sometimes not?

16        A.   Yes.

17        Q.   I believe you even said during your

18   cross-examination you never completely trusted her?

19        A.   Right.

20        Q.   Even at the end, even when you were already out

21   of the house and you were talking to her freely, did you

22   have concerns about her honesty with you?

23        A.   Somewhat.

24        Q.   Okay.  Defense Counsel asked you a number of

25   questions about your testimony that the Defendant had

1    said words to the effect of "that fucking baby is the

2    devil's child."  Do you recall being asked by Defense

3    Counsel that question?

4        A.  Yes.

5        Q.  Okay.  I want to -- do you recall, in a Facebook

6    communication with the Defendant, asking him or throwing

7    that very, very thing in front of him, that is accusing

8    him of saying those exact or almost those exact words

9    regarding this baby?

10       A.  Yes.

11       Q.  And what did he say in response?  What did he

12   write to you in response?  Do you recall?

13       A.  I don't remember word for word, but I know he

14   acknowledged that he said it.

15           MR. ROUSSEAU:  May I approach, Your Honor?

16           THE COURT:  Yes.

17       Q.  (BY MR. ROUSSEAU)  I'm looking -- I'm pointing to

18   a passage dated March 30th at 4:23 p.m.; is that

19   correct?

20       A.  Yes.

21       Q.  Okay.  Just, to yourself, please read the

22   highlighted portions.

23           Have you finished that passage?

24       A.  Yes.

25       Q.  And you see where -- is this the response down

```
 1    here at the bottom of the page, March 30th at 4:37 p.m.?
 2        A.   Yes.
 3        Q.   Okay.  Let's see.
 4             Does he acknowledge calling him that?
 5        A.   Yes.
 6        Q.   All right.  Specifically did you ask him --
 7    accuse him of calling him the devil's child?
 8        A.   Can you repeat the question?
 9        Q.   Did you specifically ask or accuse him of having
10    called Asher the devil's child?
11        A.   Yes.
12        Q.   And did he say yes, I called him that?
13        A.   Yes.
14        Q.   Or called them that?
15        A.   Yes.
16        Q.   Okay.  You just didn't use the F word, correct?
17        A.   Correct.
18        Q.   But in your face-to-face communications with him,
19    did he, in fact, use the F word?
20        A.   Yes.
21        Q.   Why did you -- I want to use Defense Counsel's
22    words here.  Why did you give Mechelle the "what for"
23    about showing up at the Defendant's job?
24        A.   Because I thought, well, if she was not liking
25    him at the time and he wasn't liking her, they were
```

```
 1   hating each other, why come in close proximity of each
 2   other.
 3        Q.  Uh-huh.  It didn't make sense, did it?
 4        A.  No.
 5             MR. ROUSSEAU:  May I approach, Your Honor?
 6             THE COURT:  Yes.
 7        Q.  (BY MR. ROUSSEAU)  I want to show you what's been
 8   marked as State's Exhibit No. 232.  It's a disc; is that
 9   correct?
10        A.  Yes.
11        Q.  Are these your initials right here?
12        A.  Yes.
13        Q.  Did you listen to this disc during the lunch
14   hour?
15        A.  Yes.
16        Q.  And do you recognize the contents of the disc?
17        A.  Yes.
18        Q.  Is that a recorded phone message that was left on
19   your home answering machine by the Defendant?
20        A.  Yes.
21        Q.  And would this be at a time after your cell phone
22   had been destroyed?
23        A.  Yes.
24        Q.  So was this your only way of receiving messages?
25        A.  Yes.
```

1    Q.   Does it fairly and accurately duplicate the

2    message that was left on the -- on your machine?

3    A.   Yes.

4    Q.   And that machine, I suppose, is capable of

5    recording accurately phone messages that someone chooses

6    to leave?

7    A.   Yes.

8    Q.   And does it actually include a -- the machine

9    itself, does it include a reference to a date and a

10   time?

11   A.   Yes.

12   Q.   And in your experience has that date and time

13   been accurate?

14   A.   Yes.

15            MR. ROUSSEAU:  Your Honor, I'll offer

16   State's Exhibit 232, subject to any objection by

17   Defense.

18            MS. KEENE:  Can I talk to Kevin real quick?

19            THE COURT:  Yes.

20            (Sotto voce discussion between attorneys)

21            MS. KEENE:  No objection, Judge.  It

22   represents the one I've had.

23            THE COURT:  All right.  It's admitted

24   without objection.

25            (State's Exhibit No. 232 admitted)

1              MR. ROUSSEAU:  May I publish, Your Honor?

2              THE COURT:  Yes, you may.

3              (State's Exhibit No. 232 played in open

4               court)

5       Q.  (BY MR. ROUSSEAU)  Rebeca, had you asked Mechelle

6    to help you out in some way?

7       A.  No.

8       Q.  Had you had any communication with Mechelle about

9    trying to get your stuff out of the apartment?

10      A.  Yes.

11      Q.  Did you ultimately -- were you already taking

12   steps to make that happen?

13      A.  Yes.

14      Q.  Did you ask her to help you?

15      A.  No.

16      Q.  Did you know that she had contacted Thomas about

17   that?

18      A.  No.

19      Q.  Did you ever contact her after getting this

20   message?

21      A.  Yes.

22      Q.  Were you happy about her having tried to

23   intervene on your behalf?

24      A.  No.

25      Q.  Was she your best friend?

```
 1        A.   No.
 2        Q.   Generally speaking, what did the Defendant think?
 3   What was his attitude towards your having any
 4   communications or any relationship with Mechelle?
 5        A.   Can you repeat that, please?
 6        Q.   Sure.   What did the Defendant think about you and
 7   Mechelle having communicated?
 8             MS. KEENE:   Your Honor, I'm going to have to
 9   object to what she thought he thought.   That's pure
10   speculation.
11             THE COURT:   Yeah.   As phrased, implies the
12   same.
13             MR. ROUSSEAU:   That's fine.
14        Q.   (BY MR. ROUSSEAU)   How did he behave regarding
15   when that topic was brought up?
16        A.   Angry.
17             MR. ROUSSEAU:   May I approach again, Your
18   Honor?
19             THE COURT:   Yes, sir.
20        Q.   (BY MR. ROUSSEAU)   Rebeca, I want to show you
21   what has been marked as State's Exhibit No. 233.   Just
22   take a second or two to look at that and I'll ask you a
23   question about it.
24             Okay.   And I let you look at this a little
25   bit during the break; is that correct?
```

1     A.   Yes.

2     Q.   Does this appear to be the same paperwork that

3   was delivered to your father's house by Mechelle?

4     A.   Yes.

5     Q.   This is the same paperwork that you have

6   described as sounding like Mechelle was the one being

7   sued, correct?

8     A.   Yes.

9     Q.   Okay.

10          MR. ROUSSEAU:  Your Honor, I will offer

11   State's Exhibit 233.  It is a certified public record

12   under seal in Cause No. 231-493121-11.

13          MS. KEENE:  May I take the witness on voir

14   dire, Judge?

15          THE COURT:  Yes.

16             VOIR DIRE EXAMINATION

17   BY MS. KEENE:

18     Q.   Is this the actual paperwork that you were given

19   by Mechelle, do you know?  Or is this a copy?

20     A.   I have no idea.

21          MS. KEENE:  Judge, I'm going to object

22   because we don't know if it's the exact same paperwork

23   she's talking about.

24          MR. ROUSSEAU:  It's a certified public

25   record, Your Honor.

```
 1            THE COURT:  Let me see it.
 2            All right.  What's your response to it as a
 3   tender offer as a public document?
 4            MS. KEENE:  I don't have any objection to
 5   offering it as a public document and representing it as
 6   a document he went and got from a public place, as
 7   opposed to that being a document that she gave to them.
 8            THE COURT:  I think he just offered it under
 9   the authentication as a certified public record.
10            MS. KEENE:  As long as it's clear to the
11   jury that that's just public record that he's putting
12   into evidence to show and to talk to her about, I don't
13   have any objection.  If he's putting it into evidence
14   saying this is the document that she was talking about
15   that was delivered to her mailbox, I do.
16            THE COURT:  All right.  Well, let's try
17   this.  How about I admit it as a public record and if he
18   wants to ask her like something she has, you can object
19   if she didn't actually see this one, to the form of the
20   question.  But you have no objection on its face value
21   of the four corners of the document?
22            MS. KEENE:  Not at all, Judge.
23            THE COURT:  Then it's admitted, 233.
24            (State's Exhibit No. 233 admitted)
25            THE COURT:  And if you think if any question
```

1   implies something that's not, then you can raise an

2   objection and I'll deal with it at the time, or not.

3                    REDIRECT EXAMINATION CONTINUES

4   BY MR. ROUSSEAU:

5       Q.  You stated already that this looks the same; is

6   that correct?

7       A.  Yes.

8       Q.  Looks the same as the documentation that was

9   delivered to your house -- your father's house, correct?

10      A.  Yes.

11      Q.  You're not trying to say this is word for word,

12  right?

13      A.  Right.

14      Q.  In fact, when you got it and were able to read

15  it, did you read every word of it?

16      A.  No.

17      Q.  Was it confusing to you?

18      A.  Yes.

19      Q.  And have you still not read every word of this?

20      A.  No.

21              MR. ROUSSEAU:  Pass the witness, Your Honor.

22              Oh, wait.  Can I ask one -- I apologize.

23  Forgot something.

24              THE COURT:  Yes.

25              MR. ROUSSEAU:  That's okay, Judge.  I'll

```
 1  pass the witness.
 2                  RECROSS-EXAMINATION
 3  BY MS. KEENE:
 4     Q.  On March the 20th of 2001 (sic) did you believe
 5  that Mechelle was going to meet with Thomas about the
 6  confusing paperwork in the child custody -- child
 7  paternity suit?
 8     A.  It was actually March 2011.
 9     Q.  I'm sorry.  You're correct.
10     A.  Can you actually rephrase the whole question?
11     Q.  Yeah.  Did you believe that they were going to
12  meet that night and discuss the paternity paperwork that
13  Mechelle had been served with that appeared to be very
14  confusing?
15     A.  Yes.
16     Q.  And --
17             MS. KEENE:  Judge, can I approach the
18  witness?
19             THE COURT:  Yes.
20     Q.  (BY MS. KEENE)  That was your understanding of
21  why they were meeting?
22     A.  Yes.
23     Q.  And Mechelle had actually brought to your
24  father's house and put inside your father's mailbox some
25  paperwork that you looked at, correct?
```

```
 1        A.   Yes.

 2        Q.   That had been served on her?

 3        A.   Yes.

 4        Q.   And when you looked at it, it was also confusing

 5   to you?

 6        A.   Yes.

 7        Q.   Correct?

 8        A.   Yes.

 9        Q.   I'm going to show you what's been marked as

10   Defense Exhibit No. 273.  And this has one more page

11   than the public record that you've already looked at.

12   Okay?

13        A.   Okay.

14        Q.   And on this page if you look at right here where

15   my finger is, does that help ring a bell about what some

16   of the big confusion was with Mechelle and with you when

17   you guys looked at this paperwork?

18        A.   Yes.

19        Q.   And what -- help me -- Defense Exhibit No. 273

20   helping ring a bell, what was so confusing about it?

21        A.   Just the wording and just the way the typing was.

22   It just didn't seem in order.

23        Q.   And it -- did it actually seem to be against

24   Mechelle Gandy?

25        A.   Yes.  And -- but I also saw Thomas' name and I
```

 1  didn't read it thoroughly so I wasn't -- I just wasn't
 2  sure.
 3       Q.   Okay.  When you hear that Mechelle is going to
 4  meet with Thomas because she needs help understanding
 5  the paternity paperwork that she's been served with,
 6  does that cause you concern as a person who loved
 7  Thomas?
 8       A.   Can you repeat that, please?
 9       Q.   Yes, I can.  And I can explain where I'm trying
10  to go.
11            You stated that you did not trust Ms. Gandy,
12  correct?
13       A.   Correct.
14       Q.   And you did not trust Ms. Gandy to be alone with
15  the man that you loved, Thomas?
16       A.   Correct.
17       Q.   And now you know, on March the 20th, you've
18  heard, that Ms. Gandy would like to see Mr. Thomas so
19  that he can explain the paternity paperwork that she's
20  been served with?
21       A.   Correct.
22       Q.   Correct?
23       A.   Yes.
24       Q.   Does that cause you concern because you're
25  worried about them being alone or anything about that?

1    A.   Yes.

2    Q.   Okay.  So you are concerned about her using you

3  and using this as a ploy to become deeper in his life?

4    A.   No.

5    Q.   Okay.  You're concerned about her taking your

6  place?

7    A.   No.

8    Q.   Okay.  What are you concerned about?

9    A.   I was concerned because I knew they were just

10  hating each other at the moment and I thought, well, why

11  in the world would either of them even think about

12  getting together in person if they're like having these

13  hateful things to say towards each other, it didn't make

14  sense to me.

15    Q.   Okay.  Oh, I follow that.  So what you're

16  thinking is he's telling me he hates her, she's telling

17  me she hates him?

18    A.   Correct.

19    Q.   But yet they're going to get together and talk

20  about paternity paperwork that she's confused about?

21    A.   Right.

22    Q.   All right.  Where does that play into also your

23  concern about her trying to get with him, so to speak?

24    A.   Well, it was more of a concern of him

25  manipulating her still, because that's how he was.

1    Q.   Well, but you testified here earlier you actually

2   didn't trust her because she is the person that was

3   sleeping with Thomas?

4    A.   Right.  I didn't trust her, either.  I didn't

5   trust the situation at all in different ways.

6    Q.   In a lot of different ways, that's actually just

7   the truth, isn't it?

8    A.   Yes.

9    Q.   And the situation doesn't make sense that they're

10   going to get together to talk about a paternity case

11   that she's in theory served on him, correct?

12    A.   Correct.

13    Q.   But yet she did bring you the paperwork and it

14   was confusing?

15    A.   Yes.

16    Q.   So then you think, well, maybe they are going to

17   get together to talk about the paperwork because it is

18   confusing?

19    A.   I didn't really think that until I was -- I had

20   the understanding that they were going to get together.

21    Q.   And it was your --

22    A.   That they might get together.

23    Q.   Okay.  It was your understanding that they

24   might -- that they might get together?

25    A.   Correct.

1   Q.   That she wanted him to help her understand this

2   paperwork?

3   A.   I think they both -- I think it was mainly Thomas

4   wanting to understand the paperwork, but I think they

5   both were trying to understand it.

6   Q.   And you at least, having seen the paperwork, can

7   say, well, it is confusing?

8   A.   I have seen the paperwork.

9           MS. KEENE:   Judge, I would offer in the two

10   charts, which I don't remember what the Defense numbers

11   are.   Okay.   I'll --

12           THE COURT:   Might as well double-check.

13           MS. KEENE:   Defense Exhibit No. 271 and 272.

14           THE COURT:   Are they single-page documents

15   or are they multiple-page documents?

16           MS. KEENE:   No, Judge.   I'm going to offer

17   in Defense Exhibit No. 272, which is a three-page

18   document -- I'm sorry -- let's start over.   Start over.

19           THE COURT:   Rewind.

20           MS. KEENE:   I'd like to offer in Defense

21   Exhibit No. 271 --

22           THE COURT:   Okay.

23           MS. KEENE:   -- which is a three-page

24   document.

25           THE COURT:   And that's three bulletin board

1    pages like have been used throughout the trial?

2              MS. KEENE:  Yes, sir.

3              THE COURT:  All right.

4              MS. KEENE:  And I'm going to offer in

5    Defense 272, which is a two-page document, the bulletin

6    pages, like has been offered in, in the trial.

7              THE COURT:  All right.

8              MS. KEENE:  And, Judge, I pass the witness.

9              THE COURT:  Hold on a second.

10             MS. KEENE:  Hang on.

11             THE COURT:  Do you remember from seeing

12   those without flipping them all over and looking at

13   them?

14             MR. ROUSSEAU:  I do, Your Honor.  I have no

15   objection.

16             THE COURT:  All right.  Then 271, the

17   three-page easel bulletin-sized documents, which are

18   basically like 16 inches by 30 inches square, plus or

19   minus, and Defense 272, a two-page document, are both

20   admitted.

21             (Defendant's Exhibit No. 271, 272 admitted)

22             THE COURT:  Any redirect?

23             (Pause in proceedings)

24             THE COURT:  All right.  Back on the record.

25             MR. ROUSSEAU:  Your Honor, I'll offer

```
 1   State's Exhibit No. 234, which is a citation in Cause

 2   No. 231-493121-11, addressed to Mechelle D. Gandy.  It's

 3   a certified public document under seal.

 4              MS. KEENE:  Judge, I have no objection to

 5   that.

 6              THE COURT:  All right.  State's 234

 7   admitted.

 8              (State's Exhibit No. 234 admitted)

 9              FURTHER REDIRECT EXAMINATION

10   BY MR. ROUSSEAU:

11      Q.  Rebeca, I promise I'm going to be brief.  I meant

12   to do this earlier.

13              March the 15th -- I don't want to get us

14   wrong.  March the 15th would have been Tuesday.

15   Counting back, towards, the 20th was a Sunday, correct?

16      A.  Yes.

17      Q.  The 19th is a Saturday?

18      A.  Yes.

19      Q.  The 18th is a Friday?

20      A.  Yes.

21      Q.  The 17th is a Thursday?

22      A.  Yes.

23      Q.  The 16th is a Wednesday?

24      A.  Yes.

25      Q.  So the 15th would be Tuesday, correct?
```

```
 1        A.   Yes.

 2        Q.   And Tuesday is the day that you went to Best Buy

 3   to pick up the Defendant, correct?

 4        A.   Yes.

 5        Q.   The next day was March the 16th, Wednesday, is

 6   that the day that the Defendant threw you out of the

 7   apartment with your kids?

 8        A.   Yes.

 9        Q.   And was that the day your phone was broken by the

10   Defendant?

11        A.   Yes.

12        Q.   And from -- that's okay for now.

13             Did you receive a telephone call sometime

14   between March the 16th, which is Wednesday, and Sunday,

15   which is the day of the murders, did you receive a

16   telephone call during that time from a friend of the

17   Defendant's named Isaac?

18        A.   Yes.

19        Q.   Do you recall what day that was?

20        A.   I want to say Wednesday or -- Thursday or Friday.

21        Q.   Okay.  You've been seeing me write on this chart,

22   which I've had marked as State's Exhibit No. 235; is

23   that correct?

24        A.   Yes.

25        Q.   Have I accurately recorded the little -- the last
```

```
 1    little conversation between the two of us?

 2        A.  Yes.

 3             MR. ROUSSEAU:  Your Honor, I'll offer

 4    State's 235.

 5             MS. KEENE:  No objection, Judge.

 6             THE COURT:  All right.  State's 235 is

 7    admitted.

 8             (State's Exhibit No. 235 admitted)

 9             MR. ROUSSEAU:  I'll pass the witness.

10             FURTHER RECROSS-EXAMINATION

11    BY MS. KEENE:

12        Q.  Did you talk to Thomas on the telephone or

13    otherwise on March the 20th of 2011?

14        A.  No.

15        Q.  Did you call him two times, though?

16        A.  Yes.

17        Q.  And when you called him, did you just sit there

18    and not talk?

19        A.  Yes.

20        Q.  And so you just called to listen to him?

21        A.  Yes.

22        Q.  And you never said, Hey, this is Rebeca, what are

23    you doing?  Nothing?

24        A.  No.

25        Q.  You just called -- and you actually blocked your
```

1  number when you called, didn't you?

2      A.  Yes.

3      Q.  So you block your number and called Thomas and

4  then just sat there?

5      A.  Yes.

6      Q.  Twice?

7      A.  Yes.

8      Q.  And the information that you had about them,

9  about Thomas and Mechelle might -- that this possible

10  meeting did not come from Thomas, it came from Mechelle?

11      A.  Yes.

12          MS. KEENE:  I'll pass the witness.

13              <u>FURTHER REDIRECT EXAMINATION</u>

14  BY MR. ROUSSEAU:

15      Q.  Why did you just sit there and listen?

16      A.  I was curious as to where he was for some reason.

17  I don't really know.  I was wondering if he was at the

18  bars or if he was going to meet with Mechelle.  Or I

19  don't really know what I was particularly listening for.

20  It was really nonsensical, even to me now, that I did

21  that.  I really don't know what I was really -- I just

22  remember then trying to listen to see if he was at the

23  bar or where he was at.

24      Q.  Looking back now at that period of time, that

25  roughly five-day period, and I guess for you it actually

 1   continued for a period of time after that, but

 2   especially that five-day period ending on the Sunday of

 3   the murders --

 4       A.   Uh-huh.

 5       Q.   -- did that -- does that seem to be a pretty

 6   tumultuous time for you?

 7       A.   Yes.

 8       Q.   It was pretty much a period during which you

 9   were --

10            MS. KEENE:   I'm going to have to object to

11   him leading his witness, Your Honor.

12            THE COURT:   Sounds like it is.

13            MR. ROUSSEAU:   Fair enough.   I'll withdraw

14   the question.

15       Q.   (BY MR. ROUSSEAU)  What was your emotional state

16   during that five-day period?  Describe it as best you

17   can.

18       A.   Confused.   Drained.   Tired.   I wanted somebody to

19   tell me something, some sort of truth.   Angry.

20   Frustration.   Sadness for my kids.   Just all kinds of

21   emotions.

22            MR. ROUSSEAU:   Your Honor, I'll offer -- I

23   didn't mark this.   I'm sorry.

24            I want to offer State's 236.   It's a

25   citation, certified copy, under seal, a citation, again,

1  in Cause No. 231-493121-11.

2          MS. KEENE:  I have no objection, Judge.

3          THE COURT:  All right.  State's 236, which

4  looks like it's a four-page document, is admitted.

5          (State's Exhibit No. 236 admitted)

6          MR. ROUSSEAU:  Thank you, Judge.  I'll pass

7  the witness.

8              FURTHER RECROSS-EXAMINATION

9  BY MS. KEENE:

10     Q.  Ms. Raudry, the reality was --

11         THE COURT:  Whoa, whoa, whoa.

12         All right.  Go ahead, Joetta.

13         MR. ROUSSEAU:  I'm sorry.  Go ahead.

14     Q.  (BY MS. KEENE)  Rebeca, the reality was, this was

15  a very stressful week, correct?

16     A.  Yes.

17     Q.  And during this week, in this time period, you

18  said you were staying on your medication?

19     A.  Yes.

20     Q.  Were you seeing your psychiatrist at all during

21  this week?

22     A.  No.

23     Q.  Did you feel like you needed to or did you feel

24  like -- just looking back, was your mind doing anything

25  weird to you?

1    A.  No.

2    Q.  Do you recall how you were becoming obsessed with

3    Thomas and watching him intensely on Facebook?

4    A.  No.

5    Q.  How you were watching every post and then

6    watching if it got removed?

7    A.  Yes, I did.

8    Q.  And you would see that if he was at a bar, when

9    he had been broken up with you, and someone had tagged

10   him there, you noticed it and how you were trying to

11   download it and see it quicker than it got removed?

12   A.  Yes.

13   Q.  And so you were watching Thomas very intensely on

14   Facebook from really the moment that he kicked you out?

15   A.  Yes.

16   Q.  And then kind of being weird and calling him?

17          MR. ROUSSEAU:  Objection, Your Honor.

18   That's argumentative.

19          MS. KEENE:  All right.

20          THE COURT:  Well, if there's a question,

21   then ask the question.

22          MS. KEENE:  There is.

23          THE COURT:  Then ask the question.

24   Q.  (BY MS. KEENE)  You agree with me it's weird to

25   call somebody and just sit there?

 1        A.   Yes.

 2        Q.   Okay.  So you were really watching him hard on

 3   Facebook and you were being weird calling him and

 4   sitting there and not talking?

 5        A.   I guess so.

 6        Q.   And it was a very difficult time period?

 7        A.   Yes.

 8             MS. KEENE:  Pass the witness.

 9             FURTHER REDIRECT EXAMINATION

10   BY MR. ROUSSEAU:

11        Q.   Rebeca, the card that we looked at earlier, the

12   invitation --

13        A.   Yes.

14        Q.   -- when it -- after you had -- when you left the

15   apartment, got kicked out of the apartment, what -- did

16   that card go with you or did you leave it behind?

17        A.   I left it behind.

18             MR. ROUSSEAU:  That's all I have, Your

19   Honor.

20             FURTHER RECROSS-EXAMINATION

21   BY MS. KEENE:

22        Q.   You got that card at your dad's house, correct?

23        A.   Yes.

24        Q.   And you testified earlier that you never left

25   that card or gave that card to Thomas?

 1     A.   No, I kept it in a drawer in our armoire, like a

 2   set of drawers.

 3     Q.   So you kept it at your house, not at your dad's

 4   house?

 5     A.   Not at my house.  At the apartment.

 6     Q.   Okay.  You kept it at your apartment?

 7     A.   Yes.

 8     Q.   But it was received at your dad's house?

 9     A.   Yes.

10     Q.   So when you left, you're saying you left the card

11   there?

12     A.   I left the card in the armoire, yes, at the

13   apartment.

14     Q.   But you ultimately get the card again?

15     A.   Yes.

16     Q.   Did you go get it out of the armoire?

17     A.   No, I -- that armoire was mine, so I took the

18   whole armoire.  And that was still in there.

19     Q.   All right.  So the card was in the same place you

20   put it, in the armoire.  When you went and got the

21   armoire, you took it with you?

22     A.   Yes.

23     Q.   When you moved out?

24     A.   Yes.

25     Q.   Okay.

```
 1                 MS. KEENE:  Pass the witness.
 2                 MR. ROUSSEAU:  Nothing further.
 3                 THE COURT:  May this witness be excused
 4   subject to recall, only if needed?
 5                 MS. KEENE:  Yes, sir.
 6                 MR. ROUSSEAU:  Yes, sir.
 7                 THE COURT:  All right.  Then may I have
 8   that, please?
 9                 THE WITNESS:  Yes.
10                 THE COURT:  Whose memory refresher does this
11   belong to?
12                 MS. KEENE:  It's mine.
13                 THE COURT:  All right.  You're excused from
14   the proceedings subject to the rules that apply to
15   witnesses; meaning, you can't talk to anyone about
16   anything that happened in the courtroom unless you're
17   speaking in private with the lawyers you've already
18   spoken to, their partners or representative or their
19   agents, if someone needs to contact you to ask you
20   questions to decide whether to call you back.  But you
21   certainly can't talk to anyone that's not an officer of
22   the court until you find out the jury has reached a
23   final decision at the end of the trial.  And you
24   promise, if I need you back, you can be back on
25   reasonable notice so you don't have to sit around and
```

```
 1   wait?
 2                 THE WITNESS:  Yes.
 3                 THE COURT:  And you plan on being in town
 4   the next week or two?  You're not planning on leaving
 5   town or anything?
 6                 THE WITNESS:  No.
 7                 THE COURT:  All right.  Excellent.  You're
 8   excused.  Thank you for coming in.
 9                 (Witness excused from courtroom)
10                 (Break taken, 3:55 - 4:05 p.m.)
11                 (OPEN COURT, DEFENDANT AND JURY PRESENT)
12                 (Witness on the stand)
13                 THE COURT:  You may call and identify your
14   next witness.
15                 MR. ROUSSEAU:  Thank you, Judge.
16                 We call Richard Armistead.
17                 THE COURT:  If you would state your name out
18   loud for Miss Karen again and this time for the members
19   of the jury, as well.
20                 THE WITNESS:  Richard Armistead.
21                 THE COURT:  You've already been sworn and
22   placed under the rules outside the jury's presence; is
23   that correct?
24                 THE WITNESS:  That's correct.
25                 RICHARD ARMISTEAD,
```

```
 1   having been first duly sworn, testified as follows:
 2                      DIRECT EXAMINATION
 3   BY MR. ROUSSEAU:
 4       Q.  How are you doing today, sir?
 5       A.  I'm doing okay.
 6       Q.  Okay.  Been all day waiting?
 7       A.  Yeah.  That's all right.
 8       Q.  Appreciate your patience.
 9               You are Richard Armistead; is that correct?
10       A.  Yes, it is.
11       Q.  Mr. Armistead, what do you do for a living?
12       A.  I'm the service director at Shady Valley Country
13   Club.
14       Q.  Where is Shady Valley Country Club?
15       A.  In South Arlington.
16       Q.  Southwest Arlington?
17       A.  Yes.
18       Q.  Near the lake?
19       A.  Off of 820.
20       Q.  Yes, sir.  Was there back in the day -- well, I'm
21   sorry.  I'm kind of getting ahead of myself.  What is
22   that?  What do you do for the Shady Valley Country Club?
23       A.  Service director.  I'm in charge of all banquets,
24   the ala carte dining, the pub, swimming, pretty much
25   everything with customer relations involving food and
```

```
 1   alcohol.
 2       Q.   Things that -- the fun things that we associate
 3   with a country club?
 4       A.   Yes.
 5       Q.   Do you have a background in the restaurant
 6   industry?
 7       A.   Yes.
 8       Q.   Specifically back in about 2011 were you working
 9   for a restaurant called Truluck's?
10       A.   In Southlake, yes.
11       Q.   How long did you work for Truluck's?
12       A.   I worked there for about four years at that
13   location and then six months prior at the Uptown
14   location.
15       Q.   Uptown in Dallas?
16       A.   Uh-huh.
17       Q.   And what -- that's yes?
18       A.   Oh, yes.  I'm sorry.
19       Q.   Makes it easier for her.
20            While you worked for Truluck's, did you come
21   to know a person named Thomas Olivas?
22       A.   Yes, sir.
23       Q.   And do you see Thomas Olivas here in the
24   courtroom today?
25       A.   Yes, I do.
```

```
 1      Q.  Would you point him out and describe something
 2  that he's wearing, please.
 3      A.  He's wearing a black suit coat and beige tie.
 4  That's beige, correct?
 5      Q.  At the end of this table?
 6      A.  Yes.
 7          MR. ROUSSEAU:  May the record reflect the
 8  witness has identified the Defendant?
 9          THE COURT:  It may.
10      Q.  (BY MR. ROUSSEAU)  Now, Mr. Armistead, how long
11  did you work with Mr. Olivas?
12      A.  Probably about three years.
13      Q.  All at Truluck's?
14      A.  Yeah, all at Truluck's.
15      Q.  Have you ever worked with him anywhere else?
16      A.  No.
17      Q.  During that period of time would you characterize
18  your relationship with him as -- well, would you have
19  considered him to be a friend?
20      A.  Yes, definitely.
21      Q.  And would you socialize outside of work, as well
22  as at work?
23      A.  After work, yes.
24      Q.  I want to -- you understand that -- well,
25  generally speaking, you know the case we're here to talk
```

1    about, correct?

2        A.   Yes.

3        Q.   And if I were to say -- to tell you that the

4    important date, the date of the occurrence, was March

5    the 20th of 2011, would that jibe with your memory

6    somewhat?

7        A.   Not with the dates, but I know the incident we're

8    referring to.

9        Q.   Exactly.  And I'm not trying to be exact, but

10   approximate time of the year.

11       A.   Yes.

12       Q.   The spring of the 2011?

13       A.   Yes.

14       Q.   During that period of time, the time leading up

15   to that, to the incident, do you recall noticing a

16   change in Thomas' behavior?

17       A.   Thomas and I used to work a lot together, almost

18   every day, and then closer to the end it was -- he was

19   working less shifts.  He was requesting to be off more.

20   He started looking to get another job.  I could tell he

21   wasn't happy with where he was at and things weren't

22   going well for him, so he was distancing himself.

23       Q.   Were you seeing less and less of him at work?

24       A.   Oh, yes.

25       Q.   Do you recall -- well, before I get to that, did

1    you know Rebeca Raudry?

2        A.   Yes.

3        Q.   And who is Rebeca Raudry?

4        A.   I had known her as his girlfriend.

5        Q.   Did you ever socialize with her?

6        A.   At some events; at work, holiday parties, a

7    little bit outside of work.  I ran into her once at a

8    supermarket.  Not really after work with him.

9        Q.   Did you know her well?

10       A.   No.

11       Q.   Did you ever discuss with Thomas the situation

12   where a woman came into the restaurant and caused him

13   some discomfort, some anxiety?

14       A.   Not until the night I went over to his house.

15       Q.   Okay.  Tell me about this situation where a woman

16   came into the restaurant.  What did he say and what

17   did -- how did he explain the situation where a woman

18   came into the restaurant and caused him to -- some

19   anxiety?

20       A.   That a girl had come into the restaurant, goes

21   into the bar, ranting and raving that he was the father

22   of her child and that he needed to pay child support,

23   and basically caused a scene at the restaurant.

24       Q.   Now, you worked at the restaurant then, right?

25       A.   Uh-huh.  Correct.

1    Q.  Is that something -- well, first of all, did you
2    witness that?
3    A.  No, I did not.
4    Q.  Is it something that you think would have been
5    noteworthy among the employees?
6    A.  Yes.
7    Q.  Did you ever hear about it from anybody else?
8    A.  No.
9    Q.  So you said this happened in -- this happened the
10   night that you went to his house?
11   A.  Yes.
12   Q.  Okay.  We're kind of -- we're going to talk about
13   that right about now.
14   A.  Okay.
15   Q.  During the time period that we've been talking
16   about -- and I know dates are hard for you, so I won't
17   try to pin you down.
18        But did you receive a telephone call from
19   Thomas at a time and on a particular night when he was
20   in some distress?
21   A.  Actually, I called him that night.
22   Q.  Okay.  What made you call him?
23   A.  I hadn't seen him in a while and I hadn't heard
24   anything from him and I thought it was time of touch
25   base to see what was going on.

1    Q.   Okay.  And when you got ahold of him, did he tell

2    you where he was?

3    A.   Yes.

4    Q.   Where was he?

5    A.   He was at his apartment.

6    Q.   And did he seem upset?

7    A.   He was very short on the phone.

8    Q.   What did he tell you?

9    A.   I asked how he was doing.  He said he wasn't

10   doing that good.  And he asked if I could come over and

11   I said sure.  And he said, "Well, just to warn you,

12   there's police at my apartment, outside," and I asked

13   what for and he said he's being accused of murder.

14   Q.   Did he give you any more details other than that?

15   A.   Not over the phone.

16   Q.   Okay.  So what did you do?

17   A.   I said, "I'll go buy the beer," and I grabbed a

18   case of beer and I went over there.

19   Q.   Where did you live, by the way?

20   A.   I lived in Trophy Club.

21   Q.   Minutes -- in minutes how far -- how far was --

22   I'm sorry.  It's been a long day for me, too.

23   A.   Probably about eight.

24   Q.   About eight minutes away?

25   A.   Eight minutes away.

STATE v. THOMAS OLIVAS

```
 1      Q.  So not very far?

 2      A.  No.

 3      Q.  So you stopped, got some beer, went to pick him

 4   up, correct?

 5      A.  Yes.

 6      Q.  And what did you do then?  When you picked him

 7   up, where did y'all go?

 8      A.  Actually we stayed at his apartment.

 9      Q.  Okay.

10      A.  We went up to his apartment and we started

11   talking about what was going on.

12      Q.  Were there police in the parking lot?

13      A.  Yes.

14      Q.  Did they question you as you went in?

15      A.  No.

16      Q.  So you sat down at his apartment and had a few

17   beers?

18      A.  Uh-huh.

19      Q.  And over the course of those beers, how did he

20   feel but the situation that he had already alluded to?

21      A.  He said that he was being accused of murdering a

22   girl, that she said that he was the father of this child

23   and that he wasn't, and that the baby died, too, that

24   they were questioning him all day and that he didn't

25   know what he should do.
```

1    Q.   Did you have any advice for him?

2    A.   Well, since he was military, since he worked with

3    military, I told him he should get the military to

4    advise him, get him a lawyer.

5    Q.   This woman that was killed, he told you that she

6    was -- did he say anything about her and him?

7    A.   He said that when he and Rebeca had a split-up,

8    that he dated that girl for a while, but he said he

9    never had any sex with her or anything.

10   Q.   He said that he and Rebeca had broken up for a

11   while and during that period of time he dated this

12   woman?

13   A.   Yes.

14   Q.   But that he never had sex with her?

15   A.   Yes.  I asked if there was any chance it was his

16   child and he said, "No, I've never had sex with her."

17   Q.   Did you ask him where he was at the time of the

18   killing?

19   A.   Yes, I did.

20   Q.   What did he tell you?

21   A.   He told me he was in the area that it happened,

22   at a friend's house.

23   Q.   He was in the area --

24   A.   Uh-huh.

25   Q.   -- of the killing?

```
 1      A.  Of the killing, yes.  It was in Arlington.

 2      Q.  But he was at where?

 3      A.  At a friend's house.

 4      Q.  Did he tell you whether or not he told the police

 5   that story?

 6      A.  I actually asked if he told them whose house he

 7   was at and he said no.

 8      Q.  Did that strike you as strange?

 9      A.  Yes.

10      Q.  Why?

11      A.  Because if I was going to be accused of murder, I

12   would be telling every single name I could think of that

13   happened that night.

14      Q.  When you -- when he said that he didn't tell the

15   police where he had been, whose house he had been at --

16      A.  Right.

17      Q.  -- did he tell -- did he give you a reason why?

18      A.  He said it would be his words -- word against

19   theirs.

20      Q.  After that -- well, after y'all finished drinking

21   your beers that night, did you go anywhere?

22      A.  Took him over to our house, my house.

23      Q.  And I'm sure you were perfectly sober enough to

24   drive?

25      A.  I was close.
```

1    Q.   It was just around the corner, right?

2    A.   Yes, eight minutes.   Uh-huh.

3    Q.   Well, so did -- he spent the night at your house

4    that night?

5    A.   Yes, he did.

6    Q.   The next day was there any more conversation

7    about this topic?

8    A.   There wasn't.   No, there wasn't any conversation

9    about that -- that topic.   Excuse me.   It was pretty

10   much over with at that time.

11   Q.   Did you ever talk to him about the situation

12   again?

13   A.   No.

14   Q.   Are you one of his Golden Tee buddies?

15   A.   Actually, we played Big Buck Hunter.

16   Q.   Big Buck Hunter, same type of game -- well, it's

17   a --

18   A.   Yeah.

19   Q.   -- big console game?

20   A.   Console game.

21   Q.   Do you know if it's made by the same company?

22   A.   No, I did not know that.

23   Q.   After that period -- after that night when he

24   spent the night at your house, did your relationship

25   with him as a friend continue on as before or did it

```
 1   change?
 2        A.  Actually, I really never saw him after that.
 3        Q.  Did you continue working at Truluck's?
 4        A.  Yes.
 5        Q.  Did he quit shortly after that?
 6        A.  Yes.  I don't know if he quit or if it just
 7   ended.
 8        Q.  In any event, he was no longer there?
 9        A.  Yes.
10        Q.  I appreciate it.
11             MR. ROUSSEAU:  I'll pass the witness, Your
12   Honor.
13                     CROSS-EXAMINATION
14   BY MR. MOORE:
15        Q.  Mr. Armistead, if a prosecutor ever ask you if
16   you have been drinking and driving, you can take the
17   Fifth Amendment if you want to.  I'll advise you of
18   that.
19        A.  I was told to be honest, so...
20        Q.  I understand.
21             You no longer work at Truluck's.  When did
22   you quit Truluck's and go to Shady Valley?
23        A.  I quit Truluck's about a year and four months ago
24   to work a Trophy Club Country Club and I moved from
25   there about four months ago.
```

1    Q.   Okay.  So you're back -- you're -- pretty much

2    your background is in the service industry?

3    A.   Yes, sir.

4    Q.   And Truluck's is what they call a fine-dining

5    restaurant, correct?

6    A.   Yes, sir.

7    Q.   And that means it costs a lot of money to eat

8    there, right?

9    A.   Yes.

10   Q.   And it's comparable to, say, a Del Frisco's or

11   Ruth Chris steakhouse, those kinds of places?

12   A.   Yes, comparable.

13   Q.   You're going to spend several hundred dollars if

14   you go out there to eat, especially if you drink?

15   A.   Yes.

16   Q.   And so when you testified earlier about hearing

17   about this disturbance that somebody made in the

18   restaurant, you didn't yourself see that, you just heard

19   that from Thomas, is that the way I'm getting it?

20   A.   Yes.

21   Q.   Okay.  And this was the same night that you

22   grabbed the case of beer and went over there to visit

23   with him?

24   A.   That I heard the story, yes.

25   Q.   Okay.  And if I understand you correctly, you had

```
1    just -- you had not seen -- well, let me make that a
2    little clearer.
3              On March 21st of 2011 is when y'all had this
4    conversation and he spent the night.  Would that be
5    fair?
6        A.  Yes.
7        Q.  And you had not seen him at Truluck's or outside
8    of Truluck's for how long before that?
9        A.  Probably for a couple of weeks.  But for like a
10   month and a half it would be less and less.  As opposed
11   to five days, it would go down to three days, then two.
12   And just he'd give up shifts when he could.
13       Q.  And prior to that, you had been friends and
14   socialized with him, correct?
15       A.  Yes.
16       Q.  And had met Rebeca Raudry?
17       A.  Yes.
18       Q.  How many times had you been around her?
19       A.  Probably about three or four.
20       Q.  And what kind of situation were those?
21       A.  Two them were holiday parties.  One of them was
22   at Truluck's, she came by.  Oh, and we also took her out
23   on the boat once.
24       Q.  Okay.  You have a boat?
25       A.  Yes.
```

 1      Q.   On Lake Grapevine?

 2      A.   It's parked at my house right now.

 3      Q.   Okay.

 4      A.   But that's where we took it out, yes.

 5      Q.   Did you have a -- did you get to know her well

 6  enough to form any kind of an opinion about her as a

 7  person?

 8      A.   She seemed like a nice person, but we didn't

 9  really have a one-on-one conversation.  It was always --

10      Q.   Okay.  Well, when you called Thomas on March 21st

11  of 2011, had you already heard about the killings in

12  Arlington?

13      A.   No.

14      Q.   Hadn't heard on the news or read in the paper or

15  anything?

16      A.   No.  I was actually at work that night and I

17  called after work, so...

18      Q.   Just kind of a coincidence that that is when you

19  decided, hey, I'm going to call old Thomas and see what

20  he's been up to?

21      A.   Yes.

22      Q.   Okay.  And he asked you to come over and grab

23  some beer and you went there and you saw cops in the

24  parking lot of his apartment complex, correct?

25      A.   Yes.

```
 1        Q.   Were they in marked police units?

 2        A.   Yes.  Lights were on.

 3        Q.   I'm sorry?

 4        A.   The lights were on on the police units.

 5        Q.   Okay.  How many of them were there?

 6        A.   I want to say I spotted two, I believe.

 7        Q.   Where were they?

 8        A.   Out on the parking lot, parked.

 9        Q.   Just sitting there?

10        A.   Yes.

11        Q.   Okay.  Did you happen to talk to either of the

12   police officers?

13        A.   No.

14        Q.   Did that raise any red flags in your mind?

15        A.   No, not really.

16        Q.   Okay.  Up until then had Thomas told you anything

17   before you got there?

18        A.   He told me that he was being accused of murder.

19        Q.   Okay.  And he told you that almost the entire day

20   he had spent with the Arlington detective being

21   questioned about it?

22        A.   Correct.

23        Q.   Did he ever -- well, let me ask you this.

24             I guess he felt, and maybe you felt, that

25   y'all were good enough friends to have you over to
```

1    discuss this pretty traumatic event.  Wouldn't you say?

2       A.   Yes.

3       Q.   Felt like you were somebody that he was

4    comfortable being around and talking to?

5       A.   Correct.

6       Q.   Comfortable confiding in?

7       A.   Correct.

8       Q.   Did he ever admit any participation in the murder

9    of Mechelle Gandy or her son?

10      A.   No.

11      Q.   In fact, you were the one that told him that he

12   might ought to get a lawyer?

13      A.   Yes.

14      Q.   Why would you tell him that?

15      A.   Because if you're being accused of murder, that's

16   what you would do.  I mean, that's the first thing I

17   would do.

18      Q.   That makes sense, doesn't it?

19      A.   Yes.

20      Q.   And so this conversation that you had with him,

21   he never admitted any participation, but he did say

22   that -- he'd mentioned he'd never had sex with this

23   woman, correct?

24      A.   Correct.

25      Q.   You did not -- in your prior socialization and

```
 1    knowing Thomas before March 20th or 21st of 2011, had he
 2    ever mentioned Mechelle Gandy or a possible son by her?
 3       A.   No.
 4       Q.   Never had come up?
 5       A.   No.
 6       Q.   Never talked about how she was harassing him or
 7    wanting child support from him?
 8       A.   No.
 9       Q.   And he told you that he was in the area at a
10    friend's house but didn't tell you who the friend's name
11    was?
12       A.   Yes.
13       Q.   Did he tell you that he cooperated with the
14    police?
15       A.   Yes.
16       Q.   Did he tell you that he left some clothes with
17    the police?
18       A.   I don't remember that.
19       Q.   Okay.  Did he tell that you he let them search
20    his apartment?
21       A.   Yes.
22       Q.   And that was the very apartment that you were in,
23    wasn't it?
24       A.   Yes.
25       Q.   Did you notice anything amiss, awry, in the
```

1   apartment?

2       A.   No, because I hadn't been over before then.

3       Q.   But basically he told you that he cooperated

4   fully with them?

5       A.   Yes.

6       Q.   And you took him to your house to spend the

7   night.  And what happened the next day?

8       A.   Nothing.  Pretty much that morning he left and we

9   didn't see or hear from him again.

10      Q.   Okay.  He didn't have a car.  How did he get --

11      A.   Well, I drove him back to his apartment.

12      Q.   Okay.  That's what I was wondering.  You gave him

13  a ride back to his apartment?

14      A.   Yes.

15      Q.   Dropped him off and might have said, "See you

16  later," and have never spoken to him since?

17      A.   Yes.

18      Q.   Okay.  Well, thank you, Mr. Armistead.  I

19  appreciate it.

20              MR. MOORE:  I'll pass the witness.

21                  REDIRECT EXAMINATION.

22  BY MR. ROUSSEAU:

23      Q.   I forgot to ask you something, sir.  You said you

24  had been out in a boat with Thomas and Rebeca?

25      A.   Yes.

STATE v. THOMAS OLIVAS

1    Q.  Was it summertime?

2    A.  Yes.

3    Q.  Skiing, that sort of thing?

4    A.  Just out on the boat, just tubing, I think.  I

5    don't remember if we tubed or not.  I don't ski.

6    Q.  Everybody wearing swimsuits and T-shirts, that

7    sort of thing?

8    A.  Yes.

9    Q.  During that day or any other time, do you

10   remember the Defendant ever complaining about any

11   chronic skin condition, makes him scratch all the time?

12   A.  No, not that I can think of.

13   Q.  Did he ever tell you, "I have eczema"?

14   A.  Not that I recall.

15   Q.  Do you know what eczema is?

16   A.  I know it's a skin condition.

17   Q.  So when you were around him outside of work on

18   occasions, would he sometime be wearing short-sleeved

19   shirts?

20   A.  Yes.

21   Q.  Did you notice him breaking out in any big red

22   welts or anything like that when he was wearing

23   short-sleeved shirts?

24   A.  No.

25   Q.  Did he -- in your experience, at least in the

```
 1    summertimes, away from the job, would he wear shorts?
 2        A.   It would always be after work that we'd hang out,
 3    so it was always no shorts.  So...
 4        Q.   Did he always wear a hoodie, like, you know, a
 5    sweatshirt with a hood on it, even in the summertime, to
 6    keep his skin from breaking out when it was exposed to
 7    the air?
 8        A.   No.
 9        Q.   That's news to you?
10        A.   Yes.
11             MR. ROUSSEAU:  That's all I have.
12             THE COURT:  Anything else?
13             MR. MOORE:  I have no other questions,
14    Judge.
15             THE COURT:  Does this witness need to remain
16    on call?
17             MR. MOORE:  I'm sorry?
18             THE COURT:  Does this witness need to remain
19    on call?
20             MR. MOORE:  Probably not.
21             MR. ROUSSEAU:  We can find him if need be,
22    Judge.
23             THE COURT:  All right.  Sounds good.  Then
24    I'm going to excuse you from the proceedings, unless
25    someone calls you in the next couple of weeks and says
```

1    they forgot to ask you something or something developed

2    they have more questions.  Just remember those

3    instructions until you get or read it from a reliable

4    source the jury has reached a verdict.

5                    THE WITNESS:  Thank you.

6                    THE COURT:  Thank you for coming in.

7                    (Witness excused from courtroom)

8                    MR. ROUSSEAU:  May we approach, Judge?

9                    THE COURT:  Yeah.

10                   (Discussion at the bench, off the record)

11                   MR. ROUSSEAU:  We'll call Tim Jopson.

12                   (Witness takes the stand)

13                   THE COURT:  All right.  Will you state your

14   name again for Miss Karen and also for the jurors,

15   please, sir.

16                   THE WITNESS:  Timothy Ryan Jopson.

17                   THE COURT:  Mr. Jopson, you have been in

18   here previously.  I swore you in, placed you under the

19   rules, asked you to return when summoned.  And you

20   understand all those rules and things apply until the

21   trial is over; is that right, sir?

22                   THE WITNESS:  It is, sir.

23                   THE COURT:  And remember, you know, make

24   sure question and answers, a pause between each, so she

25   can write it all down.  Do you remember that part?

```
 1              THE WITNESS:  Yes, sir.

 2              THE COURT:  All right.

 3              Kevin.

 4              MR. ROUSSEAU:  Thank you, Judge.

 5                     TIMOTHY JOPSON,

 6    having been first duly sworn, testified as follows:

 7                   DIRECT EXAMINATION

 8    BY MR. ROUSSEAU:

 9       Q.  How are you doing today, sir?

10       A.  Doing well.

11       Q.  You are Timothy Jopson; is that correct?

12       A.  I am.

13       Q.  You've been here all day today.  I appreciate

14    that.  Sorry to make you wait.

15       A.  It's all right.

16       Q.  I need to ask you a few questions, sir.  You

17    understand the nature of the case that you're here to

18    talk about, correct?

19       A.  I do.

20       Q.  What do you do for a living, sir?

21       A.  I manage restaurants.

22       Q.  And is that what you're doing right now?

23       A.  Yes, sir.

24       Q.  What -- which restaurant do you manage?

25       A.  Red Lobster, currently.
```

```
 1      Q.   How long have you been in the restaurant
 2   business?
 3      A.   Nine years.
 4      Q.   How old are you, sir?
 5      A.   Twenty-seven.
 6      Q.   Are you from this area?
 7      A.   Majority raised in DFW, yes, sir.
 8      Q.   I'm going to ask you about your relationship with
 9   a woman named Mechelle Gandy.  Did you know Mechelle
10   Gandy?
11      A.   I did.
12      Q.   How did you come to know her?
13      A.   We lived on streets next to each other.
14      Q.   Is that where you met, at her home or...
15      A.   Actually met her one day running.
16      Q.   You were out running?
17      A.   Yeah.
18      Q.   And where was she?
19      A.   In her front yard.
20      Q.   Do you recall what street that would have been
21   on -- well, how about this.  What street did you live
22   on?
23      A.   High Plains Court and she lived on Daniel Street.
24      Q.   On Daniel.
25           And you saw her outside?
```

```
 1        A.   Uh-huh.

 2        Q.   Did you just stop and talk?

 3        A.   We had seen each other in passing before, never

 4   spoke, and then struck up conversation.

 5        Q.   Do you recall what -- approximately when this

 6   would have been?  Well, let me help you a little bit.

 7             You understand that she was killed,

 8   murdered, on March 20th of 2011?

 9        A.   Uh-huh.

10        Q.   So backtracking from there, if you can ballpark

11   it, if that helps you.

12        A.   2008.

13        Q.   Okay.  So you've known her for a good little

14   while?

15        A.   Uh-huh.

16             THE COURT:  You've got to say yes or no

17   because uh-huhs are --

18             THE WITNESS:  I understand.

19             THE COURT:  She can't write that down.

20        Q.   (BY MR. ROUSSEAU)  Characterize for us, if you

21   would, your relationship with her.  How would you

22   describe it?

23        A.   She was a friend of mine.

24        Q.   Right from the start, from 2008 on?

25        A.   Yeah.
```

1    Q.   How often would you see her?

2    A.   Once a week, because she worked at the gas

3    station near my house, at least.  I would stop in there

4    for drinks and anything else.

5    Q.   So you would at least see her once a week?

6    A.   At the beginning, yes.

7    Q.   After that how frequently would you see her?

8    A.   Once every few weeks, every other month, every

9    couple months.

10   Q.   Okay.  So you saw her at work once a week or so

11   and then you would see her outside of work on occasion?

12   A.   On occasion, yes, sir.

13   Q.   When you would see her outside of work, where

14   would these -- I'll call it a meeting for lack of better

15   a word.  Where would these meetings take place?

16   A.   Initially at her home on Daniel, until she moved

17   to North Arlington and then there.

18   Q.   When she lived on Daniel, whose -- do you recall

19   if anyone else lived there, or do you know?

20   A.   I don't know.

21   Q.   Did you -- were you under the impression that she

22   lived there alone?

23   A.   No.  I figured someone else lived there because

24   she did have a picture of them in the house.

25   Q.   Oh, so you went actually inside the house?

1    A.   Yes, sir.

2    Q.   But did you ever see anyone else there?

3    A.   No, sir.

4    Q.   So you knew her for approximately three years?

5    A.   Two and a half to three years, yes, sir.

6    Q.   Two and a half to three years.  So sometime in

7    '08, okay.

8            And during that time did you ever become

9    involved in a dating relationship with her?

10    A.   No, sir, not dating.

11    Q.   And by dating, I mean where you actually go out

12    together, you know, to dinner, to a movie, to a bar,

13    whatever, but you go there as a couple or you'd meet

14    there?

15    A.   I understand.  No, sir.  Never.

16    Q.   Okay.  When you would socialize with her --

17    that's a better word than "meeting".  There you go.

18            When you would socialize with her, where

19    would it typically be, at her home?

20    A.   Yes, sir.

21    Q.   And you said at first it was in the house on

22    Daniel?

23    A.   Yes, sir.

24    Q.   And then later it was at a house -- at an

25    apartment in North Arlington?

```
1        A.  Yes, sir.
2        Q.  Okay.  Now, are you familiar with the apartment
3   that was burned?
4        A.  Yes, sir.
5        Q.  Was it that apartment?
6        A.  Yes, sir.
7        Q.  Were there -- was there ever any other home that
8   you would socialize with her at?
9        A.  No, sir.
10       Q.  So was your relationship with her -- you've said
11  you were friends.  Was there ever a sexual component to
12  the relationship?
13       A.  There was a physical aspect.
14            MR. MOORE:  I'm sorry, I didn't hear.
15            THE WITNESS:  There was a physical aspect.
16       Q.  (BY MR. ROUSSEAU)  Does that mean that you did,
17  in fact, have sex with her?
18       A.  Oral sex.
19       Q.  Okay.  Did you ever have intercourse with her?
20       A.  Not that I can recall.
21       Q.  That's, frankly, something I think you might
22  remember.  And I'm not trying to give you a hard time.
23  But is that something you think you would remember, if
24  you had intercourse with her before?
25       A.  I believe so.
```

STATE V. THOMAS OLIVAS

1    Q.  Okay.  So do you think you did?

2    A.  I do not.

3    Q.  But did you have oral sex with her?

4    A.  Yes, sir.

5    Q.  And frankly, I -- and I don't mean to embarrass

6    you.  Are you married, sir?

7    A.  I am, sir, now.

8    Q.  And is -- just by way of explanation, because you

9    seem a little reluctant to answer this, so...

10           Were you -- the woman that you're married to

11   now, were you engaged to her back then?

12   A.  I was.

13   Q.  And when you -- you ultimately did talk to the

14   police at one point in time; is that correct?

15   A.  Yes.

16   Q.  And were you quite reluctant to let -- for this

17   information about your relationship with Mechelle to get

18   out?

19   A.  It was a little less than flattering, yes.

20   Q.  And it's personally embarrassing because of your

21   relationship with your then fiancée, correct?

22   A.  Yes.

23   Q.  All right.  Well, for that reason I do appreciate

24   you doing this and unfortunately it is necessary.

25   A.  Yes.

1    Q.   So I need to turn your attention to an incident

2  that happened, oh, I don't have an exact timeframe, but

3  let's say in the month or so before Mechelle was killed.

4  Was there a time when you were supposed to go to her

5  house?

6    A.   Yes, sir.

7    Q.   And did you, in fact, go over there?

8    A.   I did.

9    Q.   Was it prearranged, that is I -- prearranged, I

10 mean she was expecting you?

11   A.   We had discussed it in prior weeks, but not

12 prearranged as far as that day was concerned.

13   Q.   Okay.  Well, characterize it for me then.  Just

14 going to drop by whenever you got the chance?

15   A.   I was getting ready to go out of town and she

16 said, "Come see me before you go out of the town, "and

17 that was the time I had a chance.

18   Q.   Do you recall where you were going out of town?

19   A.   Kansas.

20   Q.   Why were you going to Kansas?

21   A.   Bowling tournament.

22   Q.   Do you do a lot of bowling?

23   A.   I do quite a bit of bowling, yes, sir.

24   Q.   Is it more than a hobby for you?

25   A.   I make money from it, so I consider it a job at

STATE v. THOMAS OLIVAS

```
 1    times.
 2        Q.   So you're a professional bowler?
 3        A.   No, sir.
 4        Q.   Hustler?
 5        A.   You could say that.
 6        Q.   I'm not trying to accuse you of anything, by the
 7    way.
 8        A.   Okay.
 9        Q.   It's okay if you make a little money playing --
10    bowling.
11             What was in -- going on in Kansas?
12        A.   There was a bowling tournament there, the Wichita
13    Open, every year around the same time.
14        Q.   Give us an idea, how big is that bowling
15    tournament?
16        A.   It goes on for three months, every weekend
17    bowling all day, hundreds of people, thousands of people
18    from across the country are there to bowl.
19        Q.   Does it all take place there or are there
20    satellite events that count towards that?
21        A.   It all took -- it's all taking place in Wichita.
22        Q.   Did you go to Wichita to take part in this
23    tournament?
24        A.   I did.
25        Q.   Did you go on one occasion, I mean, for just one
```

1   visit up there or did you go -- have to visit more than

2   one time since it's a three-month-long tournament?

3       A.   I bowled two squads.  I bowled two weekends.

4       Q.   Did you stay the whole time --

5       A.   I came --

6       Q.   -- in Wichita?

7       A.   I came back home, worked, and then a few weeks

8   later went back again.

9       Q.   Okay.  So you bowled and then I guess you did

10  well enough to advance?

11      A.   I didn't do well at all.  That's why I went back.

12      Q.   Okay.  All right.  I'm a little ignorant on the

13  way bowling tournaments work.

14      A.   It's okay.

15      Q.   Anyway, you had --

16      A.   Choose to --

17      Q.   -- downtime and then you returned?

18      A.   Yes, sir.

19      Q.   Do you recall which of these trips to Kansas,

20  before which of these trips it would have been that you

21  went by Mechelle's house?

22      A.   The -- both of them, actually.

23      Q.   Both of them.  Okay.  Well, one of them did you

24  go in and spend time with Mechelle?

25      A.   A short time, yes, sir.

1    Q.   What about the other one?

2    A.   No.

3    Q.   Okay.  Well, let's talk about one time when you

4    went over there with -- you had someone accompanying you

5    over there?

6    A.   Yes, sir.

7    Q.   Who was that?  Who went with you?

8    A.   My younger brother.

9    Q.   Your younger brother?

10   A.   Uh-huh.  Yes, sir.

11   Q.   What is his name?

12   A.   Joshua Collins.

13   Q.   Joshua?

14   A.   Collins.

15   Q.   Collins?

16   A.   Yes, sir.

17   Q.   When you went over there, did you give her a call

18   before you got there?

19   A.   No, sir.

20   Q.   Okay.  How would you -- would it be your custom

21   to just show up, knock on her door, or would you let her

22   know you were coming?

23   A.   Typically that was the way it went.

24   Q.   Just knock on her door?

25        Yes?

1    A.  Yes, sir.

2    Q.  And I say that because she has to write it down.

3    A.  I understand.

4    Q.  When you stopped by with your brother, did you go

5  into her house?

6    A.  I did.

7    Q.  Did you go into her house immediately?

8    A.  No, sir.

9    Q.  Why not?

10   A.  I was talking to my brother, getting ready to go

11  inside and tell him just to wait for a little bit and I

12  would be out.

13   Q.  Okay.  Was he not going to go in with you?

14   A.  No, sir.

15   Q.  When -- was there something that slowed you down

16  from going in?

17   A.  No, sir.

18   Q.  Okay.  Did you see anyone else at the apartment?

19   A.  I saw somebody exiting the general area of her

20  apartment, yes, sir.

21   Q.  And the general area of her apartment, I mean

22  we've seen photographs, it's fairly easy to tell if

23  someone is leaving her apartment, correct?

24   A.  Yeah.  I was parked in front of the windows to

25  the left side of her door.  From there there's a

1   staircase above her apartment and I saw a gentleman in a

2   white T-shirt leaving that area.

3      Q.   Okay.  Did you have any contact with that person?

4      A.   No, sir.

5      Q.   During the time -- before you went in, did you

6   telephone her at all?

7      A.   I don't believe so, sir.

8      Q.   Okay.  How did you make contact with her that

9   night?  Did you knock on the door?

10     A.   Yes, sir.

11     Q.   Did you -- when you saw this person leaving --

12  first of all, is there a light out front of her

13  apartment?

14     A.   Yes, sir.

15     Q.   Were you able to get a -- just a general

16  description of this person?  You know, age, race, that

17  sort of thing?

18     A.   Yes, sir, I believe so.

19     Q.   And what would that have been?

20     A.   Medium build, short hair, dark hair.  There was a

21  light race, maybe not, but most likely Hispanic or

22  mixed, lighter tone than my tone maybe, but a little

23  lighter.  And it was, I think, midnight or so, late that

24  night.

25     Q.   So did you have any communication with that

```
 1   person?
 2       A.  No.
 3       Q.  When you -- after that person -- well, did you
 4   see that person actually leave?
 5       A.  I did.
 6       Q.  Leave the premises?
 7       A.  No, sir.  I believe I saw him get into his car, a
 8   vehicle.
 9       Q.  Uh-huh.
10       A.  And that was it.  I went inside.
11       Q.  When you went inside, was Mechelle there?
12       A.  She was.
13       Q.  Did y'all talk?
14       A.  We did.
15       Q.  Did she express any type of concern to you about
16   your showing up that night or about this individual,
17   that you might have had contact with?
18       A.  She --
19       Q.  At least in her mind you might have had contact
20   with?
21       A.  Well, she asked why I dropped by and I told her I
22   was going out of town and she said, "Oh, how long have
23   you been here?"  I told her just a few minutes.  And
24   then that was pretty much it.  She asked -- that was it,
25   how long I had been outside.
```

```
 1      Q.   Did you hang out for a while?

 2      A.   I hang out -- I hung out for a few minutes.

 3      Q.   Okay.  Did you have any sexual relations with her

 4   that night?

 5      A.   No, sir.

 6      Q.   Was her mood towards you different than it was on

 7   other occasions?

 8      A.   Yes, sir.

 9      Q.   Did she seem a little angry?

10      A.   Yes, sir.

11      Q.   And was she angry because you had just basically

12   shown up that night?

13      A.   I don't know, sir.

14      Q.   Did she tell you that she didn't appreciate you

15   dropping by that night?

16      A.   She asked me why I dropped by.

17      Q.   Okay.  And what did you say?

18      A.   To see her before I went out of town.

19      Q.   Was there some communications between you later

20   where she called you and discussed the fact that you had

21   dropped by that night?

22      A.   I don't believe so, sir.

23      Q.   Do you ever recall her telling you to not do that

24   anymore, to not just show up like that?

25      A.   I do, sir, actually.
```

```
 1        Q.   Was there ever a time when she accused -- well,
 2   maybe not accused you, but characterized your visit to
 3   her that night as harassing, at least in her mind?
 4        A.   To me, no, sir.
 5        Q.   Well, did you go bowling?
 6        A.   I did.
 7        Q.   And I want to move ahead now to the time you said
 8   you dropped by her house, both times, before you went to
 9   Kansas?
10        A.   Uh-huh.
11        Q.   Was that the first time or the second time?
12        A.   This was the second time.
13        Q.   The first time had there been any discomfort over
14   your dropping by?
15        A.   No, sir.
16        Q.   Everything was fine?
17        A.   Yes, sir.
18        Q.   Did you ever see her son?
19        A.   Once or twice.
20        Q.   Did you meet him?  I know he's a baby, but did
21   you see the kid?
22        A.   I saw him.  I did not meet him.
23        Q.   Okay.  What is -- we'll get to that in a minute.
24             So you went on to Kansas, correct?
25        A.   Yes, sir.
```

```
 1       Q.   How did you do that second trip?
 2       A.   I did well.
 3       Q.   I want to turn your attention to the weekend that
 4   concluded on Sunday, March the 20th.  All right?
 5       A.   Yes, sir.
 6       Q.   Do you recall, first of all, Sunday, March the
 7   20th, when that day started, were you still in Wichita,
 8   Kansas?
 9       A.   I was, sir.
10       Q.   And where did you -- at some point in time did
11   you leave Wichita, Kansas?
12       A.   I did, sir.
13       Q.   And where did you head to when you left Wichita?
14       A.   Moore, Oklahoma.
15       Q.   Were you traveling alone?
16       A.   No.
17       Q.   Who was with you?
18       A.   Brandon Chapa, Jake Rigdon, Jana -- couldn't tell
19   you her last name.  And in a vehicle separate from us,
20   my father, Leroy Willis, and Chris Vanatwep, and I
21   believe that's all.
22       Q.   So there was a group of you traveling in two
23   vehicles?
24       A.   Yes, sir.
25       Q.   And I got Brandon Chapa, Jake Rigdon, Anna, last
```

```
 1   name unknown?
 2       A.   Jana.
 3       Q.   Jana.  I apologize.  And the fourth name, I'm
 4   sorry, I didn't get?
 5       A.   Chris Vanatwep.
 6       Q.   Okay.  Was there one other person?  Your father?
 7       A.   Leroy Willis.
 8       Q.   Leroy Willis?
 9       A.   Yes.
10       Q.   Are you the only bowler in the bunch?
11       A.   No, sir.
12       Q.   Do all of you bowl?
13       A.   Yes, sir.  That weekend my father, Chris and
14   myself bowled.
15       Q.   Does Jana Savage, does that name ring a bell?
16       A.   That is her last name, yes, sir.
17       Q.   So you left Wichita and you were headed -- is
18   Moore, Oklahoma south of Wichita?
19       A.   Yes.
20       Q.   May sound silly.  But Oklahoma is south of the
21   Kansas, correct?
22       A.   Yes, sir.
23       Q.   And Moore, Oklahoma, where is that?  Is there a
24   big city that it's next to?
25       A.   Oklahoma City.
```

```
 1      Q.   Is it part of the Oklahoma --
 2      A.   Suburb.
 3      Q.   -- metropolitan area?
 4      A.   I believe so.  It's about 30 -- 20 to 30 minutes
 5   south of a drive.  It's been a while since I've been
 6   there.
 7      Q.   All right.  Are you still in the city, though?
 8      A.   Yes, sir.
 9      Q.   Like a suburb?
10      A.   To an extent, yes, sir.
11      Q.   Okay.  Is there something in Moore, Oklahoma that
12   you wanted to visit?
13      A.   Casino.
14      Q.   Did you stop at the casino?
15      A.   Yes, sir.
16      Q.   Did you go into the casino?
17      A.   Yes, sir.
18      Q.   Did you stay at the casino that night?
19      A.   I did, sir.
20      Q.   Who else stayed at the casino that night?
21      A.   Brandon Chapa, Jana Savage and Jake Rigdon.
22      Q.   And your father, Leroy Willis, and Chris Vanatwep
23   left?
24      A.   Yes.
25      Q.   Did you have your phone with you that night?
```

```
 1      A.  I did, sir.
 2      Q.  Do you recall your telephone number?
 3      A.  817-247-4045.
 4      Q.  And did you have that -- do you still have that
 5   number today?
 6      A.  Yes.
 7      Q.  Same number you had then?
 8      A.  Yes, sir.
 9      Q.  Is that telephone in your name?
10      A.  No, sir.
11      Q.  Whose name is that in?
12      A.  Currently or then?
13      Q.  I guess then.
14      A.  Then Brandon Chapa.
15      Q.  Why is that?
16      A.  We're best friends.  We got on a cell phone plan
17   together to save money.
18      Q.  Okay.  Do you pay your portion of it?
19      A.  I did, yes, sir.
20      Q.  He still your friend?
21      A.  Oh, yes, sir.
22      Q.  Did you drink that night?
23      A.  Yes, sir.
24      Q.  And at the casino?
25      A.  Yes.  Yes, sir.
```

```
 1        Q.  Were you gambling, too?

 2        A.  Yes, sir.

 3        Q.  Did you win?

 4        A.  No, sir.

 5        Q.  Did that make you drink more?

 6        A.  No, sir.  I don't need a reason to drink more.

 7        Q.  So you were drinking a fair amount that night?

 8        A.  Had a good weekend.

 9        Q.  Do you recall receiving a telephone call

10   sometime, you know, after midnight or sometime in that

11   neck of the woods --

12        A.  Yes, sir.

13        Q.  -- from a police officer in Arlington, Texas?

14        A.  Yes, sir.

15        Q.  Run that down for us.  Tell us how that came to

16   be and, you know, just walk us through it a little bit.

17        A.  I was sitting at a blackjack table.  I probably

18   had had a number of drinks, upwards of 10 to 15-plus,

19   throughout the evening.

20             And late into the night I got a phone call

21   from a private or blocked number, I believe it was.  I

22   figured it was another prank call.  At the time I

23   received some from friends and nonfriends.  I was

24   inebriated.  I was in a loud casino with music.  Slot

25   machines going.  I couldn't really hear the entire of
```

```
 1    the conversation and didn't choose to exit to engage in
 2    the phone call due to the nature that I thought it was.
 3        Q.   Do you recall getting a call and then actually
 4    you returning that call?
 5        A.   I believe I may have returned a call, yes, sir.
 6        Q.   Okay.  And I won't ask you about the intimate
 7    details of the telephone conversation.  But do you
 8    remember actually talking to someone who identified them
 9    self as a police officer?
10        A.   I believe so, yes, sir.
11        Q.   And were you polite during that conversation?
12        A.   No, sir.
13        Q.   Were you angry at having your --
14             MS. KEENE:  Objection to leading, Judge.
15             THE COURT:  Sustained.
16        Q.   (BY MR. ROUSSEAU)  What was your mood at having
17    your evening interrupted?
18        A.   I was angry.
19        Q.   Did you express that?
20        A.   I believe I did.
21        Q.   Do you think you might have used some profanity?
22        A.   I don't hold back.
23        Q.   Is that a "yes"?
24        A.   Yes, sir.
25        Q.   Now, when you got back to town, you -- well, let
```

Case 4:22-cv-00385-O   Document 16-13   Filed 08/16/22   Page 245 of 282   PageID 1733

1   me ask you, I'm getting ahead of myself a little bit.

2           You said -- you've already told us that you

3   spent the night there that night, correct?

4       A.  Yes, sir.

5       Q.  About what time of the day did you leave?  Did

6   you leave the next day?

7       A.  We left the next morning.

8       Q.  Okay.  About what time of day was that?

9       A.  I believe 11:00 a.m.-ish, somewhere in that

10  ballpark, in the morning.

11      Q.  Would that be a Monday morning?

12      A.  Monday morning, yes, sir.

13      Q.  During that -- did you drive straight back?

14      A.  With the exception of stopping at McDonald's,

15  yes, sir.

16      Q.  Did you have to work the next day?

17      A.  Monday, no, sir.

18      Q.  When you got back to town, did you become aware

19  of the fact that the police were interested in talking

20  to you?

21      A.  I believe so, yes, sir.

22      Q.  And at some point in time did you, in fact, go in

23  and sit down and have a conversation with a Detective

24  Stewart of the Arlington Police Department?

25      A.  I don't recall his name, but I did go have a

```
 1   conversation.
 2       Q.  Do you recall if he's an African-American
 3   gentleman?
 4       A.  Bald, tall.
 5       Q.  Bald?
 6       A.  Yeah.
 7       Q.  And did you talk to Detective Stewart -- well,
 8   you tell me.
 9           Had there been some telephone conversations
10   between you and Detective Stewart before you showed up
11   for that meeting?
12       A.  I believe we spoke on the phone for him to
13   explain to me the nature of needing my assistance or me
14   being present.
15       Q.  And you were -- at that point did you kind of
16   realize how badly they did need to talk to you?
17       A.  Yes, sir.
18       Q.  Did you cooperate with them?
19       A.  I believe so.
20       Q.  Did you explain to Detective Stewart where you
21   had been?
22       A.  Yes, sir.
23       Q.  At the time of the killing, did you explain to
24   him where you had been?
25       A.  Yes.  I provided him with bank statements and
```

1    photographs and I think that was it.

2        Q.  Tell me about the bank statements.

3        A.  I had bank statements from my credit card

4    transactions in Kansas, from Saturday afternoon, I

5    believe, when I arrived, all the way until Sunday

6    afternoon when I left.  And then I put the hotel room on

7    my credit card at the casino we stopped at and then,

8    also, withdrew $800 from the ATM at the casino.

9        Q.  Did you leave with more than that?

10       A.  No, sir.

11       Q.  Did you explain to Detective Stewart the nature

12   of your relationship with Mechelle?

13       A.  Yes, sir.

14       Q.  If I told you that in that interview you told

15   Detective Stewart that you had intercourse with Mechelle

16   one to two times, would that be a surprise to you?

17       A.  No, sir.  I used to drink quite a bit and do some

18   other things that would cause me maybe not to be

19   totally -- what is the word -- able to recall, maybe.

20       Q.  Okay.  So would you deny having told Detective

21   Stewart that you had sex with her one to two times?

22       A.  No, sir.

23       Q.  Would you deny telling Detective Stewart that on

24   the day after the incident that we talked about where

25   you went to her apartment, okay, that she called you and

```
 1    said that she didn't want you to drop by anymore
 2    unannounced?
 3         A.  No, sir.
 4         Q.  Okay.  That would not -- you wouldn't dispute
 5    that if I told you that that's in your interview?
 6         A.  No, sir.
 7         Q.  Okay.
 8              MR. ROUSSEAU:  Just a moment, Your Honor.
 9              (Pause in proceedings)
10              MR. ROUSSEAU:  May I approach, Your Honor?
11              THE COURT:  Yes.
12              MR. ROUSSEAU:  Judge, may we both approach
13    just a moment?
14              THE COURT:  Yes.
15              (Discussion at the bench, off the record)
16         Q.  (BY MR. ROUSSEAU)  Mr. Jopson, I'm going to show
17    you what I've had marked as State's -- there's a few
18    documents here marked as State's Exhibits 237, 238, 239,
19    240, 241, and 242.  Just take a minute, flip through
20    those and I'll ask you a question about them.  All
21    right?
22              Had a chance to look at them?
23         A.  I have.
24         Q.  Do you recognize all those documents?
25         A.  I do, sir.
```

```
 1      Q.   Are they all documents that you provided to
 2   Detective Stewart?
 3      A.   Yes, sir.
 4      Q.   Now, I apologize just a moment.  I want to ask
 5   you about -- specifically about 241.  This seems to be
 6   some sort of publication; is that correct?
 7      A.   Yes, sir.
 8      Q.   Did you give this to Detective Stewart or did you
 9   just tell him how to get it?  I really want you to work
10   straight -- strictly from your memory.
11      A.   I do not recall.
12      Q.   Okay.  Do you recall seeing this before?
13      A.   I see it every Thursday.
14      Q.   Oh, every Thursday?
15      A.   Yes, sir.
16      Q.   Okay.  State's Exhibit No. 237 seems to be a
17   rather silly photograph.  Does it fairly and accurately
18   depict you?
19      A.   That weekend, yes, sir.
20      Q.   Show you State's Exhibit No. 238.  Is this the --
21   some of the banking records that you discussed
22   previously?
23      A.   Yes, sir.
24      Q.   State's Exhibit No. 239, is this a document
25   pertaining to the bowling tournament you've been talking
```

1   about?

2       A.   Yes, sir.

3       Q.   State's Exhibit No. 240, is this a document

4   showing the schedule of that same bowling tournament?

5       A.   Yes, sir.

6       Q.   State's Exhibit No. 241, is it a circular or a

7   publication of some, an article about that tournament?

8       A.   Yes, sir.

9       Q.   And State's Exhibit No. 242, what is that?

10      A.   That's a hotel room, sir.

11      Q.   A hotel room receipt?

12      A.   Receipt, yeah.

13      Q.   Thank you.  And are these all the same documents

14  you've discussed previously?

15      A.   Yes, sir.

16      Q.   This hotel room receipt, Number 242, is this a

17  document -- well, how did you -- how did this come to be

18  in your possession?

19      A.   I paid for the hotel room, and it's something

20  they give us upon checkout.

21      Q.   So it's a receipt you get upon checkout?

22      A.   Yes, sir.

23      Q.   Is it a true and accurate copy of the original?

24      A.   Yes, sir.

25      Q.   Can you tell me what 239 actually is?

```
 1        A.   It's the Facebook page for the bowling
 2   tournament.
 3        Q.   Okay.  Does it refer to the --
 4        A.   The Wichita Southwest Bowling Open, Wichita,
 5   Kansas.
 6        Q.   And is this something that would appear on your
 7   screen if you were to go to the appropriate page?
 8        A.   Yes, sir.
 9        Q.   Okay.  And now State's Exhibit 238, is this a
10   true and accurate copy of the original statement that --
11   banking statement that you gave to Detective Stewart?
12        A.   Yes, sir.
13        Q.   And does it reflect entries on your bank account?
14        A.   Yes, sir.
15             MR. ROUSSEAU:  I would offer State's 237,
16   238, 239, 240, 241, 242, subject to any objection by the
17   Defense.
18             MS. KEENE:  Can I just ask this witness --
19   take him on voir dire for really one question?
20             THE COURT:  Yeah.
21                  VOIR DIRE EXAMINATION
22   BY MS. KEENE:
23        Q.   Are these -- all of these exhibits, are these the
24   exhibits that you gave to Detective Stewart, ultimately?
25        A.   Yes, sir -- yes, ma'am.  My apologies.
```

```
 1        Q.   That's okay.
 2             MS. KEENE:   No objection.
 3             THE COURT:   All right.   State's 237, 238,
 4   which is a three-page document, 239, 240, 241, and 242,
 5   all State's exhibits, all admitted.
 6             (State's Exhibit No. 237 - 242 admitted)
 7             MR. ROUSSEAU:   Thank you, Judge.
 8             May I publish using the ELMO?
 9             THE COURT:   Yes.
10             DIRECT EXAMINATION CONTINUES
11   BY MR. ROUSSEAU:
12        Q.   This is State's Exhibit No. 242, correct, sir?
13        A.   Yes, sir.
14        Q.   I'm going to zoom in on it a little bit.   It's
15   the Riverwind Hotel, 2901 Bankers Avenue, Norman,
16   Oklahoma, correct?
17        A.   Yes, sir.
18        Q.   All right.   Slide over here to another place,
19   right in the middle.   It's an arrival, 3/20/2011;
20   departure, 3/21/2011?
21        A.   Yes, sir.
22        Q.   And that's the receipt that you're given upon
23   checking out?
24        A.   Yes, sir.
25        Q.   Seems to have been printed a little later.   Are
```

```
 1   you sure -- is this the original that you got or is this

 2   one you were able to obtain later?  And I'm talking

 3   about this date right up here, 3/30/2011.  It appears to

 4   be printed at a later date?

 5        A.  Yes, sir, it does.  And it's not the original.

 6        Q.  Okay.  But did you provide something like this to

 7   Detective Stewart?

 8        A.  Yes, sir.

 9        Q.  Now I'm going to show you this one -- and I

10   apologize in advance.

11        A.  Thank you.

12            MR. ROUSSEAU:  Can you dim the lights just a

13   little bit, please.

14            (Pause in proceedings)

15        Q.  (BY MR. ROUSSEAU)  All right.  And that -- I'm

16   reading right here at the bottom, 2011, Southwest --

17   77th Annual Southwest Tournament, Wichita, Kansas,

18   correct?

19        A.  Yes.

20        Q.  Now, what is going on in this photograph, sir?

21        A.  Humor -- funniest photo contest.

22        Q.  Okay.  And that's, I take it, you --

23        A.  Yes, sir.

24        Q.  -- right there?

25            Okay.  And I won't ask what this gentleman
```

1    is doing, but he seems to be winning?

2        A.   He is.

3        Q.   I want to show you State's Exhibit No. 238.

4    Could you find for me a portion on there where you used

5    the ATM?  You said that it reflects a use of ATM at the

6    casino; is that correct?

7        A.   I believe so, sir.

8        Q.   If you find that, would you point it out for me,

9    please?

10       A.   And I think this is...

11       Q.   Let me see just a moment.

12            I will ask you about this top entry right

13   here, check card, Riverwind Hotel, Norman, Oklahoma, on

14   3/20, temporary merchant authorization.  Is that when

15   you checked in, or do you recall?

16       A.   I don't recall.

17       Q.   Okay.  And until we can figure it out a little

18   better, I'm not going to ask you any more questions

19   about it.  Okay?

20       A.   Okay.

21       Q.   Did you -- at the time that Mechelle Gandy was

22   killed, which I'll represent to you was in the --

23   approximately the 10:00 o'clock hour, between 9:30,

24   10:00 o'clock, something around there, of March the

25   20th, 2011, where were you?

1    A.   March 20th was what day, Sunday?

2    Q.   Sunday.

3    A.   I was at the casino.

4    Q.   And was it shortly or a few hours after that that

5    you received that telephone call from the police officer

6    in Arlington?

7    A.   Yes, sir.

8    Q.   And did you remain at that casino -- were you at

9    that casino several hours before that incident -- before

10   that time?

11   A.   Yes, sir.

12   Q.   And did you remain at that casino throughout the

13   night?

14   A.   Yes, sir.

15   Q.   And were you with Brandon Chapa, Jake Rigdon,

16   Jana Savage at that casino?

17   A.   Yes, sir.

18   Q.   Did you have anything to do with killing of

19   Mechelle Gandy or her child, Asher Rion Olivas?

20   A.   No, sir.

21        MR. ROUSSEAU:  I'll pass the witness, Your

22   Honor.

23        THE COURT:  Defense may cross.

24        <u>CROSS-EXAMINATION</u>

25   BY MS. KEENE:

```
1     Q.  Mr. Jopson, my name is Joetta Keene --
2             MS. KEENE:  Judge, I'm going to turn this
3     off, if that's okay.
4             THE COURT:  Yeah.
5             MR. ROUSSEAU:  I'll get it, Joetta.
6     Q.  (BY MS. KEENE)  My name is Joetta Keene and I
7     represent Thomas.  You and I have never met, have we?
8     A.  No, ma'am.
9     Q.  You went and talked to Detective Stewart on March
10    the 24th; is that correct?
11    A.  I don't recall.
12    Q.  Does that sound right?
13    A.  A couple of days I got back, yes, ma'am.
14    Q.  And were you aware that the conversation you had
15    with Detective Stewart was video recorded?
16    A.  I don't recall.
17    Q.  Were you aware that it was recorded?
18    A.  I don't recall.
19    Q.  Have you had an opportunity to watch that
20    recording?
21    A.  No.
22    Q.  If at any point you feel like you need to watch
23    that, would you tell me and so we could let you watch
24    that recording to refresh your memory of what you told
25    Detective Stewart?  Is that a deal?
```

```
 1        A.   I don't understand.
 2        Q.   Well, if at any point when I'm asking you
 3   questions, if you feel that watching the video of you
 4   talking to Detective Stewart would be helpful to you,
 5   rather than you giving us inaccurate information, will
 6   you just say, "I would like to watch my video," is that
 7   fair?
 8        A.   That's fair.
 9        Q.   Do you understand why I'm saying that?
10        A.   Vaguely.
11        Q.   Okay.  You said that you have a hard time with
12   your memory because of what sounded like a lot of
13   partying?
14        A.   Yes, ma'am.
15        Q.   Okay.  And would you agree with me that the
16   things you told Detective Stewart on March the 24th of
17   2011, based on a memory that's been partied out, would
18   be more accurate than the things you're testifying to
19   three years later?  Does that make sense?
20        A.   It does.
21        Q.   Okay.  So that's why I'm asking you, if any of
22   the questions I have, if you think "I need to watch that
23   video to help me with my memory," will you just tell me
24   that?
25        A.   Yes.
```

1      Q.   Okay.

2      A.   Okay.

3      Q.   We all have a copy of your video.  Okay?

4      A.   Okay.

5      Q.   Is that fair?

6      A.   Yes, ma'am.

7      Q.   All right.  You recall telling Detective Stewart

8   that you met Mechelle at the 7-Eleven where she was

9   working?

10      A.   I do not.

11      Q.   Do you recall telling Detective Stewart that she

12   was working there and you were a patron and that's how

13   you met her?

14      A.   I do not.

15      Q.   Do you recall telling Detective Stewart that that

16   was about a year prior to her death?

17      A.   I do not.

18      Q.   Do you think that you did not tell Detective

19   Stewart that you met her at the 7-Eleven?

20      A.   I'm sorry, once again.

21      Q.   Do you believe that you told Detective Stewart

22   that you met her at the 7-Eleven?

23      A.   I believe I did.  You're asking me this question?

24   Yes, ma'am.

25      Q.   And that's my point, is I don't want to just put

```
 1    words in your mouth.  Okay.  I want you to just tell us
 2    what the truth is.  Okay?
 3        A.  Okay.
 4        Q.  And want you to tell us what the truth is based
 5    on your memory as best you can.  Okay?
 6        A.  I am.
 7        Q.  All right.  And so what I'm asking you, do you
 8    think you need to watch the videotape of you talking to
 9    Detective Stewart?
10        A.  No.
11        Q.  Okay.  Would it surprise you that you told
12    Detective Stewart that you met Mechelle while she was
13    working at the 7-Eleven?
14        A.  No.
15        Q.  Okay.  Why would that not surprise you?
16        A.  Because I meet people multi times.
17        Q.  Okay.  So you could just be mistaken on where you
18    actually met her?
19        A.  The first occasion.
20        Q.  And you certainly would go up to the 7-Eleven and
21    talk with her and continue a friendship with her at the
22    7-Eleven?
23        A.  Yes.
24        Q.  And the reality of your relationship with
25    Mechelle is it was a sexual relationship?
```

1        A.  Yes.

2        Q.  You would go over to her house and get a

3   blow-job, bottom line?

4        A.  Yes.

5        Q.  And you would show up at 2:00 o'clock in the

6   morning to get a blow-job?

7        A.  Yes.

8        Q.  You would call her at 3:00 o'clock in the

9   morning, "Can I roll by and get a blow-job?"

10        A.  In other words, but yes.

11        Q.  What other words?

12        A.  "Can we hang out?"

13        Q.  Okay.  You're right.  You wouldn't be that crass

14   as I'm being.

15        A.  Right.

16        Q.  I'm just trying to boil it down at 5:30.  Okay?

17        A.  Okay.

18        Q.  And reality is, when you found out that she was

19   killed, you told Detective Stewart you were a tad bit

20   sad?

21        A.  I was sad.

22        Q.  You said a tad bit sad?

23        A.  Yes.

24        Q.  You said, "I'm not dying over this"?

25        A.  Were those my words?

1    Q.  If you need to watch the videotape, just tell me.

2    A.  I'm okay.

3    Q.  You told Detective Stewart with the attitude of

4  "I'm not dying over this."  "I'm a tad bit sad."

5    A.  I'm usually indifferent about death.

6    Q.  And you were very -- and you were indifferent

7  about the death of Mechelle and about her son on March

8  the 24th of 2011, correct?

9    A.  I believe so.

10    Q.  This was a relationship that you had that was

11  really for your own sexual gratification?

12    A.  It was physical.

13    Q.  It was a physical relationship.  You were engaged

14  to be married to a woman at the time that you were

15  showing up at Mechelle's house for sexual favors?

16    A.  Yes.

17    Q.  And you never let your fiancée know that you were

18  doing this?

19    A.  No.

20    Q.  And you were very clear with Detective Stewart

21  that you didn't want her to know that you were now being

22  talked to by a homicide detective because of this

23  relationship you had with Mechelle?

24    A.  At the time, yes.

25    Q.  And what is your fiancée's name?

```
 1        A.   Shelbi Jopson.
 2        Q.   Did you ever give that name to Detective Stewart?
 3        A.   I believe so.
 4        Q.   Do you know whether or not -- does Shelbi know
 5   now why you're coming down here to testify?
 6        A.   Yes.
 7        Q.   You ultimately had to come clean with her about
 8   your relationship with Mechelle?
 9        A.   Yes.
10        Q.   And you still got married?
11        A.   Yes.
12        Q.   When did you get married, Tim?
13        A.   May 20th of 2011.
14        Q.   So you got married within about two months of
15   Mechelle's death?
16        A.   Yes.
17        Q.   And do you recall a time period -- Detective
18   Stewart was really interested in the week before
19   Mechelle was killed in relation to you; do you remember
20   that?
21        A.   Yes.
22        Q.   And he was really interested in a time period
23   when you showed up in the middle of night after calling
24   multiple, multiple times to her house; is that correct?
25        A.   I don't recall multiple calling, but I do recall
```

```
 1    calling her and showing up.
 2        Q.   Do you recall calling her multiple times or
 3    several times and she did not answer?
 4        A.   I believe she answered on one of the occasions.
 5        Q.   You recall a time when you went over to her house
 6    and you seemed to know the young man's name, you said
 7    his name was Cameron, was coming out of her house?
 8        A.   I believe that might have been the name she gave
 9    me.
10        Q.   And she talked to you about the young man,
11    Cameron, that just left her house.  Did she give you the
12    name Cameron Livingston?
13        A.   I don't recall a last name.
14        Q.   But you remember the name Cameron?
15        A.   Vaguely.
16        Q.   And you recall Detective Stewart believing that
17    you had showed up at her house with your brother so that
18    y'all could have a threesome with her on that night, or
19    if that was your plan, by bringing your brother over to
20    a house that you could get sexual favors at?
21        A.   Not with my brother.
22        Q.   And you said "no" to Detective Stewart, didn't
23    you?
24        A.   I believe so.
25        Q.   So you went over to her house about what time on
```

 1   this night about one week before her death?

 2       A.   It was late.  Most likely after 11:30 or

 3   midnight.

 4       Q.   And you think that you called her several times

 5   and she ultimately answered the phone?

 6       A.   I believe I spoke with her that night.

 7       Q.   And when you spoke with her, did she just say,

 8   "Well, come on in, I've got this other guy, he's about

 9   to leave," or, I mean, how did that work out?

10       A.   I don't recall what we spoke about or her saying

11   that there was any other gentleman there at the time.

12       Q.   Do you recall, though, being outside of her house

13   and making phone calls?

14       A.   Not making calls outside of her house, no.

15       Q.   You stopped making the phone calls once you got

16   to her house?

17       A.   I stopped when I drove.

18       Q.   Whenever you got to her house, how long was it

19   that you sat in front of her house?

20       A.   Just a few minutes.

21       Q.   And to be clear we're talking about her house at

22   Presidents Corner Apartments, aren't we?

23       A.   Is that North Arlington?

24       Q.   Yeah.  Let me show you a picture.  Would that be

25   helpful?

```
 1      A.   Sure.

 2      Q.   Is your memory good enough, you think you'd

 3  recognize a picture of the apartments?

 4      A.   White apartments, four windows, staircases, I

 5  believe so.

 6      Q.   I'll show you what has been marked -- now they've

 7  been repainted from these pictures, but marked as

 8  Defense Exhibit No. 1.  Does that look like in general

 9  what the house -- where the house was?

10      A.   Yeah.

11      Q.   And Defense Exhibit No. 3, absent the red color

12  of the -- it was brownish -- does that look like about

13  the apartments you were going to see Mechelle at?

14      A.   Yes.

15      Q.   And do you recall how many bedrooms were in that

16  apartment?

17      A.   I believe two.

18      Q.   And whenever you walked in the house, what did

19  you walk into, Tim?

20      A.   The living room.

21      Q.   And was there a kitchen right there, too?

22      A.   Yes.

23      Q.   Whenever you were at her house, there were times

24  where you would use her computer when you were at her

25  house, weren't there?
```

```
 1        A.  I don't recall.

 2        Q.  Do you recall actually using her computer on

 3   February 13th, in the middle of the night, to check your

 4   e-mails?

 5        A.  I don't recall.

 6        Q.  Do you recall using her computer on February 25th

 7   in the middle of the night or at some point checking

 8   your e-mails?

 9        A.  I don't recall.

10        Q.  How long would you stay whenever you would show

11   up?

12        A.  Anywhere from a half-hour to an hour and a half.

13        Q.  Did you ever -- whenever you showed up, was her

14   son ever awake whenever you came over there?

15        A.  No, he was asleep.

16        Q.  And did her son have a separate room than where

17   you were?

18        A.  Yes.

19        Q.  So whatever sexual encounters you had, would you

20   have it in what room?

21        A.  Living room or bedroom.

22        Q.  After this meeting with going over there about a

23   week before, do you remember exactly what date it was

24   that you had the run-in with Cameron?

25        A.  I had no run-in with a Cameron.
```

1     Q.   Do you remember the date it was that she talked

2   to you about Cameron, about the evening before?

3     A.   I do not.

4     Q.   But you know it was about a week before she was

5   killed?

6     A.   Within that week, yes.

7     Q.   It was within that week.  And within that week,

8   do you recall her calling you the next day and telling

9   you that she did not appreciate what happened the night

10  before?

11    A.   Those weren't her words, but of that nature, yes.

12    Q.   Did she say it was unacceptable?

13    A.   Excuse me?

14    Q.   Did she say it was unacceptable?

15    A.   I don't recall her telling me it was

16  unacceptable.

17    Q.   Do you recall telling Detective Stewart that she

18  called you the next day and told you that "you showing

19  up is unacceptable and I said 'okay'"?

20    A.   I'm sorry, once again, you said okay or me?

21    Q.   This would be your words.  "She called me the

22  next day and said that 'you showing up is unacceptable'

23  and I said okay."  Do you recall telling Detective

24  Stewart those words?

25    A.   Paraphrased, yes.

1    Q.   And so she called and talked to you about it.

2    And what really happened is once you saw this guy leave,

3    you went into her house and you began to look in all of

4    her garbage looking for condoms; is that correct?

5    A.   No.

6    Q.   Do you recall talking to Detective Stewart about

7    those allegations?

8    A.   Yes.

9    Q.   And telling Detective Stewart you did not go in

10   her house acting a fool looking for condoms?

11   A.   Yes.

12   Q.   Do you recall talking to Detective Stewart about

13   her being fearful of you from that day forward to the

14   point that she actually got a shotgun?

15   A.   No.

16   Q.   Or that she considered you to this point or was

17   curious of whether or not you were now becoming a

18   stalker?

19   A.   No.

20   Q.   All right.  Did she make the pass towards you --

21   or did you make the pass towards her on that first

22   meeting?

23   A.   I believe it was a mutual thing.

24   Q.   Do you recall telling Detective Stewart that she

25   made the forward pass to make it happen?

```
 1        A.   She might have made the first eye wink.
 2        Q.   Do think that that would be the truth or is that
 3   just something you were saying to Detective Stewart?
 4        A.   I believe that's the truth.
 5        Q.   Do you recall telling Detective Stewart that you
 6   had ten sexual encounters?
 7        A.   Ten sexual encounters?  Generally, just sexual
 8   encounters?
 9        Q.   Yes.
10        A.   I could, yeah.
11        Q.   Actually, I don't know what you mean by generally
12   sexual encounters.
13        A.   What do you mean by sexual encounters?
14        Q.   I mean penis/vagina?
15        A.   No.
16        Q.   When you mean sexual encounters, what do you mean
17   when you use that term?
18        A.   Anything physically contacting from one person
19   another, other than shaking hands and hugging.
20        Q.   Okay.  So mouth/penis would be sexual encounter?
21        A.   Yeah.
22        Q.   Okay.  So is it your testimony today that in that
23   time period you knew her that you probably had ten
24   sexual encounters, or do you think more?
25        A.   Maybe more.  Ten or more.
```

1    Q.   And do you recall telling -- when Detective

2    Stewart asked you if you'd ever taken her to dinner,

3    that you began to laugh?

4    A.   Yes.

5    Q.   Why?

6    A.   Because that was not the nature of our

7    relationship.

8    Q.   She was not your girlfriend?

9    A.   No.

10   Q.   In fact, you had to kind of push her back, you

11   told Detective Stewart, because she started getting

12   feelings about you?

13   A.   Yes.

14   Q.   Is that true?

15   A.   I recall her having feelings for me one point in

16   our friendship.

17   Q.   You do?

18   A.   I do.

19   Q.   About how long before you remember you had to

20   push her back, as opposed to this whole --

21   A.   I don't know if it was more of a -- if it was a

22   push-back, that's an -- I don't think it was a

23   push-back.  That's a very strong term.

24   Q.   Okay.  You recall telling Detective Stewart that

25   y'all were having sex, penis/vagina, until she began to

```
 1   have feelings towards you and then you stopped doing
 2   that?
 3       A.   I do not.
 4       Q.   Okay.  How did that -- tell me what you remember
 5   about that part.
 6       A.   I remember discussing our relationship and our
 7   physical aspect of it.  There being a point where she
 8   had mentioned feelings and kind of liking me.  She knew
 9   my situation.  She was aware.
10       Q.   That you were engaged?
11       A.   Yes.
12       Q.   You were going to be married?
13       A.   Yes.
14       Q.   And so she knew that you were not a man who was
15   free?
16       A.   Right.
17       Q.   Do you know who this Cameron guy is?
18       A.   No.
19       Q.   Had you ever seen him prior to that night?
20       A.   No.
21       Q.   And then other than from her, how did you know
22   what his name was?
23       A.   I believe that's -- that, and maybe Detective
24   Stewart.
25       Q.   When Detective Stewart met with you, did he begin
```

```
 1    to talk to you about wanting to get your -- a DNA sample
 2    from you?
 3        A.   No.
 4        Q.   Do you --
 5        A.   He asked me if I was willing to give one, though.
 6        Q.   And did that cause you some concern?
 7        A.   No.
 8        Q.   Do you remember talking to Detective Stewart
 9    about talking to your uncle and being at least curious
10    as to why a DNA sample would be needed?
11        A.   I was curious as to the process, yes.
12        Q.   And did you ultimately give a DNA sample?
13        A.   I don't believe I did.
14        Q.   Did you --
15        A.   I apologize to interrupt.
16             I do believe they cotton-swabbed me, mouth
17    swab, oral.
18        Q.   They came in with a little cotton swab and put it
19    in your mouth?
20        A.   I believe so.
21        Q.   And do you recall whether or not they talked to
22    you about getting your actual cell phone so they could
23    look at the different text messages that you'd sent?
24        A.   I do not recall that.
25        Q.   Most of y'all talking was by text message?
```

```
 1        A.  Yes, majority.
 2        Q.  You recall talking to Detective Stewart about
 3   your -- giving him consent to get all your cell phone
 4   records so it could show exactly where you were?
 5        A.  Yes.
 6        Q.  And do you recall talking to Detective Stewart
 7   and giving him the different clothes you had on that
 8   night?
 9        A.  I don't recall turning in my clothes, no.
10        Q.  What about -- did anybody ask to search your car
11   or did you let them search your car?
12        A.  I don't believe anybody searched my vehicle.
13        Q.  Did anybody search your house or did you let them
14   search your house?
15        A.  I don't believe anybody did, but I offered full
16   cooperation at the time.
17        Q.  And so if they needed to search your house, you
18   would say search it, and if they needed to search your
19   car, you would say search it?
20        A.  I guess.
21        Q.  You realize being out of town was a good thing
22   for you, don't you, Timothy?
23        A.  Not entirely.
24        Q.  You really don't?
25        A.  Not entirely.
```

1    Q.   You have not looked back on this event and

2  thought, my, God, I am so glad I was bowling that

3  weekend?

4    A.   For what reason would I think that?

5    Q.   You were in a homicide detective's office seated,

6  correct?

7    A.   Yes.

8    Q.   And the homicide detective was asking you some

9  very difficult questions?

10   A.   He was.

11   Q.   You do not feel thankful that you were out of

12  town bowling on the weekend of the events that he was

13  talking to you about?

14   A.   Thankful is not a good way -- an accurate way to

15  describe how I feel.

16   Q.   What's a way to describe it then?

17   A.   Indifferent.

18   Q.   Just indifferent about all of it?

19   A.   The whole situation.  Maybe something would have

20  been different if I wasn't out of town.

21   Q.   What does that mean?

22   A.   It means anything.  The situation could have been

23  different.  Life could have been different.  I might not

24  lost as much money.  Other people might not have been

25  hurt, who knows.  But me being out of town is reality.

```
 1    That's where I was.
 2        Q.   At the casino that you were at, what was the name
 3    of the casino?
 4        A.   Riverwind.
 5        Q.   And at Riverwind do they have videos?
 6        A.   Most hotels and casinos do.  I believe they do.
 7        Q.   And do you know whether or not they had videos of
 8    you being there at the casino?
 9        A.   Well, if they have videos, then they would have
10    videos of me being at the casino.
11        Q.   Your phone is not in your name, is it?
12        A.   No.
13        Q.   Your phone is in your -- your home -- your
14    buddy's name; is that correct?
15        A.   It was.
16        Q.   Then how would we know that that's a phone that
17    you have on you?
18        A.   Do you have a record of me talking to the police
19    officer in Arlington?
20        Q.   I'm asking.  You -- how we would know that that's
21    your phone?  How would we know the police officer didn't
22    call that phone number and talk to your buddy Brandon?
23        A.   Because I had the phone and still have phone and
24    I was there, with video of me answering the phone.
25        Q.   So we would need to get video from Riverwind to
```

```
 1   make sure that it really was you and not your buddy
 2   Brandon, because your phone number comes back to a dude
 3   named Brandon, Timothy.
 4       A.  His phone was there, too.  That would be up to
 5   you guys.
 6       Q.  You still don't realize how lucky you are to be
 7   out of town, do you?
 8       A.  Do -- would you consider yourself lucky?
 9       Q.  Absolutely.
10       A.  Awesome.
11           MS. KEENE:  I'll pass the witness, Judge.
12           MR. ROUSSEAU:  One question, Judge.
13                   REDIRECT EXAMINATION
14   BY MR. ROUSSEAU
15       Q.  You were asked an awful lot of questions about
16   your interview with Detective Stewart.  Do you recall
17   that?
18       A.  Yes.
19       Q.  Fair to say you don't really remember everything
20   that's in those -- in that interview?
21       A.  No.
22       Q.  You have not reviewed that interview, correct?
23       A.  Correct.
24       Q.  And it was given to Detective Stewart three and a
25   half years ago, correct?
```

1    A.   Yes.

2    Q.   Did you even know, at the time that you were

3    being interviewed by Detective Stewart, did you even

4    know that you were being video recorded?

5    A.   I don't believe so.

6    Q.   There's no camera visible in this room, is there?

7    A.   No.

8    Q.   Would it surprise you or would you quibble with

9    me at all, if I were to tell you that there's not one

10   word, not one single question about Mechelle being

11   fearful to the point -- of you, to the point that she

12   got a shotgun, not one word?  Would that surprise you?

13   A.   I'm sorry.  Repeat.

14   Q.   Would you be surprised or would you question me

15   if I were to tell you that there's not one word about

16   Mechelle getting a shotgun because she was afraid of

17   you?

18   A.   No.

19   Q.   Because was she, to your knowledge?

20   A.   No.

21        MR. ROUSSEAU:  That's all I have, Your

22   Honor.

23        MS. KEENE:  I've got one question.

24             RECROSS-EXAMINATION

25   BY MS. KEENE:

```
 1        Q.   Does your fiancée smoke cigarettes?

 2        A.   No.

 3        Q.   Do you smoke?

 4        A.   Yes.

 5        Q.   What do you smoke?

 6        A.   Cigarettes.

 7        Q.   What kind?

 8        A.   Whatever.  I buy -- be Marlboro 27s today.

 9        Q.   Marlboro brand number 27?

10        A.   Yeah.

11             MS. KEENE:  I'll pass the witness.

12                  FURTHER REDIRECT EXAMINATION

13   BY MR. ROUSSEAU:

14        Q.   You got them in your pocket?

15        A.   I do.

16        Q.   Hold it up, please.

17             Those hard to find?

18        A.   No.

19        Q.   Have to send off for them or anything?

20        A.   No.

21        Q.   By them at 7-Eleven?

22        A.   Just did.

23        Q.   All right.  Thank you.

24                  FURTHER RECROSS-EXAMINATION

25   BY MS. KEENE:
```

```
 1        Q.   Do you know if Mechelle smoked?

 2        A.   I believe so.

 3        Q.   Do you know what brand she smoked?

 4        A.   I do not.

 5        Q.   Okay.

 6                  MS. KEENE:  Thank you, Judge.  I pass the

 7   witness.

 8                  MR. ROUSSEAU:  Nothing further.

 9                  THE COURT:  All right.  May the witness be

10   excused subject to recall, only if --

11                  MR. ROUSSEAU:  Oh, one more thing.

12                  THE COURT:  -- needed?

13                  Okay.  Well, never mind.

14                  MR. ROUSSEAU:  No, he can be excused.  I can

15   do this without a witness, Your Honor.

16                  THE COURT:  Oh, okay.

17                  So the witness can be excused.  Does the

18   jury need to remain?

19                  MR. ROUSSEAU:  Just for a second, Judge.

20                  THE COURT:  All right.  Then you're excused.

21   Just remember your instructions, who can and cannot talk

22   to and about what until you find out the trial is over.

23   We'll only get you back if something were to pop up.  If

24   you get a call from them, it's like a call from me.  And

25   in all fairness, if you sat outside all day, that's
```

```
 1  always my fault.  It's not theirs.
 2              Does that make sense?
 3              THE WITNESS:  Yes, sir.
 4              THE COURT:  All right.  If you'll hand those
 5  to the court reporter as you walk by.  Thanks for coming
 6  in.
 7              (Witness excused from courtroom)
 8              MR. ROUSSEAU:  Your Honor, I'll offer
 9  State's Exhibit No -- I'm sorry.  I'll offer State's
10  Exhibit 243, phone records pertaining to the telephone
11  that Mr. Jopson just testified to as being his,
12  accompanied by business records affidavit after having
13  been on file for the requisite number of days.
14              MS. KEENE:  Judge, I doubt I'm going to have
15  an objection.  Can I -- we don't need the jurors here.
16  I just want to look at the -- because it's a number of
17  pages, look at the actual record.  So I can do that
18  and --
19              THE COURT:  Can I send them home and you can
20  tell me --
21              MS. KEENE:  Exactly.
22              THE COURT:  -- first thing in the morning?
23              MS. KEENE:  That's what I was going to tell
24  you.  They don't need to sit here while I look at this.
25              THE COURT:  All right.  You good with that,
```

1    Mr. Rousseau?

2               MR. ROUSSEAU:  That's fair to me, Your

3    Honor.

4               THE COURT:  All right.  Members of the jury,

5    a few minutes behind is not as bad as my clock sometimes

6    is.  See y'all in the morning.  Get a good night's

7    sleep.

8               Everyone remain in the courtroom until the

9    jury leaves the floor.

10              (Recessed for the day at 5:45 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              COURT REPORTER'S CERTIFICATE

 2  THE STATE OF TEXAS        )

 3  COUNTY OF TARRANT          )

 4     I, Karen B. Martinez, Official Court Reporter in and

 5  for the 372nd District Court of Tarrant County, State of

 6  Texas, do hereby certify that the above and foregoing

 7  contains a true and correct transcription of all

 8  portions of evidence and other proceedings requested in

 9  writing by counsel for the parties to be included in

10  this volume of the Reporter's Record, in the

11  above-styled and numbered cause, all of which occurred

12  in open court or in chambers and were reported by me.

13     I further certify that this Reporter's Record of the

14  proceedings truly and correctly reflects the exhibits,

15  if any, admitted by the respective parties.

16     I further certify that the total cost for the

17  preparation of this Reporter's Record is **located at the**

18  **end of Volume 21**.

19     WITNESS MY OFFICIAL HAND this the 30th day of March,

20  2015.

21                   /s/ Karen B. Martinez

22                   Karen B. Martinez, Texas CSR 6735
                     Expiration Date:  12/31/2015
23                   Official Court Reporter
                     372nd District Court
24                   Tarrant County, Texas
                     (817)884-2996
25                   kbmartinez@tarrantcounty.com
```